

W2006 01081-CCA-R3-CD

IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

THE THIRTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE )            **ORIGINAL**

)

vs. )                    Case No. 05-03038

VERN BRASWELL, )

Defendant. )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF EVIDENCE

Volumes 6 of 11 Volumes

DECEMBER 5, 2005

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

APPEARANCES

FOR THE STATE:

        BETSY CARNESALE AND AMY WEIRICH
        Assistant District Attorneys General
        District Attorney General's Office
        201 Poplar Avenue - Third Floor
        Memphis, TN  38103

FOR THE DEFENDANT:

        J. BAILEY AND WALTER BAILEY
        Attorneys at Law
        100 North Main - Suite 3002
        Memphis, TN  38103



FILED
NOV 0 2 2006
Clerk of the Courts

                Reported by:
            **Katherine Knowles**
              Court Reporter

Vol.6

TABLE OF CONTENTS

VOLUME ONE

| | PAGE |
|---|---|
| Appearances | 1 |
| Table of Contents | 2 |
| List of Exhibits | 9 |
| Style and Caption | 13 |
| **Monday, December 5, 2005** | |
| Pre-trial Motions | 14 |
| Voir Dire Examination and Jury Selection | 25 |
| **(VOLUME TWO)** | |
| **Tuesday, December 6, 2005** | |
| **VERN BRASWELL** | |
| Voir Dire Examination (By Mr. J. Bailey) | 185 |
| Jury Sworn | 187 |
| Reading of Indictment and Entry of Plea | 187 |
| Opening Statements (By Ms. Weirich) | 187 |
| Opening Statements (By Mr. W. Bailey) | 192 |
| **STATE'S PROOF** | |
| **PEARLINE WASHBURN** | |
| Direct Examination (By Ms. Weirich) | 199 |
| **ANGELA SNYDER** | |
| Direct Examination (By Ms. Weirich) | 227 |
| **JESSICA GREEN** | |
| Direct Examination (By Ms. Weirich) | 236 |

TABLE OF CONTENTS

VOLUME ONE

PAGE

**ROOSEVELT COLEMAN**

    Direct Examination (By Ms. Weirich)        243
    Cross-Examination (By Mr. J. Bailey)    247

**LIEUTENANT JACKSON**

    Direct Examination (By Ms. Carnesale)    250
    Cross-Examination (By Mr. J. Bailey)    264
    Redirect Examination (By Ms. Carnesale)    270

**BABA TANZY**

    Direct Examination (By Ms. Carnesale)    271
    Cross-Examination (By Mr. W. Bailey)    283

**MATT HAMM**

    Direct Examination (By Ms. Carnesale)    285
    Cross-Examination (By Mr. W. Bailey)    293
    Redirect Examination (By Ms. Carnesale)    295

**OFFICER GALLOWAY**

    Direct Examination (By Ms. Weirich)        296
    Cross-Examination (By Mr. J. Bailey)    308

**SERGEANT KJELLIN**

    Direct Examination (By Ms. Carnesale)    313
    Cross-Examination (By Mr. J. Bailey)    323
    Redirect Examination (By Ms. Carnesale)    328

**SERGEANT MERRITT**

    Direct Examination (By Ms. Weirich)        328

1                          TABLE OF CONTENTS

2                             VOLUME ONE

3                                                                PAGE

4    **LIEUTENANT MILLER**

5          Direct Examination (By Ms. Weirich)          362
           Cross-Examination (By Mr. W. Bailey)          368
6          Redirect Examination (By Ms. Weirich)         369

7    **(VOLUME THREE)**

8    **Wednesday, December 7, 2005**

9    **DARRELL BURTON**

10         Direct Examination (By Ms. Carnesale)         384
           Cross-Examination (By Mr. J. Bailey)          389

11

12   **JERRY BROWN**

13         Direct Examination (By Ms. Carnesale)         390
           Cross-Examination (By Mr. J. Bailey)          395

14

15   **BENJANETTE STURDEVANT**

16         Direct Examination (By Ms. Carnesale)         396
           Cross-Examination (By Mr. J. Bailey)          403

17

18   **LIEUTENANT MITCHELL**

19         Direct Examination (By Ms. Carnesale)         407
           Cross-Examination (By Mr. J. Bailey)          414

20

21   Jury-Out Hearing                                   419

22   **OFFICER FAIR**

23         Direct Examination (By Ms. Weirich)           424
           Cross-Examination (By Mr. W. Bailey)          432
24         Redirect Examination (By Ms. Weirich)         434

25

TABLE OF CONTENTS

VOLUME ONE

PAGE

**CAROLYN CHAMBERS**

    Direct Examination (By Ms. Weirich)    435

**OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    444

Jury-Out Hearing

    **OFFICER WALLS**

        Direct Examination (By Ms. Carnesale)    448
        Cross-Examination (By Mr. J. Bailey)    450

**OFFICER WALLS**

    Direct Examination Continued (By Ms. Carnesale)    451
    Cross-Examination (By Mr. W. Bailey)    455
**WILLIAM MANGUM**
    Direct Examination (By Ms. Weirich)    457
    Cross-Examination (By Mr. J. Bailey)    468
    Redirect Examination (By Ms. Weirich)    475
    Recross Examination (By Mr. J. Bailey)    476

**DOCTOR CARTER**

    Direct Examination (By Ms. Carnesale)    478
    Cross-Examination (By Mr. W. Bailey)    518
    Redirect Examination (By Ms. Carnesale)    542

**(VOLUME FOUR)**

**Thursday, December 8, 2005**

**KRISTIE WOODS**

    Direct Examination (By Ms. Weirich)    563
    Cross-Examination (By Mr. J. Bailey)    618
    Redirect Examination (By Ms. Weirich)    629

TABLE OF CONTENTS

VOLUME ONE

PAGE

Jury-Out Hearing

    **VERA COLE**

        Direct Examination (By Ms. Weirich)    633
        Cross-Examination (By Mr. W. Bailey)    637

    **MAGRA HARDEN**

        Direct Examination (By Ms. Weirich)    640
        Cross-Examination (By Mr. W. Bailey)    645

    Court's Ruling    653

**KRISTIE WOODS**

    Redirect Examination Continued (By Ms. Weirich)    658
    Recross Examination (By Mr. J. Bailey)    660
    Further Redirect Examination (By Ms. Weirich)    662

**SHERONDA SMITH**

    Direct Examination (By Ms. Carnesale)    667
    Cross-Examination (By Mr. J. Bailey)    678

**VERA COLE**

    Direct Examination (By Ms. Weirich)    682
    Cross-Examination (By Mr. J. Bailey)    690
    Redirect Examination (By Ms. Weirich)    693
    Recross Examination (By Mr. J. Bailey)    695

**MAGRA HARDEN**

    Direct Examination (By Ms. Weirich)    698
    Cross-Examination (By Mr. W. Bailey)    703

Motion for Judgment of Acquittal    706

# TABLE OF CONTENTS

## VOLUME ONE

|  | PAGE |
|---|---|
| State Rests | 709 |

**(VOLUME FIVE)**

**DEFENSE'S PROOF**

**GLEN WRIGHT**

| | PAGE |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 722 |
| Cross-Examination (By Ms. Weirich) | 729 |

**VERN BRASWELL**

| | |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 730 |
| Cross-Examination (By Ms. Weirich) | 788 |

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 816 |

Jury-Out Hearing

   **DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 826 |
| Cross-Examination (By Ms. Carnesale) | 827 |
| Redirect Examination (By Mr. W. Bailey) | 829 |
| Court's Ruling | 835 |

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 838 |

| | |
|---|---|
| Jury-Out Hearing | 843 |

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 846 |
| Cross-Examination (By Ms. Carnesale) | 847 |
| Redirect Examination (By Mr. W. Bailey) | 858 |
| Recross Examination (By Ms. Carnesale) | 858 |

TABLE OF CONTENTS

VOLUME ONE

PAGE

**(VOLUME SIX)**

**Friday, December 9, 2005**

Motion for Judgment of Acquittal                        872

Jury Charge Discussion                                  872

Defense Rests                                           873

Closing Arguments (By Ms. Carnesale)                    873

Closing Arguments (By Mr. W. Bailey)                    884

Closing Arguments (By Ms. Weirich)                      899

Jury Charge                                             926

Alternates Excused                                      941

Jury Questions                                          942

Verdict                                                 945


Certificate of Reporter                                 948

1                           INDEX OF EXHIBITS

2

3     NO.   STATE/DEFENSE    ID/EVIDENCE    TO/DESCRIPTION         PAGE

4     1     State            Evidence       P. Washburn, photo      202

5     2     State            Evidence       P. Washburn, photo      207

6     3     State            ID             P. Washburn, photos     312

7     3     State            Evidence       Officer Walls, photos   452

8     4     State            Evidence       P. Washburn,            217

9                                           check and letter

10    5     State            Evidence       P. Washburn, money      218

11    6     State            ID             P. Washburn, note       218

12    6     State            Evidence       K. Woods, note          617

13    7     State            ID             P. Washburn, document   219

14    7     State            Evidence       W. Mangum, document     467

15    8     State            ID             P. Washburn, document   219

16    8     State            Evidence       W. Mangum, document     466

17    9     State            ID             P. Washburn, document   219

18    9     State            ID             W. Mangum, document     466

19    10    State            Evidence       A. Snyder, photo        235

20    11    State            Evidence       J. Green, tape          241

21    12    State            Evidence       R. Coleman, report      245

22    13    State            Evidence       Lt. Jackson, sketch     259

23    14    State            Evidence       B. Tanzy, photo         278

24    15    State            Evidence       B. Tanzy, photo         279

25

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 16 | State | Evidence | Officer Galloway, crime scene sketch | 298 |
| 17 | State | Evidence | Officer Galloway, photo | 304 |
| 18 | State | Evidence | Officer Galloway, photo | 304 |
| 19 | State | Evidence | Officer Galloway, photo | 304 |
| 20 | State | Evidence | Officer Galloway, photo | 304 |
| 21 | State | Evidence | Officer Galloway, photo | 304 |
| 22 | State | Evidence | Officer Galloway, photo | 304 |
| 23 | State | Evidence | Officer Galloway, photo | 304 |
| 24 | State | Evidence | Officer Galloway, photo | 304 |
| 25 | State | Evidence | Officer Galloway, two bottles | 308 |
| 26 | State | Evidence | Sgt. Merritt, Advice of Rights form | 335 |

1                           INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE      ID/EVIDENCE      TO/DESCRIPTION        PAGE

4    27    State              Evidence         Sgt. Merritt, CD       358

5    28    State              Evidence         Lt. Miller, statement  365

6    29    State              Evidence         J. Brown, phone record 391

7    30    State              Evidence         B. Sturdevant,         397

8                                               phone records

9    31    State              Evidence         Dr. Carter, photo      483

10   32    State              Evidence         Dr. Carter, photo      485

11   33    State              Evidence         Dr. Carter, photos     489

12   34    State              Evidence         Dr. Carter, photos     489

13   35    State              Evidence         Dr. Carter, photo      491

14   36    State              Evidence         Dr. Carter, necklace   492

15   37    State              Evidence         Dr. Carter, photo      495

16   38    State              Evidence         Dr. Carter, photo      497

17   39    State              Evidence         Dr. Carter, photo      498

18   40    State              Evidence         Dr. Carter, photo      499

19   41    State              Evidence         Dr. Carter, photo      503

20   42    State              Evidence         Dr. Carter, photo      504

21   43    State              Evidence         Dr. Carter, photo      511

22   44    State              Evidence         Dr. Carter, photo      513

23   45    Defense            Evidence         Dr. Carter, photo      525

24   46    State              ID               K. Woods, earrings     618

25   46    State              Evidence         S. Smith, earrings     676

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

1       IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE

2                           DIVISION 5

3    STATE OF TENNESSEE                )

4                                      )

5    vs.                              )     Case No.   05-03038

6    VERN BRASWELL,                    )

7               Defendant.            )

8

9              This cause came to be heard and was heard on the

10   5th day of December, 2005, et seq., before the Honorable

11   Joseph B. Dailey, Judge, holding the Criminal Court for Shelby

12   County, at Memphis, Tennessee, and a jury of twelve and two

13   alternates.

14             The jury was selected, impaneled, and duly

15   accepted by both sides and sworn.  Officers were sworn to take

16   charge of the jury; a sequestered jury being requested.  On

17   December 6th, 2005, the indictments was read by Ms. Betsy

18   Carnesale, Assistant District Attorney General for the State

19   of Tennessee; plea of not guilty was entered by Mr. J. Bailey,

20   Attorney for the Defendant.

21             The witnesses were called, placed under the Rule

22   and excluded from the courtroom.  The following proceedings

23   were had to wit:

24

25

1  THE COURT: Bring out Mr. Braswell, please. The

2  motions that need to be addressed before we bring the jurors

3  in are what?

4  MR. J. BAILEY: Two things, Judge. On -- I'm

5  sorry, Your Honor. On last week I received a -- I'm sorry,

6  week before last, last week I received a notice of the State's

7  intent to present certain evidence of other crimes, wrongs and

8  acts, overt acts, what we'd normally call prior bad acts.

9  More specifically for the record, the State intends to show

10  that in 1996, April of '96, that the defendant Mr. Braswell

11  was involved in a domestic altercation where he was charged

12  with domestic violence and that Ms. Braswell, the decedent,

13  was hit, scratched, and choked and that photos were taken.

14  That's one item.

15  Second item that we were noticed on is that in June of

16  2004, that a Ms. Kristie Woods, who is allegedly Mr.

17  Braswell's girlfriend of some sort, that at some party that

18  Ms. Woods -- that the defendant became angry with Ms. Woods,

19  grabbed her by the neck, and likewise, a similar incident,

20  which the State alleged occurred in September of 2004 a couple

21  of months later. It is our position and I filed this motion

22  this morning in limine, it is our position that under Rule

23  404(b) that these types of acts must be excluded if the

24  purpose of which -- the purpose of their admission and their

25  being offered into evidence is for the purpose of proving

1  character in conformity with those acts.

2       Now as far as I know from my own investigation, our

3  investigation in this matter and what I believe to be what the

4  State's proof will be, that's the sole purpose for admitting

5  it into -- or offering it for evidence, that they want to show

6  that Mr. Braswell, the way he's accused -- this alleged

7  homicide is -- the accusation will be that the decedent died

8  from a manual strangulation.

9       And, you know, offering proof of his choking some other

10  individual a year ago or a little more than year ago and also

11  slapping and choking the decedent Ms. Sheila Braswell almost

12  ten years ago, nine years ago, the only purpose for that would

13  be to submit into evidence, tender into evidence that when Mr.

14  Braswell gets angry, he chokes.  And that's what 404(b)

15  specifically excludes.

16       The second part of our argument is that even if the

17  Court were to rule that it's relevant and that it's not

18  excluded under 404(b), the second part of 404(b) is really a

19  restatement of 403, which simply says that if its prejudicial

20  value outweighs its probative value, Your Honor is aware of

21  that, that it has to be excluded as a matter of law.  And we

22  would conclude that all this could do would go to inflame this

23  jury, to give the jury the impression that because he choked

24  Kristie Woods or she alleges that he choked her -- there is no

25  police report or anything of that nature that we know of and I

1   checked -- that because she alleges that he choked her or that

2   he was rough and violent with her, that that means he was

3   rough and violent with the decedent.

4       And it is our position that that's exactly what the --

5   when you read the comments and the annotations to the rule,

6   that's exactly what the crafters of the rule sought to

7   exclude.  Now I submitted to the Court three cases.  I cite

8   four but I submitted copies of three.  More particularly,

9   State versus Eakes, and I won't go through them but just for

10  the record State versus Eakes, which is cited as 2003 Westlaw

11  21523244 Tennessee Criminal Court of Appeals decision;

12  likewise State versus Gilley, G-I-L-L-E-Y, that's cited at

13  2004 Westlaw 367705.  That's likewise a Tennessee Criminal

14  Court of Appeals decision; State versus Stanton,

15  S-T-A-N-T-O-N, which is cited at WL 876873.  That's a

16  Tennessee Criminal Court of Appeals decision; and finally,

17  State versus Curry, C-U-R-R-Y, which is cited at 2001 Westlaw

18  872789, again a Tennessee Criminal Court of Appeals decision.

19      In each case they simply set forth the test.  Your

20  Honor has seen that test many times.  But in applying the test

21  to the facts of this case, one can only conclude that the only

22  purpose in submitting or offering such proof of prior bad

23  acts, acts of alleged violence on the part of Mr. Braswell

24  would be to show that his alleged behavior in this case was in

25  conformity with the alleged behavior that occurred in those

1    incidents.  And again, we believe that that is exactly what

2    the Rule 62 exclude.  And after that I have one other motion.

3                THE COURT:  Unrelated to this?

4                MR. J. BAILEY:  Unrelated to this.

5                MS. WEIRICH:  Judge, just briefly.  My motion

6    speaks for itself.  The State is offering to intend --

7    intending to offer this proof, rather, to prove intent,

8    identity, motive, lack of accident or mistake.  I don't know

9    what defense is going to throw up as their defense.  In brief

10   conversations this morning after being advised that they had

11   an expert, I've learned that they've got an expert in deviant

12   behavior.  So perhaps they're going to throw forth some

13   defense that shows that this was some sex act that went

14   horribly wrong, which in the State's opinion makes this proof

15   all the more relevant to show lack of accident or mistake.

16   We're not offering to prove this to show that because he did

17   it on these other days he must have done it this night.  It

18   goes to show the lack of mistake, lack of accident, identity,

19   intent, all the things that we have to prove as part of the

20   premeditation of murder in the first degree.

21           And the cases cited by us in the motion, they talk

22   about the remoteness of the prior incident and that that is

23   something that affects only the weight, not the admissibility.

24   And what the Court looks to is a rational connection between

25   the events, not a temporal one.  That language is from Hahn, a

1   Tennessee Criminal Appeals opinion from 1985.  But that's the

2   basis of our motion, Judge, not to show conformity therewith.

3   We would never be able to get into this proof if that was the

4   basis.

5           THE COURT:  Right.  It's actually a little

6   premature to try to rule on this question.  It seems like I

7   remember at the bond hearing that we had shortly after Mr.

8   Braswell was indicted, there was some suggestion by Mr. Bailey

9   that the defense was going to be that the defendant went to

10  bed and the victim went in to take a bath and the next thing

11  he knew, he woke up and found her dead in the bathtub.  And

12  now maybe there's something different in the defense.

13          MR. J. BAILEY:  That was in his suppression

14  hearing, Judge.  That was what came out in his statement at

15  the suppression hearing.

16          THE COURT:  Or at the bond hearing.

17          MS. WEIRICH:  That will be the proof, Judge, that

18  911 received a call from the defendant indicating that he had

19  been up with his wife around 1:30 in the morning.  They were

20  having sexual intercourse.  He went to bed.  She went to take

21  a bath.  He woke up at ten 'til four and found her dead in the

22  bathtub.  That is the State's case.

23          MR. J. BAILEY:  That's the State's case.  And the

24  State is absolutely correct that we do -- it is our intention

25  to put forth a defense that this was an accidental homicide

1    that it occurred during what is commonly called "rough sex" or

2    "rough play."  And we do have an expert to testify to that and

3    to talk about that and assist the jury in understanding it.

4           THE COURT:  Okay.  Well, let me read through these

5    cases and just sort of consider the arguments that have been

6    made at least until after lunch.  We certainly won't get into

7    the part of voir dire until after lunch.

8           MR. J. BAILEY:  Very well.

9           THE COURT:  So I'll rule after lunch.

10          MR. J. BAILEY:  Very well.  And the other issue,

11   Your Honor, it's my understanding -- I think Your Honor and I

12   have already, along with Ms. Weirich, we had -- I came by the

13   Court maybe a week or so ago and we talked about whether or

14   not this case would be sequestered.  And I think Your Honor

15   indicated that it might be best if we do.  For the record, we

16   -- the defendant does not want the jury to be sequestered.

17          MS. WEIRICH:  The State does for the record.

18          MR. J. BAILEY:  We believe that particularly on a

19   case that might last over a week or at least a week, it

20   appears, that that limits us to jurors who are able to be

21   locked up for that -- and I say "locked up," sequestered for

22   that period of time.  That limits us to a certain

23   socioeconomic class of jurors, not necessarily a -- it's not a

24   Batson challenge.  We're not saying a certain race but

25   certainly a certain socioeconomic class of jurors, jurors who

1   don't have to make -- who can make arrangements for childcare

2   and on their jobs and so forth.

3          And we believe that the constitutional right to a jury

4   of one's peers outweighs -- that's a fundamental right in the

5   Bill of Rights in the Constitution, and it outweighs the

6   Tennessee statutory scheme that allows for either side to ask

7   for a sequestered jury.  And just for the record, I submit

8   that argument to the Court.

9          THE COURT:  Well, I don't find Merritt with your

10  argument.  With all do respect, I think that my experience has

11  shown over the past 24 years that people of all socioeconomic

12  categories find ways to serve on juries and find ways to get

13  off of juries and it's all about who's willing to serve on the

14  jury; all races, all socioeconomic categories.  Some folks

15  have childcare problems that can't be avoided.  But my

16  experience has been in most instances, jurors all across the

17  board have shown a willingness to serve on a sequestered jury.

18  And I haven't really had any problem in getting a jury just

19  because it was going to be sequestered.  So I'll note your

20  exception.

21          MR. J. BAILEY:  Very well.

22          THE COURT:  I don't know of any studies or

23  research that's been done to substantiate your assertion.  I

24  do think that in this case, it being a first degree murder

25  case, that I think will receive some publicity and attention

1   during the course of the week, it's necessary to -- in order

2   to ensure the progress of the trial and the integrity of the

3   case to have the jurors sequestered.  I don't think that it's

4   a security question in this case as it is in some case where

5   we have, you know, gang ties or something of that sort, but I

6   think it's a publicity issue and a distraction issue and a

7   matter that is necessary in order to ensure the speedy

8   resolution of the case and appropriate resolution of it.

9          MR. J. BAILEY:  One last thing and we may be able

10  to agree to this.  I've received a motion in limine from the

11  State.  Let me just ask.  It might be something we can agree

12  to.

13         MS. WEIRICH:  Judge, I filed this morning a motion

14  in limine regarding -- should be a copy in the jacket --

15  regarding one of the medical examiners who may testify in this

16  case, Dr. Joye Carter.  She's now working in Texas.  And these

17  were some issues that came up at the preliminary hearing.  And

18  just the different grounds that I've set forth in the motion

19  in limine.  One was this is a question that was asked by, I

20  believe, Mr. Ballin at the preliminary hearing.  He asked her

21  if she was fired as the medical examiner in Harris County,

22  Texas.  She denied that and I don't know of any proof of that.

23  These are things that I'm asking defense counsel not mention

24  in jury selection or in cross-examination of Dr. Carter, that

25  she asked individuals to fabricate individuals on autopsies.

1   This was a direct question again by defense counsel.  Dr.

2   Carter denied such in the preliminary hearing.  And I believe

3   Mr. Bailey was present at the preliminary hearing.

4          MR. J. BAILEY:  I was.

5          MS. WEIRICH:  That she was fined $1000 as part of

6   a settlement reached with the Texas State Board of Medical

7   Examiners for allowing unlicensed pathologists to perform

8   autopsies.  Again, that evidence would be irrelevant.  In the

9   State's position, it's nothing that goes to her truthfulness

10  or lack thereof; and that the Harris County Commission settled

11  two whistle-blower suits that were brought because of action

12  by Dr. Carter.  And she again has a different take on that.

13  She merely says that a settlement was reached and no wrong was

14  done.  The truth I'm sure lies somewhere in the middle.  But

15  again, any evidence of that or any questioning of that would

16  be purely irrelevant and just prejudicial.

17         MR. J. BAILEY:  Your Honor, in response, I think

18  it is premature for us to state -- I'll just state this to the

19  Court.  At the present time we don't intend to utilize any of

20  that information.  I did participate in a preliminary hearing.

21  However, Mr. Ballin was lead counsel at that time and

22  Mr. Ballin sought to bring that evidence out during the

23  question of whether or not this witness was going to be

24  tendered as an expert.  He was voir diring the witness with

25  regards to prior incidents of bad acts during that portion of

1    her being qualified as an expert.

2          Now, we reserve the right, and I'd state to the Court

3    that we're not intending to use it right now, but we reserve

4    the right to impeach this witness if it comes to it.  And so

5    I'd ask the Court to reserve judgment on that 'til such time

6    as it becomes an issue.  But in all candor, we don't intend to

7    utilize it.  That's not part of my case.

8          THE COURT:  Okay.  If there comes a time that you

9    feel that you do want to delve into any of this, by all means

10   approach the bench.  We'll have a jury-out hearing and we'll

11   discuss it at that time.

12         MR. J. BAILEY:  We'll agree to do that.

13         THE COURT:  Okay.  Obviously the Rule will be in

14   effect.  And I'm going to -- I assume these are all family

15   members but not witnesses?

16         MR. J. BAILEY:  Well one is a witness.

17         THE COURT:  Whoever the witness is cannot come

18   back in at all until he or she has testified.  The other

19   family members are welcome to come back in once we've selected

20   the jury.  But during jury selection, it's such a small

21   courtroom and we have so many jurors in here that there is

22   just not room for you.  So if you want to stay on this floor

23   during the afternoon while we're selecting the jury, you are

24   certainly welcome to do so, but I'm going to ask that you stay

25   down on that end of the hallway.

1      Mr. Bailey, you can escort them down there to that

2  lobby area down on the other side of Division 6 where the --

3  you know you go through the doors.   There's some chairs there.

4  They can sit down there.   But I want to remind all of you that

5  when we break for lunch in a few minutes, there are going to

6  be 60 or so jurors milling around, taking elevators, probably

7  downstairs in the snack bar.   You are not to discuss the case

8  in any way.   Don't talk about it among yourselves because you

9  never know when a juror may be standing next to you and

10  overhear something you may say.   And so you don't want to

11  inadvertently say something in the presence of the jury.   Now

12  that's the category of inadvertently saying something.

