

W2006-01081-CCA-R3-CD

IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

THE THIRTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE            )          **ORIGINAL**

                             )

vs.                          )          Case No.  05-03038

VERN BRASWELL,               )          FILED  8-16-06

        Defendant.           )          WILLIAM R. KEY, CLERK
                             )          BY  Cleora  D.C.

--------------------------------------------------------

TRANSCRIPT OF EVIDENCE

Volumes 7 of 11 volumes

DECEMBER 5, 2005

--------------------------------------------------------

THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

APPEARANCES

FOR THE STATE:

        BETSY CARNESALE AND AMY WEIRICH
        Assistant District Attorneys General
        District Attorney General's Office
        201 Poplar Avenue - Third Floor
        Memphis, TN  38103

FOR THE DEFENDANT:

        J. BAILEY AND WALTER BAILEY
        Attorneys at Law
        100 North Main - Suite 3002
        Memphis, TN  38103



FILED

NOV 0 2 2006

Clerk of the Courts

                Reported by:
                **Katherine Knowles**
                Court Reporter                Vol. 7

174

## TABLE OF CONTENTS

## VOLUME ONE

|  | PAGE |
|---|---|
| Appearances | 1 |
| Table of Contents | 2 |
| List of Exhibits | 9 |
| Style and Caption | 13 |
| **Monday, December 5, 2005** |  |
| Pre-trial Motions | 14 |
| Voir Dire Examination and Jury Selection | 25 |
| **(VOLUME TWO)** |  |
| **Tuesday, December 6, 2005** |  |
| **VERN BRASWELL** |  |
| Voir Dire Examination (By Mr. J. Bailey) | 185 |
| Jury Sworn | 187 |
| Reading of Indictment and Entry of Plea | 187 |
| Opening Statements (By Ms. Weirich) | 187 |
| Opening Statements (By Mr. W. Bailey) | 192 |
| **STATE'S PROOF** |  |
| **PEARLINE WASHBURN** |  |
| Direct Examination (By Ms. Weirich) | 199 |
| **ANGELA SNYDER** |  |
| Direct Examination (By Ms. Weirich) | 227 |
| **JESSICA GREEN** |  |
| Direct Examination (By Ms. Weirich) | 236 |

TABLE OF CONTENTS

VOLUME ONE

                                                                    PAGE

**ROOSEVELT COLEMAN**

        Direct Examination (By Ms. Weirich)          243
        Cross-Examination (By Mr. J. Bailey)         247


**LIEUTENANT JACKSON**

        Direct Examination (By Ms. Carnesale)        250
        Cross-Examination (By Mr. J. Bailey)         264
        Redirect Examination (By Ms. Carnesale)      270

**BABA TANZY**

        Direct Examination (By Ms. Carnesale)        271
        Cross-Examination (By Mr. W. Bailey)         283


**MATT HAMM**

        Direct Examination (By Ms. Carnesale)        285
        Cross-Examination (By Mr. W. Bailey)         293
        Redirect Examination (By Ms. Carnesale)      295

**OFFICER GALLOWAY**

        Direct Examination (By Ms. Weirich)          296
        Cross-Examination (By Mr. J. Bailey)         308


**SERGEANT KJELLIN**

        Direct Examination (By Ms. Carnesale)        313
        Cross-Examination (By Mr. J. Bailey)         323
        Redirect Examination (By Ms. Carnesale)      328

**SERGEANT MERRITT**

        Direct Examination (By Ms. Weirich)          328

# TABLE OF CONTENTS

## VOLUME ONE

                                                                    PAGE

**LIEUTENANT MILLER**

     Direct Examination (By Ms. Weirich)           362
     Cross-Examination (By Mr. W. Bailey)          368
     Redirect Examination (By Ms. Weirich)         369

**(VOLUME THREE)**

**Wednesday, December 7, 2005**

**DARRELL BURTON**

     Direct Examination (By Ms. Carnesale)         384
     Cross-Examination (By Mr. J. Bailey)          389

**JERRY BROWN**

     Direct Examination (By Ms. Carnesale)         390
     Cross-Examination (By Mr. J. Bailey)          395

**BENJANETTE STURDEVANT**

     Direct Examination (By Ms. Carnesale)         396
     Cross-Examination (By Mr. J. Bailey)          403

**LIEUTENANT MITCHELL**

     Direct Examination (By Ms. Carnesale)         407
     Cross-Examination (By Mr. J. Bailey)          414

Jury-Out Hearing                                    419

**OFFICER FAIR**

     Direct Examination (By Ms. Weirich)           424
     Cross-Examination (By Mr. W. Bailey)          432
     Redirect Examination (By Ms. Weirich)         434

TABLE OF CONTENTS

VOLUME ONE

PAGE

**CAROLYN CHAMBERS**

    Direct Examination (By Ms. Weirich)    435

**OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    444

Jury-Out Hearing

    **OFFICER WALLS**

        Direct Examination (By Ms. Carnesale)    448
        Cross-Examination (By Mr. J. Bailey)    450

**OFFICER WALLS**

    Direct Examination Continued (By Ms. Carnesale)    451
    Cross-Examination (By Mr. W. Bailey)    455

**WILLIAM MANGUM**
    Direct Examination (By Ms. Weirich)    457
    Cross-Examination (By Mr. J. Bailey)    468
    Redirect Examination (By Ms. Weirich)    475
    Recross Examination (By Mr. J. Bailey)    476

**DOCTOR CARTER**

    Direct Examination (By Ms. Carnesale)    478
    Cross-Examination (By Mr. W. Bailey)    518
    Redirect Examination (By Ms. Carnesale)    542

(VOLUME FOUR)

**Thursday, December 8, 2005**

**KRISTIE WOODS**

    Direct Examination (By Ms. Weirich)    563
    Cross-Examination (By Mr. J. Bailey)    618
    Redirect Examination (By Ms. Weirich)    629

1 TABLE OF CONTENTS

2 VOLUME ONE

3 PAGE

4 Jury-Out Hearing

5 **VERA COLE**

6 Direct Examination (By Ms. Weirich)   633
  Cross-Examination (By Mr. W. Bailey)   637
7

8 **MAGRA HARDEN**

9 Direct Examination (By Ms. Weirich)   640
  Cross-Examination (By Mr. W. Bailey)   645
10

11 Court's Ruling   653

12 **KRISTIE WOODS**

13 Redirect Examination Continued (By Ms. Weirich)   658
   Recross Examination (By Mr. J. Bailey)   660
14 Further Redirect Examination (By Ms. Weirich)   662

15 **SHERONDA SMITH**

16 Direct Examination (By Ms. Carnesale)   667
   Cross-Examination (By Mr. J. Bailey)   678
17

18 **VERA COLE**

19 Direct Examination (By Ms. Weirich)   682
   Cross-Examination (By Mr. J. Bailey)   690
20 Redirect Examination (By Ms. Weirich)   693
   Recross Examination (By Mr. J. Bailey)   695
21

22 **MAGRA HARDEN**

23 Direct Examination (By Ms. Weirich)   698
   Cross-Examination (By Mr. W. Bailey)   703
24

25 Motion for Judgment of Acquittal   706

1
                      <u>TABLE OF CONTENTS</u>

2
                          <u>VOLUME ONE</u>

3
                                              <u>PAGE</u>

4
State Rests                                  709

5
**(VOLUME FIVE)**

6
**<u>DEFENSE'S PROOF</u>**

7
**GLEN WRIGHT**

8
      Direct Examination (By Mr. J. Bailey)   722
      Cross-Examination (By Ms. Weirich)     729

9

10
**VERN BRASWELL**

11
      Direct Examination (By Mr. J. Bailey)   730
      Cross-Examination (By Ms. Weirich)     788

12

13
**DOCTOR SCHWARTZ**

14
      Direct Examination (By Mr. W. Bailey)   816

15
Jury-Out Hearing

16
      **DOCTOR SCHWARTZ**

17
      Direct Examination (By Mr. W. Bailey)   826
      Cross-Examination (By Ms. Carnesale)   827
18
      Redirect Examination (By Mr. W. Bailey)  829

19
      Court's Ruling                    835

20
**DOCTOR SCHWARTZ**

21
      Direct Examination Continued (By Mr. W. Bailey)   838

22
Jury-Out Hearing               843

23
**DOCTOR SCHWARTZ**

24
      Direct Examination Continued (By Mr. W. Bailey)  846
      Cross-Examination (By Ms. Carnesale)   847
25
      Redirect Examination (By Mr. W. Bailey)   858
      Recross Examination (By Ms. Carnesale)   858

```
1                    TABLE OF CONTENTS

2                        VOLUME ONE

3                                                      PAGE

4      (VOLUME SIX)

5      Friday, December 9, 2005
```

```
6      Motion for Judgment of Acquittal            872

7      Jury Charge Discussion                      872

8      Defense Rests                               873

9      Closing Arguments (By Ms. Carnesale)        873

10     Closing Arguments (By Mr. W. Bailey)        884

11     Closing Arguments (By Ms. Weirich)          899

12     Jury Charge                                 926

13     Alternates Excused                          941

14     Jury Questions                              942

15     Verdict                                     945

16

17     Certificate of Reporter                     948
```

```
18

19

20

21

22

23

24

25
```

1                          INDEX OF EXHIBITS

2

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 1 | State | Evidence | P. Washburn, photo | 202 |
| 2 | State | Evidence | P. Washburn, photo | 207 |
| 3 | State | ID | P. Washburn, photos | 312 |
| 3 | State | Evidence | Officer Walls, photos | 452 |
| 4 | State | Evidence | P. Washburn, check and letter | 217 |
| 5 | State | Evidence | P. Washburn, money | 218 |
| 6 | State | ID | P. Washburn, note | 218 |
| 6 | State | Evidence | K. Woods, note | 617 |
| 7 | State | ID | P. Washburn, document | 219 |
| 7 | State | Evidence | W. Mangum, document | 467 |
| 8 | State | ID | P. Washburn, document | 219 |
| 8 | State | Evidence | W. Mangum, document | 466 |
| 9 | State | ID | P. Washburn, document | 219 |
| 9 | State | ID | W. Mangum, document | 466 |
| 10 | State | Evidence | A. Snyder, photo | 235 |
| 11 | State | Evidence | J. Green, tape | 241 |
| 12 | State | Evidence | R. Coleman, report | 245 |
| 13 | State | Evidence | Lt. Jackson, sketch | 259 |
| 14 | State | Evidence | B. Tanzy, photo | 278 |
| 15 | State | Evidence | B. Tanzy, photo | 279 |

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 16 | State | Evidence | Officer Galloway, crime scene sketch | 298 |
| 17 | State | Evidence | Officer Galloway, photo | 304 |
| 18 | State | Evidence | Officer Galloway, photo | 304 |
| 19 | State | Evidence | Officer Galloway, photo | 304 |
| 20 | State | Evidence | Officer Galloway, photo | 304 |
| 21 | State | Evidence | Officer Galloway, photo | 304 |
| 22 | State | Evidence | Officer Galloway, photo | 304 |
| 23 | State | Evidence | Officer Galloway, photo | 304 |
| 24 | State | Evidence | Officer Galloway, photo | 304 |
| 25 | State | Evidence | Officer Galloway, two bottles | 308 |
| 26 | State | Evidence | Sgt. Merritt, Advice of Rights form | 335 |

1                           INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE    ID/EVIDENCE    TO/DESCRIPTION        PAGE

4    27    State            Evidence       Sgt. Merritt, CD       358

5    28    State            Evidence       Lt. Miller, statement  365

6    29    State            Evidence       J. Brown, phone record 391

7    30    State            Evidence       B. Sturdevant,         397

8                                          phone records

9    31    State            Evidence       Dr. Carter, photo      483

10   32    State            Evidence       Dr. Carter, photo      485

11   33    State            Evidence       Dr. Carter, photos     489

12   34    State            Evidence       Dr. Carter, photos     489

13   35    State            Evidence       Dr. Carter, photo      491

14   36    State            Evidence       Dr. Carter, necklace   492

15   37    State            Evidence       Dr. Carter, photo      495

16   38    State            Evidence       Dr. Carter, photo      497

17   39    State            Evidence       Dr. Carter, photo      498

18   40    State            Evidence       Dr. Carter, photo      499

19   41    State            Evidence       Dr. Carter, photo      503

20   42    State            Evidence       Dr. Carter, photo      504

21   43    State            Evidence       Dr. Carter, photo      511

22   44    State            Evidence       Dr. Carter, photo      513

23   45    Defense          Evidence       Dr. Carter, photo      525

24   46    State            ID             K. Woods, earrings     618

25   46    State            Evidence       S. Smith, earrings     676

## INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1     THE COURT:  Bring out the defendant, please.

2     MR. J. BAILEY:  Your Honor, may I address the

3 Court?

4     THE COURT:  You may.

5     MR. J. BAILEY:  Prior to our bringing the jury in,

6 may we do a quick voir dire of the defendant, please?

7     THE COURT:  You may.  Step around.

8

9       VERN BRASWELL

10 called as a witness, being first duly sworn, was examined and

11 testified as follows:

12      VOIR DIRE EXAMINATION

13 BY MR. J. BAILEY:

14  Q For the record, would you state your name, please?

15  A Vern Glover Braswell.

16  Q And you are the defendant in the matter of State versus

17 Vern Braswell; is that correct?

18  A Yes.

19  Q Mr. Braswell, over the past almost a year, you've had

20 meetings with me and various other attorneys; is that correct?

21  A That's correct.

22  Q And most recently you've had meetings with myself and

23 law partner and father Walter Bailey; is that correct?

24  A That is correct.

25  Q And is it your decision, sir, to go to trial here today

1    and to stand trial on the charges of murder in the first

2    degree?

3        A    It is.

4        Q    Now I've not communicated any offers from the State to

5    you anyway, but it is your decision not to plead to the Court

6    but to stand trial and have a jury make the decision; is that

7    correct?

8        A    It is.

9        Q    And likewise, sir, we've discussed with you your right

10   to remain silent and your right to not be compelled to testify

11   against yourself; is that correct?

12       A    That is correct.

13       Q    And after discussing the matter with us, is it likewise

14   your voluntary decision that you will take the stand in this

15   case?

16       A    That's correct.

17            MR. J. BAILEY:  Thank you, Your Honor.

18            THE COURT:  Step down.

19            MR. W. BAILEY:  Your Honor, one other housekeeping

20   matter.  I spoke with Dr. Schwartz and he can come in on

21   Thursday.

22            THE COURT:  Okay.  Good.  Thank you.  Bring in the

23   jury, please.

24            MR. J. BAILEY:  Your Honor, one thing before the

25   jury comes in, which is there are people here who weren't here

1    yesterday so we call for the rule.

2              THE COURT:  The rule is in effect.  Both sides

3    need to be aware of that.

4              MS. WEIRICH:  On that note, could we approach,

5    Judge?

6              THE COURT:  You may.

7                   (Bench conference commenced.)

8              MS. WEIRICH:  We had subpoenaed Mary Wallace, the

9    defendant's mother.  I've never met her.  I don't know if

10   she's in the courtroom or not.

11             MR. J. BAILEY:  She is in the courtroom.

12             MS. WEIRICH:  If she could please be excused?

13             THE COURT:  Is she a fact witness?

14             MS. WEIRICH:  Yes, sir.

15             THE COURT:  She will need to be excused until she

16   testifies.

17             MR. J. BAILEY:  Yes, sir.

18                  (Said bench conference concluded.)

19             (Jury present.)

20             THE COURT:  Good morning, ladies and gentlemen.

21   Let me first ask you to stand and raise your right hands to be

22   sworn in as jurors and alternate jurors in this cause.

23                        (Jury sworn.)

24             THE COURT:  Thank you.  You may be seated.

25   Ms. Carnesale, you may read the indictment.

1     (Indictment read by Ms. Carnesale.)

2    (Plea of not guilty entered by Mr. J. Bailey.)

3     THE COURT:  Opening statements, Ms. Weirich.

4    MS. WEIRICH:  Thank you, Your Honor.  Sometimes

5 things aren't as they seem.  Sometimes things might appear one

6 way but as you delve deeper into them, you find the opposite

7 to be true.

8    On November 5th, 2004, dispatchers with the 911

9 Communications Bureau in this building received a call around

10 four o'clock in the morning.  It was a call from the

11 defendant, indicating that his wife was in the tub and wasn't

12 breathing.  The 911 dispatcher, who you will hear from and

13 you'll listen to the tape, asked repeatedly for the defendant

14 to get his wife out of the tub.  He either couldn't do it or

15 wouldn't do it, but the phone call goes on for some minutes

16 while the dispatcher is trying to calm the defendant, trying

17 to plead with him to get Sheila Braswell out of the tub that

18 became her grave that morning.

19    Fire personnel are dispatched and sent to the home of

20 the defendant, the victim and their two children.

21     THE COURT:  Excuse me.

22     CAMERAMAN:  I am going to fix the TV.

23     THE COURT:  Well, we can do it later.  Thank you.

24    MS. WEIRICH:  When they arrived, they find the

25 defendant standing at the front door.  He motions them back to

1   the bedroom, shows them where the bathroom is and they find

2   her dead, stiff body.  They try to resuscitate her.  It's all

3   to no avail.

4        By this time officers of the Memphis Police Department

5   are arriving.  There are paramedics on the scene.  The

6   defendant has called various friends; some close to him,

7   others you would categorize as casual acquaintances, but he's

8   been calling and calling and calling and calling these people

9   throughout the morning.  And you'll listen to people from the

10  Bellsouth records keeping department, the Nextel records

11  keeping department.  And you'll hear from some of these people

12  that he called.  Yes, they knew the defendant.  They didn't

13  know his wife.  They weren't real close to him, hadn't seen

14  him in a while.  They weren't really sure why he was calling

15  them at four o'clock in the morning to tell them his wife was

16  dead.

17       All of these law enforcement personnel are in the home.

18  The defendant eventually gets around to calling Pearline

19  Washburn.  And you'll hear from Ms. Washburn in a moment.

20  She's the mother of Sheila Braswell.  She comes to the house,

21  along with other family members.  And the officers and the

22  personnel are talking to the defendant.  What happened?  How

23  did this petite, otherwise healthy looking woman wind up dead

24  in the bathtub?

25       Well, says the defendant, many times that morning and

1 many times to follow to anyone that would ask, we were having

2 sex around 1:30 in the morning.  We went to bed.  She got up

3 to take a bath.  I went to sleep.  Around 3:30 or 3:45 I woke

4 up, she was floating in the tub, stone cold dead.  I don't

5 know what happened.  Sometimes things aren't as they seem

6 though.

7   The paramedics that were on the scene that you'll hear

8 from and the fire personnel, who are trained to save lives,

9 noticed hemorrhaging, the tops of the eyes of Sheila Braswell.

10 They noticed discoloration around her neck.  And the water in

11 the tub was very warm, warm enough at four o'clock in the

12 morning for an adult to get in and take a bath.  It didn't

13 feel like water that had been sitting there for two and a half

14 hours.  You don't see hemorrhaging in the eyes of a drowning

15 victim.  Sometimes things just aren't as they seem.

16   Sheila Braswell's body is transported to the Regional

17 Forensic Center.  An autopsy is performed.  You'll hear from

18 the medical examiners who performed that autopsy.  You'll see

19 pictures.  You'll hear them describe the process of cutting

20 open a dead body to try to determine what went wrong.  They'll

21 tell you that the cause of death wasn't drowning.  It was

22 manual strangulation.  The defendant held his hands around her

23 neck as long and as hard as he needed to, to make sure all of

24 her life was taken from her.

25   After that ruling from the medical examiner's office,

1    the defendant was arrested the next day.  He was at a football

2    game.  He was taken into custody by the Memphis Police

3    Department Homicide Bureau.  And then the police department

4    went to work, trying to figure out why something -- why

5    something that seemed to be one thing was turning into

6    something else, why something that seemed to just be an

7    accidental horrible death of a young lady was taking the curve

8    into a homicide investigation.  And the detectives who you'll

9    hear from began doing their job, the job we want them to do,

10   the job we pay them to do, the job they take very seriously.

11        They found out that the defendant had a girlfriend,

12   Kristie Woods, a young nurse.  You'll hear from Ms. Woods.

13   She never would come in and talk to the police, but you'll

14   hear from her this week.  They found out that Ms. Sheila

15   Braswell had filed for divorce, but yet she was still living

16   in the home and yes, they were lopsided between trying to

17   reconcile and trying -- she was lopsided between trying to

18   reconcile her marriage, trying to keep it together and trying

19   to break free.

20        You'll hear that Sheila Braswell and the defendant's

21   girlfriend had a meeting.  They met face-to-face.  You'll hear

22   that the defendant appeared to live one life but in actuality

23   was living another.  Sometimes things aren't as they seem.

24        And you'll hear that just like the morning of November

25   5th, 2004, when he squeezed her neck as long and as hard as he

1   needed to, to kill her, he had done it before in 1996 when

2   they lived in Millington.  Police were called.  Pictures were

3   taken.  He got mad at Sheila Braswell and choked her.

4           And you'll hear from Kristie Woods that in June of

5   2004, around September/October 2004, he got mad at her, too.

6   And on both those occasions, he put his hands around her neck

7   and choked her to get the message across.

8           He got the message across to Sheila Braswell in the

9   early morning hours of November 5th, 2004, when her bathtub

10  became her grave.  At the end of this trial, we will ask you

11  to convict the defendant of what he did, murder in the first

12  degree.

13          THE COURT:  Mr. Bailey.

14          MR. W. BAILEY:  Thank you.  May it please, Your

15  Honor, ladies and gentlemen of the jury, let me first make a

16  point.  This is opening statement.  This is not the

17  presentation of evidence.  And I want to caution you again,

18  that I wasn't there on the night that Ms. Sheila Braswell

19  died.  Neither were the prosecutors.  We don't know what

20  occurred.  That's going to be an area in which you, ladies and

21  gentlemen, will have the function and duty of determining.

22          This phase of the trial is known as the opening

23  statement for one purpose.  And that purpose is for not -- is

24  not for us to try and convince or persuade you.  We do that

25  during the closing arguments.  The purpose of the opening

1    statement is to give you an outline of what we lawyers --

2    that's all we are in this trial, we're lawyers, we're not

3    witnesses -- what we lawyers think and anticipate the proof

4    will show.  That's all we're doing in an opening statement.

5    And you're not to -- and I want to caution you again not to

6    start making up your mind, forming opinions, taking sides

7    until you've heard the proof.  Sometimes as human beings we

8    can do that as the trial develops.

9        Now, I like to use the opening statement as a -- as an

10   outline or as a preview to a movie, as an example, to explain

11   to you how -- what our spin is in terms of how this trial is

12   going to develop.  Now one of the things that we know is that

13   Mr. Braswell had a history in which he sought an education to

14   the extent of going to Memphis State University -- or

15   University of Memphis.  You can tell my age because I still

16   refer to it as Memphis State University.

17       But in any event, he went on and obtained a degree in

18   education where he became a school teacher back in 1994,

19   public servant, dedicated law-committed public servant.  He

20   also went a little further and got his master's degree at the

21   University of Memphis.  In the interim, in the meantime, he

22   and Mrs. Sheila Braswell had married and had two lovely

23   children.

24       The Braswells were an adventure-seeking couple.  You'll

25   find that their adventure seeking included motorbike riding

1    and cliff jumping.   But in addition to that, their thrill

2    seeking experiences also included kinky sex.   And again, this

3    is not a case or trial about the morality of what they did

4    sexually.   That's up to them in the confines of their bedroom.

5    You're here to look at it and we're here to expose it because

6    he's charged with murder in the first degree.

7          As part of that kinky sex experience of theirs, they

8    got turned on to an experience called asphyxiation or

9    asphyxiafilia.   That means getting the maximum arousal out of

10   your sexual experience through choking.   And you're going to

11   hear that though it's not widespread, it's something that

12   occurs.   And you'll hear that from the medical examiner that

13   it's done in two ways.   One way is called autoasphyxiation,

14   which means that a person, proof will show, chokes him or

15   herself with a restraining device such as a belt or -- the

16   belt or a loop of a bathrobe or cord or other devices that one

17   can wrap around his or her throat and gain a state of

18   euphoria, that means a state of giddiness or light-headedness

19   while you -- the party is indulging him or herself

20   individually through masturbation.

21         The other form is when you do it as a couple.   And

22   that's called erotic asphyxiation, which you're going to hear

23   from, from a well-known national sex expert.   And in this

24   erotic asphyxiation, again the object simply being to gain the

25   highest arousal that one can possibly achieve through being

1   giddy or light-headed while you're having sex, undergoing

2   choking.

3        Now it's a very risky sexual experience but the parties

4   again, not passing any judgment on morality or what they do in

5   their bedroom, but the parties assume that risk.  They take

6   that risk.  They share that risk.  And let me quickly point

7   out and hasten and say with emphasis that as part of that

8   erotic asphyxia experience, it's no intent on the part of

9   either party for a death to result.  The death results

10  accidentally as it did in this case.

11       There were numerous case reports about autoasphyxiation

12  where a person is choking him or herself and death results.

13  And there are cases in which couples are involved and death

14  results.  But the parties themselves willingly and

15  consensually -- just like they consensually are having sex --

16  they consensually get involved in this process.

17       Now one thing that leaps out at you is that when the

18  couples are involved, the proof will show that there is no

19  intent of premeditation for a death to result.  Nobody wants

20  to murder and nobody wants to be murdered on that flip side.

21  The person who is being choked doesn't anticipate dying, and

22  the person doing the choking doesn't anticipate killing.

23  That's not part of the sexual experience.

24       Now it's our contention that the proof is going to show

25  that these parties had been indulging in this sexual activity

1    for over a span of about two or three years.  They have been

2    doing it a long time.  This wasn't any fly-by-night or recent

3    experience on the part of the Braswells.  And you might not

4    like, as the proof will show, what they did in terms of this

5    risky sexual escapade, this kinky sex of theirs, this kinky

6    way they had of expressing themselves.  But that's not what

7    you're here for, to pass judgment on that.  They're not

8    seeking -- this is not a moral-approval trial.  You're here to

9    see one thing, whether she died from an accidental choking or

10   whether that choking resulted with premeditation and

11   intentional.

12        Now there are certain things that we promised you and

13   certain things you've committed yourselves to do.  And one was

14   which that you said that you would abide by the rule of

15   presumption of innocence.  And we feel that the proof is going

16   to show that not only does Mr. Braswell maintain that -- and

17   is draped in that presumption of innocence right now, but when

18   all of the proof is in, the proof is going to show that he

19   still remains intact with that presumption of innocence.

