

W2006-01081-CCA-R3-CD

IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

THE THIRTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE                    )          **ORIGINAL**

                                      )

vs.                                   )          Case No.  05-03038

VERN BRASWELL,                        )          8-16-06

            Defendant.                )

-----------------------------------------------------------

TRANSCRIPT OF EVIDENCE

Volumes 8 OF 11 Volumes

DECEMBER 5, 2005

-----------------------------------------------------------

THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

<u>APPEARANCES</u>

FOR THE STATE:

        BETSY CARNESALE AND AMY WEIRICH
        Assistant District Attorneys General
        District Attorney General's Office
        201 Poplar Avenue - Third Floor
        Memphis, TN  38103

FOR THE DEFENDANT:

        J. BAILEY AND WALTER BAILEY
        Attorneys at Law
        100 North Main - Suite 3002
        Memphis, TN  38103



FILED

NOV 0 2 2006


Clerk of the Courts

                    Reported by:
                    **Katherine Knowles**
                    Court Reporter


Vol. 8

TABLE OF CONTENTS

VOLUME ONE

|  |  | PAGE |
|---|---|---|
| 1 | Appearances | 1 |
| 2 | Table of Contents | 2 |
| 3 | List of Exhibits | 9 |
| 4 | Style and Caption | 13 |
| 5 | **Monday, December 5, 2005** | |
| 6 | Pre-trial Motions | 14 |
| 7 | Voir Dire Examination and Jury Selection | 25 |
| 8 | **(VOLUME TWO)** | |
| 9 | **Tuesday, December 6, 2005** | |
| 10 | **VERN BRASWELL** | |
| 11 |     Voir Dire Examination (By Mr. J. Bailey) | 185 |
| 12 | Jury Sworn | 187 |
| 13 | Reading of Indictment and Entry of Plea | 187 |
| 14 | Opening Statements (By Ms. Weirich) | 187 |
| 15 | Opening Statements (By Mr. W. Bailey) | 192 |
| 16 | **STATE'S PROOF** | |
| 17 | **PEARLINE WASHBURN** | |
| 18 |     Direct Examination (By Ms. Weirich) | 199 |
| 19 | **ANGELA SNYDER** | |
| 20 |     Direct Examination (By Ms. Weirich) | 227 |
| 21 | **JESSICA GREEN** | |
| 22 |     Direct Examination (By Ms. Weirich) | 236 |

1              TABLE OF CONTENTS

2                VOLUME ONE

3                                                      PAGE

4    ROOSEVELT COLEMAN

5          Direct Examination (By Ms. Weirich)        243
           Cross-Examination (By Mr. J. Bailey)       247
6

7    LIEUTENANT JACKSON

8          Direct Examination (By Ms. Carnesale)      250
           Cross-Examination (By Mr. J. Bailey)       264
9          Redirect Examination (By Ms. Carnesale)    270

10   BABA TANZY

11         Direct Examination (By Ms. Carnesale)      271
           Cross-Examination (By Mr. W. Bailey)       283
12

13   MATT HAMM

14         Direct Examination (By Ms. Carnesale)      285
           Cross-Examination (By Mr. W. Bailey)       293
15         Redirect Examination (By Ms. Carnesale)    295

16   OFFICER GALLOWAY

17         Direct Examination (By Ms. Weirich)        296
           Cross-Examination (By Mr. J. Bailey)       308
18

19   SERGEANT KJELLIN

20         Direct Examination (By Ms. Carnesale)      313
           Cross-Examination (By Mr. J. Bailey)       323
21         Redirect Examination (By Ms. Carnesale)    328

22   SERGEANT MERRITT

23         Direct Examination (By Ms. Weirich)        328

24

25

TABLE OF CONTENTS

VOLUME ONE

PAGE

**LIEUTENANT MILLER**

    Direct Examination (By Ms. Weirich)    362
    Cross-Examination (By Mr. W. Bailey)    368
    Redirect Examination (By Ms. Weirich)    369

**(VOLUME THREE)**

**Wednesday, December 7, 2005**

**DARRELL BURTON**

    Direct Examination (By Ms. Carnesale)    384
    Cross-Examination (By Mr. J. Bailey)    389

**JERRY BROWN**

    Direct Examination (By Ms. Carnesale)    390
    Cross-Examination (By Mr. J. Bailey)    395

**BENJANETTE STURDEVANT**

    Direct Examination (By Ms. Carnesale)    396
    Cross-Examination (By Mr. J. Bailey)    403

**LIEUTENANT MITCHELL**

    Direct Examination (By Ms. Carnesale)    407
    Cross-Examination (By Mr. J. Bailey)    414

Jury-Out Hearing    419

**OFFICER FAIR**

    Direct Examination (By Ms. Weirich)    424
    Cross-Examination (By Mr. W. Bailey)    432
    Redirect Examination (By Ms. Weirich)    434

## TABLE OF CONTENTS

### VOLUME ONE

PAGE

**CAROLYN CHAMBERS**

    Direct Examination (By Ms. Weirich)    435

**OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    444

Jury-Out Hearing

    **OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    448
    Cross-Examination (By Mr. J. Bailey)    450

**OFFICER WALLS**

    Direct Examination Continued (By Ms. Carnesale)    451
    Cross-Examination (By Mr. W. Bailey)    455

**WILLIAM MANGUM**
    Direct Examination (By Ms. Weirich)    457
    Cross-Examination (By Mr. J. Bailey)    468
    Redirect Examination (By Ms. Weirich)    475
    Recross Examination (By Mr. J. Bailey)    476

**DOCTOR CARTER**

    Direct Examination (By Ms. Carnesale)    478
    Cross-Examination (By Mr. W. Bailey)    518
    Redirect Examination (By Ms. Carnesale)    542

**(VOLUME FOUR)**

**Thursday, December 8, 2005**

**KRISTIE WOODS**

    Direct Examination (By Ms. Weirich)    563
    Cross-Examination (By Mr. J. Bailey)    618
    Redirect Examination (By Ms. Weirich)    629

1                           TABLE OF CONTENTS

2                             VOLUME ONE

3                                                              PAGE

4    Jury-Out Hearing

5            **VERA COLE**

6                Direct Examination (By Ms. Weirich)      633
                 Cross-Examination (By Mr. W. Bailey)     637
7

8            **MAGRA HARDEN**

9                Direct Examination (By Ms. Weirich)      640
                 Cross-Examination (By Mr. W. Bailey)     645
10

11               Court's Ruling                           653

12   **KRISTIE WOODS**

13               Redirect Examination Continued (By Ms. Weirich)   658
                 Recross Examination (By Mr. J. Bailey)            660
14               Further Redirect Examination (By Ms. Weirich)    662

15   **SHERONDA SMITH**

16               Direct Examination (By Ms. Carnesale)    667
                 Cross-Examination (By Mr. J. Bailey)     678
17

18   **VERA COLE**

19               Direct Examination (By Ms. Weirich)      682
                 Cross-Examination (By Mr. J. Bailey)     690
20               Redirect Examination (By Ms. Weirich)    693
                 Recross Examination (By Mr. J. Bailey)   695
21

22   **MAGRA HARDEN**

23               Direct Examination (By Ms. Weirich)      698
                 Cross-Examination (By Mr. W. Bailey)     703
24

25   Motion for Judgment of Acquittal                706

## TABLE OF CONTENTS

### VOLUME ONE

|  |  | PAGE |
|---|---|---|
| State Rests | | 709 |

**(VOLUME FIVE)**

**DEFENSE'S PROOF**

**GLEN WRIGHT**

| | PAGE |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 722 |
| Cross-Examination (By Ms. Weirich) | 729 |

**VERN BRASWELL**

| | PAGE |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 730 |
| Cross-Examination (By Ms. Weirich) | 788 |

**DOCTOR SCHWARTZ**

| | PAGE |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 816 |

Jury-Out Hearing

    **DOCTOR SCHWARTZ**

| | PAGE |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 826 |
| Cross-Examination (By Ms. Carnesale) | 827 |
| Redirect Examination (By Mr. W. Bailey) | 829 |

| | |
|---|---|
|     Court's Ruling | 835 |

**DOCTOR SCHWARTZ**

| | PAGE |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 838 |

| | |
|---|---|
| Jury-Out Hearing | 843 |

**DOCTOR SCHWARTZ**

| | PAGE |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 846 |
| Cross-Examination (By Ms. Carnesale) | 847 |
| Redirect Examination (By Mr. W. Bailey) | 858 |
| Recross Examination (By Ms. Carnesale) | 858 |

TABLE OF CONTENTS

VOLUME ONE

PAGE

**(VOLUME SIX)**

**Friday, December 9, 2005**

Motion for Judgment of Acquittal               872

Jury Charge Discussion                         872

Defense Rests                                  873

Closing Arguments (By Ms. Carnesale)           873

Closing Arguments (By Mr. W. Bailey)           884

Closing Arguments (By Ms. Weirich)             899

Jury Charge                                    926

Alternates Excused                             941

Jury Questions                                 942

Verdict                                        945


Certificate of Reporter                        948

1                          INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE    ID/EVIDENCE    TO/DESCRIPTION        PAGE

4    1     State            Evidence       P. Washburn, photo     202

5    2     State            Evidence       P. Washburn, photo     207

6    3     State            ID             P. Washburn, photos    312

7    3     State            Evidence       Officer Walls, photos  452

8    4     State            Evidence       P. Washburn,           217

9                                           check and letter

10   5     State            Evidence       P. Washburn, money     218

11   6     State            ID             P. Washburn, note      218

12   6     State            Evidence       K. Woods, note         617

13   7     State            ID             P. Washburn, document  219

14   7     State            Evidence       W. Mangum, document    467

15   8     State            ID             P. Washburn, document  219

16   8     State            Evidence       W. Mangum, document    466

17   9     State            ID             P. Washburn, document  219

18   9     State            ID             W. Mangum, document    466

19   10    State            Evidence       A. Snyder, photo       235

20   11    State            Evidence       J. Green, tape         241

21   12    State            Evidence       R. Coleman, report     245

22   13    State            Evidence       Lt. Jackson, sketch    259

23   14    State            Evidence       B. Tanzy, photo        278

24   15    State            Evidence       B. Tanzy, photo        279

25

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 16 | State | Evidence | Officer Galloway, crime scene sketch | 298 |
| 17 | State | Evidence | Officer Galloway, photo | 304 |
| 18 | State | Evidence | Officer Galloway, photo | 304 |
| 19 | State | Evidence | Officer Galloway, photo | 304 |
| 20 | State | Evidence | Officer Galloway, photo | 304 |
| 21 | State | Evidence | Officer Galloway, photo | 304 |
| 22 | State | Evidence | Officer Galloway, photo | 304 |
| 23 | State | Evidence | Officer Galloway, photo | 304 |
| 24 | State | Evidence | Officer Galloway, photo | 304 |
| 25 | State | Evidence | Officer Galloway, two bottles | 308 |
| 26 | State | Evidence | Sgt. Merritt, Advice of Rights form | 335 |

1                    <u>INDEX OF EXHIBITS</u>

2

3    <u>NO.</u>   STATE/DEFENSE      ID/EVIDENCE      TO/DESCRIPTION           <u>PAGE</u>

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 27 | State | Evidence | Sgt. Merritt, CD | 358 |
| 28 | State | Evidence | Lt. Miller, statement | 365 |
| 29 | State | Evidence | J. Brown, phone record | 391 |
| 30 | State | Evidence | B. Sturdevant, phone records | 397 |
| 31 | State | Evidence | Dr. Carter, photo | 483 |
| 32 | State | Evidence | Dr. Carter, photo | 485 |
| 33 | State | Evidence | Dr. Carter, photos | 489 |
| 34 | State | Evidence | Dr. Carter, photos | 489 |
| 35 | State | Evidence | Dr. Carter, photo | 491 |
| 36 | State | Evidence | Dr. Carter, necklace | 492 |
| 37 | State | Evidence | Dr. Carter, photo | 495 |
| 38 | State | Evidence | Dr. Carter, photo | 497 |
| 39 | State | Evidence | Dr. Carter, photo | 498 |
| 40 | State | Evidence | Dr. Carter, photo | 499 |
| 41 | State | Evidence | Dr. Carter, photo | 503 |
| 42 | State | Evidence | Dr. Carter, photo | 504 |
| 43 | State | Evidence | Dr. Carter, photo | 511 |
| 44 | State | Evidence | Dr. Carter, photo | 513 |
| 45 | Defense | Evidence | Dr. Carter, photo | 525 |
| 46 | State | ID | K. Woods, earrings | 618 |
| 46 | State | Evidence | S. Smith, earrings | 676 |

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

1        THE COURT:  Are the lawyers outside?

2        DEPUTY THOMPSON:  Both the Baileys are back there

3   with their client.

4        THE COURT:  Bring the three in, please.  Bring in

5   the jury, please.

6        (Jury present.)

7        THE COURT:  Good morning, ladies and gentlemen.

8   We are ready to resume the trial at this time.  Ms. Carnesale,

9   you may call your next witness.

10       MS. CARNESALE:  Thank you, Your Honor.   State

11   calls Darrell Burton.

12

13                        DARRELL BURTON

14   called as a witness, being first duly sworn, was examined and

15   testified as follows:

16                       DIRECT EXAMINATION

17   BY MS. CARNESALE:

18   Q    Good morning.  Will you please state and spell your

19   name for the record?

20   A    Robert D. Burton.  R-O-B-E-R-T D. B-U-R-T-O-N.

21   Q    You go by Darrell Burton?

22   A    Yes, ma'am.

23   Q    Where are you employed, Mr. Burton?

24   A    Watson's Pools and Spas.

25   Q    What do you do for Watson's Pools and Spas?

1    A    Service manager.

2    Q    And how long have you worked for Watson's?

3    A    13 years.

4    Q    What is Watson's?

5    A    We sell leisure products, hot tubs, spas, saunas,

6    tanning beds, patio furniture.

7    Q    And do you have any specific training for your position

8    as service manager?

9    A    Yes.

10   Q    What is that training?

11   A    In electronics, all aspects of plumbing on hot tubs and

12   baths, anything that has to do with water flow.

13   Q    And have you served as service manager for the 13 years

14   you've worked at Watson's?

15   A    Since 1994.

16   Q    Before that did you work in this area as well?

17   A    I was in the military for ten years.

18   Q    Now specifically, I have questions for you about home

19   baths, bathtubs.

20   A    Sure.

21   Q    Are you familiar with those as well as the hot tubs and

22   spas that you sell through Watson's?

23   A    Yes, ma'am.

24   Q    Could you explain to the jury how a bathtub operates,

25   where the water flow comes from?

1    A    Yes, ma'am.  The difference between a hot tub and a

2    bathtub, the water flow from a jacuzzi bathtub that's into

3    your house is induced by your own self.  The water comes from

4    a hot water heater.  The heat from the water is depending on

5    how hot you put the water in there, and most of your hot water

6    heaters are regulated by the government to be set at 120

7    degrees, which you're going to lose 15 to 20 degrees by the

8    time it goes through all your plumbing and reaches the

9    bathtub.  Once you put the hot water into the bathtub and you

10   turn the jets on to the tub, what has happened there, you are

11   inducing air into the water so it's going to cool the water at

12   a rapid rate.  Usually, the amount of hot water that you can

13   put into a bathtub and that a person can stand and once the

14   jets are turned on, usually within 15 to 20 minutes, you need

15   to turn the hot water back on to warm it back up because it

16   cools off very quickly.

17   Q    So if I understand you correctly, the hot water heater

18   that you have in your house heats to about 120 degrees?

19   A    120 degrees.  Most of the plumbers that you talk to

20   will set them at about 140 degrees.  The time the water

21   actually reaches you, it can be anywhere from 95 degrees to

22   110 degrees.  So you could use, you know, 15 to 25 degree

23   water and heat loss before it gets to the tub.

24   Q    Just because it flows through your pipes?

25   A    Right and going through your foundation, it could be in

1    the attic.  They set them in various places in your home.

2        Q    Okay.  And you mentioned a jacuzzi-type style bathtub;

3    correct?

4        A    Correct.

5        Q    I'm going to pass forward what was previously marked

6    State's Exhibit 22.  Well, let me actually show you Exhibit

7    No. 2.  Is that a jacuzzi-style home bathtub?

8        A    Yes, ma'am, it is.

9        Q    We know that because we can see the jets in the

10   bathtub?

11       A    Correct.

12       Q    And is that the type of bathtub that you said the water

13   typically would be between 95 and I believe you said 110?

14       A    Correct, and it can cool off very quickly.

15       Q    Why is that that it cools off, the water cools off

16   quickly?

17       A    The way a hot tub or a bathtub works that's set up as a

18   jacuzzi, as you know, they have different series of jets into

19   them.  And they always have what we call an air venture on

20   them that opens and closes whether it's on the top of the tub

21   or on the inside of the tub.  And when you open that air

22   venture, what it does is water is forced through that jet.  It

23   creates a suction and makes the outside air push through the

24   jet, which gives you the therapy action, the more strong water

25   moving.  So the air that's outside and most of the air

1   ventures that are piped, even in this situation right here,

2   the pipe is ran up underneath the hot tub so it's even cooler

3   under there than it is in the room so when the jets are turned

4   on, you're pulling the outside air through the jet and it's

5   making the water cool down at a rapid rate.

6        Q    Based on your experience, you would estimate after

7   about 15 minutes the water cools?

8        A    Or sooner.

9        Q    Do you have any idea what -- by what degree it cools

10  off over time?

11       A    It -- that really depends on the temperature of the

12  water that was put in by the person.  And say if it was 110

13  degrees when they put it in there, the water within 15 or 20

14  minutes would probably be down to 90 degrees or below 90

15  degrees.

16       Q    If it were a two-hour period of time, what change in

17  temperature would you expect to see based on your experience?

18       A    Jets left on or off?

19       Q    Well, let's say jets left on.

20       A    It would be cold enough that you wouldn't want to be in

21  the water.

22       Q    And say the jets were off.

23       A    Probably in the 80-degree range or lower.

24            MS. CARNESALE:  Thank you, sir.  I'll pass the

25  witness.

THE COURT:  Mr. Bailey.


CROSS-EXAMINATION

BY MR. J. BAILEY:

Q    Mr. Burton, so am I'm correct, that if the jets are not on, the water cools at a slower pace; is that correct?

A    That is correct.

Q    And likewise, am I correct that the -- you don't know what temperature the -- in this case we're talking about, the house over on Creekside, you have no idea what temperature the water was coming out of that water tank, do you?

A    That is correct.

Q    You have not examined the water tank in that -- hot water in what we call a hot water heater here in the south. You have not examined that tank, have you?

A    No, sir.

Q    In fact, nor have you actually seen, other than on that picture, the jacuzzi that was in that home, have you?

A    That is correct.

MR. J. BAILEY:  No further questions.

MS. CARNESALE:  No redirect.

THE COURT:  You may step down.  Thank you, sir. Call your next witness.

MS. CARNESALE:  Jerry Brown.

JERRY BROWN

called as a witness, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CARNESALE:

Q    Good morning, sir.

A    Good morning.

Q    Will you state and spell your name for the record?

A    Jerry Brown.   J-E-R-R-Y B-R-O-W-N.

Q    Where are you employed, Mr. Brown?

A    Bellsouth.

Q    And what is Bellsouth for those of us who may --

A    Bellsouth, local long-distance phone company.

Q    What is your occupation with Bellsouth?

A    I'm the corporate security manager for West Tennessee. I investigate all corporate related matters, any matters like today.  I appear before the court as a representative and custodian of records.

        MR. J. BAILEY:  Your Honor, we will accept him as keeper of the records.

Q    Now, Mr. Brown, you are keeper of records, in other words you maintain records that relate to the business of Bellsouth; is that correct?

A    Correct.

Q    Did I ask you today to bring you -- for you to bring

1   some records that belong to one Vern Braswell?

2       A    Yes.

3       Q    And what is Mr. Braswell's home phone number or what

4   was it, rather, in November 2004?

5       A    901-624-5176.

6       Q    And did you indeed bring records that relate

7   specifically to the dates of November 4th and November 5th,

8   2004, belonging to that subscriber number?

9       A    Yes.

10              MS. CARNESALE:  Your Honor, at this time we'd ask

11  they be marked the next State's Exhibit.

12              THE COURT:  Exhibit 29.

13              (Exhibit No. 29 was marked and filed.)

14              MS. CARNESALE:  Your Honor, may we publish this to

15  the jury at this time?

16              THE COURT:  You may.  The whole folder?

17              MS. CARNESALE:  I'm going to place it on the

18  screen, if I may.

19              THE COURT:  Sure.

20      Q    And, Mr. Brown, I'm going to ask you to assist me if

21  you would.

22      A    Okay.

23              MS. CARNESALE:  With the Court's permission, may

24  he step down?

25              THE COURT:  Sure.

1    Q    I'm going to stand over here and look at my copy.  If

2    you would look at your copy.  Are these the records that we

3    were just discussing that relate to the home number of Vern

4    Braswell?

5    A    They are.

6    Q    Now I'm going to ask you specifically to look at the

7    date of November 5th, 2004.  What times were calls beginning

8    to be made from that number, if you would tell the jury

9    starting on the date of November 5th?

10   A    Okay.  The first call made to that number was at 4:14

11   a.m.

12   Q    Now was that number --

13   A    Excuse me.  4:05 a.m.

14   Q    The first call was at 4:05 and 53 seconds?

15   A    Correct.

16   Q    Who -- was that call placed out from the 624-5176 or

17   was it received?

18   A    624-5176 received a call at 4:05 a.m. from

19   901-753-1562.

20   Q    Now the 624 number is Mr. Vern Braswell's home phone

21   number; is that correct?

22   A    Correct.

23   Q    How do we know he received the phone -- the call?

24   A    The records indicate that call was answered.

25   Q    Okay.  My question is on the records it shows "call

1   number."  Is that what that means, someone called that phone

2   number?

3        A     Correct.

4        Q     And if you could, pull down the records just a little

5   bit to show that heading, see where it says "call number" at

6   the top.  And then "calling number," what does that mean?

7        A     Calling number is the number that's placing the call.

8        Q     So at 4:05 Vern Braswell's home received a phone call?

9        A     That's correct.

10       Q     And how long did that phone call last?

11       A     15.3 seconds.

12       Q     And the telephone was answered; is that correct?

13       A     That's correct.

14       Q     And that's what that means under "answered" when it

15   said "yes"?

16       A     Yes.

17       Q     And "call type," which is the final column -- if you

18   can move that over just a little to show the jury.  When it

19   says "call type," what does that mean?  Does that just refer

20   to a billing?

21       A     The 001 means detailed message rate, time with MBI,

22   most of the time that's billing related.

23       Q     Okay.  Just so we'll understand what that is.  Now

24   specifically, I want to ask you about certain phone calls at

25   4:14 a.m.  Do you see a phone call that was made by the home

1    phone number of Vern Braswell?

2       A    Yes.

3       Q    What number was called?

4       A    901-373-3883.

5       Q    And how long did the phone call last?

6       A    One minute and 28.9 seconds.

7       Q    At 4:33 a.m., was a phone call placed from the home of

8    Vern Braswell?

9       A    Yes, it was.

10      Q    What number was called?

11      A    901-737-6100.

12      Q    How long did that phone call last?

13      A    3.9 seconds.

14      Q    4:34 a.m. was a call made from the home phone number of

15   Vern Braswell?

16      A    Yes.  Placed to 901-367-2961.

17      Q    And how long did that call last?

18      A    Lasted one minute and 35.9 seconds.

19           MS. CARNESALE:  Your Honor, if we may have just

20   one moment.