13      Obviously, you all understand that you are not to

14  intentionally say anything to any juror.   You are not to

15  approach any juror and intentionally try to influence them or

16  say anything to them regarding this case.   If you do, then

17  you'll be on the second row and we'll have a hearing regarding

18  that.   But I don't anticipate that problem.   But the first

19  category is probably the more likely scenario.   Don't say

20  anything among yourselves because there are going to be so

21  many people around that might overhear what you say.   So don't

22  talk about the case until you are on your way home this

23  evening.

24      All right.   So for now, if you would exit and go down

25  that way to that waiting area down there.   Thank you.

1          MR. J. BAILEY:  I'll speak to them.  We'll excuse

2     them until after the jury is picked.  Your Honor, I notice

3     that the chairs are now tied together.  It's a little

4     different than the way they used to be.  May I take this chair

5     and put it behind us but a little closer for the defendant?

6          THE COURT:  No, I think y'all can talk to him

7     easily enough.  It's all of two feet behind Mr. Walter Bailey,

8     a foot and a half maybe.  I just don't see any problem.

9     They're tied together for obvious security reasons.  And I

10    think he's fine right where he is.  We're going to keep the

11    procedure the way it always is.

12         MR. J. BAILEY:  Thank you, Judge.

13         THE COURT:  Yes, sir.  All right.  Ask the jurors

14    to step in, please.

15              (Prospective jurors present.)

16         THE COURT:  Okay.  Good morning, ladies and

17    gentlemen.  I think since we don't have quite enough seating,

18    I think the first thing we'll do is call 18 of you to the

19    front and that will free up enough seating for everybody and a

20    couple of the gentlemen that are standing.  So, Officer

21    Lafferty, if you would call 18 jurors to the front, please.

22         DEPUTY LAFFERTY:  12.

23         THE COURT:  William Berry.

24         DEPUTY LAFFERTY:  18.

25         THE COURT:  Margaret Bryson.

```
1              DEPUTY LAFFERTY:  8.

2              THE COURT:  Susan Lowery.

3              DEPUTY LAFFERTY:  52.

4              THE COURT:  Danny Matthews.

5              DEPUTY LAFFERTY:  24.

6              THE COURT:  Mary Brooks.

7              DEPUTY LAFFERTY:  2.

8              THE COURT:  Earl Mitchell.

9              DEPUTY LAFFERTY:  45.

10             THE COURT:  Frances Brock.

11             DEPUTY LAFFERTY:  35.

12             THE COURT:  Jerry McCollum.

13             DEPUTY LAFFERTY:  43.

14             THE COURT:  Phillip Yeager.

15             DEPUTY LAFFERTY:  34.

16             THE COURT:  Jacqueline Green.

17             DEPUTY LAFFERTY:  40.

18             THE COURT:  Robin Smith.

19             DEPUTY LAFFERTY:  17.

20             THE COURT:  Brenda Hill.

21             DEPUTY LAFFERTY:  47.

22             THE COURT:  Victoria Jenkins.

23             DEPUTY LAFFERTY:  16.

24             THE COURT:  Marquinet Hence.

25             DEPUTY LAFFERTY:  44.
```

```
 1            THE COURT:  Luis Guerrero.

 2            DEPUTY LAFFERTY:  5.

 3            THE COURT:  Helen Anderson.

 4            DEPUTY LAFFERTY:  41.

 5            THE COURT:  Janet Russell.

 6            DEPUTY LAFFERTY:  29.

 7            THE COURT:  Darline Jordan.

 8       All right.  Now let me ask all of you up front and in

 9   the audience to stand and raise your right hands to be sworn

10   in as prospective jurors.

11                 (Prospective jurors sworn.)

12            THE COURT:  Thank you, you may be seated.  Welcome

13   to Division 5 of Criminal Court.  I'm Judge Joseph Dailey.

14   The matter for your consideration this week if you're chosen

15   to serve on this jury is Indictment Number 05-03038, charging

16   the defendant Vern Braswell with the offense of murder in the

17   first degree.  Mr. Braswell is represented by Mr. Walter

18   Bailey and Mr. J. Bailey.  State of Tennessee is represented

19   by Ms. Amy Weirich and Ms. Betsy Carnesale.

20       The phase of the trial that we're beginning right now

21   of course is the jury selection phase.  That will last

22   probably the rest of the day.  In just a few minutes we'll

23   stop for lunch, but we'll resume after lunch and it will

24   probably last for the rest of the day.  Once the jury has been

25   selected and the alternate jurors, then probably tomorrow
```

1    morning we'll swear the jury in.

2           After that the indictment will be read by the

3    prosecutors.  The indictment is the written document that's in

4    this folder that let's the defendant know exactly what he's

5    been charged with.  It's not evidence, cannot be considered by

6    you as evidence, but it will be read to you and a not guilty

7    plea will be entered on behalf of the defendant.

8           Following that, the opening statements will be given by

9    the attorneys.  Opening statements are intended to provide the

10   jury with some idea of what the lawyers think the proof will

11   be in the case so that you aren't totally in the dark as you

12   begin hearing the witnesses in the case.  So opening

13   statements will be given by the attorneys representing each

14   side.

15          After that then the prosecutors, Ms. Weirich and

16   Ms. Carnesale will present their proof.  They'll call their

17   witnesses to this witness stand and elicit sworn testimony.

18   They may introduce exhibits or photographs, things of that

19   sort as well.  They have the burden, of course, of going

20   forward first because they have the burden of proving the

21   case.

22          When they've completed their proof, then the defense

23   may present proof, if they care to, although they're not

24   required to.  They're not required to present any proof at

25   all, although they may if they care to.  And if their decision

1   is to present no proof, then you can draw no inference

2   whatsoever from that decision.  You cannot hold it against the

3   defendant in any way if he chooses to present no proof.  It's

4   entirely his prerogative.

5        Once all the proof has been presented, then the

6   attorneys will give their final arguments.  And then following

7   that, I will read to the jury the law in the case, all the law

8   that you'll need to know in deciding this case will be read to

9   you by me at the end of the trial.

10        Then following that, the jury will be allowed to begin

11   its deliberations.  So basically, that's the step-by-step

12   procedure that we'll be following this week during the course

13   of this trial.

14        As I indicated, we'll be selecting the jury today.  Let

15   me explain a little bit about the jury in this trial.  The

16   jury in this case, once it's selected will be sequestered.  So

17   you will be guests of the County for the duration of the trial

18   once the jury has been selected and sworn in.

19        That won't begin until tomorrow morning.  Even if we

20   begin the jury selection process today, which I anticipate we

21   will, we'll stop for the day.  We won't swear you in as jurors

22   until tomorrow morning so everyone will be allowed to go home

23   tonight and return tomorrow morning with your suitcase, in

24   essence to stay with us for the duration of the trial at that

25   point.

1    Now, I anticipate that the trial will last four or five
2    days.  It will take the better part of the week, but I don't
3    anticipate it spilling over into next week so I don't see that
4    as any realistic possibility.  But it probably will take the
5    bulk of this week.
6         Having said that, let me say that we all understand any
7    time we select a sequestered jury in these courts that there
8    will be some people who inevitably have some conflict that
9    they simply cannot avoid and cannot reschedule and cannot get
10   around and, therefore, can't serve on a sequestered jury and I
11   understand that there will be some that are in that situation.
12   But I urge all of you to give as much thought as possible to
13   making yourselves available to serve as jurors this week on
14   this case if you're asked to do so because it's very important
15   that we have the full participation of as many citizens as
16   possible on the trials that we hold down here in these
17   courtrooms.  And so I would ask that you all make every effort
18   possible to make yourselves available to serve on the jury if
19   you're asked to do so.
20        And as I indicated, if you are selected to serve on the
21   jury, you won't be sequestered until tomorrow at the earliest.
22   So everyone will be allowed to go home tonight and explain to
23   your family that you're on a sequestered jury and that sort of
24   thing.
25        So I think with that explanation before we go further,

1   we'll stop for lunch at this time.  Let me give a few cautions

2   to you before we break for lunch.  First, I'll ask all of you

3   to be back at 1:30.  Those of you that are up front in just a

4   moment will go with Officer Lafferty.  He'll show you where

5   our jury room is.  I'll ask you to be back in the jury room at

6   1:30.  Those of you in the audience, I'll ask you to please be

7   in the waiting area outside the courtroom where you were

8   earlier at 1:30.

9       Do not discuss the case at all.  You don't know really

10  much about the case at this point obviously, but you do know

11  what the charges are, who the lawyers are, that sort of thing.

12  Just don't talk about the case at all in any way with anybody.

13  Go to lunch and talk about other things but don't talk about

14  this case or the criminal justice system.  Don't allow anyone

15  to approach you and discuss the case with you.  Let us know if

16  somebody tries to do that.

17      So with that, we'll see all of you at 1:30.  Thank you.

18  Y'all go with Officer Lafferty, please.

19              (Prospective jurors out.)

20              THE COURT:  You can take the defendant out.

21  Mr. Bailey, it occurred to me that with your family members

22  down here, that's probably not a good spot because the jurors

23  that are back in the jury room are going to be coming and

24  going right through that holding area.

25              MR. J. BAILEY:  I will have them leave.

1          THE COURT:  So have them leave or perhaps better

2  yet, for now at least, would be move them down over to the

3  Division 7 waiting area over there so these jurors can sort of

4  file out to the elevators without, you know, sort of running

5  all through your witnesses.

6          MR. J. BAILEY:  Very well.  I'll take care of it.

7          THE COURT:  Thank you.  We'll stand in recess

8  until 1:30.

9          (Recess.)

10         THE COURT:  Okay.  With regard to the issue that

11  we discussed this morning, my ruling is that while proof of

12  other crimes or bad acts obviously should be scrutinized

13  closely before admitted and obviously one has to weigh the

14  prejudicial effect against the probative value, and obviously

15  it cannot be allowed in for the purpose of trying to

16  demonstrate that since he committed the one he therefore

17  committed the other.  But in this case if the proof develops

18  as y'all have suggested it will, if the defense develops that

19  there was some sort of deviant sexual behavior or

20  unconventional sexual behavior that resulted in this, then the

21  proof of these three prior bad acts and/or convictions would

22  be extremely relevant in my opinion to prove intent and the

23  absence of mistake.

24        Those two factors would be -- the two that come to mind

25  right now absence of or rebuttal of accident or mistake and

1   intent would, I guess, be three factors.  And I think that the

2   relevance of that proof under those circumstances would far

3   outweigh the prejudicial effect.  The jury obviously would be

4   given curative instructions at the time and during the charge

5   and told how to receive that proof if they choose to believe

6   it, then how to receive it and apply it.

7        But that's generally my ruling based on what y'all have

8   told me this morning and what you have told me the defense

9   plans to try to develop.  And in essence, I think the same

10   would be true if the defense were what was suggested at the

11   bond hearing two to three months ago, that is that he went to

12   bed and woke up three hours later and found her dead in the

13   bathtub, show absence of accident or mistake and intent.

14        But having said all that, in my opinion this proof is

15   only appropriately used in rebuttal.  I'm going to preclude

16   the State from getting into it in the case in chief because we

17   don't really know what the defense -- the defendant isn't

18   required to tell us right now what he's going to present and

19   what he plans to develop.  There have been suggestions

20   obviously, but until we know for certain what the defense is,

21   it's not --

22             MS. WEIRICH:  Well -- and I don't mean to

23   interrupt the Court.

24             THE COURT:  Go ahead.

25             MS. WEIRICH:  Along with this is the issue of --

1    and we have filed a motion for reciprocal discovery and I just

2    found out this morning that they have a defense expert that

3    they intend to call.  I have not seen a report from this

4    expert.  I got the name.  And I called his office to try to

5    talk with him, but I don't know what he's going to say.  I

6    don't know what he's looked at.  I don't know if the defendant

7    is going to testify.  All of this to say that the State would

8    ask that there not be any mention of that defense or any

9    expert testimony on that defense unless they can say for sure

10   that the defendant is going to get on the stand and say he

11   choked his wife and he choked his wife in some sex act that

12   went horribly wrong.

13        But up until this point, to the homicide detectives, to

14   the millions of people that he called that night on both his

15   home phone and his cell phone, he's been repeating the same

16   story, that they were having sex at 1:30 in the morning.  He

17   went to bed.  She got up to take a bath.  He got up two hours

18   later and she was dead.

19        So I guess it's -- the other reason the State filed the

20   request to produce the 404(b) evidence is to identity, which

21   is something we have to prove.  If he's the only other adult

22   in the house and he's saying he doesn't know what happens, why

23   should we be hamstrung, depending on what the defense is going

24   to be, and furthermore, they should not be allowed to throw

25   that defense out to the jury unless they can tell Your Honor

1    that yes, he's going to take the stand and yes, he's going to

2    admit to doing it.

3        But again, I don't know what their expert is going to

4    say because I've not seen a report.  I don't know anything.  I

5    couldn't get through to Mr. Schwartz during the lunch break so

6    I don't know.

7            THE COURT:  Mr. Bailey.

8            MR. J. BAILEY:  I'm sorry, Judge.

9            MR. W. BAILEY:  Your Honor, our response is

10   obvious that we're not precluded from -- as long as we in good

11   faith pose questions to potential jurors, then we are at

12   liberty to do it, as long as -- we couldn't do it if we

13   weren't in good faith in terms of questions we asked.

14           THE COURT:  Well, then I suppose that opens up the

15   -- if y'all go forward in good faith during voir dire and

16   opening statement, advancing the defense that was alluded to

17   earlier this morning, then I will allow the State in good

18   faith to go forward with their 404(b) proof.

19       The only way -- the only reason I indicated that it

20   should only be used in rebuttal is that at this point we don't

21   know what the defense will prove to be.  But if y'all are

22   stating in good faith that this is what the defense is going

23   to be, then -- then I think the State should not be handcuffed

24   at this point and be precluded from responding to that.  So

25   that's -- that's where we are.

1       MR. W. BAILEY:  Well, we do plan to inquire of the

2   jury for various reasons on the issue of erotic asphyxiation

3   or asphyxiafilia.  And we wouldn't raise that or we wouldn't

4   submit those inquiries with the jury during voir dire unless

5   we had some good faith basis for doing it.

6       THE COURT:  Well, that's fine.  But again, I think

7   the record should reflect clearly -- as far as I know from

8   what y'all have told me today, Mr. J. Bailey announced --

9   maybe it was Mr. Walter Bailey this morning for the first time

10  that I've heard, that you have an expert witness coming and

11  that he cannot be here on Thursday.

12      MR. W. BAILEY:  That's correct.

13      THE COURT:  And Ms. Weirich has stated that even

14  though she has asked for reciprocal discovery, today was the

15  first she's heard that y'all had an expert witness, hadn't

16  received a report, hasn't received a name and phone number,

17  any way to contact him, find out what's going on with it.  So

18  we're still going forward with the trial, but if you're going

19  to advance that defense, which is for the first time today on

20  trial date December 5th make known to anyone, then I believe

21  that the State should be entitled to go forward with their

22  404(b) proof.  It would not be necessary to require that it be

23  considered rebuttal proof.

24      And we may -- we may revisit the fact of the identity

25  factor later, depending on what the proof proves to be.  If

1   the defense -- if they revert to the defense that was

2   suggested during the bond hearing, then identity may be a

3   factor.

4           MS. WEIRICH:  Yes, sir.

5           THE COURT:  If they proceed with this defense of

6   the asphyxiation during a sexual act, then identity may well

7   not be a factor.  So we'll revisit that later.

8           MR. J. BAILEY:  Thank you, Judge.

9           THE COURT:  Is there a report that was generated

10  by your expert?

11          MR. W. BAILEY:  No, sir, we do not have a report.

12          THE COURT:  Is there any reason why you waited

13  until trial date to apprise the State of the fact that you

14  intend to call an expert in this case?

15          MR. W. BAILEY:  Well, we're not -- we don't feel

16  that we were compelled but the short answer, Judge, is we just

17  made contact with him after diligently trying to pursue

18  experts in the field and got a commitment out of him to

19  testify.  But we do not have any sort of written report.

20          THE COURT:  All right.  Bring in the jurors,

21  please.  Ask the jurors to step in from outside, please.

22          (Prospective jurors present.)

23          THE COURT:  All right.  Ladies and gentlemen, let

24  me get a little bit of background information from you at this

25  time.  Mr. Berry, are you employed, sir?

1         PROSPECTIVE JUROR:  Yes, sir.

2         THE COURT:  Where?

3         PROSPECTIVE JUROR:  Mueller Industries.

4         THE COURT:  I'm sorry?

5         PROSPECTIVE JUROR:  Mueller Industries.

6         THE COURT:  What type of industry is that?

7         PROSPECTIVE JUROR:  They're a manufacturing

8    company but I'm a network administrator.

9         THE COURT:  Okay.  How long have you been with

10   them?

11        PROSPECTIVE JUROR:  A year and a half.

12        THE COURT:  And could you stay with us starting

13   tomorrow on a sequestered jury for several days?

14        PROSPECTIVE JUROR:  Yes, I can.

15        THE COURT:  Thank you.  And, Ms. Bryson, are you

16   employed?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Okay.  And could you stay with us

19   starting tomorrow on a sequestered jury for several days?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Thank you.  And, Ms. Lowery, are you

22   employed?

23        PROSPECTIVE JUROR:  Yes, sir.

24        THE COURT:  Where?

25        PROSPECTIVE JUROR:  Time Warner Telecom.

```
1          THE COURT:  How long have you been with them?

2          PROSPECTIVE JUROR:  Nine years.

3          THE COURT:  What do you do for them?

4          PROSPECTIVE JUROR:  Sales engineer.

5          THE COURT:  Could you stay with us starting

6     tomorrow on a sequestered jury for several days?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  Thank you.  Mr. Matthews, are you

9     employed?

10         PROSPECTIVE JUROR:  Yes, sir.

11         THE COURT:  Where?

12         PROSPECTIVE JUROR:  Division of Corrections.

13         MS. WEIRICH:  I'm sorry, Judge.

14         THE COURT:  Division of Corrections.  Where are

15    you assigned, specifically?

16         PROSPECTIVE JUROR:  Manager over fire safety and

17    sanitation.

18         THE COURT:  Manager over where?

19         PROSPECTIVE JUROR:  Fire safety and sanitation,

20    heat control.

21         THE COURT:  At which facility?

22         PROSPECTIVE JUROR:  Correctional Center.

23         THE COURT:  Shelby County Correctional Center?

24         PROSPECTIVE JUROR:  Yes, sir.

25         THE COURT:  How long have you been out there?
```

1          PROSPECTIVE JUROR:  17 years.

2          THE COURT:  Obviously, during those 17 years

3    you've come in contact with a lot of inmates at the

4    Correctional Center.

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  And that does not automatically

7    exclude you from a jury, but I would need to ask you whether

8    there has been anything over the past 17 years about your job

9    at the Correctional Center that would affect your ability to

10   be fair and impartial on a jury of this sort in this

11   particular type of case?

12         PROSPECTIVE JUROR:  No, sir.

13         THE COURT:  You think you could set all that aside

14   and listen to the proof that you hear this week and render a

15   verdict based solely on the proof and the law that I would

16   read to you at the end of the trial?

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  Thank you.  And could you stay with us

19   on a sequestered jury starting tomorrow?

20         PROSPECTIVE JUROR:  Yes, sir.

21         THE COURT:  Thank you, sir.  And, Ms. Brooks, are

22   you employed?

23         PROSPECTIVE JUROR:  Yes, sir.

24         THE COURT:  Where?

25         PROSPECTIVE JUROR:  Memphis Pathology Labs.

```
1              THE COURT:  How long have you been there?

2              PROSPECTIVE JUROR:  About ten years.

3              THE COURT:  What do you do for them?

4              PROSPECTIVE JUROR:  I'm a phlebotomist.

5              THE COURT:  And could you stay with us starting

6    tomorrow on a sequestered jury for several days?

7              PROSPECTIVE JUROR:  Yes, sir.

8              THE COURT:  Thank you, ma'am.  Mr. Mitchell, are

9    you employed?

10             PROSPECTIVE JUROR:  Retired.

11             THE COURT:  From where?

12             PROSPECTIVE JUROR:  America West Airlines.

13             THE COURT:  And could you stay with us starting

14   tomorrow on a sequestered jury?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Thank you.  Ms. Brock, are you

17   employed?

18             PROSPECTIVE JUROR:  I'm retired.

19             THE COURT:  From where?

20             PROSPECTIVE JUROR:  Owned a business with two

21   other people, O.D.A. Jewelry, jewelry designers.

22             THE COURT:  And could you stay with us starting

23   tomorrow on a sequestered jury?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Thank you, ma'am.  Mr. McCollum, are
```

1   you employed?

2           PROSPECTIVE JUROR:  Retired.

3           THE COURT:  From where?

4           PROSPECTIVE JUROR:  Memphis Light Gas and Water.

5           THE COURT:  All right, sir.  And could you stay

6   with us starting tomorrow on a sequestered jury?

7           PROSPECTIVE JUROR:  Yes, sir.

8           THE COURT:  Thank you, sir.  Mr. Yeager, are you

9   employed?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  By whom?

12          PROSPECTIVE JUROR:  Fleischmann's Yeast.

13          THE COURT:  And what do you do for them?

14          PROSPECTIVE JUROR:  Control room operator.

15          THE COURT:  Do they have a factory facility here

16  in Shelby County?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  How long have you been with them?

19          PROSPECTIVE JUROR:  15 years.

20          THE COURT:  Okay.  And could you stay with us

21  starting tomorrow on a sequestered jury?

22          PROSPECTIVE JUROR:  Yes, sir.

23          THE COURT:  Thank you.  Ms. Green, are you

24  employed?

25          PROSPECTIVE JUROR:  I'm Ms. Green.

```
 1                    THE COURT:  You're Ms. Green.  Okay.  Could y'all
 2      swap seats, please.  Now, Ms. Green, are you employed?
 3                    PROSPECTIVE JUROR:  Yes, sir.
 4                    THE COURT:  Where?
 5                    PROSPECTIVE JUROR:  Internal Revenue Service
 6      center.
 7                    THE COURT:  How long have you been there?
 8                    PROSPECTIVE JUROR:  15 years.
 9                    THE COURT:  What do you do for them currently?
10                    PROSPECTIVE JUROR:  Customer service rep.
11                    THE COURT:  And could you stay with us starting
12      tomorrow on a sequestered jury?
13                    PROSPECTIVE JUROR:  Yes, sir.
14                    THE COURT:  Thank you.  Ms. Smith, are you
15      employed?
16                    PROSPECTIVE JUROR:  Yes.  My name was Lorna Smith.
17      Yes, I am.
18                    THE COURT:  Okay.  What is your name now?
19                    PROSPECTIVE JUROR:  It's Chiodo, spelled
20      C-H-I-O-D-O.
21                    THE COURT:  Okay.  And where are you employed now,
22      Ms. Chiodo?
23                    PROSPECTIVE JUROR:  Fed Ex Express.
24                    THE COURT:  How long have you been with them?
25                    PROSPECTIVE JUROR:  17 years.
```

```
1              THE COURT:  Okay.  Could you stay with us on a
2    sequestered jury starting tomorrow?
3              PROSPECTIVE JUROR:  I guess.
4              THE COURT:  Thank you.  Ms. Hill, are you
5    employed?
6              PROSPECTIVE JUROR:  Yes, sir.
7              THE COURT:  Where?
8              PROSPECTIVE JUROR:  Memphis Orthopaedic Group.
9              THE COURT:  How long have you been there?
10             PROSPECTIVE JUROR:  22 years.
11             THE COURT:  What do you do for them?
12             PROSPECTIVE JUROR:  I'm an orthopaedic technician.
13             THE COURT:  Could you stay with us starting
14   tomorrow on a sequestered jury?
15             PROSPECTIVE JUROR:  Yes, sir.
16             THE COURT:  Thank you, ma'am.  Ms. Jenkins, are
17   you employed?
18             PROSPECTIVE JUROR:  Yes, sir.
19             THE COURT:  Where?
20             PROSPECTIVE JUROR:  Former Union Planters now
21   Regions Bank.
22             THE COURT:  What do you do for them?
23             PROSPECTIVE JUROR:  I'm an accountant.
24             THE COURT:  How long have you been with them?
25             PROSPECTIVE JUROR:  18 years.
```

```
 1                    THE COURT:  How many?
 2                    PROSPECTIVE JUROR:  18 years.
 3                    THE COURT:  And could you stay with us starting
 4      tomorrow on a sequestered jury?
 5                    PROSPECTIVE JUROR:  Yes, sir.
 6                    THE COURT:  Thank you, ma'am.  Ms. Hence, are you
 7      employed?
 8                    PROSPECTIVE JUROR:  Yes, sir.
 9                    THE COURT:  Where?
10                    PROSPECTIVE JUROR:  Whiteville Correctional
11      Facility.
12                    THE COURT:  And what do you do out there?
13                    PROSPECTIVE JUROR:  Dentist.
14                    THE COURT:  Dr. Louise Blackwell out there?
15                    PROSPECTIVE JUROR:  No, sir.
16                    THE COURT:  How long have you been out there?
17                    PROSPECTIVE JUROR:  A year and a half.
18                    THE COURT:  And could you stay with us starting
19      tomorrow on a sequestered jury?
20                    PROSPECTIVE JUROR:  Yes.
21                    THE COURT:  I guess I'll ask you the same
22      questions I asked Mr. Matthews.  Working in a correctional
23      facility, is there anything about your experiences there, what
24      you've heard, what you've seen, that you think would interfere
25      with your ability to sit fairly and impartially on a jury of
```

1    this sort?

2              PROSPECTIVE JUROR:  Sort of.  I have had a couple

3    of inmates that did not appreciate the policy that we have as

4    far as their treatment, so, you know, that kind of makes

5    things a little uncomfortable, knowing that if -- it's

6    possible that I could run across this inmate again or this

7    person again at my facility.