20        Now one thing I've -- I do want to point out is that

21   the proof is going to show that he had a girlfriend.  But the

22   proof also is going to show that Mr. Braswell and his

23   girlfriend Ms. Woods themselves indulged that asphyxiated

24   sexual erotic experience, that they were somewhat involved in

25   the practice.  You're going to hear that the practice occurred

1    between them at odd places, between Mr. Braswell and

2    Ms. Woods, the girlfriend.  But again, you're not here to

3    evaluate and pass judgment on his having a girlfriend.  That's

4    not the question before you.  That's not your concern.  And

5    the reason we're talking about the girlfriend in terms of what

6    the proof is going to show is because it will show you -- it

7    will open up more, this whole weird or kinky world of

8    asphyxiation.

9        Now the proof is going to show, we don't deny it, that

10   after he discovered that she, Ms. Sheila Braswell, was in

11   distress and he couldn't revive her, that she had passed

12   beyond revival in terms of she was dead, that the normal

13   signals that she would give in terms of for him to release her

14   from a choke-hold position weren't given.  And that's when he

15   released her and determined that she had been fatally -- or

16   had reached a point of fatality.  But again, it may have been

17   bad judgment, the proof is going to show, but not anything

18   intentional as part of the erotic experience that they

19   themselves employed and underwent, that they enjoyed in the

20   comforts of their home.  Might be weird, might be kinky.

21   That's what they did.

22       Now he panicked.  And he did make several phone calls.

23   He called everybody in the world that he could think of.  And

24   you'll find though that his behavior wasn't consistent with

25   somebody who had just committed murder, that his behavior and

1    his conduct after he discovered that Ms. Sheila Braswell was

2    dead was consistent with a person who himself was in a state

3    of bereavement, distress, and didn't know what to do but call

4    around and call around and call around.  This was no cool and

5    deliberate cold and calculated man.  This man was in a state

6    of bewilderment, in a state of distress.

7        And you'll find that he may not have been totally

8    candid with the police.  He didn't want to share, the proof --

9    is going to show -- this kinky side of their lifestyle.  So he

10   wasn't candid about it after the police did the investigation.

11   But that's not what he's charged with.  He's not charged with

12   not being perfectly candid with the police.  He's charged with

13   premeditation and an intentional killing.

14       Now let me, before I sit, explain to you that I always

15   like to look upon the courtroom with a tree in the middle of

16   it.  And that's that tree of reasonable doubt.  And it's our

17   position that unless that tree is moved by the prosecutor with

18   proof, cogent and convincing proof, not speculation and

19   conjecture, but proof beyond a reasonable doubt that as long

20   as that tree sits there and is not removed by proof beyond a

21   reasonable doubt, then your mission is going to be clear.

22   Your duty will be without confusion.  It will be one of not

23   guilty.

24       Now I'm going to sit and then of course we'll start

25   putting on proof.  And I want to again say to you

1   respectfully, please don't take anything that I've said as

2   proof in this case because I wasn't there.  But conversely,

3   don't take anything this fine prosecutor had to say in her

4   opening statement as proof because she wasn't there either.

5   She doesn't know anymore about this case as I told you during

6   voir dire than you ladies and gentlemen.  She's got a theory.

7   And that's all it is, a theory, an educated guess.  I

8   appreciate your indulgence and thank you very much.

9               THE COURT:  Call your first witness.

10              MS. WEIRICH:  Thank you.  State calls

11   Pearline Washburn.

12

13                    PEARLINE WASHBURN

14   called as a witness, being first duly sworn, was examined and

15   testified as follows:

16                    DIRECT EXAMINATION

17   BY MS. WEIRICH:

18     Q     Good morning.

19     A     Good morning.

20     Q     Would you, please, tell the jury your name?

21     A     Pearline Washburn.

22     Q     Could you spell your first and last names for the court

23   reporter?

24     A     P-E-A-R-L-I-N-E.  W-A-S-H-B-U-R-N.

25     Q     Do you live in Memphis, Tennessee?

```
 1      A      Yes, I do.

 2      Q      Where do you work?

 3      A      First Tennessee.

 4      Q      How long have you worked there?

 5      A      34 and a half years.

 6      Q      What do you do at First Tennessee?

 7      A      Relationship manager.

 8      Q      Is that the job you've held for 34 and a half years?

 9      A      No.  That particular job has been about the last five

10   years.

11      Q      Okay.  Do you know Sheila Braswell?

12      A      Yes.

13      Q      How do you know her?

14      A      Sheila was my daughter.

15      Q      When was she born?

16      A      August 28th, 1970 -- '72.

17      Q      Has she died?

18      A      Yes.

19      Q      When did she die?

20      A      November 5th, 2004.

21      Q      Was there a funeral?

22      A      Yes.

23      Q      Do you remember what day that was?

24      A      Thursday, November -- it was Veteran's Day, the

25   following week, the following Thursday.
```

1    Q    Was it here in Memphis?

2    A    Yes.

3    Q    I pass you a picture.

4          MS. WEIRICH:  Your Honor, may I approach the DOAR?

5          THE COURT:  You may.

6    Q    Do you recognize that?

7    A    Yes.

8    Q    What is it?

9    A    It's a picture of Sheila that was taken at my wedding,

10 April 5th, 2003.

11    Q    April 5th, 2003?

12    A    Yes.

13    Q    Before November 5th, 2004, when was the last time you

14 saw your daughter?

15    A    Tuesday, November 2nd.

16    Q    Did she come to your work?

17    A    Yes.

18    Q    At the time of her death was she married?

19    A    Yes.

20    Q    Who was she married to?

21    A    Vern Braswell.

22    Q    Do you see him in the courtroom this morning?

23    A    Yes.

24    Q    Would you point to him for me, please, and tell me what

25 he's wearing?

1    A    He has on a suit.

2              MR. J. BAILEY:  Your Honor, I stipulate this is

3    Mr. Vern Braswell.

4              THE COURT:  All right.

5    Q    How long were they married?

6    A    Ten years.

7              MS. WEIRICH:  Your Honor, at this time I'd ask

8    that photograph be marked Exhibit 1.

9              MR. J. BAILEY:  No objection.

10             THE COURT:  All right.

11             (Exhibit No. 1 was marked and filed.)

12             MS. WEIRICH:  May I publish it?

13             THE COURT:  You may.

14   Q    You said they had been married for ten years?

15   A    Yes.

16   Q    At the time of her death?

17   A    Yes.

18   Q    Did they have children?

19   A    Yes.

20   Q    How many?

21   A    Two boys.

22   Q    What are their ages?

23   A    Eight and six.

24   Q    What are their names?

25   A    William and Miles.

1    Q    Did Sheila work?

2    A    Yes.

3    Q    What did she do for a living?

4    A    She was a physical therapy assistant and an

5    occupational therapist.

6    Q    Did she attend school to obtain those jobs?

7    A    Yes, she attended Shelby State for her PTA and UT

8    Memphis for her occupational therapist degree.

9    Q    And when did she obtain her occupational therapist

10   degree?

11   A    December 1995.

12   Q    Where did she work?

13   A    For TLC, Tender Loving Care on Sycamore View off of

14   Macon Road in Memphis.

15   Q    Did she enjoy her work?

16   A    Very much so.

17   Q    I want to turn you back to November 5th, 2004.  Were

18   you home the early morning hours of that day?

19   A    Yes.

20   Q    Were you asleep?

21   A    Yes.

22   Q    Who was home with you?

23   A    My husband and my nephew Sammy.

24   Q    Are they in the courtroom today?

25   A    My husband is.

1   Q    Okay.  Did you get a phone call?

2   A    Yes.

3   Q    Do you remember what time it was?

4   A    According to my clock 4:34.

5   Q    Who was it?

6   A    Vern.

7   Q    The defendant?

8   A    Yes.

9   Q    What did he tell you?

10   A    He told me that Sheila was not breathing and I said,

11   Vern, call 911.  He said I have and I said well what's wrong?

12   And he said that he had fallen asleep around 1:30 and when he

13   woke at 3:30, he found her floating in the tub of their home.

14   Q    What did you do when he told you that?

15   A    My husband and I got dressed and proceeded to go to

16   their home in Cordova.

17   Q    And was their home in Shelby County, Tennessee?

18   A    Yes.

19   Q    When you got there, who was there?

20   A    Well, there was several emergency vehicles that were

21   outside the home.  There were several cars.  And as my husband

22   and I entered the house, I met my son in the hallway.  And he

23   told me that --

24        MR. J. BAILEY:  Object to the hearsay.

25        THE COURT:  Overruled.

1    Q    Thank you.  What did he tell you?

2    A    He told me that he couldn't -- they wouldn't let him

3  see his sister and that he couldn't cry.  He was just numb

4  because we were just taken back that it -- that we had gotten

5  that phone call and that it had happened.

6    Q    You said there were many cars in the driveway.  Were

7  there -- were there fire trucks there?  Do you remember?  Were

8  there ambulances?  Were there police cars?

9    A    There were police cars.  There was an ambulance there.

10  I don't recall if the fire department was there or not.  I

11  just remember the red lights flashing.

12    Q    Okay.  Were most of the people inside of the home

13  wearing some type of law enforcement uniform?

14    A    A couple of them I think they did.

15    Q    Okay.  Were there other friends and family there by the

16  time you got there?

17    A    Yes.

18    Q    You said your son was there?

19    A    Yes.

20    Q    Who else was there that was not a law enforcement

21  personnel, if you remember?

22    A    There was a gentleman there by the name of Brian but I

23  was not familiar with Brian.  Vern's mother Mrs. Wallace was

24  there.  His Aunt Linda was there.  And Vern.  Those were the

25  only ones I remember there at that time.

1    Q    Okay.  When you arrived where was the defendant?

2    A    Sitting on the sofa in the living room.

3    Q    What was he wearing?

4    A    A white terry cloth robe that was wet.

5    Q    Okay.  How do you remember that it was wet?

6    A    Because when I sat beside him, I was holding his hand

7    because I sat beside him to ask him what happened.  And I felt

8    the robe -- the robe was wet when I -- my hand was beside his

9    leg and my leg.

10   Q    Okay.  Was he crying?

11   A    Yes.

12   Q    Okay.  Was he able to talk or was he too upset to talk?

13   A    He was talking and he was babbling that he kept saying

14   I should have never let her get in the tub.  I should have

15   never let her get in the tub.  And I -- I wasn't understanding

16   why he was saying that.

17   Q    Okay.

18   A    And I asked him what happened.  And he told me that

19   they had had casual sex around 1:30 and he had fallen asleep

20   and when he woke up around 3:30, that was when he found her

21   floating in the tub.  And he said sometimes after sex her hip

22   would kind of contract and she would get in the tub to kind of

23   turn the jets on to kind of ease the muscles.  But he said

24   that was -- that was often.  She did that often so I couldn't

25   understand why he kept saying I should have never let her get

1    in the tub because if that's what she normally did why was

2    this time so different.   I just couldn't visualize the

3    differences.

4        Q    I'm going to pass you another picture, Ms. Washburn.

5    Do you recognize that?

6        A    Yes.

7        Q    What is it?

8        A    It's the tub in their home.

9        Q    The tub in their bedroom?

10       A    In the bathroom off of the bedroom.

11       Q    That's the defendant and Sheila Braswell's bathtub?

12       A    Yes.

13            MS. WEIRICH:   Judge, at this time I'd ask that be

14   moved into evidence as Exhibit 2.

15            THE COURT:   All right.

16            (Exhibit No. 2 was marked and filed.)

17            MS. WEIRICH:   May I publish it?

18            THE COURT:   You may.

19       Q    Would you say that this is a normal bathroom bathtub?

20       A    It's a little oversized.   I mean, it's --

21       Q    How oversized?

22       A    It's not a jacuzzi tub itself.   It has the jacuzzi

23   flasks, but it's not a traditional jacuzzi that's up high and

24   all of the different flasks around it or jets around it.

25       Q    How big was your daughter?

1    A    4-11, about 125, 130.

2    Q    Not very big?

3    A    No, she was very small in stature.

4    Q    In the top corner of that picture, are those

5    eyeglasses?

6    A    Yes.

7    Q    Whose eyeglasses are those?

8    A    Sheila's.

9    Q    Okay.  Did she wear those often or seldom?

10   A    24 hours, seven days a week.

11   Q    The picture that the jury just saw of Ms. Braswell from

12   your wedding day, she's not wearing them?

13   A    No.

14   Q    What was the difference that day?

15   A    She had contacts in that day.

16   Q    Okay.  But normally she wore what?

17   A    She wore her glasses.  She slept in them.  They were

18   with her 24 hours a day.  Her vision was not very, very strong

19   so she basically slept in them at all times so wore them at

20   all times.

21   Q    Okay.  Had you ever seen the defendant carry his wife?

22   A    You mean pick her up?

23   Q    Lift her up?  Hold her?

24   A    Yeah.

25   Q    He was able to do that?

1    A    Yes.

2    Q    There was nothing about her size or weight that limited

3    him from being able to carry her or lift her?

4    A    No.

5    Q    When had you seen him do that?

6    A    During her pregnancies and then horsing around, horsing

7    around joking.  You know, we play around.

8    Q    Okay.  How long did you stay at the house that morning?

9    A    I think it was probably around 7:30 when we left

10   because my parents were not aware of what had happened because

11   I -- I couldn't call them over the phone to tell them so my

12   husband and I left her home to drive to South Memphis to tell

13   my parents.

14   Q    When you say "you couldn't tell them over the phone,"

15   was there a phone to use that you just didn't want to tell

16   them over the phone?

17   A    Yes.

18   Q    Are they elderly?

19   A    Yes.

20   Q    In the time that you were there, you said that you

21   first got the call at 4:30 in the morning.  What time did you

22   arrive at the house?

23   A    From my home to their home is probably a 20- 25-minute

24   drive so shortly after five or thereabout.

25   Q    So for two and a half hours while you were there, did

1    other people come and go from the house?

2        A    Yes.

3        Q    Who else came and went?

4        A    There was some other people that had come in that I

5    assume they had gotten phone calls because they showed up

6    shortly after we arrived.

7        Q    Did you know any of the people?

8        A    Some of them -- well, I don't remember -- there was a

9    lady there that I did not know, but I've later learned who she

10   was but I did not know her at the time.

11       Q    All right.  When you left around 7:30 was the defendant

12   still there?

13       A    I think he had just left to go downtown to make a

14   statement just prior to us leaving.

15       Q    With the police?

16       A    Well, my son drove him down.

17       Q    He wasn't handcuffed?

18       A    No.

19       Q    He wasn't put in the back of a squad car?

20       A    No, he got dressed and went downtown.

21       Q    Okay.  At the time of her death had your daughter filed

22   for divorce?

23       A    Yes.

24       Q    Do you know when she filed?

25       A    June of 2004.

1   Q   Who was her attorney?

2   A   Attorney Sossaman.

3   Q   But she was still living in the home with the

4   defendant?

5   A   Yes.

6   Q   Were they trying to reconcile or do you know?

7   A   I really don't know.

8   Q   What did the defendant do for a living?

9   A   Taught with the Memphis City School system, assigned to

10   Hanley Elementary School.

11   Q   Did he have any other job interests?

12   A   Yes.  There was a recycling business and there was a

13   business on Mt. Moriah that was sort of a club environment of

14   some sort, venture that he was in.

15   Q   What type of club?  Do you know?

16   A   I don't really know.

17   Q   Okay.  Do you remember the name of it?

18   A   Had an initial R, but I can't remember right now.

19   Q   All right.  Did your daughter ride motorcycles?

20   A   Not really.  She had ridden with him before but she

21   does not --

22   Q   Did she have her own?

23   A   She did not have her personal motorcycle.

24   Q   Okay.  They didn't go out riding a lot together?

25   A   Not a lot, to my knowledge.

1    Q    I'm going to pass you two other pictures.  Do you

2    recognize who is in that photograph or those photographs?

3    A    Yes.

4    Q    Who is it?

5    A    Sheila.

6    Q    Okay.

7                MS. WEIRICH:  Judge, if we could have those marked

8    for identification purposes.

9                MR. J. BAILEY:  Identification.

10               THE COURT:  ID only.

11        (Exhibit No. 3 was marked for identification.)

12    Q    Did the defendant and your daughter ever live in

13   Millington?

14    A    Yes.

15    Q    When was that?

16    A    When they first got married.

17    Q    And how long did they live there?

18    A    Two or three years maybe.

19    Q    After you went to tell your parents that their

20   granddaughter was dead, did you go back to your daughter's

21   home or did you go to your home?

22    A    I stayed at my mother's home, and I called my nephew at

23   home to tell him what had happened and we sent for him to come

24   to my parents' home.

25    Q    So you could tell him in person?

1    A    Well, I had to tell him over the phone because the

2    phones had started ringing constantly and I knew someone was

3    going to call him and tell him over the phone so I had to tell

4    him over the phone.

5    Q    Okay.  Did you at some point in the days that followed

6    go back to your daughter's house and start looking through

7    things?

8    A    The next -- the next day we went back to their home

9    after we had found out the second day what had happened

10   because we didn't have her purse or ID or anything because she

11   was on my checking and savings account and I was on hers and I

12   knew that a lot of people had been in and out of the house and

13   I didn't know if it was secure or what have you so we went

14   that Saturday night to her home and I removed personal items,

15   her purse and her computer and some clothes for the boys.

16   Q    Okay.

17   A    And there was some mail that was in a bag that I took

18   with me also.

19   Q    All right.  Did you also find some items that you

20   turned over to the police department?

21   A    Yes.

22   Q    Where did you find those items?

23   A    In the bag that was -- that had mail in it.

24   Q    Where was that bag?

25   A    In the kitchen on a little table.

1    Q     What did you find in there?

2    A     A copy of the divorce decree.  There was a piece of

3    paper that had some writing across the top of it that had $100

4    bill and a $20 bill in it.  There's another document.  A

5    document that she had filed for order of protection in '96,

6    April of '96.

7    Q     Okay.  I'm going to pass you some things.

8              MR. J. BAILEY:  Your Honor, may we approach?

9              THE COURT:  You may.

10             (Bench conference commenced.)

11             MR. J. BAILEY:  Pass to the Court the items that I

12   received from the State to view.  At this time we object to

13   any testimony from these.  This witness can't authenticate

14   these copies.  She did not publish them.  She did not write

15   them.  And unless she can say she saw them when they were

16   filled out, then, you know, it would all be hearsay.

17             MS. WEIRICH:  Well, she can and she did see them

18   filled out.  I'm not going to move them into evidence through

19   her anyway.  I'm going to call the clerks later on to

20   authenticate that these are the documents she found.

21             MR. W. BAILEY:  Just for identification?

22             MS. WEIRICH:  Those two documents right here.

23             MR. J. BAILEY:  If it's just for identification

24   then, okay.

25             MS. WEIRICH:  Those are (indiscernible) that she

1    found.   There's a note and there's some money and a check and

2    a letter to the divorce attorney or from a divorce attorney,

3    rather.

4            THE COURT:  Okay.  All for ID at this point in

5    time?

6            MS. WEIRICH:  No, sir.  Those two are evidence

7    and --

8            MR. J. BAILEY:  I object to those on the same

9    grounds.  That's something she found in her home and in her

10    daughter's purse.  She doesn't know -- she can't authenticate

11    these documents.

12            MS. WEIRICH:  She recognizes that as her

13    daughter's writing and she knows that's the attorney.  That

14    money was found with this.

15            THE COURT:  It's $100 bill and a $20 bill in

16    there.

17            MS. WEIRICH:  There will later be testimony from

18    Kristie Woods, the girlfriend, that she slashed the victim's

19    tires and then felt bad about it and went back and left this

20    money and that note on the windshield of the victim.

21            MR. J. BAILEY:  Then she needs to authenticate it

22    and get it in through Kristie Woods, not this witness.

23            THE COURT:  Well, I'll allow you to introduce it

24    for ID purposes that she located it, but I think Mr. Bailey is

25    right, it should come in actually into evidence through

1    Kristie Woods.  Do you plan to call Mr. Sossaman?

2              MS. WEIRICH:  No, sir.  I plan to call the --

3              MR. J. BAILEY:  I do.

4              MS. WEIRICH:  Well, if he plans to call him, that

5    takes care of it.

6              THE COURT:  You do plan to call Mr. Sossaman?

7              MR. J. BAILEY:  Yes.

8              THE COURT:  Well, I'll allow this to come into

9    evidence at this time, subject to your ability to ask him

10   about it.  I suppose you can ask him about it.  So this can

11   come in.  The rest of it can come in for ID purposes at this

12   time.

13             MR. J. BAILEY:  Thank you, Judge.

14             (Said bench conference concluded.)

15   Q    Ms. Washburn, I'm going to pass you right now while I

16   get the rest of this organized, pass you this envelope, ask

17   you to look inside it, please.  Do you recognize it?

18   A    Yes.

19   Q    What is it?

20   A    It's a check attached to a final payment to Dennis

21   Sossaman.

22   Q    And who is Dennis Sossaman?

23   A    The divorce attorney.

24   Q    For your daughter?

25   A    Yes.

1    Q    And is the check -- whose writing is the check in?

2    A    Sheila's.

3    Q    Okay.  Is it -- what amount is it made out to?

4    A    $288.50.

5    Q    Were those some of the things you found that day in

6    your daughter's bag?

7    A    Yes.

8    Q    All right.  I'm going to pass you --

9         MS. WEIRICH:  Your Honor, if we could ask that be

10   marked as Exhibit 4.

11        THE COURT:  All right.

12        (Exhibit No. 4 was marked and filed.)

13   Q    I pass you another envelope.  Do you recognize what's

14   in there?

15   A    Yes.

16   Q    What is it?

17   A    $100 bill and a $20 bill.

18   Q    Where did you find that?

19   A    In the papers that I -- it was in the same bag that I

20   had.

21   Q    The bag of your daughter's?

22   A    Yes.

23        MS. WEIRICH:  Judge, if we could have that marked

24   as Exhibit 5.

25        THE COURT:  Okay.

1          (Exhibit No. 5 was marked and filed.)

2     Q     There is another Manila envelope, Ms. Washburn.  Do you

3     recognize that?

4     A     Yes.

5     Q     Was that located with the money that you've just

6     identified?

7     A     Yes, the two bills were inserted inside of this and in

8     this envelope.

9     Q     And again where was that found?

10    A     It was with her papers.

11          MS. WEIRICH:  Judge, I'd ask that be marked for ID

12    purposes only at this time as Exhibit 6.

13          THE COURT:  All right.

14          (Exhibit No. 6 was marked for identification.)

15    Q     I'm going to pass you two legal-size documents and one

16    letter-size document and ask you to look at those, Ms.

17    Washburn.  Do you recognize those?

18    A     Yes.

19    Q     Did you locate those with your daughter's belongings at

20    her home shortly after her death?

21    A     Yes.

22    Q     Did you in fact for the preparation of the documents on

23    the long pieces of paper, did you go with her when those

24    documents were prepared?

25    A     Yes.

1    Q    All right.  Do you remember when that was?

2    A    April of '96.

3    Q    Where did you go?

4    A    It was one of the courthouses.  I don't remember the

5    room or anything.

6    Q    Do you remember if it was this courthouse or the

7    courthouse across the street?

8    A    It was across the street.  It was not this one.

9    Q    Thank you.

10         MS. WEIRICH:  Judge, I'd ask that those three be

11   marked as that next numbered exhibit for ID purposes only at

12   this time.

13         THE COURT:  Okay.  We'll mark these separately as

14   7, 8 and 9.

15        (Exhibit Nos. 7-9 were marked for identification.)

16         MR. J. BAILEY:  Was that collective?

17         THE COURT:  Separate.  7, 8 and 9 as separate

18   exhibits.

19         MR. J. BAILEY:  I'm sorry.

20   Q    Did you -- with regard to those longer documents that I

21   showed you, Ms. Washburn, were you with your daughter when she

22   filled those out?

23   A    Yes.

24   Q    Okay.  And did she fill them out over in the

25   courthouse?

1     A     Yes.

2     Q     Who else was present?  Do you remember?

3     A     She and I.

4     Q     Just the two of you in a room?

5     A     Yes, ma'am.

6     Q     Who gave her the papers to fill out?

7     A     The person in the office.

8     Q     Okay.  After she filled them out what happened?

9     A     She submitted them back to the person that gave them to

10    her -- that gave them to her.

11    Q     And then did y'all leave or did you go somewhere else?

12    A     We left.

13    Q     Okay.  All right.  Thank you.  Did your daughter ever

14    tell you why she was filing for divorce?

15          MR. J. BAILEY:  Object to hearsay, Your Honor.

16          MS. WEIRICH:  State of mind, Judge.

17    A     Yes.

18          MR. J. BAILEY:  No, we object to hearsay.

19          MS. WEIRICH:  May we approach?

20          THE COURT:  You may.

21          (Bench conference commenced.)

22          MS. WEIRICH:  Judge, it goes to her state of mind

23    as to her conduct as to what she's doing, not to what some

24    third party is doing but her state of mind, not for the truth

25    of the matter asserted but why she is taking certain action.

1        MR. J. BAILEY:  Judge, that's not a hearsay

2   exception.  It's not an excited utterance nor is it a dying

3   declaration.

4        MR. W. BAILEY:  And it's remote in time.

5        THE COURT:  State of mind is an exception to the

6   hearsay rule, but when did she file for divorce?

7        MS. WEIRICH:  June of '04.  I'm anticipating her

8   answer to be because of the girlfriend, because of this woman

9   named Kristie.

10       MR. J. BAILEY:  If they're utilizing that as part

11  of the motive, then it is offered for the truth of the matter

12  asserted.

13       THE COURT:  As part of what?

14       MR. J. BAILEY:  As apart of the motive.  If

15  they're utilizing this existence of his girlfriend --

16       MS. WEIRICH:  I'm not trying to prove the motive

17  for the divorce.  I could care less about that.

18       MR. J. BAILEY:  Not of the divorce but of this

19  alleged homicide, then it is offered for the truth of the

20  matter asserted.

21       THE COURT:  Well certainly the defendant's state

22  of mind would be the more relevant state of mind exception to

23  the hearsay rule.  I'm not sure that her state of mind six

24  months earlier on a peripheral matter is sufficiently relevant

25  to make an exception to the hearsay rule at this point.  I'll

1    sustain the objection.