21      Q    Okay.  Mr. Brown, you may take your seat.  I just have

22   a general question for you.  If a 911 call had been placed

23   from that home phone number, would that appear on these

24   Bellsouth records?

25      A    A 911 call?

1    Q    Yes, sir.

2    A    It should.  Call detail records, there's a possibility

3    that calls can come through that don't show up on them, but

4    generally they pick up all calls.

5    Q    But are the 911 calls tracked by a different computer

6    system than the normal calls placed from that number?

7    A    No, they're all tracked by the same system.

8    Q    Thank you.

9         MS. CARNESALE:  Your Honor, may I approach and

10   remove the exhibit?

11        THE COURT:  You may.

12        MR. J. BAILEY:  I'm going to use them on cross.

13        MS. CARNESALE:  I have no further questions.

14        THE COURT:  Mr. Bailey.

15

16                    CROSS-EXAMINATION

17   BY MR. J. BAILEY:

18   Q    Mr. Brown, now -- so let me get an understanding here.

19   If 911 were to show that a call was placed at 3:57 from

20   624-5176, a Bellsouth number, this exact same phone that your

21   records are related to or correspond with, you're not sure

22   whether they should show or what is it?

23   A    No, they should show.

24   Q    Is there any reason why it would not show?

25   A    There is a possibility that calls don't get captured in

1   the switch.  It is possible.

2   Q    Okay.  All right.  Likewise, the numbers that you were

3   asked about just now, the call at 4:05, did you -- were you

4   asked to find out who that call was placed to?

5   A    No.  The records were subpoenaed, and this is a result

6   of the subpoena.  This is what the system generated.

7   Q    And what about the second number?  I'm not going to

8   take you through each one.  You didn't check for the caller on

9   the other end for any of these calls, did you?

10   A    No.

11   Q    You don't know who they are?

12   A    (Witness shook head left to right.)

13                MR. J. BAILEY:  No further questions.

14                THE COURT:  Any redirect?

15                MS. CARNESALE:  No redirect.  Thank you.

16                THE COURT:  You may step down.  Call your next

17   witness.

18                MS. CARNESALE:   State calls Benjanette Sturdevant.

19

20                      BENJANETTE STURDEVANT

21   called as a witness, being first duly sworn, was examined and

22   testified as follows:

23                      DIRECT EXAMINATION

24   BY MS. CARNESALE:

25   Q    Good morning, ma'am.

1   A    Good morning.

2   Q    Will you please state and spell your name for the

3   record?

4   A    Sure.  Benjanette Sturdevant.  B-E-N-J-A-N-E-T-T-E.

5   Sturdevant, S-T-U-R-D-E-V-A-N-T.

6   Q    Where are you employed, Ms. Sturdevant?

7   A    Nextel Communications.

8   Q    And what is Nextel Communications?

9   A    Telecommunications company.  We sell cellular phones.

10  Q    And what do you do for Nextel?

11  A    I am a strategic care specialist.  I deal with the

12  bill, go over the bill, make changes on the account.  I review

13  details of bills of all customers nationwide.

14           MR. J. BAILEY:  Your Honor, we will accept her as

15  keeper of the records.

16  Q    Ms. Sturdevant, did I ask you to bring the Nextel

17  records or do you have a copy of the Nextel records with you

18  belonging to Vern Braswell whose Nextel number was 331-4313?

19  A    Yes.

20           MS. CARNESALE:  Your Honor, we'd ask that those

21  records be introduced as the next exhibit.

22           MR. J. BAILEY:  No objection.

23           THE COURT:  Exhibit 30.

24           (Exhibit No. 30 was marked and filed.)

25           MS. CARNESALE:  Your Honor, may I approach and

1    publish these to the jury?

2              THE COURT:  You may.

3    Q    Ms. Sturdevant, if you would, I'm going to ask you to

4    step down and place these on the equipment so the jury can

5    look at them, and then ask you to review them with the jury so

6    we can explain what we're looking at.  It's a little hard to

7    read but if you would, and feel free to move it around if you

8    need to as we discuss this.  Basically, what are these records

9    in general?

10   A    The detailed billing for cell phone number

11   901-331-4313.

12   Q    And I see the heading.  The jury may not be able to

13   read it but it says "Customer PTN" above that number.  What

14   does "PTN" mean.

15   A    Personal Telephone Number.

16   Q    And then we have the date.  And obviously that's

17   self-explanatory.  It then says "call initiated."  Is that the

18   time that each call was begun?

19   A    Yes.

20   Q    "Duration."  What does that mean?

21   A    How long the call lasted.

22   Q    And is that measured in seconds or minutes?

23   A    Seconds.

24   Q    And then it says "type."  What does that mean?

25   A    Whether it was an in-bound call or an out-bound call.

1   Q    What would an in-bound call mean?

2   A    In-bound call means a call that was called to the cell

3   phone.

4   Q    And out-bound would be a call placed from the cell

5   phone?

6   A    From the cell phone, yes.

7   Q    And then the final heading is "caller call PTN."  What

8   does that mean?

9   A    That's the number that was called from the cell phone

10  or to the cell phone.

11  Q    In the case of an in-bound call?

12  A    Right.

13  Q    Now I want to refer specifically to a certain date

14  November 5th, 2004.  Do you see calls placed on that date

15  within those records?

16  A    Yes.

17  Q    I'd like to refer to the first time of 3:55:57.  Do you

18  see it?

19  A    What page are you on?

20  Q    On November 5, '04, 3:55:57 on page seven.

21  A    I have it.

22  Q    Okay.  And if you would, pull it down a little so it

23  displays on the screen.  There we go.  3:55:57, I believe it's

24  third from the top on November 5th, 2004?

25  A    Yes, the third call from the top.

1    Q    Okay.  What number was called by the cell phone number

2    of Vern Braswell at that time?

3    A    901-737-6100.

4    Q    And it was out-bound, which means he placed the call or

5    the cell phone placed the call?

6    A    Exactly.  It was placed from the cell phone.

7    Q    And what was the duration?

8    A    The duration was 12 seconds.

9    Q    Now again, do you see a call at 3:56:47?

10   A    Yes.  The number right before the previous call.

11   Q    Okay.  Who made the call?  What number made the call?

12   A    It was out-bound from the same cell phone number,

13   901-331-4313.

14   Q    What number did it call?

15   A    The 901-737-6100.

16   Q    How long did it last?

17   A    Three seconds.

18   Q    Do you see a call at 3:57:17?

19   A    Yes.

20   Q    Was it in-bound or out-bound from the cell phone?

21   A    It was out-bound also.

22   Q    What number was called?

23   A    901-737-6100.

24   Q    How long did it last?

25   A    Four seconds.

1    Q    You may have to turn the page.  Do you see a call at

2    3:58:01 on November 5th, 2004?

3    A    3:58.

4    Q    I believe it should be page six.

5    A    Yes.  The last call from the bottom.

6    Q    Now at 3:58:01 was this an in-bound or out-bound call?

7    A    Out-bound.

8    Q    What number was called?

9    A    901-484-8568.

10   Q    How long did it last?

11   A    Two seconds.

12   Q    3:58:31 was a call made?

13   A    Out-bound to 901-737-6100, four seconds.

14   Q    3:59:23?

15   A    That was an out-bound 901-737-6100, lasted seven

16   seconds.

17   Q    3:59:57?

18   A    Same number, out-bound call 901-737-6100, lasted 13

19   seconds.

20   Q    Four o'clock and 37 seconds?

21   A    Same number out-bound call to 901-737-6100, 12 seconds.

22   Q    4:01:26?

23   A    Same number, 901-737-6100, out-bound call lasted four

24   seconds.

25   Q    And 4:01:44?

1    A    Out-bound call made to 901-553-7044.  That may have

2    been a hangup.  It was 0 seconds.

3    Q    If you place a call and immediately hang up, does it

4    register even if there weren't any seconds?

5    A    Right.  It will register the number but not the

6    seconds.

7    Q    Now at 4:03:15 was a call placed?

8    A    Out-bound call phone number 901-737-6100, lasted ten

9    seconds.

10    Q    4:06:38?

11    A    Out-bound 901-737-6100, lasted three seconds.

12    Q    4:07:30?

13    A    901-737-6100 out-bound call, lasted seven seconds.

14    Q    4:08:05?

15    A    Out-bound call 901-737-6100, lasted 11 seconds.

16    Q    4:08:21?

17    A    Out-bound call 901-737-6100, 0 seconds.

18    Q    So again that would indicate a hangup?

19    A    Right.

20    Q    4:12:01?

21    A    Out-bound 901-737-6100, 15 seconds.

22    Q    At 4:13:39?

23    A    It was out-bound 901-737-6100, six seconds.

24    Q    4:36:21?

25    A    Out-bound 901-737-6100, lasted four seconds.

1   Q      4:37:03?

2   A      901-484-8568 out-bound call, four seconds.

3   Q      4:37:53?

4   A      901-553-7044 out-bound, six seconds.

5   Q      4:38:28?

6   A      Out-bound call 901-737-6100, five seconds.

7   Q      4:40:08?

8   A      Out-bound call to 901-491-1623, lasted 647 seconds.

9   Q      And then if you would look at 6:20:47?

10  A      Okay.  It's in-bound call to 901 -- from 901-484-8568,

11  lasted 133 seconds.

12  Q      Ms. Sturdevant, you may retake your seat.  Thank you

13  very much.

14          MS. CARNESALE:  Your Honor, I pass the witness.

15

16                      CROSS-EXAMINATION

17  BY MR. J. BAILEY:

18  Q      Ms. Sturdevant, let me get you to go back to the what

19  we call a DOAR but the projector and look back down at --

20  let's start at -- now you started at 3:57 or actually you

21  started at 3:55.  But go down to 3:57 a.m. on the 5th,

22  November 5th.  Now we skipped over some numbers, didn't we?

23  Did we not?

24  A      3:57?

25  Q      Yeah, look at 3:58.  Read the number that was called at

1    3:58?

2        A     901-484-8568.

3        Q     Okay.  And then at 3:58:41?

4        A     901-299-4527.

5        Q     And go up to 4:01.  Well -- no, go to 4:01:44.

6        A     The out-bound call to 901-553-7044.

7        Q     And look at 4:14:22?

8        A     Out-bound to 901-458-0958.

9        Q     Okay.  So there were some calls that you weren't asked

10   about in that list; is that correct, that you just read off?

11       A     Yes.

12       Q     And you have not determined -- were you asked to

13   determine -- did you bring any records with you that would

14   determine who those people were that were called?

15       A     No.

16       Q     Do you even have that ability?

17       A     No.

18       Q     All right.  And now you can retake your seat.  I want

19   you to -- tell me what day -- the records that you brought

20   with you, tell me exactly what date and what time they start

21   with?

22       A     They start with -- well, it goes from November 5th to

23   November 3rd, 2004.

24       Q     So you have records going back to November 3rd; is that

25   correct?

1    A    Yes.

2    Q    And how often do you get an opportunity to look at

3  phone records, not just these but anybody's?

4    A    Everyday.

5    Q    Okay.  Would you say that these are -- whoever has this

6  phone or whoever this phone is assigned to makes a lot of

7  calls?

8    A    Yes.

9    Q    I mean, it's not just some -- that morning of November

10  5th is not unusual for this person, is it?  They make a lot of

11  calls, don't they?

12    A    Yes, they do.

13    Q    All right.  In fact, let's just start with November

14  3rd.  Give me some idea, if you can just in one day, I want

15  you to count the number of phone calls made on that day.

16    A    36.

17    Q    And that's -- what time does it start on that page and

18  what time does it end?

19    A    Starts at 6:55 a.m. and ends at 8:24 p.m.

20    Q    Okay.  A lot of calls, huh?

21    A    Yes.

22    Q    And some of those calls, they talk for quite a bit of

23  time, don't they?

24    A    Yes.

25    Q    All right.  Look at November 4th.

1    A    Okay.

2    Q    On November 4th, calls start at what time, 6:45 a.m.

3    Is that correct?

4    A    Yes.

5    Q    And there are quite a few calls, aren't there, all

6    during the day and night; isn't that correct?

7    A    Yes.

8    Q    In fact, they go all the way up to, I think on November

9    4th, they go up to 10 o'clock -- almost 11 o'clock, 10:57?

10   A    10:57, yes.

11   Q    So this person makes these calls quite -- makes a lot

12   of calls; is that correct?

13   A    Yes.

14   Q    A talkative person, huh?

15   A    Yes.

16   Q    Appears to be at least; is that right?

17   A    Yes.  Looking at the detail, yes.

18              MR. J. BAILEY:  No further questions.

19              MS. CARNESALE:  No redirect.  Thank you, Ms.

20   Sturdevant.

21              THE COURT:  You may step down.  Just leave the

22   records there if you would, please.  Call your next witness.

23              MS. CARNESALE:  Lieutenant Mitchell.

24

25

<u>LIEUTENANT MITCHELL</u>

called as a witness, being first duly sworn, was examined and testified as follows:

<u>DIRECT EXAMINATION</u>

BY MS. CARNESALE:

Q    Good morning, sir.

A    Good morning.

Q    Will you please state and spell your name for the record?

A    John E. Mitchell.  J-O-H-N. E, middle initial. Mitchell, M-I-T-C-H-E-L-L.

Q    Where are you employed, Mr. Mitchell?

A    City of Memphis Police Department.

Q    What rank do you currently hold?

A    Lieutenant.

Q    Where are you currently assigned?

A    Officer in the schools.

Q    Officer in the schools?

A    Yes, ma'am.

Q    What school are you assigned to?

A    I supervise all the men and women that are assigned to a call.

Q    And how long have you been a Memphis Police Officer?

A    22 years in a couple months.

Q    Do you know the defendant in this matter, Vern

1    Braswell?

2         A    Yes, I do.

3         Q    Do you see him in the courtroom?

4         A    Yes, he's -- I couldn't see him behind the attorney

5    over here.

6              MS. CARNESALE:   Your Honor, may the record reflect

7    he's --

8              THE COURT:   Sure.

9         A    Yes, he's behind the attorney.

10        Q    How long have you known Vern Braswell?

11        A    That's a good question.   Five plus years, probably.

12        Q    How do you know him?

13        A    Fraternity, Omega Psi Phi Fraternity, Incorporated.

14        Q    And this is a professional fraternity?

15        A    Yes, it is.

16        Q    Did you socialize with Mr. Braswell through this

17   fraternity?

18        A    Yes, I did.

19        Q    How would you characterize the relationship between the

20   two of you?

21        A    Th two of us, we come in contact during meetings, see

22   him every now and then while we are out riding our

23   motorcycles.   We might end up at the same location but besides

24   that, that's the only way I know him.

25        Q    Okay.   And in 2004, how often would you speak with Mr.

1   Vern Braswell?

2      A    2004?

3      Q    Yes, last year.

4      A    Last -- he was incarcerated last year.

5      Q    My question is, you know, before he was incarcerated,

6   how often would you speak with him?  And by that weekly?

7   Daily?  Monthly?  Less than that?

8      A    Less than that.

9      Q    Okay.  On November -- in November of 2004, what was

10  your home telephone number?

11     A    901-737-6100.

12     Q    And what was your -- did you have a cell phone at that

13  time?

14     A    Yes, I do.

15     Q    What was your cell phone number?

16     A    901-484-8568.

17     Q    On or about -- on -- not about, on November 5th, 2004,

18  were you out of town?

19     A    Yes, ma'am.

20     Q    Where were you?

21     A    Tyler, Texas.

22     Q    And did you have occasion to receive telephone calls

23  from the defendant's home phone number?

24     A    I received a -- I had several -- I had a missed call

25  from Brother Braswell.  I didn't recognize the number until I

1    woke up.  I noticed that I had several -- I had a missed call.

2    And since it was -- since I received those calls early in the

3    morning, I thought it was an emergency so I dialed the number

4    back.  I didn't recognize the number.

5    Q    Was this an area code 901 --

6    A    Yes.

7    Q    624-5176 number?

8    A    Excuse me?

9    Q    Was the number area code 901-624-5176?

10   A    I could not tell you what the number was but I know I

11   had a missed call and I dialed whatever number that was back.

12   Q    And when you dialed that number back, whose number was

13   it?

14   A    Brother Braswell.

15   Q    Did he answer the telephone?

16   A    Yes, he did.

17   Q    About what time was this?

18   A    Five or six in the morning.

19   Q    And you had received a missed call on your cell phone?

20   A    Correct.

21   Q    Do you recall what time the missed call came in at?

22   A    Between two and three, maybe.  It was early morning.  I

23   was asleep when the call came through.

24   Q    And this came in on your cell phone number; correct?

25   A    Correct.

```
1      Q    Which is 484-8568?

2      A    Correct.

3      Q    Now when you called Mr. Braswell back, did he answer

4    the telephone?

5      A    Yes, ma'am.

6      Q    What did he say?

7      A    He -- he was -- he was distraught.  He was crying, and

8    I asked him what was wrong and he said that his wife was dead.

9      Q    What did you say?

10     A    I asked him to repeat his self because I was kind of

11   shocked when I heard him say "dead."  I wanted to make sure I

12   heard him correctly.  He said my wife is dead.  And I said

13   what happened, what's going on?  And he said he had been

14   drinking, they made love and he fell asleep and when he woke

15   up, she wasn't in bed.  He went to the rest room and found her

16   in the bathtub dead.

17     Q    Is that all he said?

18     A    Yeah.

19     Q    Did he ever say anything to you about accidentally

20   choking his wife?

21     A    No.

22     Q    Did he ever mention the term "erotic asphyxia"?

23     A    No, ma'am.

24     Q    Were you -- how did you -- were you surprised when you

25   got this phone call from Mr. Braswell?
```

1   A   Yes, I was.  I mean, I called him back.

2   Q   Okay.  You saw his number and you called him back.

3   After you talked to him --

4   A   I didn't recognize the number now.

5   Q   Right.  But you dialed it back from the caller ID in

6   your cell phone?

7   A   Correct.

8   Q   And when you called him back and you talked to him,

9   were you surprised that he had called?

10  A   Yes.

11  Q   Why?

12  A   Why was I surprised that he called?

13  Q   Yes, sir.

14  A   I mean -- I take that back.  Not surprised that he

15  called, but I guess he's reaching out for some -- for some

16  help.

17  Q   When was the last --

18  A   Because I'm a brother of his.

19  Q   Through the fraternity?

20  A   Right.

21  Q   Before November 5th, 2004, when was the last time you

22  had spoken to him?

23  A   Can't say.

24  Q   Not any time recent?

25  A   Oh, you mean after the -- after the 5th?

1    Q    No, no, no, before the 5th.

2    A    Before the 5th?

3    Q    Before you got that -- before you saw that he called

4    and called the number back, when was the last time you had

5    talked with him?

6    A    Don't remember.

7    Q    Would it surprise you to learn that he called both your

8    home and cell phone numbers approximately 20 times before you

9    talked to him that morning?

10   A    That's surprising.  I didn't know that.

11   Q    Did you know Sheila Braswell his wife?

12   A    Not really.

13   Q    Had you ever met her?

14   A    I believe I met her in passing.

15   Q    Did you know a woman named Kristie Woods?

16   A    Who?

17   Q    Kristie Woods.

18   A    I'm not good with names.  I might recognize her if I

19   saw her by face.

20   Q    Okay.

21        MS. CARNESALE:  Thank you, Your Honor.  Nothing

22   further.

23        THE COURT:  Mr. Bailey.

24

25

<u>CROSS-EXAMINATION</u>

BY MR. J. BAILEY:

Q     Lieutenant Mitchell.

A     Yes, sir.

Q     It was your testimony on direct that you weren't surprised that Mr. Braswell called you because you thought that maybe he was reaching out for some help from a brother; is that right?

A     Correct.

Q     Because you're his fraternity brother; is that right?

A     That's correct.

Q     And also a week before this, approximately a week before this, am I correct that the -- that you toured -- you came and toured the Hanley Elementary School where Mr. Braswell worked; is that correct?

A     I've done that.  I don't know if that was in the same week or week before or two weeks before or a month before.  I don't know that but I've been to his school, yes, and toured the school.

Q     And you knew he was the assistant principal there?

A     Yes.

Q     And so he -- so you had seen him within a reasonable time, short time before this incident; is that correct?

MS. WEIRICH:  Objection, Your Honor.  That's not what he answered to.  He said he didn't know when it was.

1    MR. J. BAILEY:  I'm asking a different question.

2    THE COURT:  Well, on the heels of the other

3    question.  It sounded like it was connected to the other one.

4    You can rephrase it if you'd like.

5    MR. J. BAILEY:  I'll rephrase it, Your Honor.

6    Thank you.

7    Q    Did you see him within, let's say a month prior to

8    November 4th?

9    A    I cannot say that or testify to that.  I know I have

10    been over to his school on several occasions.  I don't know

11    the timespan that I was over there, but I was there at Hanley

12    School and took a tour that he took me to on the tour.  I

13    don't know when that was.

14    Q    Okay.

15    A    Okay.  I can't hardly remember what I did last week.

16    Q    Thank you, Lieutenant Mitchell.

17    MR. J. BAILEY:  No further questions.

18    MS. CARNESALE:  No redirect.  Thank you.

19    THE COURT:  All right.

20    MS. CARNESALE:  Your Honor, may we approach?

21    THE COURT:  Sure.

22    (Bench conference commenced.)

23    MS. WEIRICH:  I don't know if our next witness is

24    here yet.  Could we have a short break?

25    THE COURT:  Sure.  That's fine.

1        (Said bench conference concluded.)

2            THE COURT:  All right.  Ladies and gentlemen, we

3    will take a short recess at this time.  As always, do not

4    discuss the case among yourselves during the recess.

5            (Jury out.)

6            THE COURT:  Take him out.  We'll stand in recess.

7            (Recess.)

8            THE COURT:  Bring in the jury, please.  Are y'all

9    ready, Ms. Carnesale?

10           MS. CARNESALE:  We are.

11           THE COURT:  Bring in the jury.

12           MR. J. BAILEY:  Your Honor, are you bringing the

13   jury in now?

14           THE COURT:  Yes.

15           MR. J. BAILEY:  May we approach then?

16           THE COURT:  You may.

17           (Bench conference commenced.)

18           MR. J. BAILEY:  Your Honor, I previously requested

19   that the Court redact or exclude any conversations from the

20   jail conversations that would have involved counsel.  All I

21   would ask the Court to do is that if -- it's my understanding

22   that the State intends to play or to publish to the jury some

23   of those -- some of the conversations on the CD.  If they're

24   going to be conversations with counsel played, I would ask the

25   Court to allow us to have a jury-out hearing prior to those

1    conversations so that we can number one, determine -- make

2    objections on relevancy on some of these phone conversations.

3    And two, I want to make sure we build a record as to the basis

4    for our objection.

5            MS. WEIRICH:  Judge, the whole CD is in evidence.

6    I don't intend to play the many, many hours of it this

7    morning.  But if when the jury gets back to deliberate, they

8    want to, they can.  The whole thing is in evidence right now.

9            MR. W. BAILEY:  Of course, the Court has the

10   discretion in terms of protecting the interest of the

11   defendant based on fundamental fairness --

12           THE COURT:  I understand that.  But the issue is

13   no different than what we discussed yesterday, just the same

14   objection that's being revisited.  And I don't see any real

15   reason for any change in the ruling today than we discussed

16   yesterday.