8              THE COURT:  Right.  Well, I appreciate that and

9    understand that, but those were incidents obviously unrelated

10   to this case.  And you think though that you could listen to

11   this proof this week and base a verdict on what you hear this

12   week?

13             PROSPECTIVE JUROR:  It would be hard because, I

14   mean, the situations I've had have been with people that have

15   been accused of the same type crime.

16             THE COURT:  So you think that might spill over

17   into your thought process and affect your ability to listen to

18   the proof in this case with a totally open mind?

19             PROSPECTIVE JUROR:  Yes, sir.

20             THE COURT:  All right.  Then, Doctor, I'll excuse

21   you.  Thank you for being here.  And, please, return to the

22   large jury room across the street.  Mr. Guerrero, are you

23   employed?

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  Where?

1          PROSPECTIVE JUROR:  Walgreens.

2          THE COURT:  Which one?

3          PROSPECTIVE JUROR:  The Walgreens -- you want

4    specific location?

5          THE COURT:  Yes.

6          PROSPECTIVE JUROR:  Right now on Third and Raines.

7          THE COURT:  How long have you been there?

8          PROSPECTIVE JUROR:  At that particular one?

9          THE COURT:  With Walgreens total.

10         PROSPECTIVE JUROR:  Four years.

11         THE COURT:  What do you do currently at the one at

12   Third and Raines?

13         PROSPECTIVE JUROR:  Assistant manager.

14         THE COURT:  And could you stay with us starting

15   tomorrow on a sequestered jury?

16         PROSPECTIVE JUROR:  Yes, sir.

17         THE COURT:  Thank you.  Ms. Anderson, are you

18   employed?

19         PROSPECTIVE JUROR:  I'm retired.

20         THE COURT:  From where?

21         PROSPECTIVE JUROR:  State of Tennessee.

22         THE COURT:  Which division of the State?

23         PROSPECTIVE JUROR:  Arlington Developmental

24   Center.

25         THE COURT:  How long were you out there?

```
 1                    PROSPECTIVE JUROR:  31 years.
 2                    THE COURT:  31.  Could you stay with us starting
 3      tomorrow on a sequestered jury?
 4                    PROSPECTIVE JUROR:  Yes.
 5                    THE COURT:  Thank you, ma'am.  Ms. Russell, are
 6      you employed?
 7                    PROSPECTIVE JUROR:  Yes.
 8                    THE COURT:  Where?
 9                    PROSPECTIVE JUROR:  KPC Performance Media.
10                    THE COURT:  How long have you been there?
11                    PROSPECTIVE JUROR:  14 years.
12                    THE COURT:  What do you do for them?
13                    PROSPECTIVE JUROR:  Account manager.
14                    THE COURT:  Could you stay with us starting
15      tomorrow on a sequestered jury?
16                    PROSPECTIVE JUROR:  I don't think so.
17                    THE COURT:  Why is that?
18                    PROSPECTIVE JUROR:  I'm a single parent and I
19      don't have anybody that can help me with my child.
20                    THE COURT:  How old is your child?
21                    PROSPECTIVE JUROR:  He's 17 but he doesn't drive
22      yet.
23                    THE COURT:  And there's no one that can fill in
24      and help out?
25                    PROSPECTIVE JUROR:  I've got a brother but he's a
```

1   fireman and he works 24-hour shifts.  So I don't know if I can

2   find anybody that can help me.

3              THE COURT:  And at age 17 though, he would not be

4   able to --

5              PROSPECTIVE JUROR:  He's not a mature 17 year old.

6              THE COURT:  Well, I certainly won't challenge a

7   mother's assessment on that.  Thank you.  I'll excuse you

8   then.  If you will return to the large jury room across the

9   street.  Thank you.  And, Ms. Jordan, are you employed?

10             PROSPECTIVE JUROR:  Self-employed.

11             THE COURT:  What type of work?

12             PROSPECTIVE JUROR:  Commercial cleaning service.

13             THE COURT:  How long have you had that job?

14             PROSPECTIVE JUROR:  We've had it seven years.

15             THE COURT:  Seven years.  And could you stay with

16   us starting tomorrow on a sequestered jury?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Thank you.  If y'all would move down,

19   please, and call two more jurors.

20             DEPUTY LAFFERTY:  11.

21             THE COURT:  Hilary Moss.

22             DEPUTY LAFFERTY:  49.

23             THE COURT:  Martha Sparks.

24        Ms. Moss, are you employed?

25             PROSPECTIVE JUROR:  Yes.

```
1              THE COURT:  Where?

2              PROSPECTIVE JUROR:  Brother Industries.

3              THE COURT:  How long have you been there?

4              PROSPECTIVE JUROR:  15 years.

5              THE COURT:  Could you stay with us starting

6   tomorrow on a sequestered jury?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Thank you.  Ms. Sparks, are you

9   employed?

10             PROSPECTIVE JUROR:  Self-employed.

11             THE COURT:  What type of work?

12             PROSPECTIVE JUROR:  Childcare.

13             THE COURT:  Okay.  And could you stay with us

14  starting tomorrow on a sequestered jury?

15             PROSPECTIVE JUROR:  Sure.

16             THE COURT:  Thank you.  Ms. Weirich.

17             MS. WEIRICH:  Thank you, Your Honor.  Good

18  afternoon.  As Judge Dailey told you my name is Amy Weirich

19  and along with Betsy Carnesale, we work for your District

20  Attorney General, Bill Gibbons.  We represent the people of

21  the State of Tennessee in this matter that you've been called

22  over here to consider, okay.

23         Voir dire, this part of the jury selection that we're

24  going through, this part of the trial is set aside so that we

25  can select 12 jurors that are best suited to hear this
```

1   particular case.  All right.  And that's why you took an oath

2   to tell the truth and answer the questions honestly because

3   under the laws of the State of Tennessee, both sides in a

4   criminal case, the State of Tennessee and the Defendant, are

5   entitled to a fair trial.  All right.  That's the ultimate

6   goal at the end of the day.  That's why we go through this

7   process of asking you all some questions and trying to get to

8   know you a little bit better to make sure that that objective

9   is met.  All right.  Does everybody kind of understand that?

10  Voir dire or voir dire in French means to tell the truth and

11  that's basically what we're doing right now.

12        When you or if you are selected as a juror in this

13  case, you will go through the process that Judge Dailey spoke

14  of before lunch.  You will hear the indictment read to you.

15  You will listen to the opening statements.  You will hear

16  witnesses take the stand and be questioned by both sides of

17  the table, representatives of the State of Tennessee and

18  defense attorneys.

19        After all of the proof is in, you will listen to the

20  closing arguments.  And then Judge Dailey will read to you the

21  law that applies to this particular case.  Okay.  So if any of

22  you have ever served on jury service before, served on jury

23  duty before, you may hear something from Judge Dailey that

24  differs from what you remember from your prior experience.

25  Can you promise me that you'll focus on what Judge Dailey

1    tells you and follow the law that he gives you?

2        All right.  And when it's read to you, it will be a lot

3    of words that are kind of weird that we're not used to

4    listening to everyday and kind of don't make a lot of sense,

5    but I'm going to try to go through a few of those with you

6    this afternoon.  But rest assured that when you go back to the

7    jury room, you're going to have the charge in front of you.

8    You're going to have all of the law that applies to this case

9    typed out for you, for you to look at and review.  Okay?

10       When you go back there, you'll be sent back with the

11   charge, but you'll also be sent back there with three tools,

12   okay.  And they are the tools that you must use in your

13   deliberation process.  The first tool that you will use as a

14   juror is the evidence.  Evidence comes in the form of real

15   live people that will walk through that back door, take an

16   oath to tell the truth just as you've done, and they'll sit in

17   that chair and they'll answer questions.  They're not actors.

18   We've not had a rehearsal, all right.  They'll answer to the

19   best of their ability the questions posed to them.  And you'll

20   listen.

21       Evidence also can come in the form of items that can't

22   speak; pictures or tangible items, things like that that will

23   sit on this table.  You'll also get to take those back with

24   you to the jury room.  So you'll have the evidence.

25       The second tool is the law.  It comes from Judge

1   Dailey.   I'm going to talk to you a little bit about it this

2   afternoon.   And we'll talk to you more about it in opening

3   statement and in the closing argument.   If any of us tells you

4   something that differs from what Judge Dailey tells you,

5   please listen to what Judge Dailey tells you, okay.   That's

6   where the law comes from.

7        The third tool is your common sense; your good,

8   old-fashioned common sense that all of you use everyday at

9   work, at home, with your neighbors, with your in-laws,

10   whatever.   We all use our common sense everyday in making

11   decisions.   And we want you to bring that same common sense

12   with you to the jury room.   Can all of you promise you will?

13        All right.   Before I talk to you about the law, there

14   are -- there are two things for which there is no room in this

15   courtroom Division 5 of the Criminal Courts of Shelby County

16   or in any other.   And it's the reason that lady liberty is

17   blindfolded whenever you see pictures of the scales of justice

18   and the lady in middle with the blindfold on, there is no

19   place in this courtroom and certainly not in that jury room

20   for sympathy or prejudice.   All right.   And you'll be told

21   that by Judge Dailey at the end, but we want that to be out

22   here in the front today as we begin this process.

23        So can all of you promise that the only tools you will

24   use are the evidence, the law, and your common sense and that

25   you will not allow sympathy nor prejudice to step into that

```
1    jury room?  Can you promise us that?  Okay.  All right.  Yes,
2    sir?
3                    PROSPECTIVE JUROR:  I had two people very dear to
4    me get murdered and it will be very difficult for me.
5                    MS. WEIRICH:  Okay.  And that's one of my
6    questions that I will pose to everyone, that very situation.
7    And by the fact that it's that much on your mind right now,
8    they were both murdered?
9                    PROSPECTIVE JUROR:  Yes.
10                   MS. WEIRICH:  How long ago was that?
11                   PROSPECTIVE JUROR:  About six years.
12                   MS. WEIRICH:  And were they murdered together or
13   was it two separate incidents?
14                   PROSPECTIVE JUROR:  Separate.
15                   MS. WEIRICH:  Okay.  And because of that life
16   experience that you've had to endure, you think it might be
17   difficult for you to listen to this proof with an open mind?
18                   PROSPECTIVE JUROR:  Yes.
19                   MS. WEIRICH:  All right.  Judge, I'd pass for
20   cause.
21                   THE COURT:  All right.  Mr. Matthews, I'm sorry to
22   hear about your situation.  I appreciate you bringing that to
23   our attention and I'll excuse you at this time.  If you would
24   return to the large jury room across the street, please.  You
25   may proceed.
```

1              MS. WEIRICH:   Thank you.   Did you have your hand

2     raised?

3              PROSPECTIVE JUROR:   No.

4              MS. WEIRICH:   Okay.   That's why we go through this

5     line of questioning.   Just because something that may have

6     happened in your past may not suit you best for this

7     particular case, you might be better suited for another trial

8     that's going on.   We talked about the three tools and the two

9     things that there's no room for.

10            Let me talk to y'all a little bit about some legal

11    terms, okay, before I get into some specific questions for

12    each of you.   Thanks to John Grisham and all of the Hollywood

13    movies and all of the TV shows that seem to inundate our

14    lives, there are a lot of legal terms that are thrown around

15    on TV and in books and in Hollywood movies and sometimes

16    they're used incorrectly.   And so what I want to do is kind of

17    switch the tables a little bit and get your focus on what the

18    law of the State of Tennessee is because that's what will

19    control your job as jurors this week.

20            The first one of those phrases is the one "beyond a

21    reasonable doubt."   Okay.   We hear it all the time.   Sometimes

22    you hear "beyond a shadow of a doubt, beyond all doubt."   I

23    think there's even been a book titled *Beyond a Reasonable*

24    *Doubt*.   In the State of Tennessee, it's as helpful I think to

25    talk about what beyond a reasonable doubt does not mean as it

1    is to talk about what it means.

2         All right.  We talk about beyond a reasonable doubt

3    because the State of Tennessee, Ms. Carnesale and I, have the

4    burden, have the job, have the responsibility of proving to

5    you that the defendant is guilty of murder in the first

6    degree.  And we have to prove that to you beyond a reasonable

7    doubt.

8         Now I'm going to talk to you in a minute about what

9    murder first degree means.  But first of all, let's talk about

10   beyond a reasonable doubt.  What it means is that the State of

11   Tennessee has to prove the elements of the crime of murder

12   first degree, the ingredients that go into making murder in

13   the first degree in the State of Tennessee.  You will not be

14   told by Judge Dailey or anyone else that the State of

15   Tennessee has to answer every one of your questions, okay.

16   Sometimes we can.  A lot of times we can't.

17        You will not be told that the State of Tennessee has to

18   prove beyond all doubt that the defendant is guilty of murder

19   in the first degree.  You're probably thinking but yeah,

20   Ms. Weirich, we're talking about murder in the first degree.

21   Shouldn't you be held to a higher burden?  No.  The burden is

22   the same whether we're talking about someone's car being

23   stolen or someone's life being taken.  It's beyond a

24   reasonable doubt.

25        If at the end of this trial you go back in the jury

1  room and you start going through the elements of murder in the

2  first degree; intentionally and with premeditation did kill

3  Sheila Braswell, if you start going through those elements and

4  you have a doubt as to whether or not we've proved one of

5  them, you have to take it another step and you have to ask

6  yourself is my doubt a reasonable one or am I getting hung up

7  on things that don't matter?  Am I getting hung up on

8  insignificant issues that are not relevant to the elements of

9  the case, intentional killing with premeditation.  Okay.  If

10  your doubt is a reasonable one, then we've not done our job.

11  But if your doubt is one based on the what-ifs, the might

12  haves, the could haves, the oh, yeah it could have been, then

13  it's not reasonable and you're getting hung up on irrelevant

14  issues.  And we have done our job, okay.  The reasonable in

15  that phrase is capitalized.  All right?  Does that make sense

16  to everybody?

17          Do you agree or do you understand how difficult it

18  would be for Ms. Carnesale and I to prove to you beyond all

19  doubt that something happened?  What would you have to do to

20  be convinced beyond all doubt that something happened?

21              PROSPECTIVE JUROR:  See it yourself.

22              MS. WEIRICH:  You'd have to see it yourself,

23  wouldn't you?  And even then if Officer Lafferty were to come

24  over here right now and knock me over and Judge Dailey were to

25  send all of you to the back to write down what you just saw,

1   how many different versions would we have?  As many people as

2   we have sitting here, wouldn't we?  And that's just a human

3   trait.  Some of you are focused on me.  Some of you are

4   looking at me, probably wondering about whether your kids got

5   home safe from school, what are you going to make for dinner

6   tonight, how long is this trial going to last, what's going on

7   at the office while I'm not there.  The law allows for those

8   human characteristics and doesn't make the burden beyond all

9   doubt.  That's why we need 12 eyes and ears, okay?  Does that

10  make sense to everybody?

11          Okay.  All right.  That's one of the terms and it's

12  kind of the big umbrella over everything we do.  I think at

13  the end of the trial Judge Dailey will instruct you first

14  degree murder in the State of Tennessee in this particular

15  case the State must prove that the defendant unlawfully killed

16  the victim and that the defendant acted intentionally.

17          Intentionally.  Intent.  It's a word that shows up in a

18  lot of legal settings but it's also a word we use everyday.

19  How can you tell what somebody's intent is?  I'll tell you

20  right now we're not going to have anybody walk in with a

21  crystal ball to tell you that on November 5th, 2004, the

22  defendant's intent was X, Y and Z.  How can we tell what

23  people meant to do or say?  By their what?

24          PROSPECTIVE JUROR:  Actions.

25          MS. WEIRICH:  By their actions, by their words,

1    those types of things.  All right.  So even if it's a word

2    that shows up in a fluffy jury instruction, intentionally is

3    the same way that you're used to using it, in the same way

4    you're used to thinking about it.  You look to people's

5    actions and words to discern what they intended to do, whether

6    they acted intentionally.  And that the killing was

7    premeditated.  That's another word that gets kind of twisted

8    around in Hollywood.  What does premeditated mean?

9              PROSPECTIVE JUROR:  Plan out.

10             MS. WEIRICH:  Plan, yes.  One thing that it

11   doesn't mean, there's no set time.  There's no clock that has

12   to tick for a certain number of minutes for premeditation to

13   develop, okay?  It has to exist before the killing, but you're

14   not going to hear anybody come in and testify that there was

15   premeditation in the mind of the defendant for five minutes

16   and six seconds on November 5th, 2004.  All right.  The

17   definition, I believe this is what Judge Dailey will tell you

18   and if he tells you something different, listen to him.  A

19   premeditated act is one done after the exercise of reflection

20   and judgment.  Premeditation means that the intent to kill

21   must have been formed prior to the act itself.  It is not

22   necessary that the purpose to kill preexist in the mind of the

23   accused for any definite period of time.  It is not required

24   that the premeditation exist in the mind of the defendant for

25   a certain number of seconds or minutes.  Okay?  Does that make

1    sense?

2         All right.  Have any of you ever been the victim of a

3    crime or have the same situation that we've already heard of,

4    a close friend or family member that's been a victim of a

5    violent crime?  Let me start in the back row just to keep

6    myself -- yes, ma'am?

7              PROSPECTIVE JUROR:  It wasn't a violent crime but

8    I have been burglarized.

9              MS. WEIRICH:  Okay.  And how long ago was that?

10             PROSPECTIVE JUROR:  Five years.

11             MS. WEIRICH:  All right.  Were you home?

12             PROSPECTIVE JUROR:  No.

13             MS. WEIRICH:  Okay.  Were you at work when it

14   happened?

15             PROSPECTIVE JUROR:  I had left and went to the

16   grocery store.

17             MS. WEIRICH:  Was anyone ever arrested?

18             PROSPECTIVE JUROR:  No.

19             MS. WEIRICH:  Did they take a lot of things?  A

20   few things?

21             PROSPECTIVE JUROR:  Yes.

22             MS. WEIRICH:  A lot of things?

23             PROSPECTIVE JUROR:  Yes.

24             MS. WEIRICH:  All right.  The police were called?

25             PROSPECTIVE JUROR:  Yes.

1       MS. WEIRICH:  I assume.  And they came out?

2       PROSPECTIVE JUROR:  Yes.

3       MS. WEIRICH:  Okay.  A report was taken and all of

4  those things.  You told them what was taken from your house

5  and you crossed your fingers and hoped that they'd call you

6  back and tell you we found your stuff and that never happened?

7       PROSPECTIVE JUROR:  No.

8       MS. WEIRICH:  Anything about -- and the reason we

9  ask this question, and it may not seem clear to you since it's

10  just a burglary and this is a murder case, but if you were

11  treated either so poorly by the Memphis Police Department or

12  so wonderfully by the Memphis Police Department, that after

13  that point you vowed to either never believe another word a

14  police officer told you or to believe anything a police

15  officer told you, that's the kind of thing we'd need to know.

16  When officers come in here, we want you to listen to their

17  testimony and judge it the same way everybody else does.  Do

18  you see what I mean?

19       PROSPECTIVE JUROR:  Uh-huh.

20       MS. WEIRICH:  Is there anything about having gone

21  through that, that will keep you from giving both sides of

22  this case a fair trial?

23       PROSPECTIVE JUROR:  No.

24       MS. WEIRICH:  Anybody else on the back row?

25       PROSPECTIVE JUROR:  Same thing.

1        MS. WEIRICH: And same question to you. Was there

2   anything about having gone through that that would keep you

3   from giving both sides of this case the State and Defendant a

4   fair trial?

5        PROSPECTIVE JUROR: (Shook head left to right.)

6        MS. WEIRICH: All right. Anybody -- did I get

7   everybody back there? Anybody on the middle row? And the

8   front row, yes, ma'am?

9        PROSPECTIVE JUROR: My sister was murdered by her

10  husband.

11       MS. WEIRICH: How long ago was that?

12       PROSPECTIVE JUROR: I was a child but I can

13  remember.

14       MS. WEIRICH: Okay. All right. And it was here

15  in Memphis?

16       PROSPECTIVE JUROR: Well, it wasn't in Memphis.

17  They lived in Mississippi.

18       MS. WEIRICH: All right. Here the defendant is

19  accused of killing his wife. Do you think that would be

20  something that might be difficult for you to listen to with an

21  open mind, given what your family went through?

22       PROSPECTIVE JUROR: I think so. I think so

23  because as a child I kind of, like, formed opinions at that

24  time and they have not left.

25       MS. WEIRICH: Okay. All right. I'll pass for

1   cause, Your Honor.

2              THE COURT:  Okay.  Ms. Anderson, right?

3              PROSPECTIVE JUROR:  Right.

4              THE COURT:  I'll excuse you, Ms. Anderson.  Thank

5   you.

6              MS. WEIRICH:  Should I proceed?

7              THE COURT:  Sure.

8              MS. WEIRICH:  Thank you.  Anyone else on the front

9   row?  Have any of you ever been -- and I'm going to use all

10  the words that are used -- arrested, convicted, indicted,

11  charged with a crime?  Anybody?  Yes, sir?

12             PROSPECTIVE JUROR:  I've been arrested.

13             MS. WEIRICH:  Okay.  For what?

14             PROSPECTIVE JUROR:  Public drunkenness, many, many

15  years ago.

16             MS. WEIRICH:  Many, many years ago.  All right.

17  And they held you in jail a little time and they let you go?

18             PROSPECTIVE JUROR:  Yeah.

19             MS. WEIRICH:  All right.  Anything about that that

20  would keep you from giving both sides a fair trial?

21             PROSPECTIVE JUROR:  No.

22             MS. WEIRICH:  Thank you for being honest.  I

23  appreciate that.  When the jury is sworn in, in this case, you

24  at that point the defendant will be asked how he pleads and he

25  will stand up and enter a plea of not guilty.  At that point,

1   the challenge is made, if you will, for the State of Tennessee

2   to prove to you that the defendant is guilty of murder in the

3   first degree.   And if you are sworn in as jurors in this case,

4   Ms. Carnesale and I look forward to doing that.   Thank you.

5   Pass for cause, Your Honor.

6                   THE COURT:   Mr. Bailey.

7                   MR. W. BAILEY:   Thank you, Your Honor.   May it

8   please Your Honor, ladies and gentlemen of the jury, I'm as

9   the Court has previously announced, I'm Walter Bailey.   And

10   with me trying this lawsuit is J. Bailey.   The obvious

11   question is are we related and we are.   That's my son.

12           Do -- I'm going to ask you some preliminary questions

13   and I'm going to take a little longer.   And let me explain to

14   you my purpose of this voir dire examination.   My purpose is

15   to help to obtain or to get 12 fair and impartial jurors to

16   try this lawsuit.   We're looking for people who don't have a

17   bone to pick or an ax to grind.   We're looking for people who

18   can call, I like to use baseball terminology because everybody

19   understands baseball, American way of life.   Everybody

20   understands a ball is a ball and strike is a strike.   And

21   that's all we are looking to obtain.   We want 12 fair,

22   balanced jurors that can call a ball a ball and a strike a

23   strike.   We don't want jurors who can lean or would be

24   inclined to lean one way or the other.

25           Now this is not going to be a pleasant experience, no

1    trial involving first degree murder is a pleasant trial. It's
2    not pleasant for anybody. And I want to ask you at the
3    outset, is there anybody just by the very nature of the case
4    itself who feels that you can't stick with us, be a fair and
5    impartial juror and won't be so emotionally overwhelmed just
6    by the sheer nature of the case that you wouldn't give us the
7    benefit of your fair judgment? Anybody feel that way? Yes,
8    ma'am?
9              PROSPECTIVE JUROR: Mr. Bailey, I don't know. I
10   don't know what the charges are. I do not believe in the
11   death penalty. I could not do that. I have worked in the
12   Salvation Army Daycare Center. I have seen people that have
13   been abused that have had no home life. My feeling is not
14   that they should be free but I could not convict somebody to
15   death when they have had no background of learning right from
16   wrong. I've been around children. I've had my own school. I
17   know the importance of a background of somebody, and I have
18   known a lot of cases where you see that these people who do
19   these horrible crimes, granted they should not be out, but I
20   could not convict them to the death penalty and live with
21   myself because I personally feel that a person's character
22   comes from their background 90 percent of the time. And if
23   they have not had that, I could not -- I feel like the parents
24   should be put in jail instead of the person. I'm just telling
25   you my personal. I don't know if this is important or not,

1    but I just feel like I need to say something.

2             MR. W. BAILEY:  I appreciate that.  I'm going to

3    let the Court indulge you on that issue.

4             THE COURT:  Well, Ms. Brock, thank you for that

5    statement.  This case, so you'll know so all of y'all will

6    know, does not involve the death penalty.  The State is not

7    seeking the death penalty, and the jurors will not be charged

8    with the responsibility of setting any punishment but it will

9    not involve the death penalty in any way.  So that should

10   allay your concerns about that issue.  Thank you.

11            PROSPECTIVE JUROR:  I have a comment.

12            MR. W. BAILEY:  Yes, ma'am.

13            PROSPECTIVE JUROR:  You mentioned anyone being --

14            MR. W. BAILEY:  Ms. Smith?

15            PROSPECTIVE JUROR:  Well, that's my maiden name.

16            MR. W. BAILEY:  Chiodo.

17            PROSPECTIVE JUROR:  Yeah.  I haven't lived there

18   in several years.  I'm a sucker for a sob story myself.  I

19   don't know, I may be sympathetic.  I don't know.

20            MR. W. BAILEY:  Well, the whole notion is to be

21   able to set aside any sympathy.  And all of us at some point

22   in our life, you know, we're vulnerable.  We fall for things

23   that we sometimes get embarrassed over.  That's just the way

24   we are.  We're constituted that way as human beings.

25            But the point is for you to be able to -- even though

1   you may have gut feelings or gut instincts but to follow the

2   law and look at the evidence, look at the facts and set aside

3   any personal feeling you may have, you're not here rooting for

4   one team or one side or the other.  You're just here to call

5   it as you see it.  And I'm going to talk to you about some of

6   the principles of law that apply to this case that you will

7   have to follow that we anticipate His Honor will charge you.