2                    (Said bench conference concluded.)

3    Q    When did Sheila tell you, your daughter, when did your

4    daughter tell you that she had filed for divorce?  Did she

5    tell you before she had filed or after she had done it?  Or do

6    you remember?

7    A    She told us before she filed.

8    Q    Okay.  Do you know a woman named Kristie Woods?

9    A    I know of her.

10   Q    You've heard of her?

11   A    Yes.

12   Q    You never met her?

13   A    No, ma'am.

14   Q    And who did you hear of her from?

15   A    Sheila.

16   Q    When you were at your daughter's home the morning that

17   your son-in-law called and you told you she was dead, do you

18   remember did they have a house phone?

19   A    Yes.

20   Q    Do you remember anyone using it?

21   A    I don't remember -- well, I don't remember.  I know his

22   mother was there and his aunt, but I'm not sure if they used

23   the house phone or their cell phones.  I'm not sure.

24   Q    Did the defendant have a cell phone?

25   A    Yes.

1    Q    When you would typically call your son-in-law, would

2    you call him on his cell phone or would you call him at work

3    or at the house?

4    A    Cell phone.

5    Q    Do you know how many cell phones he had?

6    A    Two, I think.

7    Q    He had two of his own cell phones?

8    A    Yeah.

9    Q    Did your daughter also have a cell phone?

10   A    Yes.

11   Q    Okay.  Do you remember which of the two cell phone

12   numbers you would use when you would call your son-in-law?

13   A    1-3.  The last two digits were 13.

14   Q    Do you remember him using either one of those cell

15   phones the morning that you were there?

16   A    I did not see him use the cell phone in my presence

17   when I was talking with him.

18   Q    Were you sitting by him the whole time?

19   A    No.

20   Q    Okay.  Was he talking with other people?

21   A    Yes.

22   Q    And you were likewise, I'm sure, talking with other

23   people?

24   A    Yes.

25            MS. WEIRICH:  If I may have one moment, Your

1   Honor.

2      Q      The day that you went over and retrieved the items that

3   we've talked about, was that the last day you ever went to

4   your daughter's home to clean out her belongings or did you go

5   another time?

6      A      We went another time.

7      Q      Did you go many times or just one other time?

8      A      We went -- we went one other time, and we went back a

9   second time and the locks had been changed on the doors so we

10  could not gain entrance to the house.

11     Q      Okay.  The time that you went in-between there before

12  the locks had been changed, you were able to get in the house;

13  right?

14     A      Yes.

15     Q      Who was with you?

16     A      My son, two or three other girlfriends.

17     Q      Which girlfriends?  Do you remember?

18     A      I'm drawing a blank.  I'm sorry.

19     Q      Have you seen them today?

20     A      I'm trying to remember the different occasions.  The

21  first time we went, the girlfriends that I've seen today were

22  there but the second time we went because Vern's brother was

23  here from out of the city and I went to her home at that time

24  to remove items because with her being a physical therapist,

25  PT assistant, she had a file there at home that had all of her

1    patients' social security numbers, dates of birth and

2    information, and I wanted to retrieve them as soon as I could

3    because I didn't know if the house may be vandalized or

4    whatever the case may be.  And we did not want to expose that

5    data of her patients so we retrieved those boxes so we went to

6    get her clothing and those boxes that particular time.

7        Q    So you went for that purpose of retrieving those

8    particular items?

9        A    Yes.

10       Q    Did you wander all through the house and look in every

11   nook and cranny?

12       A    No.

13       Q    You knew where the box was with the information, and

14   you also knew where her clothes were?

15       A    Yes.

16       Q    You retrieved them and left?

17       A    Right.  We just retrieved the things that were in the

18   bedroom, the kind of split down the bedroom, that half we

19   removed and all of her clothing and the things of course that

20   were in the closet that particular time.

21       Q    All right.

22            MS. WEIRICH:  Judge, at this time if I could have

23   Exhibits 4 and 5 published to the jury.  I believe all the

24   rest are for ID only at this time.

25            THE COURT:  Okay.

1          MR. J. BAILEY:  Now I show 5 as ID only.

2          THE COURT:  It was actually introduced into

3   evidence but --

4          MR. J. BAILEY:  We don't have an objection to it.

5          THE COURT:  Why don't we publish those or I'll

6   just have Officer Lafferty hold them up.  They have the

7   fingerprint dust on them so rather than ask the jurors to --

8   so let's do that first with 5.  You can hold the two bills up

9   for the jurors to see.

10     Q    While that's being passed, Ms. Washburn, when you found

11  the money, did it have that purple tint on it?

12     A    No, it was clean.

13                    (Jury viewed exhibits.)

14     Q    Officer Lafferty, if you could be so kind to pass that

15  back to Ms. Washburn.  If you could take a look at that check.

16  When was that made out?

17     A    October 24th, 2004.

18          MS. WEIRICH:  Thank you.  Pass the witness.

19          THE COURT:  Ladies and gentlemen, I think we will

20  take about a ten-minute break at this time.  As always, do not

21  discuss the case during the recess.  You may leave your note

22  pads in your chairs.  They'll be fine right there.

23                    (Jury out.)

24          THE COURT:  Ms. Washburn, you may step down during

25  the recess but do not discuss your testimony with anyone

1    during the recess.  Take him out, please.  Stand in recess.

2                        (Recess.)

3                        THE COURT:  Bring out the defendant, please.

4    Bring in the jury, please.

5                   (Witness Washburn, resumed the witness stand,

6                         having been previously sworn.)

7                        (Jury present.)

8                        THE COURT:  Mr. Bailey.

9                        MR. W. BAILEY:  Mrs. Washburn, we're sorry about

10   the loss of your daughter but we have no questions.

11                       THE COURT:  You may step down.  Call your next

12   witness.

13                       MS. WEIRICH:  State calls Angela Snyder.

14

15                        <u>ANGELA SNYDER</u>

16   called as a witness, being first duly sworn, was examined and

17   testified as follows:

18                        <u>DIRECT EXAMINATION</u>

19   BY MS. WEIRICH:

20      Q    Good morning.

21      A    Good morning.

22      Q    Would you please tell the jury your name and spell your

23   last name?

24      A    Angela Tall Snyder, S-N-Y-D-E-R.

25      Q    What do you do for a living, Ms. Snyder?

1    A    I am a nurse practitioner at St. Jude Children's

2    Hospital.

3    Q    How long have you been there?

4    A    I've been there ten years.

5    Q    Did you know Sheila Braswell?

6    A    Yes.

7    Q    How long did you know Sheila Braswell?

8    A    I met her February of last year.

9    Q    Where did you meet?

10    A    She came to a day of pampering that I sponsored with

11    her mom.

12    Q    Her mother being Ms. Washburn?

13    A    Uh-huh.

14    Q    What do you mean "a day of pampering"?

15    A    I part time do in-home spas with Beauty Control and we

16    do these day of pampering where we invite people and pamper

17    them for an hour and that is where we first met.

18    Q    Okay.  Did she then get into that side business?

19    A    Yes, the next month when I did a spa at her home, and

20    then she became a consultant that night.

21    Q    So during the day you are a nurse practitioner and then

22    as a side job you did this?

23    A    Yes.

24    Q    Did Sheila Braswell likewise have a day job?

25    A    Yes.

1    Q    What did she do?

2    A    Occupational therapist.

3    Q    I'm going to pass you Exhibit 1.   Do you recognize

4    that?

5    A    Yes.

6    Q    Who is that?

7    A    Sheila.

8    Q    Is that what she looked like when you knew her?

9    A    Yes.

10   Q    Is there anything different about her appearance in

11   that picture than the way you would usually see her?

12   A    She usually wears glasses.

13   Q    What kind of glasses?

14   A    Just small little reading -- not reading glasses,

15   seeing glasses.

16   Q    Did she wear them a lot?

17   A    Usually when I saw her she had glasses on.

18   Q    Okay.   When was the last time you saw Ms. Braswell?

19   A    The night she died.

20   Q    Where did you see her?

21   A    I came to her home that night.

22   Q    About what time?   Do you remember?

23   A    It was about 10 o'clock.

24   Q    Was she there?

25   A    Uh-huh.

1    Q    Who else was there?

2    A    I didn't see anybody else.

3    Q    What was your purpose of going there?

4    A    I just had a spa that night and they ordered something

5    that I didn't have and I called Sheila and asked her did she

6    have it and she said yes.  And since I was going out that way,

7    I told her I wanted to stop by and I stopped by to pick it up.

8    Q    Okay.  Did you also deliver something to her as well as

9    taking something from her Beauty Control supply?

10   A    Yes.  I gave her some money to wire for me the next

11   day.

12   Q    How much money?  Do you remember?

13   A    It was between 375 and 400.  The only reason I say that

14   is because I remember having to borrow the next day because

15   after she died, I didn't want to bother the family so I called

16   my father to loan me $400 so my sister could take care of the

17   business that I had given Sheila to do for me.

18   Q    Was there a time later on that you ever got that money

19   back?

20   A    No --

21            MR. J. BAILEY:  I object to relevance, Your Honor.

22   What's the relevance?

23            THE COURT:  Well, if y'all would like to approach.

24            (Bench conference commenced.)

25            THE COURT:  Where are you headed?

1    MS. WEIRICH:  It's just a fact in issue that she

2    dropped off this Beauty Control money for Ms. Washburn to wire

3    and then it was never seen again.

4    THE COURT:  Well, I don't know if it's that

5    significant one way or another but I'll sustain the objection.

6    MS. WEIRICH:  All right.

7    (Said bench conference concluded.)

8    Q    Was it cash money?

9    A    Yes.

10   Q    All right.  And why did you give it to Ms. Braswell?

11   MR. J. BAILEY:  Your Honor, I thought you just

12   sustained the objection.

13   THE COURT:  Well, I --

14   MS. WEIRICH:  May we approach, Judge?

15   THE COURT:  We had gotten to the point of getting

16   it back and all when you objected.  I'll allow this question.

17   Q    What was your point in taking it to Ms. Braswell?

18   A    I knew her mom worked at First Tennessee and Sheila

19   always wired things and I thought that would be the easiest

20   way to get the money wired to Beauty Control the next day

21   because I knew she would be able to do it where I was going

22   out of town and I wasn't going to be able to do it.

23   Q    So this was Beauty Control money?

24   A    Yes.

25   Q    Did you go in the home that night?

1    A    Yes.

2    Q    Where did Sheila live?

3    A    She lived -- this is really sad.  I don't know the

4    exact street because I just knew how to get there because my

5    step -- my niece lived -- used to go to the school right

6    behind her house, but it's off of Germantown Parkway and once

7    you got off the expressway it was, like, the second light to

8    the left and then I turned left but I just don't remember the

9    name of the street.

10   Q    Was it in Shelby County?

11   A    Yes.

12   Q    All right.  Was Ms. Braswell awake when you got there?

13   A    Yes.

14   Q    What was she doing?

15   A    Talking on the telephone.

16   Q    On a cell phone or the house phone or do you know?

17   A    I'm not sure which phone.  She was on a little phone

18   that she put on a stand so I thought it was a cell phone.  It

19   was on speaker.

20   Q    All right.  Did she get off the phone when you came in?

21   A    No.

22   Q    What did she do?

23   A    She kind of had, like, conversations with me and then

24   she would go back to the conversation she was having on the

25   phone.  There was several people on the line that she was

1    talking on so they were kind of having the conversation while

2    she was talking with me.

3        Q    All right.  How long did you stay at the house?

4        A    I was there about 30 minutes.

5        Q    Did you know her husband the defendant Vern Braswell?

6        A    Yes, we met.

7        Q    Do you see him in court this morning?

8        A    Yes.

9        Q    Would you point to him for me, please, and tell me what

10   he's wearing?

11       A    He's sitting back there with the black suit on and a

12   white or gray shirt and a black and white tie, maybe.

13            MS. WEIRICH:  Let the record reflect she's

14   identified the defendant.

15       Q    Was he at the home that night while you were there?

16       A    I did not see him.

17       Q    Did you see his car?

18       A    No.

19       Q    Did you see their two children at the house?

20       A    No.

21       Q    All right.  I may have already asked you this, how long

22   were you there?

23       A    About 30 minutes.

24       Q    Was Ms. Braswell on the phone the whole time with these

25   people that she was talking to?

1    A    Yes.

2    Q    And likewise, she was talking with you?

3    A    Right, because she would, like, leave them and we would

4    have a conversation and then she went to go get the neck wraps

5    and so it was kind of busy.  We were just busy -- but she

6    never hung the phone up from them.

7    Q    Okay.  Did she appear to be in a good mood?

8    A    Yeah.

9    Q    Did she appear to be physically fit?

10   A    Yeah.

11   Q    I'll pass you a photograph, Ms. Snyder.  Do you

12   recognize that?

13   A    Yes.

14   Q    What is it?

15   A    That's her home.

16   Q    That's the home you went to?

17   A    Yes.

18   Q    On November -- what date was it?

19   A    It was November, I'm thinking -- I just remember it was

20   Thursday.  I remember it was a Thursday the first week of

21   November of last year.  I don't remember the exact date, I'm

22   sorry.

23   Q    That's all right.  Thank you.

24        MS. WEIRICH:  Judge, if we could move that into

25   evidence as Exhibit 10.

1          MR. W. BAILEY:  Your Honor, before we do that, we

2     don't have any objection, but may we see it?

3          THE COURT:  Sure.

4          MR. W. BAILEY:  Thank you.

5          MS. WEIRICH:  Judge, for the record they have all

6     these pictures.

7          MR. W. BAILEY:  Judge, we didn't know what picture

8     she was presenting.

9          THE COURT:  Okay.  That's fine.

10          MR. W. BAILEY:  No objection.

11          THE COURT:  Okay.

12          (Exhibit No. 10 was marked and filed.)

13          MS. WEIRICH:  May I publish it, Your Honor?

14          THE COURT:  You may.

15          MS. WEIRICH:  Pass the witness.

16          THE COURT:  Mr. Bailey.

17          MR. W. BAILEY:  Would Your Honor indulge us?

18          MR. J. BAILEY:  No questions.

19          THE COURT:  You may step down.  Call your next

20     witness.

21          MS. WEIRICH:  State calls Jessica Green.

22

23

24

25

JESSICA GREEN

called as a witness, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. WEIRICH:

Q    Good morning.

A    Good morning.

Q    Would you please tell the jury your name?

A    Jessica Green.

Q    Where do you work?

A    I'm a dispatcher for the Memphis Police Department.

Q    What does a dispatcher do?

A    We answer 911 calls and dispatch the police on various incidents.

Q    Were you working as a -- how long have you been a dispatcher?

A    Five years.

Q    Were you working the early morning hours of November 5th, 2004?

A    Yes.

Q    Do you work -- what shift do you work normally?

A    I work 11:45 p.m. to 7:45 a.m.

Q    Currently that's the shift you work?

A    I'm still on that shift.

Q    Was that the same shift you were working back in

1    November of 2004?

2       A    Yes.

3       Q    Did you receive a call early morning hours of November

4    5th, 2004, regarding a woman in a tub?

5       A    Yes.

6       Q    All right.  Did the call come in to your office?

7       A    Yes.

8       Q    Explain to the jury how that works.  We all know about

9    calling 911.  Is that how someone reaches you is to call 911?

10      A    Yes, ma'am.

11      Q    And where is the 911 office located?

12      A    It's on the 12th floor of this building.

13      Q    Okay.  Are there other businesses conducted out of that

14   office?

15      A    It's only 911.  We also answer the non-emergency line

16   for the police department, but that's all we do in

17   communications.

18      Q    Okay.  Do you pick up a phone like we all have at home

19   or do you have a special phone?

20      A    We have a headset.  And the calls come in, you push the

21   button to take the call.  Push a button to receive the

22   incoming call.

23      Q    Okay.  And what happens when a call is received?  What

24   is done to preserve it, if anything?

25      A    The calls are recorded.  All of the calls are recorded.

238

1    Q    How are they recorded?  Do you know?

2    A    We used to have recorders that were actually on the

3    floor.  I think there are recorders in the supervisor's office

4    now.  But it's a computer that records it.

5    Q    Does it record everything that's said or is it more of

6    a summary of what's said?

7    A    It records everything that's said.

8    Q    And from these recordings, can you hear your voice as

9    well as the voice of the person calling?

10   A    Yes.

11   Q    If you were to dispatch people, what does that mean?

12   A    Once you get the information, all the information that

13   you need, you figure out what type of call it is.  We have

14   call types.  It determines how many officers you send out,

15   according to the type of call it is.  You get on the radio and

16   you tell the officers the address and what's going on at that

17   location and what they're responding to.

18   Q    Okay.  So are you the person that makes the decision as

19   to how many officers are needed?

20   A    What we do is half of the shift you take calls and the

21   other half of the shift you dispatch so I am that person on

22   one half of the shift.

23   Q    Okay.  All right.  You've listened to a tape this

24   morning; correct?

25   A    Yes.

1    Q    Did you recognize the tape that you listened to?

2    A    Yes.

3    Q    How did you recognize it?

4    A    I remember taking the call.  I remember transferring

5    the call to the fire department and staying on the line

6    listening to it.  I heard my voice on the tape.

7    Q    All right.  When you say you turned it over to the fire

8    department, what does that mean?

9    A    We receive calls for the fire department and they

10   handle medical and fires.  So if we get a call that's a fire,

11   it's fire related or medical related, we connect it to the

12   fire department.  We do stay on the phone to make sure that

13   it's a medical or a fire emergency and then at that point we

14   can disconnect.

15            MR. W. BAILEY:  Your Honor, we'll stipulate to the

16   admission of the tape.

17            MS. WEIRICH:  Okay.

18            THE COURT:  Okay.  That's fine.  Thank you.

19   Q    When -- you said that the tape you listened to this

20   morning, you said that you stayed on the line and listened.

21   Are you supposed to do that or were you just interested in

22   this call?

23   A    I -- there's a lot of determination that you have to do

24   on your own and a lot of times the fire department will tell

25   us on a call like that, they'll tell us, police, we want you

1    to go because they don't know exactly what's going on.  So

2    just in case they need us, they'll tell us to meet them.

3        Q     So you stayed on the line in case you needed to

4    dispatch somebody else?

5        A     Yes.

6        Q     Can the fire department not dispatch the police?

7        A     No.

8        Q     Does that have to come from you?

9        A     Well, if I had hung up and they determined I was not on

10   the line and they felt like they needed the police, they'll

11   immediately call us back and say we need you to go with us.

12       Q     Okay.  All right.  All right.

13              MS. WEIRICH:  Judge, at this time if I could have

14   this passed to Ms. Green.

15              MR. W. BAILEY:  Your Honor -- go ahead.  Is that

16   the tape?

17              MS. WEIRICH:  Uh-huh.

18       Q     Would you open it up for me, please.  Do you recognize

19   that?

20       A     Yes.

21       Q     Is that the tape that you just listened to?

22       A     Yes.

23       Q     All right.

24              MS. WEIRICH:  Judge, if we could have that marked

25   as Exhibit 11.

```
1              THE COURT:  All right.

2              (Exhibit No. 11 was marked and filed.)

3              MS. WEIRICH:  If we could play that for the jury

4    at this time, Your Honor.

5              THE COURT:  You may.

6                   (Played Exhibit 11.)

7    Q    The two voices, the two female voices on the tape, was

8    one of those yours?

9    A    Yes.

10   Q    And who did the other one belong to?

11   A    The fire department dispatcher.

12   Q    All right.

13             MS. WEIRICH:  Pass the witness.

14             THE COURT:  Mr. Bailey.

15             MR. J. BAILEY:  We have no questions.

16             THE COURT:  You may step down.  Call your next

17   witness.

18             MS. WEIRICH:  Judge, if we could approach?

19             THE COURT:  Sure.

20             (Bench conference commenced.)

21             MS. WEIRICH:  I'm not sure if he's here.  If I

22   could just -- I'm not sure if he's here.  Can I just --

23             MR. J. BAILEY:  Can I move this up?

24             MS. CARNESALE:  We moved it back because I

25   couldn't see.
```

1          THE COURT:  We'll deal with it at lunch.

2              (Said bench conference concluded.)

3          MR. W. BAILEY:  Your Honor --

4              (Bench conference commenced.)

5          MR. W. BAILEY:  It appears Mr. Braswell needs a

6   break.  He's crying and --

7          THE COURT:  Okay.  We'll take a recess.

8              (Said bench conference concluded.)

9          THE COURT:  All right.  Ladies and gentlemen,

10  we'll take a brief recess.  As always, do not discuss the case

11  among yourselves during the recess.

12             (Jury out.)

13         THE COURT:  Take him out.  Is your witness out

14  there?

15         MS. WEIRICH:  Yes, Judge.

16         THE COURT:  And is it a relatively short witness?

17         MS. WEIRICH:  Yes, sir.

18         THE COURT:  We'll try to get him on before lunch

19  then.  We'll take a brief recess.

20             (Recess.)

21         THE COURT:  Bring in the jury, please.

22             (Jury present.)

23         THE COURT:  Call your next witness.

24         MS. WEIRICH:  State calls R. Coleman.

25

1                          ROOSEVELT COLEMAN

2      called as a witness, being first duly sworn, was examined and

3      testified as follows:

4                          DIRECT EXAMINATION

5      BY MS. WEIRICH:

6          Q     Good afternoon.

7          A     Good afternoon.

8          Q     Would you please tell the jury your name and spell your

9      first and last names for the court reporter?

10         A     I'm Roosevelt Coleman.   That's R-O-O-S-E-V-E-L-T

11     C-O-L-E-M-A-N.

12         Q     Where do you work, Mr. Coleman?

13         A     For the police communications.

14         Q     What is police communications?

15         A     That's where any transaction between the police and the

16     citizens is recorded.

17         Q     All right.   When citizens call 911, are those calls

18     recorded as well?

19         A     They are, yes.

20         Q     What is your duty or what are your duties with MP

21     communications?

22         A     I'm a communications supervisor.   I handle scheduling.

23     I handle citizen complaints.   I handle attorney requests.   And

24     I am a custodial of records.   I maintain and keep updates on

25     the logs of records.

1    Q    What types of records does the communications bureau

2    keep?

3    A    As we before stated, anything that comes in that is

4    recorded is considered a record.  We keep them for at least 18

5    months.

6    Q    You keep -- the jury has just listened to an actual 911

7    tape that was made from your office.

8    A    Okay.

9    Q    Is there also a written documentation of that tape?

10   A    Yes, it's called an event chronology.

11   Q    Explain to the jury how that's made.

12   A    It's a computer-generated entry that's entered by the

13   dispatcher that's on either the radio or the telephone and

14   it's typed in and it's a timely entry.  And we can retrieve it

15   by looking at it and printing the screen.

16   Q    When you say "it's a timely entry," what do you mean?

17   A    That whenever the incident occurs, whatever transaction

18   it is, we enter it into the system as soon as possible and the

19   computer generates a time factor for it.

20   Q    I will pass you a document.

21            MR. W. BAILEY:  May we see what you are passing

22   up?

23            MS. WEIRICH:  You may.

24   Q    Do you recognize that?

25   A    I do.

1    Q    What is it?

2    A    It's an event chronology.

3    Q    All right.  Can you tell when the event was generated?

4    A    Yes, I can.

5    Q    When?

6    A    On November 5th, 2004 at 3:57 a.m.

7    Q    From where was the event generated?  Where was the call

8    placed from?

9    A    It was placed from 8152 Creekside Circle North in the

10   Maple Creek Drive cross street.

11   Q    And what phone number?

12   A    From phone number 901-624-5176.

13             MS. WEIRICH:  Judge, if we could have that marked

14   as the next numbered exhibit.

15             THE COURT:  All right.

16             MR. W. BAILEY:  No objection.

17             THE COURT:  Exhibit 12.

18             (Exhibit No. 12 was marked and filed.)

19             MS. WEIRICH:  And I've made copies for the jurors,

20   Judge, ask that those be passed out.

21             THE COURT:  All right.

22   Q    Mr. Coleman, if you could, you just told the jury that

23   the event was created November 5th, '04, at a certain time.

24   Where is that indicated on the document that the jury is now

25   looking at?

1     A    The very first line under the highlighted area; date,

2  time and term.

3     Q    Okay.  And the operator, what does that number

4  indicate?

5     A    That's the operator that took the call initially.

6     Q    Okay.  And the narration on the right-hand side from --

7  how can you tell where the phone number was that the call came

8  from?

9     A    If you'll look down a little, I think it's the fifth or

10  sixth line, it says ANI/ALI phone number.  Any 911 calls that

11  originated come in with one transaction tells the location,

12  the cross street and the registered name of the owner of the

13  location.

14     Q    Okay.  And then under that is that the phone number?

15     A    Under that is the phone number, yes.

16     Q    Does that information have to be given by the caller or

17  does it just show up on the computer?

18     A    When they dial 911 it shows up on the computer.

19     Q    All right.  Is this an exact word chronology of what's

20  being said on the tape or is it more of a summary?

21     A    This is more of a summary.

22     Q    Okay.  All right.  And the last page, page three, where

23  the typing ceases.  When do they stop making a record of this?

24     A    When is says "event closed" and the last time entry

25  there 07:43 and 57 seconds.

1    Q    How is the determination made to close the event?

2    A    When all of the units that are assigned to this event

3    clear or get back into service and the dispatcher then takes

4    them off that particular event, it closes it.

5    Q    All right.  Thank you.  When you say "when they clear,"

6    what does that mean?

7    A    That means that the officers that were assigned to the

8    event advise their dispatcher they are again available for

9    service for another call.

10   Q    They're leaving that scene?

11   A    They're leaving that scene, yes.

12        MS. WEIRICH:  Pass the witness, Your Honor.

13        THE COURT:  Mr. Bailey.

14

15                    CROSS-EXAMINATION

16   BY MR. J. BAILEY:

17   Q    Is it Officer Coleman?

18   A    No, civilian.

19   Q    Mr. Coleman, now of course you weren't the person who

20   does the input into the computer system as it begins to

21   generate this report, are you?

22   A    No, I'm not.

23   Q    You are here, as you stated earlier, as keeper of the

24   records so you supervise those people; is that correct?

25   A    Yes.

1    Q    And as the prosecutor just asked you on direct, this is

2    not a word-by-word transcript of what occurs is that -- that's

3    correct, isn't it?