17           MR. J. BAILEY:  May I just be heard a little

18   further on that?  Yesterday, in all honesty -- in all candor,

19   I'm sorry, my objection was really based on it being

20   privileged, those conversations being privileged.  Now I guess

21   what I'm saying is that some of those conversations may not

22   even be relevant to this case.

23           THE COURT:  Well, they may not be, but you're the

24   one that was demanding as quick a trial as possible.  You went

25   -- when I set this trial date, you and your client wanted an

1   earlier trial date.  It's incumbent on you to -- you've had

2   access to this in this -- in these months leading up to the

3   trial.  If there are portions of these 35 phone calls

4   extending over many hours that you feel aren't relevant, then

5   you should have brought that to my attention pretrial, and we

6   could have had a hearing pretrial.

7           But in the middle of a trial, I don't plan to halt the

8   proceedings to listen to 35 phone calls that extend over many,

9   many hours just because you think some of them may not be

10  relevant.  If you can point to a specific conversation that

11  you feel is not relevant, let me know.  If you've got a

12  transcript and you want to say here, this call made on this

13  date to this person is not relevant because it talks about X,

14  Y and Z, let me know.  But to just come up here now and just

15  say, well, let's have an out-of-jury hearing and listen to all

16  these 35 phone calls because some of them may be relevant and

17  some of them may not be, no, we're not going there.  That's

18  why we have pretrial hearings.

19          MR. J. BAILEY:  All right.  Well, I'll just state

20  this that I'm --

21          MR. W. BAILEY:  This whole thing may be moot if

22  she would -- are you prepared to identify what portions of the

23  --

24          THE COURT:  The point she made is that the whole

25  CD is in evidence.  And so whatever portions she plays for the

1    jury are in evidence at this point.  If you --

2             MS. WEIRICH:  Even the ones that I don't play are

3    in evidence.

4             THE COURT:  Of course.  And I suppose if after a

5    conversation is played for the jury, if you want to for the

6    record the next time we send --

7             DEPUTY LAFFERTY:  Judge, can the jury step back?

8             THE COURT:  Sure.  Let me excuse all of y'all,

9    please.  We can continue this from counsel table since the

10   jury is going out.

11                (Said bench conference concluded.)

12                (Jury out.)

13            THE COURT:  One of the jurors needed a break and

14   so that's why they're excused.  But to finish my thought.  I

15   suppose if after portions of that CD are played for the jury,

16   if you want to renew your objection on relevance grounds, you

17   can certainly do so, approach the bench or the next time the

18   jury is excused at lunch or whenever, make a statement for the

19   record that you believe that this portion or that portion was

20   not relevant.

21            MR. J. BAILEY:  Yes, sir.

22            THE COURT:  And if it was -- if I agree with you,

23   then I guess I could take the step of then excluding it from

24   the jury's consideration and giving them some curative

25   instruction to that effect.

1      MR. J. BAILEY:  Very well, Your Honor.

2          THE COURT:  But at this point in time, given the

3  amount of time that has been -- that everyone has had to

4  prepare for this trial and the access everyone has had to all

5  of this evidence, as I indicated, I'm not inclined to at this

6  point have an out-of-jury hearing to listen to all 35 phone

7  conversations just to try and fair it out what may be more

8  relevant and what may be less relevant.  That's something that

9  is incumbent on the attorneys and call it to my attention

10  pretrial.  We have those types of hearings pretrial.  And it

11  all comes a little too late at this point.

12          And so as to the relevance issue, I don't intend to

13  have an out-of-jury hearing at this point in time.  You may

14  renew your objection.  We may revisit that at a later point if

15  you want to renew it.

16          MR. J. BAILEY:  Very well.

17          THE COURT:  As to the privileged question, we

18  discussed that yesterday and for all the reasons I stated on

19  the record yesterday, I don't think that that objection has

20  Merritt either.

21          MR. J. BAILEY:  May I -- and I just -- without

22  objection, accept Your Honor's ruling.  I just wanted just for

23  the record clear up something.  It's not that we did not

24  address the issue.  I mean, we did not file a pretrial motion

25  on it.  But I had received a summary of all 35 calls, and I

1   have that with me.  And there are calls that mention myself

2   and calls, you know, summaries where it says suspect or

3   defendant talked to J. Bailey or talked to Leslie Ballin or

4   what have you.  And it doesn't get into any privileged

5   material.  And so I assumed -- I've had other cases where jail

6   calls were monitored or were obtained pursuant to a search

7   warrant or what have you and they always would, you know, once

8   they saw that he was talking to his lawyer, they dropped that.

9   And the other calls would remain.  And in this case it appears

10  like there is nothing --

11          THE COURT:  Of course, I don't know what the

12  conversations are, what the content of the conversations might

13  have been.  But again, those are all the types of things that

14  need to be hashed out pretrial.

15          MR. J. BAILEY:  I understand.

16          THE COURT:  Every case is different.  Every set of

17  circumstances is different.  And the case law that you are

18  alluding to, although I have not seen any of it yet, but that

19  you're familiar with and I'm sure there is plenty of case law

20  on that issue, but I don't know what the facts of those cases

21  might have been --

22          MR. J. BAILEY:  I understand.

23          THE COURT:  -- compared to the facts of this case.

24  I don't know if those cases might have dealt with the types of

25  phone calls from the phones that are dedicated for calling --

```
1    for an inmate calling an attorney, if those were monitored
2    improperly.  Or if those cases dealt with this type of phone
3    call that is just a general call that has to be made collect
4    and then by a three-way hookup is then hooked up with the
5    attorney.  I don't know if those calls included the type of
6    warning that's given in the calls from the correctional center
7    and the jail that this call will be monitored.
8              MR. J. BAILEY:  Yes, sir.
9              THE COURT:  It is just impossible for me just to
10   say now point blank well, it's privileged we have to exclude
11   it.  And those are the types of issues that need to be raised
12   pretrial so we can examine it more closely and hash it out.
13   And I'm not inclined three days into the trial with 14
14   sequestered jurors to take the time now to listen to 35 phone
15   calls and fair all that out and review the case law and rule.
16        That's incumbent upon defense counsel to raise and for
17   us to explore.  And as far as I'm concerned, there is ample
18   reason to conclude -- there is more than ample reason to
19   conclude that those phone conversations made by your client
20   through that telephone that is one, that has the announcement
21   that it's being monitored to a third person and then connected
22   to the attorney under all these circumstances is not
23   privileged.  The privilege has been waived.  And therefore,
24   we're going to proceed.
25             MR. J. BAILEY:  Thank you, Your Honor.
```

1            THE COURT:  I'll note your exception.

2            MR. J. BAILEY:  Thank you, Judge.

3            THE COURT:  Bring in the jury, please.

4            (Jury present.)

5            THE COURT:  All right.  Ladies and gentlemen, let

6    me make one brief explanation to you.  Under Tennessee law

7    currently and for the past several years, cameras are allowed

8    in courtrooms.  I guess the merits of that could be debated at

9    a different time but nonetheless, that is the law now.  And so

10   as you've noticed when you came in this time, we do have a

11   camera in the courtroom.  However, the cameras are not allowed

12   under any circumstances to film jurors or the audience and so

13   y'all need to just put it out of your mind and not focus on

14   the camera but focus on the proof that comes in and the trial

15   itself.  But I just wanted to give that explanation to you

16   that the jurors will not be photographed at any time under any

17   circumstances.  All right.  Call your next witness.

18            MS. WEIRICH:  Thank you.  State calls Officer

19   Fair.

20            THE COURT:  Officer Fair.

21

22

23

24

25

OFFICER FAIR

called as a witness, being first duly sworn, was examined and

testified as follows:

DIRECT EXAMINATION

BY MS. WEIRICH:

Q    Good morning.

A    Good morning.

Q    Would you please tell the jury your name and spell your

first and last names for the court reporter?

A    Myron Fair.  M-Y-R-O-N F-A-I-R.

Q    And I called you in here as an officer but you are

dressed nicely in a suit today.  Are you a Memphis Police

Department officer?

A    Yes, I am.

Q    How long have you been with the department?

A    14 and a half years.

Q    Where are you currently assigned?

A    Organized Crime.

Q    Are you off duty today?

A    Yes.

Q    In fact, you are recovering from some surgery; is that

correct?

A    Yes.

Q    How long have you been with Organized Crime?

A    Six and a half years.

1     Q     Do you know the defendant Vern Braswell?

2     A     Yes, I do.

3     Q     Do you see him in court this morning?

4     A     Yes, I do.

5     Q     Would you point to him for me, please, Officer Fair,

6     and tell me what he's wearing?

7     A     The guy on the front row with a white shirt, brown

8     sports jacket on.

9           MS. WEIRICH:  Let the record reflect he has

10    identified the defendant.

11          THE COURT:  Yes, ma'am.

12    Q     When was the last time you saw the defendant before

13    today?  How long has it been?

14    A     Been a while, about -- a little bit over a year, right

15    at a year, something like that.

16    Q     All right.  How do you know the defendant?

17    A     We're fraternity brothers.

18    Q     What fraternity?

19    A     Omega Psi Phi.

20    Q     Y'all pledged together?

21    A     Yes.

22    Q     All right.  And this was a fraternity that you became a

23    member of after college; is that correct?

24    A     Correct.

25    Q     When did you and the defendant pledge this fraternity

1    together?

2       A    1999.

3       Q    Were you working as an officer then?

4       A    Yes.

5       Q    And what was the defendant doing for an occupation, if

6    you know, at that time?

7       A    Teacher.

8       Q    Okay.  Did y'all become close friends?

9       A    Yeah, we was -- yes.

10      Q    All right.  Did you talk everyday?

11      A    Not everyday, every once in a while.

12      Q    All right.  Did you socialize with he and his wife?

13      A    Yeah, I have before, yes.

14      Q    Often?

15      A    Not often.

16      Q    How often?

17      A    Just once every now and then I see them out and, you

18   know, I speak to them and stuff like that.

19      Q    Okay.  Did you ride motorcycles with him?

20      A    No.

21      Q    So you weren't part of that motorcycle club?

22      A    No.

23      Q    Did you ever frequent the Rough Rider Club?

24      A    No.

25      Q    Did you ever go there?

1    A    No.

2    Q    Had you ever heard of it?

3    A    I heard of it.

4    Q    Okay.  From whom?

5    A    Vern.

6    Q    Okay.  Before -- let me take you back to November 5th,

7    2004.  Were you at home the early morning hours of that

8    morning?

9    A    Yes, I was.

10   Q    What were you doing?

11   A    Sleep.

12   Q    All right.  And what was your home phone number then?

13   A    383-2506.

14   Q    Okay.  Did you have a cell phone?

15   A    Yes, I had two.

16   Q    What were those -- why did you have two cell phones?

17   A    One was a personal and the other one was a work phone.

18   Q    One was MPD property?

19   A    Right.

20   Q    And the other was your personal?

21   A    Right.

22   Q    Okay.  Did you use both of them?

23   A    Yes.

24   Q    Did the defendant have all of your numbers?

25   A    Yes, he had my numbers.

1    Q    Your home number and both your cell phones?

2    A    I don't know about the home.  I think he had both cell

3    numbers.

4    Q    Okay.  How often would you and the defendant talk to

5    one another on the cell phone?

6    A    Probably like once, twice a month, something like that.

7    Q    Okay.  Would you see him at fraternity functions?

8    A    Yes.

9    Q    How often would you see him at fraternity functions?

10   A    Well, I couldn't go a lot because of my work schedule.

11   Q    You couldn't go a lot?

12   A    Right, because I work a lot.

13   Q    Okay.

14   A    But when I did I saw him.

15   Q    Okay.  With OCU, Organized Crime Unit, you work

16   different hours than the rest of the world, don't you?

17   A    Right.

18   Q    Are you working a lot of times at night?

19   A    Right.

20   Q    Do you work a lot of overtime?

21   A    Yes.

22   Q    All right.  So on November 5th, 2004, did you get a

23   call from the defendant?

24   A    Yes.

25   Q    Okay.  Did you answer the phone when he called?

1    A    No, I didn't.

2    Q    Because why?

3    A    I was asleep.

4    Q    And was the call on your cell phone or your home phone?

5    A    Cell phone.

6    Q    When did you realize you had gotten a call from him or

7   did you?

8    A    The next -- the next morning.

9    Q    Okay.  That morning November 5th, 2004?

10    A    Yes.

11    Q    When you woke up?

12    A    Right.

13    Q    Were you going to work?

14    A    Yes, taking my son to daycare.

15    Q    Okay.  And did you see on your phone that you had

16   missed a call?

17    A    Well, I got a phone call.

18    Q    Okay.  You got a phone call from someone else?

19    A    Then I checked my phone.

20    Q    Okay.  Because of what that person told you, you

21   checked your phone; is that correct?

22    A    Correct.

23    Q    All right.  About what time was that?

24    A    About 7:45, eight o'clock.

25    Q    After you dropped your son off at school, were you

1     headed to work or do you remember?

2        A    I can't exactly remember if I was headed to work.

3        Q    Okay.  Because of the phone call that you got that made

4     you check your cell phone --

5        A    Right.

6        Q    -- and you saw that you had missed a call --

7        A    Right.

8        Q    -- from the defendant, did you call the defendant?

9        A    Yes.

10       Q    Okay.  About what time?

11       A    Probably about nine, 9:30, somewhere between there,

12    ten.  Somewhere in that area.

13       Q    Okay.  Where was he when you called him?

14       A    Well, he couldn't really talk when he -- when I called

15    him.

16       Q    What number did you call him on?

17       A    It's a -- it was a cell phone.  All I can remember is

18    331.  It was a cell phone number.

19       Q    Okay.  What do you mean he really couldn't talk?

20       A    When I called him he was real short with me.

21       Q    Okay.  Did he tell you where he was?

22       A    Well, basically all he said is that he fixing to give a

23    statement and these people think I killed my wife.

24       Q    Okay.  Did you say -- did you ask him why did they

25    think that?

1    A    No, I couldn't ask him because like I said, it was real

2    -- I didn't know where he was at.  He was real short.

3    Q    Did he tell you I'm up in the Homicide Bureau?

4    A    No, he just said he was fixing to give a statement.

5    Q    He said he was fixing to give a statement?

6    A    Yes.

7    Q    But he didn't tell you where he was?

8    A    No.

9    Q    And this was about what time again?

10   A    I think it was about nine, between nine and ten,

11   somewhere in that ballpark.

12   Q    Was that the last time you talked to him that day?

13   A    That day, yes.

14   Q    Okay.  Did you talk to him after that day while he was

15   in custody?

16   A    Yes.

17   Q    Did he ever mention to you, Myron, you've got to help

18   me, Buddy.  My wife and I were having sex and we went a little

19   too far and she died and I've got to get out of this mess?

20   A    No.

21   Q    Ever say that?

22   A    No.

23   Q    Did he ever tell you, Myron, Buddy, you've got to help

24   me.  This was all a big misunderstanding and I'm being held in

25   the jail for no reason.  Did he ever say that?

1    A    No.

2    Q    And maybe I've asked you this.  If I did, I apologize.

3    What was your -- back in November of 2004, November 5th, what

4    was your home phone number?

5    A    383-2506.

6    Q    And your cell phone number, both of them?

7    A    My personal was 870-8667.  And my work was 553-7044.

8    Q    7044?

9    A    Yes, ma'am.

10   Q    Which one of those phones did the defendant call you

11   on, your personal cell phone or your MPD cell phone or do you

12   remember?

13   A    I can't remember.

14   Q    All right.

15              MS. WEIRICH:  Nothing further, Your Honor.

16              THE COURT:  Mr. Bailey.

17              MR. W. BAILEY:  Thank you, Judge.

18

19                   CROSS-EXAMINATION

20   BY MR. W. BAILEY:

21   Q    Mr. Fair, as I understand you've known Mr. Braswell for

22   an extensive period of time; is that correct?

23   A    Yes.

24   Q    And he felt comfortable calling you to -- let me back

25   up.  You knew each other for such an extensive period of time

1    that there was a certain comfort level with you that the two

2    of you shared; is that correct?

3         A    Yeah, I been knowing him a while, yes.

4         Q    And when you finally got a chance to talk with him

5    where he wasn't short, isn't it true that he was very

6    distraught, wouldn't you say?

7         A    I can't say.

8         Q    You don't know whether he was distraught or not?

9         A    No, sir.

10        Q    Was he crying at the time he talked with you?

11        A    Well, he sounded kind of, like, I can't say if he was

12   crying.

13        Q    Was he incoherent?

14        A    No, sir.

15        Q    And -- which means you can understand him?

16        A    Right.

17        Q    And he shared with you that he had been charged with

18   killing his wife, didn't he?

19        A    Yes.

20        Q    And he denied it, didn't he?  In other words, he didn't

21   tell you I killed my wife, did he?

22        A    No, he didn't tell me that.

23        Q    And he didn't tell you I intentionally killed my wife,

24   did he?

25        A    No, sir.

1               MR. W. BAILEY:  No further questions.

2

3                   REDIRECT EXAMINATION

4  BY MS. WEIRICH:

5    Q   Did he tell you he accidentally killed his wife?

6    A   No, sir -- I mean, no, ma'am.

7    Q   Did he tell you that he was -- they thought he had

8  killed his wife?  Tell me exactly what he told you.

9    A   Well, he said -- he said he was fixing to give a

10  statement, these people think I killed my wife.

11    Q   These people think I killed my wife?

12    A   Right.

13    Q   Did he say anything else about it?

14    A   No.

15    Q   Okay.  If your wife had shown up dead in the bathtub,

16  would you call Vern Braswell?

17               MR. J. BAILEY:  Your Honor, I object.

18               THE COURT:  Sustained.

19               MS. WEIRICH:  Nothing further.

20               THE COURT:  You may step down.  Call your next

21  witness.

22               MS. WEIRICH:  State calls Carolyn Chambers.

23

24

25

1                    CAROLYN CHAMBERS

2   called as a witness, being first duly sworn, was examined and

3   testified as follows:

4                    DIRECT EXAMINATION

5   BY MS. WEIRICH:

6       Q    Good morning.

7       A    Good morning.

8       Q    Would you please tell the jury your name?

9       A    Carolyn Chambers.

10      Q    Where do you work?

11      A    Shelby County Sheriff's Department.

12      Q    If you could spell your name also for the court

13  reporter.  I'm sorry.

14      A    First name Carolyn, C-A-R-O-L-Y-N.  Last name Chambers,

15  C-H-A-M-B-E-R-S.

16      Q    What do you do for the Sheriff's Department?

17      A    I work in the Metro Gang Unit Special Operations.  I

18  pull jail tapes from the telephones.

19      Q    Okay.  Tell us how the phone system in the jail works.

20  Can inmates in the Shelby County jail make calls whenever they

21  want to?

22      A    Well, they're limited by where they're housed.  It

23  would depend on how many hours they have out in their cell and

24  everything.  And when they come in, they get two free phone

25  calls.  It's supposed to be two but they get more than that.

1    It depends on what jailer is working.  Once they get through

2    the process of being booked in, they go to a post-booking area

3    where they get, like, unlimited calling time until they're put

4    into usually a lower level pod, which is a 23 and one and

5    you're out -- you're locked up for 23 hours and out for one

6    hour so they have one hour to get on the phone.  Then from

7    there, they're put up on the floor depending on their security

8    level what their hours will be in the pod and out.

9        Q    And their security level dictates how many hours they

10   might have access to a phone?

11       A    Yes.

12       Q    All right.  How do you make a call from the phones in

13   the jail?  Can an inmate just pick up the phone and call

14   anybody in the world?

15       A    No, they pick up the phone.  The phone that's actually

16   in the jail is not an outside phone.  It's an internal phone

17   that routes them to a cam system.  And the cam system once

18   they put the phone number in with the area code, it will

19   validate the number and then they'll call the number if it's a

20   valid number.  And once they call the number, the person hears

21   at the other end hears a recording that comes on saying this

22   is a collect call from the Shelby County jail and the inmate

23   has to state their name and then it says -- goes into a little

24   bit about the fees of how much it costs for the collect call.

25   And then at the end once they -- it tells them to push three

1    if they want to accept the call or just hangup or push nine if

2    they don't.  And then once they accept it, both parties hear

3    the recording state, this call is subject to monitoring and

4    recording.

5         Q    All right.

6         A    And then the phone call begins.

7         Q    So the person receiving the call has to agree to pay

8    for the call?

9         A    Yes.

10        Q    All right.  Is there a phone in the jail separate from

11   the phone system that you've just described where an inmate

12   can call his attorney and there's no recording?

13        A    Yes, on the intake phones.  Those are not recorded.

14   They get their free supposedly two phone calls.  And they can

15   call their attorney or whoever they wish to call on those.

16   But once they're inside a pod all they have to do is request

17   of the counselor to give them access to a free phone to talk

18   to their attorney.  This is posted on a sign above the phone,

19   and it's also posted on a sign attached to the phone.

20        Q    And what do you mean by a free phone?

21        A    It's a phone that's not recorded and not charged

22   collect call.

23        Q    Doesn't cost anything to make the call?

24        A    No.

25        Q    How long have you been with the Sheriff's Department?

1    A    A little over ten years.

2    Q    Back in November of 2004, were you requested by

3    Sergeant Merritt to monitor some phone calls of an inmate by

4    the name of Vern Braswell?

5    A    Yes, I was.

6    Q    Are requests like that made of you often?

7    A    Yes, they are.

8    Q    How do you go about doing that?

9    A    Well, once I receive the request, it's a written

10   request and the officer signs it or the detective signs it,

11   they fax it to my office.  And then I go to the JMS system

12   which is the Jail Monitoring System.  And I pull up the

13   inmate's arrest history because on the arrest history they

14   list emergency contacts, home phone numbers sometime and I

15   check it for any kind of phone numbers that might come up.

16   Once I do that, then I go to the floor logging activity, which

17   shows me every place the inmate has been in the jail at what

18   time, that way I know what phone they have access to.  I also

19   pull up the relatives listing from this machine and it tells

20   me addresses of relatives that they've listed, phone numbers

21   that they've listed, anything like that.  And once I get all

22   this compiled, I go to the actual phone system machine.

23        The phone system machine is a completely separate

24   machine that is ran through Evercom in Texas.  The server is

25   in Texas but we have the actual cam systems here.  I believe

1   there's eight of them that store the calls onto the system.

2   And once they're stored on the system, depending on where the

3   inmate is housed, I have had calls stored up to six months on

4   it.  And once I retrieve them and put them on CD, they're

5   stored from now on, indefinite amount of time.  But once I go

6   to where the person is housed, if none of the numbers that I

7   got off the JMS, the Jail Management System come up, I look on

8   the floor activity to see where he's at and each pod if it's a

9   secure pod has two phones, an A phone and a B phone.  And I

10  check each call that goes out of that phone for a day.  And I

11  listen to the introduction of it and see if the person says

12  their name on the introduction.  If they do, then I go through

13  the call to make sure that it's positively this inmate.  If

14  I'm not sure it's that inmate, I don't use it.  I just

15  disregard that phone call.

16      But once I do verify that it is the inmate that I'm

17  looking for, then I load them onto a CD.  Once I load them

18  onto the CD, I call the detective and they have to come up

19  there and I assign an evidence number to the CD and they have

20  to sign for it.  That way it keeps the chain of custody that

21  the phone calls cannot be tampered with from the time it

22  leaves my hand until the time it comes to court.

23  Q    When Sergeant Merritt requested that you go through

24  this process for the inmate Vern Braswell and the process that

25  you've just explained to the jury that you go through, how

1    long does that take?