8   But that's the direction in which we're going.  So don't be

9   embarrassed about your natural instincts and your natural

10  feelings.  Nobody walked in this courtroom without having

11  natural instincts and feelings.  We all do.  I mean, that's

12  just the way we're made up.  Sometimes we automatically

13  respond.  We may look at a person and not like the way that

14  person looks and immediately have some hostile vibe, but that

15  doesn't mean you couldn't be fair to that person.  Does that

16  answer your question?

17              PROSPECTIVE JUROR:  Yes.

18              MR. W. BAILEY:  Thank you.  And let me also point

19  out that His Honor is going to tell you that he's the provider

20  of the law.  The judge gives you what the law is, not the

21  lawyers.  And these fine prosecutors here, they don't tell you

22  what the law is either.  They can give you their version, like

23  I'm going to give you my version like we will.  But the

24  prosecutors don't know anymore about this case than you so

25  consequently, we don't want you accepting anything said in the

1    voir dire or anything said in the opening statement or

2    arguments when we get to that as being facts because we're not

3    here to provide fact.  We're only here as a conduit through

4    which the information flows.

5         So -- and I'm glad I mentioned that because sometimes

6    when we lawyers speak, jurors think well, we may have some

7    special knowledge.  We don't.  We weren't at the scene.  We

8    don't know what happened.  We're just providing you what we

9    understand is available to be provided.  That's as far as we

10   can go.

11        Now one of the things I neglected to ask, is there

12   anybody related or knows anyone personally in the prosecutor's

13   office?

14             MS. WEIRICH:  Ms. Brock has her hand up.

15             PROSPECTIVE JUROR:  I know someone in Judge

16   Dailey's office.  I do not know anyone in the prosecutors

17   office.

18             MR. W. BAILEY:  I see.  You don't know Judge

19   Dailey personally, do you?

20             PROSPECTIVE JUROR:  No, I do not.

21             MR. W. BAILEY:  And anybody else?  Anybody got any

22   close relative or friend, close friend that is, who is in law

23   enforcement?  Yes, sir, Mr. Guerrero?

24             PROSPECTIVE JUROR:  Yes, sir.  My aunt, she's --

25   she's not an officer but she's a probation officer so she's

```
1    been there for about I say 20 years.

2                MR. W. BAILEY:  That wouldn't have anything to do

3    with this case, would it?

4                PROSPECTIVE JUROR:  No.

5                MR. W. BAILEY:  What about you, Ms. Jordan?

6                PROSPECTIVE JUROR:  I'm Ms. Jordan and I also have

7    a son that's a policeman here in Memphis.

8                MR. W. BAILEY:  Now there are going to be some

9    police officers who are going to testify in this case, you

10   know, officers whenever you've got a death at a scene, you

11   have police officers who go out and investigate.  That's what

12   our fine officers do.  But -- and they will testify.  And His

13   Honor is going to tell you the ground rules by which you

14   evaluate the testimony of police officers.  Now will you

15   promise us that you will follow those ground rules?  You

16   promise that you'll evaluate the testimony of police officers

17   the same way you would lay people, non-enforcement officers?

18                PROSPECTIVE JUROR:  Yes, I will.

19                MR. W. BAILEY:  You're Ms. Sparks?

20                PROSPECTIVE JUROR:  Yes.

21                MR. W. BAILEY:  Okay.  Thank you.  Yes, ma'am?

22                PROSPECTIVE JUROR:  My husband is in federal

23   criminal investigation for Internal Revenue Service.

24                MR. W. BAILEY:  You're Ms. Brooks?

25                PROSPECTIVE JUROR:  Yes, sir.
```

1     MR. W. BAILEY:  Okay.  But that won't have

2  anything to do with this, will it?

3     PROSPECTIVE JUROR:  No.

4     MR. W. BAILEY:  You're not going to try to relate

5  to the prosecution's side of it just because your husband is

6  in law enforcement?

7     PROSPECTIVE JUROR:  No, he's strictly tax.

8     MR. W. BAILEY:  That's the general idea.  We just

9  don't want people taking sides on things that are outside this

10  courtroom because if you do that, then we've got a tough

11  fight.  We're trying to fight more than just a battle of

12  what's before us here in the courtroom.  We've got outside,

13  extraneous stuff that we're trying to fight here, too, and we

14  don't want to do that.  I know you're not going to put us in

15  that position because you're going to let us know.

16     Now have any of you -- I think we've heard some of you

17  refer to your own experiences as having been victims of crime.

18  Any of you had close relatives or friends who have been

19  victims of crimes?  Yes, ma'am.

20     PROSPECTIVE JUROR:  Yes.

21     MR. W. BAILEY:  Ms. Brown, is that correct?

22     PROSPECTIVE JUROR:  Ms. Bryson.

23     MR. W. BAILEY:  Ms. Bryson, I'm sorry.

24     PROSPECTIVE JUROR:  One of my friends, her sister,

25  she was murdered and it's been about -- I think the kids are,

1    like, 17 so it's been about 17 years.

2         MR. W. BAILEY:  Well, now Mr. Vern Braswell is

3    sitting over here, is charged with first degree murder.  Now

4    you think you can give him the benefit of a fair trial?

5         PROSPECTIVE JUROR:  My honest opinion?  No.

6         MR. W. BAILEY:  You don't?

7         PROSPECTIVE JUROR:  No.

8         MR. W. BAILEY:  You think you might -- I guess

9    you're pretty clear on that.  You're pretty candid.

10        PROSPECTIVE JUROR:  I'm very clear.  I don't

11   believe so.

12        MR. W. BAILEY:  Very well.

13        THE COURT:  All right.  Ms. Bryson, thank you.

14   I'll excuse you at this time.

15        MR. W. BAILEY:  Thank you, ma'am.  Is there

16   anybody else who's got a close friend or family member who's

17   been the victim of a crime that would cause that experience to

18   interfere with this process?

19        Now I'm going to ask you some personal questions.  And

20   again, it isn't out of an effort to be nosy or to probe but --

21   Ms. Weirich, do you need a break?

22        MS. WEIRICH:  No, sir.  Thank you though.

23        MR. W. BAILEY:  It's not out of any effort to be

24   nosy or probe, but what we're trying to do is our way and

25   sometimes to look at your experience and see whether based on

```
1    that experience that you'd be the type person we'd be

2    comfortable with serving as a juror in this case.  That

3    doesn't mean you're a good or bad person either.  Let me

4    quickly hasten to say, if you're excluded from this panel, it

5    doesn't mean there's something wrong with you.  It simply

6    means that we were a little edgy about based on your history

7    and your experience and your exposure on your sitting in on

8    this type case.  And it may be that on another type case,

9    maybe a civil case that you would be very appropriate.  But in

10   this type case it may be we may have a feeling that you're

11   not.  So I'm going to quickly starting with you, Mr. Mitchell,

12   I understand you're retired.

13              PROSPECTIVE JUROR:  Yes.

14              MR. W. BAILEY:  And you worked for America West

15   Airline?

16              PROSPECTIVE JUROR:  I was a pilot with America

17   West Airlines.

18              MR. W. BAILEY:  Did you fly all over the world?

19              PROSPECTIVE JUROR:  Just over this part of the

20   world, South America, Canada, Mexico, Caribbean and all over

21   the U.S.

22              MR. W. BAILEY:  I see.  And how long were you a

23   pilot?

24              PROSPECTIVE JUROR:  Totally pilot almost 30 years.

25   I was in corporate aviation before I got in the airline.
```

1            MR. W. BAILEY:  Corporate what, sir?

2            PROSPECTIVE JUROR:  I was with the corporate

3  aviation with different companies here in Memphis, W.R. Grace

4  and Company, Dublin Enterprises, sharing (indiscernible) for a

5  while.

6            MR. W. BAILEY:  Now I take it are you married?

7            PROSPECTIVE JUROR:  Yes.

8            MR. W. BAILEY:  Do you have children?

9            PROSPECTIVE JUROR:  Yes.

10           MR. W. BAILEY:  How many, sir?

11           PROSPECTIVE JUROR:  Two children.  Two daughters.

12           MR. W. BAILEY:  And does Mrs. Mitchell work?

13           PROSPECTIVE JUROR:  Yes.

14           MR. W. BAILEY:  What does she do, sir?

15           PROSPECTIVE JUROR:  She's a school teacher.

16           MR. W. BAILEY:  City or County school system?

17           PROSPECTIVE JUROR:  She's in the private school

18  system.

19           MR. W. BAILEY:  Private school system.

20           PROSPECTIVE JUROR:  She was in both those others

21  though at one time.

22           MR. W. BAILEY:  All right.  Ms. Brooks, you're a

23  phlebotomist?

24           PROSPECTIVE JUROR:  Yes, sir.

25           MR. W. BAILEY:  And what lab are you employed?

1          PROSPECTIVE JUROR:  Memphis Pathology.

2          MR. W. BAILEY:  And how long have you been there,

3    ma'am?

4          PROSPECTIVE JUROR:  About ten years.

5          MR. W. BAILEY:  And I know there is a Mr. Brooks

6    because you earlier mentioned him.  What does he do?

7          PROSPECTIVE JUROR:  He works for Internal Revenue

8    Service as a special agent.

9          MR. W. BAILEY:  Children?

10         PROSPECTIVE JUROR:  Two.

11         MR. W. BAILEY:  All right.  And, Ms. Lowery, as I

12    understand you work for a telecom system?

13         PROSPECTIVE JUROR:  Time Warner Telecom.

14         MR. W. BAILEY:  And how long have you been there?

15         PROSPECTIVE JUROR:  Nine years.

16         MR. W. BAILEY:  Is there a Mr. Lowery?

17         PROSPECTIVE JUROR:  Yes.

18         MR. W. BAILEY:  And what does he do, ma'am?

19         PROSPECTIVE JUROR:  He's self-employed.

20         MR. W. BAILEY:  Children?

21         PROSPECTIVE JUROR:  19 year old.

22         MR. W. BAILEY:  You wouldn't have a problem

23    calling a ball a ball and a strike a strike, would you?

24         PROSPECTIVE JUROR:  No, sir.

25         MR. W. BAILEY:  All right.  Thank you.  Mr. Berry,

1   how about you, sir?  Is there a Mrs. Berry?

2            PROSPECTIVE JUROR:  Yes, sir.

3            MR. W. BAILEY:  And what does she do, sir?

4            PROSPECTIVE JUROR:  She's a bookkeeper for a

5   grocery store chain.

6            MR. W. BAILEY:  Do you have children?

7            PROSPECTIVE JUROR:  One 16 year old.

8            MR. W. BAILEY:  And I understand you say you were

9   the victim of a crime?

10           PROSPECTIVE JUROR:  Yes, sir.

11           MR. W. BAILEY:  What happened?

12           PROSPECTIVE JUROR:  My house was broken into about

13   eight years ago.

14           MR. W. BAILEY:  Now you're not going to look at

15   Mr. Braswell, Vern Braswell over here and hold that against

16   him, are you?

17           PROSPECTIVE JUROR:  No, sir.

18           MR. W. BAILEY:  You'll give him a fair shake?

19           PROSPECTIVE JUROR:  (Nodded head up and down.)

20           MR. W. BAILEY:  Ms. Hill, how about you, ma'am?

21           PROSPECTIVE JUROR:  I work for Memphis Orthopaedic

22   Group.  I've been there 22 years.

23           MR. W. BAILEY:  Is there a Mr. Hill?

24           PROSPECTIVE JUROR:  No, sir.

25           MR. W. BAILEY:  And tell us a little something in

1    terms of your daily tasks at the Orthopaedic Group.

2             PROSPECTIVE JUROR:  I'm the one that goes to put

3    casts on patients, take stitches out, go to surgery with the

4    doctors, assist clinically in the clinic area only.

5             MR. W. BAILEY:  Enjoy your work?

6             PROSPECTIVE JUROR:  Love it.

7             MR. W. BAILEY:  And Ms. Chiodo?

8             PROSPECTIVE JUROR:  Chiodo.

9             MR. W. BAILEY:  I don't know why I can't --

10            PROSPECTIVE JUROR:  Everybody does.

11            MR. W. BAILEY:  You're at Fed Ex.

12            PROSPECTIVE JUROR:  Yes.

13            MR. W. BAILEY:  And your husband?

14            PROSPECTIVE JUROR:  My husband's a pilot at Fed Ex

15   as well.

16            MR. W. BAILEY:  Does he do international flights?

17            PROSPECTIVE JUROR:  Not right now but he has.

18            MR. W. BAILEY:  You jump seat?

19            PROSPECTIVE JUROR:  You know, they took that away

20   from us.

21            MR. W. BAILEY:  Children?

22            PROSPECTIVE JUROR:  No.

23            MR. W. BAILEY:  And, Ms. Green, Ms. Jacqueline

24   Green; right?  Did I get that correct?

25            PROSPECTIVE JUROR:  Yes, sir.

1          MR. W. BAILEY:  You're in customer service at IRS?

2          PROSPECTIVE JUROR:  Yes, sir.

3          MR. W. BAILEY:  You calm people down when they

4    come in mad?

5          PROSPECTIVE JUROR:  No, they call me.

6          MR. W. BAILEY:  And how long have you been at IRS?

7          PROSPECTIVE JUROR:  15 years.

8          MR. W. BAILEY:  Is there a Mr. Green?

9          PROSPECTIVE JUROR:  Separated, long time.

10         MR. W. BAILEY:  Do you have children?

11         PROSPECTIVE JUROR:  Two.

12         MR. W. BAILEY:  Ages?

13         PROSPECTIVE JUROR:  20 and 15.

14         MR. W. BAILEY:  Enjoy your work?

15         PROSPECTIVE JUROR:  Yes, sir.

16         MR. W. BAILEY:  You're not going to hold that

17   against us because we're going to hold you a week, are you?

18         PROSPECTIVE JUROR:  No, I'm glad, the calls we

19   get.

20         MR. W. BAILEY:  Mr. Yeager, how are you doing?

21         PROSPECTIVE JUROR:  Doing fine.

22         MR. W. BAILEY:  Is there a Mrs. Yeager?

23         PROSPECTIVE JUROR:  Yes, there is.

24         MR. W. BAILEY:  What does she do, sir?

25         PROSPECTIVE JUROR:  Right now she's currently

1    unemployed.

2              MR. W. BAILEY:  And you work as a control room

3    operator.  Where?  I didn't get that.

4              PROSPECTIVE JUROR:  Fleischmann's Yeast.

5              MR. W. BAILEY:  Tell us a little something about

6    your company.

7              PROSPECTIVE JUROR:  Company sells yeast to

8    bakeries such as Wonder, pizza companies, different

9    organizations like that.

10             MR. W. BAILEY:  And do you have children?

11             PROSPECTIVE JUROR:  Yes, sir, I have two sons, 27

12   and 21.

13             MR. W. BAILEY:  Mr. McCollum, did I get that

14   correct?

15             PROSPECTIVE JUROR:  Yes.

16             MR. W. BAILEY:  You're retired from MLGW.

17             PROSPECTIVE JUROR:  That's right.

18             MR. W. BAILEY:  How long have you been retired,

19   sir?

20             PROSPECTIVE JUROR:  First day of April.

21             MR. W. BAILEY:  Enjoying your retirement?

22             PROSPECTIVE JUROR:  Somewhat.

23             MR. W. BAILEY:  How long did you work at MLGW?

24             PROSPECTIVE JUROR:  21 years.

25             MR. W. BAILEY:  What did you do while you were

1   there?

2           PROSPECTIVE JUROR:  Worked in the body shop.

3           MR. W. BAILEY:  Do you have children?

4           PROSPECTIVE JUROR:  Yes, I do.

5           MR. W. BAILEY:  Thank you, sir.  Ms. Brock, back

6   to you, ma'am.  You're in the jewelry business?

7           PROSPECTIVE JUROR:  I was, yes, with -- I did it

8   for 13 years.

9           MR. W. BAILEY:  And you managed your own jewelry

10  store?

11          PROSPECTIVE JUROR:  No, no, no, sir.  I did it

12  with three friends and we traveled with it.  It was handmade

13  jewelry that we traveled to shows all over the country.

14          MR. W. BAILEY:  Okay.  Very interesting.  And is

15  there a Mr. Brock?

16          PROSPECTIVE JUROR:  I'm divorced.

17          MR. W. BAILEY:  And of course you can call a ball

18  a ball and a strike a strike?

19          PROSPECTIVE JUROR:  I feel I can, yes.  I must say

20  I am an emotional person, yes.  I do -- I do have empathy.

21          MR. W. BAILEY:  But you understand that of course

22  His Honor is going to tell you that all of that must be set

23  aside.

24          PROSPECTIVE JUROR:  Yes, sir.

25          MR. W. BAILEY:  And you're going to have to weigh

1    the evidence and you are the sole judges of the facts and that

2    being the judges of the fact, that you've got to go in there

3    and just call it as you see it.

4              PROSPECTIVE JUROR:   (Nodded head up and down.)

5              MR. W. BAILEY:   Thank you, ma'am.   Ms. Jordan --

6    see, I got mixed up.   I'm sorry.   Tell us a little something

7    about yourself.   Is there a Mr. Jordan?

8              PROSPECTIVE JUROR:   Yes.

9              MR. W. BAILEY:   And you have children?

10             PROSPECTIVE JUROR:   Three grown.   Lots of

11   grandchildren.

12             MR. W. BAILEY:   And you have your own commercial

13   cleaning service?

14             PROSPECTIVE JUROR:   We do.

15             MR. W. BAILEY:   You and your husband?

16             PROSPECTIVE JUROR:   My husband.

17             MR. W. BAILEY:   You have children?

18             PROSPECTIVE JUROR:   We have three children.

19             MR. W. BAILEY:   I'm sorry.   You say they're grown?

20             PROSPECTIVE JUROR:   Yes.

21             MR. W. BAILEY:   Okay.   Anything about this case

22   that would cause you not to be able to call a ball a ball or a

23   strike a strike?

24             PROSPECTIVE JUROR:   No, I can do that.

25             MR. W. BAILEY:   Now, you know, when we talk about

1  sympathy and emotional responses, there is a -- on a serious

2  note, very serious note, of course we're talking about a

3  death.  And is there anybody among you who thinks that because

4  there is a death, because a person did die, that that would

5  cause you not to be able to be fair and impartial?

6      Ms. Ross, how about you, ma'am?

7          PROSPECTIVE JUROR:  Moss.

8          MR. W. BAILEY:  Moss, I'm sorry.  I can't read my

9  -- the fact that there's a death involved, which is the crux

10 of this case, that this case evolves around a young lady

11 Mr. Braswell's wife being found dead, is that in and of itself

12 something to cause you not to be fair and impartial?

13         PROSPECTIVE JUROR:  No.

14         MR. W. BAILEY:  Is there a Mr. Moss?

15         PROSPECTIVE JUROR:  No.

16         MR. W. BAILEY:  And you're employed where, ma'am?

17         PROSPECTIVE JUROR:  Brother Industries.

18         MR. W. BAILEY:  Is that office hardware?

19         PROSPECTIVE JUROR:  It's a factory.

20         MR. W. BAILEY:  How long have you been there?

21         PROSPECTIVE JUROR:  15 years.

22         MR. W. BAILEY:  Enjoy your work?

23         PROSPECTIVE JUROR:  Love it.

24         MR. W. BAILEY:  Mr. Guerrero, did I pronounce that

25 correctly?

1           PROSPECTIVE JUROR:  Yes, sir.

2           MR. W. BAILEY:  You're at Walgreens?

3           PROSPECTIVE JUROR:  Yes, sir.

4           MR. W. BAILEY:  And you've been there how long,

5  sir?

6           PROSPECTIVE JUROR:  Four years.

7           MR. W. BAILEY:  Tell us a little something about

8  what you do there.

9           PROSPECTIVE JUROR:  I guess you could say I do

10  some of everything.  Even though I'm assistant manager, I do

11  everything from assisting the pharmacy to dealing with

12  customer relations, making sure all the customer's needs are

13  done, making sure the shelves are properly stocked and making

14  sure all the other employees are working and constantly busy.

15           MR. W. BAILEY:  Which one?

16           PROSPECTIVE JUROR:  It's the one on Third and

17  Raines.

18           MR. W. BAILEY:  I see.  Ms. Jenkins, how about

19  you, ma'am?  Is there a Mr. Jenkins?

20           PROSPECTIVE JUROR:  I'm a widow -- I mean,

21  divorced.

22           MR. W. BAILEY:  And you have children?

23           PROSPECTIVE JUROR:  Four, they're all grown.  I

24  have three grandchildren.

25           MR. W. BAILEY:  Congratulations.

1          PROSPECTIVE JUROR:  Thank you.

2          MR. W. BAILEY:  And you've been at Regions 18

3    years?

4          PROSPECTIVE JUROR:  Formerly Union Planters 18

5    years, yes.

6          MR. W. BAILEY:  Mr. Guerrero, is there a

7    Ms. Guerrero?

8          PROSPECTIVE JUROR:  No, sir.

9          MR. W. BAILEY:  Now let's talk about some of the

10   things that will occur in this case that you're going to be

11   listening to.  And stop me at any given point and let me know

12   your feelings.  As we have talked about, that the prosecutor

13   mentioned earlier, this case involves the charge of murder in

14   the first degree and Mr. Vern Braswell is charged with killing

15   his wife.  Now, do any of you know Mr. Braswell, ever read

16   anything about this case, saw anything in the papers or on

17   television about it?

18       And if you -- let me also ask, Mr. Braswell is a

19   graduate of Memphis State University where he got his --

20         MS. WEIRICH:  May we approach, Judge?

21         THE COURT:  You may.

22            (Bench conference commenced.)

23         MS. WEIRICH:  I'm going to object to this line of

24   statement unless they're certain the defendant is going to

25   testify.

1        THE COURT:  They've all indicated that they don't

2   know him so I don't see any relevance to giving a bio of your

3   client.  He can do that himself when he testifies.

4        MR. W. BAILEY:  Very well.

5             (Said bench conference concluded.)

6        MR. W. BAILEY:  Did any of you do -- do any of you

7   happen to have any familiarity or know anything about

8   Ms. Braswell?  She was involved in occupational therapy.

9        PROSPECTIVE JUROR:  I do.

10        MR. W. BAILEY:  You do?

11        MR. J. BAILEY:  May we approach on that, Judge?

12        THE COURT:  You may.  Ms. Chiodo, would you step

13   up here, please?

14             (Bench conference commenced.)

15        THE COURT:  Did you know Ms. Braswell?

16        PROSPECTIVE JUROR:  I didn't know her, but she was

17   my best friend's mother's nurse who came by the house to take

18   care of her.

19        THE COURT:  Okay.  And did you meet her personally

20   or you just heard your best friend talk about her or how do

21   you know?

22        PROSPECTIVE JUROR:  Well, the name kept sounding

23   familiar to me and when you said what she did for a living, I

24   realized who it was.

25        THE COURT:  Okay.  Did your friend talk about her?

1    I mean, how would you know who your best friend's mother's

2    occupational therapist was if you weren't there?  Would she

3    talk about her?

4            PROSPECTIVE JUROR:  No, she just mentioned about

5    what had happened to her.

6            THE COURT:  Okay.  After it happened your friend

7    mentioned to you about it?

8            PROSPECTIVE JUROR:  Uh-huh.

9            THE COURT:  Okay.

10           MS. WEIRICH:  Can we inquire what her friend's

11   name was?

12           PROSPECTIVE JUROR:  Pat Williams.  Her mother's

13   name is Brenda.

14           THE COURT:  Okay.  I think I'll excuse you then,

15   Ms. Chiodo.  Thank you very much for bringing that to our

16   attention.  Please return to the jury room across the street.

17               (Said bench conference concluded.)

18           MR. W. BAILEY:  One of the things I wanted to

19   mention to you is that -- I want to ask first, how many of you

20   have had previous jury experience?  Three of you, I see.  And

21   were they civil or -- let's start with you Mr. McCollum.

22           PROSPECTIVE JUROR:  Same type case.  It wasn't

23   murder.  It was attempted murder case.

24           MR. W. BAILEY:  Did you sit through the trial?

25           PROSPECTIVE JUROR:  Yes, I did.

1    MR. W. BAILEY:  Did you render a verdict with the

2    jury?

3            PROSPECTIVE JUROR:  Yes, we did.

4            MR. W. BAILEY:  All right.  And, Ms. Green, I

5    believe you had your hand up?

6            PROSPECTIVE JUROR:  Yes, sir, but I didn't sit

7    through the whole trial.

8            MR. W. BAILEY:  Was it a civil or criminal

9    proceeding?

10           PROSPECTIVE JUROR:  Criminal.

11           PROSPECTIVE JUROR:  I was on federal jury duty but

12   that's all.  I didn't sit on a trial the whole month.

13           MR. W. BAILEY:  You didn't get called?

14           PROSPECTIVE JUROR:  No.  I was called in later and

15   put on grand jury for two years, but they had to switch me

16   around to an alternate so I never did serve as far as a jury

17   is concerned, sitting like this.

18           MR. W. BAILEY:  Ms. Brooks, I believe I saw your

19   hand.

20           PROSPECTIVE JUROR:  I was on grand jury for I

21   think at the time six months on Tuesdays and Thursdays when it

22   was Tuesdays and Thursdays.

23           MR. W. BAILEY:  How long ago was it?

24           PROSPECTIVE JUROR:  Now I think it was in the last

25   ten years but since y'all called me again I don't know.  I

1    can't be for certain.

2         MR. W. BAILEY:  Well, I'm glad you mentioned the

3    -- both of you mentioned the grand jury service because you

4    know the grand jury service is unilateral.  It's just the

5    prosecution that puts forth the proof and not the defendant.

6    And that the -- and I'm saying this for the benefit of you

7    other grand jurors.