4    A    That's correct, yes.

5    Q    And in fact, it's essentially a log, would you say?

6    A    It is a log, yes.

7    Q    And this log also includes the -- sometimes it includes

8    the perception of the operator; is that correct?

9    A    We steer clear of that but yes, it does.

10   Q    Let me -- you're holding the event chronology in your

11   hand?

12   A    I am, yes.

13   Q    Let me refer you to page 2.  And I would like for you

14   to look at 404.  This is military time.  That's right, isn't

15   it?

16   A    Yes, it is.

17   Q    So this would be 4:04 and 49 seconds a.m.  Is that

18   correct?

19   A    Yes.

20   Q    And it says "term CT 10."  What does that mean?

21   A    That's the position where the incident occurred, this

22   particular transaction.

23   Q    All right.  And would you read for me what's in your

24   record as the comment.  It says "event comment."  That means

25   this operator's perception; is that correct?

1    A    Yes.

2    Q    Would you read the perception of the operator as she --

3    he or she put it into the system?

4    A    The complainant is hysterical and screaming, keeps

5    putting the phone down and coming back screaming.

6    Q    So in your record it indicates that the complainant,

7    and you don't know who that person is, but whoever it was that

8    called in was hysterical; isn't that correct?

9    A    Yes.

10   Q    Now just one more question.  Where it says event closed

11   and we go some three and a half hours later to 7:43 a.m.,

12   that's on the third page.  Now is someone on the phone all

13   this time or do the -- or are the units that are dispatched,

14   they just keep making entries by calling in?

15   A    There's two types of functions.  There's a call-taker

16   function where the dispatcher is talking on the phone to a

17   complainant.  And the second type is where the dispatcher

18   talking to the police officers on a two-way radio.

19   Q    Okay.  And so after the complainant hangs up, at that

20   point you go into that second function; is that correct?

21   A    That's correct.

22   Q    So there wasn't somebody on the phone the whole time?

23   A    No.

24   Q    All right.

25        MR. J. BAILEY:  No further questions, Judge.

```
 1              THE COURT:  Anything further, Ms. Weirich?

 2              MS. WEIRICH:  No, Your Honor.

 3              THE COURT:  You may step down.  If y'all will pass

 4    those back in, please.  All right.  Ladies and gentlemen,

 5    we'll stop for lunch at this time.  We will resume the trial

 6    at 1:30.  And as always, do not discuss the case in any way

 7    among yourselves or with anyone else during your lunch break.

 8              (Jury out.)

 9              THE COURT:  Take him out, please.  Recess until

10    1:30.

11              (Recess.)

12              THE COURT:  Bring in the jury, please.

13              (Jury present.)

14              THE COURT:  You may call your next witness.

15              MS. CARNESALE:  Thank you, Your Honor.  The State

16    calls Fred Jackson.

17

18              LIEUTENANT FRED JACKSON

19    called as a witness, being first duly sworn, was examined and

20    testified as follows:

21              DIRECT EXAMINATION

22    BY MS. CARNESALE:

23    Q    Good afternoon.

24    A    Good afternoon.

25    Q    Will you please state and spell your name for the
```

1  record?

2     A    Fred Jackson, F-R-E-D J-A-C-K-S-O-N.

3     Q    Where are you employed, Mr. Jackson?

4     A    City of Memphis Fire Department.

5     Q    And what do you do for the fire department?

6     A    I'm a lieutenant.

7     Q    Are you trained in the medical field as an EMT or

8  paramedic or are you a firefighter?

9     A    I'm a firefighter.

10    Q    How long have you been a firefighter?

11    A    21 years.

12    Q    And have you always worked for the City of Memphis Fire

13 Department?

14    A    Yes.

15    Q    Currently a lieutenant?

16    A    Yes.

17    Q    On or about November 5th, 2004, did you respond to a

18 call that went out from the location of 8152 Creekside Circle

19 North?

20    A    Yes, I did.

21    Q    What was your role in responding to that call?

22    A    We arrived on the scene and I was met at the door by

23 Mr. Braswell and he led -- led us into the house down a

24 hallway and into the bedroom.

25    Q    Okay.  I'm going to pass forward a photograph that was

1    previously marked State's Exhibit No. 10 and ask you to take a

2    look at that photograph.  Was that the house that you

3    responded to, sir?

4        A    Yes, it is.

5        Q    And what area of town is that?

6        A    This is in the Cordova area, a recently annexed area of

7    the City of Memphis.

8        Q    Which is why the City responded to the call?

9        A    Exactly.

10       Q    And, sir, you're welcome to put that down on the table

11   in front of you.  Now do you recall what type of call it went

12   out as that you were responding to?

13       A    Yes, I remember correctly.  It came in as a person not

14   breathing and that CPR was being performed.

15       Q    Okay.  Approximately how long did it take for -- after

16   the call went out for you, the fire department, to get to that

17   house?

18       A    About -- about six minutes, I should say.

19       Q    And have you reviewed records in preparation for your

20   testimony today?

21       A    Yes.

22       Q    And aside from yourself, how many other members of the

23   Memphis Fire Department responded to the call?

24       A    Five.

25       Q    Five?

1    A    Right.

2    Q    So six total?

3    A    Exactly.  Four personnel were on the truck and two

4    personnel were with the unit or the ambulance.

5    Q    So the ambulance is called "the unit"?

6    A    Yes.

7    Q    And two people rode in that?

8    A    Right.

9    Q    And those would be paramedics?

10   A    One would be a paramedic and the other one is an EMT.

11   Q    What is the difference between a paramedic and an EMT?

12   A    The EMT is a basic -- a basic technician as far as

13   assisting the paramedic who is more skilled in assessing a

14   patient and treating the patient with certain drugs and that

15   type of thing.  The EMT is mainly a support personnel for the

16   paramedic.

17   Q    And you rode on the truck as you were a firefighter; is

18   that right?

19   A    Yes.

20   Q    Were you the supervising employee on the scene as a

21   lieutenant?

22   A    Yes.

23   Q    What number of those six employees were you in entering

24   the house?

25   A    I was the first.

1    Q    You were the very first?

2    A    I was the first, yes.

3    Q    Okay.  And when you got to the scene you saw Mr.

4    Braswell; is that correct?

5    A    Yes.

6    Q    Do you remember what he looks like?

7    A    Yes, he's a -- I consider him stocky.  He was short

8    compared to me but a fairly stocky person in my opinion.

9    Q    Do you see him today in the courtroom?

10   A    I can't say that I do.

11   Q    Okay.  And when you spoke with Mr. Braswell, was he

12   inside or outside the house when you got there?

13   A    He was on the outside.

14   Q    What was he doing?

15   A    He was -- he was standing there.  He was just standing

16   there.  He had a white robe on and he then proceeded to lead

17   me or us into the house down the hallway and into the bedroom.

18   Q    And when you got to the bedroom, what did you do?

19   A    I observed Mrs. Braswell in the -- in the tub or she

20   was halfway in the tub, I should say.

21   Q    Let me pass forward -- before we get into that -- what

22   was previously marked State's Exhibit No. 2.  Is this the

23   bathtub that you found Ms. Sheila Braswell in?

24   A    Yes, it is.

25   Q    Is that how it looked that night?

1    A    With the exception of Mrs. Braswell's body, that's the

2    way I remember it.

3    Q    Okay.  And you're welcome to set that down, if you'd

4    like.  You say her body was positioned how in the tub?

5    A    I consider it an awkward position.  Her lower body was

6    in the tub, not in a position as far as we may think as far as

7    taking a bath or what have you.  Her upper part of her body

8    was out -- was outside of the tub but not on the floor.

9    Q    If you would --

10                MS. CARNESALE:  Your Honor, may I approach the

11   witness?

12                THE COURT:  You may.

13   Q    Sir, may I have that photograph of the bathtub.  I'm

14   going to put it up here for us to look at.

15                MS. CARNESALE:  And with Your Honor's permission,

16   may he step down to demonstrate?

17                THE COURT:  You may.

18   Q    Mr. Jackson or Lieutenant Jackson, I'm going to place

19   the photograph on here.  If you could with just your finger,

20   explain to the jury how she was situated in the bathtub?

21                THE COURT:  Could you do me a favor and point on

22   this photograph?  That way it will show up on the monitor.

23   A    If I remember correctly, her face was in this area and

24   her upper body was across the tub in this way.

25   Q    As if it were coming over the side of the wall?

1    A    Yes.

2    Q    Okay.  Okay.  I understand.  Thank you, sir.  If you

3    would retake your seat.  What was -- was Ms. Braswell, how did

4    she appear?  Was she moving?  Was she breathing?

5    A    Oh, no.  There were no sign of life, visual sign as far

6    as the chest moving up and down, that type of thing.  No,

7    there appeared to be no sign of life.

8    Q    Okay.  What did you do when you saw her there in the

9    bathtub?

10   A    At that time another -- the EMT that was riding on the

11   company assisted -- I assisted him in taking her out of the

12   tub and laying her at the foot of the bed, from what I recall

13   later.

14   Q    Was this a bathroom that was connected to the bedroom?

15   A    Yes.

16   Q    And you and -- do you recall who the EMT was that

17   assisted you?

18   A    Babatunji Tanzy.

19   Q    His name is Baba Tanzy?

20   A    Right.

21   Q    So you and Mr. Tanzy took her into the bedroom and lay

22   her on the floor?

23   A    Exactly.

24   Q    And then what happened after that?

25   A    The paramedics came in and they started to do what they

1    did, put a strip on her, hooked her up to the monitor, that

2    type of thing.  But at that time I was leaving out, going back

3    into the living room area consoling Mr. Braswell.

4        Q    Was he making any statements to you?

5        A    Yes.  Yes, he did.  He made statements to the effect of

6    what was he going to do without his wife, what was his kids

7    going to do without his wife, can we do anything to help her,

8    to help her and that type of thing.  He was -- some things to

9    that effect.

10       Q    Did you see any children in the house?

11       A    I don't recall seeing kids in the house at that -- at

12   that time.  I don't recall.  I don't recall seeing kids.

13       Q    Do you know where they were at that time?

14       A    If I remember, there was a neighbor, a next-door

15   neighbor who came over and that's -- that's who either had the

16   kids or who took the kids from the household.

17       Q    Did you see him take the kids?

18       A    I don't recall seeing him take the kids from the

19   household.

20       Q    Okay.  And did you ask or did Mr. Braswell say what

21   happened to have Ms. Braswell end up in the bathtub?

22       A    Not directly.  He made references to -- that I

23   shouldn't have let her had that drink or I should have

24   awakened or something to that effect.  I don't recall him

25   specifically saying how she got in the tub, when she got in or

1    that type of thing.

2        Q    How long did you speak to Mr. Braswell?

3        A    Maybe 15 minutes.  And this wasn't a back-and-forth

4    conversation between Mr. Braswell and myself.  It was more of

5    a conversation he was having.  He was just speaking aloud,

6    asking questions what can we do for her or help or and this,

7    that and the other.  It was not a one-on-one conversation

8    between the two where there were certain things exchanging --

9    exchanged between the two.

10       Q    Was anyone else present while he was making these

11   statements?

12       A    The other -- the other EMT may have been there, Mr.

13   Tanzy.  He may have been there or the other paramedic.  He may

14   have been there.

15       Q    Okay.  Anyone such as family or friends or was it all

16   just fire department personnel?

17       A    Initially, it was just Mr. Braswell and the fire

18   department personnel.  But later, what I would assume would be

19   family members started to come.

20       Q    Before they started to come or -- let me rephrase.

21   While you were speaking with Mr. Braswell, was he ever on the

22   telephone?

23       A    Yes.

24       Q    Were -- was he placing calls or was the phone ringing

25   and he was receiving calls?

1    A    If I remember and I do that he was placing calls.  He

2    was making calls.

3    Q    Did you notice whether this was his home phone or a

4    cell phone?

5    A    It was a cordless phone.  I can't remember if it was a

6    cell phone or a home cordless phone.

7    Q    Lieutenant Jackson, I'm going to ask you, were you ever

8    called upon to put down in the form of a picture how Ms.

9    Braswell was situated in the bathtub?

10   A    Yes, I was.

11   Q    For the police department?

12   A    Yes.

13   Q    In fact you made a sketch; is that right?

14   A    Yes.

15   Q    If I may pass this forward to you, Lieutenant Jackson.

16   Is this the sketch you made of Sheila Braswell and how she was

17   situated in the bathtub on November 5th, 2004?

18   A    Yes, it is.

19             MS. CARNESALE:  Your Honor, we'd ask that that be

20   marked the next State's exhibit.

21             MR. J. BAILEY:  No objection.

22             THE COURT:  Exhibit 13.

23             (Exhibit No. 13 was marked and filed.)

24             MS. CARNESALE:  If I may approach, Your Honor, and

25   publish that to the jury?

1     THE COURT:  You may.

2  Q Again, Mr. Jackson or Lieutenant Jackson, that depicts

3 Ms. Braswell actually lying in the bathtub and then the prone

4 drawing is how you placed her on the floor; is that correct?

5  A Yes, yes.

6  Q And I believe at the bottom you signed and dated it

7 December 14th, 2004, 9:18 a.m.  Is that correct?

8  A Yes.

9  Q Is that when you drew it?

10  A Yes, it is.

11  Q Returning to when you entered the bathroom, did you

12 notice anything unusual about the bathroom and the air that

13 was in the bathroom?

14  A The room seems to have been humid or moist.

15  Q I'm sorry.

16  A I did notice that, that the room seemed to be humid or

17 moist.

18  Q When did you first notice that?

19  A As soon as I walked in.

20  Q And you were the first --

21  A Into the bathroom, rather.

22  Q And you were the first person into the bathroom?

23  A Yes, as far as the fire department personnel, yes, I

24 was.

25  Q Did you notice anything unusual about the water when

1   you got Ms. Braswell out of the bathtub?

2       A    The water -- the water was warm.

3       Q    Did it -- would you quantify that as warm as if you

4   were going to take a bath?  Bath water that warm?

5       A    With my gloved hands, I took hold to her legs and the

6   water was warm.  For me, I -- I felt that temperature was a

7   temperature where I probably could take a bath in it.

8       Q    Not hot but warm?

9       A    It was warm, yes.

10      Q    And you stated you had gloved hands on?

11      A    Yes.

12      Q    What type of gloves do you wear?

13      A    Latex.

14      Q    Just those thin rubber gloves?

15      A    Exactly.

16      Q    Did you inform anyone about your feelings about the

17  water and how warm it was?

18      A    No, no, no, I didn't.

19      Q    Okay.

20           MS. CARNESALE:  Your Honor, may I have one moment?

21           THE COURT:  You may.

22      Q    Lieutenant Jackson, you stated that you got Ms.

23  Braswell out with the assistance of Mr. Tanzy; is that right?

24      A    Yes.

25      Q    Was she difficult to get out of the bathtub?

1    A    No, no, she wasn't.

2    Q    Do you recall approximately how tall she appeared to

3    be?

4    A    Estimating five-three, five-four.

5    Q    A small woman?

6    A    Yes.

7    Q    Do you see any reason why it would have been difficult

8    for someone to get her out of that bathtub?

9    A    In my opinion, no.

10   Q    Did you notice anything about her body and the

11   condition it was in?

12   A    Her body seem to me to be rigid or stiff, I should say.

13   Q    And was that any indication to you of something?

14   A    To me I felt that perhaps rigor mortis was setting in.

15   I wasn't for sure but that's just what came to mind to me.

16   Q    And if you would explain to the jury what is rigor

17   mortis?

18             MR. J. BAILEY:  Your Honor, he's not -- I'd object

19   on the grounds that he's not qualified to give that kind of

20   explanation to the jury.  That would have to come in through a

21   different witness.

22             MS. CARNESALE:  Well, Judge, he used a term that

23   everyone may not be familiar with and he obviously is familiar

24   with it.  He used the term.

25             MR. J. BAILEY:  I'd ask for a cautionary

```
 1   instruction then.
 2                   THE COURT:  How many years have you been on the
 3   fire department?
 4                   WITNESS JACKSON:  21 years.
 5                   THE COURT:  I think with his experience on the
 6   fire department, this is a term that he is capable of
 7   explaining.  We're not talking about medical terms that only
 8   doctors would be capable of explaining.  I think this is
 9   within his purview of experience and training.  I'll overrule
10   the objection.
11                   MR. J. BAILEY:  Very well, Your Honor.
12                   THE COURT:  Ask the question again if you would,
13   please.
14   Q    Can you explain to the jury, Lieutenant Jackson, what
15   is rigor mortis?
16   A    Rigor mortis is a state that all living creatures go
17   through once they're deceased.  I don't know about the medical
18   side of it but that process is when the body -- the person is
19   no longer alive, there's no blood flowing through the body and
20   the process -- the body just -- the body stiffens up.  The
21   body stiffens up.
22   Q    Do you recall what part of her body appeared stiff to
23   you when you lifted her out of the bathtub?
24   A    To me it was the lower extremities.  That's the part
25   that I handled.  Just that part seemed -- seemed stiff.
```

1    Q    Her legs?

2    A    Yes.

3              MS. CARNESALE:  Thank you.  Your Honor, I'll pass

4    the witness.

5              THE COURT:  Mr. Bailey.

6

7                        CROSS-EXAMINATION

8    BY MR. J. BAILEY:

9    Q    Lieutenant Jackson, now you responded to this call, and

10   I think it was your testimony that there were approximately

11   six other fire department personnel that responded to the

12   call; is that correct?

13   A    Yes.

14   Q    And when you arrived on the scene, the truth of the

15   matter is that Mr. Braswell was outside frantically waving,

16   trying to let y'all know that this was the house; is that

17   correct?

18   A    Well, I can't say that he -- I don't recall him

19   frantically waving but he was out there.  He was outside.

20   Q    He was letting you know come on here, this is where it

21   is; right?

22   A    Yes.

23   Q    And when you came into the house, you testified -- it

24   was your testimony that he ushers you to the back, shows you

25   where the bathroom is that's the subject of this lawsuit; is

1    that correct?

2        A    Yes.  He directed us.

3        Q    And it was also your testimony I think you drew a

4    sketch that in that bathtub that's still on the screen, that

5    you found the decedent Ms. Sheila Braswell halfway in the tub,

6    lower part of the body in the tub, the rest of her body is

7    hanging on the side; is that correct?

8        A    Yes, sir.

9        Q    As if somebody had tried to get her out; is that

10   correct?

11       A    Possibly.

12       Q    Okay.  And you prepared or at least signed on to a

13   report in this matter, did you not?

14       A    Yes, sir.

15       Q    And in that report, I think that you indicated or at

16   least signed on the report, didn't you, that it appeared to be

17   cardiac arrest?  Isn't that what you all said on the report?

18       A    I -- I do not make --

19               MS. WEIRICH:  Objection, Your Honor, to the

20   relevance.

21               THE COURT:  Overruled.  You may ask.

22       Q    At that point in time, it appeared to you that this

23   decedent died from cardiac arrest; is that correct?

24       A    I had no way of knowing that.

25       Q    Okay.  You certainly wouldn't sign a report that you

1   didn't think was accurate, would you?

2                   MS. WEIRICH:  Objection, Your Honor.

3                   MR. J. BAILEY:  This is cross.

4                   THE COURT:  Overruled.  You may ask.

5   A     I signed the reports that the EMTs, firefighter

6   paramedics prepare.  My confidence is through them.  And when

7   they finished that report, my signature will go on it because

8   I'm not -- I'm not capable to decide whether their report is

9   wrong or truth.  That's just --

10  Q     But now you were the first one in; right?

11  A     Yes, sir.

12  Q     So it wasn't just their report.  I mean, you were

13  attesting to your observations, too, weren't you?

14  A     Yes, sir.

15  Q     And again, I ask you, it appeared -- it says -- do you

16  remember signing a report that said it appeared that the

17  decedent died from cardiac arrest?

18  A     I don't recall all the facts as far as what was written

19  down in the report, but if my signature is on that -- on that

20  paper there, then I signed that.

21                  MR. J. BAILEY:  Your Honor, may I pass this to the

22  witness?

23                  THE COURT:  You may.

24  Q     Does that appear to be your signature on the bottom of

25  that document?

1    A    Yes, sir, that is.

2    Q    And would you explain what that document is?

3    A    This is the fire department's first respond to incident

4    report that -- this is something that we all have to fill out

5    when we make these type of incidents.

6    Q    Now I gave you the bottom page.  Let me pass you the

7    rest of it.  I didn't mean to give you half of a document.

8    Tell me if that's the rest of the document.

9    A    That looks familiar.

10   Q    All right.  And that's your signature at the bottom on

11   the last page; is that correct?

12   A    Yes, sir.

13   Q    And would you read at the top where it says pertinent

14   history.  Do you see the term "cardiac arrest"?

15              MR. WEIRICH:  Objection, Your Honor.

16              THE COURT:  Sustained.  If you would approach?

17              (Bench conference commenced.)

18              THE COURT:  It's okay for you to ask him initially

19   since his signature appears on it in my opinion.  But once he

20   explains that he's signed it as a supervisor but he isn't

21   medically capable of testifying to or attesting to the

22   specific medical conclusions that the EMT and medical people

23   put on there, that's the end of it.  You can ask them.  You

24   can subpoena them.  I assume they are going to testify.  They

25   can testify.  He's already explained his relationship to that

1    document.   And that's the end of it.

2                    MR. J. BAILEY:   All right.   Very well.

3                    (Said bench conference concluded.)

4    Q     You got an opportunity to review -- let me get that

5    back from you.   You got an opportunity and I think it was your

6    testimony that you were one of the people, two of you who

7    pulled the decedent out of the water; is that correct?

8    A     Yes, sir.

9    Q     Halfway out of the tub; is that correct?

10   A     Yes, sir.

11   Q     So you did get an opportunity to view the body of the

12   decedent; is that correct?

13   A     Yes, sir.

14   Q     And she was nude; is that right?

15   A     Yes, sir.

16   Q     And would you describe for me if there was any jewelry

17   on the decedent?

18   A     No, sir, I don't recall any jewelry being on the

19   decedent.

20   Q     Okay.   Do you not recall a necklace on her neck?

21   A     I do not recall that.

22   Q     What about body piercings?

23   A     There was.   There was body piercing.

24   Q     Okay.   And you don't remember a necklace on her?

25   A     No, sir, I don't.

1    Q    Now you testified earlier that the temperature of

2    the -- a better word, I guess, in that bathroom was warm to

3    you, kind of moist?

4    A    Yes.

5    Q    You don't know how they normally keep their house, that

6    was the first time you were in the house; weren't you?

7    A    Yes, sir, that was the first time.

8    Q    And it was November; is that correct?

9    A    Yes, sir.

10    Q    And so you don't know what the temperature normally is

11    in that room, do you?

12    A    No, sir.

13    Q    And of course, you didn't check to see what the water

14    temperature was as it comes out the tank, did you?

15    A    No, sir.

16    Q    So you don't know how hot the water enters that tub, do

17    you?

18    A    No, sir.

19    Q    And one last thing.  You testified about at least -- I

20    know it wasn't medical testimony but your perception as to an

21    explanation of rigor mortis.

22    A    Yes.

23    Q    Not perception but your definition of rigor mortis; is

24    that correct?

25    A    Yes, sir.

1     Q    But you can't tell us about how long it takes for rigor

2    mortis to set in?

3     A    Absolutely not.

4     Q    Okay.  So you don't -- you're not here to tell us how

5    long Ms. Braswell had been in the water, are you?

6     A    No, sir.

7     Q    And likewise, I think this will be my last question of

8    you, sir.  You don't know what happened that day either, do

9    you?

10     A    No, sir, I don't.

11     Q    You don't know how she died?

12     A    No, sir.

13     Q    You are just here to testify as to your observations;

14    is that right?

15     A    Yes, sir.

16             MR. J. BAILEY:  Thank you.  Pass the witness.

17             THE COURT:  Any redirect?

18             MS. CARNESALE:  Just briefly, Your Honor.

19

20                  REDIRECT EXAMINATION

21    BY MS. CARNESALE:

22     Q    Lieutenant Jackson, when you entered the house, did you

23    notice if the entry and the rooms that you walked through to

24    get to the bedroom, were those moist?

25     A    No.

1    Q    When did you first notice the moistness in the air?

2    A    When I went -- when I entered the bedroom/bath area.

3              MS. CARNESALE:   Thank you.   Nothing further.

4              THE COURT:   You may step down.   Call your next

5    witness.

6              MS. CARNESALE:   Thank you, Your Honor.   The State

7    calls Baba Tanzy.

8

9                        BABA TANZY

10   called as a witness, being first duly sworn, was examined and

11   testified as follows:

12                     DIRECT EXAMINATION

13   BY MS. CARNESALE:

14   Q    Good afternoon, sir.

15   A    Good afternoon.

16   Q    Will you please state and spell your name for the

17   record?

18   A    Baba Tanzy.   B-A-B-A T-A-N-Z-Y.

19   Q    Mr. Tanzy, are you employed?

20   A    Yes.

21   Q    Where do you work?

22   A    Memphis Fire Department.

23   Q    How long have you worked for the Memphis Fire

24   Department?

25   A    Eight years.

1   Q      And what is your occupation with the fire department?

2   A      Firefighter EMT.

3   Q      And an EMT, what is that?  What is that exactly?

4   A      Emergency Medical Technician.

5   Q      So you have some medical training?

6   A      Correct.

7   Q      Can you explain to the jury what your training entails?

8   A      We just basically make first-responder calls and treat

9   signs and symptoms and make car wrecks, bandage wounds and,

10  you know, stuff like that.

11  Q      And do you assist paramedics?

12  A      Yes, I do.

13  Q      Paramedics have more extensive medical training than

14  the EMTs; correct?

15  A      Correct.

16  Q      Have you been a firefighter and EMT for eight years?

17  A      Yes.

18  Q      On November 5th, 2004, were you called to the location

19  of 8152 Creekside Circle North?

20  A      Yes.

21  Q      Approximately what time did you arrive at that

22  location?

23  A      Around four o'clock a.m.

24  Q      And you were serving in your capacity as an EMT; is

25  that right?

1      A      Yes.

2      Q      Did you ride on the fire truck or the ambulance?

3      A      Fire truck first responder.

4      Q      And did you ride with Lieutenant Jackson the gentleman

5   who just left the courtroom?

6      A      Yes, I did.

7      Q      Was he your supervisor that night?

8      A      Correct.

9      Q      And did you know at that time what type of call you

10  were responding to?