2       A    Well, if I'm lucky and I get an inmate that has given

3    the phone calls, it might take a couple of hours.  But if

4    there's no phone calls listed for him, I have to search.  It

5    can take up to three days.  It just depends on how quick I can

6    find them.

7       Q    All right.  And again, what do you mean if I'm lucky

8    and the inmate has given me the phone numbers?

9       A    Okay.  If I'm able to get the phone number on the Jail

10   Management System on the arrest history or the relatives or

11   anything like that, I can put that phone number into the

12   machine and it'll pull up any time that phone number was

13   called anywhere in the jail for however many months I go back.

14   And then once I get that, I'll look at what pod they're in.

15   If they only get one hour out, that shortens my search.  I

16   only have to check a span of an hour before and an hour after

17   the call on that pod to see if they're using any other

18   numbers.

19      Q    All right.  And you prepared such a compact disc for

20   Sergeant Merritt?

21      A    Yes, I did.

22      Q    And have you listened to it since that time?

23      A    I have not listened to the disc I gave him because it's

24   the evidence disc.

25      Q    Okay.  Did you keep a copy or retain a copy or how does

1    that work?

2    A    Yes, I do.  I keep a master copy of every disc I sign

3    out because the room I'm in is secured.  It has locks on it

4    and stuff.  No one has access to the room except myself and my

5    supervisor.

6    Q    All right.  I'm going to pass you, Ms. Chambers, what

7    has been marked Exhibit 27.  I pass you this CD and the

8    envelope.  Do you recognize any of that?

9    A    Yes, this is my writing on the CD and this is my

10   evidence number that's assigned to this CD.

11   Q    Okay.  For this particular case Vern Braswell?

12   A    Yes.

13   Q    Do you give everybody a different number?

14   A    Yes, I do.  Every CD I give a different number.  One

15   inmate I might end up with four CDs full of phone calls and I

16   give each separate CD a separate number.

17   Q    And that is what you turned over to Sergeant Merritt;

18   is that correct?

19   A    Uh-huh, this is what he signed for and dated.

20   Q    All right.  If I could have that back.

21        MS. WEIRICH:  Judge, at this time with Ms.

22   Carnesale's assistance, if we could play certain phone calls

23   for the jury.

24        THE COURT:  You may.

25        MR. W. BAILEY:  Would Your Honor note our

1   continued objection?

2          THE COURT:  So noted.

3     Q   Is each call given an identifying number?

4     A   Yes, it is.  When you pull up the call, it's saved

5   under a WAV file number, which is a long number the computer

6   assigns it with a dot and then WAV at the end, and it gives

7   each call a separate number.  And then on the call detail when

8   you print it out telling you the date, the phone number, the

9   time of the call, the phone number called, it will have the

10   WAV number on there also so you just match the WAV file number

11   and you find out the date and time of the call and the phone

12   number.

13          (Played Exhibit No. 27.)

14     Q   While she's setting up the next one, Ms. Chambers, the

15   various voices that you hear on that, is that how a three-way

16   call is made?

17     A   Yes, it is.  They call the primary number and then they

18   flash over to the -- use the flash button and go to the second

19   line and that way they can make an outgoing call on a second

20   line to a third party.

21     Q   Why would they want to do that?  Why not just call the

22   number they want to call?

23     A   Because a lot of the times the number they want to call

24   is blocked.  There's blocks that are placed on the collect --

25   on the phones where they can't receive any kind of collect

1   call from the jail.  There's several different types of blocks

2   that they can place on it.  Sometimes if they have too much

3   money built up on a phone for collect calls, Evercom will put

4   a block on it so that they can't receive anymore until they

5   pay their bill.

6                    (Continued to play Exhibit 27.)

7                    THE COURT:  Can you pause it, Ms. Carnesale?

8                    MS. CARNESALE:  Yes, sir.

9                    THE COURT:  All right.  Ladies and gentlemen, we

10  will stop at this time.  We will resume the trial at 1:30.  As

11  always, do not discuss the case among yourselves.

12                   (Jury out.)

13                   THE COURT:  You may step down, Ms. Chambers.

14  Please be back at 1:30.  Take him out.  Recess until 1:30.

15                   (Recess.)

16                   THE COURT:  Bring out the defendant, please.  Ms.

17  Chambers, if you would resume the witness stand please.

18                   (Carolyn Chambers resumed the witness stand,

19                        having previously been sworn.)

20                   THE COURT:  Bring in the jury, please.

21                   (Jury present.)

22                   THE COURT:  Ms. Weirich.

23                   MS. WEIRICH:  Thank you, Your Honor.

24

25

<u>DIRECT EXAMINATION CONTINUED</u>

BY MS. WEIRICH:

   Q   I believe when we broke we were about to start the next phone call, Ms. Chambers.

   A   Yes.

          MS. WEIRICH:  I'll let Ms. Carnesale hook that up for us.

          (Continued to play Exhibit No. 27.)

          MS. WEIRICH:  Pass the witness, Your Honor.

          THE COURT:  Mr. Bailey.

          MR. J. BAILEY:  Your Honor, indulge us one moment.

          MR. W. BAILEY:  Would Your Honor indulge me a moment?  Thank you, Your Honor.  We don't have any questions.

          THE COURT:  Thank you.  You may step down.  Call your next witness.

          MS. CARNESALE:  Your Honor, the State calls Officer Walls.


                  <u>OFFICER WALLS</u>

called as a witness, being first duly sworn, was examined and testified as follows:

              <u>DIRECT EXAMINATION</u>

BY MS. CARNESALE:

   Q   Good afternoon, sir.

   A   Good afternoon.

1    Q    Will you please state and spell your name for the
2    record?

3    A    Sure.  Troy Walls.  T-R-O-Y W-A-L-L-S.

4    Q    Where are employed, Mr. Walls?

5    A    Millington Police Department.

6    Q    How long have you been with the Millington Police
7    Department?

8    A    Ten years.

9    Q    What rank are you currently?

10   A    Patrolman.

11   Q    Have you been a patrolman during the ten years you've
12   worked for the Millington Police Department?

13   A    Yes, ma'am.

14   Q    Were you working as such in April of 1996?

15   A    Yes, ma'am.

16   Q    And you were a patrolman; is that right?

17   A    Yes, ma'am.

18   Q    Can you tell the jury what a patrolman does?

19   A    A patrolman's job is basically day-to-day operations,
20   to answer any call that they may get that's dispatched to them
21   from traffic to disturbance to a fight call.

22   Q    Do you patrol a certain area of Millington or the
23   entire city?

24   A    The entire city.

25   Q    Back in 1996, do you recall what shift you worked?

1    A    Midnight shift, three to 11 -- I'm sorry.  I worked

2    from 11 to seven.

3    Q    11 p.m. to 7 a.m.?

4    A    Yes, ma'am.

5    Q    Were you riding alone or with a partner?

6    A    I was with a partner at that time.

7    Q    And were you in uniform?

8    A    Yes, ma'am.

9    Q    Were you in a marked police car?

10   A    Yes, ma'am.

11   Q    Did you have occasion to answer a call to the location

12   of 5301 Forrestal Street in Millington on April 17th, 1996?

13   A    Thereabouts.  I believe there's an error on that

14   report.  The correct address I believe would have been 4503

15   was where we were called to.

16   Q    Okay.  And do you recall approximately what time the

17   call went out?

18   A    Approximately by looking at my notes, I think it was

19   about 11:30.

20   Q    P.M.

21   A    Yes, ma'am.

22   Q    Shortly before midnight?

23   A    Yes, ma'am.

24   Q    What type of call were you responding to?

25   A    Domestic assault.

1    Q    And when you arrived, was it a house or an apartment?

2    A    It's a townhouse.

3    Q    A townhouse.  When you arrived at the townhouse, what

4    did you find?

5    A    We found a young lady that was upset.

6              MR. W. BAILEY:  Your Honor, may we approach?

7              THE COURT:  You may.

8              (Bench conference commenced.)

9              MR. W. BAILEY:  We object to him using the

10   collective term "we."  He can tell us what he knows, what he

11   observed, if he's doing it from his own recollection.  I've

12   got some questions as to whether this is past recollection

13   recorded.  He's relying on the document and if he --

14             THE COURT:  Well, that's all proper

15   cross-examination, but I'll be glad to ask that you have him

16   rephrase and testify as to what he saw.

17             MR. J. BAILEY:  While we're here, I object on the

18   grounds of hearsay to his testifying as to what Sheila

19   Braswell has told him.

20             MS. WEIRICH:  It's excited utterance, Your Honor.

21             THE COURT:  It would depend on the circumstances.

22   I haven't heard yet what it is that she told him.  Perhaps we

23   would have to have an out-of-jury hearing, but anything that's

24   said as an excited utterance or something of that sort, then

25   it may not be but or if it's not stated for the truth of the

1   matter but -- let me send the jury out and we'll have a brief

2   hearing and make sure.

3                    (Said bench conference concluded.)

4                    THE COURT:  Ladies and gentlemen, I'm going to

5   excuse you for a few minutes.  We'll call you back shortly.

6                    (Jury out.)

7                    THE COURT:  All right.  Ms. Carnesale.

8   BY MS. CARNESALE:

9       Q    Officer Walls, when you arrived at the scene, did you

10  go with your partner up to the townhouse?

11      A    Yes.

12      Q    Okay.  And did someone answer the door or was someone

13  outside?

14      A    I believe someone answered the door.  We went to the

15  door.

16      Q    And was that Sheila Braswell?

17      A    I believe at the original location we went to it was

18  not her.  It was a neighbor.

19      Q    Okay.  Was Ms. Braswell at the neighbor's house or

20  townhouse?

21      A    Yes.

22      Q    Did you speak to her personally?

23      A    Yes.

24      Q    And did you observe her demeanor?

25      A    Yes.

```
1    Q    What was her demeanor?

2    A    As best of my recollection, she was upset and crying.

3    Q    And you say as best as your recollection.  Do you

4  recall this incident?

5    A    Somewhat.  After -- after reading my report and I

6  remember it.  I remember parts of it.  I didn't remember the

7  whole thing.

8    Q    So in other words, you're not just testifying from

9  what's written in the report, you actually recall this?

10    A    I recall some of it, yes.

11    Q    Okay.  And she was upset.  Was she crying?

12    A    Yes.

13    Q    Did you see any injuries to her?

14    A    Yes.  There was a scratch on her eye, one on her arm

15  and if I remember -- if I remember correctly, she had -- she

16  was kind of -- I don't want to say flushed but it looked like

17  her face is not necessarily punched but almost something like

18  a carpet burn.  It was, you know, like something had been

19  brushed up against her face.

20    Q    Was there a lot of color to her --

21    A    Yes, I guess that would be the best way to say it.

22    Q    Did she tell you how she received these injuries?

23    A    Yes.

24        MS. CARNESALE:  Your Honor, I'd ask that he be

25  allowed to testify as an excited utterance exception.
```

1          MR. J. BAILEY:  May I voir dire him on that?

2          THE COURT:  You may.

3

4                  CROSS-EXAMINATION

5  BY MR. J. BAILEY:

6    Q   Officer, when she was talking to you, was she speaking

7  coherently?

8    A   I -- from what I remember, I think it was just talking

9  during sobs.  She was excited and crying.

10         MR. J. BAILEY:  All right.

11         THE COURT:  Bring in the jury, please.  All right.

12  Well, the jury is occupied right now.  Take him out, please.

13  You may step down.  Don't talk to anybody about your testimony

14  during the recess, please.  We'll stand in recess.

15         (Recess.)

16         THE COURT:  Bring in the defendant, please.

17  Officer Walls, if you would resume the witness stand, please.

18        (Officer Walls resumed the witness stand,

19            having previously been sworn.)

20         THE COURT:  Bring in the jury.

21        (Jury present.)

22         THE COURT:  Ms. Carnesale, you may continue.

23         MS. CARNESALE:  Thank you, Judge.

24

25

1           DIRECT EXAMINATION CONTINUED

2    BY MS. CARNESALE:

3        Q    Officer Walls, when you arrived at 4503 that night of

4    April '96, April 17th, what did you find?

5        A    Spoke to a young lady that was upset.  She had a -- she

6    was upset and crying, had a scratch over her right eye and a

7    scratch on her right arm and she was kind of flushed.

8        Q    Kind of flushed.  Did she tell you how she had received

9    these injuries?

10       A    She said her and her husband had got into an argument

11   over him drinking and using some kind of drugs.

12       Q    Did she tell you what else happened?

13       A    She said during the argument that he had hit her.  I

14   don't recall what sort, that during her trying to get away,

15   that he had scratched her on the face and had scratched her on

16   the arm and had held her in a headlock, type choke hold.

17       Q    Choke hold?

18       A    Uh-huh.

19       Q    And did you -- you saw these injuries to the face?

20       A    Yes.

21       Q    Do you recall this woman's name?

22       A    I didn't until the report.  It was Sheila Braswell, I

23   believe.

24       Q    And you reviewed a report in anticipation of your

25   testimony today; is that correct?

1    A    Yes, ma'am.

2    Q    However, do you recall this incident?

3    A    Somewhat.

4    Q    Once you read the report, did that jog your memory?

5    A    Yes, it did.

6         MS. CARNESALE:  Your Honor, at this time I'd ask

7    that Officer Walls be shown what was previously shown for ID

8    only Exhibit No. 3.

9         THE COURT:  Yes.

10   Q    Officer Walls, do you recognize what's depicted in

11   those photographs?

12   A    It appears to be the pictures that we would have took

13   on the scene that night.

14   Q    In April of '96?

15   A    Yes, ma'am.

16   Q    Who is in those two photographs?

17   A    Sheila Braswell.

18   Q    Is that how she appeared the evening you saw her?

19   A    From what I remember.

20        MS. CARNESALE:  Your Honor, we'd ask that that be

21   admitted into evidence as Exhibit No. 3 at this time.

22        MR. J. BAILEY:  Well --

23        THE COURT:  Would you like to approach?

24        MR. J. BAILEY:  May I just see it one second, Your

25   Honor?

1          THE COURT:  Sure.

2          MR. J. BAILEY:  I know we marked it earlier, but

3     le me take a look at it.  No objection.

4          THE COURT:  All right.  Exhibit 3.  Remove the ID

5     designation.

6          (Exhibit No. 3 was marked and filed.)

7          MS. CARNESALE:  Your Honor, may we publish it to

8     the jury?

9          THE COURT:  You may.

10    Q    Officer Walls, there are two photographs; is that

11    correct?

12    A    Yes.

13    Q    And underneath there is a name Sheila F. Braswell

14    04/17/96?

15    A    Yes, ma'am.

16    Q    Did you or your partner write that under the

17    photograph?

18    A    Yes, ma'am, I believe we would have.

19    Q    And the second photograph same, same name and date?

20    A    Yes, ma'am.

21    Q    And these are copies of the black and white photograph

22    but she's holding up her arm.  Did you see an injury to that

23    arm?

24    A    On the scene we would have, but I can't really see it

25    on this photo.

1   Q    Okay.  Because of the poor quality?

2   A    Yes.

3   Q    And here is a side -- photograph of the side of her

4   face.  Do you see anything in that photograph that you saw

5   that evening?

6   A    Other than just what you can see that I recall.  It's

7   been so long ago.

8   Q    Okay.  Now did you go in -- the townhouse where you

9   spoke with Ms. Braswell, whose home was that?

10  A    It was a neighbor's.

11  Q    Did you actually go into Ms. Braswell's home?

12  A    Yes, we did.

13  Q    Why did you do that?

14  A    We went to her residence to check to see if anyone was

15  left in the residence.

16  Q    Was anyone present?

17  A    No.

18  Q    Did you observe anything in the residence itself?

19  A    There was, according to my report I don't really recall

20  everything that was knocked over, but there was lamps and

21  furniture kind of moved around and knocked over and as well as

22  in the bedroom.

23  Q    Did it look as if there had been some sort of

24  altercation?

25  A    Yes, ma'am.

1    Q    Did you or your partner arrest anyone that evening?

2    A    No, ma'am.

3    Q    Why not?

4    A    The subject was gone on arrival.

5    Q    Did you advise Ms. Braswell of anything before you

6    left?

7    A    Well, we advised her how to obtain a warrant for the

8    incident, and then also gave her the number for the domestic

9    abuse shelters.

10   Q    And for the benefit of the jury, what is a warrant?

11   A    A warrant would be an implement for arrest for the

12   assault on her.

13             MS. CARNESALE:   Thank you.   Your Honor, I'll pass

14   the witness.

15             THE COURT:   Mr. Bailey.

16

17                    CROSS-EXAMINATION

18   BY MR. W. BAILEY:

19   Q    Officer Walls, how long have you been with the

20   Millington Police Department?

21   A    Ten years.

22   Q    You there now?

23   A    Yes, sir.

24   Q    What's your rank now?

25   A    Patrolman.

1   Q   And of course you've made a lot of calls since you've

2   been on the force, haven't you?

3   A   Yes, sir.

4   Q   And you were being honest when you said you don't

5   remember most of this, do you?

6   A   No, sir.

7   Q   In fact, you're trying to your best recollection have

8   your memory revived by reading the report; is that correct?

9   A   Yes, sir.

10  Q   You don't have any independent recollection, do you?

11  A   Yes, sir.   The reason being is I was in training at the

12  time, and for some reason this and a couple other calls while

13  I was in training stand out.

14  Q   Uh-huh.   But you mention something about a warrant.

15  You don't recall her ever going down and getting a warrant, do

16  you?

17  A   No, sir.

18  Q   And if one had been obtained, you would have known,

19  wouldn't you?

20  A   Not necessarily.

21  Q   And this was nine years ago?

22  A   Yes, sir.

23          MR. W. BAILEY:   No further questions.

24          MS. CARNESALE:   No redirect.   Thank you, Officer.

25          THE COURT:   You may step down.   Call your next

1   witness.

2              MS. WEIRICH:  State calls Mr. Mangum.

3

4                   WILLIAM MANGUM

5   called as a witness, being first duly sworn, was examined and

6   testified as follows:

7                   DIRECT EXAMINATION

8   BY MS. WEIRICH:

9       Q    Good afternoon.

10      A    Good afternoon.

11      Q    Would you please tell the jury your name?

12      A    William Mangum.

13      Q    Where do you work, Mr. Mangum?

14      A    Circuit Court.

15      Q    How long have you been there?

16      A    19 years.

17      Q    What are your duties and responsibilities in Circuit

18  Court?

19      A    My duty was --

20              MR. W. BAILEY:  Your Honor, we'll stipulate that

21  he's properly qualified as custodian of records.

22              THE COURT:  All right, sir.

23      Q    Where are you currently assigned, Mr. Mangum?

24      A    Circuit Court Division 2 Judge Russell's courtroom.

25      Q    And do you work in Judge Russell's courtroom everyday?

1    A    Yes, I do.

2    Q    And are you employed by Jimmy Moore the Circuit Court

3  Clerk?

4    A    Yes.

5    Q    And have you been employed by Mr. Moore for your entire

6  duration at Circuit Court?

7    A    No, I haven't.

8    Q    Where else did you work?

9    A    Jimmy Moore was Circuit Court Clerk and Clint Crabtree

10  was Circuit Court Clerk before Jimmy Moore.

11    Q    Okay.  So you've always worked for the clerk just not

12  necessarily Mr. Moore?

13    A    Correct.

14    Q    All right.  You brought with you today some files from

15  Circuit Court; is that correct?

16    A    Right.

17    Q    What files did you bring with you?

18    A    Order of protection file.

19    Q    Let's start with that one.  Is there a certain number

20  that is unique to that file?

21    A    Yes, it is.

22    Q    What is it?

23    A    77666.

24    Q    And what is an order of protection?

25    A    An order of protection is someone been abused by their

1    spouse.

2       Q    All right.  They do what?

3       A    They come in my office when I'm doing order of

4    protection to get order of protection.

5       Q    Okay.  You used to do orders of protection?

6       A    Correct.

7       Q    Okay.  How would it work?

8       A    If a person -- they would come in the office and then

9    we ask them questions, has it been abuse?  Threatening abuse?

10   Physical abuse?  Destroying property?

11      Q    Okay.

12            MS. WEIRICH:  Your Honor, I believe the Court has

13   Exhibit 7.

14            THE COURT:  I do.

15            MS. WEIRICH:  7 and 8.

16            THE COURT:  7, 8 and 9.  Let me hand all of them

17   to you.

18            MS. WEIRICH:  Yes, sir.

19      Q    Mr. Mangum --

20            THE COURT:  Hand them to Ms. Weirich, please.

21      Q    I'm going to pass you what has been marked previously

22   as Exhibit 7 and 8, for identification purposes only --

23   correction.  I'm going to pass you Exhibits 8 and 9 right now

24   so we don't get confused.  Do those documents appear to be

25   identical to the documents that you brought over contained in

1   Circuit Court file 77666?

2   A    Yes, they are.

3   Q    Okay.  When was the first document executed, the one

4   that's on top there?

5   A    The top here April 19th, 1995.

6   Q    Okay.  And how would that document have been executed?

7   A    She came in to tell us what happened order of

8   protection and then I would read over and ask her -- as a

9   matter of fact, it is in her own handwriting.

10  Q    All right.

11          MR. W. BAILEY:  Your Honor, I object to hearsay.

12          THE COURT:  Overruled.

13          MR. J. BAILEY:  Thank you, Your Honor.

14  Q    What is in her own writing?

15  A    The order of protection.

16  Q    Well, did she make up the order of protection or are

17  you talking about the facts that she's giving you?

18  A    The facts she's giving me.

19  Q    Okay.  She's sitting in your office with you while

20  she's doing it?

21  A    Yes, she is.

22  Q    And who is the petitioner that we are talking about in

23  this case?

24  A    Sheila Braswell.

25  Q    Okay.  So you give her that document and she writes out

1   what she wants to write out?

2      A      Right.

3      Q      And then what happens?

4      A      And then I read it and go over her whole order of

5   protection and make sure everything she put in the order of

6   protection reflect what -- what she might say.

7      Q      Okay.  Then what happens?

8      A      Then I would take it to the judge and get the judge to

9   sign it.

10     Q      And how do you know which judge to take it to?

11     A      Pull it out of slot.

12     Q      It's just random; right?

13     A      Random drawing.

14     Q      Which judge did this one go to?

15     A      Judge Robilio.

16     Q      All right.  Is that Kay Robilio?

17     A      Right.  Kay Robilio.

18     Q      What happened when you took Sheila Braswell to Judge

19  Kay Robilio?  What do you take with you?

20     A      Take the order of protection, the petition, the order

21  of protection and the order.

22     Q      Okay.  And then what happens in the presence of Judge

23  Robilio?

24     A      She would read it and sign it and then I would give a

25  court date.  Court date we set in 15 days.

1    Q    Okay.  Did Judge Robilio sign that -- is it called an

2    order of protection at this point or ex parte order of

3    protection?

4    A    Ex parte order of protection.

5    Q    And did Judge Robilio sign that ex parte order of

6    protection?

7    A    Yes.

8    Q    What day?

9    A    May 10th, 1996.

10    Q    All right.  Wait a minute.  We may be getting ahead --

11    I may be getting ahead of myself.  The ex parte order of

12    protection was signed on May 10th, 1996?

13    A    Let's back up.  Order of protection.

14    Q    Okay.

15    A    This one is good when she come back to court.

16    Q    That one is good until she comes back to court?

17    A    Right.  And then once the judge go to court, the judge

18    will sign the ex parte order of protection.