8         You understand that the fact that Mr. Braswell has been

9    indicted and charged with first degree murder only means that

10   the grand jury said that there's enough proof here, enough

11   information here, I should say, not proof but information for

12   you, Mr. Braswell, to come down and face 12 people of your

13   peers and let them hear -- let's air out the accusations.  You

14   understand that that's just a method by which -- it's a tool.

15   That's all the indictment is.  It's a tool, a paper tool just

16   like a summons in a civil case.

17        How many of you have you been -- received a summons in

18   a civil case or a citation or traffic offense?  That's all it

19   is for a document to be issued to say come to court, Mr.

20   Braswell, and stand trial.  That's all that means.  It doesn't

21   mean that he's guilty or innocent.

22        Now how many of you can give him the presumption of

23   being innocent?  That presumption stays with him now.  As he

24   sits over here, Mr. Braswell is presumed to be innocent.

25   That's one of the most sacred presumptions in the law, the

1    presumption of innocence.  And he's entitled to that

2    presumption.  Now can y'all -- yes, ma'am?

3              PROSPECTIVE JUROR:  I was called on jury duty

4    about ten or 15 years ago but I never did serve.

5              MR. W. BAILEY:  Can you give Mr. Braswell the

6    benefit of the presumption of innocence?

7              PROSPECTIVE JUROR:  Well, everyone is assumed

8    innocent until proven guilty.

9              MR. W. BAILEY:  Very well.  That's what we want.

10   The rest of you can do that?  You won't take the fact that

11   he's sitting over here behind his lawyers charged with this

12   offense as meaning anything?

13        Now let's talk about that presumption.  In order for

14   the presumption and that presumption stays with him throughout

15   this trial until or unless it's overcome by competent and

16   convincing evidence, that is by proof beyond a reasonable

17   doubt.  And we're going to talk about that.

18        But before we get to that, let's talk about burden of

19   proof because in order for him to be deprived of that

20   presumption of innocence, the burden of proof is on the

21   prosecution.  He's not required to prove anything.  He's not

22   required to take the stand.  He's not required to put on any

23   proof on his behalf.  He's not required to do anything.  But

24   he's required to come to court because once you're indicted,

25   you've got to show up and stand trial.  But that burden of

1   proof is on the prosecution.

2          Now can all of you require the prosecution in order to

3   obtain a conviction to prove guilt beyond a reasonable doubt

4   that they've got to discharge that burden?  Can all of you do

5   that?  All of you?

6          Now let's talk about proof beyond a reasonable doubt.

7   And I like to -- let me first share with you there are two

8   types of proof, two types of evidence.  One is direct evidence

9   and the other is circumstantial evidence.  Now let me -- and

10  this is very important.

11         Direct evidence, of course, is where if somebody --

12  I've got my glasses here and somebody comes along and removes

13  them and someone witnesses, any of you witness that my glasses

14  were taken and saw who did it, then that's direct proof.  You

15  were an eyewitness.  You saw the glasses taken.

16         But now if the glasses are here and I come back in the

17  room and they're gone and you say well, we don't know who took

18  them but I saw somebody else with glasses that looked like

19  yours going out the door, well that can be circumstantial

20  evidence, the timing and the characteristics of the glasses

21  that you saw but you still are not prepared to swear that

22  those were my glasses that you saw him with.

23         But the point is that direct is something that you

24  eyewitness and circumstantial is something that's like a

25  chain.  And I like to refer -- I wear a bracelet for the

1   purpose of illustrating to you that this bracelet is a

2   bracelet because all of the chains connect.  And if the chains

3   don't connect, then we don't have a bracelet.  We've got a

4   piece of jewelry but we don't have a bracelet.  And that's

5   what circumstantial evidence is.

6       All of the chain of evidence in a circumstantial

7   evidence -- case have got to connect.  They've got to hold

8   together.  That's what a circumstantial evidence case is.

9   It's not based on conjecture, suspicion or gut instinct.

10      And let's talk about that for a minute, if you will.  A

11  case is not tried -- it's not your duty to use your gut

12  instinct or your suspicion.  And I like to use illustration of

13  -- an example.  You watch a person who gets -- who is led out

14  of, let's say Walgreens department store, Mr. Guerrero, and

15  you see a police officer putting him in the car.  And

16  instinctively and we say he must have stolen something or they

17  wouldn't be putting him in the car.  But oftentimes -- and we

18  just instinctively do that.  We're human.  But oftentimes that

19  person is released.  It wasn't a theft or he didn't do it.

20  But we had a suspicion that he did because we saw him

21  arrested.

22      Now can all of you promise that you won't judge this

23  case based on suspicion?  Can all of you promise us that

24  you'll say to yourself, well, you know, something is not right

25  or I don't like the way this case stacks up but yet, I'm not

 1    satisfied.  I don't think they've proved this case beyond a

 2    reasonable doubt and you scratch your head and say I don't

 3    think they've gotten there yet.  Would you have any problem at

 4    that point after all the proof is in and you're not satisfied

 5    that the burden has been discharged regarding that proof

 6    beyond a reasonable doubt, are all of you satisfied that you

 7    could come back with a verdict of not guilty?  You, ma'am?

 8    You?  You, sir?  Rest of you?  All of you can do that and feel

 9    comfortable and feel good about yourself?

10         Would any of you have a problem in a murder case

11    saying, you know, I tried the murder case of Vern Braswell and

12    I thought he may have been guilty but I wasn't sure.  They

13    didn't prove it.  Would any of you have any proof -- any

14    problem going back home to your personal environments among

15    your relatives and friends and saying that I sat in that case

16    and they didn't -- the proof didn't stack up beyond a

17    reasonable doubt and returned a verdict of not guilty?  Any of

18    you got any problem with that?

19              PROSPECTIVE JUROR:  If the proof is not there.

20              MR. W. BAILEY:  Now one of the things about this

21    case is going to involve -- we anticipate the proof is going

22    to center around exotic sexual experiences that the Braswells

23    practiced.  And you're going to see sex toys, sexual items.

24    And you're going to hear about sexual devices.  And you're

25    going to hear a term called "erotic asphyxiation" and "erotic

1   asphyxiafilia."  Now those terms have to do with the

2   constraint of oxygen going to the brain.

3        Now is there anybody among you who feel that you

4   couldn't -- that this is not the type case for you?  If it's

5   not, I want to point out quickly, it's not to pass judgment on

6   anybody's sexual activity or sex life.  That's not what we're

7   here for.  We're not here to do that.  We're not here to

8   condemn nor condone anybody regarding their sexual practices.

9        But we anticipate that this is the kind of proof that's

10  going to come in involving the sexual practices of these two

11  married people.  And you're going to hear about those sort of

12  sexual practices.  You're going to hear it's going to open up

13  what they did sexually, how they sought sexual gratification.

14       And that's why I say that -- why I mention on the front

15  end that this is going to be a fairly rough ride.  Now is

16  there anybody among you who feel that you can't sit and listen

17  fairly and hear the proof?  And is there anyone who feels that

18  if you don't like the sexual practices in and of themselves

19  but those sexual practices don't amount up to a premeditated

20  and intentional killing that you couldn't stick by your --

21  that you wouldn't have any -- that you have any hesitancy

22  about acquitting this young man?  Any of you feel that way?

23       You're going to hear from a psychologist who

24  specializes in the field of deviant sexual behavior, written

25  many books.  Anybody feel that -- His Honor is going to tell

1  you how to evaluate the testimony of expert witnesses.  So I

2  won't go into that, but His Honor will instruct you on how to

3  accept and evaluate testimony of expert witnesses.  One of the

4  things he'll tell you, I must share with you, is that you

5  don't have to accept the testimony of expert witnesses.

6  You're not bound by it, but he's here to guide you or she's

7  here to guide you.

8       Now is there anybody who feels that you couldn't accept

9  the testimony of expert witness and follow the guidelines that

10  His Honor will give you in terms of how you accept expert

11  testimony?

12       Now you're going to see photographs and you're going to

13  see photographs of the decedent and they're never pleasant to

14  look at.  But is there anybody who feels that you would get so

15  emotionally inflamed or carried away by virtue of looking at

16  autopsy photographs from our fine forensic center that you

17  couldn't maintain your fair judgment and call a ball a ball

18  and a strike a strike?  Anybody feel that you couldn't do

19  that, that you'd get emotionally or passionately carried away

20  one way or the other?  I take it all of you could sit there

21  and -- yes, ma'am?

22       PROSPECTIVE JUROR:  I don't know if I can

23  emotionally -- something like that is awfully hard to ever

24  erase out of my head.  That's why I cannot go see horrible

25  movies or anything because if it's very gory, I don't think I

1  could deal with it.  I don't know.  I don't know because I

2  haven't seen the pictures but no.

3         MR. W. BAILEY:  Well, the point is when it's all

4  said and done of course what we're getting at is after those

5  pictures leave your view, can you sit there and give

6  Mr. Braswell the benefit of your fair judgment?

7         PROSPECTIVE JUROR:  I can do that.

8         MR. W. BAILEY:  And be a fair and impartial jury

9  -- juror?

10         PROSPECTIVE JUROR:  Oh, I could do that.  But I

11  don't know if I -- to erase the pictures, that would be a

12  problem to me in my own personal -- no, I could -- no, that

13  would not make me feel any different against him, no.

14         MR. W. BAILEY:  I see.  You wouldn't penalize him

15  for it?

16         PROSPECTIVE JUROR:  No, sir.  No, sir.

17         MR. W. BAILEY:  You wouldn't say how awful those

18  photographs were --

19         PROSPECTIVE JUROR:  No, sir.

20         MR. W. BAILEY:  -- and I'm going to have to --

21         PROSPECTIVE JUROR:  No, sir.

22         MR. W. BAILEY:  -- punish you or punish somebody?

23         PROSPECTIVE JUROR:  No, sir.

24         MR. W. BAILEY:  All right.  And all of you as well

25  understand that it's not your job here to solve a homicide

```
1    puzzle in terms of -- but it's your job to simply look at the
2    situation and determine whether there's proof beyond a
3    reasonable doubt to show that Mr. Braswell intentionally and
4    deliberately and with premeditation killed his wife?
5              THE COURT:  Mr. Bailey, Ms. Lowery has her hand
6    raised.
7              PROSPECTIVE JUROR:  I am emotionally enraged at
8    this moment, and I'm sorry but I can't sit here and listen
9    just to this and not get upset.  It makes me mad and that may
10   be just normal, but I'm already looking at him thinking he's
11   done something.  And that's -- I'm sorry, but that's how I
12   feel.
13             THE COURT:  Well, you do understand that in our
14   system of justice, people are presumed innocent?
15             PROSPECTIVE JUROR:  Yes, sir, I do.
16             THE COURT:  And the burden is on the State to
17   bring forth proof.  And if they fail in that responsibility,
18   then an individual is found not guilty.  That's the way the
19   system works.
20             PROSPECTIVE JUROR:  I understand.  I understand
21   that.  But I just find myself emotionally enraged at this
22   moment.  I'm sorry.
23             THE COURT:  No, I appreciate your calling that to
24   our attention and I understand and I think Ms. Brock was
25   alluding to something similar to that, that is an emotional --
```

1   and Mr. Bailey is apprising you of the fact that this will be

2   -- could be an emotional trial for some jurors and he wants

3   people to know on the front end.  And if you feel that because

4   of the subject matter it would be too emotional for you to

5   keep a clear head and render sound judgment, then perhaps you

6   should be excused.

7              PROSPECTIVE JUROR:  I just feel like out of

8   respect that I should say that.

9              THE COURT:  And I appreciate that.  But of course

10  at this point, you don't know whether Mr. Braswell has

11  committed any crime or not.  You presume him to be innocent at

12  this point.  In spite of what other emotional feelings you

13  have, the law requires that you presume him to be innocent.

14  But are you telling me, Ms. Lowery, that you might find that

15  difficult to do given the charges?

16             PROSPECTIVE JUROR:  I find it difficult to do

17  right now.  I'm sorry.

18             THE COURT:  Thank you for calling that to our

19  attention and I'll excuse you at this time.

20             PROSPECTIVE JUROR:  Thank you.

21             THE COURT:  All right.  Mr. Bailey.

22             MR. W. BAILEY:  Thank you, Your Honor.  Is there

23  anyone else who has any sort of reaction?  As we said, it's

24  going to be a rough ride.

25             Now is there anyone who feels that because of your

1   religious beliefs and if you -- that you couldn't -- that you

2   would hold against the Braswells, Mr. and Mrs. Braswell, any

3   deviant sexual behavior and penalize them for being off into

4   any deviant sexual behavior and not be able to call a ball a

5   ball and a strike a strike and evaluate the case solely on

6   that?

7        Any of you would feel that your lifestyle may be so

8   different from his that you would want to penalize him for

9   whatever he was off into, he and his wife?  Any of you feel

10  that way?  You wouldn't -- you could give him the benefit of

11  your fair judgment?  Because again, we're not here to morally

12  pass judgment on lifestyles.  That ain't why we're here today.

13  That's not our objective.  And being a juror is one of the

14  highest callings, as you know, that one can render in his

15  country or her country.

16       Now I make a few notes and we anticipate sex toys are

17  going to come into play and be introduced into evidence and

18  devices, sex devices you'll be looking at.  Would any of that

19  cause you to be embarrassed or uneasy to such an extent that

20  you couldn't be a fair and impartial juror?  I mean, it's not

21  -- let me put it to you this way.  It's not embarrassing to be

22  embarrassed.  But we just don't -- we want you to be able to

23  sit there after your embarrassment if you are embarrassed and

24  not hold that against Mr. Braswell because this is a murder

25  trial.

```
 1            Now the other thing is His Honor, we anticipate and
 2      I've been around a long time trying cases, and judges always
 3      charge minority verdict.  And what that means is it means that
 4      if the majority of the jurors were one persuasion or one
 5      opinion but you weren't convinced after holding yourself open
 6      to be convinced and persuaded by the other jurors, you
 7      wouldn't look at the other jurors and say well y'all so vastly
 8      outnumber me as 11 to one, or whatever it is or five to seven,
 9      you wouldn't say I'm going to throw in the towel because all
10      of y'all must be right and I'm wrong.  You wouldn't let that
11      -- the fact that other jurors got one opinion and you might
12      singularly be of an opinion.
13            But now you've got to hold yourself open to be
14      convinced and persuaded.  That doesn't mean you can go in with
15      a closed mind and say I don't want to listen to anything
16      you've got to say because that's why we have 12 collective
17      people who sit back there and sort through and in the end
18      usually works out.  But if you can't in good conscience come
19      to the conclusion with the other jurors, would any of you have
20      any problem in sticking by your own opinion?  I mean, we don't
21      want other jurors who would go along just to get along.
22      That's not what this system is about.
23            All right.  Now one other thing and I touched on civil
24      jury experience and criminal jury experience.  And I do want
25      to show the difference in the civil trial -- and I try both
```

1    civil and criminal cases.  And on the civil side, I tell

2    jurors that the burden of proof is by the plaintiff.  That is

3    if you get in an accident or something and you sue somebody,

4    then you've got the burden of proof by what is known as the

5    preponderance of the greater weight.  And I think I saw a hand

6    or two who had been involved in a civil trial.

7         But now preponderance of greater weight is entirely

8    different from proof beyond a reasonable doubt in a criminal

9    case.  In other words, the proof in a criminal case is much --

10   there's a much greater demand in a criminal prosecution that

11   these prosecutors have in terms of their burden than that of a

12   plaintiff lawyer in a civil case.  He doesn't have that big

13   burden that the prosecution has in the civil courts over

14   there, that the prosecutors over here have in Criminal Court.

15        And I want to make that distinction because oftentimes

16   people -- unless you call it to their attention, they don't

17   realize that there's a markable -- remarkable difference

18   between the proof of the greater weight and preponderance of

19   the evidence as opposed to proof beyond a reasonable doubt.

20   There are two different standards in terms of proof demands.

21        If we -- we anticipate we're going to call an expert

22   from St. Louis, Missouri, an expert in the sexual field.  Now

23   the fact that he's coming from St. Louis, would any of you

24   hold that against him or would you look upon him as you would

25   as if he were here in our own backyard?

1          I take it that wouldn't make any difference, that you

2     would listen and evaluate his testimony solely by what

3     Judge Dailey tells you.  Is that a fair assessment?

4          Would Your Honor indulge me?

5          THE COURT:  Let's see.  Ms. Jenkins and

6     Mr. Guerrero and Ms. Jordan, if y'all will take the three

7     seats on the back row, please, back there.  And, Ms. Moss, if

8     you would have a seat in the middle row, please.

9          MR. W. BAILEY:  May I, Your Honor?

10         THE COURT:  Sure.

11         MR. W. BAILEY:  One of the things I neglected to

12    ask you is that you're going to hear from Mr. Braswell.  And

13    he's not required to take the stand, nor are we required to

14    announce or tell you that he's going to take the stand.  But

15    if you do hear from him, and we anticipate you will, can you

16    evaluate and judge his testimony by the same ground rules that

17    you can evaluate and judge the testimony of other witnesses?

18         And His Honor is going to tell you how to do that.  His

19    Honor will charge you with the law on how to evaluate the

20    testimony of witnesses.  And when he takes that stand, he's a

21    witness.  And of course you would use all of the equipment and

22    skills at your command.  And one of the things you have to use

23    in these cases, I don't care what kind of case it is, whether

24    it's a shoplifting or a first degree murder or whether it's a

25    rear-ender in a civil case, one of the things that you always

1    employ and that is your common senses.

2            And I am saying that to say that that's why we get --

3    otherwise, we would have jurors of nothing but professionals

4    if we didn't want people using their common senses.  We want

5    people to use their common senses.  You don't leave those

6    outside the building just because you walk in here and become

7    jurors.  You bring into this courtroom your common senses.

8    And whatever your common senses tell you in terms of how to

9    evaluate things and how to look at things based on your own

10   life experiences, that's what you bring with you.  That's the

11   value.  That's the beauty of a jury of your peers.  That's the

12   beauty.

13           Now will all of you use your common senses and look at

14   the testimony and follow the guidelines given to you by the

15   Court, by Judge Dailey, in terms of evaluating the testimony

16   of Mr. Braswell?  All of you can do that?

17           Would Your Honor indulge?  Thank you, Your Honor.

18           MR. J. BAILEY:  Your Honor, may we approach?  I

19   just have a procedural question.

20           THE COURT:  All right.

21               (Bench conference commenced.)

22           MR. J. BAILEY:  Are our strikes exercised only on

23   the 12 in the box or do we strike from the floor also?

24           THE COURT:  12 in the box.

25           MR. W. BAILEY:  That means -- that means if we are

1     not -- that once we pass the jurors we can always come back?

2                    THE COURT:  Yes.

3                        (Said bench conference concluded.)

4                    THE COURT:  Would y'all approach the bench,

5     please?

6                            (Bench conference commenced.)

7                    THE COURT:  Ms. Bryson has already been excused.

8     Did you mean the person who took her place?

9                    MR. J. BAILEY:  I'm sorry.  I apologize.

10                   THE COURT:  That would be Jordan; is that correct?

11                   MR. J. BAILEY:  That's correct.

12                       (Said bench conference concluded.)

13                   MR. J. BAILEY:  Your Honor, excuse us.  Let us

14    approach again.

15                   THE COURT:  Okay.

16                       (Bench conference commenced.)

17                   MR. W. BAILEY:  It's Ms. Margaret Bryan (sic), the

18    -- from right to left, the second lady at the top, the second

19    person.

20                   THE COURT:  Ms. Bryson has been excused.

21    Ms. Jordan is in that spot now.

22                   MR. W. BAILEY:  Ms. Jordan.  That's who it is.

23                       (Said bench conference concluded.)

24                   THE COURT:  All right.  Ms. Brock, Ms. Jordan,

25    Mr. Mitchell, Ms. Hill and Mr. Yeager, y'all are all excused

1   at this time.  Thank you for your participation.  Please check

2   back across the street.

3        Ms. Sparks, if you would have a seat on the back row

4   next to Mr. Berry, please.  And I think we'll take a

5   ten-minute break at this time.  Those of you who are in the

6   audience, please wait right outside the courtroom.  And as

7   always, do not discuss the case in any way among yourselves

8   during the break.  Those of you up front will go with Officer

9   Lafferty.  As always, do not discuss the case.

10                  (Prospective jurors out.)

11             MS. WEIRICH:  May we approach, Judge?

12             THE COURT:  You may.  Take him out, please.

13                  (Bench conference commenced.)

14             MS. WEIRICH:  I'd like to raise a Batson challenge

15   at this point for the record, considering there were four

16   whites struck at one time.

17             THE COURT:  Okay.  Well, it's -- there are eight

18   total challenges and so only four have been exercised so at

19   this point, I don't think we've crossed that threshold that

20   would necessitate a race-neutral reason being articulated, but

21   I'll note your exception.

22                  (Said bench conference concluded.)

23             THE COURT:  We are going to just take a brief

24   recess so if you would, make sure you don't go too far from

25   the courtroom.  Stand in recess.

```
 1              (Recess.)

 2              THE COURT:  Bring out the defendant, please.  Ask

 3    the jurors to step in, please.  Bring in the jury.

 4                   (Prospective jurors present.)

 5              THE COURT:  All right.  You may call eight more

 6    jurors, please.

 7              DEPUTY LAFFERTY:  20.

 8              THE COURT:  Brian Oliver.  Actually, we need ten

 9    more.

10              DEPUTY LAFFERTY:  58.

11              THE COURT:  Clarence Owens.

12              DEPUTY LAFFERTY:  50.

13              THE COURT:  Gloria Bolton.

14              DEPUTY LAFFERTY:  46.

15              THE COURT:  Deborah Easley.

16              DEPUTY LAFFERTY:  54.

17              THE COURT:  Mark Widner.

18              DEPUTY LAFFERTY:  Nine.

19              THE COURT:  Sandra Clay.

20              DEPUTY LAFFERTY:  42.

21              THE COURT:  Lee Jordan.

22              DEPUTY LAFFERTY:  57.

23              THE COURT:  Evelyn Benton.

24              DEPUTY LAFFERTY:  22.

25              THE COURT:  Thomas Nagel.
```

```
 1                    DEPUTY LAFFERTY:  38.

 2                    THE COURT:  Verna Jackson.

 3              Mr. Oliver, are you employed?

 4                    PROSPECTIVE JUROR:  Yes, sir.

 5                    THE COURT:  Where?

 6                    PROSPECTIVE JUROR:  I work for a company called

 7       Tubelite.  It's a sign, silk screen digital company.

 8                    THE COURT:  What kind of company?

 9                    PROSPECTIVE JUROR:  Sign, silk screen and digital

10       company.

11                    THE COURT:  How long have you been with them?

12                    PROSPECTIVE JUROR:  Ten years.

13                    THE COURT:  What do you do for them?

14                    PROSPECTIVE JUROR:  Customer service.

15                    THE COURT:  And could you stay with us for several

16       days on a sequestered jury starting tomorrow?

17                    PROSPECTIVE JUROR:  Yes, sir.

18                    THE COURT:  Thank you, sir.  Mr. Owens, are you

19       employed?

20                    PROSPECTIVE JUROR:  Retired, sir.

21                    THE COURT:  From where?

22                    PROSPECTIVE JUROR:  U.S. Postal Service.

23                    THE COURT:  Okay.  Could you stay with us for a

24       few days on a sequestered jury?

25                    PROSPECTIVE JUROR:  Yes, sir.
```

1          THE COURT:  Thank you, sir.  Ms. Bolton, are you

2     employed?

3          PROSPECTIVE JUROR:  Retired.

4          THE COURT:  From where?

5          PROSPECTIVE JUROR:  Shelby County Schools.

6          THE COURT:  Okay.  And could you stay with us for

7     a few days on a sequestered jury?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Thank you.  Ms. Easley, are you

10    employed?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Where?

13         PROSPECTIVE JUROR:  Continental Cleaners.

14         THE COURT:  How long have you been there?

15         PROSPECTIVE JUROR:  Seven years.

16         THE COURT:  Could you stay with us for a few days

17    on a sequestered jury?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Thank you.  Mr. Widner, are you

20    employed, sir?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  By whom?

23         PROSPECTIVE JUROR:  Federal Express.

24         THE COURT:  How long have you been with them?

25         PROSPECTIVE JUROR:  Nine years.

1   THE COURT:  What do you do for them?

2   PROSPECTIVE JUROR:  I'm a programmer.

3   THE COURT:  Could you stay with us for a few days

4   on a sequestered jury?

5   PROSPECTIVE JUROR:  Yes.

6   THE COURT:  Thank you.  Ms. Clay, are you

7   employed?

8   PROSPECTIVE JUROR:  No, I'm unemployed.

9   THE COURT:  Could you stay with us for a few days

10  on a sequestered jury?

11  PROSPECTIVE JUROR:  Yes.

12  THE COURT:  Thank you.  Mr. Jordan, are you

13  employed, sir?

14  PROSPECTIVE JUROR:  Yes, sir.

15  THE COURT:  Where?

16  PROSPECTIVE JUROR:  River City Contractors.

17  THE COURT:  How long have you been with them?

18  PROSPECTIVE JUROR:  23 years.

19  THE COURT:  Okay.  Could you stay with us for a

20  few days on a sequestered jury?

21  PROSPECTIVE JUROR:  Yes.

22  THE COURT:  Thank you, sir.  Ms. Benton, are you

23  employed?

24  PROSPECTIVE JUROR:  No, sir.

25  THE COURT:  Could you stay with on a sequestered

1     jury?

2                     PROSPECTIVE JUROR:  Yes, sir.

3                     THE COURT:  Thank you.  Mr. Nagel, are you

4     employed?

5                     PROSPECTIVE JUROR:  Yes, sir.

6                     THE COURT:  By whom?

7                     PROSPECTIVE JUROR:  First Tennessee.

8                     THE COURT:  How long have you been with them?

9                     PROSPECTIVE JUROR:  14 years.

10                    THE COURT:  What do you do for them?

11                    PROSPECTIVE JUROR:  Commercial loan review.

12                    THE COURT:  Could you stay with us for a few days

13    on a sequestered jury?