11     A      Yes.

12     Q      What type of call was it?

13     A      It was a full-arrest call.

14     Q      A what?

15     A      Full arrest.

16     Q      Full arrest.  What does that mean?

17     A      Party is not breathing.

18     Q      And did the fire truck arrive before the ambulance or

19  did they arrive together?

20     A      We arrived, like, a minute before.  They was right

21  behind us.

22     Q      Okay.  And when you got there, you got off the truck.

23  Did you see anybody outside?

24     A      Yes, I did.

25     Q      Who did you see?

1    A    I seen the young lady's husband.

2    Q    What was his name?

3    A    Vern Braswell.

4    Q    Did you actually know Mr. Braswell?

5    A    No.

6    Q    And he was outside?

7    A    Correct.

8    Q    What was he doing?

9    A    Standing outside in his robe.

10   Q    Okay.

11   A    Trying to flag for us, wave for us to come on with the

12   equipment.

13   Q    And did you go inside the house?

14   A    Yes.

15   Q    What did you do when you went inside?

16   A    First when we went in, we found out which room to go

17   to.  And once we went in, we saw that we had a party in the

18   tub not responding.

19   Q    I'm going to pass forward what's previously been marked

20   as State's Exhibit No. 2.  Is that the bathtub that you found

21   the victim in?

22   A    I -- I suppose.

23   Q    Does that look like how it looked that night?

24   A    Pretty -- yeah.

25   Q    Is there anything in that picture that doesn't look

1    right?

2    A    No, I mean, I just don't really remember what the tub

3    looked like.  I mean, I just knew she was in the tub.

4    Q    And how was she situated?  You may set that down on the

5    table in front of you.  How was she situated in the tub?

6    A    In an awkward position.  Her back was sort of facing

7    the outside of the tub.

8    Q    Okay.  What did you do when you saw her in the tub?

9    A    Checked for a pulse and she didn't have a pulse so I

10   pulled her out of the tub.

11   Q    And where was Vern Braswell at that time?

12   A    I don't know.

13   Q    When you pulled her out of the tub, what did you do?

14   A    We took her in the bedroom and lied her down on the

15   floor.

16   Q    And then what?

17   A    Started chest compressions while the paramedic got the

18   monitor ready to put the monitor on her.

19   Q    What is the monitor?

20   A    It's a life pack.  It's what we use to check to see if

21   the patient has a rhythm, heartbeat.

22   Q    You hadn't felt a pulse but you use the monitor also?

23   A    To verify, yes.

24   Q    Okay.  And who was the paramedic who was preparing the

25   monitor?

1    A    It was Matt Hamm.

2    Q    Did you notice anything unusual about the water when

3    you pulled Ms. Braswell out of the bathtub?

4    A    The water was warm.

5    Q    When did you first notice the warmth of the water?

6    A    When I first went in.

7    Q    To pull her out?

8    A    Right.

9    Q    Were you wearing gloves?

10   A    Yes.

11   Q    Latex rubber gloves?

12   A    Yes.

13   Q    How warm was the bathtub?

14   A    I couldn't give a degree, but according to what he told

15   us, I felt the water should have been cold.

16   Q    And what do you mean by "according to what he told us"?

17   A    Well, he told us that she had went in and got in the

18   tub at approximately 2 a.m. and we received the call at 4

19   a.m.

20   Q    And you felt that since two hours had passed --

21   A    Right.

22   Q    -- it was too warm for that much time to have passed?

23   A    Correct.

24   Q    Did you speak with the defendant about how she ended up

25   in the bathtub?

1   A     No, he kind of told us on his own as we asked what

2   happened.

3   Q     What did he say?

4   A     He told us that they had been having intercourse and

5   that she had got out of the bed around two to take a bath

6   because she was hurting and he continued laying in the bed and

7   went to sleep.  He woke up a little bit before four and

8   noticed she wasn't in the bed and he got -- went up to go look

9   for her and that's when he found her in the tub and he called

10  911.

11  Q     Do you see the man in the courtroom today who made

12  those statements to you?  If the TV is in your way, you can

13  step down.

14  A     Yes.

15  Q     Can you point to him and tell me what he's wearing?

16  A     A suit behind this gentleman here.

17        MS. CARNESALE:  Your Honor, may the record reflect

18  he's identified Mr. Vern Braswell.

19  Q     Mr. Tanzy, when you pulled Ms. Braswell out of the

20  bathtub, did you notice any markings on her body?

21  A     Not at that time, no.

22  Q     When did you notice, if you did?

23  A     After we laid her down.

24  Q     What did you notice?

25  A     She had a necklace on with a little charm on it, and

1   she had just a little light red marks around her neck.

2        Q    I'm going to pass forward a photograph to you.  Ask you

3   to take a look at that picture.  Do you recognize what's

4   depicted in that photograph?

5        A    Repeat that.

6        Q    Do you recognize what's depicted in that picture?

7        A    Yes.

8        Q    Is that the woman Sheila Braswell that you pulled out

9   of the bathtub on November 5th, 2004?

10       A    Yes.

11            MS. CARNESALE:  Your Honor, I'd ask that that be

12   marked as the next exhibit.

13            THE COURT:  Okay.

14            (Exhibit No. 14 was marked and filed.)

15            MS. CARNESALE:  Your Honor, if I may approach and

16   publish that to the jury on the DOAR?

17            THE COURT:  You may.

18       Q    And, Mr. Tanzy, if you would, it's a little difficult

19   to see with the light but if you would, step down and point to

20   the jury where you saw -- and if you would, stand right here

21   and point on the photograph where you see the red markings on

22   her neck.  Let me step out of the way.

23       A    You can't really tell on this picture.

24       Q    If you take it off the lamp, can you see in the

25   picture?

1    A     Yeah, you can see when you hold it up in the light.

2    Q     Okay.  If you would now place it back there and then

3    point to where you saw it as you were holding it.

4    A     See, it's one right here and another right over here.

5    Q     Now it appears to me as if you're pointing on either

6    side of her neck?

7    A     Yes.

8    Q     The left and the right side.  Okay.  I'm going to pass

9    forward another photograph to you, Mr. Tanzy.  Is that a

10   different angle of Ms. Braswell after she was taken out of the

11   bathtub on that date?

12   A     Yes, it's a different angle.

13   Q     Can you see the markings on her neck in that photograph

14   as well?

15   A     Yes.

16          MS. CARNESALE:  Your Honor, I'd ask that be marked

17   the next exhibit.

18          THE COURT:  Okay.

19          (Exhibit No. 15 was marked and filed.)

20          MS. CARNESALE:  May I approach, Your Honor, and

21   publish that to the jury as well?

22          THE COURT:  You may.

23   Q     Mr. Tanzy, again, if you would step down and if you

24   can, indicate to the jury where the markings on her neck were?

25   A     On her right side coming down about here and on the

1    left side coming down about right here.  And on this picture,

2    you can see the impression from the charm that she had on the

3    chain also.

4    Q    And where would the impression be?

5    A    Right there.

6    Q    In the center of her chest?

7    A    Correct.

8    Q    Thank you.  You may take your seat.  Mr. Tanzy, when

9    you pulled her out of the bathtub, did you notice anything

10   unusual about her body?

11   A    Yes.

12   Q    What did you notice?

13   A    She was stiff, slightly stiff.

14   Q    Slightly stiff?

15   A    Yes.

16   Q    What portion of her body did you think was slightly

17   stiff?

18   A    At that time I could only tell that her upper arms.

19   Q    Her arms?

20   A    Correct.

21   Q    Is that the portion that you handled?

22   A    Correct.

23   Q    Did that mean anything to you as an EMT?

24   A    It's a sign of rigor mortis.

25        MS. CARNESALE:  Your Honor, at this time I'd ask

1   that these pictures be passed to the jury since the glare of

2   the DOAR equipment.

3           THE COURT:   That would be Exhibits 14 and 15?

4           MS. CARNESALE:   Yes.

5           THE COURT:   All right.

6           (Jury viewed exhibits.)

7   Q   Mr. Tanzy, did you notice, other than the marks on her

8   neck, any other markings or anything unusual on Ms. Braswell?

9   A   No.

10  Q   Did you ever look into her eyes?

11  A   Yes.

12  Q   Did you see anything unusual in her eyes?

13  A   She had, like, a blood vessel had burst in her eyes.

14  Q   When did you notice the blood vessels in her eyes?

15  A   After we stopped working her.

16  Q   Was that visible in the photographs I showed you?

17  A   I didn't pay attention.   I was looking for the red

18  marks.

19  Q   Did you have to pull up her eyelids to see the blood

20  vessels in her eyes?

21  A   No, her eyes were open.

22  Q   I'm going to pass back to you the photographs then that

23  we marked Exhibit 14 and 15 and ask you to look specifically

24  into her eyes.   Can you see the broken blood vessels there?

25  A   I can't tell on these two pictures, no.

1    Q    Thank you.  You may set them down.  As an EMT did those

2    blood vessels mean anything to you?

3    A    Yes.

4    Q    What did they signify?

5    A    Sign of suffocation or asphyxiation.

6    Q    Is that something you learned in your training as an

7    EMT?

8    A    Yes.

9    Q    Have you seen blood vessels in the eyes broken in other

10   cases where a person has been strangled?

11   A    This was the first.

12   Q    Had you ever met Mr. Vern Braswell before?

13   A    I've seen him.

14   Q    And can you tell the jury where you have seen him?

15   A    Out riding motorcycles.

16   Q    Do you ride motorcycles?

17   A    Yes, I do.

18   Q    And is that -- you've seen him at gatherings where

19   people ride motorcycles?

20   A    Yes.

21   Q    Were you friends with him?

22   A    No.

23   Q    Had you ever spoken to him?

24   A    Just hey, you know.

25   Q    When you arrived at his house that evening, did you

1    recognize him?

2    A    Yes, I did.

3    Q    Did you see the children at the house?

4    A    No, I did not.

5    Q    Did you know where they were?

6    A    I heard that they was next door.

7    Q    But when you came in the house they were gone?

8    A    I'm not for sure.

9    Q    You never saw them?

10   A    Never saw them.

11   Q    Did you know Ms. Sheila Braswell?

12   A    No, I did not.

13   Q    Had you ever seen her before?

14   A    No.

15          MS. CARNESALE:  Thank you.  Your Honor, I'll pass.

16          THE COURT:  Mr. Bailey.

17

18                      CROSS-EXAMINATION

19   BY MR. W. BAILEY:

20   Q    Mr. Tanzy, how long had you gone to EMT school?

21   A    Went through the fire department training around 19

22   weeks.

23   Q    And you say that you've seen blood vessels in eyes or

24   the sort that you saw in Ms. Braswell?

25   A    No, I said that was the first.

1      Q     That was the first?

2      A     (Witness nodded head up and down.)

3      Q     And you haven't been trained to diagnose or to tell

4    what those blood vessels represent, do you -- have you?

5      A     No, it's just a sign.  All I treat are signs and

6    symptoms.

7      Q     I see.  So have you ever seen a person who has been

8    deprived of oxygen?

9      A     Yes.

10     Q     And is that the kind of symptom you see?

11     A     And they turn blue in the face.

12     Q     Did you see any blueness -- bluishness on Ms. Braswell?

13     A     No, I did not.

14     Q     So all you know is that there at some point was oxygen

15   deprivation; is that a fair statement?

16     A     Correct.

17             MR. W. BAILEY:  Thank you.

18             THE COURT:  Any redirect?

19             MS. CARNESALE:  No, sir.

20             THE COURT:  You may step down.  Call your next

21   witness.

22             MS. CARNESALE:  State calls Matt Hamm.

23

24

25

1              MATT HAMM

2   called as a witness, being first duly sworn, was examined and

3   testified as follows:

4              DIRECT EXAMINATION

5   BY MS. CARNESALE:

6       Q    Good afternoon, sir.  Will you please state and spell

7   your name for the record?

8       A    Matthew Wayne Hamm.  First name is Matthew,

9   M-A-T-T-H-E-W.  Wayne is W-A-Y-N-E.  Hamm, H-A-M-M.

10      Q    Where are you employed, Mr. Hamm?

11      A    For the Memphis Fire Department.

12      Q    What do you do for the fire department?

13      A    I'm a firefighter paramedic.

14      Q    How long have you been with the firefighters?

15      A    About almost 11 years, about ten and a half.

16      Q    And you're a paramedic as well as a firefighter?

17      A    Yes, ma'am.

18      Q    That means you have medical training?

19      A    Yes, ma'am.

20      Q    Can you tell the jury the extent of that training?

21      A    It's basically when I did it, it was about 13 years ago

22  and went through school it was two full years of college, EMT

23  and then an intermediate and then a paramedic.

24      Q    And what type of courses do you take?

25      A    We take advance life support, pediatric advanced life

1    support, drug therapy, anatomy, physiology, illness, sickness

2    training, trauma, you know, a whole bunch of stuff packed in.

3        Q     So in other words, you don't just put out fires when

4    you respond to calls but you also treat people who are

5    injured?

6        A     Correct.

7        Q     And on November 5th, 2004, were you acting in that

8    capacity when you responded to a call at 8152 Creekside Circle

9    North?

10       A     Yes.  I was on the ambulance riding as a paramedic that

11    day, night.

12       Q     And who was on the ambulance with you?

13       A     It was EMT Basic Kevin Moore.

14       Q     And a fire truck responded also; is that correct?

15       A     Correct.

16       Q     And when you're on the ambulance, do you have equipment

17    with you?

18       A     Yes, ma'am.

19       Q     When you got to the scene, what number in line were you

20    into the house?

21       A     I believe I was the third in line.

22       Q     And the man who just left the courtroom Baba Tanzy and

23    Lieutenant Fred Jackson, they also went into the house; is

24    that right?

25       A     Yes.

1    Q    Did they go in before you?

2    A    Yes.

3    Q    When you went into the house, what did you find?

4    A    I found a female laying on her back on the floor in, I

5    believe, it was the bedroom.

6    Q    Did you ever go into the bathroom?

7    A    After a little while, yes.  I don't remember exactly

8    how long I had been there before I did.

9    Q    She was on the floor when you found her?

10   A    Yes, ma'am.

11   Q    Let me pass forward what's been previously marked

12   State's Exhibit No. 15.  Is that who you found on the floor

13   there?

14   A    Yes, ma'am.

15   Q    And is that how she appeared early that morning?

16   A    Yes.

17   Q    This was approximately what time that you got there?

18   A    It was about four in the morning, around 4:05 or so, a

19   little bit right at four o'clock in the morning.

20   Q    And if you would, when you see the victim Ms. Braswell

21   laying on the floor, what do you do?

22   A    Well, first we check to see if they're breathing.  If

23   they're not breathing, then we check for a heartbeat.  If not

24   a heartbeat then if you can -- I put what we call a

25   defibrillator on her or a heart monitor.  That's what the --

1    if you looked at it, the little stickers are on her.  And then

2    I see if she has a rhythm that we can treat or not -- a

3    treatable rhythm would be if it has what we call PQRS waves.

4    If there's any waves in it, then there's something we can do.

5    But if it's the flat line, we call that a systole, there's

6    nothing we can do for that usually.

7        Q    That means the heart is not beating at all?

8        A    Well, there's no electrical activity of the heart.

9        Q    And you can tell that by putting the monitor on her and

10   that's what those little sticky things on her are?

11       A    Yes.

12       Q    Did you do all those things for Ms. Sheila Braswell?

13       A    Yes.

14       Q    And was there any sign of life?

15       A    No.

16       Q    Other than that, did you notice anything else about her

17   that indicated to you that she might be dead?

18       A    Yes.  She was in what we call "rigor mortis,"

19   stiffening of the joints or the body, arms and legs and jaw.

20   When those get -- when that gets to that point -- it's

21   different for everybody but when it gets to that point,

22   they've been deceased for a while and there's nothing we can

23   do at all for --

24       Q    Based upon the training that you have in your

25   experience as a paramedic, the fact that rigor mortis had set

1    in, could you estimate how long she had been dead when you saw

2    her?

3        A    Not a definitive.  And like I said, it's different for

4    everybody.  And plus, they pulled her out of the bathtub so I

5    don't know.

6        Q    Does that affect rigor mortis setting?

7        A    It can but I'm not -- that's above what I know so I'm

8    not for sure.

9        Q    Did you examine her body?

10       A    Uh-huh.

11       Q    Did you notice anything else about her?

12       A    There was some marks on her neck that -- we were

13   actually on the scene over an hour.  And when we first got

14   there we couldn't see them but after being on the scene for so

15   long they became more noticeable and also checked her eyes.

16   And when I checked her eyes, she had this condition called

17   "petechiae," which is busted blood vessels of the cornea, the

18   white part of the eye, which indicates a strangulation-type

19   trauma.

20       Q    The petechiae occurs when someone has been strangled?

21       A    That's one cause of it, yes.

22       Q    Had you ever seen that in someone before?

23       A    I have seen that before.

24       Q    I'm sorry?

25       A    I have seen that before, yes.

1    Q    And when did you notice the broken blood vessels in her

2    eyes?

3    A    That was a little -- maybe 15 to 20 minutes later

4    after.

5    Q    Were they visible or did you have to look into her eyes

6    and lift her eyelids up?

7    A    You had to lift her eyelids up.  You couldn't see them

8    without lifting her eyelids.

9    Q    And if you would just demonstrate on yourself where

10   were they on the eye?

11   A    They were in the upper half of the cornea, the upper

12   half of the eye, of the white part of eye.

13   Q    In both eyes?

14   A    Yes.

15   Q    The markings on her neck, if you would again

16   demonstrate on yourself on your neck where you observed those?

17   A    There was one across the -- I don't remember exactly

18   where at -- but it was just a thin mark across and then one

19   was down -- there were three marks.  As I say one was across,

20   one was kind of down at an angle and I can't exactly remember

21   where the third one was at.  I think it was a little bit lower

22   around down this way.

23   Q    Are you able to see the markings on her neck in that

24   photograph?

25   A    Yes.  Yeah.

1  Q    The markings that appear in that picture, is that how
2  you recall?

3  A    Right, correct.

4  Q    Did you ever speak to Mr. Vern Braswell, the husband of
5  the deceased?

6  A    We were all kind of talking to him at the same time,
7  but basically we just asked him what had happened.

8  Q    And do you recall what he said?

9  A    Yes.  He said approximately two hours prior to him
10 calling us his wife wanted to take a bath.  And he said that
11 was about two hours before we got there, which would have made
12 it around two o'clock.  And I can't remember exactly if he
13 said he went back to sleep or just let her be, but then two
14 hours after that he checked on her, found her not breathing
15 and then called us.

16 Q    Did you ever go into the bathroom?

17 A    Yes.

18 Q    Why did you go into the bathroom?

19 A    Well, we were just looking around for any -- because we
20 were -- it was still kind of unclear what was going on so we
21 kind of, you know, looked around to see if there was maybe
22 medicine bottles or just anything, you know, medically related
23 to the patient since we were -- we were confused as to why
24 this had happened ourselves so, you know, we were trying to
25 figure something out.

1    Q    And did you ever touch the water that was in the

2    bathtub?

3    A    Well, when they pulled her out, Baba Tanzy and

4    Lieutenant Jackson, they said they had mentioned the water

5    being hot and then I did go in there -- again, I don't

6    remember exactly how long -- and stick my -- I had a gloved

7    hand, stuck that in there and it was still hot.  It was more

8    hot.  It was more than warm.  It was hot.

9    Q    Would you have -- would that water have been warm

10   enough for you to take a bath in to your own personal liking?

11   A    It would have been too hot for me.

12   Q    Did you actually test the temperature of the water?

13   A    Yes.  One of the detectives asked me to take the

14   temperature of the water, and it was 94.6 and that was about

15   an hour after we had been there.

16   Q    You arrived around 4 a.m.?

17   A    Right.  And it was at 5:07, I believe, in the morning.

18   And it was 94.6.

19   Q    94.6 degrees Fahrenheit?

20   A    Correct.

21   Q    If you would look at the photograph that you have in

22   your hand.  It appears that there is, like, a substance in Ms.

23   Braswell's mouth.  Can you explain what that is?

24   A    White frothy substance.  In this case it was water or I

25   don't know, you know, it was water, more than likely the bath

1   water, but from moving her out of the tub and moving her

2   around a little bit and we could hear her kind of a gurgling

3   noise and that was water in her lungs.  Like I said, we moved

4   her around.  You know, they were kind of -- you know, they

5   yanked her, pretty much yanked her out of the tub.  I mean,

6   we're not -- you know, when we know you're not breathing and

7   heart is not beating, we're not -- you know, we're trying to

8   hurry up and do what we need to do as fast as we can so we're

9   not too gentle is what I mean.  I mean, we're gentle enough

10  not to hurt you anymore.

11      Q    Want to get the treatment started --

12      A    -- started right away, correct.

13      Q    And did that white froth in her mouth indicate anything

14  to you?

15      A    Other than water in her lungs.  She had water in her

16  lungs.

17           MS. CARNESALE:  Thank you, Mr. Hamm.  I'll pass.

18           THE COURT:  Mr. Bailey.

19           MR. J. BAILEY:  Would Your Honor hold on just one

20  minute?

21

22                       CROSS-EXAMINATION

23  BY MR. W. BAILEY:

24      Q    Mr. Hamm, I believe you said strangulation is one cause

25  that you saw that would cause those signs that you saw?

1    A    Yes, sir.

2    Q    Am I correct?

3    A    Yes, sir.

4    Q    Could have been other causes, too, couldn't it?

5    A    Mainly, it's what we're taught is strangulation.   Other

6    signs I'm not -- or causes, I mean --

7    Q    But the bottom line is oxygen deprivation to the brain,

8    isn't it?

9    A    Correct.

10   Q    Suffocation?

11   A    Right.

12   Q    Okay.   Now are you familiar with autoasphyxiation?

13   A    Yes, yes.

14   Q    Have you had the occasion to run across cases of

15   autoasphyxiation?

16   A    Personally, no.   I've just read about them.

17   Q    Read about them and studied about them?

18   A    Correct.

19   Q    Tell the jury what autoasphyxiation is, what you know

20   about it.

21   A    It's a form of sexual heightened pleasure when somebody

22   -- they cut off the oxygen to the brain, not fully, but it's

23   supposed to heighten sexual pleasure.   And it's a -- a form of

24   putting your hands or tying a towel or rag or rope or

25   something around your neck to cut off some of the oxygen to

1     your brain to heighten sexual pleasure.

2         Q     And sometimes the result is accidentally fatal, isn't

3     it?

4         A     Yes.

5              MR. W. BAILEY:  No further questions.

6

7                      REDIRECT EXAMINATION

8     BY MS. CARNESALE:

9         Q     Mr. Hamm, this is just something you've read about?

10        A     Yes, ma'am.

11        Q     Never seen from a medical standpoint?

12        A     Right, never have made a personal call on my own of

13    that type.

14        Q     And it's a type of choking involving --

15        A     A number of different.  Ropes, towels, hands or

16    whatever.

17        Q     Have you ever read about anything using as delicate as

18    a necklace choking someone?

19        A     No.

20              MS. CARNESALE:  Nothing further.

21              THE COURT:  You may step down.  Call your next

22    witness.

23              MS. WEIRICH:  State calls Officer Galloway.

24

25

1                                    OFFICER GALLOWAY

2      called as a witness, being first duly sworn, was examined and

3      testified as follows:

4                                DIRECT EXAMINATION

5      BY MS. WEIRICH:

6         Q     Good afternoon.

7         A     Good afternoon.

8         Q     Would you please tell the jury your name and spell your

9      first and last names for the court reporter?

10        A     My name is David Galloway.  D-A-V-I-D G-A-L-L-O-W-A-Y.

11        Q     You're obviously with the Memphis Police Department.

12        A     Memphis Police Department, yes, ma'am.

13        Q     How long have you been with the department?

14        A     About nine years now.

15        Q     Where are you currently assigned?

16        A     I'm assigned to crime scene investigation.

17        Q     All right.  How long have you been with crime scene?

18        A     A little over five years.  A little over five years.

19        Q     What does crime scene do?

20        A     Basically, we come into a scene wherever a crime has

21      been committed and we take photographs or in the case of a

22      homicide we might -- or suspicious death, we might do a

23      sketch, plus photographs and collect any evidence available.

24        Q     All right.  Back on November 5th, 2004, were you

25      assigned to the crime scene unit?

1     A     Yes, ma'am.

2     Q     Were you working that morning?

3     A     Yes, ma'am.

4     Q     Were you asked to go to a home on Creekside Circle

5   North in Shelby County?

6     A     Yes, ma'am.

7     Q     Did you go to that home?

8     A     Yes, ma'am.

9     Q     Was anyone with you?

10    A     I had Officer Hill met me at the scene and he's also in

11  crime scene, yes.

12    Q     Tell the jury what was going on there when you got

13  there.  Were you one of the first people to get to the scene

14  or were there lots of people already there by the time you got

15  there?

16    A     There were people already there by the time I got

17  there; uniform patrol, I think Lieutenant Bullard was the

18  supervisor on the scene, a few other officers.  I don't

19  remember exactly who.

20    Q     What is your responsibility when you walk into a scene

21  like that?

22    A     Well, once the officers give me an idea of what's going

23  on at the scene, I'll look around for myself to find out what

24  I can do to capture the scene as it was at that particular

25  time since it was a person that was deceased.

1   Q    Was the victim's body still there?

2   A    Yes, it was.

3   Q    All right.  And the scene that we're talking about

4   here, are we just talking about one particular room or are we

5   talking about the entire house?  How do you determine?

6   A    In this case we are basically dealing -- we were

7   basically dealing with the bedroom and the master bath that's

8   adjoined with it.

9   Q    You indicated that sometimes with a homicide or with a

10  deceased body you make a sketch?

11  A    Yes, I do.

12  Q    Did you do that in this case?

13  A    Yes, ma'am.

14  Q    I'm going to pass you a piece of paper.

15       MR. W. BAILEY:  Excuse me.  Would you mind passing

16  the documents to us so we can see them first?  I don't know

17  whether -- I assume it's the same document.

18       MS. WEIRICH:  That's it.

19  Q    Do you recognize that?

20  A    Yes, ma'am.

21  Q    What is that?

22  A    This is a sketch I made at that particular location.

23       MS. WEIRICH:  Judge, at this time if we could have

24  that marked as Exhibit 16.