19    Q    Okay.  So the order of protection is the first thing

20    that happened?

21    A    Right.

22    Q    When was the order of protection signed?

23    A    The order of protection was signed May 10th, 1996.

24    Q    All right.  The document that Ms. Braswell would have

25    written on and taken to Judge Robilio on April 19th when she

1    first came down to Circuit Court, do you have that in front of

2    you?

3        A    Yes.

4        Q    Did the judge sign anything that day?

5        A    Yes, she did.

6        Q    What is that called?

7        A    Okay.  I'm sorry.  We talking about the order of

8    protection; right?  Ex parte?

9        Q    I'm just talking about April 19th.

10       A    Yes, right.

11       Q    What are you calling that document?

12       A    Order of protection.

13       Q    Okay.  And that's signed by the judge?

14       A    Right, correct.

15       Q    Okay.  Is there a way that the defendant or the

16   respondent, rather, is notified?

17       A    Yes, ma'am.

18       Q    How?

19       A    By the Sheriff's Department.

20       Q    Okay.  And did the Sheriff's Department notify this

21   respondent?

22       A    Right.

23             MR. J. BAILEY:  Object to hearsay, Your Honor.

24             THE COURT:  Is it reflected on the document?

25             MS. WEIRICH:  Yes, sir.

```
 1                  THE COURT:  It's overruled.

 2      Q    How do you know that, Mr. Mangum?

 3      A    Give me a minute here.  Notice.  Notice.

 4      Q    Who filled out the notice?

 5      A    I do.

 6      Q    And then who serves it?

 7      A    Sheriff's Department.

 8      Q    And what does it tell -- who was the respondent in this

 9 matter?

10      A    Mr. Vern G. Braswell.

11      Q    Vern Braswell?

12      A    Right.

13      Q    Okay.  Does the notice tell Mr. Braswell to come to

14 court on a certain day?

15      A    Correct.

16      Q    What day?

17      A    Be a minute here.  May 10th, 1996.

18      Q    That's the day he was supposed to come to court?

19      A    Right.

20      Q    If he wants to?

21      A    Right.

22      Q    Okay.  So there was a court setting on May 10th, 1996?

23      A    Correct.

24      Q    Can you tell by your documents if the respondent

25 appeared for court that day?
```

1    A    No, cannot.

2    Q    All right.  What happens -- let's take the scenario

3    that the respondent does appear in court.  What happens then?

4    Do they go back in front of Judge Robilio?

5    A    Right.

6    Q    Okay.  And what happens?

7    A    The judge will talk to both of them and then issue

8    order of protection and tell him not to go around her for a

9    year.

10   Q    Okay.  Let's take the scenario that the respondent

11   doesn't come to court.  Does the petitioner still get to have

12   an audience with Judge Robilio?

13   A    Right.

14   Q    What happens then?

15   A    And then the judge will issue the ex parte order of

16   protection and then will send him a copy in the mail.

17   Q    Okay.  Was an ex parte order of protection issued?

18   A    Right, correct.

19   Q    On May 10th, 1996?

20   A    Right.

21   Q    And how long is it good for?

22   A    One year.

23   Q    Okay.  From that date?

24   A    Correct.

25   Q    All right.  Is that the last activity in the file of

1    77666 from the Circuit Court Clerk's office?

2    A    Correct.

3    Q    All right.

4         MS. WEIRICH:  Judge, at this time I would ask that

5    Exhibits 8 and 9 for ID only be moved into evidence.

6         THE COURT:  All right.

7         (Exhibit No. 8 was marked and filed.)

8         (Exhibit No. 9 was marked and filed.)

9         MS. WEIRICH:  And may they be passed to the jury?

10        THE COURT:  They may be.

11             (Jury viewed exhibits.)

12        THE COURT:  Ms. Weirich.

13        MS. WEIRICH:  Thank you, Your Honor.

14   Q    Mr. Mangum, did you also bring with you Circuit Court

15   file T003443-04?

16   A    That's correct.

17   Q    What is contained in that file?

18   A    Complaint for divorce.

19   Q    Filed by whom?

20   A    By Ms. Sheila Braswell.

21   Q    Against whom?

22   A    Vernon G. Braswell.

23   Q    When was it filed?

24   A    June 15th of '04.

25   Q    What was the final action on that file as far as the

1    Circuit Court Clerk's office is concerned?

2        A    Order nonsuit.

3        Q    What is a nonsuit?

4        A    Nonsuit is when you bring an action against a party,

5    you decide not to go through with it.

6        Q    When was the order for nonsuit entered?

7        A    11/9/04.

8        Q    November 9th, 2004?

9        A    Correct.

10       Q    I'm going to pass you what has been marked as Exhibit 7

11   for identification purposes only.  Is that identical to what

12   your file shows as the complaint for divorce in file

13   T003443-04?

14       A    Yes, correct.

15            MS. WEIRICH:  Judge, at this time I'd ask that be

16   moved into evidence.

17            THE COURT:  All right.

18            (Exhibit No. 7 was marked and filed.)

19            MR. W. BAILEY:  Would Your Honor note our

20   objection?

21            THE COURT:  On new grounds or the grounds we've

22   already discussed?

23            MR. W. BAILEY:  On grounds already discussed.

24            THE COURT:  Certainly.  It's in the record.

25            MS. WEIRICH:  Thank you, Judge.  I'll pass the

1    witness.  And if we could have that passed to the jury as

2    well.

3                    THE COURT:  I think we'll make 14 copies of that

4    so they can read it simultaneously.  Would you like to do that

5    at this time?

6                    MS. WEIRICH:  Yes, Judge.

7                    THE COURT:  You may proceed with your

8    cross-examination while we are making copies.

9

10                   CROSS-EXAMINATION

11   BY MR. J. BAILEY:

12   Q    Mr. Mangum, with regard -- let's start with first

13   marked exhibit the 1996 documents.  Now your records don't

14   indicate that there was ever a hearing with both sides

15   present, does it?

16   A    No, no, it does not.

17   Q    And likewise, you can't tell us today whether or not

18   these two parties got together and decided that they were --

19   that everything was okay and they were going to move forward

20   with their lives in their marriage, can you?

21   A    No, I cannot.

22   Q    And you just have some cold paper here.  You don't know

23   the background surrounding this paper, do you?

24   A    No, I do not.

25   Q    Also, let me ask you this question.  The order that's

1   done -- that's a form.  That wasn't filled out by -- that

2   wasn't created by any lawyers, was it?  That's a form that you

3   fill in the blanks, isn't it?

4   A    No.  Actually, only thing that's fill in the blank was

5   her address and her name, that's it.

6   Q    Okay.  Let me -- let me refer you directly to what I'm

7   talking about.

8          THE COURT:  You may approach the witness.

9          MR. J. BAILEY:  Okay.  Thanks.  Let me step back,

10  Judge.

11  Q    With regards to the ex parte order of protection, now

12  explain to the jury one more time.  You've been with the

13  Circuit Court quite a while; isn't that right?

14  A    Correct.

15  Q    And what does ex parte mean?

16  A    Ex parte order of protection means that person get

17  order of protection good for one year.  Ex parte order of

18  protection is when they come in and the judge sign it.

19  Q    Ex parte means that only one side is present, doesn't

20  it?

21  A    Not exactly, no, it's not.

22  Q    Now the petition for order of protection.  I'm going to

23  show this to you.  I'm sorry, not the petition.  The order of

24  protection.

25         MR. J. BAILEY:  May I approach, Your Honor?

1                THE COURT:  Sure.

2    Q    Once again I ask you, is that not just a form with the

3    name Vern Braswell is filled in?

4    A    That's correct.

5    Q    All that other stuff is just standard, which means that

6    every single one of those reads exactly the same way, doesn't

7    it?

8    A    No.

9    Q    It doesn't matter who comes in?

10           MS. WEIRICH:  If he could answer, Judge.

11    A    No.

12    Q    Okay.  Then tell me what is handwritten on each line?

13    A    Let's back up.  The protective order of protection,

14    that's from when the person -- he or she comes in and fills

15    out --

16    Q    Listen to me.  I'm sorry.  I want to make sure you

17    answer my question.

18    A    Go ahead.

19           MR. J. BAILEY:  May I approach one more time,

20    Judge.

21    Q    My question to you is with regards to the ex parte

22    order of protection, all right, not the petition but the

23    judge's order, isn't it true that that's a form where all you

24    guys do is fill in the person's name?

25    A    Correct.

1    Q     Every one of those orders reads exactly the same way.

2  All you do is put in a name; right?  You put in the

3  respondent's name; is that correct?

4    A     Yeah.

5    Q     They don't read differently according to the facts.

6  Each order reads exactly the same, doesn't it?

7    A     No.

8    Q     Then tell me who filled out the rest of that, other

9  than the name Vern Braswell?  Who typed that up?

10   A     The ex parte order of protection -- ex parte order of

11  protection we the one type that up.

12   Q     Okay.  And you're telling me that you don't have a form

13  that you all just fill in the name?  That's not a form where

14  the name is just filled in?

15   A     It is.

16   Q     And so if I go find 20 ex parte orders of protection

17  over there, every single one of them is going to read just

18  like that one, aren't they?

19   A     Yes, the ex parte will.

20   Q     All right.  Now let me refer to the 2005, the divorce

21  papers that were filed.

22   A     2004?

23   Q     I'm sorry, 4.  Sorry.  Plaintiff's counsel on those

24  papers was Mr. Dennis Sossaman; isn't that correct?

25   A     Correct.

1    Q    Now you don't know -- you aren't here today to tell us

2    whether or not these parties went to Mr. Sossaman and decided

3    not to get a divorce, are you?

4    A    No.

5    Q    You don't know that, do you?

6    A    No.

7    Q    Likewise, am I correct that there was no response filed

8    within 30 days?

9    A    Yes -- no, correct.

10   Q    All right.  And I know you're not a lawyer and I'm not

11   asking you a legal question, just in terms of the record.  Am

12   I correct that there's no request for a default judgment, is

13   there?

14   A    Application.

15   Q    There's a motion for default?

16   A    I don't see a motion here, no, I don't.

17   Q    Okay.  And do you show an order of default judgment?

18   A    No.

19   Q    Do you show whether or not in 2004 there was an order

20   of protection issued?

21   A    No.

22   Q    In fact, was there an order ordering Mr. Braswell to

23   leave the home?

24   A    No.

25   Q    You all do those, don't you?

1    A    I don't.

2    Q    You work in Division 2 of Circuit Court?

3    A    Correct.

4    Q    You've often seen the judge and you've taken documents

5    to the judge for the judge to sign where people are ordered to

6    leave the home for their own protection, haven't you?

7    A    Correct, yes.

8    Q    Was there one in this case?

9    A    No.

10   Q    Now in 2004, with regards to the documents you brought

11   with you, you don't know anything about the truth of those

12   papers, do you?

13   A    No.

14            MS. WEIRICH:  Objection, Your Honor.

15            THE COURT:  Overruled.  Go ahead.

16            MR. J. BAILEY:  Thank you.

17   Q    You don't know that, do you?

18   A    No.

19   Q    You are just here as keeper of the records to tell us

20   what's in your record; is that right?

21   A    Correct.

22   Q    All right.  And who was defense counsel?

23   A    I don't see one.

24   Q    And the parties didn't move forward with that divorce,

25   did they?

1    A    No, they did not.

2    Q    Other than the initial filing; is that correct?

3    A    Right.

4    Q    Nothing else after that, is there?

5    A    According to my records, no.

6    Q    You brought the full record; right?

7    A    Right.

8    Q    You were subpoenaed or the clerk was subpoenaed and

9    you've come on behalf of Mr. Jimmy Moore; right?

10   A    Right.

11   Q    And you brought us that record; right?

12   A    Right.

13   Q    And there's nothing done after that filing, was there?

14   A    No.

15   Q    And that filing was in June; is that correct?

16   A    Correct.

17   Q    Do you show anything filed in July, any action at all?

18   A    No.

19   Q    Any action at all in August?

20   A    No.

21   Q    September?

22   A    No.

23   Q    October?

24   A    No.

25   Q    And then in November you show the matter dismissed; is

1    that correct?

2        A    November, yes, correct.

3        Q    Now that's just an order of voluntary dismissal?

4        A    Correct.

5        Q    Was there a motion for voluntary dismissal filed?

6        A    No.

7        Q    And so that order of voluntary dismissal was done by

8    Mr. Dennis Sossaman; is that correct?

9        A    Correct.

10       Q    So would it be fair to say that Mr. Sossaman would be

11   the better person to tell us any background information

12   rather?

13       A    That's correct.

14              MR. J. BAILEY:  No further questions.

15              THE COURT:  Ms. Weirich.

16              MS. WEIRICH:  If I could see that file for just a

17   moment, Mr. Mangum.  May I approach, Your Honor?

18              THE COURT:  You may.

19

20                    REDIRECT EXAMINATION

21   BY MS. WEIRICH:

22       Q    Mr. Mangum, referring to the divorce file, what is that

23   that was filed July 28th, 2004?

24       A    Application for default judgment.

25       Q    Okay.  What does that mean?

```
1    A    He didn't answer to the complaint for divorce.  He

2    didn't answer.

3    Q    Who didn't answer?

4    A    Mr. Braswell.

5    Q    Okay.  So that's just something that's filed as what?

6    A    Record of court.

7    Q    I'm sorry, as what?

8    A    Court records.

9    Q    Okay.  And who was it filed by?

10   A    Dennis Sossaman.

11   Q    All right.  And filed with the Clerk's Office; correct?

12   A    Correct.

13   Q    And then the next entry in that file, am I correct, is

14   the voluntary nonsuit of November 9th, 2004?

15   A    Right.

16   Q    All right.  Thank you.

17             MS. WEIRICH:  Nothing further.

18             MR. J. BAILEY:  May I redirect, Judge?

19             THE COURT:  Sure.

20

21                    RECROSS EXAMINATION

22   BY MR. J. BAILEY:

23   Q    Of your experience with the clerk's office, I would --

24   and again, you've been in the clerk's office for a while and

25   you've seen many divorces; is that correct?
```

1    A    Correct.

2    Q    And you've assisted in the filing and the setting of

3    many cases, haven't you?

4    A    Right.

5    Q    Fair to say hundreds?

6    A    Thousands.

7    Q    Thousands?

8    A    Yeah.

9    Q    Now, when a lawyer files a motion or petition or

10   whatever language that lawyer chooses to use for default

11   judgment, isn't it true that that lawyer can put that thing on

12   the docket within the next five to ten days?

13   A    Correct.

14   Q    Was it done in this case?

15   A    Not to my records it wasn't.

16        MR. J. BAILEY:  All right then.  No further

17   questions.

18        THE COURT:  You may step down.  And we'll pass the

19   copies of the divorce to the jury.

20             (Jury viewed exhibit.)

21        THE COURT:  All right.  If you will pass them back

22   down to the end, please.  You may call your next witness.

23        MS. CARNESALE:  Your Honor, the State calls Dr.

24   Joye Carter.

25

1        DOCTOR CARTER

2   called as a witness, being first duly sworn, was examined and

3   testified as follows:

4        DIRECT EXAMINATION

5   BY MS. CARNESALE:

6        Q     Good afternoon.  Will you please state and spell your

7   name for the record?

8        A     My name is Joye Maureen Carter.  First name J-O-Y-E.

9   Middle name M-A-U-R-E-E-N.  Last name C-A-R-T-E-R.

10       Q     Dr. Carter, what is your occupation?

11       A     I'm a forensic pathologist.

12       Q     How long have you been a forensic pathologist?

13       A     Over 20 years.

14       Q     Where are you currently employed?

15       A     I have my own business in Petersburg, Virginia.

16       Q     And did you fly down particularly for this trial?

17       A     Yes, I did.

18       Q     What do you do in Virginia with your business?  What

19   type of business is it?

20       A     I do forensic pathology consulting.

21       Q     How long have you been so employed?

22       A     Three years.

23       Q     Were you working as a forensic pathologist in Memphis

24   in 2004?

25       A     Yes, I was.

1    Q    If you would, if you'd tell the jury your background

2    and training to be a forensic pathologist?

3    A    Certainly.  I'm a medical physician.  I attended

4    college at Wittenberg University in Springfield, Ohio.  I

5    attended medical school at Howard University in Washington

6    D.C.  Upon finishing medical school, I went to New York City

7    to study internal medicine for one year.  Upon completing that

8    I returned to Washington D.C. to do a combined residency in

9    pathology in anatomical and clinical pathology.  Upon

10   completing that I went to Miami, Florida to do a fellowship

11   in --

12              MR. W. BAILEY:  Your Honor, I think we can

13   expedite matters by stipulating that Dr. Carter is qualified.

14              THE COURT:  Thank you.  You may proceed though, if

15   you care to, her explanation.

16              MS. CARNESALE:  I'd like for the jury to hear Dr.

17   Carter's background.

18              THE COURT:  Sure.  You may proceed.

19   A    Upon completing my residency, I went to Miami, Florida

20   to study forensic pathology at the Dade County Medical

21   Examiner's Office.  And I was an active duty Air Force member

22   the whole time in medical school.  I went full-time active

23   duty at the Air Force, passed my boards in anatomical and

24   clinical pathology and forensic pathology as a full-time

25   medical examiner for the federal government.

1      Q      What exactly is forensic pathology?

2      A      Forensic pathology is a specialty area of pathology.

3    Pathology itself is the study of disease and how the body

4    functions.  And that is one of the main courses of study in

5    medical school.  Forensic pathology, you add on how injuries

6    cause death in medical legal investigation.  It's one of the

7    few non-hospital based medical specialties where you actually

8    work with police, detectives, insurance companies outside of a

9    medical institution to determine how a person has died in a

10   particular location, whether it's under federal government,

11   state, county or city regulations.

12     Q      And as a forensic pathologist, are you called to

13   testify as an expert in that area in criminal trials?

14     A      Yes, I am.

15     Q      Have you done so before?

16     A      Yes, I have.

17     Q      Few or many times?

18     A      Many.

19     Q      Do you have an idea of how many times you have

20   testified as an expert in this area?

21     A      Well over 500 times.

22            MS. CARNESALE:  Your Honor, at this time we'd

23   tender Dr. Carter as an expert in the area of forensic

24   pathology.

25            THE COURT:  Right.  And I assume you stipulate as

1    you indicated before?

2                    MR. W. BAILEY:  No objection.

3                    THE COURT:  You may proceed.

4    Q     Now, Dr. Carter, as one of your duties as a forensic

5    pathologist, do you conduct autopsies?

6    A     Yes.

7    Q     What is an autopsy?

8    A     That is the pathologist's tool since we do not have the

9    ability to talk with patients.  What we do is examine their

10   body very thoroughly in a forensic autopsy, which is called a

11   postmortem examination.  The entire body is examined.

12       The first part of the examination is called the

13   external where the body is looked at, the way it is presented

14   to the medical examiner.  It is photographed the way it comes

15   in.  If there are any noticeable injuries, wound tracts, moles

16   or scars, those are documented in notes or dictated into a

17   form.  Photographs are taken when the body is undressed.

18       Then the second part of the autopsy is the internal

19   examination where all of the body cavities are to be entered

20   and the organs examined, weighed, described as to their

21   appearance, whether it's normal or abnormal, any disease that

22   is there.  And then specimens are taken from body fluids from

23   toxicology to see if there is any drug or alcohol or any type

24   of poison in the body.  And all of those findings are created

25   into a document, which is transcribed by secretary and then

1    read and signed by the doctor.

2    Q    Did you conduct such an autopsy and create such a

3    report for a woman named Sheila Braswell on November 5th,

4    2004?

5    A    Yes, I did.

6    Q    And did you bring a copy of that report today with you?

7    A    Yes, I did.

8    Q    Would that assist in your testimony today?

9    A    Yes, it would.

10            MS. CARNESALE:   Your Honor, I would ask that Dr.

11   Carter be allowed to access her report.

12            THE COURT:   Certainly, you may do so.

13   Q    Dr. Carter, what time was the autopsy conducted on

14   Sheila Braswell on November 5th, 2004?

15   A    Approximately 9:15 in the morning.

16   Q    Is that the time that the body arrives at the morgue at

17   the Regional Medical Center?

18   A    That was the time that I began to examine the body.  I

19   believe the body came in perhaps an hour earlier than that.

20   Q    I'm going to pass forward a photograph to you.  Ask if

21   this is a photograph of Ms. Sheila Braswell, the way she

22   appeared when you saw her when you conducted the autopsy that

23   day?

24   A    Yes, it is.

25            MS. CARNESALE:   Your Honor, I'd ask that be marked

1    as the next State's Exhibit.

2         MR. W. BAILEY:  No objection.

3         THE COURT:  31.

4         (Exhibit No. 31 was marked and filed.)

5    Q    Dr. Carter, when you received Ms. Braswell's body, had

6    you been given any information as to possible cause of death?

7    A    Yes, I had.

8    Q    What was that information?

9    A    That she had drowned in the bathtub accidentally.

10   Q    And what is the first thing you do when you conduct an

11   autopsy?

12   A    I review all available information and then I look at

13   the body.

14   Q    Is that what you did in this matter?

15   A    Yes.

16   Q    What did you observe when you looked at Ms. Braswell?

17   A    I looked at the body, I found some injuries to the

18   neck.  When I examined the eyes, I found a lot of hemorrhages

19   in the whites of the eyes.

20   Q    Did they signify anything to you as a forensic

21   pathologist?

22   A    Yes.

23   Q    What did this signify?

24   A    That this was not an accidental drowning.

25   Q    Why is that?

1    A     Because of the injuries to the neck and the appearance

2    of the eyes and the appearance of the facial skin.

3    Q     What did you suspect or know if that's true at that

4    point when you saw these injuries?

5    A     I was highly suspicious of a strangulation death.

6    Q     Why is that?

7    A     Because the appearance of the body was too extreme to

8    be considered as an accidental drowning.  There were injuries

9    that were visual to the surface of the neck and there were

10   petechiae, which are very small hemorrhages on the eyes, on

11   the facial skin, on the lips, even on the frenulum, which

12   connects the lips to the gum.  And I was very concerned that

13   this was not consistent with an accidental death.

14   Q     Dr. Carter, I'm going to pass forward a photograph to

15   you.  If you would take a look at that.  Is that a photograph

16   of Sheila Braswell during the autopsy?

17   A     Yes, it is.

18   Q     In fact, did you take that photograph?

19   A     I didn't take the photograph.  I had the photographer

20   of the office take the photograph.

21   Q     Were you present when it was taken?

22   A     Yes, I was.

23   Q     What does that depict in the photograph?

24   A     This is the photograph of the face of Ms. Braswell.

25   The eyelids have been pulled upward to show the large amount

1    of hemorrhage in the whites of the eyes.

2    Q    That you were just describing a moment ago?

3    A    That's correct.

4                MS. CARNESALE:  Your Honor, we'd ask that be

5    marked the next State's Exhibit 32.

6                THE COURT:  All right.

7                (Exhibit No. 32 was marked and filed.)

8                MS. CARNESALE:  Judge, may I approach the witness?

9                THE COURT:  You may.

10   Q    Dr. Carter, I'm going to display this on our DOAR

11   equipment.  And if you would look at the Judge's screen if you

12   can see it.  If you would --

13               MS. CARNESALE:  In fact, Judge, may she step down?

14               THE COURT:  She may.  You may step down.

15   Q    Dr. Carter, it might be more beneficial to the jury if

16   you could point here on the photograph and describe what

17   you're seeing for the jury.  Could you specify where the

18   damage in the eyes that you saw were?