14                    PROSPECTIVE JUROR:  Yes, sir.

15                    THE COURT:  Thank you.  Ms. Jackson, are you

16    employed?

17                    PROSPECTIVE JUROR:  Yes.

18                    THE COURT:  Where?

19                    PROSPECTIVE JUROR:  Holiday Inn and Fed Ex.

20                    THE COURT:  And could you stay with us on a

21    sequestered jury?

22                    PROSPECTIVE JUROR:  Yes, I could.

23                    THE COURT:  Thank you, ma'am.  Ms. Carnesale.

24                    MS. CARNESALE:  Good afternoon.  As Judge Dailey

25    told you my name is Betsy Carnesale.  And along with Amy

1    Weirich, we represent the State of Tennessee in this matter

2    and we are bringing the prosecution against Mr. Vern Braswell

3    the defendant in this case.

4        For all of you newcomers, I think there are several of

5    you, were you able to hear the voir dire or the jury selection

6    questions that we went through earlier this afternoon?  I'm

7    not going to take as long as we did the first time because I

8    imagine most of you were able to hear and understand what

9    we're asking.

10        Before I get started on some individual questions, is

11    there any reason that any of you newcomers to the panel know

12    that you would be unable to be fair and impartial in this

13    matter?  For example, we heard some of the prior people

14    sitting up in the box based on things that had happened to

15    them in their past, they felt they would not be able to be

16    fair and impartial for this particular case.

17        And, Ms. Benton, you're shaking your head.  Are you

18    agreeing that you heard that or is there something you would

19    like to say?

20             PROSPECTIVE JUROR:  I would like to say this if I

21    could, please.  My daughter was killed in 2003 in an

22    automobile accident, and I'm emotional over that and I don't

23    know if it would have anything to do with this particular case

24    or not.

25             MS. CARNESALE:  And I'm so sorry that happened to

1   you.   This is a homicide case where Mr. Braswell has been

2   indicted for first degree murder for killing his wife Sheila

3   Braswell.   I don't know if your daughter died in an automobile

4   accident, it sounds that that would be different.

5                 PROSPECTIVE JUROR:  Yes, ma'am.

6                 MS. CARNESALE:  However, you know, I understand

7   that must have been very traumatic for you.  Do you think

8   you'll be able to set that aside and listen?

9                 PROSPECTIVE JUROR:  Yes, ma'am.

10                 MS. CARNESALE:  As Ms. Weirich explained earlier,

11   it's very important that you jurors are going to be

12   fact-finders in this matter.  So it's very important that you

13   listen closely to all the evidence.  What I'm saying or what

14   Mr. Bailey is saying is not evidence in this case.  The

15   evidence comes through the witness.

16                 PROSPECTIVE JUROR:  Okay.

17                 MS. CARNESALE:  Does everybody understand that?

18   At the conclusion of the trial, after all the witnesses have

19   testified, your job will be to remember the evidence you've

20   heard, to take the law that is given to you by the Judge,

21   apply the law to the facts and come up with a verdict.  Does

22   everybody understand that?

23                 Now, the State has the burden of proof in this case.

24   As Ms. Weirich explained, our burden is to prove to you beyond

25   a reasonable doubt that Mr. Braswell the defendant in this

1   case killed his wife.  And he's charged with first degree

2   murder, which is an unlawful killing with premeditation.  Does

3   everybody understand that?

4         Do you understand that if the State proves to you

5   beyond a reasonable doubt that that occurred, it is your duty

6   to follow the law and hold him accountable and convict him as

7   charged?  Can everybody promise to do that if the State meets

8   its burden and proves to you beyond a reasonable doubt that

9   first degree murder was committed by Vern Braswell?  Mr.

10  Widner, is it?

11              PROSPECTIVE JUROR:  Widner.

12              MS. CARNESALE:  Would you have a problem with

13  that?

14              PROSPECTIVE JUROR:  No.

15              MS. CARNESALE:  If the State proves to you through

16  the evidence presented to you beyond a reasonable doubt that

17  Vern Braswell killed his wife with premeditation unlawfully

18  and intentionally, would you be able to convict him as

19  charged?

20              PROSPECTIVE JUROR:  Yes.

21              MS. CARNESALE:  How about you, Ms. Clay?

22              PROSPECTIVE JUROR:  Yes.

23              MS. CARNESALE:  Mr. Jordan, are you shaking your

24  head?

25              PROSPECTIVE JUROR:  I don't know.  I had a cousin

1    that got killed in the streets, and his murder got by with a

2    little bit of less time and murdered somebody else so I don't

3    know.

4              MS. CARNESALE:  The man who killed your cousin

5    didn't serve much time and then actually committed another

6    murder?

7              PROSPECTIVE JUROR:  Yeah.

8              MS. CARNESALE:  And so that probably made you

9    unhappy with the system.  I'm sorry to hear that.  How long

10   ago was that?

11             PROSPECTIVE JUROR:  About five or six years ago.

12             MS. CARNESALE:  Was that here in Shelby County?

13             PROSPECTIVE JUROR:  Yeah.

14             MS. CARNESALE:  Was that a trial?  Did it go to

15   trial?

16             PROSPECTIVE JUROR:  Yeah.

17             MS. CARNESALE:  And you weren't satisfied with the

18   verdict?

19             PROSPECTIVE JUROR:  No.

20             MS. CARNESALE:  Do you think that you'd be able to

21   set aside what happened in that case and give both the State

22   and Vern Braswell a fair trial?

23             PROSPECTIVE JUROR:  I don't think I would.

24             MS. CARNESALE:  You think that might affect your

25   judgment in this matter?

1          PROSPECTIVE JUROR:  Yeah.

2          MS. CARNESALE:  To be more prejudiced for or

3  against the defendant?

4          PROSPECTIVE JUROR:  Probably against.

5          MS. CARNESALE:  And you don't think you could

6  separate that from what you hear in this case?

7          PROSPECTIVE JUROR:  I probably wouldn't.

8          MS. CARNESALE:  Your Honor, I'll submit

9  Mr. Jordan.

10         THE COURT:  All right.  Mr. Jordan, I'll excuse

11  you.  Thank you for participating.

12         MS. CARNESALE:  Anybody else for whatever reason

13  feel that they would not be able to give the State or the

14  defendant a fair trial in this matter?  How about you,

15  Mr. Oliver?  Do you think that you can sit on this case, give

16  both sides a fair trial?

17         PROSPECTIVE JUROR:  Yes, I could.

18         MS. CARNESALE:  Have you ever served on jury duty

19  before?

20         PROSPECTIVE JUROR:  Yes, ma'am.

21         MS. CARNESALE:  How long ago was that?

22         PROSPECTIVE JUROR:  About ten, 11 years ago.

23         MS. CARNESALE:  They really do get you every ten

24  years.

25         PROSPECTIVE JUROR:  Yeah.

1      MS. CARNESALE:  Y'all probably well know that.

2    Anything about that -- was that a civil or criminal case?

3           PROSPECTIVE JUROR:  Criminal.

4           MS. CARNESALE:  Criminal.  Was it in this

5    building?

6           PROSPECTIVE JUROR:  Yeah, but I don't -- it's been

7    11 years.  I can't remember that.

8           MS. CARNESALE:  Don't remember it very well.  Did

9    you actually sit on the jury?  Get in the box?

10          PROSPECTIVE JUROR:  Yes.

11          MS. CARNESALE:  Was a verdict reached in your

12   case?

13          PROSPECTIVE JUROR:  Yes, it was.

14          MS. CARNESALE:  Okay.  Anything about that

15   experience that might affect your ability to be fair in this

16   case?

17          PROSPECTIVE JUROR:  No.

18          MS. CARNESALE:  How about you, Ms. Easley?  Have

19   you ever served on jury duty before?

20          PROSPECTIVE JUROR:  No.

21          MS. CARNESALE:  Now I wrote down that you work for

22   a cleaners.  Are you married?

23          PROSPECTIVE JUROR:  Yes.

24          MS. CARNESALE:  Does your husband work?

25          PROSPECTIVE JUROR:  Uh-huh.

1     MS. CARNESALE:  What does he do?

2     PROSPECTIVE JUROR:  He works for Pyramid Trucking.

3     MS. CARNESALE:  Is he a truck driver?

4     PROSPECTIVE JUROR:  Yes.

5     MS. CARNESALE:  Is he home this week so you can be

6 sequestered if need be?

7     PROSPECTIVE JUROR:  No, he won't be.

8     MS. CARNESALE:  But that won't pose a problem for

9 you?

10     PROSPECTIVE JUROR:  No.

11     MS. CARNESALE:  Now, Mr. Oliver, I left you out.

12 Are you married?

13     PROSPECTIVE JUROR:  No.

14     MS. CARNESALE:  How about you, Ms. Jackson?

15     PROSPECTIVE JUROR:  Widow.

16     MS. CARNESALE:  And you work for Holiday Inn and

17 Fed Ex?

18     PROSPECTIVE JUROR:  Yes.

19     MS. CARNESALE:  You're a busy lady.  Have you ever

20 served on jury duty before?

21     PROSPECTIVE JUROR:  Yes.

22     MS. CARNESALE:  How long ago was that?

23     PROSPECTIVE JUROR:  About 12 years ago.

24     MS. CARNESALE:  Was that civil or criminal?

25     PROSPECTIVE JUROR:  I believe it was civil.

1          MS. CARNESALE:  And were you -- was a verdict

2     reached in that matter?

3          PROSPECTIVE JUROR:  Yes.

4          MS. CARNESALE:  I believe Mr. Bailey touched on

5     the burden of proof is different in a civil and criminal case.

6     And as Ms. Weirich said, the law in this case always comes

7     from the judge.  You understand that?

8          PROSPECTIVE JUROR:  Yes.

9          MS. CARNESALE:  Even if you remember anything

10    about that old case, you need to set that aside.  Is it Mr.

11    Nagel?  Are you married, sir?

12         PROSPECTIVE JUROR:  Yes.

13         MS. CARNESALE:  Is your wife employed?

14         PROSPECTIVE JUROR:  Yes.

15         MS. CARNESALE:  Where does she work?

16         PROSPECTIVE JUROR:  Devita.  It's a hemo-analysis

17    company.

18         MS. CARNESALE:  What does she do?

19         PROSPECTIVE JUROR:  Some kind of a manager with a

20    title about that long.  I couldn't tell you.

21         MS. CARNESALE:  Very important.  Any reason why

22    you can't sit with us this week and give this trial your full

23    undivided attention?

24         PROSPECTIVE JUROR:  No.

25         MS. CARNESALE:  Have you ever served on a jury

1    before?

2              PROSPECTIVE JUROR:  Yes.

3              MS. CARNESALE:  How long ago?

4              PROSPECTIVE JUROR:  Probably close to 15 years

5    ago.

6              MS. CARNESALE:  Was it civil or criminal?

7              PROSPECTIVE JUROR:  Civil.

8              MS. CARNESALE:  Was a verdict reached in that

9    matter?

10             PROSPECTIVE JUROR:  Yes.

11             MS. CARNESALE:  Thank you, sir.  Ms. Benton, are

12   you married?

13             PROSPECTIVE JUROR:  Yes.

14             MS. CARNESALE:  Does your husband work?

15             PROSPECTIVE JUROR:  Yes.

16             MS. CARNESALE:  What does he do?

17             PROSPECTIVE JUROR:  He's a groundskeeper at the

18   University of Tennessee.

19             MS. CARNESALE:  Downtown here?  I mean, over in

20   the medical?

21             PROSPECTIVE JUROR:  Uh-huh, yeah.

22             MS. CARNESALE:  Have you ever served on a jury

23   before?

24             PROSPECTIVE JUROR:  No, ma'am.

25             MS. CARNESALE:  Thank you.  And, Ms. Clay, are you

1    married?

2              PROSPECTIVE JUROR:  Separated.

3              MS. CARNESALE:  Okay.  How long have you been

4    separated?

5              PROSPECTIVE JUROR:  A month after I got married.

6              MS. CARNESALE:  We won't go into that.

7              PROSPECTIVE JUROR:  You going to leave that alone.

8              MS. CARNESALE:  Have you ever served on a jury

9    before?

10             PROSPECTIVE JUROR:  No, but I've been called for

11   jury duty.

12             MS. CARNESALE:  Any reason why you can't stay with

13   us and give this trial your full attention?

14             PROSPECTIVE JUROR:  No.

15             MS. CARNESALE:  Mr. Widner, are you married?

16             PROSPECTIVE JUROR:  Yes.

17             MS. CARNESALE:  Where does your wife work?

18             PROSPECTIVE JUROR:  She's a stay-at-home mom.

19             MS. CARNESALE:  Any reason why you can't sit on

20   this trial and give it your full attention?

21             PROSPECTIVE JUROR:  I don't think so.

22             MS. CARNESALE:  Mr. Owens, are you married, sir?

23             PROSPECTIVE JUROR:  Separated.

24             MS. CARNESALE:  Again, we won't ask.  And I

25   understand you're retired from the postal service?

1          PROSPECTIVE JUROR:  Correct.

2          MS. CARNESALE:  What did you do?

3          PROSPECTIVE JUROR:  Postman.

4          MS. CARNESALE:  Have you ever served on a jury?

5          PROSPECTIVE JUROR:  '87 or '85.  Same as this one.

6          MS. CARNESALE:  Criminal?

7          PROSPECTIVE JUROR:  Same as this one we in now.

8          MS. CARNESALE:  Murder.

9          PROSPECTIVE JUROR:  Murder, sequestered.

10          MS. CARNESALE:  So you understand.  It's not so
11   bad; right?  You can reassure them.

12          PROSPECTIVE JUROR:  I understand, yeah.

13          MS. CARNESALE:  Hopefully the accommodations have
14   improved with time.  I think they used to have a dorm in this
15   building.  Is that where you stayed?

16          PROSPECTIVE JUROR:  Uh-huh.

17          MS. CARNESALE:  Anything about that experience
18   that would affect your ability to serve on this case?

19          PROSPECTIVE JUROR:  It wouldn't affect, no.  That
20   experience wouldn't affect nothing.

21          MS. CARNESALE:  You're eager to serve again, I'm
22   sure.

23          PROSPECTIVE JUROR:  I wouldn't say that.

24          MS. CARNESALE:  But you understand how important
25   it is?  This is a very serious matter.

1            PROSPECTIVE JUROR:  Yes, I do.

2            MS. CARNESALE:  Have I gotten to everybody in the

3    second row?  I'm sorry.  Ms. Bolton.  Everybody starts to

4    blend together after a while.  I apologize.  Are you married?

5            PROSPECTIVE JUROR:  No.

6            MS. CARNESALE:  You're retired from the County

7    Schools?  Were you a teacher?

8            PROSPECTIVE JUROR:  Administrator.

9            MS. CARNESALE:  How long did you work for the

10   County?

11           PROSPECTIVE JUROR:  31 years.

12           MS. CARNESALE:  Have you ever served on a jury

13   before?

14           PROSPECTIVE JUROR:  No.

15           MS. CARNESALE:  Anything about this that you've

16   heard so far or any reason in your personal life that you'd be

17   unable to serve this week and give this trial your full

18   undivided attention?

19           PROSPECTIVE JUROR:  Don't have anything.  I will

20   be able to do that.

21           MS. CARNESALE:  Thank you.  And this is to the

22   whole panel.  Why don't we just go row by row.  And again, if

23   there is some reason that this question embarrasses you, we

24   can approach the judge so everyone doesn't hear your answer

25   but it's important to know some of this background

1    information.  Has anyone close to you or any of yourself ever

2    been arrested or charged with a crime?

3                    PROSPECTIVE JUROR:  DUI.

4                    MS. CARNESALE:  Was that you?

5                    PROSPECTIVE JUROR:  It was me.

6                    MS. CARNESALE:  Okay.  What year was that?

7                    PROSPECTIVE JUROR:  '97.

8                    MS. CARNESALE:  Was that here in Shelby County?

9                    PROSPECTIVE JUROR:  Right, that's correct.

10                    MS. CARNESALE:  That would have been my office

11   that prosecuted you then.

12                    PROSPECTIVE JUROR:  Probably would have been.

13                    MS. CARNESALE:  And not that that's a good thing,

14   but my question is that you wouldn't hold that against me in

15   this murder case?

16                    PROSPECTIVE JUROR:  No, I don't even know you.

17                    MS. CARNESALE:  Okay.  Good.  Or Ms. Weirich.

18   Anybody else in the second row?  Okay.  Let me come back to

19   you.  Ms. Clay.

20                    PROSPECTIVE JUROR:  For a felony writing a check.

21   I forgot about the check and it came back to haunt me.

22                    MS. CARNESALE:  Okay.  So you didn't have funds at

23   the time so then they charged you.  Anything about that

24   experience that would affect your ability to serve in this

25   case and give the State a fair trial?

1          PROSPECTIVE JUROR:  No, that was my fault.

2          MS. CARNESALE:  Thank you.  I appreciate your

3 honesty.  Anybody else on the front row?  Second row?  Okay.

4 Mr. Oliver?

5          PROSPECTIVE JUROR:  I was in -- I had got a charge

6 one time where it was like a misdemeanor.  They charged me for

7 having a baked potato in a car, say used for paraphernalia.

8 They said I was going to smoke it or something.  I don't know.

9 Seriously.

10         MS. CARNESALE:  Okay.  I haven't heard of that

11 before.  When was that?

12         PROSPECTIVE JUROR:  Back in '95.

13         MS. CARNESALE:  Here in Shelby County?

14         PROSPECTIVE JUROR:  Yeah.

15         MS. CARNESALE:  Were you actually arrested and

16 brought downtown?

17         PROSPECTIVE JUROR:  Yeah, for paraphernalia.

18         MS. CARNESALE:  What happened to the case?

19         PROSPECTIVE JUROR:  I guess they just threw it out

20 or whatever.  I got, like, fined and all that.  But they threw

21 it out.

22         MS. CARNESALE:  Well, I'm sorry to hear that.  Is

23 there anything about -- again, that would have been my office

24 and the District Attorney's office that prosecuted you.  Do

25 you think that would affect your ability to be fair in this

1    case?

2              PROSPECTIVE JUROR:  No.  No.

3              MS. CARNESALE:  Well, thank you.  I appreciate

4    your honesty.  Anybody else in the top row?  You or anyone

5    close to you?  Mr. Guerrero?

6              PROSPECTIVE JUROR:  I had one of my uncles he was

7    charged with possession of marijuana.

8              MS. CARNESALE:  Here in Shelby County?

9              PROSPECTIVE JUROR:  Yes, ma'am.

10             MS. CARNESALE:  How long ago was that?

11             PROSPECTIVE JUROR:  Four years ago.

12             MS. CARNESALE:  And anything about that experience

13   that might affect your ability to be fair in this case?

14             PROSPECTIVE JUROR:  No.

15             MS. CARNESALE:  Thank you.  Ms. Benton?

16             PROSPECTIVE JUROR:  I have a cousin that was

17   charged with murder and he's doing time now in Nashville.

18   It's been that long, a long time.  It's been a long time.

19             MS. CARNESALE:  A long time since it happened?

20             PROSPECTIVE JUROR:  Yes.

21             MS. CARNESALE:  And he's been in prison a long

22   time?

23             PROSPECTIVE JUROR:  Uh-huh.

24             MS. CARNESALE:  Do you know who he was convicted

25   of killing?

1          PROSPECTIVE JUROR:  Not really.  Another person.

2          MS. CARNESALE:  Are you close to this cousin?

3          PROSPECTIVE JUROR:  Unh-unh.

4          MS. CARNESALE:  You don't hear from him or you

5     don't send him anything?

6          PROSPECTIVE JUROR:  No.

7          MS. CARNESALE:  And again, as always the question

8     is would that affect your ability to be fair in this case?

9          PROSPECTIVE JUROR:  No, ma'am.

10         MS. CARNESALE:  Anybody else that I missed?

11         PROSPECTIVE JUROR:  I had a close relative

12    convicted of a drug crime.

13         MS. CARNESALE:  Where was that?

14         PROSPECTIVE JUROR:  It was in Nashville.

15         MS. CARNESALE:  Was that person serving time or

16    did he have to serve time or anything?

17         PROSPECTIVE JUROR:  Yes.

18         MS. CARNESALE:  Anything about that that would

19    affect your ability to sit in a criminal jury?

20         PROSPECTIVE JUROR:  Not at all.

21         MS. CARNESALE:  Thank you.  Anybody else?

22    Ms. Sparks, I think we might have missed you earlier when we

23    went through some of the questions.  Are you married?

24         PROSPECTIVE JUROR:  No, I'm divorced.

25         MS. CARNESALE:  And you're self-employed and

1    you're in childcare.

2                    PROSPECTIVE JUROR:  Yes.

3                    MS. CARNESALE:  Have you ever served on a jury

4    before?

5                    PROSPECTIVE JUROR:  No.

6                    MS. CARNESALE:  Now I understand your son is a

7    police officer with the City?

8                    PROSPECTIVE JUROR:  Yes.

9                    MS. CARNESALE:  Do you know what division he works

10   in?

11                   PROSPECTIVE JUROR:  He works in the North

12   precinct.

13                   MS. CARNESALE:  Is he on patrol in a squad car?

14                   PROSPECTIVE JUROR:  Yes.

15                   MS. CARNESALE:  You will be hearing from some

16   police officers.  This is a Memphis Police Department case,

17   that investigated the case.  Will that affect your ability to

18   be fair in this matter?

19                   PROSPECTIVE JUROR:  No, not at all.

20                   MS. CARNESALE:  Anybody else that has police

21   officers as relatives or husbands?  Wives?  Okay.

22           Everybody understands that the State has the burden to

23   prove this case beyond a reasonable doubt and everyone agrees

24   that if the State meets that burden, you will convict the

25   defendant as charged.  Is that fair?  Everybody agree?

1    Ms. Moss, can you make me that promise?

2              PROSPECTIVE JUROR:  Yes.

3              MS. CARNESALE:  Your Honor, I'll pass the jury.

4              THE COURT:  Mr. Bailey.

5              MR. W. BAILEY:  Thank you, Your Honor.  I want to

6    speak directly to the new jurors primarily and a couple of

7    things I want to ask you.  When I was addressing the other

8    jurors prior to your assuming the box, the jury box, was I

9    speaking loud enough for you to have heard the questions that

10   were put to the other jurors?  Anybody couldn't understand any

11   of those questions or want me to ask that question again?

12         Now I'm going to ask you would any of you answer any of

13   those -- does it leap out at you that you may have answered

14   one of those questions differently?

15         All right.  Now let's start with you, Ms. Jackson.  And

16   I don't believe I -- did you say you're employed?

17             PROSPECTIVE JUROR:  Yes, I am.

18             MR. W. BAILEY:  Where, ma'am?

19             PROSPECTIVE JUROR:  Holiday Inn Select on Democrat

20   and Fed Ex.

21             MR. W. BAILEY:  Did you say there's a Mr. Jackson?

22             PROSPECTIVE JUROR:  No, I said he's deceased.

23             MR. W. BAILEY:  Okay.  Sorry to hear that.  And

24   you're a native lifelong Memphian?

25             PROSPECTIVE JUROR:  Oh, yes.

1      MR. W. BAILEY:  Thank you, ma'am.  Mr. Nagel, did

2  I pronounce that correctly?

3      PROSPECTIVE JUROR:  Nagel.

4      MR. W. BAILEY:  Nagel.  And you are a loan officer

5  with First Tennessee?

6      PROSPECTIVE JUROR:  Commercial loan review.  We

7  grade commercial loans after they're made.

8      MR. W. BAILEY:  I see.  And how long have you been

9  with First Tennessee?

10      PROSPECTIVE JUROR:  14 years.

11      MR. W. BAILEY:  And your wife?

12      PROSPECTIVE JUROR:  (Indiscernible).

13      MR. W. BAILEY:  But you don't know her exact title

14  I understand.

15      PROSPECTIVE JUROR:  No.

16      MR. W. BAILEY:  Ms. Benton, have you had any

17  previous jury experience?

18      PROSPECTIVE JUROR:  No, sir.

19      MR. W. BAILEY:  Any of the rest of you new jurors

20  had any previous experience?

21      PROSPECTIVE JUROR:  I had grand jury experience.

22      MR. W. BAILEY:  Mr. Wagner; is that correct?

23      PROSPECTIVE JUROR:  Widner.

24      MR. W. BAILEY:  Widner.  And was that federal?

25      PROSPECTIVE JUROR:  It was federal.

1          MR. W. BAILEY:  How long did you serve?

2          PROSPECTIVE JUROR:  It was four years ago.

3          MR. W. BAILEY:  Got an opportunity to review and

4     hear a lot of cases?

5          PROSPECTIVE JUROR:  Yes, I was seated on the jury.

6          MR. W. BAILEY:  And based on your experience, is

7     there anything that would cause you -- that would seep over

8     into this case that would cause you not to be a fair and

9     impartial juror?

10          PROSPECTIVE JUROR:  No, sir.

11          MR. W. BAILEY:  Could you call a ball a ball and a

12     strike a strike?

13          PROSPECTIVE JUROR:  Yes.

14          MR. W. BAILEY:  Ms. Clay, how about you, ma'am?

15          PROSPECTIVE JUROR:  Yes, I would.

16          MR. W. BAILEY:  Be fair and objective?

17          PROSPECTIVE JUROR:  Yes, I would.

18          MR. W. BAILEY:  Call it as you see it?

19          PROSPECTIVE JUROR:  Call it as I see it.

20          MR. W. BAILEY:  Give us a level playing field?

21          PROSPECTIVE JUROR:  Yes, I would.

22          MR. W. BAILEY:  All right.  Ms. Easley, as I

23     understand you -- is there a Mr. Easley?

24          PROSPECTIVE JUROR:  Uh-huh, yes.

25          MR. W. BAILEY:  And you work, been seven years at

1    which cleaners?