25       (Exhibit No. 16 was marked and filed.)

1      Q     How do you go about making that sketch?

2      A     Basically, we work from -- we look at where the body is

3    located and then we'll try to put in information that might be

4    pertinent to investigators as far as recapturing where the

5    victim was lying, if they have to come back a week later or a

6    day later or what have you, and we'll put in some items that

7    may or may not be important but at the same time they were in

8    the scene or in that area.  But -- and we'll make some -- take

9    some measurements to help with that.

10     Q     Okay.  And do you actually get a ruler and measure

11   things?

12     A     Yes, ma'am, just a tape measure in this case.

13     Q     Okay.  The -- where the body is depicted in that

14   sketch, is that where the body was when you got there?

15     A     Yes, ma'am.

16     Q     In other words, you don't go back and try to recreate a

17   scene?

18     A     No, ma'am.

19     Q     You draw it as you see it?

20     A     Yes, ma'am.

21     Q     All right.

22           MS. WEIRICH:  Judge, may I publish that?

23           THE COURT:  You may.

24           MS. WEIRICH:  If he may be allowed to step down?

25           THE COURT:  He may.

1    Q    Point for the jury -- and you might have to slide it up

2    and down but for now we'll do the top half of it.  What is the

3    jury looking at there?  Actually, let me start with the

4    heading.  What does that heading tell you?

5    A    Okay.  It's a DOA unknown basically.  We're saying at

6    that location we wasn't sure, you know, what was the victim's

7    cause of death at that time.  So we made a sketch just

8    depicting what the area where she was last, you know, where

9    she was -- we was dealing with the bedroom and the master

10   bath.

11   Q    All right.  Those numbers there in the key, what are

12   those?

13   A    Number one is always, generally speaking, I shouldn't

14   say always but generally speaking is the victim herself.  And

15   number two was an item of Skyy Blue beverage bottle, which I

16   think is some type of liquor or something.  The same with

17   three was a Skyy Blue beverage bottle, and T was a tile that

18   was located in the scene.

19   Q    All right.  Did you measure the bathtub?

20   A    I actually measured to the rims of the bathtub where it

21   comes wall to wall.

22   Q    All right.  I'm going to pass you what's been marked as

23   Exhibit 2.  Do you recognize that?

24   A    Yes, ma'am.

25   Q    Is that the bathtub?  Did you take that picture?

1       A       No, ma'am, I didn't.

2       Q       Did a crime scene officer?

3       A       I believe so.

4       Q       Okay.  Is that the bathtub that you measured that's

5   shown in the sketch?

6       A       Yes, ma'am.

7       Q       All right.  If you could place the photograph down,

8   that might be a better -- and explain to the jury what you

9   mean by measuring from wall to wall?

10      A       Okay.  Where this tile is cut, the lower part right

11  below the --

12      Q       If you could lower it a little bit so the jury could

13  see the whole thing.

14      A       Okay.  This lower end here will go from the inner side

15  of the bathtub to this -- actually not to the wall in this

16  case because there's a border before the wall.  So it will be

17  to that border, from border to border.

18      Q       And how long was it?

19      A       We've got it measured at five-feet-one inch and

20  lengthwise, we measure from the edge of the tub to the border

21  which would be two-feet-ten inches.

22      Q       For the width?

23      A       For the width going from north to south.

24      Q       Thank you.  I'll take that photograph back.  And if you

25  could slide the sketch up.  What is the -- and if it helps

1    you, you can look at the Judge's screen to make sure the jury

2    is seeing what you are talking about.  What does the bottom

3    portion of that sketch tell us?

4      A    Okay.  This is a bedroom where the victim was lying

5    when I came into the scene.  And you can see where the victim

6    is pretty much.  We measured from the victim's feet, which

7    were from the south to north to that doorway.  The doorway was

8    actually even with that measuring point.  And from her head to

9    the wall going from her head to the south end would be six

10   feet from that location.  And then we measured from east to --

11   from east to west.

12     Q    I'm sorry.  What was that?

13     A    We measured from her head to the west -- west side.  I

14   believe it was the west side of the room.

15     Q    Okay.  And is there anything on the bottom further down

16   on the sketch or is that the end of the sketch where it shows

17   the hallway closet?

18     A    Yes, that's the hallway leading to the bedroom and

19   there's a closet in that hallway, which just letting you know

20   it was there.

21     Q    All right.  You may have your seat.  Did you dust for

22   prints?

23     A    No, ma'am.

24     Q    Why?

25     A    Generally, if there is a reason for prints on a case as

1   this, a secondary unit will come in and do that on another

2   date.

3       Q    Were there any signs of any forced entry?

4       A    Not that I know of or reported to me.

5       Q    All right.  If they had been reported to you, would you

6   have dusted yourself or had someone come to dust?

7       A    We would have probably dusted that day if it was

8   reported to you, you know, as apart of the case itself right

9   away since it was -- I believe it was kind of cool that night

10  so we probably would have dusted to try to get it while it's

11  fresh.

12      Q    All right.

13      A    That morning.

14      Q    I'm going to pass you eight photographs.  I pass you

15  these photographs, Officer Galloway, and ask you to look

16  through them for me first.

17      A    Okay.

18      Q    Do you recognize those?

19      A    Yes, ma'am.

20      Q    What are they?

21      A    These are the photographs that I guess would best

22  depict what the bedroom and that bathroom looked like at the

23  time that I was on the scene.

24      Q    All right.

25             MS. WEIRICH:  Judge, I'd ask that those eight

 1    photographs be moved into evidence as the next numbered

 2    exhibits.

 3              THE COURT:  All right.

 4         (Exhibit Nos. 17-24 were marked and filed.)

 5              MS. WEIRICH:  May I publish those, Your Honor?

 6              THE COURT:  You may.

 7    Q    Again, Officer Galloway, if you will --

 8              MS. WEIRICH:  May he be allowed to step down, Your

 9    Honor?

10              THE COURT:  He may.

11    Q    What is the jury looking at in Exhibit 24?

12    A    This is the little, I guess, like a vanity inside of

13    the bathroom.

14    Q    In the same bathroom area where the bathtub was?

15    A    Yes.

16    Q    That they've seen the picture of?

17    A    Yes.

18    Q    All right.  And Exhibit 23?

19    A    This is the victim lying on the floor in the bedroom.

20    Q    All right.  If we were to -- what's down that hallway

21    there?

22    A    Okay.  That is leading to the bathroom itself.

23    Q    Exhibit 22?

24    A    That is the bathtub that I did measurements of earlier.

25    Q    Is that the water as you found it?

1      A     Yes.

2      Q     All right.  Exhibit 21?

3      A     That is a bed in the bedroom as it was that particular

4    day.

5      Q     All right.  Exhibit 20?

6      A     Yes, that's the dresser and the ironing board and the

7    Skyy Blue bottle that was on the ironing board.

8      Q     All right.  Is that the same Skyy Blue bottle that you

9    indicated in the crime scene sketch?

10     A     Yes, that's one of them.  There was two of them

11   indicated in that sketch.

12     Q     Again what is that a picture of?  I'm sorry, for the

13   record that is Exhibit 19.

14     A     That's the dresser in the bedroom showing the big

15   screen television and the ironing board again.

16     Q     All right.  Exhibit 18?

17     A     18 is showing the bathtub.  That's the side of it

18   showing the tiles down the edge of the bathtub.

19     Q     And is there anything indicated from the sketch in that

20   photograph down on the floor?

21     A     I would have to look at the sketch to see if we have

22   anything.  Item three, yes, that's the tile -- excuse me.

23   That was a bottle, the Skyy Blue bottle right here.

24     Q     Move that up for the jury to see it.  Where is the

25   bottle?

```
 1      A     Okay.  Right below the tub.  Right below the tub by

 2   some spray bottle.

 3      Q     And Exhibit 17.  What is the jury looking at there?

 4      A     Okay.  That is the complete -- I think that is the

 5   complete vanity set that's inside the -- the mirror is

 6   actually in the picture showing a back shot.

 7      Q     Is that the same bathroom area that we've been talking

 8   about?

 9      A     Let me go back to one photograph to make sure that I'm

10   --

11      Q     Sure.  I'll give you this stack.  Yes, sir.

12      A     I'm not really sure about this one.

13      Q     Is it indicated in your sketch?

14      A     That's what -- well, no.  It's nothing in here that I

15   have that I can recall that's in my sketch so I'm not really

16   -- I wouldn't want to say for sure.  It looks like the vanity

17   in the corner but I'm not 100 percent sure.

18      Q     Do you remember a vanity in the corner?

19      A     Yes, it's kind of an L-shape that I did in the sketch,

20   but I -- I'm not really 100 percent sure.

21      Q     Okay.  All right.  Thank you.  I believe that was all

22   of the pictures.

23      A     Okay.

24      Q     I'm going to ask that this bag be passed to you,

25   Officer Galloway.
```

1          MR. J. BAILEY:  Let us take a look at that,

2     please.

3     Q     On the outside of that bag is there an identifying tag?

4     A     Yes, ma'am.  There should be another one.  Here it is

5     right here.  Yes, ma'am.

6     Q     And is that tag -- was it filled out by you or someone

7     else?

8     A     This was filled out by me.

9     Q     All right.  What information is contained on there?

10    A     Okay.  First of all it has the receipt number, which

11    the property room would give us when we tag it into the

12    property room, myself and Officer Hill's IBM number and

13    information about the victim and the location.

14    Q     All right.  Does every case have its own property

15    receipt number?

16    A     Yes, it does.

17    Q     And if you could look inside the bag and tell me if you

18    recognize what's in it?

19    A     Okay.  This is the Skyy Blue bottle.  Do you want me to

20    take it out?

21    Q     Please.

22    A     Skyy Blue bottle I mentioned earlier.  And this was the

23    one from the bathroom floor by the bathtub.

24    Q     All right.

25    A     Okay.  This is Skyy Blue bottle that was sitting on the

1    ironing board.

2       Q    Yes, sir.

3       A    In the bedroom.

4              MS. WEIRICH:  Judge, if we could have that marked,

5    please, collectively as Exhibit 25.

6              THE COURT:  25.

7              (Exhibit No. 25 was marked and filed.)

8       Q    And, Officer, are those the same Skyy Blue bottles that

9    the jury has seen depicted in the photographs and on the crime

10   scene sketch that you drew?

11      A    Yes, ma'am.

12             MS. WEIRICH:  Your Honor, I'll pass the witness.

13             THE COURT:  Mr. Bailey.

14

15                          CROSS-EXAMINATION

16   BY MR. J. BAILEY:

17      Q    Now, Officer Galloway, it was your testimony during

18   direct that -- I think you testified that it's your job to try

19   to recapture the scene so that if the detectives who are case

20   officers have to come back and take a look at it, they're able

21   to recreate the scene.  You don't recreate it but you try to

22   capture it as it is for purposes of the detectives'

23   investigation?

24      A    Yes, with the combination of sketch and photographs it

25   should.

1    Q    And of course have you been trained in crime scene

2    work?

3    A    Yes, sir.

4    Q    And isn't it true that when an officer is on a crime

5    scene that you want to secure the area because you don't want

6    that crime scene disturbed as little as possible; is that

7    correct?

8    A    Yes, officers on the scene, initial officers on the

9    scene should secure the scene.

10    Q    All right.  And there's some other things that are done

11    in furtherance of investigation, such as -- and you tell me if

12    this is true -- such as I think the bags were placed on the

13    hands of the decedent so that when the decedent was shipped to

14    the medical examiner, whatever might be under the nails and so

15    forth could be preserved; is that correct?

16    A    She should, yes.

17    Q    That was done in this case, too, wasn't it?

18    A    I believe so.

19    Q    All right.  And that's a precautionary measure to

20    preserve what might be under the nails, if there was skin or

21    blood or what have you; is that correct?

22    A    Yes.

23    Q    And likewise, now I know there was some testimony about

24    you all didn't call in a fingerprint team or whatever you call

25    them, fingerprint -- you didn't call anybody to dust for

1    latent prints; is that correct?

2        A    No, I didn't.

3        Q    What about those Skyy bottles?  Did you all -- did you

4    have those examined for prints?

5        A    Actually, it was up to the investigator.  If he felt he

6    or she felt that they needed to be examined, they could have

7    examined them the next day.

8        Q    And I think --

9        A    That it was collected.

10       Q    I didn't mean to cut you off.

11       A    Once they collect it, they're in our custody so it's

12   not an extreme rush for that.  But if the investigator sees a

13   reason to have them processed, they can just send them to the

14   lab to be processed.

15       Q    And it would tell us whose fingers, if they are

16   examined for prints, it might tell us who handled that bottle?

17       A    Possibly, yes.

18       Q    Now also, you used the term on direct examination that

19   you tried to preserve the scene for pertinent things, meaning

20   if it seems like it's relevant to this investigation, you try

21   to preserve it; right?

22       A    Yes.

23       Q    And you were asked did you check for signs of forced

24   entry.  And I think you said you didn't see any.

25       A    No.  And generally, the investigators were on the

1    scene.  Officers who were securing the scene, they would

2    probably have -- they would have already checked for that

3    unless there was a reason why they wouldn't have and they

4    would have told me, well, we have some questions about this

5    place, this location or that location.

6        Q    Truth of the matter is that while you were on the

7    scene, you all thought this was a drowning, isn't that true?

8        A    I wasn't sure what it was.

9        Q    Okay.  Well you all didn't look to see whether any

10   intruders had come in, did you?

11       A    I didn't.

12       Q    They didn't tell you to go and check the back door and

13   take pictures of the back door or front door or all the

14   windows, did they?

15       A    Nobody made any mention of that.

16       Q    And there was an upstairs to this residence; is that

17   correct?

18       A    No, sir.

19       Q    And you didn't go upstairs to photograph anything up

20   there, did you?

21       A    No, sir, I didn't.

22       Q    Now on your sketch -- may I pass to you what's

23   previously been marked Exhibit 16.  Now on your sketch you

24   indicate two nightstands on the -- on each respective side of

25   the bed; isn't that correct?

1    A    Yes, sir.

2    Q    Now you didn't open those nightstands to photograph the

3    inside of them, did you?

4    A    No, sir, I didn't.

5    Q    Now I want to ask you this question.  Were you told by

6    either of the officers to look for any certain things?

7    A    No, sir.

8    Q    Okay.

9         MR. J. BAILEY:  Would Your Honor indulge me one

10   moment?  No further questions.

11        THE COURT:  Any redirect?

12        MS. WEIRICH:  No, sir.

13        THE COURT:  You may step down.  All right.  Ladies

14   and gentlemen, we'll take about a ten-minute recess at this

15   time.  As always, do not discuss the case during the recess.

16        (Jury out.)

17        THE COURT:  Take him out, please.  Stand in

18   recess.

19        (Recess.)

20        (Jury present.)

21        THE COURT:  Call your next witness.

22        MS. CARNESALE:  State calls Sergeant Kjellin.

23

24

25

1    SERGEANT KJELLIN

2    called as a witness, being first duly sworn, was examined and

3    testified as follows:

4    DIRECT EXAMINATION

5    BY MS. CARNESALE:

6    Q    Good afternoon.

7    A    Good afternoon.

8    Q    Would you please state and spell your name for the

9    record?

10   A    Andrew Kjellin.  Spelling of last name K-J-E-L-L-I-N.

11   Q    Where are you employed, Sergeant Kjellin?

12   A    Memphis Police Department, Felony Response Unit.

13   Q    And you're currently the rank of Sergeant?

14   A    Yes.

15   Q    How long have you been a Memphis police officer?

16   A    16 years.

17   Q    How long have you been the rank of Sergeant?

18   A    A little over two.

19   Q    And you're currently assigned to Felony Response?

20   A    Yes.

21   Q    Can you tell the jury what that is?

22   A    We do all preliminary investigations for all rapes,

23   robberies, homicides, major felonies between the hours of

24   midnight and 8 a.m.

25   Q    And then at 8 a.m. what happens to those cases that

1    you've investigated overnight?

2        A    The specialty bureaus take over.

3        Q    Such as robbery --

4        A    -- homicide.

5        Q    Were you a Sergeant with the felony response team in

6    November of 2004?

7        A    Yes, I was.

8        Q    On November 5th, 2004, were you called to the location

9    of 8152 Creekside Circle?

10       A    Yes.

11       Q    And that is in Memphis, Shelby County, Tennessee?

12       A    Yes, it's in Cordova.

13       Q    And approximately what time did you go to that house?

14       A    I arrived somewhere around 5:30 in the morning.

15       Q    Who called you to that location?

16       A    I was assigned by my lieutenant who received a call

17   from the field lieutenant who was on the scene of an unknown

18   death.

19       Q    And who was your lieutenant at that time?

20       A    Lieutenant Hanscom.

21       Q    When you got there did you go by yourself or were you

22   with a partner?

23       A    I had a partner follow but I was there.  I drove by

24   myself.

25       Q    And are you dressed as you are now in street clothes?

1    A    Yes.

2    Q    Not in uniform?

3    A    Not in uniform.

4    Q    When you arrived what did you find?

5    A    When we got there I met the field lieutenant.  There

6    was several people in the house already.  We went back.  They

7    escorted me to the back where the crime scene was and noticed

8    the body laying on the ground.

9    Q    Was that the bedroom -- I'm sorry.

10   A    That was the bedroom.

11   Q    I interrupted you.  What were you --

12   A    That's okay.

13   Q    It was a female body?

14   A    Yes.

15   Q    Had you been given any information about what happened?

16   A    Just that it was an unknown death.

17   Q    I'm going to pass forward to you what was previously

18   marked Exhibit No. 15.  Is that the body that you saw lying on

19   the floor that day?

20   A    Yes.

21   Q    Early that morning?

22   A    Uh-huh.

23   Q    What did you do when you got into the room and saw that

24   body?

25   A    Well, I asked the field lieutenant and the officers

1    there what preliminary information they did have; victim's

2    name, who was in the house, what information they had as to

3    the particulars of why she was laying on the floor and that.

4       Q    What were you told?

5               MR. W. BAILEY:   Objection, hearsay.

6               MS. CARNESALE:   Your Honor, I'm not asking to

7    introduce this for the truth of the matter asserted, it goes

8    to explain what he did next and what actions --

9               THE COURT:   I'll sustain the objection.

10      Q    Based on the information you were given, what did you

11   do?

12      A    Based on that information, we looked around the room

13   for any signs of entry and there didn't appear to be any.  The

14   room was heavily cluttered with personal items and clothing,

15   et cetera.  The bathroom, we looked in the bathroom because we

16   were told she had been in the tub.  The field lieutenant had

17   mentioned that the water was still warm and the paramedics

18   said that the temperature was in the 90s.

19              MR. J. BAILEY:   Again, objection.

20              THE COURT:   Overruled.  Go ahead.

21      Q    I'm sorry.  The paramedics said what?

22      A    The temperature in the water was in the 90s.

23      Q    Did you observe the bathtub?

24      A    I looked at the bathtub.  I didn't feel the water, no.

25      Q    Was there water still in the tub?

1    A    Yes.

2    Q    And then what did you do?

3    A    From there I left and went and talked to Mr. Braswell.

4    Q    Do you see Mr. Braswell in the courtroom today?

5    A    Yes, he's here.

6    Q    Can you point to him and tell me what he's wearing?

7    A    He's sitting behind the attorney table there.  He's in

8 a dark suit with a black and white tie, I believe, or could be

9 possibly gray from this point of view.

10          MS. CARNESALE:  Your Honor, may the record reflect

11 he has identified the defendant Vern Braswell.

12    Q    Did you speak with Vern Braswell?

13    A    Yes, I did.

14    Q    Where were you when you spoke with him in the house?

15    A    I originally took him to the den area.  And I asked --

16 there were six people in the house and we asked them to leave,

17 step outside so I could talk with him and find out since he

18 was the only adult in the house at the time what happened.

19    Q    Were the six people you asked to leave, were they not

20 law enforcement or firefighters?

21    A    No, they weren't related -- as far as they weren't law

22 enforcement or emergency personnel, no.

23    Q    Okay.  And they left and you spoke with Mr. Braswell?

24    A    Yes.

25    Q    What was he wearing at that time?

```
1     A     He was wearing a bathrobe.

2     Q     How was he acting?

3     A     Kind of calm.

4     Q     And what did he tell you had happened?

5     A     He had told me that around midnight he and his wife

6  were having sex in the jacuzzi tub and that she had gotten dry

7  so they decided to move to the bed and they moved into the bed

8  and around 1:30 they had talked about letting the bath water

9  -- who was going to let the bath water out.  He then said he

10 -- she was complaining of cramping.  So he rolled over and

11 went to sleep.  He then told me that he woke up around 3:40 to

12 3:50, somewhere in that time frame.  She wasn't in the bed.

13 He went in the bathroom and found her and then he called a

14 friend and then called 911, and then he stated that he

15 couldn't get her out of the tub.

16          From then I questioned him again concerning when he

17 called his friend because I was unsure whether he called his

18 friend before or after calling 911.  He stated he called them

19 before calling 911.

20    Q     Did he tell you that friend's name?

21    A     Brian.  I don't recall the last name.  I'd have to look

22 in my supplement for that.

23    Q     And he stated he called Brian before he called 911?

24    A     Yes.

25    Q     Did he say why?
```

1    A    No, I don't recall.

2    Q    And then he called 911.  Then what did he do?

3    A    He called and said he couldn't get her out of the tub.

4    Q    Did you see anything about the bathroom or the bathtub

5    that would explain why he could not get her out of a bathtub?

6    A    No, it's a rather shallow tub.  It's a small jacuzzi

7    tub.

8    Q    Is it -- well, I'm going to pass forward a photograph

9    previously marked Exhibit No. 2.  Was that the bathtub that

10    was in the house that morning?

11    A    Yes, it was.

12    Q    And is that a normal size bathtub as opposed to an

13    oversized jacuzzi tub that you see in some houses?

14    A    Yeah, it would be considered smaller.  It would be more

15    like a standard tub with the jet added to it.

16    Q    Okay.  Based on what Mr. Braswell told you, what did

17    you do?

18    A    From there I went back into the room and talked with my

19    partner, and we consulted our supervisor.  And by that time

20    it's getting later in the morning so we asked him to go ahead

21    and get dressed and come to our office for a statement once

22    body removal had taken care of all their -- and crime scene

23    finished.  Since the children were taken care of already, we

24    went ahead and asked Mr. Braswell -- he had a friend that

25    followed me in their vehicle to 201 Poplar, and from there it

1   was getting close to eight o'clock so I allowed homicide to

2   take over the investigation.

3       Q    So you got to the house around 5:30; is that right?

4       A    That's correct.

5       Q    How long did you investigate the scene, by that I mean

6   look around the house and talk to people on the scene?

7       A    I'm not sure the exact time but I got -- we returned

8   back here around eight.  It was getting close to eight

9   o'clock.

10      Q    So you were there a total of --

11      A    An hour and a half, two hours.

12      Q    How long did you speak with the defendant?

13      A    Five minutes at the most.

14      Q    Why did you ask him to come down to this building to

15  give a statement?

16      A    Typically though when we have a felony or an unknown

17  event, we try and get the witness or victim to come down and

18  provide a type-written statement right then because their

19  thoughts are clear and untainted from friends' points of view,

20  media, should they be there, or any other outside stimuli.  We

21  get it as quickly as possible.

22      Q    And normally you would take that statement; is that

23  correct?

24      A    Yes, normally I would if it was -- depending on the

25  situation, myself or another investigator in the office.

1   Q    Why did you turn this case over to homicide to take the

2   statement?

3   A    Well, due to the budget shortfall, there -- in an

4   unknown case like this, homicide will eventually get the case

5   from us anyway.  And since they were coming in, they have more

6   time, better equipped than we are to interview.  They've got

7   interview rooms where we don't.

8   Q    Okay.  Mr. Braswell was not arrested; is that correct?

9   A    No, he was not under arrest.

10  Q    He was free to come and go but you asked him to come

11  down?

12  A    Yes.

13  Q    And he came down by way of a friend bringing him?

14  A    Yes, they followed me in their vehicle.

15  Q    Did you consider him to be a suspect at that point?

16  A    I had some reservations but until further

17  investigation, I wouldn't be able to say for sure.

18  Q    What were your reservations about what you knew about

19  this case?

20  A    Well, her being --

21       MR. W. BAILEY:  Your Honor, objection.

22       THE COURT:  Sustained.

23  Q    Did you look at Ms. Braswell's body?

24  A    Yes, I did.

25  Q    Did you notice anything unusual about it?

1    A    Yes.   There was some discoloration around the neck,

2    looked like bruising but I'm not a physician so I can't say

3    for sure.   But she also had -- and I had never seen it before,

4    one of the other investigators that had seen petechiae and I

5    had never seen it so they showed me what the eye looks like

6    when someone experiences choking, the blood vessels bursting

7    in the eyes.

8    Q    The blood vessels bursting in the eyes?

9    A    Right.   I had never had a case similar to that before

10   and they showed me what it looked like so in the future if I

11   came across that, it would be an indicator.

12   Q    Where -- you saw that on Ms. Braswell?

13   A    Yes.

14   Q    Where on her eyes did you see it?

15   A    They opened the eye just a little bit so we could see

16   it.

17   Q    And if you would for the jury explain where on the eye?

18   The upper?   The lower?

19   A    They just opened the lids of the eye.   They took the

20   finger and just barely moved them up and you could see the

21   discoloration on the pupil and in the area of the eye.

22   Q    While you were speaking with the defendant, did you

23   ever see him making any phone calls?

24   A    He had been on the phone off and on from my

25   understanding.   I don't recall specifically.

1          MR. W. BAILEY:  Objection.

2          MS. CARNESALE:  Well, let me rephrase.

3          THE COURT:  Rephrase.

4     Q    From what you personally observed, did Mr. Braswell

5     make or receive any telephone calls?

6     A    I believe he received one after I was through with him.

7     Q    Was this on a house phone or cell phone?

8     A    I don't recall whether.  It was portable, whatever type

9     he was using.

10         MS. CARNESALE:  Thank you.  No further questions,

11    Your Honor.

12         THE COURT:  Mr. Bailey.

13

14                    CROSS-EXAMINATION

15    BY MR. J. BAILEY:

16    Q    Sergeant Kjellin, how are you?

17    A    I'm fine.

18    Q    I just have a couple questions for you.  Now, you see

19    Mr. Braswell.  You've identified him; is that correct?

20    A    That's correct.

21    Q    And he has a lighter complexion than myself; is that

22    correct?