19   A    Okay.  This is the right eye that my index finger is

20   on, if you can see that.  Can you?

21   Q    We can.  We can.  I'm sorry.

22   A    In this upper area it's very dark.  This is hemorrhage,

23   subconjunctival hemorrhage.  The white of the eye is lined by

24   a very thin film called conjunctiva.  And there's hemorrhage

25   below that.  In fact, it's bulging out at the inner portion of

1    the right eye where my finger is at the bottom, if you can see

2    that.

3         On the left eye you'll also see where you have

4    hemorrhage on the whites of the eye, bulging out in the bottom

5    of the -- at the lower eyelid in the outer portion and the

6    inner portion of the eyelid.  This is subconjunctival

7    hemorrhage.

8         Q    Okay.  And were you able to see those before the

9    eyelids were lifted?

10        A    When I -- part of the examination is looking at the

11   eyes.  And when you first pull back the eyelids to look, you

12   see that there are small petechiae and then these larger areas

13   of blood.

14        Q    What are petechiae?

15        A    Petechiae are pinpoint hemorrhages, the tiniest vessels

16   in the body called capillaries are the tiniest vessels where

17   oxygen is exchanged at the cellular level.  And increase in

18   pressure will burst these tiny vessels and that's what

19   petechiae hemorrhages are.  They mean pinpoint hemorrhages.

20        Q    When they burst, that becomes a petechiae?

21        A    That's correct.

22        Q    Is it only in the eye?

23        A    It's not only in the eye.  They are commonly seen in

24   the eye because the white of the eye is light, but you can

25   have petechiae that occur on the skin and in other organs.

1    Q    Did you see petechiae other than in her eyes on Ms.

2    Braswell?

3    A    Yes, I did.

4    Q    Where did you see that?

5    A    All over her face.

6    Q    Okay.

7    A    On the lining of the lips and the gum.  And actually,

8    looking on parts of the neck you can see petechiae.  And then

9    on the inside of the body, the actual trachea where we breathe

10   through, (indiscernible) petechia lining the larynx and the

11   internal portions of the neck.

12   Q    What causes petechiae, which is the bursting of the

13   capillaries?

14   A    Usually from increased pressure.

15   Q    Such as?  Can you give us an example?

16   A    Well, such as someone applying pressure to the neck or

17   a ligature tied around the neck or perhaps a person is

18   compressed between two hard objects, like underneath a car or

19   someone leans over and gets stuck between a washer and a

20   dryer.

21   Q    Okay.  Thank you.  And before you take your seat, one

22   more question.  I know you probably want to sit down.  The

23   fluid we see -- or I call it fluid -- the stuff on Ms.

24   Braswell's face, what is that?

25   A    The red material that's streaming down her face is

1   coming out of the nose and the mouth and that is called

2   pulmonary edema fluid.

3       Q    Did that come out of her nose?

4       A    It usually comes out of the nose and comes out of the

5   mouth because they are connected inside of the body.

6       Q    And if you would take your seat.

7               MS. CARNESALE:   Your Honor, may I approach?

8               THE COURT:   You may.

9       Q    Dr. Carter, I'm going to pass forward two more

10  photographs and ask if you would identify what those are

11  pictures of.  Do you recognize what's in those pictures?

12      A    Yes, I do.

13      Q    What are they?

14      A    These are high magnifications of the eyes, the right

15  and left eye.

16      Q    And do they also depict the burst hemorrhages in the

17  eyeball of the petechiae?

18      A    Yes, they do.

19      Q    Do you see anything else of significance in those

20  photographs?

21      A    Well, you not only have the petechiae, you have what we

22  call confluence of petechiae, where there are so many that

23  just form one large lump of blood.  These photographs were

24  taken to show the extent of the bleeding in the whites of the

25  eye.

1    Q    Would those also result from pressure?

2    A    Yes, they do.

3              MS. CARNESALE:  Your Honor, if those could be

4    marked and admitted collectively as Exhibit 33.

5              THE COURT:  All right.  Exhibit 33.

6              (Exhibit No. 33 was marked and filed.)

7    Q    Now, Dr. Carter, you stated that you also saw petechiae

8    around the mouth or inside the mouth of Ms. Braswell?

9    A    Yes.

10   Q    I'm going to pass forward another photograph to you,

11   two pictures.  Do those photographs depict what you were

12   referring to?

13   A    Yes, they do.

14   Q    What is the difference in the two pictures?

15   A    They're the same photograph.  One is a higher

16   magnification of the other, showing it's a close-up.

17   Q    Okay.

18             MS. CARNESALE:  Your Honor, if we could mark those

19   and introduce those as the next State's Exhibit collective.

20             THE COURT:  Okay.

21             (Exhibit No. 34 was marked and filed.)

22   Q    Could you just explain to the jury what you are

23   referring to in the photograph?

24   A    Yes.  This is showing the inside of the upper lip and

25   the gum, the central teeth.  That little piece right in the

1    middle is called the frenulum where the lip is attached to the

2    gum line, where we usually look for bottle injuries in

3    infants.   That area has small petechiae or small pinpoint

4    hemorrhages on it.

5         Q    The redness that I see, is that what that means?

6         A    Yes.   That central area that is discolored in the

7    Judge's screen, those are tiny hemorrhages.

8         Q    Okay.   And also in the other portion of the exhibit, is

9    that just a further away shot of the same thing?

10        A    Yes, it is.

11        Q    Okay.   Now, Dr. Carter, I believe you also stated that

12   you observed something unusual to her neck?

13        A    Yes.

14        Q    From the outside, the external?

15        A    That is correct.

16        Q    Let me pass forward a photograph to you.   Does that

17   picture accurately depict what you observed on her neck when

18   you conducted the autopsy?

19        A    Yes.

20        Q    Could you describe what you see in the picture?

21        A    What you have on this part of the neck are some curved

22   contusions.   I call them curve linear in my report but there

23   is some shape to them.   There's redness on the neck.   In the

24   center you have some areas that are curved.   They go around

25   like -- they're oval shaped contusions or bruises.

1          MS. CARNESALE:  Your Honor, we'd ask that be

2    marked State's Exhibit 35.

3          THE COURT:  Okay.

4          (Exhibit No. 35 was marked and filed.)

5          MS. CARNESALE:  May I approach?

6          THE COURT:  You may.

7    Q    Again, Doctor, I will display it on the screen.  If you

8    would, if you don't mind, will you step down and point it out

9    to the jury?  Where in the photograph are the contusions?

10   A    You see this area of red along here.  You have an

11   outline of an oval shape.  You have red in this upper right

12   corner of the photograph.  You have some red on the left side.

13   Q    Thank you.  You may take your seat.  Do you have any

14   idea what could cause that type of contusion on a neck?

15   A    That pattern is more consistent with manual, with hands

16   placed around the neck.

17   Q    As opposed to an object?

18   A    That's correct.

19   Q    Did you in fact find an object around Ms. Braswell's

20   neck when you autopsied her?

21   A    Yes.

22   Q    I pass forward a photograph to you.  Is this the object

23   you found around her neck?

24   A    Yes, it is.

25         MS. CARNESALE:  Your Honor, we'd ask that be

1    marked State's Exhibit No. 36.

2              THE COURT:  All right.

3              (Exhibit No. 36 was marked and filed.)

4              MS. CARNESALE:  May I approach?

5              THE COURT:  You may.

6    Q    It's a necklace; right, Dr. Carter?

7    A    Yes, it is.

8    Q    The contusions depicted in Exhibit No. 35, could they

9    in your opinion have been caused by that necklace?

10    A    No.

11    Q    Why not?

12    A    Because of the shape of the contusions and the shape

13    and size of the chain link of the necklace.

14    Q    The chain is too thin?

15    A    The chain is too thin.

16    Q    Thank you.  Now, Dr. Carter, after you examined her

17    externally, what is the next step you do in an autopsy or you

18    did in this matter?

19    A    The next step is the internal examination.

20    Q    Can you describe that for the jury?

21    A    Yes.  That is where the body cavities are opened and

22    the skin underlying muscle and fat tissue is separated.  You

23    look for any changes to that tissue.  Then the rib cage is

24    examined for any fractures, any abnormalities.  Then you open

25    up the rib cage, look at the internal organs in the chest, the

1    heart and the lungs.

2        Q    Did you observe anything of significance when you

3    looked at Ms. Braswell internally?

4        A    The most significant findings were in the neck area,

5    actually.

6        Q    And did you bring anything with you today to assist you

7    in demonstrating to the jury what you found?

8        A    Yes, I did.

9            MS. CARNESALE:   Your Honor, I'd ask that she be

10   allowed to bring out her object.

11           THE COURT:   She may, certainly.

12       Q    Can you tell the jury what that is and what you found

13   with relation to Ms. Braswell?

14       A    This is actually an enlarged model of the internal

15   structures of the neck.   This is what we call the Adam's apple

16   in a male.   This is the thyroid cartilage.   This is the hyoid

17   bone that is literally up underneath our chin.   This is the

18   thyroid gland that goes across the front of the neck.   This

19   part extending down is the trachea that goes into the lungs

20   for air.   And when I hold it like this, we're looking at the

21   inside of the throat area where we get our voice and where we

22   swallow food and get air into our lungs, and this is called

23   the pharynx.   This is where food goes into this back part down

24   into the stomach and the esophagus.   This part is called the

25   epiglottis.   And this folds over to keep food from going into

1   our lungs.  And this part of the throat is what lays against

2   the cervical spine.  So this is the front and this is the back

3   of the neck.

4       Q    When you examined Ms. Braswell in this particular area

5   of her neck, what did you find?

6       A    Well, what I did, to explain, is there's a procedure in

7   forensics called "a layer-wise neck dissection."  What holds

8   the head to the neck are several groups of thick muscles.  And

9   I dissected the layer step by step and photographed that, and

10  I found among the layers of muscle multiple areas of

11  hemorrhage where there was blood within the muscle tissue.  I

12  then found there was hemorrhage in the pharynx where the food

13  goes down into the esophagus and stomach.  This part.  There

14  were petechial hemorrhages all throughout the lining of the

15  epiglottis and the inside of the larynx where our voice box

16  is.  I did not find that the hyoid bone was fractured.  And

17  the thyroid cartilage was not fractured.

18          But when I took a sharp knife and opened up the thyroid

19  cartilage, there was hemorrhage within that cartilaginous

20  tissue.  This is not bone.  It's a little more flexible than

21  bone, but there was blood within that.

22      Q    Did you take photographs or were photographs taken?

23      A    I took many photographs of this area.

24      Q    I'm going to pass forward several photographs to you,

25  ask you to take a look at those.  And if you would, if you see

1    photographs that depict what you just described of the

2    different hemorrhages that you found if you would --

3      A    I'm sorry, I didn't hear your last part.

4      Q    If you would let me know.  In that first photograph,

5    what did you see?

6      A    This is the early part of the neck dissection and there

7    are areas that look black, but that's areas of hemorrhage in

8    the strap muscles of the neck.

9      Q    And on yourself if you would, what area are you talking

10   about?

11     A    Well, I'm talking about this area.  And if you actually

12   put your fingers right below your ear, you'll feel the larger

13   strap muscle, called the sternocleidomastoid muscle.  It's the

14   largest muscle that goes from behind the ear down to the

15   clavicle bone.  I pulled that back and there are about six

16   layers underneath that and there are areas of hemorrhage in

17   those layers on the right and left sides of the neck.

18     Q    Is hemorrhage, is that bleeding?

19     A    Yes, that's where blood has left the blood vessels and

20   is out in the tissue.

21            MS. CARNESALE:  Your Honor, I'd ask that that

22   photograph be marked as State's Exhibit No. 37.

23            THE COURT:  All right.

24            (Exhibit No. 37 was marked and filed.)

25     Q    Dr. Carter, I believe you stated there were six layers

1    of muscle in the neck; is that right?

2    A    Yes.

3    Q    Was there hemorrhaging under all six of the layers?

4    A    There was patchy hemorrhaging, yes, under all the

5    layers in various sections of the neck.  The muscles are very

6    broad.

7              MS. CARNESALE:  Your Honor, may I approach the

8    witness?

9    Q    Dr. Carter, I'm going to display what was previously

10    marked State's Exhibit No. 37 so the jury can see what we're

11    talking about.  And if you don't mind, if you would step down

12    and just point to where the hemorrhages are in the photograph.

13    A    You have an area of hemorrhage in this muscle where my

14    finger is.  This dark area is hemorrhage.  You have hemorrhage

15    here actually just in the fat underneath the skin, would be

16    right in the front of the neck in the midline area.  You have

17    two larger areas of hemorrhage that look black in these two

18    areas on the right side of the neck.

19    Q    Thank you.  If you would take your seat.  What would

20    cause such hemorrhaging throughout the layers of muscle in the

21    neck?

22    A    Blunt trauma to the neck.  That disrupts the integrity

23    of the muscles.

24    Q    Would that be consistent with a strangulation?

25    A    Yes.

1    Q    Now again, if you would look back at the other

2    photographs that you -- do you see other photographs that

3    depict the injuries that you observed to Ms. Braswell?

4    A    Yes, I do.

5    Q    Okay.  And just feel free to choose in whatever order

6    you choose, describe for the jury what you find.

7    A    There are two pictures that are actually the same

8    thing, and it's showing the left side of the neck with the

9    muscle tissue with multiple areas of hemorrhage that appear

10   black.  The area is covered by surgical towel to focus on the

11   area of injury of the strap muscle.

12   Q    And it's on the left side of the neck?

13   A    Yes.

14        MS. CARNESALE:  Your Honor, we'd ask those be

15   marked collectively, please.

16        THE COURT:  All right.

17        (Exhibit No. 38 was marked and filed.)

18        MS. CARNESALE:  May I publish those to the jury?

19        THE COURT:  You may.

20   Q    Show these one at a time, Dr. Carter.  You stated this

21   is a towel surrounding that area of the neck?

22   A    That's a blue surgical towel.

23   Q    Just to highlight what we're looking at.  And is this

24   the same injuries from a different angle?

25   A    That's correct.  The same area, the left side of the

1    neck.

2       Q    Okay.  Taking a look at the next photograph you have.

3    What did you observe?

4       A    We have two photographs.  This is showing the back of

5    the neck organs.  Again, that would be right in front of the

6    cervical spine on the right side.  We have some large

7    hemorrhages in the soft tissue going into the pharynx where

8    the food goes down into the esophagus.  And we have a

9    photograph that is a high magnification blowup and then we

10   have one that's a smaller magnification.

11      Q    Of this same injury?

12      A    Yes.

13            MS. CARNESALE:  Your Honor, may we mark that as

14   State's Exhibit No. 39 collective.

15            THE COURT:  All right.

16            (Exhibit No. 39 was marked and filed.)

17            MS. CARNESALE:  May I publish those to the jury?

18            THE COURT:  You may.

19      Q    Dr. Carter, we see a specimen number on there.  What

20   does that refer to?

21      A    That's the case number in the records that are kept at

22   the Regional Forensic Center in Memphis.

23      Q    Is that case number specific to the autopsy for Sheila

24   Braswell?

25      A    Yes, it is.

1     Q     That's the one photograph and then here is the other of

2    the exhibit.   Again, those are the hemorrhages inside the

3    layers of muscle in the neck?

4     A     That is actually on the back of the internal neck

5    structures.

6     Q     So that wouldn't be muscle, I guess, back there?

7     A     No, that's soft tissue.

8     Q     Okay.   And again, the question I asked you before,

9    would all of these be caused by pressure to that area?

10    A     Yes.

11    Q     Do you have another photograph in your hand?

12    A     Yes, I do.

13    Q     And what is that a picture of?

14    A     This is again showing the back of the neck structures.

15   There's forceps on the right side of the thyroid cartilage and

16   it's showing hemorrhage right in this area in the soft tissue

17   of the pharynx where the food goes through the mouth down into

18   the esophagus.   And that's what this picture is showing the

19   entire organ on the back.

20               MS. CARNESALE:   Judge, may we mark that and

21   introduce that as State's Exhibit No. 40.

22               THE COURT:   All right.

23               (Exhibit No. 40 was marked and filed.)

24               MS. CARNESALE:   May I publish that?

25               THE COURT:   You may.

1     Q     Just in the bottom of the right-hand corner we see the

2     edge of the forceps; is that correct?

3     A     That's correct.

4     Q     You've actually removed the neck now, it's separate?

5     A     That is correct.

6     Q     And after you do that and have it photographed, what do

7     you do with the neck?

8     A     Well, on this particular case the neck was fixed in a

9     formalin solution.  And it was then again examined.  Some of

10    the soft tissue was removed for microscopic examination, and

11    that particular organ was also evaluated by the anthropologist

12    on staff at the office.

13    Q     Why do you do that?  Why do you put it in the solution

14    and have all of that removed?

15    A     That's part of the documentation process that a

16    forensic pathologist does.  You not only describe what you

17    have, you document it on diagrams.  You document it in

18    photographs.  You also document the injured area by looking at

19    microscopic sections and determining whether or not you have a

20    recent injury or an older injury.

21    Q     How would this injury be classified?

22    A     Very recent.

23    Q     When you say "very recent," would it have been

24    instantaneous with death?

25    A     It's not instantaneous with death.  It's a

1   several-minute process.  But you can tell by the type of blood

2   cells that are there, microscopically how old the injury is.

3   Not exactly like they do on TV but within a reasonable amount

4   of hours.

5       Q     And what time period did you give this injury?

6       A     The injury occurred more than likely over several

7   minutes time.  And the blood cells that were there

8   microscopically were all red blood cells.  An older injury

9   would have white blood cells that would come into the area to

10  help the body heal.

11      Q     And how long does it take for white blood cells to come

12  to the area?

13      A     Several hours.

14      Q     Now when you put the neck in the solution and remove

15  the tissue, did you find any other injuries or make any other

16  observations when that was done?

17      A     Once the neck organs were fixed in formalin, this area

18  was opened completely up.  Where I have the tape, this

19  actually comes apart to demonstrate the inside.  And I cut

20  that open and show that there were petechiae throughout the

21  entire internal structures, our voice box, our vocal folds,

22  vocal cords going down into the trachea just a (indiscernible)

23  covered with these tiny petechia.

24      Q     Different from the hemorrhages that we saw in all the

25  photographs we just looked at?

1    A    That's correct.

2    Q    Did you have photographs taken of those injuries?

3    A    I certainly did.

4    Q    I'm going to pass forward two pictures to you.  Are

5    these photographs of what you're describing?

6    A    Yes, they are.

7    Q    Looking at them separately the first photograph, what

8    is that?

9    A    The first photograph is again showing this back portion

10   of the neck structures.  It's showing this part, the

11   epiglottis at the top that has petechiae on it.  It's showing

12   in just a little bit different detail that there are

13   hemorrhages on the -- in the pharynx area on both right and

14   left sides on the back of the neck structures.

15   Q    And this is after all the tissue has been stripped

16   away?

17   A    It's not all been stripped away.  This is after the

18   tissue has been removed to look at it under the microscope.

19   And this organ has been put into formalin tissue so it has a

20   little bit of a color change because of what the formalin does

21   to preserve the tissue.

22   Q    What is formalin?  Is it solution?

23   A    It's a solution.  It's actually a gas in solution.  If

24   you've heard of formaldehyde, it's formaldehyde gas in a

25   liquid solution so it's not as strong but it does keep the

1   tissue from deteriorating.

2       Q     So it's a preservative for the tissue?

3       A     Yes, it is.

4             MS. CARNESALE:  Your Honor, may we mark that and

5   introduce that as the next exhibit, please.

6             (Exhibit No. 41 was marked and filed.)

7             MS. CARNESALE:  May we publish that?

8             THE COURT:  You may.

9       Q     Dr. Carter, if you would step down again and point to

10  the jury where you observed the petechiae?

11      A     This is what I showed you on the model.  This is the

12  flap that tries to prevent food from getting into the

13  respiratory tract.  These dots here are where you have small

14  hemorrhages.  This is what I showed in the other photograph,

15  these dark areas here, which is on the right side of the neck,

16  and these areas here -- there's more than one on the left side

17  and this is where you have this hemorrhage that is gutting out

18  of the blood vessels and into the muscular tissue.

19      Q     And I believe you have another photograph up there.

20  Can you take a look at that?

21      A     This is a photograph showing that previous specimen

22  completely opened.  This is showing where you have hemorrhage

23  on the lining of the larynx.  There's an area actually where

24  our voice comes from, called the vocal cords and the vocal

25  folds.  And also you see within the cartilage, you see areas

1   of hemorrhage within the cartilage which makes up the thyroid

2   cartilage, this blue area.   You can see there's hemorrhage in

3   the area where it has been cut open.

4       Q    Hemorrhage is different than petechiae; correct?

5       A    Yes.   Hemorrhage signifies you have a lot more.   It's

6   more and a lot larger than pinpoint.

7               MS. CARNESALE:   Your Honor, we'd ask that be

8   marked State's Exhibit No. 42.

9               THE COURT:   All right.

10              (Exhibit No. 42 was marked and filed.)

11              MS. CARNESALE:   May I publish it?

12              THE COURT:   You may.

13      Q    Dr. Carter, if you would again step down and point to

14  what you are referring to.

15      A    These are neck structures open.   This dark area here is

16  actually where our voice comes from.   This upper part of the

17  vocal folds and beneath where my fingertip is on both sides

18  are the vocal cords, where we get our voice from.   This is the

19  lining of the larynx, which is formed by the thyroid

20  cartilage.   This has petechial hemorrhages that have formed

21  together, making larger areas of blood here.   And then where I

22  have my finger, this is the inside of the thyroid cartilage.

23  And you can see on both sides there is blood within that

24  tissue.

25      Q    Okay.   Thank you.   Dr. Carter, based upon everything

1   you observed throughout the autopsy of Sheila Braswell, were

2   you able to determine her cause of death?

3       A    Yes.

4       Q    And what was that?

5       A    Asphyxiated manual strangulation.

6       Q    What is manual strangulation?

7       A    That is where the hands are used to apply pressure to

8   the structures of the neck.

9       Q    Why did you determine that that was the cause of death?

10      A    The pattern of injury on the neck is not consistent

11  with a ligature being used where a strap or a chain or some

12  implement or belt has been stretched across the neck.   The

13  pattern finding the multiple areas of bleeding in the muscle

14  tissue is more consistent with hands being around the neck and

15  causing tissue injury.

16      Q    How long would it take someone to be manually

17  strangled?

18      A    It takes several minutes.

19      Q    Can you give us more specific?

20      A    Well, I can give you a range.   From the textbook

21  usually three to seven minutes the brain can be without

22  oxygen.   And there's no precise way to say exactly because

23  that would -- you would have to injure a human being.   But we

24  know the brain can be without oxygen for that period of time,

25  and it's caused by the pressure around the neck that prevents

1   the blood flow and oxygen getting to the brain that needs it.

2       Q    So a minimum of three but a maximum of seven according

3   to the textbook?

4       A    That's correct.

5       Q    Would that be constant pressure on the neck?

6       A    It's constant pressure.

7       Q    And is the injuries that you saw in her eyes, all the

8   petechiae and the hemorrhaging that you saw throughout her

9   neck, is that consistent with constant pressure being applied

10  to her neck?

11      A    That's correct.  It's a result of that pressure causing

12  those blood vessels to rupture.

13      Q    Would it cause death immediately after that time period

14  three to seven minutes?

15      A    Yes.  By that time period you have irreversible damage

16  to the brain and the neurons have died from lack of oxygen.