2             PROSPECTIVE JUROR:  Continental.

3             MR. W. BAILEY:  I'm sorry?

4             PROSPECTIVE JUROR:  Continental.

5             MR. W. BAILEY:  What do you do there, ma'am?

6             PROSPECTIVE JUROR:  Counter clerk.

7             MR. W. BAILEY:  Is there anything about this case

8    that would prohibit you or bar you from being a fair and

9    impartial juror?

10            PROSPECTIVE JUROR:  I don't think so.

11            MR. W. BAILEY:  You could call it as you see it?

12            PROSPECTIVE JUROR:  Uh-huh.

13            MR. W. BAILEY:  Ms. Bolton, how about you, ma'am?

14            PROSPECTIVE JUROR:  (Nodded head up and down.)

15            MR. W. BAILEY:  You've been with the County School

16   System for how many years?

17            PROSPECTIVE JUROR:  31 years.

18            MR. W. BAILEY:  Ma'am?

19            PROSPECTIVE JUROR:  31 years.

20            MR. W. BAILEY:  In administration?

21            PROSPECTIVE JUROR:  Not the entire time but the

22   last 12 years.

23            MR. W. BAILEY:  So you've been through three

24   superintendents, I take it.

25            PROSPECTIVE JUROR:  Four.

1          MR. W. BAILEY:  Enjoy your work?

2          PROSPECTIVE JUROR:  Love it.

3          MR. W. BAILEY:  Mr. Owens, how about you, sir?

4          PROSPECTIVE JUROR:  Call it like it is.

5          MR. W. BAILEY:  Call a ball a ball and a strike a

6     strike?

7          PROSPECTIVE JUROR:  Yes, sir.

8          MR. W. BAILEY:  Ever play baseball?

9          PROSPECTIVE JUROR:  Yes, sir, younger.

10          MR. W. BAILEY:  So you know what we're talking

11     about?

12          PROSPECTIVE JUROR:  Yes, sir.

13          MR. W. BAILEY:  Is it -- Mr. Brian, how do you

14     pronounce your last name?

15          PROSPECTIVE JUROR:  Oliver.

16          MR. W. BAILEY:  Oliver.  I can't read my own

17     writing here.  You play baseball?

18          PROSPECTIVE JUROR:  I have.

19          MR. W. BAILEY:  Call a ball a ball and a strike a

20     strike in this case?

21          PROSPECTIVE JUROR:  Absolutely.

22          MR. W. BAILEY:  Won't lean one way or the other?

23          PROSPECTIVE JUROR:  No.

24          MR. W. BAILEY:  The fact that this young man sits

25     over here under indictment, would you give him the benefit of

1    not having done anything, that he's in here to face a charge?

2                    PROSPECTIVE JUROR:  Absolutely.  Absolutely.

3                    MR. W. BAILEY:  You wouldn't hesitate to do that?

4                    PROSPECTIVE JUROR:  No, he's innocent until proven

5    guilty, sir.

6                    MR. W. BAILEY:  Now, check and see did I omit

7    anybody.  I don't think so.  Let me ask, one of the things --

8    a key -- an essential element in a first degree murder case is

9    that they've got to prove beyond a reasonable doubt two

10   things:  That the murder was premeditated and it was

11   intentional.  That's what the law says.

12            Now if you find either one of you that the murder was

13   not premeditated and intentional, would any of you have any

14   problem returning a verdict on first degree murder of not

15   guilty?  How about you, sir?

16                   PROSPECTIVE JUROR:  (Shook head left to right.)

17                   MR. W. BAILEY:  You, ma'am?

18                   PROSPECTIVE JUROR:  Unh-unh.

19                   MR. W. BAILEY:  You?

20                   PROSPECTIVE JUROR:  No.

21                   MR. W. BAILEY:  You, sir.

22                   PROSPECTIVE JUROR:  You.

23                   MR. W. BAILEY:  You, sir?

24                   PROSPECTIVE JUROR:  No.

25                   MR. W. BAILEY:  You, ma'am?  Ms. Bolton, would

1   you?

2          PROSPECTIVE JUROR:  No, not a problem.

3          MR. W. BAILEY:  How about you, Mr. Owens?  If you

4   found that premeditation wasn't proved to you beyond a

5   reasonable doubt, how would you vote, sir?

6          PROSPECTIVE JUROR:  I wouldn't have a problem

7   voting no.

8          MR. W. BAILEY:  Not guilty?

9          PROSPECTIVE JUROR:  Not guilty.

10          MR. W. BAILEY:  Now if you find that the

11   prosecution failed to overcome the presumption of innocence

12   and they're required to do that, they've got to overcome that

13   by proving with proof beyond a reasonable doubt premeditation,

14   an intentional killing on the first degree murder charge.

15   It's just that simple.  If you say to yourself, if you say I

16   can't -- I don't have an answer as to how she died, in this

17   instance talking about Mrs. Braswell or that it was

18   accidental, but you're satisfied that the prosecution hasn't

19   proven that it was premeditated and intentional, would you

20   have any problem with voting not guilty?  How would you vote,

21   sir.

22          PROSPECTIVE JUROR:  Not guilty.

23          MR. W. BAILEY:  You, ma'am?

24          PROSPECTIVE JUROR:  Not guilty.

25          MR. W. BAILEY:  You, ma'am?

1    PROSPECTIVE JUROR:  Not guilty.

2    MR. W. BAILEY:  You, ma'am?

3    PROSPECTIVE JUROR:  Not guilty.

4    MR. W. BAILEY:  You, sir?

5    PROSPECTIVE JUROR:  Not guilty.

6    MR. W. BAILEY:  You, ma'am?

7    PROSPECTIVE JUROR:  Not guilty.

8    MR. W. BAILEY:  You, ma'am?

9    PROSPECTIVE JUROR:  Not guilty.

10    MR. W. BAILEY:  You, Ms. Bolton?

11    PROSPECTIVE JUROR:  Not guilty.

12    MR. W. BAILEY:  Mr. Oliver, how about you, sir?

13    PROSPECTIVE JUROR:  Not guilty.

14    MR. W. BAILEY:  Now I have talked with the other

15    jurors about alternative sex styles or sex play.  And we had

16    talked about how graphic that the presentation of evidence

17    might be in terms of sex toys and devices that the couple may

18    have used.  Now would that cause any of you to be so

19    embarrassed that you would be uncomfortable in this kind of

20    case, that you couldn't sit as fair and impartial jurors?  Any

21    of you?

22         And you know we're not here to judge the sexual

23    behavior in the context of passing moral judgment.  That's not

24    what we're here for.  I don't know of any trial where one --

25    where a jury has sat in moral judgment on one's sex

1    preferences, his sex style or her sex style.  That's not what

2    we're here for.  You're not here to determine, to morally

3    judge him or Mrs. Braswell.  It's not a case about morality.

4         It's not a case about religion.  Any of you have any

5    religious belief that would not allow you to sit as a fair and

6    impartial juror in a case of this sort when we're talking

7    about possible alternative sexual behavior that may differ

8    from what you've been understood to believe what was basic?

9    Anybody feel that you've got any kind of institutional beliefs

10   like religious beliefs or philosophical beliefs that would

11   cause you to do other than look at the proof in this case and

12   judge this case solely on the proof?

13        Now there may be character proof introduced in this

14   case.  And His Honor will tell you how to judge and evaluate

15   character proof.  It stands as a witness in behalf of the

16   person for whom the character proof is submitted.  And if

17   there is character proof here, and His Honor will tell you the

18   ground rules under which you evaluate and judge character

19   proof, but if you feel that the character proof measures up,

20   could you give it the benefit of character proof?

21        And character proof is admitted on two questions, not

22   that he -- that a defendant couldn't have committed the act.

23   That ain't the purpose of character proof.  Character proof is

24   limited to what is his reputation for truth and veracity and

25   community and would you believe that's the purpose of

1    character proof?  Can y'all follow that?

2         Listen to character proof.  And of course character

3    proof can be assailed.  It can be attacked.  Prosecution asks

4    the character witnesses about other instances -- incidents

5    that they feel might have some materiality or relevance in

6    terms of getting at how well that character witness really

7    knows this person.  Would you weigh all of that though fairly

8    and impartially?  How about you, ma'am, Ms. Easley?  Would

9    you?

10        PROSPECTIVE JUROR:  Uh-huh.

11        MR. W. BAILEY:  Now one other thing, too, again

12   getting into -- this kind of case is unusual in that you open

13   up the marital lifestyle of the parties.  And one of the

14   things that I want to ask you about is that there may be some

15   proof that -- and I'm asking all of you jurors -- that

16   Mr. Braswell may have dated outside the marriage.  And you

17   might hear from a dear friend of his.  Would that cause any of

18   y'all to hold that against him on this first degree murder

19   charge?  Any of you?  Any of you would be so morally turned

20   off because he may have had a girlfriend or accused of having

21   a girlfriend that you would be so turned off that you couldn't

22   sit there and fairly and impartially judge him?

23        So I guess I take it by the nature of your answers and

24   responses that everybody understands that this is not a case

25   about the moral sexual behavior of the Braswells, except to

1    the extent of what sort of sexual occurrences went on, if any,

2    that resulted in this death.  Can all of y'all understand

3    that?  Any problems?

4         And you may hear -- one thing you may hear references

5    about is -- and again, I don't think I asked -- I may have

6    asked you about a sex toy, I believe I did.  But I don't know

7    whether you've read incidents about sexual play called choking

8    games.  I don't know whether any of you may have heard that or

9    not, but whatever you've heard about it is not important

10   because you're not to bring that, whatever you've been exposed

11   to in that regard whatever you read about in this trial, that

12   you are to get your evidence solely from the witness stand.

13   And I take it that all of you are prepared to do that.

14        And I understood that among you new jurors that none of

15   you are related or have any close ties with the prosecutor's

16   office and you don't know these two prosecutors in the

17   courtroom today.

18        And you understand that we're all on a level playing

19   field, that the prosecutor doesn't have any edge on this case

20   anymore than the Defense does, than we do.  You understand

21   that we weren't there and any statements that you've heard us

22   make or anything that you hear us make in the opening

23   statements, which will be done probably sometime in the

24   morning, that those remarks are not to be taken as evidence in

25   the case because nobody -- none of the people sitting at

1   counsel table was here.  We don't know anymore about this case

2   than you do.  So we don't have any special knowledge or any

3   special edge.

4        Can all of you abide by that and treat us as lawyers

5   and not people who were there on the scene, that we don't know

6   anymore about what happened between the Braswells than you do?

7   Our job is just to bring before you what we have been able to

8   gather.

9        Now one final thing and that is we've talked about if

10  you found that premeditation and intentional -- and intent

11  weren't there that you wouldn't have any problem on voting not

12  guilty.  You expressly said that and we're going to hold you

13  to it.

14       Now I'm checking my notes here because this case is so

15  important.  I've -- oh, my expert.  We're going to -- you're

16  going to hear, we anticipate, testimony regarding -- from an

17  expert regarding erotic asphyxiation.  That means involving

18  the choking experience in a sexual relationship.  And can you

19  evaluate that expert's testimony, Ph.D. from St. Louis the

20  same way you evaluate the testimony of other witnesses?

21       And you're also going to hear testimony, we anticipate,

22  from our own County medical examiner regarding what is known

23  as autoasphyxiation.  And again, asphyxiation meaning to

24  constrain or choke off the air dealing with certain vessels

25  running to the brain transporting the blood.

1        Now would that in any sort of way cause you not to be

2   able to follow the proof because we're going to get into that,

3   we anticipate about autoasphyxiation, again that word where

4   people become hyponoxemia (phonetically spelled) setting in

5   and that sort of thing.  If you hear all those scientific

6   terms -- and they'll explain to you what they mean.  They'll

7   explain to you what asphyxiation -- what the significance of

8   it is and what we're talking about here today.  That's what

9   experts are for, to break it down for me.  They have to break

10  it down for me as well as jurors.

11       Because I didn't -- but in any event, as I sit, I

12  understand that all of you can be fair and impartial and

13  there's nothing about this case religiously or morally that

14  would not cause you not to be able to sit as fair and

15  impartial jurors?

16       Would Your Honor indulge me?

17            THE COURT:  Yes, sir.

18            MS. WEIRICH:  Judge, if Mr. Bailey is finished,

19  can we approach?

20            THE COURT:  You may.

21            MR. W. BAILEY:  I'm sorry, we're finished.

22                 (Bench conference commenced.)

23            MS. WEIRICH:  With regard to Ms. Clay, I couldn't

24  hear her.  I got the impression that she was convicted of a

25  felony passing bad check.  My understanding would be that she

1    would be excluded but maybe I misunderstood her, too.

2             THE COURT:  I don't think it was ever directly

3    asked of her.  But I could ask her now.  Ms. Clay, would you

4    step up here a minute, please.  The matter that you had with

5    the check, how long ago was that?

6             PROSPECTIVE JUROR:  About eight years ago, seven

7    years ago.

8             THE COURT:  And were you actually charged with

9    that?

10            PROSPECTIVE JUROR:  Yeah, made restitution, paid

11   it off.

12            THE COURT:  And what happened to the case?

13            PROSPECTIVE JUROR:  Throwed it out.

14            THE COURT:  You were not convicted at any point?

15            PROSPECTIVE JUROR:  Unh-unh.  They erased it from

16   my record.

17            THE COURT:  So you made restitution.

18            PROSPECTIVE JUROR:  And can I say this?  He looks

19   kind of familiar.

20            THE COURT:  The defendant does?

21            PROSPECTIVE JUROR:  Yeah.  I mean, I stay on

22   Summer.  It look like he's been around.

23            THE COURT:  You live on Summer?

24            PROSPECTIVE JUROR:  Yeah.

25            THE COURT:  Where on Summer?

1    PROSPECTIVE JUROR:  Off of Tillman in that area.

2    I mean, he looks like he worked at a hospital that I worked at

3    a long time ago at Baptist, St. Francis.

4         MS. WEIRICH:  His wife was in the medical field.

5    She may have worked in the hospitals.

6         THE COURT:  But he looks familiar but you can't

7    say for sure?

8         PROSPECTIVE JUROR:  I can't say for sure.

9         THE COURT:  Thank you.  You may be seated.

10   Mr. Bailey, do you know whether your client lived anywhere

11   near Summer and Tillman?

12        MR. W. BAILEY:  Where he lives now?

13        THE COURT:  Where he has lived over the past

14   several years?

15        MR. J. BAILEY:  No, he's never lived over there.

16   His mother lived over in the Douglas Community, which is not

17   far from there.  But I think that his wife worked at an agency

18   that contracted with those hospitals.  I think that might be

19   --

20        MS. WEIRICH:  As did his girlfriend.

21        THE COURT:  Did he ever work in the hospitals?

22        MR. J. BAILEY:  No.

23        THE COURT:  But he may well have frequented them.

24        MR. J. BAILEY:  That's possible.

25        (Said bench conference concluded.)

1            MS. WEIRICH:  While they're discussing, Judge, may

2    I step out briefly?

3            THE COURT:  All right.  Mr. Oliver, Mr. Owens and

4    Ms. Bolton, y'all are excused at this time.  Thank you very

5    much.  Please check back tomorrow morning across the street in

6    the large jury room.  Mr. Widner, if you would have a seat on

7    the end of the back row, please.  And, Ms. Clay, the seat

8    right behind you on the end of the middle row.  And,

9    Ms. Benton, the seat right behind you there in the middle of

10   the middle row.

11           Mr. Bailey, you need to challenge.

12           MR. J. BAILEY:  Just one second, Your Honor.

13           THE COURT:  Ms. Benton and Ms. Clay, y'all are

14   excused at this time.  Thank you very much for your

15   participation.  Check back across the street tomorrow morning.

16   And, Mr. Nagel and Ms. Jackson, if you'd have the two seats in

17   the middle row there, please.

18           Mr. Nagel, you're excused at this time.  Thank you very

19   much for your participation.

20           MS. WEIRICH:  May we approach, Judge?

21           THE COURT:  You may.

22               (Bench conference commenced.)

23           MS. WEIRICH:  We would renew our Batson challenge.

24           THE COURT:  All right.  Well, I will note that

25   five of the eight challenges have now been exercised all

1   against Caucasians.  So I will state that from this point

2   forward if anymore are exercised against Caucasians, we will

3   have to have an out-of-jury hearing.  The threshold would have

4   been met at that point.

5            MR. J. BAILEY:  We also now have several on the

6   jury now, Judge.

7            THE COURT:  Well, there aren't enough challenges

8   -- I will note you are correct, that there have been a couple

9   of rounds where you have passed and not challenged and that's

10  a factor that does enter into it.  So I acknowledge that and

11  we'll move on at this point.

12           MR. W. BAILEY:  In fact, the panel that's

13  currently sitting has five whites.

14           THE COURT:  I understand that.  That is not the

15  test --

16           MR. W. BAILEY:  I understand.

17           THE COURT:  -- applied.  That has no bearing on

18  relevance whatsoever at this point.  None.  But, Mr. Bailey,

19  what I just mentioned does have some bearing and that is if

20  you pass a round without challenging anybody, then that

21  factors into it.  So at this point we'll move on, but be

22  forewarned that we're getting -- we're at the threshold now.

23           MR. W. BAILEY:  Very well.  Thank you.

24           (Said bench conference concluded.)

25           THE COURT:  You may call seven more jurors.

1              DEPUTY LAFFERTY:  60.

2              THE COURT:  Thomas West.

3              DEPUTY LAFFERTY:  15.

4              THE COURT:  Constance Fite.

5              DEPUTY LAFFERTY:  23.

6              THE COURT:  Marvin Oliver.

7              DEPUTY LAFFERTY:  6.

8              THE COURT:  W.B. Wade.

9              DEPUTY LAFFERTY:  51.

10             THE COURT:  Larry Braddock.

11             DEPUTY LAFFERTY:  32.

12             THE COURT:  Frank Gillespie.

13             DEPUTY LAFFERTY:  48.

14             THE COURT:  John Glover.

15        Mr. West, are you employed, sir?

16             PROSPECTIVE JUROR:  I'm a retired surgeon.

17             THE COURT:  All right, sir.

18             MR. J. BAILEY:  Your Honor, there's something I

19   need to bring to the Court's attention.

20             THE COURT:  Okay.

21                  (Bench conference commenced.)

22             MR. J. BAILEY:  Mr. Oliver is my son's basketball

23   coach over at Booker T. Washington so I just want to go ahead

24   and save some time and let the Court know that now.

25             THE COURT:  Mr. Oliver's been excused.

1           MR. BAILEY:  No.  He's my son's basketball coach

2      currently.

3           THE COURT:  Thank you.  I'll excuse him.

4                (Said bench conference concluded.)

5           THE COURT:  Dr. West, could you stay with us for a

6      few days on a sequestered jury?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Thank you.  Ms. Fite, are you

9      employed?

10          PROSPECTIVE JUROR:  I am, the law firm of Baker

11     Donelson.

12          THE COURT:  What do you do with them?

13          PROSPECTIVE JUROR:  I am an information technology

14     trainer.

15          THE COURT:  How long have you been with them?

16          PROSPECTIVE JUROR:  31 years.

17          THE COURT:  They don't do much criminal work in

18     that firm?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Probably none.  But having worked

21     around lawyers all these years, is there anything about your

22     job with the law firm that you think would affect your ability

23     to be fair and impartial on this jury?

24          PROSPECTIVE JUROR:  No, not at all.

25          THE COURT:  And could you stay with us for a few

1    days on a sequestered jury?

2             PROSPECTIVE JUROR:  I can.

3             THE COURT:  And, Mr. Oliver, I'm informed that you

4    know Mr. J. Bailey and his son so I think I'll go ahead and

5    excuse you at this time.  Thank you, though, for your patience

6    today.  Please check back tomorrow morning across the street.

7    Mr. Wade, are you employed?

8             PROSPECTIVE JUROR:  Yes.

9             THE COURT:  Where?

10            PROSPECTIVE JUROR:  With International Paper.

11            THE COURT:  What do you do with them?

12            PROSPECTIVE JUROR:  I manage global sales.

13            THE COURT:  How long have you been with them?

14            PROSPECTIVE JUROR:  22 years.

15            THE COURT:  Could you stay with us for a few days

16   on a sequestered jury?

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  Thank you.  Mr. Braddock, are you

19   employed?

20            PROSPECTIVE JUROR:  Yes.

21            THE COURT:  Where?

22            PROSPECTIVE JUROR:  Self-employed.

23            THE COURT:  What type of work?

24            PROSPECTIVE JUROR:  Lawn service.

25            THE COURT:  Could you stay with us for a few days

1    on a sequestered jury?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  Thank you.  Mr. Gillespie, are you

4    employed?

5               PROSPECTIVE JUROR:  Yes, I am.

6               THE COURT:  Where?

7               PROSPECTIVE JUROR:  I work at Fed Ex.

8               THE COURT:  What do you do for them?

9               PROSPECTIVE JUROR:  I'm a telecommunications

10   specialist.

11              THE COURT:  And how long have you been with them?

12              PROSPECTIVE JUROR:  27 years.

13              THE COURT:  Could you stay with us for a few days

14   on a sequestered jury?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Thank you.  Mr. Glover, are you

17   employed?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Where?

20              PROSPECTIVE JUROR:  Smith & Nephew Orthopaedics.

21              THE COURT:  How long have you been with them?

22              PROSPECTIVE JUROR:  32 years.

23              THE COURT:  And could you stay with us for a few

24   days on a sequestered jury?

25              PROSPECTIVE JUROR:  No.

1          THE COURT:  Why is that, sir?

2          PROSPECTIVE JUROR:  Because I've got animals and I

3    ain't got nobody to feed them, cats, stuff like that.

4          THE COURT:  I'll excuse you, sir.  Thank you.  If

5    you three would move down one, please.  You may call two more

6    jurors.

7          DEPUTY LAFFERTY:  28.

8          THE COURT:  Robert Dawkins.

9          DEPUTY LAFFERTY:  37.

10         THE COURT:  Melvin Morris.

11     Mr. Dawkins, are you employed?

12         PROSPECTIVE JUROR:  Yes, sir, I am.

13         THE COURT:  Where?

14         PROSPECTIVE JUROR:  Bellevue Baptist Church.

15         THE COURT:  What do you do for them?

16         PROSPECTIVE JUROR:  I'm president of the Bellevue

17   Foundation.

18         THE COURT:  And how long have you held that

19   position?

20         PROSPECTIVE JUROR:  For five years.

21         THE COURT:  Okay.  And could you stay with us on a

22   sequestered jury for a few days?

23         PROSPECTIVE JUROR:  Well, I've been thinking about

24   that.  It would be hard but I guess I'd have to do it.  It's

25   just a two-man office and I'm the president.

1          THE COURT:  Right.  But you feel as though you

2    could make arrangements for -- from a work standpoint, you

3    feel it would be difficult is that your concern?

4          PROSPECTIVE JUROR:  Yes, sir, I think it would be.

5    I think there's also an issue with the nature of the trial.

6          THE COURT:  That you feel might affect your

7    ability?

8          PROSPECTIVE JUROR:  Yes, sir.

9          THE COURT:  To listen to it fairly and

10   impartially?  I'll go ahead and excuse you, Mr. Dawkins.

11   Thank you for being down here.  Please come back tomorrow

12   morning across the street.

13        Mr. Morris, are you employed?

14         PROSPECTIVE JUROR:  Yes, sir, I am.

15         THE COURT:  Where?

16         PROSPECTIVE JUROR:  (Indiscernible) Line trucking

17   company.

18         THE COURT:  How long have you been with them?

19         PROSPECTIVE JUROR:  16 years.

20         THE COURT:  What do you do for them?

21         PROSPECTIVE JUROR:  Warehouseman.

22         THE COURT:  And could you stay with us for a few

23   days on a sequestered jury?

24         PROSPECTIVE JUROR:  Yes, I could.  But on behalf

25   -- by me knowing Mr. Bailey, me and him former classmates and

```
 1   friends and in the past, I feel like I would like to be
 2   excused at this time.
 3              THE COURT:  Okay.  Thank you for calling that to
 4   our attention.  I'll excuse you, Mr. Morris.  Thank you, sir.
 5   You may call two more jurors.
 6              DEPUTY LAFFERTY:  1.
 7              THE COURT:  Glenith Calvin.
 8              DEPUTY LAFFERTY:  27.
 9              THE COURT:  Sheila Gray.
10        Mr. Calvin, are you employed, sir?
11              PROSPECTIVE JUROR:  Yes, sir, I am.
12              THE COURT:  Where?
13              PROSPECTIVE JUROR:  Technicolor Distributions.
14              THE COURT:  How long have you been there?
15              PROSPECTIVE JUROR:  Two years.
16              THE COURT:  And could you stay with us on a
17   sequestered jury for a few days?
18              PROSPECTIVE JUROR:  Yes, but some comments that
19   you all made earlier about people knowing people, I know
20   Walter Bailey.
21              THE COURT:  Okay.  How long have you known
22   Mr. Bailey?
23              PROSPECTIVE JUROR:  Back when there used to be --
24   that's a long time ago, about 20 years ago.
25              THE COURT:  Okay.  I'll excuse you.  Thank you for
```

1    bringing that to our attention.

2        And, Ms. Gray, are you employed?

3            PROSPECTIVE JUROR:  Yes, I am.

4            THE COURT:  Where?

5            PROSPECTIVE JUROR:  State of Tennessee University

6    of Memphis.

7            THE COURT:  What do you do?

8            PROSPECTIVE JUROR:  Business and finance.

9            THE COURT:  How long have you been there?

10           PROSPECTIVE JUROR:  Three years.

11           THE COURT:  Could you stay with us on a

12   sequestered jury for a few days?

13           PROSPECTIVE JUROR:  Yes, sir.

14           THE COURT:  Thank you.  If you would move down one

15   seat, please.  And you may call one more juror.

16           DEPUTY LAFFERTY:  36.

17           THE COURT:  Jan Kinard.  Ms. Kinard, are you

18   employed?