23    A    I'd have to -- yes, he's lighter.

24    Q    As light as this juror sitting here?

25         MS. WEIRICH:  Objection, Your Honor.

1               THE COURT:  Sustained.  That's not appropriate,

2    Mr. Bailey.

3       Q    He's lighter than I am; is that correct?

4       A    Yes.

5       Q    And you viewed him there at the house and downtown; is

6    that correct?  You had a chance to see him; is that correct?

7       A    Uh-huh.

8       Q    And did you see any scratches on him anywhere?

9       A    I didn't notice any.

10       Q    No blood trickling from any abrasions or anything of

11    that nature?

12       A    I didn't recall any, no.

13       Q    Did you notice that Mr. Braswell had nipple piercings

14    himself?

15       A    I didn't notice that.

16       Q    Did you notice -- you certainly noticed the body

17    piercings on the decedent; is that correct?

18       A    Yes, there's some piercings.

19       Q    Nipples, belly button or navel; is that correct?

20       A    It looks that way in the photo.

21       Q    Okay.  And had you seen wounds or markings on Mr.

22    Braswell, that would have at least heightened your suspicion;

23    is that correct?

24       A    I didn't see any.  I didn't notice any.

25             MR. J. BAILEY:  Your Honor, indulge me a moment.

1    Q    You knew that Mr. Braswell was the spouse of the

2    decedent Ms. Sheila Braswell; is that correct?

3    A    Yes.

4    Q    And as a trained investigator, certainly as you're

5    talking to this person who's on the scene of what at least was

6    a death, an unexplained death but was possibly a homicide,

7    you're viewing that person and you're at least observing to

8    see if you do see anything that may be pertinent.  That would

9    be fair to say, wouldn't it?

10   A    What are you trying to ask?

11   Q    No, just answer my question.

12   A    Well, I --

13   Q    I'll rephrase it for you.

14   A    I'm not sure what you were wanting me to answer.

15   Q    As you were talking with Mr. Braswell, you certainly

16   were looking at Mr. Braswell to see if there were any markings

17   or bruisings on him, weren't you?

18   A    I didn't disrobe him, no.

19   Q    When you arrived at the house, how was he dressed?

20   A    He was wearing a robe.

21   Q    Okay.  And so you were able to see his hands, weren't

22   you?

23   A    Yeah, he had his hands just like this.

24   Q    And you were able to see his face, weren't you?

25   A    Uh-huh.

1  Q And there were no scratches or marks on the hands or

2 face, were there?

3  A Not that I noticed.

4  Q And did you notice the fingernails of the decedent?

5  A I didn't look at the fingernails of the deceased.

6  Q You did not?

7  A No, I did not touch her hands.

8  Q Would that be something that you would normally look at

9 to see whether or not you've got broken nails or blood under

10 the nails or anything of that nature?

11  A Not necessarily.

12  Q Okay.  Truth is you weren't -- there was --

13    MS. WEIRICH:  Your Honor, may we approach?

14    THE COURT:  You may.

15    (Bench conference commenced.)

16    MS. WEIRICH:  I object to Mr. Bailey's

17 characterization of the truth of the matter is or what the

18 truth is.  I think that's for the jury to determine and not

19 Mr. Bailey to testify to.

20    MR. J. BAILEY:  I can rephrase it, Judge.

21    THE COURT:  Do rephrase it.  You've used that

22 several times now.

23    MR. J. BAILEY:  I will.

24    (Said bench conference concluded.)

25  Q Sergeant Kjellin, you've testified in this matter

1    before; is that correct, preliminary hearing?

2        A    Yes, downstairs.

3        Q    Okay.  And during that preliminary hearing, am I

4    correct that you testified that there were no visible signs of

5    any kind of struggle?

6        A    I -- in what way?

7        Q    Was that your testimony?

8        A    Well, yeah, I was asked the question did I see any

9    visible signs in the surrounding area concerning any kind of

10   struggle.  And with all the clutter and the way the area was,

11   it didn't appear to have been a struggle like, I mean, things

12   weren't broken or out of place.  There was so much clutter I

13   couldn't tell the difference if there was a struggle.

14       Q    In fact the whole house was kind of cluttered, wasn't

15   it?

16       A    It was cluttered.  But in the room that I was in there

17   was a lot of clutter.

18       Q    And what room was that?

19       A    The bedroom and the bathroom.

20       Q    Okay.

21            MR. J. BAILEY:  Your Honor, excuse me.  No further

22   questions, Your Honor.

23            THE COURT:  Redirect?

24

25

REDIRECT EXAMINATION

BY MS. CARNESALE:

Q     Sergeant Kjellin, can you describe the robe that the
defendant was wearing?  The length?

A     I don't know the exact length.  I know that it covered
the majority of his body, if I remember correctly.

Q     Was it tied closely?

A     It was kind of loose in the front and he'd wear it like
this.  And he was sitting on the couch so it was, you know,
drawn to.

Q     And did you ever physically examine his body?

A     No, I didn't go up to him and open his robe or -- I
just visual during our conversation.

          MS. CARNESALE:  Thank you.  No further questions.

          THE COURT:  You may step down.  Call your next
witness.

          MS. WEIRICH:  Sergeant Merritt.


                    SERGEANT MERRITT

called as a witness, being first duly sworn, was examined and
testified as follows:

                    DIRECT EXAMINATION

BY MS. WEIRICH:

Q     Good afternoon.

A     Hello.

1    Q    Would you please tell the jury your name?

2    A    William D. Merritt.

3    Q    Would you spell your last name, please, for the court

4    reporter?

5    A    M-E-R-R-I-T-T.

6    Q    Where do you work?

7    A    I'm currently employed with the Memphis Police

8    Department in the Homicide Squad.

9    Q    How long have you been with Homicide?

10   A    Right at five years.

11   Q    What are your responsibilities in the Homicide Bureau?

12   A    We're responsible for investigating homicides, any

13   accidental-type death, any suicide and then any deaths that

14   are seemingly unexplained at the time the person passes away.

15   It's what we do in that office.

16   Q    All right.  How long have you been with MPD?

17   A    It will be 21 years in February.

18   Q    Were you assigned the case of the death of Sheila

19   Braswell?

20   A    Yes, I was.

21   Q    When were you assigned it, if you know?

22   A    November 5th, 2004.

23   Q    Did you make the scene of the home where her body was

24   found?

25   A    No, I did not.

1    Q    How did you come to get this case?

2    A    I arrived at work that morning on November 5th and the

3    case was assigned to me at that point.  It was about 8:15 that

4    morning.

5    Q    All right.  Who assigned you the case?

6    A    My supervisor Lieutenant Joe Scott.

7    Q    What did you do at that point?

8    A    At that particular point when I first arrived at work,

9    I learned that we had a case where a female had been found

10   dead in her bathroom by her husband.  I spoke with Sergeant

11   Kjellin and I believe Sergeant Key, who were the midnight

12   shift investigators who went to the Braswell residence.  I

13   read over their reports.  They briefed me on what they had

14   found at the scene.  Short time later Mr. Braswell arrived at

15   the homicide office and we began to interview him.

16   Q    All right.

17   A    About what occurred or what he knew about the incident.

18   Q    Okay.  When you say he arrived in your office -- first

19   of all where is your office?

20   A    It's in this building on the 11th floor.

21   Q    And describe to the jury what it looks like.

22   A    It's just a regular-size office.  You -- if you didn't

23   know it was a police department, you would think it was a bank

24   or, you know, accounting firm or anything.  Just computers and

25   desks and telephones, just, you know.

1    Q    How many people are there at any given time?

2    A    It varies.  On that particular day there may have been

3    12 to 15 people that would be investigators, support people,

4    transcriptionists, whatnot.

5    Q    Do each of the investigators have their own cubical?

6    A    Yes.

7    Q    Does the lieutenant have his own office?

8    A    Yes, he does.

9    Q    And is there an interview room?

10   A    We have two interview rooms in the homicide office; one

11   larger room that can accommodate several people and then a

12   smaller room where, you know, you might be comfortable with

13   three or four people in that particular room.

14   Q    If you are going to interview someone, do you always

15   take them to the interview room or do you sometimes interview

16   them at your desk?

17   A    Normally, you take them to an interview room because

18   you want some privacy.  You're not sure what the person is

19   going to tell you, and, you know, a lot of people don't want

20   to be out in the open when they're talking to the police about

21   a sensitive matter like a death or, you know, investigation.

22   Q    You said the defendant arrived at the homicide office.

23   About what time was it, do you remember?

24   A    If I recall correctly it was around 8:30, 8:45.  It was

25   in that time frame, a.m.

1    Q    How did he get there?

2    A    He arrived with a friend of his, I believe, with a

3    brother-in-law.

4    Q    He wasn't handcuffed?

5    A    No, he was not.

6    Q    Had he come on his own free will?

7    A    Yes.

8    Q    Do you see him in the courtroom this afternoon, the

9    defendant?

10   A    Yes, I do.

11   Q    Would you point to him for me, please, Sergeant, and

12   tell me what he's wearing?

13   A    Mr. Braswell is sitting behind Mr. Bailey, has on a

14   dark suit, light colored shirt and a black or gray striped

15   tie.

16   Q    Did you -- were you standing at the door greeting him

17   or how did you two come in contact with one another?

18   A    I believe I had been over at the felony response office

19   where Sergeant Kjellin worked, was getting information on the

20   case.  And when I arrived back at the homicide office I

21   learned -- through the grapevine, I learned Mr. Braswell was

22   there waiting for us.

23   Q    Where was he waiting?

24   A    I believe he had been seated in one of our interview

25   rooms, either that or we have a small lobby right there inside

```
 1    the office.  He may have been there.
 2        Q    Did you -- if he was in the lobby and not the interview
 3    room, would you have taken him or did you take him to an
 4    interview room?
 5        A    Yes, I did.
 6        Q    Who went with you?
 7        A    Myself and Sergeant Miller.
 8        Q    And the defendant?
 9        A    Correct.
10        Q    So there's three of you?
11        A    That is correct.
12        Q    What is your focus at that point?  What are you trying
13    to obtain from sitting down and interviewing him?
14        A    At that particular point we were just interested very
15    first just getting some information about -- from Mr.
16    Braswell, his educational background, where he works, things
17    of that nature.  At that particular point based on the --
18    where the investigation was going at that time, we weren't
19    sure how Ms. Braswell died.  We knew it was a little bit
20    unusual because she was young, appeared healthy.  We didn't
21    know of any -- no medical problems.  And from speaking with
22    Sergeant Kjellin, there did not appear to be any noticeable
23    injuries to her, no stab wound, no gunshot wound, anything
24    that you would typically see in, you know, someone who's been
25    murdered.
```

1    Q    Was there any indication from any of the people you had

2    talked to that there had been forced entry or there was some

3    other third party that had been in the home?

4    A    At that time no.  We spoke with Sergeant Kjellin or I

5    did myself and he told me that he checked the windows, doors

6    the perimeter of the residence and did not find any sign of

7    forced entry into the house.

8    Q    When you sit down and talked with the defendant that

9    morning, is he free to leave at any time?

10   A    At that particular time yes, he was because he was not

11   in custody at that time.  We were there basically just to get

12   information from him about what happened that night with, you

13   know, with his wife.

14   Q    Okay.  And do you just sit down at a table and ask

15   questions and they answer, kind of like you and I are doing

16   right now or is it a little more formal?

17   A    It was formal in the sense that since we did not know

18   what caused Ms. Braswell's death, we wanted to be safe in the

19   event it was some foul play or whatnot involved.  So before we

20   began the interview and started obtaining information from Mr.

21   Braswell, we advised him of his rights.

22   Q    All right.  What does that mean when you advise them of

23   their rights?

24   A    What we do we have a form and it has the Miranda

25   warnings on it and we sat down.  We went over it with Mr.

1    Braswell.  We had him read a little bit of the form just to

2    verify that he could read.  We went over the form with him.  I

3    read it out loud to him and he signed the form and he agreed

4    to talk to us about his wife's passing and, you know, the

5    events that led up to that.

6        Q    All right.  And again, in the room right now it's the

7    defendant, you, and Mark Miller?

8        A    That is correct.

9        Q    I'm going to pass you two documents.  The one with the

10   red ink, do you recognize that?

11       A    Yes, this is the original copy that we filled out the

12   day we initially interviewed Mr. Braswell.

13       Q    All right.  And are those the Miranda Rights that

14   you've just spoken of?

15       A    Yes, they are.

16       Q    The other document, what does it appear to be?

17       A    This is a photocopy of the original document that's in

18   red.

19            MS. WEIRICH:  Your Honor, at this time I'd ask

20   that the red marked document be moved into evidence as Exhibit

21   26.

22            THE COURT:  Okay.

23            (Exhibit No. 26 was marked and filed.)

24       Q    Does the copy appear to be an exact copy of the

25   original?

1    A     Yes, it does.

2            MS. WEIRICH:   Judge, I do have copies of that copy

3    to pass out to the jury.

4            THE COURT:   All right.

5    Q     If you could, Sergeant Merritt, holding the red marked

6    document, if you could read that to the jury?

7    A     Okay.   In the upper right-hand corner this was written

8    with my handwriting.   It states master's degree University of

9    Memphis.   That was just to indicate that we checked with Mr.

10   Braswell on his level of education.   It states:   Interrogation

11   Advice of Rights, Your Rights.   Place: 201 Poplar Room 11-20.

12   Date: 11/5/04.   Time: 8:50 a.m.

13           Before we ask you any questions, you must understand

14   your rights.   You have the right to remain silent.   Anything

15   you say can be used against you in court.   You have the right

16   to talk to a lawyer for advice before we ask you any questions

17   and to have him with you during questioning.   If you cannot

18   afford a lawyer, one will be appointed for you before any

19   questioning if you wish.

20           Waiver of Rights.   I have read the statements of my

21   rights and I understand what my rights are.   I'm willing to

22   talk to you and answer questions.   I do not want a lawyer at

23   this time.   I understand and know what I am doing.   No

24   promises or threats have been made to me and no pressure or

25   coercion of any kind has been used against me.

1    Q    At this point when this document was executed, had the

2    homicide office been notified by the medical examiner's office

3    what the cause of death was?

4    A    No.

5    Q    All right.  After this document is filled out -- let me

6    ask you this.  At this point could the defendant have left?

7    A    Absolutely.

8    Q    Walked out of the room?

9    A    That is correct.

10   Q    Could he have told you he didn't want to talk to you?

11   A    That is correct.

12   Q    Could have told you he wanted a lawyer?

13   A    That is correct.

14   Q    He didn't indicate any of those things?

15   A    No, he did not.

16        MR. W. BAILEY:  Your Honor, we'll stipulate that

17   he was fully cooperative at that point and complied and was

18   doing so willingly and freely at that point.

19        THE COURT:  Thank you.  You may proceed.

20        MS. WEIRICH:  Thank you, Your Honor.

21   Q    Now after this document is executed, what is -- and the

22   defendant indicates that he's willing to stay and willing to

23   talk with you, again, it's just the three of you men in the

24   room; right?

25   A    That is correct.

1    Q    What's the next thing that happens?

2    A    What we did at that point, we started speaking with Mr.

3    Braswell about his activities and the activities of Ms.

4    Braswell the evening that she passed away.

5    Q    All right.  And are you taking notes as he's talking or

6    are you just listening?

7    A    Yes, we're scribbling notes and taking notes and, you

8    know, just writing down what he is telling us.

9    Q    All right.  What did he tell you?

10   A    Mr. Braswell told us that he and his wife were at home

11   and that they were intimate, they'd had sex.  They had been in

12   the bathtub and they left the bathtub and then went to the bed

13   where they proceeded with another sexual encounter.  After the

14   sex was completed, Mr. Braswell told me that his wife went to

15   the bathroom to get in the jacuzzi because she was complaining

16   of stomach cramps.  He told me that he began to watch TV for a

17   short while, fell asleep and then woke up around I think 4:30,

18   four o'clock, 4:30 a.m., saw that she was not in the bed with

19   him, went to the bathroom and found her in the bathtub where

20   he found her dead.

21   Q    All right.  Did he ever tell you, Hey, Sergeant, let me

22   be honest with you, we were into a little kinky sex?

23   A    No, he did not.

24   Q    Did he ever tell you --

25        MR. W. BAILEY:  Your Honor, I object.  That's

1    leading.

2              MS. WEIRICH:   It doesn't call for an answer.

3              THE COURT:   Overruled.

4    Q    Did he ever tell you, Hey, this is just between us, you

5    and me and Mark Miller sitting here, just us three guys, my

6    wife and I got into kinky sex?

7    A    No, he did not.

8    Q    Did he ever tell you that his wife liked to have him

9    choke her?

10   A    No, he did not.

11   Q    Did he ever tell you that he had a girlfriend that he

12   liked to choke?

13   A    No, he did not.

14   Q    Was he calm, cool and collected that morning?

15   A    That particular morning he was crying.  He was upset

16   about, you know, what occurred and what we were doing at that

17   particular time.  He was -- he was upset.  You know, he was

18   emotional.

19   Q    Did he have any phones with him?

20   A    He had two cellular telephones.

21   Q    Was he using them?

22   A    Yes, he was allowed to make calls and made and received

23   a couple of calls, several calls for that matter, while we

24   were conducting the interview.

25   Q    During the course of this -- this talk at the table?

1    A    That is correct.

2    Q    He would get calls and he would make calls?

3    A    That is correct.

4    Q    Did both phones appear to be working?

5    A    I believe so.  We let him stop and answer the phone and

6    make his calls when he wanted to.

7    Q    Did he ever tell anybody on that phone, Hey, they got

8    me up here and they're about to charge me with murder and

9    you've got to get me out of here?

10            MR. W. BAILEY:  Excuse me.  Excuse me.  May we

11   approach?

12            THE COURT:  You may.

13                (Bench conference commenced.)

14            MR. W. BAILEY:  Your Honor, she's asking questions

15   that are framed in a manner to elicit a yes or no response.

16   We object to leading.

17            THE COURT:  It's not leading if you don't suggest

18   which answer to give.  A leading question would be:  He never

19   told you X, Y, and Z, comma, did he?  That would be leading.

20   She says did he ever say this.  He could say yes.  He could

21   say no.  He could say I don't remember.  He could say, well,

22   he told me partially that.  But that doesn't suggest the

23   answer.  It directs his attention to a subject matter.  But

24   it's not leading in my opinion.  Leading would be to say the

25   light was red, comma, wasn't it?  Not was the light red.  If

1   you say was the light red, he could say yes, no, it was green,

2   it was yellow.  You know, but the light was red, comma, wasn't

3   it?  That's leading.  So I disagree with you.  I'll overrule

4   your objection.

5          MR. W. BAILEY:  Very well.

6          (Said bench conference concluded.)

7   Q   Sergeant Merritt, in any of these phone calls he was

8   making or receiving, did you ever hear him say, Buddy, you've

9   got to get me out of here, they're about to charge me with the

10  murder of my wife and we were just having sex, it was just a

11  night of love that went wrong?

12  A   No.

13  Q   Could he have left at any time?

14  A   Yes.

15  Q   That initial talking with him when you're asking him

16  questions and jotting down notes, is that the final encounter

17  you had with him or is there then a stage where you formalize

18  that information?

19  A   After we obtain Mr. Braswell's information about the

20  activities with his wife that evening, we -- what we do we sit

21  down with a transcriptionist and we asked the same questions

22  in a question-and-answer format that we had typed out, printed

23  up and he was able to read the document and sign the document

24  that morning in our office.

25  Q   All right.  So for the formalization of that

1    conversation, another person is brought into the room, a

2    transcriptionist?

3    A    That is correct.

4    Q    Is that a female or a male?

5    A    It was a female.

6    Q    How long were you with the defendant and Mark Miller

7    just the three of you in the room?

8    A    We began speaking with Mr. Braswell at 8:50 a.m. that

9    morning.  I believe around 9:30 or so we sat down and started

10    the transcribed part of the statement so maybe 40 minutes, 45

11    minutes or so.

12    Q    He's alone with just the two of you?

13    A    That is correct.

14    Q    The door is shut?

15    A    Yes.

16    Q    Nobody is watching?

17    A    No.

18    Q    Nobody's listening?

19    A    No.

20    Q    When the statement was formalized and then you asked

21    him the same questions again that you'd already asked him,

22    were his answers identical to what he had just told you?

23    A    Yes, they were.

24    Q    I pass you two sets of documents, Sergeant Merritt.  Do

25    you recognize the one with the red ink?

1      A      Yes.  This is the statement that myself and Sergeant

2   Miller obtained from Mr. Braswell on November 5th, 2004.

3      Q      All right.  Is that the formalization that we've spoken

4   of, of the conversation that you and Mark Miller had with the

5   defendant?

6      A      That is correct.

7      Q      All right.  And if you've already explained this to the

8   jury, I'm sorry but I missed it.  Explain to them how that

9   document is made, how it's produced.

10     A      Okay.  What we did this particular morning we sat down

11  with our transcriptionist.  It would have been myself,

12  Sergeant Miller, Mr. Braswell and our transcriptionist and a

13  blank form that would have read Homicide Witness Statement was

14  pulled up on the computer screen where the transcriptionist

15  was seated.  She filled in or typed in all of Mr. Braswell's

16  personal information; his name, his birth date, social

17  security number, home address, where he worked, typed in his

18  emergency contact person, which here shows to be his mother,

19  and then just the date and time that we took the statement.

20  And when she finished that would be the heading of the

21  statement.  It's all on computer at that time.  It's on the

22  computer screen.  She's typing this information in.  And then

23  we would go into the question-and-answer format where we would

24  ask Mr. Braswell a question, transcriptionist would type

25  exactly what the question, you know, was that was asked.  And

1    then Mr. Braswell would answer and then she would type his

2    answer.  And we asked a series of questions.  She would type

3    the question, he would answer.  She would type until we

4    finished with what we wanted to ask.  And then at that point

5    it was printed, the question-and-answer format was printed

6    from the computer to this paper.  And we sat down with Mr.

7    Braswell.  He read over the document and actually made some

8    changes that he found on here and then he signed it.

9        Q    Okay.  He's given an opportunity to review it and make

10   changes if he wants to?

11       A    That is correct.

12       Q    Were any of those changes, Hey, we were into this thing

13   where I choked her until the point where she almost became

14   unconscious and then we would have sex?

15       A    No.

16       Q    Were any of the changes, Hey, she liked me to choke her

17   while we had sex?

18       A    No.

19       Q    Were any of the changes, She liked rough sex?

20       A    No.

21       Q    Were any of the changes, We have a closet full of whips

22   and other sex toys.  I've got to tell you about it.  I've got

23   to show you where it is?

24       A    No.

25       Q    Is the copy that you have up there, Sergeant Merritt,

1    is that an exact copy of the original?

2    A    Yes, it is.

3    Q    But for the red ink?

4    A    That is correct.

5         MS. WEIRICH:  And, Judge, I do have 14 copies for

6    the jury.

7         THE COURT:  All right.

8    Q    Sergeant Merritt, if you could starting with This is

9    the statement of, if you could read this statement to the

10   jury.

11   A    This is the statement of Vern Braswell.  Date of birth:

12   11/30/70.  Social security number:  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.  Home

13   address:  8152 Creekside Circle North.  Home phone number:

14   901-624-5176.  Education:  Master's degree University of

15   Memphis.  Employed by:  Memphis City Schools Hanley

16   Elementary.  Work address:  680 Hanley.  Work phone:

17   901-416-0561.  Occupation:  Assistant principal.  Next of kin

18   emergency contact:  Mary Wallace.  Home address:  3018

19   Calvert.  Home phone:  901-458-0958.  Occupation:  Retired.

20   Employment:  NA.  Business phone:  NA.  Business address:  NA.

21   This statement is made on Friday, November 5th, 2004, at 0922

22   hours in the Homicide Office west interview room, 201 Poplar,

23   Room 11-17 to Sergeant W.D. Merritt, IBM 5546 and Sergeant M.

24   Miller, IBM 5574, relative to the death investigation of

25   Sheila Braswell, which occurred at 8152 Creekside Circle North

1    on Friday, November 5th, 2004, at approximately 2 a.m. and

2    which is filed under MPD report number 0411002362 M.E.

3    Questioned by Sergeant W.D. Merritt, IBM 5546 and Sergeant

4    Mark Miller, IBM 5574.  Typed by:  Melody Montgomery, IBM

5    10318.

6         Question:  Mr. Braswell, are you the husband of Sheila

7    Braswell?  Answer:  Yes.  Question:  Were you and Sheila

8    together at 8160 Creekside Circle North on November 5th, 2004?

9    Answer:  Yes.  Question:  Was anyone else at the residence

10   during that time?  Answer:  The children.  Were you and Sheila

11   -- were you and Sheila together at approximately 12 a.m. on --

12   12 a.m. on November 5th, 2004?  Answer:  Yes.  In your own

13   words tell me what happened while you and Sheila were together

14   around midnight November 5th, 2004.  Answer:  We were in the

15   jacuzzi together around midnight relaxing and bathing.  We

16   began getting intimate and engaged in sex.  As a result of

17   inadequate amount of lubrication, we continued sex in the

18   bedroom and in the bed.  At approximately 1:30 a.m. we stopped

19   and joked about who was going to let the water out of the

20   jacuzzi.  She commented about an aching cramping pain in her

21   abdomen.  Then she got up and walked with a limping motion to

22   the bathroom and shortly thereafter, I heard in the bathroom

23   the jacuzzi faucet as well as the jacuzzi jets turn on at

24   which time or shortly thereafter I fell asleep.  It was

25   approximately 1:30 to 1:40 a.m.  At approximately 3:50ish to 4

1    a.m. I noticed that she wasn't in the bed.  I went to check on

2    her and she had fallen somewhat submerged in the water.  I

3    called 911 and Brian James as well as a host of other family

4    and friends trying to get help.  Question:  Were the jets

5    running when you found Sheila in the tub?  Answer:  Yes.

6    Question:  What position was Sheila resting when you found

7    her?  Answer:  She was midway between being on her side and on

8    her back.  Question:  Was her head and face out of the water?