17      Q    What would a person be feeling as they are manually

18  strangled?

19      A    Well, everyone is an individual and the brain is what

20  controls the heart rate and controls the breathing and the

21  body temperature.  And there are various levels that one can

22  restrict its blood flow before you get to a point where it's

23  irreversible.  The earliest sign is euphoria, a feeling of

24  feeling good and light-hearted.  And then you have various

25  other syndromes that are particular to the individual.

1   Q    Such as?

2   A    Well, some individuals urinate on themselves or they

3   defecate because that is loss of control by the central

4   nervous system.  Some may fight.  Some may scream.  It really

5   depends on what we know about the situation.

6   Q    When you autopsied Ms. Braswell, did you measure her

7   and weigh her?

8   A    Yes.

9   Q    What was her height and weight?

10  A    Her weight was 125 pounds.  And the height was 58 and

11  one-half inches from the top of the head to the heel.

12  Q    Which is?

13  A    Which is just a little under five feet.

14  Q    A little under five feet, okay.  Now this case came to

15  you as a possible drowning?

16  A    Yes, it did.

17  Q    Could this have been a drowning?

18  A    In my opinion no.

19  Q    Why is that?

20  A    Because of the severe injuries to the neck.

21  Q    Did you see any indications when you autopsied her that

22  would indicate a drowning?

23  A    There was some indication that there was fluid.

24  Through the dark fluid in the stomach, we do examine and

25  measure the stomach contents.  And the lungs were just

1    slightly heavy.

2        Q    What does that mean?

3        A    They are roughly -- the average lungs in a woman of

4    this size usually 250 to 300 grams.  Her lungs were a little

5    heavier than that, 300 -- let me just refresh my memory so I'm

6    -- the right left lungs were 393 and 80 grams.  Usually,

7    they're heavy when a lot of water has been taken on.  But what

8    the pathologist needs to do in this case is determine why a

9    person may have ingested water or taken on water, what caused

10   them to do that.  Someone who would be in a bathtub, you would

11   either be under the influence of drugs or injured in some way

12   or perhaps have a mental deficit.  Otherwise, they just didn't

13   stand up out of the water.  So something has occurred.

14        When you find an injury, then you usually look at what

15   has caused the person to not be able to get out of that

16   situation.  It's not like a person that's in a pool, swimming

17   pool that cannot swim as someone who could have stood up,

18   they've begun to take on water.  Their senses would be alert.

19   Their brain would say you're in danger, you need to get up and

20   stand up.

21        Q    So she had some fluid in her lungs.  Was there enough

22   -- and you say more than you would expect to see in a woman

23   her size; is that fair to say?

24        A    Yes.

25        Q    Was it enough to have caused her to drown?

1    A    In my opinion no.

2    Q    Based on the amount found in the lungs?

3    A    Based on the size and shape of the lungs.

4    Q    Okay.  Now is it possible that she could have been
5    strangled in water, which caused the water to go into her
6    lungs?

7    A    That's entirely possible.

8    Q    I'm sure, Dr. Carter, you're familiar with the term
9    "rigor mortis"?

10   A    Yes, I am.

11   Q    Can you explain to the jury what that is?

12   A    Rigor mortis is the stiffening of the body that occurs
13   after death.  And it's usually due to the (indiscernible) of a
14   lactic acid in the muscle tissue.  It begins within a couple
15   of hours of death and forms in the head-to-toe direction in
16   the first 36 hours of death.

17   Q    Does it begin any earlier than an hour or two after
18   death?

19   A    Well, it -- it can begin earlier in individuals who
20   have had serious burns from a fire or a person that is engaged
21   in a lot of physical activity right before death, like they
22   were running or if they have an extreme infection where the
23   body temperature is already elevated.

24   Q    Is there anything that you know about Ms. Sheila
25   Braswell that would have indicated that her body would have

1    gone into rigor mortis faster than an hour or two after death?

2    A    No.

3    Q    Did you observe rigor mortis?

4    A    I observed some early forms by the time the examination

5    had begun at nine.   It had been, I believe, almost six hours

6    since the body was discovered.   And right at six hours you

7    begin to get some stiffening.

8    Q    Do you recall where you saw the stiffening?

9    A    There was some early stiffening in the extremities.

10   But where I look for stiffening that's formed from the muscles

11   themselves is usually the circular muscles that are around the

12   eyes and around the mouth.   And there was not fixed rigor

13   mortis in my opinion.

14   Q    Based on what you found in the autopsy, are you able to

15   tell this jury approximately what time she died?

16   A    From everything that I was able to review, certainly

17   close to the time that the body was found, within give or take

18   one or two hours.   We cannot be precise to the exact time of

19   death.

20   Q    I pass forward another photograph to you, Dr. Carter.

21   Can you describe what you see in that picture?

22   A    This is a photograph of Ms. Braswell's feet.

23   Q    And was that picture taken with you present during the

24   autopsy?

25   A    Yes, it was.

1    Q    Why did you take a picture of her feet?

2    A    Because of the history that was given by the police

3    officers that she had been found in a body of water, had been

4    there for some time.  I did not feel that she had adequate

5    what we call washer-woman effect of the skin of the feet.

6    Q    And for the jury, what is washer-woman effect?

7    A    Washer-woman is that wrinkling that you get on your

8    fingers and on your toes.  And that's from water soaking in,

9    in-between the layers of skin.  And usually occurs within 15

10   to 20 minutes of being in water and usually see it on your

11   hands and on your feet.  It will also form in the dead body as

12   well.

13   Q    So even if she had died and then lay in the bathtub for

14   a long time, you'd still expect to see washer-woman effect on

15   the feet?

16   A    That's correct.

17   Q    And do you see much, if any, in that photograph?

18   A    No.

19          MS. CARNESALE:  Your Honor, may we mark that

20   State's Exhibit No. 43.

21          THE COURT:  You may.  All right.

22          (Exhibit No. 43 was marked and filed.)

23          MS. CARNESALE:  May I publish it, Judge?

24          THE COURT:  You may.

25   Q    Dr. Carter, if you would just look at the Judge's

1    screen.  We see some wrinkling on the bottom of her feet.  Is

2    that what you're talking about?

3        A    Yes.  That's very, very minimal.  We don't see

4    wrinkling on the toes.  And part of that foot is more of the

5    posturing of the body when the central nervous system is not

6    intact.

7        Q    So the smooth area of the upper part of the foot,

8    that's where you would expect to see the washer-woman effect?

9        A    That's correct.

10       Q    Thank you.  Dr. Carter, was she tested for alcohol or

11   drugs?

12       A    Yes, that's part of a complete autopsy.

13       Q    And what were the results of those toxicology reports?

14       A    No drugs, no alcohol were found in the body, specimens

15   that were tested for drugs and alcohol.

16       Q    At all?

17       A    At all.

18       Q    I'm going to pass forward another photograph to you.

19   This is a photograph of Sheila Braswell; is that right?

20       A    That's correct.

21       Q    It appears a substance is coming out of her mouth and

22   nose.  Do you know what that is?

23       A    Yes.  That is the edema foam that I described earlier.

24   It starts out being white and then it gets mixed with blood.

25   And the picture that we showed in the very beginning with the

1    red substance, it's the same material, edema foam coming out

2    of the respiratory tract and it usually comes out through the

3    nose and mouth.

4        Q    In that picture it's white but it later turns to red?

5        A    Yes, it's white coming out of the mouth and there is

6    also some red that's coming out of the nostril draining down

7    into the right eyelid area.

8        Q    Is that the fluid that was in her lungs?

9        A    Yes, that's edema fluid.

10       Q    Okay.

11            MS. CARNESALE:  Your Honor, may we move that into

12   evidence as Exhibit No. 44?

13            THE COURT:  All right.

14            (Exhibit No. 44 was marked and filed.)

15            MS. CARNESALE:  May we publish that, Judge?

16            THE COURT:  You may.

17       Q    A little difficult to see, Dr. Carter, I think in this

18   photograph.  But that fluid was underneath the nose; is that

19   correct?

20       A    Yes, the red fluid is coming out of the right nostril

21   in this photograph and streaming down to the right eye so the

22   eye looks dark in this photograph.  And it looks like a white

23   strip going across the lips and it's the same material.  It's

24   edema foam, comes out of the respiratory tract.

25       Q    Dr. Carter, are you familiar with the term "erotic

1    asphyxia"?

2    A    Yes.

3    Q    What does that mean?

4    A    It's usually called autoerotic asphyxia.  It is a

5    practice that some people indulge in whereby constricting the

6    blood flow, there is a heightened sense of pleasure when

7    undergoing either sexual -- sexual activity.

8    Q    And autoerotic asphyxia is when someone does it to

9    themselves?

10    A    Yes.

11    Q    Have you ever served as a forensic pathologist on cases

12    involving that as a cause of death?

13    A    Yes, I have.

14    Q    Few or many times?

15    A    Many.

16    Q    And when you say "many," are you referring to

17    autoerotic asphyxia or both auto and just regular erotic

18    asphyxia?

19    A    Both.

20    Q    Which is more common?

21    A    Autoerotic is more common.

22    Q    Have you autopsied bodies where you determined that was

23    the cause of death?

24    A    Yes.

25    Q    Few or many times?

515

1    A    Many.

2    Q    And based on what you know in the past and based on

3    your autopsy in this matter, was Sheila Braswell the victim of

4    that as a cause of death?

5    A    In my opinion no.

6    Q    And why is that?

7    A    Well, scene investigation is very important on erotic

8    asphyxial deaths, how the body was found.  We usually look for

9    signs of ligatures.  We also look for signs of safe escape,

10   whether there's something that needs to be pulled or a knot or

11   even a key if they're using handcuffs.  There's usually

12   pornographic material around and they're usually found in the

13   position where they have asphyxiated accidentally from having

14   something that has constricted the blood flow to the brain.

15   Q    What if it's a couple choking each other?

16   A    When you have a couple that chokes, either the person

17   that survives usually gives an explanation as to what they

18   were doing and you see if that's consistent.  If indeed it's a

19   couple that's engaged in this behavior, medically speaking it

20   would still be a homicide if by injuring another person you

21   cause their death.

22        MR. W. BAILEY:  Your Honor, I'm going to object to

23   that.  That's a conclusion offering opinion in fact.  Ask the

24   jury to disregard it.

25        MS. WEIRICH:  It's a conclusion she has to make,

1    Your Honor.

2              MS. CARNESALE:  Judge, she determines whether --

3              THE COURT:  Overruled.  She stated that medically

4    speaking that's how she categorizes it and so I'll overrule

5    the objection.  You may proceed.

6    Q    Just for clarification, Dr. Carter, a homicide is

7    anything other than a natural death; is that right?

8    A    A homicide is someone else being responsible for

9    another person's death.

10   Q    Okay.  Were the injuries that you observed on Sheila

11   Braswell consistent with erotic asphyxia?

12   A    In my opinion no.

13   Q    Why not?

14   A    One, because there was no evidence of any ligature

15   mark.  There were multiple areas of damage to the strap

16   muscles, literally encircling the neck versus a pattern of a

17   ligature that you usually find in autoerotic cases.

18   Q    What types of objects in your experience have people

19   used on each other to participate in this?

20   A    I've seen belts.  I've seen towels.  I've seen dog

21   collars.  I've seen wire.  I've seen almost anything that can

22   be tied around the neck.  I've even seen handcuffs that have

23   been joined together and pulled around the neck.

24   Q    Were the abrasions or -- I'm sorry, contusions you saw

25   on Sheila Braswell consistent with any such object?

1      A    No.

2                  MS. CARNESALE:  Judge, may I have a moment?

3      That's all I have, Dr. Carter.  Thank you, Judge.  I'll pass

4      the witness.

5                  THE COURT:  Mr. Bailey.

6                  MR. W. BAILEY:  Will Your Honor give me a moment?

7      May I step out for a second?

8                  THE COURT:  All right.  We'll take a brief recess.

9      Ladies and gentlemen, we'll take a brief recess.  As always,

10     do not discuss the case during the recess.

11                 (Jury out.)

12                 THE COURT:  Doctor, you are welcome to step down

13     during the recess if you care to.  Take him out, please.

14     Stand in recess.

15                 (Recess.)

16                 THE COURT:  Bring the defendant in, please.  Bring

17     the jury in, please.

18                 (Dr. Carter resumed the witness stand,

19                      having previously been sworn.)

20                 (Jury present.)

21                 THE COURT:  Mr. Bailey.

22                 MR. BAILEY:  Thank you, Your Honor.

23

24

25

CROSS-EXAMINATION

BY MR. W. BAILEY:

Q     Dr. Carter, I'm Walter Bailey.  I represent this young
man sitting over here, Mr. Braswell who is the defendant in
this matter.  And I'm going to ask you a few questions.  And
in the process of my asking questions, if there is any
question you don't understand, will you ask me to repeat it?

A     I certainly will.

Q     Thank you.  I understand you were at UT Forensic
Science Center for how many years?

A     Less than a year.

Q     Less than a year?

A     Yes.

Q     And before that you were where?

A     I was in Houston.

Q     And how long?

A     With my own company for a year and prior to that as the
chief medical examiner of Harris County, Texas.

Q     All right.  And how long were you at Harris County?

A     Roughly six and a half years.

Q     All right.  Okay.  And after you left Harris County you
came here to Shelby County?

A     No, sir.

Q     Where did you go then?

A     I initially went to Maryland to be closer to my mother.

1      Q    Okay.  And you were associated with the forensic
2    services there?

3      A    No.  I had had my own company by that time.

4      Q    I see.  And when you said "had your own company," that
5    meant that you peddled yourself out to be hired or employed by
6    law firms?

7      A    No, sir.  That meant I formed a company and
8    incorporated under the term of "biblical dogs."

9      Q    I see.  But you also held yourself out to be hired by
10   private lawyers and law firms?

11     A    Private law firms, the federal government,
12   associations.

13     Q    I see.  And now you are out solely to be hired by
14   lawyers and law firms and associations?

15     A    And the federal government and local governments.

16     Q    I see.  Now let me ask you.  You never saw -- you
17   didn't go out to the scene of course, did you?

18     A    That's correct, I did not visit the scene.

19     Q    But normally, it's not unusual for a pathologist such
20   as yourself who is employed by county government to go out to
21   the scene?

22     A    Not in the Memphis area seldom does the pathologist go
23   out to the scene.  In other areas that I've worked in, yes, we
24   went to the scene.

25     Q    I see.  Now one of the things I want to ask you is that

1   is it a fair statement to say that this fatality resulted as a

2   result of primarily of compression of the carotid artery?   Is

3   that a fair statement to say?

4   A   That's partially a fair statement.

5   Q   And isn't that your diagnosis primarily that the

6   carotid artery had pressure applied for an extended period of

7   time?

8   A   That's the mechanism, along with the vein, the jugular

9   vein that keeps blood from going in and out of the brain.

10   Q   But the jugular vein, there's no mention of the jugular

11   vein being compressed in your report, is there?

12   A   Well, that's a mechanism.

13   Q   Do you want to look at your report --

14   A   Which page are you referring to, sir?

15   Q   -- to refresh your memory?

16       MR. W. BAILEY:   May I, Your Honor?

17       THE COURT:   You may.

18       MR. W. BAILEY:   I'll let Mr. Lafferty do it.

19   Q   Is there anywhere in that report about the jugular vein

20   being involved with compression?

21   A   Well, I have a copy here.   I thought you were referring

22   to a particular page.

23   Q   No.   No.   I'm just talking about anywhere in your

24   report did you make any reference to the jugular vein?   Take

25   your time.

1    A    I didn't make direct reference to the jugular vein or

2    the carotid artery because that's the mechanism.

3    Q    May I have that back?  Now we've got the thyroid

4    cartilage in place, haven't we?  I mean, no fracture?

5    A    That's correct.

6    Q    And wouldn't that be eventful or informational to know

7    if there had been a fracture of that thyroid cartilage?

8    A    Yes.

9    Q    That would have been indicative of trauma, wouldn't it?

10   A    You mean to have a fracture there?

11   Q    Yeah.

12   A    That would be further evidence of trauma.

13   Q    Yeah.  And the hyoid bone, there's no evidence of

14   fracture there either, is it?

15   A    That's correct.  It's very flexible at that age.

16   Q    All right.  Show us on your model that you brought, you

17   wouldn't mind exhibiting that again?

18   A    Of course not.

19   Q    All right.  The thyroid cartilage, is the -- what is

20   known as the Adam's apple, isn't it?

21   A    In the male, it is.

22   Q    All right.  And that was intact, no disturbance there?

23   A    No, that's not correct, sir.

24   Q    Except for hemorrhaging.

25   A    That's correct.

522

1    Q    All right.  And the same thing about the hyoid bone,

2    there's nothing eventful about it except for hemorrhaging in

3    that area?

4    A    That's correct.

5    Q    All right.  Thank you.  You may put it down.  Now let

6    me -- you had -- I believe you mentioned that you examined

7    both the external features of the body first, didn't you; is

8    that correct?

9    A    That's correct.

10   Q    That's normal protocol?

11   A    That's correct.

12   Q    All right.  And as part of that process, you didn't see

13   anything informational about the exterior surface of the body,

14   did you?

15   A    I don't believe I testified to that, sir.

16   Q    Well, did you?

17   A    Yes, I did.

18   Q    Did you make notes of anything eventful or

19   informational about the external portion of the body?

20   A    Yes, I did.

21   Q    You mention the neck.

22   A    That's correct.

23   Q    The redness of the neck.

24   A    The redness of the neck, the bruises on the neck, the

25   --

1    Q    But the other portions of -- the entire other -- the

2    body, the chest cavity portion and the lower limb and the

3    upper limb, none of that showed any disturbance at all?

4    A    That is correct.

5    Q    What I'm getting at is there weren't any defensive

6    wounds, were there?  You know what defensive wounds are, don't

7    you?

8    A    Yes, sir, I do.

9    Q    Do you recall any defensive wounds?

10   A    No, sir.

11   Q    All right.  Explain to the jury what defensive wounds

12   are.

13   A    Defensive wounds can be wounds that occur when one is

14   trying to defend themselves.

15   Q    And that's normal, isn't it?  That's almost done

16   instinctively in an attack, isn't it?

17   A    It depends on how the person is attacked and what

18   condition there is and whoever the person is that's attacking

19   him.  Depends if there is a weapon is being used.  There are

20   many different considerations.

21   Q    Right.  But the bottom line is there are no defensive

22   wounds here?

23   A    No, there are not.

24   Q    All right.  Now let me ask you.  Let's talk about the

25   fingernails.  There's a photograph here with bags on the

1    fingernails.  Do you recall bags being on the fingernails when

2    you saw the remains?

3        A    Yes, the body was presented with bags around the hands.

4        Q    And that's -- there's a purpose for that, isn't there?

5        A    That is correct.

6        Q    Explain to the jury what that purpose is.

7        A    The purpose is to protect the hands if there is any

8    evidence there or if there's a need to make identification,

9    the hands are routinely bagged by law enforcement officers at

10   the scene.

11       Q    But let me show you, may I hand you this photograph.

12   And there are bags on the hands; is that correct?

13       A    That's correct.

14       Q    What kind of bags are they?

15       A    They're brown paper bags.

16       Q    And isn't the bags to preserve information?  Don't they

17   serve that purpose?

18       A    Yes, that's what I just said.

19       Q    Right.  Information about a defense or defensive

20   reaction; is that not correct?

21       A    Any information, sir.

22       Q    Right.  And you look under the fingernails for DNA,

23   don't you?

24       A    Well, you routinely for completeness sake look under

25   the fingernails and at the condition of the fingernails.  And

1     on many occasions you might collect tissue from underneath the

2     fingernails.

3     Q    Because when one is being attacked, you expect normally

4     there to be some DNA under the fingernails; is that not

5     correct?

6     A    I wouldn't say normally.  On many --

7     Q    But in many instances?

8           MS. WEIRICH:  Judge, if she could be allowed to

9     answer.

10          THE COURT:  Yes.  Please let her complete her

11    answer.

12          MR. W. BAILEY:  All right.  Very well.

13    Q    In many instances.

14    A    That is correct, sir.

15    Q    And that's why you preserve the hands from

16    contamination with bags over the fingernails?

17    A    That's one of the reasons, yes.

18    Q    All right.

19          MR. W. BAILEY:  May we mark that as an exhibit,

20    Your Honor?

21          THE COURT:  You may.  45.

22          (Exhibit No. 45 was marked and filed.)

23    Q    Now let me hand to you what is a more -- and these are

24    lab pictures, are they not?

25    A    These are photos that I had directed to be taken.

1   Q    In the lab?

2   A    In the morgue, yes, sir.

3   Q    All right.  And that's a more dramatic presentation of

4   the hands showing the fingernails; is that not correct?

5   A    Well --

6   Q    A blown-up version.  Let's put it that way.

7   A    It's an enlargement of the hand showing the

8   fingernails.

9   Q    And there was a purpose for that to show that you had

10  examined the hand and the fingernails and that the examination

11  was uneventful; is that correct?

12  A    Well, this photograph shows the hand that has acrylic

13  nails glued on.  And that's important to document that.

14  Q    Right.

15  A    Underneath are the natural nails.

16  Q    Because oftentimes in a struggle those acrylic nails

17  are disturbed, aren't they?

18  A    It depends on how well they are attached.

19  Q    I see.  But those are just normal as if nothing has

20  happened to those hands at all.  Is that a fair statement?

21  A    That's correct.  The hands are not injured.

22  Q    I don't mean injured, I'm talking about in any sort of

23  way are the nails damaged?

24  A    There's no damage to the nails.

25  Q    All right.  Now let me ask you, so it's not your

1    testimony that the, as I understand what you're telling us,

2    it's your testimony that you don't single in on the carotid

3    arteries as being the pressure points, primary pressure points

4    upon which strangulation or suffocation occurred; is that your

5    testimony?

6    A    That's not my testimony.

7    Q    Well, is that your testimony?

8    A    That was not my testimony.

9    Q    I'm asking you is that your testimony -- is that within

10   your opinion, is that the primary source of strangulation, the

11   carotid arteries?

12   A    I don't understand your question.

13   Q    I think my question is pretty simple.

14        MS. WEIRICH:  Argumentative, Your Honor.

15        THE COURT:  Sustained.

16        MR. W. BAILEY:  Very well.  Thank you, Your Honor.

17        THE COURT:  Just ask a question.  You don't have

18   to state whether you think it's simple or not.  Just ask the

19   question.  Rephrase it if the witness doesn't understand.

20        MR. W. BAILEY:  Very well.

21        THE COURT:  Just as you indicated at the beginning

22   of your examination.

23        MR. W. BAILEY:  Very well.

24   Q    All right.  Now, let me ask you.  You, I believe, said

25   that you didn't mention the carotid arteries as having unusual

1    pressure applied in your report.  Is that -- did I understand

2    you correctly?

3        A    That is correct.

4        Q    And are you telling this jury that that wasn't a focal

5    point of the strangulation?

6        A    No, I have not told the jury that.

7        Q    Well, I'm asking you in your opinion is that a focal

8    point of the compression?

9        A    It is the mechanism.

10       Q    No, ma'am.  I'm sorry.  I didn't ask you that.

11            MS. CARNESALE:  Judge, she's trying to answer the

12   question.

13            THE COURT:  Let her complete her answer.  Then if

14   you want to follow-up with another one, you may.  But she got

15   two words out, three words out.  Let her finish her answer and

16   then you may ask the next question.  Go ahead.