19           PROSPECTIVE JUROR:  Yes, I am.

20           THE COURT:  Where?

21           PROSPECTIVE JUROR:  I work for Judy McClellan and

22   Crye-Leike Realtors.

23           THE COURT:  And how long have you been with them?

24           PROSPECTIVE JUROR:  Beginning my fifth year.  I

25   was a paralegal before I went to work for Judy.

```
1              THE COURT:  With whom?

2              PROSPECTIVE JUROR:  Williams, McDaniel, Wolfe and

3    Womack, estate probate and tax.

4              THE COURT:  Could you stay with us on a

5    sequestered jury for a few days?

6              PROSPECTIVE JUROR:  Yes, sir.

7              THE COURT:  And, Mr. Braddock, you had your hand

8    up?

9              PROSPECTIVE JUROR:  I also know Brother Bailey

10   through my brother-in-law.

11             THE COURT:  Brother Bailey.

12             PROSPECTIVE JUROR:  Through my brother-in-law I

13   know him.

14             THE COURT:  Mr. Bailey?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  And do you know him --

17             PROSPECTIVE JUROR:  Just as meeting.

18             THE COURT:  You don't know him personally?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  You're not a long-time personal friend

21   or anything?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Met him through your brother-in-law on

24   how many occasions?

25             PROSPECTIVE JUROR:  Just at passing.
```

1          THE COURT:  Okay.  Do you think -- and I guess

2     you're the only one that can answer this.  Do you think that

3     that would affect your ability to listen impartially to the

4     case?

5          PROSPECTIVE JUROR:  Oh, no.  No.

6          THE COURT:  You could listen to the proof and to

7     what the lawyers say, including Mr. Bailey, and still base a

8     verdict on the proof and the law?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And not be unduly swayed by

11     Mr. Bailey.  You'd want to listen to what he said, of course,

12     but you could set aside your knowledge and friendship?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Is that a fair statement?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  I don't want to put words in your

17     mouth.  Thank you for bringing that to our attention.

18     Ms. Weirich.

19          MS. WEIRICH:  Thank you, Your Honor.  Good

20     afternoon.  I'm going to direct my comments to the seven of

21     you that are new with us.  The first question being were all

22     of you able to hear everything that's been discussed here this

23     afternoon?

24          PROSPECTIVE JUROR:  Yes.

25          MS. WEIRICH:  Just a little review.  What are the

1   three tools that jurors have to use?

2                   PROSPECTIVE JUROR:  Common sense.

3                   MS. WEIRICH:  Yes.  What else?

4                   PROSPECTIVE JUROR:  Evidence.

5                   MS. WEIRICH:  And what comes from the judge?

6                   PROSPECTIVE JUROR:  The law.

7                   MS. WEIRICH:  That's right, the only three things

8   you can use.  And there's no room in this courtroom or any

9   other for sympathy or prejudice.  Were you all able to hear us

10  when we were talking about beyond a reasonable doubt and what

11  it means and more specifically what it doesn't mean, that

12  we're not held to proving the case beyond all doubt.

13         Do you agree that it would be impossible, Dr. West, for

14  me to prove to you beyond all doubt that anything happened?

15                  PROSPECTIVE JUROR:  Yes.

16                  MS. WEIRICH:  You would have to see it, wouldn't

17  you?

18                  PROSPECTIVE JUROR:  Yes.

19                  MS. WEIRICH:  Okay.  And the law allows for that

20  human characteristic, if you will.  It doesn't require that of

21  us.

22         Premeditation is a word that has come into play.  It

23  doesn't have to exist in the mind of the defendant for a set

24  period of time.  It just has to exist before the killing.

25         Intent is another word we talked about.  How do we know

1   what someone's intent might be?  By what?

2           PROSPECTIVE JUROR:  Their actions.

3           MS. WEIRICH:  Their actions, their words, things

4   like that.  Dr. West, there may be -- or there will be some

5   doctors that will testify in this case and they may use terms

6   that I ask or Ms. Carnesale asks them to explain to the jury

7   and you might obviously already know what those words mean and

8   may already be six steps ahead everyone else.  Can you put

9   your vast medical training and your vast medical experience

10  aside and just focus on what you learn about this case from

11  the courtroom?

12          PROSPECTIVE JUROR:  Yes, I think so.

13          MS. WEIRICH:  Okay.  Were you a specific type of

14  surgeon?

15          PROSPECTIVE JUROR:  General surgeon.

16          MS. WEIRICH:  Where did you practice?

17          PROSPECTIVE JUROR:  Baptist.

18          MS. WEIRICH:  When did you retire?

19          PROSPECTIVE JUROR:  1996.

20          MS. WEIRICH:  Okay.  All right.  So any -- you

21  won't feel the temptation to hold a class or hold a lecture

22  back in the jury room about any medical term or concepts

23  that might --

24          PROSPECTIVE JUROR:  Not at all.

25          MS. WEIRICH:  All right.  Probably be relieved not

1    to have to.

2         All right.  And, again, to you the judge already asked

3    you this a little bit.  I know that Baker Donelson hardly does

4    any criminal work unless they just have to, but anything about

5    the exposure that you've had to the lawyers and to the clients

6    and hearing what you hear on a daily basis, some of that may

7    sound familiar to you here in a courtroom.  Can you separate

8    your legal knowledge from what goes on at Baker Donelson from

9    this courtroom?

10              PROSPECTIVE JUROR:  Definitely.

11              MS. WEIRICH:  And just reach a verdict based upon

12   what you hear within the confines of this courtroom and your

13   common sense?

14              PROSPECTIVE JUROR:  Right.

15              MS. WEIRICH:  Okay.  All right.  Have any of the

16   seven of you been the victim of a crime or had a close friend

17   or family member that's been a victim of a violent crime?

18   Yes, sir?

19              PROSPECTIVE JUROR:  Yes, capital murder.

20              MS. WEIRICH:  Sir?

21              PROSPECTIVE JUROR:  Yes.  Not a victim but I know

22   someone.

23              MS. WEIRICH:  What were they a victim of?

24              PROSPECTIVE JUROR:  Capital murder.

25              MS. WEIRICH:  They were killed?  You know someone

1    that was killed?

2               PROSPECTIVE JUROR:  Yes.

3               MS. WEIRICH:  Or you know the person that was --

4               PROSPECTIVE JUROR:  The person accused of the

5    killing.

6               MS. WEIRICH:  And are they currently -- what is

7    the situation?  Is the case pending?

8               PROSPECTIVE JUROR:  No.

9               MS. WEIRICH:  It's over?

10              PROSPECTIVE JUROR:  They doing time.

11              MS. WEIRICH:  They're doing time.  Did you know

12   the person that was killed as well?

13              PROSPECTIVE JUROR:  No.

14              MS. WEIRICH:  You just knew the defendant.  All

15   right.  How long ago was the incident?

16              PROSPECTIVE JUROR:  11 years ago.

17              MS. WEIRICH:  Did you come -- was there a trial?

18              PROSPECTIVE JUROR:  Yes.

19              MS. WEIRICH:  Did you attend the trial?  Did you

20   testify at the trial?

21              PROSPECTIVE JUROR:  No.

22              MS. WEIRICH:  All right.  And is there anything

23   about that experience that would keep you from giving both

24   sides of this case a fair trial?

25              PROSPECTIVE JUROR:  I'm not sure.

1          MS. WEIRICH:  Okay.  There might be?

2          PROSPECTIVE JUROR:  Might be.  I'm not sure.

3          MS. WEIRICH:  Well, it's really only a question

4     that only you can answer.  Was there -- you just don't know.

5          PROSPECTIVE JUROR:  I guess my problem with it, I

6     didn't agree with the --

7          MS. WEIRICH:  With the verdict?

8          PROSPECTIVE JUROR:  Yes.

9          MS. WEIRICH:  Okay.  Okay.  Because of your

10    connection with the person accused?

11         PROSPECTIVE JUROR:  Exactly.  Exactly, and what

12    they were accused for.

13         MS. WEIRICH:  And that might be kind of hard for

14    you to separate?

15         PROSPECTIVE JUROR:  Yes.

16         MS. WEIRICH:  Understanding that it might be

17    difficult and understanding as well that we don't expect you

18    all to come to us having had no life experiences and to have

19    lived life with blinders on, we're not asking you to forget

20    that, but what the situation we don't want to see arise is

21    that you can't evaluate the evidence and the law fairly.  In

22    other words, what you experienced when you sat in court and

23    watched the verdict being returned would so cloud your mind

24    this week that you wouldn't be able to give both sides a fair

25    trial.

```
 1                    PROSPECTIVE JUROR:  It won't cloud it.

 2                    MS. WEIRICH:  Okay.  You don't think it will come

 3       into play?

 4                    PROSPECTIVE JUROR:  No, I don't think so.

 5                    MS. WEIRICH:  In your deliberations?

 6                    PROSPECTIVE JUROR:  I don't think so.  And I hope

 7       not.

 8                    MS. WEIRICH:  Okay.  Can you promise us that

 9       you'll only return a verdict based upon the law, the evidence,

10       and your common sense?

11                    PROSPECTIVE JUROR:  Yes.

12                    MS. WEIRICH:  And that you won't allow sympathy or

13       prejudice back there?

14                    PROSPECTIVE JUROR:  Yes.

15                    MS. WEIRICH:  Okay.  All right.  Anyone else?

16       Yes, ma'am?

17                    PROSPECTIVE JUROR:  My cousin was murdered.

18                    MS. WEIRICH:  Okay.  How long ago was that?

19                    PROSPECTIVE JUROR:  Nine years ago not in

20       Tennessee.

21                    MS. WEIRICH:  And again, the same question to you,

22       was there anything about that --

23                    PROSPECTIVE JUROR:  No.

24                    MS. WEIRICH:  From giving both sides a fair trial?

25                    PROSPECTIVE JUROR:  No.
```

1          MS. WEIRICH:  All right.  Anyone else?  Yes,

2     ma'am?

3          PROSPECTIVE JUROR:  Family member was injured.

4          MS. WEIRICH:  Okay.  Seriously injured?

5          PROSPECTIVE JUROR:  Seriously, yeah.

6          MS. WEIRICH:  Okay.  How long ago was that?

7          PROSPECTIVE JUROR:  About a year or two.

8          MS. WEIRICH:  Okay.  And were they injured as a

9     result of a criminal act?

10          PROSPECTIVE JUROR:  Yes.

11          MS. WEIRICH:  Okay.  Was it a domestic situation?

12     Or do you know?

13          PROSPECTIVE JUROR:  Well, I don't know how to

14     explain it.  He was attacked.

15          MS. WEIRICH:  Okay.  All right.  By someone he

16     knew or someone he didn't know?

17          PROSPECTIVE JUROR:  Someone he knew.

18          MS. WEIRICH:  Okay.  And is there a case pending

19     because of that?

20          PROSPECTIVE JUROR:  No, ma'am.

21          MS. WEIRICH:  Was anyone caught?

22          PROSPECTIVE JUROR:  Yes, ma'am.

23          MS. WEIRICH:  The person that attacked him?

24          PROSPECTIVE JUROR:  Uh-huh.

25          MS. WEIRICH:  Okay.  But you don't know what's

1   happened to the case or what the outcome of the case was?

2                   PROSPECTIVE JUROR:  No, I don't, since that's been

3   a couple of years and I never went to court for it or had to

4   be in there or never heard of a trial or anything.

5                   MS. WEIRICH:  And this was a cousin you said?

6                   PROSPECTIVE JUROR:  No, ma'am, a family member.

7                   MS. WEIRICH:  A family member, okay.  Anything

8   about that that would keep you from giving both sides of this

9   case a fair trial?

10                  PROSPECTIVE JUROR:  No, ma'am.

11                  MS. WEIRICH:  Anyone else I've left off?  Have any

12  of you been arrested, convicted, indicted or charged with a

13  crime, any of you new people?

14          Okay.  All right.  Thank you.  I'll pass for cause,

15  Your Honor.

16                  THE COURT:  Mr. Bailey.

17                  MR. W. BAILEY:  Thank you, Your Honor.  I trust

18  that I was talking loud enough when I was addressing your

19  predecessors, that you jurors before could hear me.  Would any

20  of you answer any of those questions differently?

21          We talked about a lot of things.  We talked about the

22  burden of proof, that the burden of proof is -- rests with the

23  prosecutors and that these fine young ladies have got the

24  responsibility of discharging that burden beyond a reasonable

25  doubt.

1          Now we also talked about the presumption of innocence.

2     And any of you have -- I take it all of you can give

3     Mr. Braswell -- and that's a very important presumption.   It's

4     not just an empty ritual that we go through.   I think I used

5     the illustration of the person coming out of Walgreens being

6     escorted by the police and we talked about sometimes we would

7     rush to judgment and say he must be guilty of something,

8     otherwise, they wouldn't be putting him in the squad car.

9          Ms. Fite, you would give him the presumption?

10              PROSPECTIVE JUROR:   Pardon me?

11              MR. W. BAILEY:   You would give him the presumption

12    of being innocent?

13              PROSPECTIVE JUROR:   Oh, absolutely, yes.

14              MR. W. BAILEY:   You work at Baker Donelson?

15              PROSPECTIVE JUROR:   Yes.

16              MR. W. BAILEY:   You're in litigation?

17              PROSPECTIVE JUROR:   No, I'm in information

18    technology, doing software training.   I have no connection

19    with clients or actually the only time I have the attorneys is

20    when they come through training.

21              MR. W. BAILEY:   So you're not part of the trial

22    advocacy team?

23              PROSPECTIVE JUROR:   No, not at all.

24              MR. W. BAILEY:   Thank you.   Is there a Mr. Fite?

25              PROSPECTIVE JUROR:   Yes, there is.

1          MR. W. BAILEY:  What does he do, ma'am?

2          PROSPECTIVE JUROR:  He's the credit manager at

3     Seabrook Wallcoverings.

4          MR. W. BAILEY:  Is there anything about this case

5     that would cause you not to be able to call a ball a ball and

6     a strike a strike?

7          PROSPECTIVE JUROR:  No.

8          MR. W. BAILEY:  How about you, Mr. Wade?  Wade,

9     isn't it?

10         PROSPECTIVE JUROR:  Yes.

11         MR. W. BAILEY:  Is there anything about this case

12    that would put you in a position of not being able to be fair

13    and impartial?

14         PROSPECTIVE JUROR:  No.

15         MR. W. BAILEY:  You could apply your common senses

16    and reach a fair and impartial verdict?

17         PROSPECTIVE JUROR:  Yes.

18         MR. W. BAILEY:  And is there a Mrs. Wade?

19         PROSPECTIVE JUROR:  Yes.

20         MR. W. BAILEY:  And what does she do?

21         PROSPECTIVE JUROR:  She's a homemaker.

22         MR. W. BAILEY:  I see.  Thank you.  Mr. Braddock,

23    how about you, sir?

24         PROSPECTIVE JUROR:  Yes, sir.

25         MR. W. BAILEY:  Is there a Mrs. Braddock?

1           PROSPECTIVE JUROR:  Mrs. Braddock.

2           MR. W. BAILEY:  Is there anything about this case

3  that would cause you not to be able to call a ball a ball and

4  a strike a strike?

5           PROSPECTIVE JUROR:  No.

6           MR. W. BAILEY:  Mr. --

7           PROSPECTIVE JUROR:  -- Gillespie.

8           MR. W. BAILEY:  Gillespie.  Is there anything

9  about this case that would make you uncomfortable?

10          PROSPECTIVE JUROR:  No, sir.

11          MR. W. BAILEY:  And is there a Mrs. Gillespie?

12          PROSPECTIVE JUROR:  Yes, sir.

13          MR. W. BAILEY:  What does she do?

14          PROSPECTIVE JUROR:  She's a school counselor at

15  Charjean Elementary.

16          MR. W. BAILEY:  I see.  And what do you do?

17          PROSPECTIVE JUROR:  I'm a telecommunications

18  technician.  I work in the network operations center at Fed

19  Ex.

20          MR. W. BAILEY:  I see.  Thank you.  Ms. Gray, how

21  about you?  It is Ms. Gray, isn't it?

22          PROSPECTIVE JUROR:  Correct.

23          MR. W. BAILEY:  How about you, Ms. Gray?

24          PROSPECTIVE JUROR:  As far as what?

25          MR. W. BAILEY:  Can you be fair and impartial?

1          PROSPECTIVE JUROR:  Yes, I can.

2          MR. W. BAILEY:  You can hang with us?

3          PROSPECTIVE JUROR:  I sure can.

4          MR. W. BAILEY:  Follow the proof?

5          PROSPECTIVE JUROR:  I sure can.

6          MR. W. BAILEY:  Don't be swayed?  All right.

7    We'll leave that there.  Ms. Kinard, did I pronounce that

8    correctly?

9          PROSPECTIVE JUROR:  Around here most people say

10   Kinard.  I answer to both.

11         MR. W. BAILEY:  And I take it you can be fair and

12   impartial?

13         PROSPECTIVE JUROR:  Yes, sir.

14         MR. W. BAILEY:  Is there a Mr. Kinard?

15         PROSPECTIVE JUROR:  Yes.  Well, there was this

16   morning anyway.  He's with realty title company.  It's a

17   division of Crye-Leike.

18         MR. W. BAILEY:  And I think you're in real estate,

19   too, right?

20         PROSPECTIVE JUROR:  Actually, I am and I'm not.

21   I'm an office manager for the number one agent for Crye-Leike.

22         MR. W. BAILEY:  Dr. West, how about you, sir?  Can

23   you be fair and impartial?

24         PROSPECTIVE JUROR:  Certainly.

25         MR. W. BAILEY:  Can you call a ball a ball and a

1    strike a strike?

2              PROSPECTIVE JUROR:  Yes, I can.

3              MR. W. BAILEY:  Let me ask you.  You enjoy a

4    unique position in that this case is going to involve medical

5    testimony from experts.  And, of course, you are -- you've had

6    extensive practice in general surgery; is that correct?

7              PROSPECTIVE JUROR:  That's correct, yes, sir.

8              MR. W. BAILEY:  And, of course, you'll be sitting

9    with lay jurors.  And when I say "lay," I mean this is not

10   within their field.  Just like I'm a layperson in terms of the

11   medical field.  Would you use your medical position to make

12   the field unlevel, that is to try and convince them and

13   persuade them based on your own medical knowledge?

14             PROSPECTIVE JUROR:  No, sir.  I think each has to

15   hear his own.

16             MR. W. BAILEY:  And you understand that even

17   though you've got the expertise, you qualify as a medical

18   expert, I mean, that's what you are in surgery.  And a lot of

19   the evidence will center around wound and an analysis of

20   wound.  And, of course, you have a responsibility to listen to

21   the experts as they testify about wound damage on the stand.

22   Would you be inclined to or could you subjugate your own

23   knowledge and listen to them and not try to second-guess those

24   experts?

25             PROSPECTIVE JUROR:  Oh, yes.  I think I would not

1   try to second-guess them.  There's no way to dispel knowledge.

2   You can't set your actual knowledge aside.

3          MR. W. BAILEY:  I understand that.  I understand

4   that.  You're absolutely right.  But would you try to

5   second-guess them and supplant their opinions and what they've

6   said with your own opinion?

7          PROSPECTIVE JUROR:  No, sir.

8          MR. W. BAILEY:  You'd be -- you'd feel locked in

9   by what they would say?

10          PROSPECTIVE JUROR:  I'd feel open to certainly

11   listening to what was presented.

12          MR. W. BAILEY:  Well, as an example, we're going

13   to have forensic pathologists.  And in that context, of

14   course, they're going to talk about the medical proof, their

15   analysis, their diagnoses and their findings.  And the

16   question is can you listen to them and accept their testimony

17   and weigh it, of course His Honor will tell you how you weigh

18   the testimony of expert witnesses, but the point is could you

19   subjugate your own opinion and even though you may disagree

20   with them and accept what they say under the ground rules of

21   how you accept the testimony of expert witnesses?

22          PROSPECTIVE JUROR:  Yes, I could, certainly.

23          MR. W. BAILEY:  We're going to have the testimony,

24   we anticipate, of a psychologist.  And can you listen to the

25   psychological testimony, the expert testimony and evaluate

1   that?

2           PROSPECTIVE JUROR:  Yes, sir.

3           MR. W. BAILEY:  Under the same ground rules of how

4   you evaluate expert testimony?

5           PROSPECTIVE JUROR:  I believe indeed I could.

6           MR. W. BAILEY:  You wouldn't try to second-guess

7   the psychologist?

8           PROSPECTIVE JUROR:  No, sir.

9           MR. W. BAILEY:  Now do you -- could you listen to

10  the other jurors and hear what they've got to say and hold

11  yourself open to be convinced and persuaded by their arguments

12  as well about this case?

13          PROSPECTIVE JUROR:  Yes, I do.  I think certainly

14  I can keep a very open mind.

15          MR. W. BAILEY:  Now let me ask you other jurors,

16  the fact that we would have a physician in the box or in the

17  jury room during deliberations, could the rest of you rely

18  upon your own independent recollection of what the facts were,

19  what was said here on the stand and listen -- and go by the --

20  evaluate this case solely on the presentation of proof by the

21  medical experts that His Honor swore in and allowed to

22  testify?

23          And you understand that anything that the -- Dr. West,

24  if he were chosen, wouldn't be back there as a witness, he'd

25  be back there just as an ordinary common juror.  All of you

1    understand that?  And that you -- you would do us a disservice
2    if you relied on him and his medical opinion.  All of you feel
3    that you could do that?
4              PROSPECTIVE JUROR:  Yes, sir.
5              PROSPECTIVE JUROR:  Yes.
6              MR. W. BAILEY:  Would Your Honor indulge me?
7    Thank you.
8              THE COURT:  Dr. West, you're excused at this time.
9    Thank you, sir, for your participation.  And, Ms. Fite, if you
10   would have a seat behind you, please.
11        All right.  The 12 jurors on the back two rows have now
12   been selected as to the jurors in this case.  We will now
13   select two alternate jurors.  Let me ask Mr. Wade to have a
14   seat on the back row, please, next to Mr. Berry.
15        All right.  Mr. Wade has been selected as alternate
16   number one.  We'll now select alternate number two.
17   Mr. Braddock, if you would have a seat on the back next to
18   Mr. Wade, please.
19        Mr. Braddock, you're excused at this time.  Thank you
20   very much for your participation.  And, Mr. Gillespie, if
21   you'd have a seat on the back row, please, sir.
22              MR. J. BAILEY:  Court indulge us one moment.
23              THE COURT:  All right.  Mr. Gillespie has been
24   chosen as alternate number two.  At this time I'd like to
25   thank Ms. Gray and Ms. Kinard and those of you still in the

audience for your patience today and your willingness to serve on this case, even though you weren't actually called upon. At this time you are all excused.  Please check back tomorrow morning in the large jury room.

All right.  Ladies and gentlemen, we'll stop for the day at this time.  I'll ask you all to be back down here at nine o'clock tomorrow morning.  You do not need to go across the street to the large jury room and check in over there. They know that you've been assigned to this case so just come straight to this building and straight on up to our jury room here on the sixth floor.  Don't linger in the hallway or down in the snack bar or anything of that sort.  When you come in the building, come straight on up the elevator and straight on back to the jury room, please.  Please, bring your suitcases with you tomorrow and we'll swear you in tomorrow morning and we will resume the trial.

So we will see all of you -- and of course as always, do not discuss the case at all tonight with family or friends or tomorrow when you return.  Obviously, you can tell your family that you are on a sequestered jury starting tomorrow and that's why you won't be home tomorrow night, but other than that you cannot discuss the case tonight or anything about the case at all with anybody.

JUROR:  Is it somewhere we can park or we just need to get dropped off?

1          THE COURT:  Best to get dropped off.  Officer

2     Lafferty can answer all those questions for you.  He's had a

3     lot of experience on that.

4          JUROR:  Is there something I can take my employer

5     tonight?

6          THE COURT:  We'll get you something.

7          JUROR:  I am a diabetic so the medicines I usually

8     put -- some of my medicines I put in a pill bottle, my little

9     daily pill thing.  Do I need to bring the original bottles or

10    can I keep them in my container?

11         THE COURT:  I think you can keep them in your

12    container.  I don't -- I can't anticipate a problem getting

13    through security, but if there is I'll come down and make sure

14    that there is no problem.

15         Thank you.  We'll see you tomorrow morning at nine

16    o'clock in the jury room.

17          (Jurors out.)

18         MR. J. BAILEY:  Your Honor, just so we'll have an

19    idea, exactly what time does Your Honor plan for the trial

20    itself to start?

21         THE COURT:  Nine o'clock.

22         MR. J. BAILEY:  Your Honor is not going to call a

23    calendar?

24         THE COURT:  Nine o'clock every morning.  Nine to

25    six will be the hours.

1                MR. W. BAILEY:  On that expert?

2                THE COURT:  You know, my best guess is that we'll

3      need him on Thursday.  And I know you said that's the day

4      that's difficult for him.  I don't know how difficult,

5      difficult is.  But we've got these jurors and we're in the

6      middle of this trial and it's December and I certainly don't

7      want -- I know y'all don't want to keep the jurors any longer

8      than is absolutely necessary.

9           It just looks to me like Thursday is going to be the

10     day we get to the Defense proof.  So if you have other proof

11     you can put on Thursday and call him first thing Friday

12     morning, I don't see us realistically getting through the

13     State's proof early enough on Wednesday to put an expert on of

14     that sort.  And so there is no way that you'll need to have

15     him here Wednesday.  Thursday afternoon would be good.  If he

16     absolutely cannot be here under any circumstances Thursday,

17     then have him here ready to testify first thing Friday

18     morning.

19               MR. J. BAILEY:  We can do that.

20               MR. W. BAILEY:  Very well.

21               THE COURT:  Take him out.

22               MR. W. BAILEY:  We'll plead with him, Judge.

23               THE COURT:  And as soon as I say that, it may be

24     Friday anyway.  So who knows but we do the best we can.  You

25     may adjourn court.

```
 1
 2                    (Court was adjourned until 9 a.m.,
 3                       Tuesday, December 6, 2005.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                         (END OF VOLUME ONE)
```