9    Answer:  No.  Question:  Did you move or reposition the body

10   before the paramedics came?  Answer:  I stepped in the bathtub

11   and attempted to grab her around the waist and pull her out of

12   the tub.  My efforts left her on the side of the tub.  Shortly

13   thereafter, the paramedics came in.  Also, I noticed that the

14   pink bath pillow was floating in the tub.  It was detached

15   from the wall and was floating in the tub.  Question:  Did

16   Sheila consume any alcoholic beverages during the night?

17   Answer:  Before midnight she consumed one 12-ounce Skyy Blue.

18   While in the jacuzzi she had another one.  Question:  Was

19   Sheila on any medication?  Answer:  No.  However, she would

20   occasionally take Skelaxin, Hydrocodone or Tylenol with

21   Codeine for cramping in the joints and aching pains.

22   Question:  What medical problems did Sheila suffer from?

23   Answer:  She suffered from endometriosis as well as two

24   complicated pregnancies which left her with hip and leg

25   cramps.  Question:  Has Sheila been in the hospital within the

1   last year, and if so, for what?  Answer:  It was, like,

2   mid-December 2003 she had, like, a pseudoparalysis which -- or

3   where she couldn't move or do anything.  We spent three days

4   at Baptist East.  The doctors said it was a Potassium

5   deficiency.  She couldn't walk or do anything from the neck

6   down.  As a result, she is supposed to be taking some

7   Potassium pills but I haven't seen them.  She has complained

8   maybe once over the summer for not being able to move or

9   anything.  Question:  Did you ejaculate while you and Sheila

10  were having sex?  Answer:  No.  Question:  Prior to today,

11  when was the last time that you and Sheila had been intimate

12  together?  Answer:  On the night of November 3rd.  Question:

13  Were you watching TV when Sheila returned to the bathroom?

14  Answer:  Yes.  Question:  Do you remember the name of the show

15  that was on at that time?  Answer:  I don't know what the name

16  of the show that was on, but I was waiting on the show *Erotic*

17  *Confessions* to come on at 1:40 a.m. on Cinemax.  Question:

18  Did you attempt to remove Sheila from the tub when you

19  discovered her?  Answer:  Yes.  During the 911 call the

20  operator told me numerous times to remove her from the water.

21  I tried lifting her and pulling but I couldn't get her out.

22  Question:  Is there anything else you'd like to add to this

23  statement that would aid in this police investigation?

24  Answer:  It wasn't uncommon for Sheila to fall asleep in the

25  tub with the jacuzzi jets on.  Question:  Can you read and

1   write without the aid of eyeglasses?  Answer:  Yes.  Question:

2   Was this statement given freely and voluntarily without any

3   promises, threats or coercion?  Answer:  Yes.  Question:  I'm

4   going to ask you to read this statement and if you find it to

5   be true and correct, initial the bottom of each page and sign

6   and date the last.  Do you understand?  Answer:  Yes.

7       And then at the conclusion of the statement, once again

8   it was printed up and I was with Mr. Braswell as he reviewed

9   his statement and when he placed his signature, the date and

10  time on this document.

11  Q    All right.  Thank you.  About how long did this take?

12  A    According to the time that's printed on the statement,

13  we began the statement at 9:22 a.m.  By the time we asked the

14  questions and answers, had it printed and Mr. Braswell

15  reviewed the document, it was 10:03 a.m. so 43 minutes, about

16  40 minutes.

17  Q    Okay.

18       MS. WEIRICH:  Thank you.  That's all with regard

19  to the statement.

20       THE COURT:  Y'all need to pass them back down,

21  please.  And do you still have this other document?  Pass it

22  back down too, please.

23  Q    Thank you.  Did the defendant ever mention the name

24  Kristie Woods to you?

25  A    No, he did not.

1    Q    Where did you first hear that name?

2    A    During a -- well, actually I first heard just the name

3    Kristie from one of the witnesses that we interviewed during

4    the initial investigation.

5    Q    All right.  Did you later hear it through something you

6    were listening to?

7    A    Yes, I did.

8    Q    What were you listening to?

9    A    It was a recorded conversation from the jail phones

10   where the inmates are that was placed from Mr. Braswell to

11   Kristie Woods, who was an employee at St. Jude Children's

12   Hospital at the time.

13   Q    All right.  I'm going to pass you an envelope.  Do you

14   recognize that envelope?

15   A    Yes, I do.

16   Q    Is that your writing on it?

17   A    Yes, it is.

18   Q    What is contained inside of it?

19   A    It's one Compact Disc that has several telephone --

20   recorded telephone calls from the jail that Mr. Braswell

21   placed from the jail to family members and friends, whatnot.

22   Q    Have you listened to that Compact Disc?

23   A    Yes, I have.

24   Q    How long is it?

25   A    On this particular disc there's probably 35 calls that

1    range anywhere from two to three minutes to 15 minutes.   Some

2    of the calls are 15 minutes long.   Some are -- I mean, the

3    calls vary, but I believe on this particular disc there are

4    probably 35 calls.

5        Q    All right.   And you've listened to all of them?

6        A    That is correct.

7        Q    How did you get that?

8        A    I obtained this from a Deputy Chambers.   She works for

9    the Shelby County Sheriff's Department and she was able to

10   retrieve the calls.   I put in a request for her to monitor Mr.

11   Braswell's calls from the jail just as apart of this

12   investigation and she downloaded them from her computer onto

13   this disc.

14       Q    And turned them over to you?

15       A    That is correct.

16       Q    Did you collect them from her and put them in that

17   envelope?

18       A    Yes, I did.

19       Q    What did you do with that envelope and that disc?

20       A    After I listened to the calls -- and this was not done

21   over a period of a couple of days.   It was done over a period

22   of a couple of months.   It took a while to listen to these

23   calls.   After I listened to the calls, I tagged the disc in

24   our property room.

25       Q    All right.   Is it safe to say, Sergeant Merritt, that

1    in addition to being the case coordinator for the homicide of

2    Sheila Braswell, you had other duties?

3        A    That is correct.

4        Q    You had other cases that you were both case coordinator

5    for and just assisting on?

6        A    That is right.

7        Q    About how many homicide cases are you working at any

8    given time?

9        A    I mean, several.  I mean, it's -- I know for instance,

10   this particular year I've been in charge of ten cases on my

11   own but then helping other investigations just we've -- I

12   think we've had almost 150 murders in Memphis this year.  So

13   we stay very busy.

14       Q    And is this year much different than years past as far

15   as numbers of homicides?

16       A    We're up about 35 this year.

17            MR. J. BAILEY:  I object to relevance.

18            THE COURT:  Overruled, it's relevant.  I'll be

19   glad to explain it if you'd like to approach.

20            MR. J. BAILEY:  I accept Your Honor's ruling.

21       Q    Is this year much different than other years?

22       A    Yes, it's been busier.

23       Q    Okay.  Now that CD that you listened to, you said it

24   took several months to listen to all the calls?

25       A    Yes.

1    Q    Did the defendant ever mention anything about erotic
2    asphyxia to anybody?
3    A    No.
4    Q    And these are calls that he's placed to friends and
5    family members?
6    A    That is correct.
7    Q    Ever mention anything about kinky sex?
8    A    No.
9    Q    Ever mention anything about the fact that his wife
10   liked for him to put his hands around her neck while they had
11   sex?
12   A    No.
13   Q    Did he mention Kristie Woods in there?
14   A    Yes, he actually had a couple of conversations with Ms.
15   Woods.
16   Q    Did you try to contact Kristie Woods?
17   A    Yes.  I actually spoke with her on a couple of
18   occasions and met with her once at St. Jude.
19   Q    All right.  Did you ask her to -- did you ever meet
20   with her in the homicide office?
21   A    No, I did not.
22   Q    Did you ask her to come there?
23   A    Yes, I did.
24   Q    And she didn't?
25   A    That is correct.

```
1     Q     All right.
2                 MS. WEIRICH:  Judge, I'd ask that that CD be
3     marked as Exhibit 28.
4                 MR. J. BAILEY:  Your Honor, before you do that,
5     there's something I need to bring to the Court's attention
6     before we mark it.
7                       (Bench conference commenced.)
8                 MR. J. BAILEY:  Judge, I haven't heard the CD.  I
9     was given somewhat of a summary of it.  I just want to make
10    sure that there are no privileged communications on there.
11    I've been through this issue in other courts and I just want
12    to say why I bring this to the Court's attention.  There is a
13    recording that comes on, on every inmate call that says this
14    call is subject to monitoring.  However, this issue has been
15    raised many times, particularly in the Federal Courts when
16    they bring the conversations over there from over here.  And
17    if they're conversations either with Mr. Ballin, Mr. Jerry
18    Stokes or myself, I would -- I would suggest to the Court that
19    those are privileged.  That is the only objection I would have
20    to it.
21                THE COURT:  Well, before we get to issues of the
22    privilege, do you know are there any conversations?
23                MS. CARNESALE:  Mr. Ballin had a few and Mr.
24    Bailey but there is always a third party present, which is how
25    the calls are made.
```

1    MS. WEIRICH:  And let me just say the fact that I
2    had -- this CD was given to them in their discovery and I was
3    never once contacted to copy it for them.  I was never given a
4    CD to make a copy for them.  I don't think it's my
5    responsibility to track them down and remind them that they
6    might want to listen to this.  They knew about it.
7    MR. J. BAILEY:  Nobody is suggesting that.  I got
8    a summary of it.
9    MS. WEIRICH:  The summary is not all of it.
10   That's my point.
11   THE COURT:  But there was always a third party
12   present when the calls were made.  Who would that have been,
13   somebody from the jail?
14   MS. CARNESALE:  No.  The defendant would make a
15   call and then that person would three-way Mr. Ballin.  He has
16   to call collect.  The defendant would call collect to a friend
17   or family member and then they would make the call to the
18   attorney.
19   MS. WEIRICH:  There is actually a dead phone in
20   the jail that is just for calling your attorney directly.
21   That is not where this CD came from.  This is the CD that's
22   generated when they place a collect call to someone.  If the
23   attorney is called, it is done by that third party.
24   THE COURT:  Okay.  And so if -- if an inmate wants
25   to make a direct call to an attorney, there is a separate

1    phone in the jail?

2            MS. WEIRICH:  Yes, sir.

3            THE COURT:  Specifically designated for that

4    purpose?

5            MS. WEIRICH:  And they are told, there are signs

6    above the phone and below the phone letting them know this is

7    the phone for calling your attorney.

8            MR. J. BAILEY:  I'm not aware of that.  And I

9    don't dispute counsel.  It might be that I just don't know.

10   But I will state this to the Court that every time or at least

11   every time I have been aware that he had somebody on the

12   phone, I've told him and he has indicated to me that he asked

13   that person to put the phone down while we talked.  Now that's

14   my understanding.  You know, I have no way of always verifying

15   that.  I mean, because I'm not on the other end -- you know, I

16   don't know.  The nature of an inmate calling from the jail

17   means that there might be someone else standing around or

18   whatever.  There is no privacy there.  But if he's locked up

19   and he needs to contact counsel by phone, that's the only way

20   he knows that he can do it.  I'm not aware of any special

21   phones, although I can't say that there aren't any.

22           MS. WEIRICH:  The defendant also says several

23   times on these calls that he's aware he's being recorded

24   because there is that announcement that comes on letting you

25   know that.

1          THE COURT:  Right.  Right.  Well, for several

2   reasons I'm going to -- I guess you're requesting that those

3   phone conversations be removed from this CD or not allowed

4   into evidence?

5          MR. J. BAILEY:  Yes or at least -- at least be

6   restricted just to those that don't encounter Mr. Ballin, Mr.

7   Stokes and myself.

8          THE COURT:  Well, number one I find your request

9   to come awfully late.  Here we are ten witnesses into this

10  trial.  It's been pending for a year or the case has been

11  pending for a year.  It's been in here for probably six

12  months.  I remember when it was first arraigned, you announced

13  that you didn't need a report date, you just needed a trial

14  date.  So, I mean, you were focusing on the trial from the

15  outset as everyone has been.  There are always third parties

16  to these conversations at least initially.  Now, whether third

17  parties kept the phone to their ear the entire time or not, I

18  guess it's impossible to know and say.  But clearly, there

19  were always third parties to these conversations at the outset

20  because that's how the attorney would get pulled into it.

21          There were also separate, apparently from Ms. Weirich's

22  statements as an officer of the court, separate phones in the

23  jail that do not require going through a third party that

24  allow an inmate to make a direct call to an attorney.  And

25  apparently, according to Ms. Weirich's statement as an officer

1    of the court, there is also an acknowledgment by your client

2    on more than one occasion in various conversations recorded on

3    this CD indicating that he's fully aware that he is being

4    recorded, which what I think effectively waive any claim to

5    attorney-client confidentiality.

6         So there are a variety of reasons for concluding that

7    any claim to any attorney-client privilege has been waived by

8    your client's acknowledgment, by his actions, by his decision

9    to use this phone as opposed to the other phone, by bringing

10   third parties into it, and by the fact that you have had

11   access at least to this information since this case began and

12   we're just now approaching the subject.  For all those

13   reasons, I'm going to deny your request that those portions of

14   this CD be excised from it and I'll note your exception.

15                  (Said bench conference concluded.)

16                  THE COURT:  Exhibit 27.

17                  (Exhibit No. 27 was marked and filed.)

18   Q    Do you remember, Sergeant Merritt, a particular phone

19   call when the defendant was giving Kristie Woods instructions

20   on how to communicate with him?

21   A    That is correct.

22   Q    What did he tell her?

23   A    I remember that he told her that she could write

24   letters to him but to have the letters sent, I believe, to the

25   address of his parents or his mother's address on Calvert

1    Street.  If I remember correctly, he wanted her to come and

2    visit him in jail, but I believe his jail visitor -- she was

3    not on the list and he was going to have to refer to her as a

4    cousin or something like that in order to make the visitation

5    legal -- not legal but in order for her to be able to visit.

6        Q    Do you recall some conversations where he referred to

7    her or other people on the phone refer to her as "The

8    Soldier"?

9        A    I remember that particular terminology during the --

10   during some of the very initial conversations that I listened

11   to, but we had no idea who that person was at the time.  It

12   was just "The Soldier" about "The Soldier" being underground

13   or something like that or "The Rabbit" being underground or

14   something to that effect.

15       Q    Could you tell from the context and when they were

16   talking about "The Soldier" being underground what they meant

17   or what the defendant meant?

18       A    As we got further into the investigation and learned

19   more about Ms. Woods, I believe that -- just that he was

20   referring to her.

21       Q    But what did he mean by "underground"?  Do you know?

22       A    By us not being able to find her, to locate her.

23       Q    Was he inquiring whether or not she was underground?

24       A    From the nature of the conversations on the -- on those

25   first initial calls, he was asking, I believe -- I don't want

1    to say who it was because I can't recall -- but the nature of

2    the conversation he was wanting to know if "The Soldier" was

3    underground.  And after we learned Ms. Woods' identity, we

4    assumed that he was referring to her.

5        Q    Okay.  Do you remember any conversation about life

6    insurance?

7        A    Yes.

8        Q    What do you remember and who was the conversation

9    between?

10       A    It was between Mr. Braswell and I believe his mother.

11   They were discussing trying to -- I think Mr. Braswell was

12   talking about life insurance that he had through the Board of

13   Education and there was some topic of conversation -- I

14   believe it came from Mr. Braswell's mother -- about not being

15   able to get the life insurance at the time because of it being

16   a murder investigation and that type of thing.

17       Q    All right.  What is his mother's name?  Do you

18   remember?

19       A    I could look at the statement because I know his

20   mother's name is on the statement that I took but I can't --

21   is that okay?

22       Q    Sure, if that would refresh your memory?

23       A    Right, Mary Wallace.

24       Q    Did you discover in your investigation, Sergeant

25   Merritt, that in addition to being -- as he put on his witness

1    statement an assistant principal -- did he have another

2    business interest, the defendant?

3        A    Yes, he did.  I believe he -- through the jail

4    conversations that I listened to, apparently he was a manager

5    or had some type of an ownership in a -- I don't know if I'd

6    call it a nightclub but it was some type of -- apparently, it

7    was a hall that they would rent out for parties or banquets or

8    whatnot.  And through some of the conversations, he's having

9    conversation with people trying to decide if he's going to

10   keep that banquet hall open, if he's going to sell it or shut

11   it down or what.  So there was some -- quite a bit of

12   conversation about that.

13       Q    Do you remember the name of it?

14       A    I know there was -- it was a Rough Riders Motorcycle

15   Club.  I don't know if that's the same as the banquet hall

16   conversation or what, but I know he had some dealings with

17   Rough Riders, like the motorcycle club guys that got together

18   and would ride or, you know, socialize or whatever.

19       Q    All right.

20            MS. WEIRICH:  May I have one moment, Your Honor?

21            THE COURT:  You may.

22       Q    Did he ever mention in any of these phone calls that

23   you listened to over this three-month period to any of these

24   friends or family members that he's talking to, this is all

25   just a big misunderstanding?  Y'all have got to get me out of

1   here?

2      A     No, he didn't.

3      Q     Did he ever mention his wife wanted to be choked that

4   night?

5      A     No, he did not.

6      Q     Did he mention anything about choking his wife?

7      A     No, he did not.

8            MS. WEIRICH:  Pass the witness.

9            THE COURT:  Mr. Bailey.

10           MR. W. BAILEY:  Would Your Honor indulge me?

11           MR. J. BAILEY:  No questions, Your Honor.

12           THE COURT:  You may step down.  Call your next

13   witness.

14           MS. WEIRICH:  State calls Officer Miller.

15

16                    LIEUTENANT MILLER

17   called as a witness, being first duly sworn, was examined and

18   testified as follows:

19                    DIRECT EXAMINATION

20   BY MS. WEIRICH:

21      Q     Good afternoon.  And I apologize, you are a Sergeant,

22   aren't you?

23      A     Lieutenant.

24      Q     Lieutenant, I'm sorry.  Again, I'm sorry.  Would you

25   please tell the jury your name?

1     A    I'm Lieutenant Mark Miller.

2     Q    Where do you work?

3     A    I'm currently assigned to the Felony Assault Unit.

4     Q    And where -- how long have you been there?

5     A    Felony Assault since its inception in July this year.

6     Q    All right.  Where were you before that?

7     A    Homicide.

8     Q    How long were you in homicide?

9     A    Almost four years.

10    Q    All right.  Did you and Sergeant Merritt work on a case

11 together involving the homicide of Sheila Braswell?

12    A    We did.

13    Q    What were your primary responsibilities?

14    A    I assisted Sergeant Merritt in an interview of Mr.

15 Braswell and then I went out and arrested Mr. Braswell.

16    Q    Okay.  Let me start with the first part first.

17    A    Okay.

18    Q    Statement from the defendant.  The jury has had the

19 statement read to them by Sergeant Merritt.  Were you present

20 during the entire conversation with the defendant and the

21 formalization of that statement?

22    A    I was.

23    Q    Where did it take place?

24    A    The interview took place in the interview room and the

25 formal statement was given in the secretary's office.

1   Q    Okay.  And who was present in the interview room?

2   A    Myself, Sergeant Merritt and the defendant.

3   Q    The door shut?

4   A    Yes, ma'am.

5   Q    Y'all were alone the three of you?

6   A    Yes.

7   Q    Nobody was watching?  Nobody was listening?

8   A    No.

9   Q    Did the defendant at any time tell you, Hey, I've got

10  to tell y'all what really went on that night at our house.  We

11  were having kinky sex where my wife liked to be choked and I

12  went a little too far and she died in my arms?

13  A    No, ma'am, he did not.

14  Q    He mention anything about that?

15  A    No, ma'am.

16  Q    Did he mention anything about erotic asphyxia?

17  A    No, ma'am.

18  Q    Did he have the opportunity?

19  A    Several times.

20  Q    Did he mention anything about his wife liking rough

21  sex?

22  A    No, ma'am.

23  Q    Did he have the opportunity?

24  A    Yes, ma'am.

25  Q    And were you present as well during the entire course

1   of the formalization of the statement, what has been marked as

2   --

3               MS. WEIRICH:  I thought it had been marked.

4               THE COURT:  The statement has not been marked into

5   evidence.

6               MS. WEIRICH:  Okay.  Could we do that at this

7   time?

8               THE COURT:  Okay.

9               (Exhibit No. 28 was marked and filed.)

10    Q    During the entire formalization of that, Lieutenant

11   Miller, were you present?

12    A    I was.

13    Q    And again, how long a process was that?

14    A    We started at 9:22 in the morning and it was signed at

15   10:03 a.m.

16    Q    All right.  Was this defendant given an opportunity to

17   review that?

18    A    Yes, he was.

19    Q    Before signing it?

20    A    Yes, he was.

21    Q    And is that a process where you're just kind of

22   standing over him, going come on, come on, we've got other

23   things to do, other places to be?

24    A    No, ma'am.  He's given the statement, a red pen and as

25   much time he needs.

1    Q    Do you see the defendant in the courtroom this morning
2    -- this afternoon, rather?
3    A    I do.
4    Q    Would you point to him for me, please?
5    A    He's in the dark suit on the front row sitting by Mr.
6    Bailey.
7         MS. WEIRICH:  Let the record reflect he's
8    identified the defendant.
9    Q    Was he given all the time he needed to make changes to
10   that statement if he needed to?
11   A    He was and in fact did make several changes.
12   Q    Okay.  Did any of the changes have to do with erotic
13   asphyxia?
14   A    No, they did not.
15   Q    Or rough sex?
16   A    No, they did not.
17   Q    Or this was just a night of passion that went too far?
18   A    No.
19   Q    On November 6th, 2004, was the defendant placed under
20   arrest?
21   A    He was.
22   Q    By whom?
23   A    By myself.
24   Q    All right.  Tell us about that.  Did you go to his
25   house and arrest him?

1    A    I received a call that the defendant was at a football

2    game at Bolton High School.  I went out to Bolton High School,

3    waited in the parking lot, notified the Sheriff's Department

4    that I was there and that I needed assistance.  I saw Mr.

5    Braswell come out of the stadium and into the parking lot.  He

6    walked around for a few minutes.  And as he was headed back

7    towards the stadium, I stopped him and placed him under

8    arrest.

9    Q    All right.  Were you in plain clothes as you are today

10    or were you in uniform?

11    A    No, I was dressed like I am now.

12    Q    Were you in a marked car?

13    A    No, ma'am.

14    Q    Okay.  About what time of day was this?  Do you

15    remember?

16    A    It was early in the morning, 8:30, somewhere around

17    there, about that time.

18    Q    You said you needed -- you indicated, rather, that you

19    notified the Sheriff's Department that you were out there.

20    Why did you have to do that?

21    A    Because the high school is in the county, not in the

22    city.  I needed a car to transport Mr. Braswell back to the

23    office.

24    Q    So he didn't ride in your car?

25    A    No, he did not.

1    Q    He rode in the Sheriff's Department car?

2    A    That's correct.

3    Q    Back to the office here in this building?

4    A    That's correct.

5    Q    All right.

6         MS. WEIRICH:  I'll pass the witness, Your Honor.

7         THE COURT:  Mr. Bailey.

8         MR. J. BAILEY:  Would Your Honor indulge us just

9    one second?

10

11                    CROSS-EXAMINATION

12   BY MR. W. BAILEY:

13   Q    Lieutenant Miller, one thing I want to get clear.  You

14   knew he was at the football game because he was there with his

15   two children?

16   A    That's correct, sir.

17   Q    And he, I believe, shared with you that he wanted to

18   keep things normal as he could.  That's why he was there with

19   his children.

20   A    That's correct, sir.

21   Q    And you mentioned that he didn't mention the choking

22   game of sexual arousal, that is erotic asphyxia or kinky sex.

23   And the fact is you never asked him about that, did you?

24   A    No, sir.

25        MR. W. BAILEY:  No further questions.

REDIRECT EXAMINATION

BY MS. WEIRICH:

 Q Did you ask him about other things?

 A Yes, ma'am.

 Q Did you ask him how his wife ended up dead in the bathtub?

    MR. W. BAILEY: Your Honor, we would object. That's leading.

    THE COURT: Overruled.

 Q Did you ask him how his wife ended up dead in the bathtub?

 A Yes, ma'am.

 Q Is that statement there full of questions that you're asking him?

 A Yes, ma'am.

 Q Is the -- one of the final questions, Is there anything else you'd like to tell us that could help us?

 A Yes, ma'am.

 Q Did you ask him that question?

 A I did.

 Q And what did he tell you?

 A His answer was:  It wasn't uncommon for Sheila to fall asleep in the tub with the jacuzzi jets on.  That's all he added.

 Q Did he nudge you under the table and say there's really

1   more I've got to tell you but I'm too embarrassed?

2   A     No, ma'am, he did not.

3               MS. WEIRICH:  I don't have anything else.

4               THE COURT:  You may step down.  Call your next

5   witness.

6               MS. WEIRICH:  May we approach, Judge?

7               THE COURT:  You may.

8               (Bench conference commenced.)

9               MS. WEIRICH:  Our next witnesses are here but we

10  would like a quick break to talk with them briefly before we

11  put them on.  I didn't know how long Your Honor wanted to go

12  tonight.

13              THE COURT:  Well, I'm saying about 30 more

14  minutes.  Do you have a witness or are the next witnesses

15  particularly long witnesses?

16              MS. WEIRICH:  They could be, yeah.  I just don't

17  know.  They could be.

18              THE COURT:  Why don't we stop at this point then

19  rather than launch into a lengthy witness this late in the

20  day.  We'll do that.  We'll stop at this point.

21              (Said bench conference concluded.)

22              THE COURT:  All right.  Ladies and gentlemen, we

23  will stop for the day at this time.  We will resume the trial

24  tomorrow morning at nine o'clock.  As always, do not discuss

25  the case in any way among yourselves or with anyone else

1    overnight.  We'll see you tomorrow morning at nine o'clock.

2         Let me make mention of this as well.  Obviously, you

3    are all welcome to take notes.  You have note pads and pens

4    and I will remind you of this when I read the law to you at

5    the end of the trial, but the notes that you take are for your

6    own individual use only.  They're not to be shown to others,

7    nor referred to as authority during deliberations, but they're

8    for your own individual use to refresh your own individual

9    memory.  But having said that, we'll see you tomorrow morning

10   at nine o'clock.  You can leave the note pads right in the

11   chairs.  That will be fine.

12              (Jury out.)

13              THE COURT:  Take him out, please.  You may adjourn

14   court.

15

16              (Court was adjourned until 9 a.m.,

17                 Wednesday, December 7, 2005.)

18

19

20

21

22

23

24

25              (END OF VOLUME TWO)