17            WITNESS CARTER:  Thank you, Your Honor.

18       A    It's the mechanism that reduces the blood flow in and

19   out of the brain.  It is the encircling of the neck with firm

20   pressure that creates the injuries that were documented in

21   this case that allows me to give the opinion that the

22   mechanism, how the death occurred is that the blood flow was

23   restricted into the central nervous system.  It's a little

24   different because these vessels are very flexible and they

25   don't necessarily have to show any type of injury.

1    Q    Well, do you have an opinion as to whether or not the

2    carotid arteries were restricted?

3    A    In a case of strangulation --

4    Q    No, ma'am.  Go ahead.  I'm sorry.

5    A    Either the jugular vein can be compressed or the

6    carotid artery.  You can obstruct flow in or out and cause the

7    same problem.

8    Q    I'm asking you in the case of Ms. Braswell, Ms. Sheila

9    Braswell, was that the case dealing with carotid arteries?

10    A    In my opinion with the amount of injury that was

11    observed, both vessels would have been compressed.

12    Q    But you don't mention that in your report?

13    A    That's because it's a mechanism, sir, and the mechanism

14    we use to explain to the jury to explain how the death

15    occurred.

16    Q    Now let me also ask you.  You said that there was no --

17    that this was manual strangulation, but when we talk about

18    manual strangulation, that can characterize many traumatic

19    applications of strangulation, can't it?

20    A    I don't know what you mean by "many."

21    Q    By that I mean it doesn't necessarily involve the

22    hands?

23    A    The term usually refers to the hands, manual.

24    Q    Well, can you not manually use a ligature and strangle

25    somebody?  Isn't that manual strangulation?

1    A    Actually the ligature itself is what does the

2  strangulation and that is called ligature strangulation.

3    Q    So you differentiate between in your characterizing of

4  strangulation for manual, if you thought that a device was

5  employed, you would call it ligature strangulation.  Is that

6  what you're telling the jury?

7    A    That's correct.  There would be a different pattern to

8  the injury.

9    Q    And that's what you always do?

10    A    That's --

11    Q    In your definition of a strangulation?

12    A    It's not just my definition.  It's the definition used

13  in the major forensic textbooks.

14    Q    I see.  Now let me ask you.  You mentioned ligatures

15  could run the range of anything from a strap to a cord; is

16  that a fair statement?

17    A    Yes, it is.

18    Q    And it also -- but if you don't use a device such as a

19  ligature, which is nothing more than a device such as a strap,

20  cord or whatever, rope, bathrobe cord; is that a fair

21  statement?

22    A    Yes, it is.

23    Q    If you use the arm, that's not a ligature, is it?

24    A    No, it's not.

25    Q    That's manual.  That's just purely manual; right?

1    A    That's a form of manual, yes, it is.

2    Q    Uh-huh.  And if you use the forearm, let's talk about

3    portions of the arm.  Let me start with the hand.  Hand you

4    say would be manual; right?

5    A    That's correct.

6    Q    Forearm would be manual; right?

7    A    It's a form of it and that's really stretching the

8    definition there.  Those are different types of holds that are

9    described differently.

10   Q    All right.  Before we start talking about holds, there

11   are certain type holds out there?

12   A    Yes, sir.

13   Q    What is a bar hold?

14   A    A bar hold?

15   Q    Uh-huh.

16   A    I don't know.

17   Q    You don't know what bar hold is.  Do you know what a

18   sleep hold is?

19   A    Yes, I do.

20   Q    All right.  Is that terminology in your profession,

21   sleeper hold?

22   A    I think it's more in police profession.  We don't use

23   that.

24   Q    You don't use sleeper hold in your profession is what

25   you're telling the jury?

1    A     That's correct.  I've never used the term.

2    Q     All right.  Now so you don't -- will you tell the jury

3    in your opinion precisely what particular arteries or what

4    particular portion of the neck -- neck is often called the

5    larynx, isn't it?

6    A     That's the internal structures of the neck.

7    Q     What happened within that internal structure of the

8    neck in this strangulation?  Can you tell the jury what was

9    emphasized?  Where were the points of emphasis?  Do you know?

10   Let me first ask you do you know?

11   A     Yes, sir, I do.

12   Q     All right.  What were they?

13   A     As I showed the jury in the photographs, there were

14   multiple points of injury on the larynx, on the pharynx, on

15   the internal surface of the larynx and the thyroid cartilage,

16   as well as the strap muscles that attach the head to the neck.

17   Q     I believe you said that -- let me just ask you.  I want

18   to make sure I understand your manual strangulation.  Within

19   forensic sciences, manual strangulation is the application of

20   the arm, forearm or the armpit is that -- I mean the elbow

21   bent?

22   A     It's usually an indication of the hands encircling the

23   neck.

24   Q     Well, what do they call it if the arm is used?

25   A     They usually call it a hold, a yoke or a choke hold.

1  Q     Choke hold?  They don't call that the manual?  Is that

2  your testimony?

3  A     Yes, sir, that's a different category.  It's a very

4  broad term for asphyxial deaths.  There are many different

5  categories underneath that.

6  Q     Well, quite frankly, there's -- in terms of looking at

7  the signs, or the findings I should say in medical parlors,

8  there's no -- you really can't -- you're not -- you really

9  can't tell the difference between hands or the forearm, can

10  you?

11  A     You can in the way the injuries are laid out on the

12  structures because you have fingertips and you have different

13  areas of pressure.  And in this particular case, there are

14  many different areas of pressure and degrees of injury with

15  the blood escaping into the muscle tissue, versus generally

16  the history of an arm being folded around the neck would not

17  give you this same pattern of discreet injuries to the muscle

18  tissue.

19  Q     I'm talking about the forearm.

20         MS. WEIRICH:  If she could finish, Judge.

21         MR. W. BAILEY:  I think she had.

22         THE COURT:  Go ahead.  Ask your next question.

23  Q     I'm talking about the forearm.

24  A     The forearm around the neck would give you a wide

25  distribution of pressure versus individual areas of injury

1    that I have described and demonstrated for the jury.

2        Q    Now you're not trying to tell this jury that you've

3    always been 100 percent correct, are you?

4        A    I don't think I've said that to the jury at all today.

5        Q    And you've been wrong in many instances, haven't you?

6        A    I'm human like everybody else.

7        Q    And your opinions have been wrong in many instances,

8    have they not?

9        A    In some cases I'm sure they have been.

10       Q    All right.  And of course your practice isn't an exact

11   science, is it?

12       A    Medicine has never been an exact science.

13       Q    All right.  It's a practice.  Is that correct?

14       A    It's an art, yes, that we practice.

15       Q    And what you do is render an opinion.  And oftentimes

16   your other professionals take exceptions to your opinion; is

17   that correct?

18       A    I would not agree with that, sir.

19       Q    Well, we won't go into that in terms of -- but let me?

20            MS. WEIRICH:  Objection, Your Honor.  May we

21   approach?

22            (Bench conference commenced.)

23            THE COURT:  Mr. Bailey, that was really uncalled

24   for to state in front of the jury "Well, we won't go into

25   that," leaving the unanswered implication that there are all

1    sorts of examples that you can cite where professionals have

2    disagreed with her opinions.

3              MR. W. BAILEY:  Your Honor, let me explain.  My

4    reference to that was I don't want to continue on this line of

5    questioning.  That's what I meant.

6              THE COURT:  Well, it was pretty obvious that you

7    asked her, the very question before was, there have been in

8    fact a lot of disagreements by professionals with your

9    opinions, haven't there?  And she said, no, I don't agree with

10   that.  And then you pause and said well, we won't go into

11   that.  I mean, it seems pretty coincidental that that

12   gratuitous comment would come right after that question and

13   answer.

14             MR. W. BAILEY:  Well, I started to ask another

15   question and I decided I said, we won't go into that.  That's

16   what I meant.

17             THE COURT:  Okay.

18             (Said bench conference concluded.)

19   Q    Let's talk about occlusion.  Define to the jury what

20   occlusion is.

21   A    Occlusion usually refers to when a vessel is blocked

22   from blood flow.  That's usually indicating that there's

23   atherosclerosis or hardening of the arteries that narrows down

24   the area the blood would flow through.

25   Q    And did you find occlusion here?

```
 1      A    No.

 2      Q    There was no occlusion here?

 3      A    That's correct.

 4      Q    All right.  Now I believe you said that it takes --

 5  sometimes it takes minutes for a person to reach the point of

 6  fatality as a result of asphyxia; is that correct?

 7      A    That's correct.

 8      Q    But that depends.  It varies from individual to

 9  individual, doesn't it?

10      A    Yes, it does.

11      Q    And it could be as short -- would it be a fair

12  statement to say as 45 seconds?

13      A    We usually say 90 seconds in an infant.

14      Q    90 seconds?

15      A    Yes, sir.

16      Q    All right.  So it can range anywhere from 90 seconds to

17  the state of anoxia which is deprivation of oxygen to the

18  brain fatally, isn't it?

19      A    That's correct.

20      Q    It could be anywhere from 90 seconds to anoxia,

21  couldn't it?  I mean, in terms of time period, it could be 90

22  seconds to minutes?

23      A    That's correct.

24      Q    All right.  Now a person is rendered -- can be rendered

25  unconscious in even a matter of seconds, couldn't they?
```

1    A    That's correct.

2    Q    Let's say 10 or 15 seconds you can be rendered

3    unconscious; is that not a fair statement?

4    A    That's correct in some situations.

5    Q    All right.  Now let's talk a moment about

6    autoasphyxiation.  And of course I understood your testimony

7    on direct you defined it as one person involved in hanging him

8    or herself; is that correct?

9    A    Well it's not necessarily hanging.

10   Q    Not, okay.

11   A    But it's inducing a state of low oxygen.

12   Q    And some people get off on that and use sex toys along

13   with that process, don't they?

14   A    That's correct.

15   Q    Such sex toys as dildos and other devices if you're

16   female; is that correct?

17   A    I've seen it in both sexes, sir.

18   Q    And men masturbating; is that correct?

19   A    Yes, men and women.

20   Q    I see.  And I think you said you've seen this

21   widespread and many times; is that a fair statement?

22   A    I said I've seen it many times.

23   Q    And individuals brought in as a result of it?

24   A    I've seen it directly at scenes.  I've seen individuals

25   brought in.

1    Q   And you also, I understand, have seen couples involved

2  -- I mean, the result of where couples have been involved in

3  this process; is that a fair statement?

4    A   That is a fair statement.

5    Q   Many times?

6    A   Many times.

7    Q   Where couples where the -- one of the parties involved

8  accidentally, it resulted in death?

9    A   That's correct.

10    Q   It's a risky process, needless to say; is that not a

11  fair statement?

12    A   That is a fair statement.

13    Q   But both parties assume the risk, don't they?

14    A   Well, I don't know that.

15    Q   Uh-huh.  Now one thing you mentioned was that in terms

16  of Ms. Braswell, you don't have knowledge of where her body

17  was initially found, do you?  You just saw the photographs?

18    A   I was given information by the police, a statement that

19  was made, and then I did see the photographs.

20    Q   All right.  But in terms of where the first -- where

21  the body first rested after being taken out of the tub, you

22  don't have that information, do you?

23    A   After being taken out of the tub?

24    Q   Uh-huh.

25    A   I don't have that exact information.  We had statements

1   written up by the police.

2       Q     All right.  Now one of the things you mentioned that

3   you said would be informational regarding erotic asphyxiation

4   would be the environment.  You didn't say environment, but I'm

5   using environment to mean the surroundings; is that not a fair

6   statement?

7       A     That's right I didn't say environment, you're correct.

8       Q     But using my terminology "environment," would you not

9   say that sex toys would be very helpful information if you

10  were aware that there has been sex toys present?

11      A     The whole scene examination is important; sex toys,

12  pornographic material.

13      Q     Right.

14      A     Substitutes for sex toys.

15      Q     Right.

16      A     Repetitive behavior and the positioning of how the body

17  is found or of that description would all be important, as

18  well as the examination of the body and the nature of the

19  injuries that are there.

20      Q     And that's important in both autoasphyxiation as well

21  as erotic and I'm distinguishing.  I'm calling where couples

22  are involved erotic.  Both are the same though, aren't they?

23  Except in one instance you've got two people and auto you've

24  just got one person?

25      A     That's correct.  To my knowledge the term is autoerotic

1    asphyxia.

2      Q    All right.  So let's talk about couples.  It would be

3    -- again it would be helpful to know the sex practice of the

4    couples, wouldn't it?

5      A    If that can be known, yes.

6      Q    And that would be very informational, wouldn't it?

7      A    It would be.

8      Q    And exotic devices on the body such as rings being

9    pierced in the nipples and in the stomach, would that be

10   informational?

11     A    That's informational.  It doesn't necessarily go with

12   autoeroticism.

13     Q    But it's informational?

14     A    It is informational, sir.

15     Q    Okay.  It would cause you to scratch your head,

16   wouldn't it?

17     A    Scratch my head?

18     Q    Well, by that I mean cause you to wonder.

19     A    It may cause you to wonder, but I'm an experienced

20   pathologist and this is not unknown in the forensic section.

21     Q    I see.  So you've seen a lot of fatalities where the

22   persons came in with the bodies pierced?

23     A    Yes, sir.

24     Q    All right.  And you say that with emphasis?

25     A    Yes, sir.

1  Q    All right.  Now we know that the necklace on Ms. Sheila

2  Braswell remained intact on her neck when you saw the

3  photograph?

4  A    That's correct.

5  Q    And we know that -- did that in any sort of way capture

6  your attention in particular?

7  A    I noted that it was there and had it photographed and

8  looked at the condition of it and removed it.  You know, we

9  looked at the body and that's part of what a forensic

10  pathologist would do.

11  Q    But isn't it also a fair statement to say that in many

12  instances you find where if a necklace has been pulled apart

13  or broken in a struggle situation?

14  A    Well, that depends on the situation.

15  Q    I mean defensively.

16  A    Well, you can't just say defensively.  You look at how

17  the body is presented to you and the condition of whatever is

18  on the body.  If it's broken you note that.  If it's bloody,

19  you note that.  If it's intact you note that.

20  Q    I understand.  Now how widespread is this erotic

21  asphyxiafilia?  That's another name for asphyxiation, isn't

22  it?  Asphyxiafilia, isn't that the erotic name for it?

23  A    I've never used that name.

24  Q    Okay.  But in any event, let's say asphyxiation then.

25  How widespread is this spousal or couple asphyxiation?  It's

1    pretty frequent, isn't it?  In your practice?

2       A    I actually can't -- can't say that.  Those are usually

3    private practices and unless somebody dies, we would not know

4    how many couples actually perform this.

5       Q    And in many instances -- on that note, in many

6    instances what happens is when a person -- death does result

7    from a miscalculation of time in that kind of situation.  Time

8    is precious, isn't it?

9       A    Always.

10      Q    And when you have a miscalculation of time you have an

11   unintentional death sometimes, don't you?

12      A    Sometimes you do.

13           MR. W. BAILEY:  Very well, thank you.

14           THE COURT:  Redirect?

15

16                    REDIRECT EXAMINATION

17   BY MS. CARNESALE:

18      Q    Dr. Carter, did you see evidence of trauma on Sheila

19   Braswell?

20      A    Yes.

21      Q    Specifically what was that?

22      A    Evidence of trauma to the neck muscles, to the skin,

23   the tissue underneath the skin and to the larynx.  And the

24   other evidence, of course, is the pressure that results in the

25   injury that we saw to the eyes.

```
1    Q    So she had trauma basically all the way through her

2    muscle and tissue to the stuff that's underneath?

3    A    That's correct.

4    Q    Or lack of a better medical way to put it?

5    A    Internal structures.

6    Q    Internal structures.  And that's what we saw in the

7    photographs when you dissected the neck and put in the

8    solution and part of the tissue went away; right?

9    A    That's correct.

10   Q    And then the hemorrhaging in the eyes, that's trauma?

11   A    That's resulting from trauma, yes.

12   Q    I think Mr. Bailey has me confused.  Carotid and

13   jugular, can you explain what those are and where they are?

14   A    Yes.  The carotid vessels are the arteries that carry

15   blood directly into the brain.  And the jugular veins carry

16   blood away from the vein so that it's recirculated with fresh

17   oxygen and the heart and lungs.  These vessels occur literally

18   just below your ear.  That broad muscle that I told you about

19   earlier covers those.  That's how people get fluid through the

20   jugular vein when they have a collapse or they're low in

21   fluid.  These are vessels and they can be compressed and leave

22   no mark.  That's the mechanism that is explained and not put

23   into the death certificate as to how the effect of asphyxia

24   occurs, the prevention of blood flow in and out of the brain.

25   Q    And basically when someone is strangled, that flow is
```

1   being prevented both into and out of?

2      A   When someone is strangled that flow is being prevented,

3   as well as the difficulty in getting air in and out of the

4   respiratory tract.

5      Q   Which is the nose and --

6      A   The nose and the mouth going into the lungs, which is

7   your source of fresh oxygen.

8      Q   How long does it take to manually strangle an adult?

9   You told Mr. Bailey 90 seconds perhaps for an infant but

10   what's the minimum time for an adult?

11      A   Textbooks give a range of three to seven minutes.  You

12   can't be more precise without taking a human being and

13   submitting them to injury in this way.  So we know that the

14   brain cannot survive maximally after seven minutes without

15   oxygen.

16      Q   Have you ever heard of a case taking less than three

17   minutes in an adult?

18      A   Yes.  It depends on what kind of trauma you have where

19   someone is compressed to where they actually break the thyroid

20   cartilage or stuff an object down there or use some type of

21   gas that would give you another type of asphyxia, like cyanide

22   occurs very rapidly.  It's poisoning at the cellular level so

23   I mentioned there are very many different kinds of asphyxial

24   death that occur.

25      Q   How about for manual strangulation?

1     A    Depending on the force used and what kind of injuries
2  we see, you have to give the range of three to seven minutes,
3  unless you have something that would cause instantaneous
4  death, which is unusual in a strangulation death,
5  instantaneous.
6     Q    And in this case was death instantaneous?
7     A    In my opinion it was not.  This is an occurrence over
8  several minutes.  You had the well-formed areas of bleeding in
9  the muscle.  You have those petechiae that have taken time to
10  form completely inside of the larynx and the eyes.  That took
11  some time to occur.
12     Q    Do they form before a person -- or in this case before
13  Ms. Braswell died?  Is that when they formed?
14     A    Because an increase in pressure and when a person has
15  died, you're not going to develop petechiae after death.  It's
16  a condition of blood flow.  So these have formed while the
17  injury is being produced in what we call the peri-mortem
18  period as the body is beginning to shut down, you still have
19  some little pumping.  You still have some blood flowing and
20  that pressure is resulting in those petechiae hemorrhages.
21     Q    Now you observed injuries, is it fair to say, all
22  around the neck?
23     A    That is correct.
24     Q    Sorry?
25     A    That is correct.

1    Q    There was some discussion about manual, what is manual.

2    By "manual" do you mean with someone's hands?

3    A    Yes.

4    Q    You told Mr. Bailey and I missed the end of your

5    response.  I believe he asked you could it have been done --

6    could Ms. Braswell have been strangled with someone's forearm

7    and I believe you stated --

8              MR. W. BAILEY:  Your Honor, I think this is

9    leading.

10             MS. CARNESALE:  Judge, I'm trying to clarify and

11   I'll rephrase it if you wish, but I'm trying to repeat what he

12   said to clarify my confusion.

13             THE COURT:  Yes, you may ask.

14   Q    Mr. Bailey I believe asked you if this strangulation

15   could have occurred by the use of someone's forearm.  I heard

16   you to say that you would have seen a wide range of injuries.

17   Is that what you were saying to him?

18   A    What I was trying to say is you have a distribution of

19   pressure when a forearm is used that's not going to give you

20   these particular areas of injury to the muscles that were

21   described and documented.  It's a different process.  The end

22   result is the same, but it's a different process that causes

23   these injuries to the neck structures.

24             MS. CARNESALE:  Thank you.  No further questions.

25             THE COURT:  Anything further, Mr. Bailey?

1          MR. J. BAILEY:  Nothing further, Judge.

2          THE COURT:  You may step down.  Can I see y'all at

3     the bench?

4               (Bench conference commenced.)

5          THE COURT:  You have one additional witness you

6     need to get on tonight before --

7          MS. WEIRICH:  I think so but let me just check.

8     We may even be to the point now she has to stay overnight

9     anyway.  And if that's the case and Your Honor wants to

10    adjourn --

11         THE COURT:  If she's going to have to stay

12    overnight anyway, then let --

13         MS. WEIRICH:  Let me find out.

14         MR. J. BAILEY:  May I say this to the Court?  I

15    think if we're talking about Ms. Woods, our cross-examination

16    is going to be pretty long of her.  So I would just want to --

17    so we will have a gauge of time.  So she may have to stay

18    over --

19         THE COURT:  Yeah.  I think you're probably going

20    to need to make arrangements.  I mean, you can talk to her.

21    We'll take a break.

22         MS. WEIRICH:  Those arrangements may have already

23    been made.  I don't know.

24         MR. W. BAILEY:  Your Honor, one other thing was in

25    terms of marshaling our proof, --

1          THE COURT:  Let me send the jury out.

2          MR. W. BAILEY:  Very well.

3              (Said bench conference concluded.)

4          THE COURT:  Ladies and gentlemen, we'll take a

5     brief recess and call you back.

6              (Jury out.)

7          MS. WEIRICH:  Her flight is at 8:30 in the

8     morning, Judge.  And it's apparently a nonrefundable ticket

9     that we bought under the -- thinking that we could get her on

10    and off tonight.

11         THE COURT:  Well, I just don't know how realistic

12    it is.  I mean, the Attorney General's office may just have to

13    buy another ticket because the direct I suspect will be fairly

14    long.  The cross I'm sure will be very long.  And so we would

15    have to stop for dinner for the jury's sake.  I mean, it would

16    be 11 o'clock at night before we finished that testimony

17    probably, and I just don't think that that's appropriate or

18    wise.  So I regret the added expense but I think that that's

19    going to be unavoidable.  She had planned to stay overnight

20    anyway but take a flight out tomorrow; right?

21         MS. WEIRICH:  Would be out first thing in the

22    morning, yes, sir.

23         THE COURT:  Well, she'll have to stay overnight

24    and just have to take a later flight.  And y'all can get her

25    an afternoon flight or an evening flight tomorrow or something

1    of that sort.  And just do what you can with the other ticket.

2    I think we're just going to have to do that.

3         And then with regard with your marshaling of the proof?

4    I would suspect that after lunch would be a safe assumption so

5    1:30 if you would have your proof ready at 1:30, we won't get

6    to it before then.  Even if for some reason we should finish

7    the State's proof midmorning or late morning, we'll wait until

8    1:30 to start your proof so have your proof lined up to begin

9    at 1:30 tomorrow.

10        MR. J. BAILEY:  Let me -- one second.  Nothing

11   further.

12        THE COURT:  Bring the jury back in, please.

13        (Jury present.)

14        THE COURT:  All right.  Ladies and gentlemen,

15   we've reached a stopping point for the day, and I just wanted

16   to bring you back in and remind you again not to discuss the

17   case or anything about the case overnight.  And we will resume

18   the trial at nine o'clock tomorrow morning.  We'll see you at

19   that time.

20        (Jury out.)

21        THE COURT:  Take him out, please.  You may adjourn

22   court.

23

24

25

```
 1                  (Court was adjourned until 9 a.m.,

 2                   Thursday, December 8, 2005.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                      (END OF VOLUME THREE)
```