W2006-01081-CCA-R3-CD

IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

THE THIRTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE )          ORIGINAL

)

vs.                 )          Case No.  05-03038

VERN BRASWELL,      )          8-16-06

Defendant.     )          Cleared

------------------------------------------------

TRANSCRIPT OF EVIDENCE

Volumes 9 OF 11 Volumes

DECEMBER 5, 2005

------------------------------------------------

THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

<u>APPEARANCES</u>

FOR THE STATE:

    BETSY CARNESALE AND AMY WEIRICH
    Assistant District Attorneys General
    District Attorney General's Office
    201 Poplar Avenue - Third Floor
    Memphis, TN  38103

FOR THE DEFENDANT:

    J. BAILEY AND WALTER BAILEY
    Attorneys at Law
    100 North Main - Suite 3002
    Memphis, TN  38103

FILED

NOV 0 2 2006

Clerk of the Courts

Reported by:
**Katherine Knowles**
Court Reporter

Vol. 9

| | | |
|---|---|---|
| 1 | TABLE OF CONTENTS | |
| 2 | VOLUME ONE | |
| 3 | | PAGE |

| | | |
|---|---|---|
| 4 | Appearances | 1 |
| 5 | Table of Contents | 2 |
| 6 | List of Exhibits | 9 |
| 7 | Style and Caption | 13 |
| 8 | **Monday, December 5, 2005** | |
| 9 | Pre-trial Motions | 14 |
| 10 | Voir Dire Examination and Jury Selection | 25 |
| 11 | **(VOLUME TWO)** | |
| 12 | **Tuesday, December 6, 2005** | |
| 13 | **VERN BRASWELL** | |
| 14 | Voir Dire Examination (By Mr. J. Bailey) | 185 |
| 15 | Jury Sworn | 187 |
| 16 | Reading of Indictment and Entry of Plea | 187 |
| 17 | Opening Statements (By Ms. Weirich) | 187 |
| 18 | Opening Statements (By Mr. W. Bailey) | 192 |
| 19 | **STATE'S PROOF** | |
| 20 | **PEARLINE WASHBURN** | |
| 21 | Direct Examination (By Ms. Weirich) | 199 |
| 22 | **ANGELA SNYDER** | |
| 23 | Direct Examination (By Ms. Weirich) | 227 |
| 24 | **JESSICA GREEN** | |
| 25 | Direct Examination (By Ms. Weirich) | 236 |

1                    <u>TABLE OF CONTENTS</u>

2                        <u>VOLUME ONE</u>

3                                            <u>PAGE</u>

4  **ROOSEVELT COLEMAN**

5        Direct Examination (By Ms. Weirich)     243
         Cross-Examination (By Mr. J. Bailey)    247

6

7  **LIEUTENANT JACKSON**

8        Direct Examination (By Ms. Carnesale)    250
         Cross-Examination (By Mr. J. Bailey)    264

9        Redirect Examination (By Ms. Carnesale)   270

10  **BABA TANZY**

11       Direct Examination (By Ms. Carnesale)    271
        Cross-Examination (By Mr. W. Bailey)    283

12

13  **MATT HAMM**

14       Direct Examination (By Ms. Carnesale)    285
        Cross-Examination (By Mr. W. Bailey)    293

15       Redirect Examination (By Ms. Carnesale)   295

16  **OFFICER GALLOWAY**

17       Direct Examination (By Ms. Weirich)     296
        Cross-Examination (By Mr. J. Bailey)    308

18

19  **SERGEANT KJELLIN**

20       Direct Examination (By Ms. Carnesale)    313
        Cross-Examination (By Mr. J. Bailey)    323

21       Redirect Examination (By Ms. Carnesale)   328

22  **SERGEANT MERRITT**

23       Direct Examination (By Ms. Weirich)     328

24

25

TABLE OF CONTENTS

VOLUME ONE

PAGE

**LIEUTENANT MILLER**

Direct Examination (By Ms. Weirich)          362
Cross-Examination (By Mr. W. Bailey)         368
Redirect Examination (By Ms. Weirich)        369

**(VOLUME THREE)**

**Wednesday, December 7, 2005**

**DARRELL BURTON**

Direct Examination (By Ms. Carnesale)        384
Cross-Examination (By Mr. J. Bailey)         389

**JERRY BROWN**

Direct Examination (By Ms. Carnesale)        390
Cross-Examination (By Mr. J. Bailey)         395

**BENJANETTE STURDEVANT**

Direct Examination (By Ms. Carnesale)        396
Cross-Examination (By Mr. J. Bailey)         403

**LIEUTENANT MITCHELL**

Direct Examination (By Ms. Carnesale)        407
Cross-Examination (By Mr. J. Bailey)         414

Jury-Out Hearing                             419

**OFFICER FAIR**

Direct Examination (By Ms. Weirich)          424
Cross-Examination (By Mr. W. Bailey)         432
Redirect Examination (By Ms. Weirich)        434

TABLE OF CONTENTS

VOLUME ONE

PAGE

**CAROLYN CHAMBERS**

    Direct Examination (By Ms. Weirich)    435

**OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    444

Jury-Out Hearing

    **OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    448
    Cross-Examination (By Mr. J. Bailey)    450

**OFFICER WALLS**

    Direct Examination Continued (By Ms. Carnesale)    451
    Cross-Examination (By Mr. W. Bailey)    455
**WILLIAM MANGUM**
    Direct Examination (By Ms. Weirich)    457
    Cross-Examination (By Mr. J. Bailey)    468
    Redirect Examination (By Ms. Weirich)    475
    Recross Examination (By Mr. J. Bailey)    476

**DOCTOR CARTER**

    Direct Examination (By Ms. Carnesale)    478
    Cross-Examination (By Mr. W. Bailey)    518
    Redirect Examination (By Ms. Carnesale)    542

**(VOLUME FOUR)**

**Thursday, December 8, 2005**

**KRISTIE WOODS**

    Direct Examination (By Ms. Weirich)    563
    Cross-Examination (By Mr. J. Bailey)    618
    Redirect Examination (By Ms. Weirich)    629

TABLE OF CONTENTS

VOLUME ONE

PAGE

Jury-Out Hearing

**VERA COLE**

    Direct Examination (By Ms. Weirich)    633
    Cross-Examination (By Mr. W. Bailey)   637

**MAGRA HARDEN**

    Direct Examination (By Ms. Weirich)    640
    Cross-Examination (By Mr. W. Bailey)   645

    Court's Ruling    653

**KRISTIE WOODS**

    Redirect Examination Continued (By Ms. Weirich)   658
    Recross Examination (By Mr. J. Bailey)   660
    Further Redirect Examination (By Ms. Weirich)   662

**SHERONDA SMITH**

    Direct Examination (By Ms. Carnesale)   667
    Cross-Examination (By Mr. J. Bailey)   678

**VERA COLE**

    Direct Examination (By Ms. Weirich)    682
    Cross-Examination (By Mr. J. Bailey)   690
    Redirect Examination (By Ms. Weirich)   693
    Recross Examination (By Mr. J. Bailey)   695

**MAGRA HARDEN**

    Direct Examination (By Ms. Weirich)    698
    Cross-Examination (By Mr. W. Bailey)   703

Motion for Judgment of Acquittal    706

# TABLE OF CONTENTS

## VOLUME ONE

|  | PAGE |
|---|---|
| State Rests | 709 |

**(VOLUME FIVE)**

**DEFENSE'S PROOF**

**GLEN WRIGHT**

| | |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 722 |
| Cross-Examination (By Ms. Weirich) | 729 |

**VERN BRASWELL**

| | |
|---|---|
| Direct Examination (By Mr. J. Bailey) | 730 |
| Cross-Examination (By Ms. Weirich) | 788 |

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 816 |

Jury-Out Hearing

   **DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination (By Mr. W. Bailey) | 826 |
| Cross-Examination (By Ms. Carnesale) | 827 |
| Redirect Examination (By Mr. W. Bailey) | 829 |

   Court's Ruling                                    835

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 838 |

Jury-Out Hearing                                     843

**DOCTOR SCHWARTZ**

| | |
|---|---|
| Direct Examination Continued (By Mr. W. Bailey) | 846 |
| Cross-Examination (By Ms. Carnesale) | 847 |
| Redirect Examination (By Mr. W. Bailey) | 858 |
| Recross Examination (By Ms. Carnesale) | 858 |

1                         <u>TABLE OF CONTENTS</u>

2                             <u>VOLUME ONE</u>

3                                                <u>PAGE</u>

4   **(VOLUME SIX)**

5   **Friday, December 9, 2005**

6   Motion for Judgment of Acquittal        872

7   Jury Charge Discussion                872

8   Defense Rests                          873

9   Closing Arguments (By Ms. Carnesale)    873

10   Closing Arguments (By Mr. W. Bailey)    884

11   Closing Arguments (By Ms. Weirich)     899

12   Jury Charge                         926

13   Alternates Excused                941

14   Jury Questions                     942

15   Verdict                             945

16

17   Certificate of Reporter            948

18

19

20

21

22

23

24

25

## INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 1 | State | Evidence | P. Washburn, photo | 202 |
| 2 | State | Evidence | P. Washburn, photo | 207 |
| 3 | State | ID | P. Washburn, photos | 312 |
| 3 | State | Evidence | Officer Walls, photos | 452 |
| 4 | State | Evidence | P. Washburn, check and letter | 217 |
| 5 | State | Evidence | P. Washburn, money | 218 |
| 6 | State | ID | P. Washburn, note | 218 |
| 6 | State | Evidence | K. Woods, note | 617 |
| 7 | State | ID | P. Washburn, document | 219 |
| 7 | State | Evidence | W. Mangum, document | 467 |
| 8 | State | ID | P. Washburn, document | 219 |
| 8 | State | Evidence | W. Mangum, document | 466 |
| 9 | State | ID | P. Washburn, document | 219 |
| 9 | State | ID | W. Mangum, document | 466 |
| 10 | State | Evidence | A. Snyder, photo | 235 |
| 11 | State | Evidence | J. Green, tape | 241 |
| 12 | State | Evidence | R. Coleman, report | 245 |
| 13 | State | Evidence | Lt. Jackson, sketch | 259 |
| 14 | State | Evidence | B. Tanzy, photo | 278 |
| 15 | State | Evidence | B. Tanzy, photo | 279 |

1                        INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE    ID/EVIDENCE    TO/DESCRIPTION        PAGE

4    16    State            Evidence       Officer Galloway,     298

5                                          crime scene sketch

6    17    State            Evidence       Officer Galloway,     304

7                                          photo

8    18    State            Evidence       Officer Galloway,     304

9                                          photo

10   19    State            Evidence       Officer Galloway,     304

11                                         photo

12   20    State            Evidence       Officer Galloway,     304

13                                         photo

14   21    State            Evidence       Officer Galloway,     304

15                                         photo

16   22    State            Evidence       Officer Galloway,     304

17                                         photo

18   23    State            Evidence       Officer Galloway,     304

19                                         photo

20   24    State            Evidence       Officer Galloway,     304

21                                         photo

22   25    State            Evidence       Officer Galloway,     308

23                                         two bottles

24   26    State            Evidence       Sgt. Merritt,         335

25                                         Advice of Rights form

1        INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE    ID/EVIDENCE    TO/DESCRIPTION        PAGE

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 27 | State | Evidence | Sgt. Merritt, CD | 358 |
| 28 | State | Evidence | Lt. Miller, statement | 365 |
| 29 | State | Evidence | J. Brown, phone record | 391 |
| 30 | State | Evidence | B. Sturdevant, phone records | 397 |
| 31 | State | Evidence | Dr. Carter, photo | 483 |
| 32 | State | Evidence | Dr. Carter, photo | 485 |
| 33 | State | Evidence | Dr. Carter, photos | 489 |
| 34 | State | Evidence | Dr. Carter, photos | 489 |
| 35 | State | Evidence | Dr. Carter, photo | 491 |
| 36 | State | Evidence | Dr. Carter, necklace | 492 |
| 37 | State | Evidence | Dr. Carter, photo | 495 |
| 38 | State | Evidence | Dr. Carter, photo | 497 |
| 39 | State | Evidence | Dr. Carter, photo | 498 |
| 40 | State | Evidence | Dr. Carter, photo | 499 |
| 41 | State | Evidence | Dr. Carter, photo | 503 |
| 42 | State | Evidence | Dr. Carter, photo | 504 |
| 43 | State | Evidence | Dr. Carter, photo | 511 |
| 44 | State | Evidence | Dr. Carter, photo | 513 |
| 45 | Defense | Evidence | Dr. Carter, photo | 525 |
| 46 | State | ID | K. Woods, earrings | 618 |
| 46 | State | Evidence | S. Smith, earrings | 676 |

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|---|---|---|---|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

```
 1              THE COURT:  Bring out the defendant, please.  All
 2    right.  Bring in the jury, please.  I have prepared a short
 3    curative instruction I plan to read the jury upon completion
 4    of this next witness's testimony because I assume she'll
 5    complete the testimony regarding the prior bad acts and
 6    convictions.
 7              MS. WEIRICH:  Yes, sir.
 8              MR. J. BAILEY:  Thank you, Your Honor.
 9              (Jury present.)
10              THE COURT:  Good morning, ladies and gentlemen.
11    We are ready to resume the trial at this time.  You may call
12    your next witness, Ms. Weirich.
13              MS. WEIRICH:  Thank you, Your Honor.  State calls
14    Kristie Woods.
15
16                            KRISTIE WOODS
17    called as a witness, being first duly sworn, was examined and
18    testified as follows:
19                         DIRECT EXAMINATION
20    BY MS. WEIRICH:
21      Q    Good morning.
22      A    Good morning.
23      Q    Would you please tell the jury your name and spell your
24    first and last names for the court reporter?
25      A    Kristie Michelle Woods.  K-R-I-S-T-I-E W-O-O-D-S.
```

```
1    Q    Where do you work right now, Ms. Woods?

2    A    Currently work at Petaluma Valley Hospital in Petaluma,

3    California.

4    Q    How long have you been working there?

5    A    About a week.

6    Q    What do you do there?

7    A    I'm a registered nurse.

8    Q    Did you used to work and live in Memphis, Tennessee?

9    A    Yes.

10   Q    Where did you work?

11   A    St. Francis Hospital.

12   Q    Did you also work at St. Jude Hospital?

13   A    Correct.

14   Q    And were you a registered nurse at both of those

15   places?

16   A    Yes, ma'am.

17   Q    Do you know the defendant Vern Braswell?

18   A    Yes.

19   Q    Would you point to him for me, please, and tell me what

20   he's wearing?

21        MR. J. BAILEY:  Judge, we stipulate she can

22   identify him.

23        THE COURT:  All right.

24   Q    Do you see Mr. Braswell in the courtroom?

25   A    Yes.
```

```
 1      Q      What is he wearing?

 2      A      I can't see.

 3      Q      You can stand up.

 4      A      He's got a brown suit on.

 5      Q      Thank you.  How long have you known him?

 6      A      Two and a half years.

 7      Q      Okay.  Where did y'all meet?

 8      A      On the corner of Pauleen and Union.

 9      Q      Were you in school at the time?

10      A      Yes.

11      Q      Nursing school?

12      A      Yes, ma'am.

13      Q      All right.  And what's at the corner of Pauleen and

14   Union?

15      A      Baptist College of Health Sciences.

16      Q      Did you actually meet him there or did you meet him at

17   another location near the college?

18      A      Right there at the corner.

19      Q      Okay.  What were you doing?

20      A      On my way to go study.

21      Q      Who were you with?

22      A      With a classmate.

23      Q      And did this classmate know the defendant?

24      A      Yes.

25      Q      Do you remember the classmate's name?
```

1    A    Randall Yates.

2    Q    Okay.  So tell us what was happening.  Were you

3    crossing the street?

4    A    About to cross the street.

5    Q    And what happened?

6    A    Saw him in a white Mustang.  The guy that was with me

7    knew him so he kind of flagged him over, and then we just

8    hooked up from there.

9    Q    All right.  Did you two exchange phone numbers?

10   A    Yes.

11   Q    And again, do you remember what year that was?

12   A    Approximately 2002.

13   Q    Okay.  When did you see him next after that first

14   encounter when you exchanged phone numbers?

15   A    About a couple of days later.

16   Q    Did he call you?

17   A    Yes.

18   Q    What did he say?

19   A    Just general conversation, what's my name, how I'm

20   doing, just getting to know each other.

21   Q    Did y'all begin to go out?

22   A    At that time, no.

23   Q    When did you?

24   A    About a couple of weeks later.

25   Q    How did that happen?  Did he initiate that as well or

1    did you?

2       A    We both.

3       Q    Okay.  How did it happen?

4       A    He called and asked could he come over and see me and I

5    was, like, that was fine.

6       Q    Where were you living then?

7       A    With my parents.

8       Q    In Memphis?

9       A    Yes.

10      Q    You were in school?

11      A    Yes.

12      Q    So he came over to see you.  Then did y'all continue to

13   see each other?

14      A    Yes.

15      Q    Until when?

16      A    When did we stop seeing each other?

17      Q    Yes, ma'am.

18      A    Up until November of 2005.

19      Q    2005?

20      A    Uh-huh.

21      Q    Last month?

22      A    Uh-huh -- no, 2004, I'm sorry.

23      Q    And what happened in November 2004 that caused you to

24   stop seeing him?

25      A    He told me that his wife had died.

```
1    Q    Okay.  And where did he end up living?

2    A    At 201 Poplar.

3    Q    He didn't want you to come see him, did he?

4    A    Yes.

5    Q    Yes, he did or no, he didn't?

6    A    Yes, he did.

7    Q    He wanted you to come see him?

8    A    Uh-huh.

9    Q    Did you come see him?

10   A    Yes, I did.

11   Q    How many times?

12   A    That I can't remember.

13   Q    Okay.  Would he sometimes call you "The Soldier"?

14   A    Yes.

15   Q    Would he sometimes call you "The Rabbit" that you know?

16   A    No, I'm not familiar with "The Rabbit."

17   Q    But "The Soldier" you recognize?

18   A    Yes, ma'am.

19   Q    Okay.  I've gotten a little bit ahead of myself.  From

20   November of 2004 back to when y'all first started going out,

21   about what month was that?  Do you remember?

22   A    Like, March, April.  In that time was when we first

23   started talking.

24   Q    Okay.  Of 2003?

25   A    2.
```

| | | |
|---|---|---|
| 1 | Q | 2002. Did he mention to you that he was married? |
| 2 | A | Yes. |
| 3 | Q | Immediately? |
| 4 | A | No. |
| 5 | Q | When did he finally tell you he was married? |
| 6 | A | Around Thanksgiving of 2002. |
| 7 | Q | Y'all had been seeing each other that whole time? |
| 8 | A | Yes, ma'am. |
| 9 | Q | How often would you see him? |
| 10 | A | I'll say about two to three times a week maybe. |
| 11 | Q | You were living at your parents? |
| 12 | A | Yes. |
| 13 | Q | Would he come over there? |
| 14 | A | Yes. |
| 15 | Q | Would he spend the night there? |
| 16 | A | No. |
| 17 | Q | Was there a place that y'all would spend the night |
| 18 | | together then? |
| 19 | A | No. |
| 20 | Q | Were you sexually active back then with the defendant? |
| 21 | A | Yes. |
| 22 | Q | Where would y'all have sexual intercourse? |
| 23 | A | At my parents or a hotel. |
| 24 | Q | Okay. You would get hotel rooms? |
| 25 | A | Yes, ma'am. |

1    Q    How did he break it to you that he was married?

2    A    He told me that he had to tell me something.  And I was

3    actually at school at the time, and he said he'd talk to me

4    once I got out of class.  And he just told me over the phone.

5    Q    What did he say, hey, I'm married?

6    A    Uh-huh.

7    Q    Tell you he had two kids?

8    A    I knew that.

9    Q    Okay.  So as far as you knew he was a single parent?

10   A    Yes.

11   Q    Did you break it off with him when he told you he was

12   married?

13   A    I attempted to but I didn't.

14   Q    Why?

15   A    I still cared about him.

16   Q    Okay.  Did he tell you this has got to stop, this isn't

17   right?

18   A    He just told me that he was married, and I really can't

19   remember the gist of the conversation then.

20   Q    Did it change anything about y'all's relationship?

21   A    No.

22   Q    When you learned that?

23   A    At first it did but after a while it didn't.

24   Q    For how long did it change your relationship?

25   A    I'd say about a few weeks.

1   Q   You didn't see each other and then you went back to

2   seeing each other?

3   A   Well, he actually went out of town for Thanksgiving,

4   but he always called to check on me to make sure that I was

5   okay and how was I feeling and how was I doing.

6   Q   And you would speak to him?

7   A   Yes.

8   Q   And you wanted to reconcile with him?

9   A   Not -- sort of kind of but my heart still told me that

10  I loved him.

11  Q   Okay.  After Thanksgiving did you continue your

12  relationship?

13  A   Yes.

14  Q   Were you still living at your parents?

15  A   No.

16  Q   Where did you move then?

17  A   To Baptist College of Health Sciences on campus.

18  Q   Okay.  You were still in school?

19  A   Uh-huh.

20  Q   How long did you live there?

21  A   For my senior -- up until my senior year.

22  Q   Which was what year?

23  A   I graduated 2003.

24  Q   You saw him during this whole time?

25  A   Uh-huh.

1    Q    Again, how often would you go out during this period?

2    A    Just whenever the opportunity came by.

3    Q    So now you know he's married?

4    A    Uh-huh.

5    Q    And so you know when he's leaving you he's going home

6    to his wife?

7    A    Uh-huh.

8    Q    Correct?

9    A    Correct.

10   Q    Did the fact that you knew he was married and that he

11   was married limit your encounters during that period?

12   A    Somewhat.

13   Q    Did y'all start seeing each other less or more?

14   A    It all depended on what it was.  I would ride with him

15   if he went anywhere or he would come and pick me up or just

16   whenever I had the opportunity to see him I saw him.

17   Q    And when you say you would ride with him, what do you

18   mean?

19   A    If he would say I'm going to the store or I need to do

20   this and that, I'll go with him.

21   Q    He'd come get you and you'd be together?

22   A    Uh-huh.

23   Q    Would he visit your dorm room?

24   A    Yes.

25   Q    Would he sleep there?

1    A    No.

2    Q    Would the two of you have sex there?

3    A    Yes.

4    Q    Where did you move after the dorms?

5    A    To Canterbury Woods in an apartment.

6    Q    Where are they located?

7    A    Sycamore View and Macon.

8    Q    Who did you live with there?

9    A    By myself.

10   Q    How long did you live at Canterbury Woods?

11   A    I moved in January of '03 and I stayed there until I

12   bought my house.

13   Q    Okay.  When did you buy your house?

14   A    In '04.

15   Q    Around what month?  Do you remember?

16   A    In early June, early June, late June.

17   Q    Who paid your rent at Canterbury Apartments?

18   A    I paid 250, he paid the rest.

19   Q    The defendant?

20   A    Yes.

21   Q    Every month he paid that for you?

22   A    For six months.

23   Q    Just to help you get your feet on the ground?

24   A    Uh-huh.

25   Q    Would he give you cash or write you a check or what?

```
1     A     Cash.

2     Q     When you had your apartment, how often would the

3  defendant come by?

4     A     Every chance he got just about.

5     Q     Was it more often when you were in your apartment?

6     A     Uh-huh.

7     Q     Than it had been in the dorm and it had been when you

8  were living with your parents?

9     A     Yes.

10     Q     Okay.  Did the two of you ever talk about the situation

11  that he's married and he has two kids and he's seeing you on

12  the side and how to fix the situation?

13     A     Not really.

14     Q     Just went on as business as usual?

15     A     Uh-huh.

16     Q     Did there come a time when he told you he was going to

17  do something about it?

18     A     He told me that he would make things right.

19     Q     What did you think he meant by "he was going to make

20  things right"?

21     A     That he would leave her to be with me.

22     Q     That's what you wanted?

23     A     Uh-huh.

24     Q     And that's what he was telling you he wanted?

25     A     He just said he'd make things right.
```

1    Q    Okay.  When did he begin telling you that?

2    A    In October.

3    Q    Of what year?

4    A    '04.

5    Q    Was that news that made you happy?

6    A    Yes.

7    Q    That's what you wanted to happen?

8    A    Uh-huh.

9    Q    What type of social activities did you and the

10   defendant participate in?

11   A    We would go dancing.  We'll go out to eat.  We'll go to

12   different parties, things of that nature.

13   Q    What about motorcycles?

14   A    Yes.

15   Q    Okay.  Was the defendant part of a motorcycle club?

16   A    Yes, he was.

17   Q    What was the name of the motorcycle club?

18   A    Rough Riders of Memphis.

19   Q    Were you also a member of the motorcycle club?

20   A    Yes.

21   Q    When did the two of you start doing that?

22   A    That I can't recall.  I know it was in the summer.

23   Q    Okay.  You know it was summertime, you just don't

24   remember what year?

25   A    Yes, ma'am.

1    Q    Okay.  Did you have a motorcycle?

2    A    No, ma'am.

3    Q    Had you been interested in motorcycles?

4    A    Somewhat, a little.

5    Q    Did the defendant have a motorcycle?

6    A    Yes.

7    Q    When you would ride, you would ride with him?

8    A    Correct.

9    Q    Is this something you did often?

10   A    Some -- most Saturdays, some Friday nights and some

11   Sundays.

12   Q    All right.  And how does a motorcycle club work?  Does

13   everybody meet somewhere and then go off on a ride and meet

14   somewhere else again?

15   A    They'll just call can be, like, we're all at the gas

16   station, do you want to ride?  And we'll just ride.

17   Q    That group of people that rode motorcycles was called

18   the Rough Riders Club.  Was there also a building called the

19   Rough Riders Club?

20   A    Yes.

21   Q    Tell us about that.  Where was it?

22   A    On Mt. Moriah.

23   Q    Whose was it?

24   A    The defendant's.

25   Q    Okay.  What type of building was it?  What type of

1   space was it?

2       A    It was more for, like, party rentals, just an open area

3   with a kitchen area and a dance floor.

4       Q    So you didn't have to be in the motorcycle group to use

5   the Rough Rider --

6       A    No, ma'am.

7       Q    -- banquet hall or whatever you want to call it?

8       A    No, ma'am.

9       Q    They just had the same names?

10      A    Uh-huh.

11      Q    When did the defendant purchase that business?  Do you

12  know?

13      A    That I can't remember.

14      Q    Was it after you two started seeing each other or did

15  he have it when you started seeing him?

16      A    It was after we had started seeing each other.

17      Q    Did he have the motorcycle when he started seeing you

18  or did he purchase the motorcycle after he started seeing you?

19      A    After he started seeing me.

20      Q    Would you visit the Rough Rider building often?

21      A    Whenever need be.

22      Q    Like for what?  What would you be needed for?

23      A    Any type of function that we had going on.

24      Q    You would help?

25      A    Uh-huh.

1    Q    Make sure the function ran smoothly?

2    A    Correct.

3    Q    Did you have keys to the business?

4    A    No.

5    Q    When you would go, would the defendant go with you?

6    A    He would already be there.

7    Q    You would meet him up there?

8    A    Uh-huh.

9    Q    Would he call you and ask you to come there?

10   A    It was already a given that I'd be there.

11   Q    Okay.  So would you say you were at that club, the

12   building once a week?  Once a month?

13   A    About once a week.

14   Q    And you just did whatever odd jobs needed to be done?

15   A    Uh-huh.

16   Q    And would you and the defendant lock up when the party

17   was over and the business was concluded?

18   A    Yes, ma'am.

19   Q    Did he pay you for that work?

20   A    No.

21   Q    Did he make money off of that?

22   A    Yes.

23   Q    How do you know?

24   A    I worked the door.

25   Q    Okay.  People gave you money?

1    A    Uh-huh.

2    Q    Where did the money go?

3    A    Towards our motorcycle club.

4    Q    Okay.  Who kept the money?

5    A    The defendant and I.

6    Q    Okay.  Where did y'all keep it?

7    A    In a -- we would keep it in a safe at night and then in

8    the morning or a couple of days later, we'll make a deposit at

9    the bank.

10   Q    Okay.  When did the Rough Rider Club close down or do

11   you know?

12   A    That I don't know.

13   Q    Okay.  When did you stop going there?

14   A    The day he got arrested.

15   Q    The day he got arrested.  When did you find out he had

16   been arrested?

17   A    That day on the -- I think it was the 5th of November.

18   Q    Did he call you?

19   A    Yes.

20   Q    Okay.  Where was he when he called you?

21   A    201 Poplar.

22   Q    Did he call you from a cell phone?

23   A    First time he did.

24   Q    The second time what?

25   A    From, I guess, the jail number here.

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | 201. |
| 3 | Q | What type of cell phone did the defendant have? |
| 4 | A | Nextel. |
| 5 | Q | Did he have another one, too? |
| 6 | A | Yes. |
| 7 | Q | What kind was that? |
| 8 | A | A Cricket. |
| 9 | Q | Okay.  Do you have a cell phone? |
| 10 | A | Yes. |
| 11 | Q | What kind do you have? |
| 12 | A | Cingular. |
| 13 | Q | Have you ever had a Cricket phone? |
| 14 | A | Yes. |
| 15 | Q | Is your Cricket -- the records that Cricket Company |
| 16 | | keeps, are they different from the way Cingular keeps records? |
| 17 | A | That I'm not quite sure. |
| 18 | Q | Okay.  When he called you from his cell phone, was it |
| 19 | | the Nextel phone or the Cricket phone or do you know? |
| 20 | A | Both. |
| 21 | Q | Huh? |
| 22 | A | Talking about on the day he was arrested? |
| 23 | Q | Yes, ma'am. |
| 24 | A | It was the Nextel. |
| 25 | Q | The Nextel.  Do you remember what that number was? |

```
1    A     331-4313.

2    Q     Did you ever call him at home?

3    A     No.

4    Q     Do you remember what his Cricket number was?

5    A     649-5045.

6    Q     Why did he have two phones?  Do you know?

7    A     He operated a business online and he used the Cricket

8    for that.  And his Nextel was just like his normal leisure

9    phone.

10   Q     What kind of online business?

11   A     It was -- he recycled printer cartridges.

12   Q     Okay.  So that's why he needed the Cricket phone?

13   A     Yes, ma'am.

14   Q     Did you talk to him the night of November 4th, 2004,

15   late in the night?

16   A     Yes.

17   Q     Do you remember about what time it was?

18   A     It was about 11, about 10:30-ish, 11.

19   Q     Where were you?

20   A     At home.

21   Q     At this point you're at your house; right?

22   A     My house.

23   Q     You purchased your home?

24   A     Uh-huh.

25   Q     Where was your home?
```

1    A    1290 Grangeway Drive Cordova, Tennessee.

2    Q    Was it close to where the defendant lived?

3    A    Yes.

4    Q    How close?

5    A    About five minutes.

6    Q    When he called you around 11 o'clock on November 4th,

7    2004 --

8         MR. J. BAILEY:  Your Honor, she didn't say that he

9    called her.  She just said she talked to him.

10   Q    I'm sorry.  Did you call him or did he call you?

11   A    I called him.

12   Q    Why did you call him?

13   A    To let him know that I was going to bed.

14   Q    Okay.  Was he supposed to come over or were you just

15   checking in with him?

16   A    Just letting him know I was going to bed.

17   Q    What did he tell you?

18   A    He said okay.

19   Q    Did he tell you where he was?

20   A    En route home.

21   Q    Did he tell you where he had been?

22   A    To the motorcycle club.

23   Q    The Rough Rider building?

24   A    The building, uh-huh.

25   Q    What had been going on up there?  Do you know?

1    A    He was letting someone fix the air conditioning and

2    heating system.

3    Q    So he was up there with them?

4    A    Yes.

5    Q    Had you been up there earlier with him?

6    A    No.

7    Q    Okay.  Had you seen him that day?

8    A    Yes.

9    Q    Where?

10   A    At my house.

11   Q    About what time?

12   A    It was about eightish, eight o'clock.

13   Q    What time did he leave your house?

14   A    About 8:45, nine o'clock.

15   Q    Where did he tell you he was going then?

16   A    To the building, the Rough Rider building.

17   Q    To meet the repairman?

18   A    Yes, ma'am.

19   Q    All right.  So then you call around 11 and tell him

20   you're going to bed?

21   A    Correct.

22   Q    What kind of mood was he in?

23   A    Same casual mood.

24   Q    Okay.  What kind of mood were you in?

25   A    Same casual mood.

1    Q    Tell you he loved you when he hung up?

2    A    Yes.

3    Q    Did the defendant have nipple rings?

4    A    Yes.

5    Q    When did he get them?

6    A    In June of 2004.

7    Q    Did you go with him when he got them?

8    A    No.

9    Q    Did you encourage him to get them?

10   A    No.

11   Q    Was it something he'd ever spoken to you about?

12   A    No.

13   Q    Did you see them in June of 2004 for the first time?

14   A    Yes.

15   Q    Describe them to the jury.

16   A    They looked like little small hoops that women would

17   wear in their ear.  They're just real small and they were

18   gold.

19   Q    He had one in each nipple?

20   A    Yes, ma'am.

21   Q    How did you see them?

22   A    Took his shirt off.

23   Q    And showed you?

24   A    Yes, ma'am.

25   Q    Did he want you to go get them?

| | | |
|---|---|---|
| 1 | A | No, ma'am. |
| 2 | Q | Did you have any body piercings or do you have any? |
| 3 | A | Yes, ma'am. |
| 4 | Q | Where? |
| 5 | A | My navel. |
| 6 | Q | Was that something -- when did you have that done? |
| 7 | A | Can't remember. |
| 8 | Q | Before you met the defendant or after? |
| 9 | A | After. |
| 10 | Q | Was it something he asked you to do? |
| 11 | A | No. |
| 12 | Q | You just did it on your own? |
| 13 | A | Yes, ma'am. |
| 14 | Q | Did you ever meet Sheila Braswell? |
| 15 | A | Yes. |
| 16 | Q | I'm going to pass you what's been marked Exhibit 1.  Do |
| 17 | | you recognize her? |
| 18 | A | Yes. |
| 19 | Q | Who is that? |
| 20 | A | Sheila Braswell. |
| 21 | Q | When is the first time you met her? |
| 22 | A | I was at the track, motorcycle sports track. |
| 23 | Q | Okay.  She came up there? |
| 24 | A | Yes. |
| 25 | Q | Was the defendant there? |

1    A    Yes.

2    Q    Would she come up there a lot with him?

3    A    No.

4    Q    Was that kind of y'all's turf?

5    A    Yes.

6    Q    So she didn't ride with him?

7    A    To my knowledge I don't know.

8    Q    Okay.  If you were riding with him would she be riding

9    alongside in a motorcycle?

10   A    No.

11   Q    If you were at the club, would she be there with y'all?

12   A    No.

13   Q    When you met her, were you and the defendant dating?

14   A    Yes.

15   Q    Do you know if she knew that?

16   A    No.  At that time no.

17   Q    I'm sorry?

18   A    At that time no.

19   Q    Okay.  I'm going to pass you this.  At that time she

20   didn't know or you don't know?

21   A    I don't know.

22   Q    Okay.  Would you look inside there for me, Ms. Woods.

23   Do you recognize those?

24   A    No.

25   Q    You've never seen those before?

1      A      No.

2                      MR. J. BAILEY:  Can we take a look at them?

3                      MS. WEIRICH:  I'll take them back from her.

4                      MR. J. BAILEY:  You're supposed to pass them to us

5      before.

6                      MS. WEIRICH:  May we approach, Your Honor?

7                      THE COURT:  You may.

8                          (Bench conference commenced.)

9                      MS. WEIRICH:  Again, this evidence has been

10     sitting in the property room for a year.

11                     MR. J. BAILEY:  That doesn't matter.  We're still

12     entitled to look at it before she passes it to a witness.

13     That's the rules.

14                     THE COURT:  You need to let them know what you're

15     passing.

16                     MS. WEIRICH:  I'd be happy to.

17                     THE COURT:  They may have already seen it.  They

18     may not necessarily know precisely what you're passing at any

19     given moment so let them see.

20                     MS. WEIRICH:  I'll be happy to but I don't think

21     Mr. Bailey needs to scold me in front of the jury, either.

22                     THE COURT:  I agree with that.  These gratuitous

23     remarks need to be kept to yourselves.

24                     MR. J. BAILEY:  Very well.

25                     THE COURT:  I agree with your position, but keep

1    your gratuitous remarks to yourselves.

2                    MR. J. BAILEY:  Very well.

3                    (Said bench conference concluded.)

4    Q    You've never seen these?

5    A    No, ma'am.

6    Q    Okay.  Do you remember when it was that you saw Sheila

7    Braswell at the track?  And what is the track?

8    A    It's the motorsports parkway where they go and race

9    cars and motorcycles.

10   Q    I'm sorry.  I can't hear you.

11   A    It's a motorsports park.  They race cars and

12   motorcycles.

13   Q    Okay.  And where is it?

14   A    It's in Millington.

15   Q    Okay.  And when was it that you met her there, if you

16   remember?

17   A    I don't.

18   Q    Was it warm outside?  Was it cold outside?

19   A    It was warm.

20   Q    Probably summertime?

21   A    Uh-huh.

22   Q    Was it early on in your relationship with the defendant

23   or middle or toward the end?

24   A    Middle.

25   Q    How many times after that did you see Mrs. Braswell?

| | | |
|---|---|---|
| 1 | A | One more time. |
| 2 | Q | Where was that? |
| 3 | A | Waffle House. |
| 4 | Q | Okay. Did y'all run into each other at the Waffle |
| 5 | | House? |
| 6 | A | No. |
| 7 | Q | How did you come to be with her at the Waffle House? |
| 8 | A | I called her. |
| 9 | Q | When was that? |
| 10 | A | In June of '04. |
| 11 | Q | Okay. Why did you call the wife of your boyfriend? |
| 12 | A | I was upset with him. |
| 13 | Q | Why were you upset with him? |
| 14 | A | He put his hands on me. |
| 15 | Q | Show me how he put his hands on you. |
| 16 | A | He put his hands around my neck. |
| 17 | Q | Where were you when he did that? |
| 18 | A | At a motorcycle function. |
| 19 | Q | At the Rough Rider Club? |
| 20 | A | No, ma'am, a different -- |
| 21 | Q | Where -- okay. Were y'all outside or inside? |
| 22 | A | Inside. |
| 23 | Q | Were there people around? |
| 24 | A | Yes. |
| 25 | Q | Why did he put his hands on your neck? |

1    A     He was upset because I was dancing with other people.

2    Q     When you motioned how he did it, you used one hand.   Is

3  that what he did?

4    A     Yes, to my -- to my knowledge, yes.

5    Q     Okay.  Did you take it to be a playful gesture or did

6  it scare you?

7    A     It wasn't playful.

8    Q     Was it uncomfortable for you?

9    A     Yes.

10    Q     Did he merely place his hand on your neck or did he

11  squeeze, too?

12    A     He was applying pressure.

13    Q     Where?

14    A     Right here.

15    Q     On both sides of your neck?

16    A     Yes, ma'am.

17    Q     What did you tell him?

18    A     That his hands were too tight, he needed to loosen up.

19    Q     What else was he doing when he had his hand on your

20  neck?  Was he talking to you?

21    A     Yes.

22    Q     What was he saying?

23    A     He told me I had F'd up this time and not to call him

24  anymore.

25    Q     What did you say?

1    A    I told him that was okay.

2    Q    What did you do?

3    A    After?

4    Q    Did he take his hands off of you?

5    A    Yes.

6    Q    Okay.  Did you go to the police?

7    A    No.

8    Q    Where did you go?

9    A    To get my purse.

10   Q    Where was your purse?

11   A    On a table.

12   Q    Inside the club?

13   A    Yes, ma'am.

14   Q    Did you leave?

15   A    Yes.

16   Q    Were you in your own car or had you come with the

17   defendant?

18   A    My own car.

19   Q    Where did you go?

20   A    I went home to my apartment.

21   Q    When did you call Mrs. Braswell?

22   A    En route to my apartment.

23   Q    What did you say to her?

24   A    I just told her who I was and what had been going on.

25   Q    Did you tell her you wanted to meet with her?

1    A    That I don't remember.

2    Q    Okay.  Well, how did y'all end up hooking up at the

3    Waffle House?

4    A    She told me that he had come home and had gotten off

5    his motorcycle and gotten into the truck.

6                MR. W. BAILEY:  Objection, hearsay.

7                THE COURT:  Sustained.

8    Q    She told you something and then you did something after

9    that?

10    A    I just went to my apartment, yeah.

11    Q    Okay.  When did you go to the Waffle House?

12    A    Shortly after we got to the apartment.

13    Q    After who got to the apartment?

14    A    Both of us.

15    Q    Both of us who?

16    A    Sheila and I.

17    Q    Okay.  Where did you hook up with her to go to your

18    apartment?

19    A    Outside of my apartment.

20    Q    Okay.  Had she ever been to your apartment before?

21    A    No.

22    Q    Did you have to give her directions there?

23    A    Yes.

24    Q    Do you remember what time of day this was?

25    A    It was at night.

| | | |
|---|---|---|
| 1 | Q | Okay.  What Waffle House did you go to? |
| 2 | A | The one on Sycamore View. |
| 3 | Q | How long did the two of you stay there? |
| 4 | A | For a couple of hours. |
| 5 | Q | Talking? |
| 6 | A | Yes. |
| 7 | Q | Was it a civilized conversation -- |
| 8 | A | Yes, ma'am. |
| 9 | Q | -- the two of you were having? |
| 10 | A | Yes, ma'am. |
| 11 | Q | What time did you leave there?  Do you remember? |
| 12 | A | It was in the wee hours of the morning. |
| 13 | Q | Did she leave with you? |
| 14 | A | Yes. |
| 15 | Q | Did she come with you to your apartment? |
| 16 | A | The second time, no. |
| 17 | Q | Okay.  I mean after you left the Waffle House? |
| 18 | A | Uh-huh. |
| 19 | Q | She went one way and you went the other? |
| 20 | A | Uh-huh. |
| 21 | Q | Did you go home? |
| 22 | A | Yes. |
| 23 | | THE COURT:  Would you like some water? |
| 24 | | WITNESS WOODS:  I'm fine, thank you. |
| 25 | Q | Did you hear from the defendant during that time? |

1    A    Yes.

2    Q    While you were at the Waffle House?

3    A    Yes.

4    Q    Did he call you?

5    A    Yes.

6    Q    On your cell phone?

7              MR. W. BAILEY:  Your Honor, we object to the

8    leading nature of this examination.

9              THE COURT:  Overruled.

10   Q    Did he call you?

11   A    Yes.

12   Q    On your cell phone?

13   A    Yes.

14   Q    Was he on his cell phone?

15   A    Yes.

16   Q    The Nextel or the Cricket?

17   A    That I don't know.

18   Q    Okay.  Did you answer when you were there at the Waffle

19   House with his wife?

20   A    Sometimes I did.  Sometimes I didn't.

21   Q    How many times did he call?

22   A    Repeatedly.

23   Q    During the whole course of your encounter with Mrs.

24   Braswell?

25   A    Just about.

1    Q    When you would answer and speak with him, what did he
2    say?
3    A    He said he needed to see me.
4    Q    Did you tell him where you were?
5    A    No.
6    Q    Did you tell him who you were with?
7    A    No.
8    Q    What did you tell him?
9    A    I didn't tell him anything, I told him no.
10   Q    Then when he would call back and you would answer, what
11   would he say, same thing?
12   A    Uh-huh.
13   Q    Did he sound frantic?
14   A    No.
15   Q    Did he sound upset?
16   A    Not really.
17   Q    Did he sound happy?
18   A    No.
19   Q    Was he angry?
20   A    Not on the phone, no.
21   Q    Okay.  When you got back home to your apartment, did he
22   continue to call?
23   A    Yes.
24   Q    How many times?
25   A    I don't remember.

```
1      Q      One or many?

2      A      Many.

3      Q      Did you answer each time?

4      A      Sometimes I did.  Sometimes I didn't.

5      Q      Again, when you would answer, would he just say I

6   needed to see you?

7      A      Uh-huh.

8      Q      What did you tell him?

9      A      Not right now.

10     Q      Was that encounter at the Waffle House the last time

11  you saw Mrs. Braswell, or did you see her again?

12     A      I think that was the last time.

13     Q      Did you see the defendant again after that night?

14     A      Yes.

15     Q      When?

16     A      He came over that morning.

17     Q      The next morning?

18     A      Uh-huh.

19     Q      Do you remember what time it was?

20     A      Shortly after I had gotten home from the Waffle House.

21     Q      Okay.  So you -- when you say you got home in the wee

22  hours of the morning --

23     A      It was actually, like, six in the morning.

24     Q      Okay.  Okay.  That you got home?

25     A      Uh-huh.
```

1    Q    So how long were you home before he came over?

2    A    I'd say about 30 to 45 minutes.

3    Q    Do you remember how long you were at the Waffle House?

4    A    That I don't know.

5    Q    Hours?

6    A    I'll say about an hour or two.

7    Q    Okay.  When he came over that morning -- was this a

8  weekday or a weekend?

9    A    Weekend.

10   Q    A weekend?

11   A    Uh-huh.

12   Q    When he came over what did he say?

13   A    He just asked me how could I do that to him.

14   Q    How could you do that to him?

15   A    Uh-huh.

16   Q    What was he talking about?

17   A    Me calling her.

18   Q    Did you tell him you were with her?

19   A    No.

20   Q    What did you say?

21   A    I didn't say anything.

22   Q    Were you happy to see him?

23   A    No, not really.

24   Q    But you let him in?

25   A    Yes.

| | | |
|---|---|---|
| 1 | Q | What else did he say? |
| 2 | A | Can't remember. |
| 3 | Q | Did y'all kiss and make up? |
| 4 | A | No. |
| 5 | Q | Did you break it off at that point? |
| 6 | A | No. |
| 7 | Q | Did he leave your apartment that morning? |
| 8 | A | Yes. |
| 9 | Q | After how long? |
| 10 | A | I'd say about 30 minutes. |
| 11 | Q | Do you know where he was going? |
| 12 | A | I assume home. |
| 13 | Q | Did you have somewhere to be? |
| 14 | A | No. |
| 15 | Q | Did y'all make plans to see each other again that day? |
| 16 | A | No. |
| 17 | Q | The next day? |
| 18 | A | No. |
| 19 | Q | Or the next day? |
| 20 | A | No. |
| 21 | Q | Did he call you? |
| 22 | A | Yes. |
| 23 | Q | Did he call you that same day? |
| 24 | A | Uh-huh. |
| 25 | Q | Many times or repeatedly? |

| | | |
|---|---|---|
| 1 | A | Many times. |
| 2 | Q | Okay.  From which phone? |
| 3 | A | I can't remember. |
| 4 | Q | Cell phones though? |
| 5 | A | Uh-huh. |
| 6 | Q | What would he say? |
| 7 | A | He would ask if he could see me. |
| 8 | Q | What did you tell him? |
| 9 | A | I told him no, I -- I didn't want anybody to come over. |
| 10 | Q | Did he keep calling the next day? |
| 11 | A | He called, yes. |
| 12 | Q | Many times or just a few? |
| 13 | A | A few times. |
| 14 | Q | Saying the same thing? |
| 15 | A | I can't remember. |
| 16 | Q | Did you finally give in and see him again? |
| 17 | A | Yes. |
| 18 | Q | When? |
| 19 | A | I can't remember.  It was after the incident though. |
| 20 | Q | A couple of days?  A couple of weeks?  A couple of |
| 21 | | months? |
| 22 | A | A couple of days. |
| 23 | Q | What made you finally give in? |
| 24 | A | My heart. |
| 25 | Q | Where did y'all hook up? |

1    A    My apartment.

2    Q    He came by?

3    A    Uh-huh.

4    Q    Was this a weekday, a business day?

5    A    I think so.

6    Q    Where were you working then?

7    A    St. Jude.

8    Q    Did he come by morning?  Noon?  Night?

9    A    Afternoon.

10   Q    What hours did you work?

11   A    St. Jude I worked night shift.

12   Q    Okay.  So what time did you have to be there?

13   A    Seven.

14   Q    So when he would come by, he would come by before you

15   would go to work?

16   A    Uh-huh.

17   Q    So he came by that day and was that kind of the end of

18   the bad period and y'all picked it up where you left off?

19   A    Uh-huh.

20   Q    And this is June of '04; correct?

21   A    Uh-huh.

22   Q    How many days a week would you say you saw him in July

23   of '04?

24   A    I'd say about two to three.

25   Q    August of '04?

1    A    About the same.

2    Q    September?

3    A    About the same.

4    Q    October?

5    A    About the same.

6    Q    Okay.  Was there a period sometime between September

7    and October of '04 that the two of you had another argument?

8    A    Yes.

9    Q    What was it over?

10   A    Me seeing someone else.

11   Q    The same thing the first argument had been over?

12   A    Uh-huh.

13   Q    Except you had just been dancing with somebody?

14   A    Uh-huh.

15   Q    Okay.  Who were you seeing?

16   A    Some guy I met at Ole Miss that goes to Ole Miss.

17   Q    How did you meet him?

18   A    At a party.

19   Q    In Oxford or here in town?

20   A    In Memphis.

21   Q    Was it a party you had gone to with the defendant?

22   A    No.

23   Q    When was the party?

24   A    Around Labor Day weekend.

25   Q    All right.  Early part of September?

```
1    A    Uh-huh.

2    Q    Did you begin seeing this person regularly?

3    A    No.

4    Q    How did the defendant know you were seeing him?

5    A    Got my phone records.

6    Q    How do you know he got your phone records?

7    A    He brought them over to my house.

8    Q    Okay.  Let's back up a little bit.  During this period,

9    were you and the defendant kind of -- had you kind of broken

10   things off?

11   A    Not really.

12   Q    All right.  So you were still seeing him?

13   A    Uh-huh.

14   Q    But you're also seeing this other person?

15   A    Uh-huh.

16   Q    And the defendant is still married?

17   A    Yes.

18   Q    Did he come to your house and encounter you and

19   confront you about the other person?

20   A    Who?

21   Q    The defendant.

22   A    Yes.

23   Q    Do you remember when that was?

24   A    No, ma'am, but it was in September.

25   Q    Had you been to Oxford, Mississippi to see this person?
```

1    A    Yes.

2    Q    When had you been down there?

3    A    It was one day during a week in September.

4    Q    How long after you returned from visiting this person

5    in Oxford did the defendant come to your house and confront

6    you with it?

7    A    That next day.

8    Q    What did he say to you?

9    A    Asked me where had I been.

10   Q    What did you tell him?

11   A    I didn't answer at first.

12   Q    Did he keep asking you where you had been?

13   A    Uh-huh.

14   Q    Was he asking -- was he talking to you calmly like I

15   am?

16   A    Somewhat.

17   Q    Okay.  Were you talking calmly to him?

18   A    Yes.

19   Q    All right.  Why wouldn't you tell him?

20   A    Felt like he didn't need to know.

21   Q    Did you tell him that?

22   A    No.

23   Q    Did you finally tell him where you had been?

24   A    To an extent, yes.

25   Q    But not the whole story?

1   A   Uh-huh.

2   Q   What did you tell him?

3   A   That me and my friend had went to Oxford.

4   Q   What did he say?

5   A   I can't remember.

6   Q   Was that the end of it?

7   A   No.

8   Q   What happened?

9   A   He -- as he was leaving, he got rough with me.

10  Q   What do you mean?

11  A   He grabbed me and threw me on my love seat.

12  Q   How did he grab you?

13  A   By my arms.

14  Q   Where was your love seat?  In what room?

15  A   In the great room.

16  Q   Is it by the front door?

17  A   Yes.

18  Q   So he's leaving your apartment --

19  A   No, my house.

20  Q   Your house, I'm sorry.  And you're walking behind him

21  or in front of him?

22  A   Behind him.

23  Q   And does he get to the door and then turn around?

24  A   Not quite to the door.

25  Q   But he turned around?

1    A    Uh-huh.

2    Q    And did what?

3    A    Grabbed me and threw me on the love seat.

4    Q    What was he saying?

5    A    I can't remember.

6    Q    Was it a playful gesture?

7    A    No.

8    Q    Were you scared?

9    A    Yes.

10    Q    Then did he leave?

11    A    Not after that, no.

12    Q    What did he do?

13    A    We moved from the love seat to the wall.

14    Q    What do you mean?

15    A    He banged my head up on the wall.

16    Q    How was he holding you and banging your head up against

17 the wall?

18    A    He had my hands, like, behind my back with my head up

19 against the wall.

20    Q    What was he holding -- was he holding your head with

21 anything?

22    A    No.

23    Q    Okay.  What was he doing?

24    A    Exactly what I just said.

25    Q    Okay.  Was he in front of you?

```
 1    A    Behind me.

 2    Q    So you're facing the wall?

 3    A    Uh-huh.   Uh-huh.

 4    Q    Okay.   What was he saying?

 5    A    I can't remember.

 6    Q    Was it a playful gesture?

 7    A    No.

 8    Q    Did he leave then?

 9    A    No.

10    Q    What happened?

11    A    I got away and walked around my coffee table.

12    Q    Where were you trying to go?

13    A    Away from him.

14    Q    Okay.   Did he catch up with you?

15    A    Yes.

16    Q    What did he do?

17    A    We got -- we wrestled there.   We kind of wrestled there

18  in front of my couch.   We kind of wrestled there in front of

19  my couch.

20    Q    Wrestled playfully?

21    A    No.

22    Q    And then what happened?

23    A    Then he grabbed me by my neck and placed it up against

24  one of my round tables.

25    Q    Did he gently place it up against one of your round
```

1    tables or was it rough?

2        A    It was rough.

3        Q    What's the table made out of?

4        A    Glass.

5        Q    How did he grab you by your neck?

6        A    Like this.

7        Q    With one hand?

8        A    Uh-huh.

9        Q    From the back?

10       A    Uh-huh.

11       Q    What was he saying to you?

12       A    He'd bang my head on this table.

13       Q    He said he would bang your head on this table?

14       A    Uh-huh.

15       Q    And what else?

16       A    That's all I can remember.

17       Q    Okay.  Did he bang your head on that table?

18       A    No.

19       Q    Okay.  When he had his hand around your neck, was he

20   applying pressure like the time before?

21       A    Yes.

22       Q    Were you able to move?

23       A    To an extent, yes.

24       Q    To the extent that you wanted to?

25       A    Uh-huh.

```
 1      Q      Could you get up and leave from his hold?

 2      A      No.

 3      Q      Okay.  What part of you could you move?

 4      A      My lower extremities and my hands.

 5      Q      Okay.  Did he leave then?

 6      A      Yes.

 7      Q      Did you continue to see him?

 8      A      Yes.

 9      Q      Why?

10      A      My heart.

11      Q      When did you purchase your home?

12      A      In June.

13      Q      Of what year?

14      A      I think it was '0 -- I'll be in there two years come

15   this coming up June in 2006.

16      Q      So '04?

17      A      '04.

18      Q      And this incident happened at your home?

19      A      Uh-huh.

20      Q      Did you call the police?

21      A      No.

22      Q      Why?

23      A      Felt no need to.

24      Q      You didn't think it was a big deal or you just didn't

25   want to bother?
```

1   A      Just didn't want to bother.

2   Q      How often would you and the defendant have sexual

3   intercourse?

4   A      Just about every chance we get.

5   Q      Every time you were together?

6   A      Just about.

7   Q      I asked you the other day if you had ever heard the

8   phrase "erotic asphyxia."  Do you remember what you said to

9   me?

10  A      I said no.

11  Q      You said what is that, didn't you?

12  A      Uh-huh.

13  Q      Had you ever choked the defendant while y'all were

14  having sex to the point that he was unconscious?

15  A      No.

16  Q      Did he ever ask you to?

17  A      No.

18  Q      Did he ever choke you to the point of

19  unconsciousness --

20  A      No.

21  Q      -- while you were having sex?

22  A      No.

23  Q      Did he ever want to?

24  A      No, not to my knowledge.

25  Q      Did he ever ask you to let him?

1    A    No.

2    Q    You did tell me that you would characterize your sexual

3    history with the defendant as "rough sex."  Right?

4    A    Uh-huh.

5    Q    Why do you say that?

6    A    Because it wasn't just your soft gentle gliding in and

7    out.  It was just like banging.

8    Q    Did you enjoy it?

9    A    Yes.

10   Q    Okay.  It was never anything --

11        MR. J. BAILEY:  Object to leading.

12   Q    Was it ever anything that you weren't fully

13   participating in?

14   A    No, I always fully participated.

15   Q    Okay.  Did he ever tie a belt around your neck?

16   A    No.

17   Q    Did y'all use whips?

18   A    No.

19   Q    Did you use some sex toys?

20   A    Yes.

21   Q    What?

22   A    Vibrators.

23   Q    Was that it?

24   A    And dildos.

25   Q    Okay.  Is that it?

1    A    Uh-huh.

2    Q    Would the defendant ever place his forearm around your

3    neck while you were having sex?

4    A    Yes.

5    Q    Tightly?

6    A    To keep me steady, yes.

7    Q    Did it choke you?

8    A    No.

9    Q    Was it like the time that he grabbed your neck and

10    threw it against the glass coffee table?

11    A    No, ma'am.

12    Q    Was it like the time when he grabbed your neck in the

13    parking lot and you told him he was holding on too tight?

14    A    No.

15    Q    What was different?

16    A    He basically would just keep me steady up against him

17    so that I wouldn't move.

18    Q    Did you ever tell him not to do it?

19    A    No.

20    Q    Did you ever tell him it was uncomfortable?

21    A    No.

22    Q    Was he ever applying pressure when he did it?

23    A    Sometimes, yes.

24    Q    Okay.  Too much pressure?

25    A    No.

1    Q    Different pressure than the time he banged your head

2    against the glass coffee table?

3    A    Yes.

4    Q    Different pressure than when he grabbed you in the

5    parking lot or in the building, rather, at the party?

6    A    Yes.

7    Q    You still love him?

8    A    To an extent, yes.

9    Q    Mixed emotions?

10   A    Yes.

11   Q    When was the last time you talked to him?

12   A    I think it was June of '05.

13   Q    He call you?

14   A    Yes.

15   Q    When he was arrested and put into custody, he continued

16   to talk to you?

17   A    Uh-huh.

18   Q    You two continued to communicate?

19   A    Uh-huh.

20   Q    You would come visit in the jail?

21   A    Uh-huh.

22   Q    When did you stop coming to visit him?  Do you

23   remember?

24   A    Right before I left for California.

25   Q    When was that?

1    A    In June of '05.

2    Q    Okay.  When he would call you and make sure you were

3    underground, what did that mean?

4    A    That the police or anyone wasn't after me.

5    Q    The police were looking for you though, weren't they?

6    A    Yes.

7    Q    They left you cards.  They left you notes.  They made

8    phone calls; right?

9    A    (Witness nodded head up and down.)

10   Q    And you'd never come in; right?

11   A    Right.

12   Q    Why?

13   A    Afraid.

14   Q    Afraid of what?

15   A    Didn't want to be bothered.

16   Q    Well, afraid or didn't want to be bothered?  Those are

17   two different things.

18   A    Both.

19   Q    Afraid of the police?

20   A    Afraid of what may happen.

21   Q    Are you still afraid?

22   A    No.

23   Q    Was it you the defendant was talking to when he told

24   you to refer to yourself as "his cousin"?

25   A    Yes.

1    Q    When you would write letters?

2    A    Yes.

3    Q    Why?

4    A    To keep me hidden.

5    Q    And whose address did he want you to use as a return

6    address?

7    A    Darnell Gardner's.

8    Q    Who is Darnell Gardner?

9    A    A member of Rough Riders.

10   Q    Is that Papa Bear?

11   A    Yes.

12   Q    He's just a friend?

13   A    Yes.

14   Q    Did y'all hang out with him?

15   A    Who, Papa Bear?

16   Q    Uh-huh.

17   A    Yes.

18           MS. WEIRICH:  May I have a moment, Your Honor?

19   Pass the witness, Your Honor.

20           THE COURT:  Mr. Bailey.

21           MR. J. BAILEY:  Do you have any Jencks statements?

22           MS. WEIRICH:  No.

23           THE COURT:  Ladies and gentlemen, we will take a

24   brief recess at this time.  As always, do not discuss the case

25   during the recess.

1          (Jury out.)

2                THE COURT:  Take him out, please.  Ms. Woods, you

3     may step down during the recess but do not discuss your

4     testimony with anyone during the recess.  Stand in recess.

5          (Recess.)

6                THE COURT:  Ms. Woods, if you would resume the

7     witness stand, please.  Bring in the jury, please.

8          (Witness Woods resumed the witness stand,

9                having previously been sworn.)

10                MS. WEIRICH:  Judge, before they begin, may I ask

11     two omitted questions?  I meant to pass something that has

12     been marked for ID that Your Honor may have.

13                THE COURT:  You may.  I do have one more exhibit

14     for ID up here.

15          (Jury present.)

16                THE COURT:  Ms. Weirich, you have a couple of

17     omitted questions?

18                MS. WEIRICH:  Yes, Your Honor.  Thank you.

19

20                DIRECT EXAMINATION CONTINUED

21     BY MS. WEIRICH:

22     Q    Ms. Woods, I'm going to pass you these two envelopes.

23     One has been marked Exhibit 6 for identification purposes

24     only, and the other is Exhibit 5.  If you could open those and

25     let me know if you recognize what's inside of them.

| | | |
|---|---|---|
| 1 | A | This one is $120. |
| 2 | Q | Do you recognize that? |
| 3 | A | Yes. |
| 4 | Q | What is it? |
| 5 | A | It's a letter. |
| 6 | Q | Who wrote it? |
| 7 | A | Me. |
| 8 | Q | Did you leave it with the $120? |
| 9 | A | Yes. |
| 10 | Q | Where did you leave it? |
| 11 | A | If I recall I think it was in the mailbox. |
| 12 | Q | Whose mailbox? |
| 13 | A | Vern Braswell's mailbox. |
| 14 | Q | Why did you leave that money and that note in the |
| 15 | | defendant's mailbox? |
| 16 | A | Because I slashed some tires. |
| 17 | Q | Whose tires? |
| 18 | A | Sheila's. |
| 19 | Q | Why did you slash her tires? |
| 20 | A | Angry at Vern. |
| 21 | Q | Okay.  Why did you slash Sheila Braswell's car if you |
| 22 | | were angry at the defendant? |
| 23 | A | Because it was the only car at home. |
| 24 | Q | In the driveway? |
| 25 | A | Uh-huh. |

1    Q    When was that?  Do you remember?

2    A    September-ish.

3    Q    Of what year?

4    A    '04.

5    Q    Okay.

6         MS. WEIRICH:  Judge, I'd ask that that be marked

7    in evidence now.

8         THE COURT:  All right.  Exhibit 6.  Remove the ID

9    designation.

10        MR. J. BAILEY:  Was that collectively, Judge, or

11   two separate?

12        THE COURT:  Exhibit 5 is already in evidence and

13   we'll now mark Exhibit 6 in evidence.

14        (Exhibit No. 6 was marked and filed.)

15        MS. WEIRICH:  May I approach the witness, Your

16   Honor?

17        THE COURT:  You may.

18   Q    When I passed you this and asked you to take it out, do

19   you recognize this smaller item in the bag?

20   A    It looks like an earring, a hoop earring.

21   Q    All right.  Is that similar to the type of nipple ring

22   that the defendant wore?

23   A    Yes.

24   Q    It is?

25   A    Uh-huh.

1          MS. WEIRICH:  Judge, if we could have this marked

2     for identification purposes.

3          (Exhibit No. 46 was marked for identification.)

4          MS. WEIRICH:  I'll pass the witness.

5          THE COURT:  Mr. Bailey.

6

7                    CROSS-EXAMINATION

8     BY MR. J. BAILEY:

9     Q    Ms. Woods, good morning.

10    A    Good morning.

11    Q    Now let me take you back to 2002.  That's when you say

12    you first met Vern Braswell; is that correct?

13    A    Correct.

14    Q    And I think you testified that you met him while you

15    were in school; is that correct?

16    A    Correct.

17    Q    And the -- and you testified that at some point you all

18    became sexually active; is that correct?

19    A    Correct.

20    Q    And am I correct that the sexual activity built to the

21    point where it became rough sex?

22    A    Not really.

23    Q    Did it start out that way?

24    A    Sort of kind of, yeah.

25    Q    And would you say that Vern Braswell liked rough sex?

1    A    Yes.

2    Q    In fact, he always engaged in rough sex?

3    A    Correct.

4    Q    In fact, am I correct -- is it your testimony that he

5    would get behind you and -- demonstrate for me how he would

6    get behind and hold you.

7    A    Can I have someone stand in front of me?

8         MR. J. BAILEY:  Is that okay?

9         THE COURT:  Sure.

10    A    He would be on his knees and I would be on my knees and

11    he either had me this way to keep me steady, kissing me at the

12    same time so my head would be turned around or I would be

13    completely on my knees with my hands on the bed and he would

14    be holding me this way.

15    Q    He would hold you with both hands around your neck?

16    A    Sometime both hands.  Sometimes he'll have one hand

17    here and one hand on the headboard.

18    Q    And so sometimes he used his hands and sometimes he

19    used his forearm; is that correct?

20    A    Correct.

21    Q    And that was apart of the sex act, wasn't it?

22    A    Yes.

23    Q    On more than one occasion?

24    A    Yes.

25    Q    And it was frequent, wasn't it?

1    A    Yes.

2    Q    Now let me walk you through.  This whole bit about

3    being called "The Soldier," that didn't start when he went to

4    jail, did it?

5    A    No.

6    Q    They've been calling you "The Soldier."  That was your

7    nickname in the club, wasn't it?

8    A    Correct.

9    Q    That didn't start when he called you from the jail, did

10   it?

11   A    No.

12   Q    That wasn't something that he used to hide your

13   identity in the jail, was it?

14   A    No.

15   Q    That's what Papa Bear called you, wasn't it?

16   A    Correct.

17   Q    That's what other members of the Rough Riders called

18   you; is that correct?

19   A    Correct.

20   Q    They called you "The Soldier."  Is that correct?

21   A    Correct.

22   Q    And am I correct that they called you that because you

23   were small in stature and you were tough?

24   A    Correct.

25   Q    Okay.  Likewise, you were more than just Mr. Braswell's

1    girlfriend hanging around the club.  You also helped handle

2    the finances; is that correct?

3       A    Correct.

4       Q    You became kind of the bookkeeper; is that correct?

5       A    Correct.

6       Q    And this wasn't something that was hidden, was it?

7       A    No.

8       Q    Everybody knew that; right?

9       A    Yes.

10      Q    He didn't -- this wasn't some illicit relationship that

11   was hidden underground, was it?

12      A    No.

13      Q    He open -- you were openly there with him, weren't you?

14      A    Yes.

15      Q    And when you -- now I'm going to move forward a little

16   bit.

17      A    Okay.

18      Q    In June of 2004 when you called Sheila Braswell, isn't

19   it true that Ms. Braswell told you I had heard about you

20   already?

21      A    Yes.

22      Q    She already knew who you were, didn't she?

23      A    Yes.

24      Q    In fact, on one occasion she came to the motorsports

25   park and you were sitting on Mr. Braswell's bike and she met

1    you; is that correct?

2        A    Correct.

3        Q    So that wasn't a new occasion in June of 2004 either,

4    was it?

5        A    No.

6        Q    Moving forward.  When Mr. Braswell, and I think you

7    testified September, October of 2004 when he said I'm going to

8    make things right and you were asked by the State did you

9    think that to mean -- was it your impression that he meant he

10   was going to leave his wife.  I've asked you that question

11   before, haven't I?

12       A    Yes.

13       Q    And isn't it true that it could have also meant that he

14   was going to leave you?

15       A    Correct.

16       Q    You don't deny that, do you?

17       A    No.

18       Q    In fact, am I correct that at some point you pretty

19   much discovered -- and this was before Ms. Braswell's death --

20   that he wasn't doing anything to leave his wife, was he?

21       A    Correct.

22       Q    He made no overt acts to leave Mrs. Braswell, had he?

23       A    No.

24       Q    He hadn't done anything overtly?

25       A    No.

1    Q    To indicate he was going to leave home, had he?

2    A    No.

3    Q    He didn't pack no bags and move to your house, did he?

4    A    No.

5    Q    He could have, couldn't he?

6    A    Yes.

7    Q    In fact, if he wanted to leave her he could have come

8 to your house, couldn't he?

9    A    Yes.

10    Q    He'd been to your house before, hadn't he?

11    A    Yes.

12    Q    Now during the -- and this may seem like a small thing

13 to you -- but during the direct examination you were

14 frequently asked "the defendant" and you responded "the

15 defendant."  But that's not what you call him, is it?

16    A    No.

17    Q    In fact all the way up to -- until you left town, you

18 called him what?

19    A    Either Vern or Big Head.

20    Q    Okay.  You don't call him the defendant, do you?

21    A    No.

22    Q    Now I want you to tell this jury about Vern's telephone

23 patterns, that if you know of your own personal knowledge.

24 Did he frequently use the phone?

25    A    Yes.

1    Q    It's not unusual for him to call people every other

2    second, is it?

3    A    Correct.

4    Q    All the time he's on the phone; is that correct?

5    A    Yes.

6    Q    When he's at work he's on the phone; is that correct?

7    A    Correct.

8    Q    You know that of your own personal knowledge, don't

9    you?

10   A    Yes.

11   Q    And when you're around him, he's using both phones,

12   isn't he?

13   A    Correct.

14   Q    All the time; is that correct?

15   A    Yes.

16   Q    So it wasn't unusual, am I correct, that it wasn't

17   unusual for Vern to be -- if he -- if there was something

18   traumatic or important to happen in his life, for him to call

19   several friends, was it?

20   A    That's right.

21   Q    That's his pattern, isn't it?

22   A    Yes.

23   Q    Before Sheila Braswell died; right?

24   A    Yes.

25   Q    He was always -- in fact, the two years that you were

1    with him, that was his pattern, wasn't it?

2        A    Yes.

3        Q    Now I want you to tell this jury -- you've been around

4    him a lot; right?

5        A    Uh-huh.

6        Q    Been intimate with him; is that correct?

7        A    Yes.

8        Q    And I want you to tell this jury what was your

9    impression of his demeanor when you talked to him and he told

10   you his wife had died?

11       A    I had called him that morning because I was supposed to

12   pick up the keys to the club to go and let all the inspection

13   people in.  And I called him and he didn't answer and I called

14   him again and he didn't answer and I knew that was unusual

15   because he would normally be en route to Hanley Elementary.

16   So finally I sent him a text message saying that I would be

17   there, you know, as soon as I got done running my errands.  I

18   love you.  And then I finally got ahold to him and he was just

19   crying hysterically, and he couldn't get his words out.  And I

20   was, like, what's wrong?  What's wrong?  My first instinct was

21   that something was wrong with his kids.  And he just kept

22   crying and I said what's wrong?  And he told me to call Brian.

23   And I was, like, why do I need to call Brian?  And he told me

24   just call Brian.  I was, like, well I don't think I have his

25   number.  And he couldn't even get the number out but

1    eventually he got it out and I hung up and I called Brian.

2        Q    Okay.  And in your personal lay opinion of a man that

3    you know well, was he truly distraught?

4              MS. WEIRICH:  Object, Your Honor.

5              THE COURT:  Sustained.

6        Q    In your opinion what was his demeanor?

7        A    He couldn't function at the time.  Seemed like he was

8    dropping the phone or it was, like, real staticy.  He was just

9    crying, just crying, couldn't get anything out.

10       Q    Okay.  Now let me get this straight.  On the night of

11   November 4th, which would have been the night before Mrs.

12   Braswell's tragic death, he didn't call you that night.  You

13   called him, that 10:30 call; is that right?

14       A    Yes.

15       Q    Okay.  And it wasn't unusual for you to call him on his

16   cell phone, was it?

17       A    No.

18       Q    Now I want to clear up one other thing.  There was one

19   occasion, I think you testified on direct that the last time

20   you saw Sheila Braswell was on June 4th; is that correct?

21       A    I think so.

22       Q    In June, I'm sorry, of 2004.  But there was one

23   occasion where you stopped at the club and thought he was

24   there and you went in and found out it was Sheila?

25       A    Yes.

1    Q    And you ended up having to talk to her after that,

2    didn't you?

3    A    I can't remember if I talked to her or not.

4    Q    Did you call her and apologize?

5    A    I don't think so -- I think -- I -- that I can't

6    remember.  I know that I went to the club and I thought it was

7    him.  I was going to stop by and see him.  It wasn't him so I

8    left.  And then I called him but I couldn't ever get ahold to

9    him.

10   Q    So but you and Mrs. Braswell wasn't fighting and

11   scratching and going off about Vern Braswell, were you?

12   A    No.

13   Q    Now did you ever get an indication that Sheila Braswell

14   was -- and Vern Braswell -- that she was going to stay with

15   her husband?

16   A    Yes.

17   Q    Now near the end of your direct testimony there was --

18   you were asked were you afraid of what might happen and is

19   that why you were underground.  You didn't think he was going

20   to do anything to you, did you?

21   A    No.

22   Q    When you said that, you didn't think he was going to

23   come after you and hurt you, did you?

24   A    No.

25   Q    When you said that, you didn't want to be involved in

1    this criminal case; is that correct?

2       A    Correct.

3       Q    That's what you meant; right?

4       A    Yes.

5       Q    Now let me take you -- let's go backward a bit.  I want

6    you to tell this jury, you -- from 2002 to 2004 you've been

7    around Vern Braswell a whole lot, haven't you?

8       A    Yes.

9       Q    Tell this jury about some of the social events and

10   community activities that he was involved in.

11                  MS. WEIRICH:  Objection, Your Honor.

12                  MR. J. BAILEY:  May we approach?

13                  THE COURT:  Uh-huh.

14                  (Bench conference commenced.)

15                  MR. J. BAILEY:  Your Honor, there has been

16   testimony by this witness as to the character of the

17   defendant, and I want to cross-examine her about some of his

18   good character traits.

19                  MS. WEIRICH:  Well, there's a very specific way to

20   do that.

21                  THE COURT:  Right.  You are welcome to ask the

22   character witness questions if you'd like, but this is not the

23   manner in which to do it.  So if you want to ask her is she

24   familiar with his reputation in the community for the truth

25   and veracity or for peace and quietude, and yes, that's fine.

1    But you can't just launch into some open-ended inquiry into

2    his boy scout days or something.

3              MR. J. BAILEY:  Okay.  All right.

4              (Said bench conference concluded.)

5              MR. J. BAILEY:  Would Your Honor indulge me one

6    moment?

7    Q    Are you aware of his reputation in the community?

8    A    Yes.

9    Q    And what would you say it is?

10   A    He was always trying to lend out a helping hand.  He

11   organized a ride up in Tennessee --

12             MS. WEIRICH:  Objection, Your Honor.

13             THE COURT:  Sustained.  Rephrase the question as

14   you know it should be asked.

15             MR. J. BAILEY:  Very well.

16             THE COURT:  We just discussed that.

17             MR. J. BAILEY:  Yes, Your Honor.  That's okay,

18   Your Honor.  I pass the witness.

19

20                    REDIRECT EXAMINATION

21   BY MS. WEIRICH:

22   Q    Do you know John Mitchell, Ms. Woods?

23   A    No, not to my knowledge.

24   Q    Never heard that name?  Do you know Myron Fair?

25   A    No.

1    Q    Ever heard that name?

2    A    Unh-unh.

3    Q    You testified that he had a good reputation in the

4    community?

5    A    Uh-huh.

6    Q    Are you aware that when he and Ms. Braswell were living

7    in Millington, that he beat her up and choked her and she

8    called the police?

9    A    No.

10   Q    You didn't know that?

11   A    No, not until you mentioned it when I met with you.

12   Q    You didn't know that when you knew the defendant?

13   A    No.

14   Q    Are you aware that she got a protective order?

15   A    No.

16   Q    You knew she'd filed for divorce, didn't you?

17   A    Yes.

18   Q    How did you know that?

19   A    He told me.

20   Q    When did he tell you?

21   A    In June.

22   Q    Of what year?

23   A    '04.

24              MS. WEIRICH:  May we approach, Judge?

25              THE COURT:  You may.

1       (Bench conference commenced.)

2           MS. WEIRICH:  We have information about the

3   defendant having choked the victim when he was in rehab.  It

4   was not part of our 404(b) notice, however, because the

5   witness that knows about it, only knows that the victim came

6   to live with her afterward and didn't rise to an excited

7   utterance.  And I don't think that it would have been

8   admissible in our case in chief, but this witness who we've

9   talked to knows that the victim went to visit the defendant in

10  rehab and he choked her there and there were bruises on her

11  neck and she came to live with this witness shortly after

12  that.

13          I would like to ask this witness about that in

14  cross-examination of what Mr. Bailey has now laid out as a

15  character proof.  Also, that when the victim was pregnant with

16  their first child, he drug her down the stairs by her hair and

17  she went to live with the defendant's sister-in-law for two

18  weeks.  Again, these are questions I think I should be able to

19  --

20          THE COURT:  What proof do you have with regard to

21  the second allegation?

22          MS. WEIRICH:  The sister-in-law.

23          MR. W. BAILEY:  Was she a witness?

24          THE COURT:  Was she a witness or --

25          MS. WEIRICH:  She knows that -- and this is all

1   something we found out last night.  The victim showed up at

2   her house crying and hysterical, wanting to live with them for

3   a while, wanting to move in with them.  She had packed her

4   bags.

5              THE COURT:  Okay.  We need to have an out-of-jury

6   hearing.

7              MR. J. BAILEY:  Your Honor, and I don't understand

8   what that has to do with this witness.

9              THE COURT:  Well, she's asking to be able to ask

10   this character witness do you know or have you heard that X, Y

11   and Z happened, which is appropriate once we have an

12   out-of-jury hearing if I rule that there's a sufficient

13   factual basis for it then she can ask.

14              MR. J. BAILEY:  I'm just asking a procedural

15   question.  Are they going to bring that person in so we can

16   establish if it's hearsay or if it --

17              THE COURT:  Yes.  That's why we're having an

18   out-of-jury hearing.

19              (Said bench conference concluded.)

20              THE COURT:  Ladies and gentlemen, I'll excuse you

21   for a few minutes.  I'll call you back shortly.

22              (Jury out.)

23              THE COURT:  Do you have that witness here?

24              MS. CARNESALE:  We do, Judge.

25              THE COURT:  The sister-in-law?

1          MS. WEIRICH:  Yes.

2          THE COURT:  Ms. Woods, if you would step outside

3    for a few moments, but do not discuss your testimony with

4    anyone while you're outside, please.  And just remain outside

5    the courtroom.

6          MS. WEIRICH:  Do you want her in here, Judge?

7          THE COURT:  Yes.  Go ahead and call her, if you

8    would, please.

9

10                        VERA COLE

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13                    DIRECT EXAMINATION

14   BY MS. WEIRICH:

15   Q    Please tell the Judge your name.

16   A    Vera Cole.

17   Q    Do you know the defendant?

18   A    Yes.

19   Q    How do you know him?

20   A    He's my brother-in-law.

21   Q    You're married to his brother?

22   A    Yes.

23   Q    What's your husband's name?

24   A    Eric Cole.

25   Q    How long have you two been married?

1    A    We've been married for 16 years, divorced and remarried

2    a year.

3    Q    Okay.  Do you remember Sheila Braswell?

4    A    Yes.

5    Q    She was your sister-in-law?

6    A    Yes.

7    Q    Was there a time when she came to live with you?

8    A    Yes.

9    Q    When was that?

10   A    I want to say between -- somewhere in '97.  All I know

11   is she was pregnant with the first baby.

12   Q    And who is the first baby?

13   A    William.

14   Q    And how old is William, if you know today?

15   A    About -- I think he's about eight maybe.

16   Q    Okay.  Where was Sheila Braswell living when she came

17   to stay with you?

18   A    In Millington.

19   Q    Do you remember what street in Millington?

20   A    No.

21   Q    When she came to you, was it daytime or nighttime?

22   A    It was night.

23   Q    What kind of condition was she in?

24   A    She was upset.

25   Q    Was she injured?  Hurt?

1    A    I didn't see the injuries -- injury until she came in

2    the house.

3    Q    Okay.  So she came to your doorstep, you answered the

4    door.  What time of night was it?

5    A    I don't know but it was dark.  It was maybe about 10,

6    11 at night.

7    Q    What did she say?

8    A    She just said she needed to stay here -- stay over

9    here.  And I said what is wrong.

10   Q    What did she tell you?

11   A    She just said we had got into it.

12   Q    When she said "we" who did she mean?

13   A    Her and her husband, her and Vern.

14   Q    Okay.  Did she tell you what he did?

15   A    Yes.

16   Q    What did he do?

17   A    She just -- what she said to me was that he -- they had

18   got into it and she was going down the stairs and he pulled

19   her by the hair down the stairs.

20   Q    What had they gotten into it about?  Did she say?

21   A    I don't know.  I don't know.

22   Q    When she came into your house, did you see injuries on

23   her?

24   A    I just saw -- all I remember is her crying.  She was

25   crying.

1    Q    Do you remember something about her mouth?

2    A    Yes.  Later on we were laying on the floor talking and

3    she just -- it wasn't a busted lip and it wasn't on the

4    outside.  It was maybe like a tooth indention, like, on her

5    lip, you know.  It wasn't swollen big or anything.

6    Q    Did she want you to call the police?

7    A    No.

8    Q    Did you want to call the police?

9    A    I can't remember if I -- I don't -- I -- I don't

10   remember all of that.

11   Q    Did she want anybody to find out about it?

12   A    At that point I asked her how come she didn't go to --

13   my husband asked her how come she didn't go to her mother's

14   and she said she didn't want them to know.

15   Q    Okay.  Did she stay with you?

16   A    Yes.

17   Q    For how long?

18   A    I know it was -- it was over five days.

19   Q    Okay.  And did she have her belongings with her when

20   she showed up?

21   A    Yes, she had some things.

22   Q    Did the defendant try to contact her during that time?

23   A    He never came to the house, but he called and he was

24   concerned about how she was doing.  And he would talk more to

25   my husband.

1    Q      Okay.

2    A      But they didn't talk for, like -- I know for, like, the

3    first two or three days.  They didn't talk.

4              THE COURT:  Mr. Bailey, do you have any questions?

5              MR. J. BAILEY:  Before we do that, may I ask one

6    question of someone in the court?  He'll handle it.

7

8                         CROSS-EXAMINATION

9    BY MR. W. BAILEY:

10   Q      I'm sorry.  State your name again.

11   A      Vera Cole.

12   Q      Ms. Cole, when Mrs. Braswell arrived at your home, did

13   she tell you how long it had been and how she got there?

14   A      How did she get where?

15   Q      To your home.

16   A      She drove.

17   Q      And did she tell you how long it was that they had

18   gotten into it?

19   A      No, she didn't talk very much about it.

20   Q      Uh-huh.  And when you saw her, she was crying and upset

21   and was she -- she had calmed down, hadn't she?

22   A      Yes.

23   Q      She wasn't excited or anything, was she, at that point?

24   You say she was crying?

25   A      She was crying.

1   Q    But she was very rational and to herself then, wasn't

2   she?

3   A    Yes.

4   Q    And did y'all do any joking then?

5   A    It was so long.  Not that I know of.

6   Q    You just don't remember?

7   A    I mean, we talked a lot.  We both stayed in the same

8   room in the living room talking.

9   Q    How long did y'all stay there talking?

10  A    I don't know.  We were both on the floor.

11  Q    You kind of had to drag out of her what had happened,

12  didn't you?

13  A    I didn't -- no, I mean -- no, because I didn't pick at

14  it.

15  Q    Uh-huh.

16  A    I didn't pick.

17  Q    Uh-huh.  And did y'all drink or consume anything like

18  water or anything?  Any beverages?

19  A    Not to my knowledge.  I don't know.

20  Q    You don't remember?

21  A    No.

22  Q    But the bottom line is she was crying but had calmed

23  down a great deal, hadn't she?

24  A    Yes, she calmed down.

25  Q    And that's when she went on to tell you about what had

1  happened?

2     A   She didn't tell me everything that happened.  She just

3  said they had gotten into it.  All I know is they got into it

4  and she was upset and that he had pulled her by the hair down

5  the stairs.  That's all that I know.

6     Q   And how long had she been at your house when she told

7  you that?

8     A   She wasn't there long, you know.

9     Q   About ten or 15 minutes?

10    A   No, it was a little -- you know.

11    Q   It was about five or ten minutes?

12    A   No, probably about 20 or 30 minutes, probably.

13    Q   About 20 or 30 minutes?

14    A   Uh-huh.

15    Q   When she went into that?

16    A   Yes.

17           MR. W. BAILEY:  Thank you.

18           THE COURT:  Thank you.  Ms. Cole, if you would

19 wait outside the courtroom and don't discuss your testimony

20 with anyone while you're out there, please.  Thank you.

21           With regard to the other incident that you mentioned at

22 the bench, do you have proof on that?

23           MS. WEIRICH:  That witness, Judge, is at work.  I

24 can get her here quickly.  She's at St. Jude.

25           THE COURT:  And that proof would be what again

1    now?

2              MS. WEIRICH:   That proof would be that the victim

3    called this woman.   They were friends from school, asked can I

4    come stay with you for some time -- come stay with you and the

5    woman said of course.   When she saw the victim later that day,

6    she noticed her neck was red, her voice was raspy.   The victim

7    indicated that she had been to visit -- she is here.

8              THE COURT:   Okay.   Call the witness.   Let's hear

9    from her.

10

11                            MAGRA HARDEN

12   called as a witness, being first duly sworn, was examined and

13   testified as follows:

14                         DIRECT EXAMINATION

15   BY MS. WEIRICH:

16        Q    Good morning.

17        A    Good morning.

18        Q    Would you please tell the Judge your name?

19        A    My name is Magra Harden.

20        Q    And would you spell your name?

21        A    M-A-G-R-A is the first name.   The last name is Harden,

22   H-A-R-D-E-N.

23        Q    Where do you work?

24        A    I work for Methodist Alliance private duty.

25        Q    Did you know Sheila Braswell?

1      A    I do.

2      Q    How long had you known her?

3      A    I met Sheila in the summer of 1993.

4      Q    Where did you meet her?

5      A    At the University of Tennessee campus.

6      Q    Both in school?

7      A    Correct.

8      Q    Was there a time when she came to live with you?

9      A    There was.

10     Q    When was that?

11     A    That was in the -- it was warm weather, spring or early

12   summer of 1995.

13     Q    Okay.  Why did she come to live with you?

14     A    She came to live with me because she had been in a

15   physical altercation with her husband Vern, and she had made

16   some statements that he had been out carousing was sort of the

17   term that she used.  And she didn't want to go back and stay

18   with her mother or brother and involve them in the situation

19   so she asked if she could come stay with me for a while.

20     Q    All right.  And where were she and the defendant living

21   at the time?

22     A    In Millington.

23     Q    Okay.  And again, this was '95?

24     A    It was '95.  Yeah, they were married in '94.  We were

25   still doing field work.  We were doing clinical field work so

1   we were still technically students at the University of

2   Tennessee.  But I believe she and Vern were living in

3   Millington at the time in an apartment.

4       Q    Did you see any signs of this physical abuse?

5       A    When she came to stay with me originally, no.

6           MR. W. BAILEY:  Your Honor, excuse me, I don't

7   think she said "physical abuse."  I think she said carousing

8   around.

9           MS. WEIRICH:  I thought she said she was injured.

10          THE COURT:  She said the reason -- well, you can

11  cross-examine her when the time comes.  Go ahead and ask your

12  question.

13          MS. WEIRICH:  Thank you.

14      Q    What were you saying?  I'm sorry.  You said not at

15  first or when she came to stay with you, you did?

16      A    Well, we discussed it by phone.  She didn't come

17  immediately to stay with me.  She contacted me by phone and

18  just in conversation she had ask me if I was interested in

19  having a roommate.  And of course being students and us

20  obviously having student loans and having financial distress,

21  I thought she was just trying to help me, she knew a friend

22  that might want to come live with me.  I said no, I don't want

23  a roommate.  And in the conversation it -- she started

24  indicating that the person that she wanted to come live with

25  me was in fact her.  And then she sort of explained that she

1  and Vern had had some problems and that he had been out -- she

2  called it in the streets.  I think she just basically called

3  it "in the streets."  There had been a physical confrontation

4  and that she --

5      Q    Between the two of them?

6      A    Between the two of them and that she would like to come

7  and live with me for a while.

8      Q    Okay.  And did she do that?

9      A    She did.

10     Q    And when she came to stay with you, did you notice any

11 physical signs on her?

12     A    Not as soon as she moved in but some days elapsed

13 between the time that she actually came to stay with me.  I

14 did later at a confrontation they had when Vern was in rehab.

15     Q    Okay.  Tell me about that.

16     A    Well, Vern had checked into rehab and Sheila went on a

17 weekend to -- I don't recall where he was in a rehab but

18 somewhere that she went on the grounds for the weekend to see

19 him on a visit.  And I saw her later in the evening.  And at

20 that time she had a very raspy voice and she had marks on her

21 neck.

22     Q    What kind of marks?

23     A    Kind of a darkened area.  They were, like, just a

24 reddish darkened area around her throat and her voice was very

25 very dry, very raspy.  She was extremely upset and she said

1    that she and Vern had had a confrontation on the grounds at

2    the rehab and that he had gotten her in a position where there

3    was a van that sort of separated her and the other people on

4    the grounds and that he had choked her.

5        Q    Okay.  Did she say what the -- what he was upset about?

6        A    She didn't say specifically, that he was just accusing

7    her of some things and that he was just -- she really didn't.

8    I mean, I was just very concerned about it and really wanted

9    her to go to the police and report it and she was -- I mean,

10   you know, she was just upset and she was very embarrassed

11   about her family knowing and she just didn't want to do that

12   at that time, although I strongly encouraged her to please

13   file a police report to please let me at least take pictures.

14       Q    She wouldn't even let you do that?

15       A    No, whatever she decided later, that she would at least

16   have that evidence.  I mean, she hadn't even been married a

17   year.  You know, very young, very impressionable, a newlywed,

18   wanting her marriage to work, and she was just very private

19   really about her life.

20       Q    Okay.  How long did she live with you then?

21       A    She was there several months because we both had to

22   leave to go out of town to go to field work in later states,

23   later into the summer or the early fall.  I don't remember the

24   exact dates because it's been ten years so I don't recall the

25   exact dates.

1    Q    And then did she go back to live with her husband?

2    A    We she came back from field work, we both went to work

3    together at the same facility, at Healthsouth Rehabilitation

4    Hospital here in Memphis and she and Vern then got back

5    together after that.

6            MS. WEIRICH:  Nothing further, Judge.

7            THE COURT:  Mr. Bailey.

8            MR. J. BAILEY:  Just one second, Your Honor.

9

10                    CROSS-EXAMINATION

11   BY MR. W. BAILEY:

12   Q    Ms. Harden, how far do you live from the rehab

13   facility?

14   A    Which one?  From where I work now?

15   Q    No, the one from where she made the call?  I think you

16   said she telephoned you first?

17   A    She was at home.  When she called me the first time

18   when she wanted to come live with me?

19   Q    Yeah, when she was at the rehab when she said that she

20   and Vern had gotten into it at the rehab facility?

21   A    Oh, she wasn't at the rehab facility when she called

22   me.  She was at home when she called me.

23   Q    Oh, I see.  Did she tell you when that happened?

24   A    I don't recall.

25   Q    You don't know when she said it happened?

1    A    When or where?  I'm sorry-

2         THE COURT:  I think we're talking about two

3    different things.  I don't want to -- are you talking about

4    the day that she went to the rehab facility and then came back

5    with the marks?  Is that what you're talking about, referring

6    to?

7         MR. W. BAILEY:  That's what I'm talking about.

8         THE COURT:  Okay.

9    A    Well, I lived at the time in Berclair so I don't

10   recall.  And I didn't see her until much later in the evening.

11   I didn't see her, like, the minute she came home.  I don't

12   know where he was in rehab.  I saw her later in the afternoon

13   or, like, late in the evening.

14   Q    So late in the evening she came and gave you an account

15   and she was upset.

16   A    Sometime in the evening.  I don't recall the exact

17   time.  As I said it's been some time, but she had been there

18   in the daytime I think to visit him, and I saw her later in

19   the evening at my home -- well, our home when she came back,

20   which is where when she was living at the time.  I don't know

21   where he was in rehab so I'm not sure of the distance.

22   Q    I see.  And it was -- what time over in the afternoon?

23   Would you say four, five, six o'clock?

24   A    Well, I couldn't say.

25   Q    You don't have any idea?

1    A    I just don't recall.

2    Q    And you didn't see any of this yourself of course, did

3    you?

4    A    Well, no, I was not on the rehab facility visiting

5    Vern, no.

6    Q    And this happened early in the morning, you say?

7    A    No, I don't know the exact time because I don't know

8    what time she left and what time she came back.  We lived

9    together.  She left that day to go and I did things and she

10   did things and we saw each other later in the evening.

11   Q    But you know it was over in the morning when this

12   happened?

13   A    I don't know what time of day it happened.

14   Q    I see.

15             MR. W. BAILEY:  No further questions.

16             THE COURT:  So when you got in that evening she

17   was already there, the day that she had gone to visit the

18   defendant at the rehab center?

19             WITNESS HARDEN:  Well, I don't recall exactly

20   whether I arrived first or who was home first.  I just

21   remember that we reconnected in the later part of the day.  I

22   mean, I just couldn't pinpoint the time since it's been so

23   many years.

24             THE COURT:  And when y'all reconnected at your

25   house later in the day on the day that she had gone to the

1    rehab center to visit her husband, tell me what her demeanor

2    was at that time.

3             WITNESS HARDEN:  Her demeanor she was crying.  She

4    was upset, and she was just, like, really confused.  She was

5    distraught, you know, and her voice was very raspy.  She had

6    discoloration on her neck and it was kind of -- I guess our

7    age difference was a little bit different.  I didn't probably

8    approach her as much, like I would my best girlfriend.  I

9    tried to just strongly encourage her to file a police report

10   and that she needed to follow through with some sort of

11   protection to keep something like that from happening again.

12            THE COURT:  And y'all discussed all that in your

13   house?

14            WITNESS HARDEN:  In my house in Berclair that

15   evening.

16            THE COURT:  That evening of the day --

17            WITNESS HARDEN:  That it occurred.

18            THE COURT:  -- on which she had gone to the rehab?

19            WITNESS HARDEN:  Yes, sir.

20            THE COURT:  All right.  Thank you.  If you would

21   step outside and just wait outside the courtroom and not

22   discuss your testimony with anyone while you're out there,

23   please.

24            MS. WEIRICH:  Judge, while we're on the subject,

25   we also had filed a notice of Mr. Braswell's record that he

1   had been convicted of theft of property under $500 and an

2   assault case that if character witnesses are going to testify

3   to his good reputation, we'd ask to go over those as well.

4           THE COURT:  You may ask about those as well.  Go

5   ahead.  Well, before we get to those, let's address these two

6   matters that we just heard proof on.  Do you care to make a

7   statement?

8           MR. W. BAILEY:  I do, Your Honor.  These are in my

9   humble opinion based on the law just rank hearsay instances in

10  that excited utterances are designed to display the protection

11  against a hearsay and reliability that's what we're talking

12  about in terms of excited utterances is where the excitement

13  is there and you get animalistic behavior.  You're not getting

14  someone who has calmed down or who is in a state or frame of

15  mind after -- or had sufficient time from the event just in

16  terms of time alone to calmly or to express what occurred.

17          And here we have a lady who -- we have a witness who is

18  talking on the latter incident, we have a witness who is

19  saying what Ms. Braswell experienced up in the day, in which

20  she said she had experienced up in the day.  And this

21  certainly is remote in time.  This certainly doesn't come

22  under the purview of excited utterances.  There is nothing

23  animalistic in terms of instinctive expressions here.  There

24  is nothing reliable about this.

25          And secondly, going to the first incident where we had

1   the witness who said that she told her later on after she had

2   gotten to her home about he had -- what Mr. Braswell did and

3   that it was 20 or 30 minutes later after she had arrived at

4   the house and they were discussing it.  And it seems to me

5   none of this -- neither one of these incidents fall within the

6   bracket or meet the bar that's set for the admission of

7   excited utterances.  In both instances Mrs. Braswell had every

8   opportunity of being calm and sober and not fainting, and it

9   seems to me that these are not, as I indicated, these are not

10  instances of excited utterances.

11          THE COURT:  Well, I guess opportunity, yes, but in

12  reality no.  And in fact as we all know in the law there's no

13  magic time limit for an utterance to be considered an excited

14  utterance.  I mean, there are cases in which excited

15  utterances are made days and days after an event if the

16  circumstances present themselves properly.

17          And in this instance, these two statements that were

18  testified to related to events that occurred on that same day

19  within a relatively brief period of time.  Now while it's true

20  that they weren't made instantaneously contemporaneous with

21  the event itself, they are relatively close in time to the

22  occurrence that was testified to.  And just as significantly,

23  they were made to individuals in whom the victim had

24  confidence, in whom she was confiding.

25          There's case law to suggest that if an event occurs and

1   days later a victim of an event for the first time is in a

2   climate or an environment where he or she has someone in whom

3   he or she has faith and confidence, then that opportunity to

4   confide in that person could well constitute the excited

5   utterance because that's the first opportunity they had to

6   really confide with someone in whom they had trust and

7   confidence.

8          And in point of fact, in spite of the questions that

9   were asked on cross-examination, both of these witnesses

10  repeatedly maintained that the victim was distraught, crying,

11  upset at the time these statements were made; not cool, calm

12  and collected.  They did state pursuant to questioning that

13  the victim was coherent but nonetheless upset and crying and

14  exhibiting the type of emotion and conduct that would lend

15  that indicia of reliability to the statements that the victim

16  was making at the time; not a cool, calm, collected statement

17  made ten days later to somebody in passing.  This was a

18  product of the emotional distress that she was in from the

19  events that had occurred, at least according to the witnesses

20  that testified under oath today.

21          So I am of the opinion that there is a reasonable

22  basis, a reasonable factual basis to support the events with

23  which these two witnesses have testified.  And that this

24  testimony from each of these witnesses is highly probative as

25  to the issues of -- as we discussed earlier before the trial

1    began -- as to the issues of intent, identity, lack of

2    mistake, lack of accident.  They go to the very heart of that

3    and so I think that the probative value far outweighs the

4    prejudicial effect, just as I'd ruled previously with regard

5    to the testimony on the other matters.

6          MR. J. BAILEY:  May I be heard on a different

7    issue on same subject matter but different issue?  Your Honor,

8    the defendant has a Constitutional right to confrontation.

9    I'm going to state this for the record.  And as we get --

10   we're talking about incidents ten years ago.  We're talking

11   about and I understand Your Honor's ruling on the excited

12   utterance exception to hearsay.  But we're now getting to the

13   point where the defendant's absolute right under the

14   Constitution to a right to confront the accuser is getting

15   well beyond -- I mean, we're getting well beyond his ability

16   to do so.

17       For instance for the record, Ms. Vera Cole took the

18   stand and her statement -- the sister-in-law -- and she takes

19   the stand and says well, she told me this.  I don't know

20   whether it really happened.  She just told me this.  I mean, I

21   saw that she was upset.  We laid down.  We talked about it.

22   How does the defendant confront his accuser in that case?

23   Because what we're implying to the jury -- what's being

24   implied to the jury is that it's true and it's being used to

25   show, in my opinion and my argument to the Court, is being

1    used to show that his actions on the date in question as the

2    subject of this lawsuit, of this criminal action was in

3    conformity with that.

4         THE COURT:  Well, I'll -- I'll instruct the jury

5    appropriately with regard to how to receive this proof.  But

6    of course, that's what the whole hearsay exception is about.

7    That's what we study in law school.  That is why exceptions to

8    the hearsay rule exist, when the indicia of reliability is

9    there, then hearsay statements are admissible.  This is a

10   classic example in my judgment.  I don't know how -- I mean,

11   this seems to me to be a textbook example of excited utterance

12   that is highly probative of a central issue to this case,

13   absence of accident or mistake.

14        Was this a tragic accident or not?  And proof from

15   these victim -- from these witnesses regarding statements of

16   the victim and observations these witnesses made of marks on

17   her neck and raspy voice would certainly be highly probative

18   to the issue of accident or absence thereof.  And it is an

19   exception to the hearsay rule and under our law is admissible.

20   I'll note your objection.

21        MR. J. BAILEY:  Well, Your Honor, may I ask this

22   question of the Court and I'll leave it at this.  I'd like to

23   know there is a -- in the discovery packet the police had

24   identified two young ladies who indicated that Mrs. Braswell

25   also told them about the sexual practices that we talked

1    about, the choking and so forth.  And I couldn't call them

2    because of the -- it would be hearsay.  It would go to rebut

3    this though.

4           THE COURT:  I don't know how that would go to

5    rebut this.  We'll take that up at the appropriate time, if

6    you want to raise it and if there is an appropriate exception

7    to the hearsay rule, well then certainly it will be

8    admissible.  And we'll just take it witness by witness.  And

9    if you want to suggest that there's an appropriate exception

10   to the hearsay rule that would allow that testimony in, I'll

11   be glad to hear from you.  But we'll just take it witness by

12   witness.

13          With regard to the testimony in these two instances,

14   the testimony of the second witness Ms. Harden will need to be

15   narrowed and I'll have you -- we'll take a recess so you can

16   talk to her.  None of the statements about -- from her earlier

17   phone conversation when the victim was first calling saying

18   would you like a roommate, my husband has been in the streets,

19   he's been carousing, I need to move in with you, none of that

20   is admissible.  Only the testimony of the events on the night

21   of the alleged attack at the rehab center, that testimony is

22   all that's admissible from Ms. Harden.  As far as the first --

23          MS. WEIRICH:  Is the fact that the victim was

24   living with that witness at that time?

25          THE COURT:  Yes, because that lends credence to

1   the reliability of the safety and the role that these two

2   women had with one another.  So that's admissible.  But not

3   how she came to be living with her or anything of that sort.

4   Stay away from all that.

5           As to Ms. Cole, all those events occurred on the night

6   that she showed up at her door at ten or 11 that night with

7   her bag and so all of the events that she's testified to thus

8   far, I believe are admissible and are appropriate.  So she's

9   okay as long as you confine yourself as to what she's already

10  testified to.

11          So what we'll do, my ruling is you may first ask Ms.

12  Woods was she -- does she know or was she aware of this

13  incident or this incident for purposes of challenging her

14  credibility as a character witness.  And then you're bound by

15  her answer with regard to that.  Once she has completed

16  testifying though, you are allowed to call these other

17  witnesses pursuant to the same 404(b) for those same purposes

18  that we discussed pretrial.

19          And then with regard to the theft of property and

20  assault arrests?

21          MS. WEIRICH:  Yes, sir.

22          THE COURT:  That's again, classic information

23  that's admissible to challenge the credibility of a character

24  witness.  When a witness testifies under oath that this person

25  enjoys a good reputation in the community, then proper

1    cross-examination always has been and continues to be well,

2    did you know or are you aware of the fact that he's been

3    convicted of theft of property, that he was arrested for

4    assault?  Well, no, I didn't know that.  Well now that you do

5    know that, does that affect your opinion with regard to his

6    character?  Yes or no.  Or if she says, yes, I did know that,

7    then the jury can weigh that in concluding -- in deciding on

8    her credibility as a character witness.

9         So that's I think classic character cross-examination

10   or questioning, I should say.  So we'll take a brief recess so

11   you can talk to Ms. Harden.  Take him out, please.  Take a

12   recess.

13             (Recess.)

14             THE COURT:  Ask Ms. Kristie Woods to step back in,

15   please.  Ms. Woods, you may resume the witness stand.  You're

16   still under oath.  Bring in the jury, please.

17             (Kristie Woods resumed the witness stand,

18                  having been previously sworn.)

19             MS. WEIRICH:  May we approach, Judge, while

20   they're coming in?

21             THE COURT:  Sure.

22             (Bench conference commenced.)

23             MS. WEIRICH:  Something I remembered during the

24   break.  Vera Cole had been subpoenaed by the State and came to

25   my office Monday morning with her husband, who is the

1    defendant's brother, and was very tight-lipped, would not talk

2    to me at all with her husband sitting there.  And I got the

3    distinct impression that either we had been getting completely

4    false information about what she knew or that she just didn't

5    want to talk to us.  We stopped the interviews and I told her

6    we didn't need her.  So she was in the courtroom on Tuesday.

7              MR. J. BAILEY:  She was here on Tuesday and

8    Wednesday.

9              MS. WEIRICH:  And midday yesterday.  She went down

10   to the third floor.  She got away from her husband.  She went

11   down to the third floor.  She had our receptionist call Amy

12   McCullough, our victim-witness coordinator and say I need to

13   talk to you and met on a different floor, a different area

14   away from her husband.  And she proceeded to tell Ms.

15   McCullough what we had heard that she knew about but explained

16   that she couldn't do it with her husband sitting there.  She

17   was afraid of him and afraid of what the family would do.

18        So that is why we didn't find out everything about what

19   she knows until late last night after we adjourned court for

20   the night.  We talked with her.  We got her away from her

21   husband.  She told us everything, but she was in the courtroom

22   for Tuesday and part of Wednesday until she felt comfortable

23   enough to approach one of us.

24             THE COURT:  Right.  Okay.  Well I think under

25   those circumstances, that would certainly constitute an

1    exception to the imposition of the rule.  Those are some

2    pretty unique circumstances.

3            MR. J. BAILEY:  I'm not often agreeing with the

4    State, but I will admit I talked with her, too, and she kind

5    of withheld a lot of stuff from me, too.  I don't have any

6    argument on that.

7            (Said bench conference concluded.)

8            THE COURT:  All right.  Ms. Weirich.

9            MS. WEIRICH:  Thank you.

10

11           REDIRECT EXAMINATION CONTINUED

12   BY MS. WEIRICH:

13   Q    Ms. Woods, let me go back to where we were before the

14   break.  You indicated that you did not know that the defendant

15   had hit, punched and choked his wife back in 1996 when they

16   lived in Millington; right?

17   A    Correct.

18   Q    You did not know that she had sought a protective order

19   and was given a protective order by a judge here in town?

20   A    No.

21   Q    Did you know or have you heard that the victim Sheila

22   Braswell went to live with a woman named Magra Harden back in

23   about 1995?

24   A    No.

25   Q    Did you know or have you heard that while Sheila

1   Braswell was living with Magra Harden away from her husband

2   that she went to visit her husband at a rehab facility and he

3   choked her there?

4   A    No.

5   Q    Did you know that?

6   A    No.

7   Q    Did you know or have you heard that when Sheila

8   Braswell was pregnant with their first child, he got mad at

9   her and drug her down the stairs by her hair?  Did you know

10  that?

11  A    No.

12  Q    Have you heard that?

13  A    No.

14  Q    Knowing that, does that change your opinion about his

15  reputation in the community?

16  A    Can you repeat your question?

17  Q    Knowing that, that he choked her when they lived in

18  Millington and she had to go to the Circuit Court and get a

19  protective order, that he drug her down the stairs by her hair

20  when she was pregnant with their first child, that she went to

21  visit him in a rehab facility and he choked her to the point

22  that she couldn't speak very well, does that change your

23  opinion about his reputation in the community?

24  A    Yes.

25  Q    Did you know he was convicted of theft of property in

1  1992?

2     A    No.

3     Q    Did you know he was convicted of assault in 1990?

4     A    No.

5     Q    Does that further change your opinion as to his

6  reputation in the community?

7     A    Yes.

8          MS. WEIRICH:  I don't have anything else.

9          THE COURT:  Mr. Bailey, anything further?

10         MR. J. BAILEY:  Indulge me one moment.

11

12              RECROSS EXAMINATION

13 BY MR. J. BAILEY:

14    Q    Ms. Woods, Sheila Braswell didn't tell you about those

15 things either, did she?

16    A    No.

17    Q    And you met with her, didn't you?

18    A    Yes.

19    Q    And she talked about Vern Braswell, didn't she?

20    A    Yes.

21    Q    She opened up to you, didn't she?

22    A    Yes.

23    Q    She didn't tell you any of that, did she?

24    A    No.

25    Q    Did she tell you that he dragged her down the stairs

1    when she was pregnant?

2      A   No.

3      Q   In fact on either occasion that you talked to her, did

4    she tell you that?

5      A   No.

6      Q   Did she tell you that he choked her to the point where

7    she couldn't talk?

8      A   No.

9      Q   Mrs. Sheila Braswell didn't tell you that, did she?

10      A   No.

11      Q   Did she tell you that she went to live with some Vera

12    Cole?

13      A   No.

14      Q   You never heard that before, have you?

15      A   No.

16      Q   In fact, in the two years you were with Mr. Braswell,

17    did he ever tell you that?

18      A   No.

19      Q   So neither Sheila nor Vern Braswell told you that, did

20    they?

21      A   No.

22            MR. J. BAILEY:  No further questions.

23

24

25

<u>FURTHER REDIRECT EXAMINATION</u>

BY MS. WEIRICH:

Q   When you did meet with her at the Waffle House that day, what did she tell you to do?

A   She told me to leave him alone.

Q   Why?

A   Because that was her husband.

Q   What other reason did she give you?

A   To my knowledge, that's all I can think of.

Q   Didn't she tell you, you didn't know what you were messing with?

MR. J. BAILEY:   Your Honor, that's leading.  I object.

THE COURT:   Sustained.

Q   What did she tell you?

A   She told me to leave him alone, that that was her husband.

Q   What else did she tell you?

MR. J. BAILEY:   Your Honor, she's already testified to that answer.

MS. WEIRICH:   May we approach, Judge?

THE COURT:   You may.

(Bench conference commenced.)

MS. WEIRICH:   Judge, she's told me before that the victim told her to stay away from him because she didn't know

1   what she was messing with and she'd get hurt.  The victim even

2   went back to -- if I'm remembering this correctly, correct me

3   if I'm wrong -- went back to her apartment with her to make

4   sure that he wasn't there waiting for her.  Sheila Braswell

5   took on a very protective role of this young lady that day

6   after that meeting for some reason.  And I think Mr. Bailey's

7   questions opened the door to that.

8         MR. J. BAILEY:  Judge, she just testified that to

9   her knowledge that's all she said.  And what they're trying to

10  do is lead her into saying something else.

11        MS. WEIRICH:  Yes, I am, because she's being a

12  hostile witness.

13        MS. CARNESALE:  Mr. Bailey raised the issue did

14  she ever tell you that Vern had hurt her and she'd had to move

15  out.  And Ms. Woods, I believe Mrs. Braswell told Ms. Woods

16  that Vern might hurt her and that's what she should stay away

17  from.  And I think Ms. Weirich should be allowed to ask that

18  question directly.  And we're stuck with her answer but that

19  was the information we had prior to trial.

20        MR. J. BAILEY:  Judge, she's not a hostile

21  witness.  They subpoenaed her.  When she -- she came in and

22  met with them.  She's been here for three days.  She's not --

23  I mean, she's not been hostile toward them at all.  She's

24  answered every question to both sides.  That's blatantly

25  leading and that's our position.

1          MR. W. BAILEY:  And I might add furthermore it's

2     hearsay, Judge.

3          MS. CARNESALE:  Everything Mr. Bailey elicited

4     was hearsay and (indiscernible).

5          MR. J. BAILEY:  I have to in light of the

6     character proof.

7          MS. WEIRICH:  The fact that we subpoenaed her

8     doesn't dictate whether she's a hostile witness or not, Your

9     Honor.  This is a woman that hid from the police department,

10    hid from the entire justice process until two weeks ago.

11         MR. J. BAILEY:  So was Vera Cole.

12         THE COURT:  Well, I agree that certainly under the

13    rules as they exist now, you can subpoena somebody and they

14    can still be a hostile witness.  In fact, you don't vouch for

15    your witnesses like you used to back in the days when your

16    father and I started practicing law.  Things have changed

17    since then.

18         But -- and I do agree that she's answered that

19    question.  I'll allow this in the form of refreshing

20    recollection.  I'll allow you to ask her in a very limited way

21    something to the effect that do you remember talking to me in

22    my office and say what did you tell us then.  But if she says

23    -- if she still maintains what she said, then I think you're

24    bound by that answer and we're going to move on.

25         MS. WEIRICH:  Thank you.  Can I ask her about

1    specifically the victim going back to the apartment to make

2    sure --

3              THE COURT:  Well, she's already testified that

4    they went separate ways after that.  And again, she hasn't

5    said that she doesn't remember.  She hasn't said well, I can't

6    really remember what she did or what I said.  She's testified

7    pretty definitively.  So I think you are bound by those

8    answers.

9              (Said bench conference concluded.)

10   Q    Ms. Woods, do you remember coming to my office, I guess

11   it's been two or three weeks ago?

12   A    Yes.

13   Q    Okay.  Do you remember what you told me about what

14   Sheila Braswell gave you was the reason you needed to get away

15   from the defendant?

16   A    She told me that that was her husband.  Only thing she

17   did was follow me home to make sure that I would be okay.

18   Q    Why did she do that?

19   A    After our conversation.

20   Q    Why did she follow you home?

21             MR. J. BAILEY:  She can't testify to why this lady

22   did anything, Judge, unless she's going to say -- I mean, that

23   would be hearsay.

24             MS. WEIRICH:  If she told her why she was going to

25   follow her home, she can.

1          MR. J. BAILEY:  That would be hearsay.

2          MS. WEIRICH:  State of mind, Judge.

3          THE COURT:  Sustained.

4     Q    All right.  Did she follow you home?

5     A    Yes.

6     Q    To your apartment?

7     A    Yes.

8     Q    Okay.  And then did she leave?

9     A    She only drove by my apartment and then I went in.  She

10    just made sure that I got from the Waffle House back to my

11    house okay.

12    Q    Okay.  In the time that you were with her at the Waffle

13    House, did she ever raise her voice at you?

14    A    No.

15    Q    Did she ever threaten you?

16    A    No.

17    Q    Did she ever hurt you?

18    A    No.

19    Q    Did she ever tell you that she would hurt you?

20    A    No.

21    Q    Was she kind of a friend to you that day?

22    A    Yes.

23    Q    Was she kind of protective of you that day?

24    A    Yes.

25         MS. WEIRICH:  Nothing further.

1      THE COURT:  You may step down.  Call your next

2  witness.

3      MS. CARNESALE:  Your Honor, the State calls

4  Sheronda Smith.

5

6                SHERONDA SMITH

7  called as a witness, being first duly sworn, was examined and

8  testified as follows:

9                DIRECT EXAMINATION

10  BY MS. CARNESALE:

11      Q    Good morning.

12      A    Hi.

13      Q    Will you please state and spell your name for the

14  record?

15      A    Sheronda Smith, S-H-E-R-O-N-D-A.  Smith, S-M-I-T-H.

16      Q    And, Ms. Smith, are you employed?

17      A    Yes.

18      Q    What do you do for a living?

19      A    I work with Head Start programs at Porter-Leath

20  Children's Center.

21      Q    You live here in Memphis, Shelby County?

22      A    Yes, I do.

23      Q    Were you a friend of the victim in this matter Sheila

24  Braswell?

25      A    Yes, I was.

1    Q    How long have you known Mrs. Braswell?

2    A    About five years or so.

3    Q    When did you first meet her?

4    A    We met during different home base businesses.  We

5 started working with a business called World Connect and been

6 knowing each other ever since.

7    Q    How would you characterize the relationship you had

8 with Sheila Braswell?

9    A    She's a very dear friend of mine.

10    Q    I'm going to pass forward what was previously marked

11 Exhibit No. 1.  Do you recognize the person in that

12 photograph?

13    A    Yes.

14    Q    Who is that?

15    A    Sheila.

16    Q    When was the last time -- and you may lay that on the

17 table if you'd like.  When was the last time you saw Sheila?

18    A    I'm sure it was probably the week of her death, but I'm

19 not remember -- I can't remember the last time I saw her.  I

20 talked to her more than I saw her.  We saw each other --

21    Q    You talked to her frequently?

22    A    Yes, we talked to each other three or four times a day

23 in the morning, on the way to work, in-between patients and on

24 my way home from work and then, you know, before we went to

25 bed.  We talked to each other several times a day.

1   Q    Do you recall the last time you spoke with her?

2   A    Yes, I spoke with her Thursday night.  I called her and

3   she was on the phone.  I called on her cell phone and she was

4   on the phone talking to a group of people about a cheerleader.

5   She was volunteering with this cheerleader group and she was

6   talking to another group of people and she was just --

7             MR. W. BAILEY:  Objection, hearsay, Judge.

8             THE COURT:  Sustained.

9   Q    Without revealing what the conversation was, was she on

10  the telephone when you called?

11  A    Yes, she was on the telephone talking to a group of

12  people, and we talked for a few minutes and she said she was

13  going to call me --

14            MR. W. BAILEY:  Objection, hearsay.

15            THE COURT:  Sustained.

16  Q    Without revealing what Sheila said to you, you had a

17  telephone conversation with her that evening; is that right?

18  A    Yes.

19  Q    What time was that?

20  A    That was earlier in the night.  It was probably around

21  nine or so.  And then later I called her back because I was

22  doing some Christmas shopping, and I was asking her about the

23  spelling of Miles' name because I was getting some things

24  monogrammed for them.  And she gave me -- and I said did you

25  forget to call me back and so she just -- I told her that --

1    she gave me the spelling of the name and she said that she

2    would call me back and then she said oh, it's pretty late.

3    It's about 11 or so.  I'll talk to you in the morning so that

4    was the last time I talked to her.

5         Q    That was the evening before she died?

6         A    Yes.

7         Q    And Miles is who?

8         A    Her son, her youngest son.

9         Q    Now, when did you learn of Sheila's death?

10        A    Friday morning around -- it had to be around six

11   o'clock in the morning because I hadn't got up to get dressed

12   yet so it had to be around six in the morning.

13        Q    Who told you?

14        A    Robin called me.

15        Q    And who is Robin?

16        A    Robin is a friend of Sheila's as well.

17        Q    Okay.  And when you received the phone call and the

18   news, what did you do?

19        A    Well, I got dressed and took my girls to school and --

20   and I drove to Sheila's house.

21        Q    About what time did you get there?

22        A    I think it was about nine.

23        Q    And Sheila was married to Vern Braswell; is that right?

24        A    Yes.

25        Q    Did you know Vern?

```
1    A    Yes.

2    Q    Do you see him today in the courtroom?

3    A    Yes.

4    Q    Can you point to him and tell me what he's wearing?

5    A    He has on a brown suit.

6    Q    Was he there when you arrived?

7    A    No, he was not.

8    Q    Who was at the house?

9    A    Ms. Wallace, Vern's mom.  Robin was there.  Ms.

10   Wallace's sister was there.  And that's -- I think it was a

11   few other people there.

12   Q    Okay.  Now what was your purpose in going to the house?

13   A    That was where I was supposed to be and --

14   Q    I'm sorry.

15   A    I thought Ms. Pearline was going to be there, but she

16   wasn't there and I was just supposed to be there.

17   Q    Okay.  Did you ever see the defendant at the house that

18   day?

19   A    Yes.

20   Q    When did you first see him?

21   A    He had gone to -- gone downtown to give a testimony and

22   he came back home.

23            MR. J. BAILEY:  Your Honor, may we approach one

24   second, please?

25            THE COURT:  All right.
```

1      (Bench conference commenced.)

2     MR. J. BAILEY:  Forgive me if I'm wrong because

3 I'm not trying to be wrong, but if remember correctly, this

4 witness was in the courtroom the day before yesterday also.

5     MS. WEIRICH:  No, she wasn't.

6     MR. J. BAILEY:  I apologize then.  I thought she

7 was.

8      (Said bench conference concluded.)

9  Q Are you all right?

10  A Yes.

11  Q Okay.  When did you -- if you recall, when did you

12 first see the defendant at the house that day?

13  A I'm not sure.

14  Q Was it morning or afternoon?

15  A It was morning.

16  Q Okay.  Did you talk to him about what happened to

17 Sheila?

18  A We really didn't talk about what happened to Sheila.

19 He was talking.  He was just kind of saying, you know, he

20 don't know what happened.  But we never really engaged in a

21 conversation about what really happened to Sheila.

22  Q Okay.  And later that day did you have occasion to go

23 into the bathroom where Sheila had been in the bathtub?

24  A Yes, I did.

25  Q Why did you do that?

673

1    A    Karen and I and Robin, we went to Ms. Harris' house,

2    Sheila's grandmother's house and when we got back -- because

3    we was just cleaning up.  When we got back, we asked Ms.

4    Wallace if anybody had cleaned up Sheila's room, and Ms.

5    Wallace said no, she couldn't go back there.  So she said

6    she'll do it later.  We didn't want Ms. Wallace to do it so we

7    went in there and cleaned up the room.  And so we went in

8    there to clean up.

9    Q    The bedroom and the bathroom?

10   A    I'm sorry?

11   Q    Both the bedroom and the bathroom?

12   A    Yes.

13   Q    Okay.  What all in the room needed to be cleaned?

14   A    In the bathroom?

15   Q    Both, yes, ma'am.

16   A    Well, you know, it was just lived in and there were

17   clothes on the floor.  The ironing board was still up.  And we

18   just straightened up a little bit because we knew that, you

19   know, people would be over so we were just cleaning up,

20   folding up clothes and putting them back where they should be

21   and cleaning up the bathroom, straightening up the bathroom

22   and things like that.

23   Q    Did you see the bathtub?

24   A    Yes.

25   Q    Let me pass forward what's been previously marked

1   Exhibit No. 2.  Do you recognize what's depicted in that

2   photograph?

3       A    Yes.

4       Q    What is that?

5       A    A tub full of water.

6       Q    Is that the way the tub looked that night when you went

7   in to clean up?

8       A    Yes.

9       Q    Was the water still in the tub?

10      A    Yes, it was.

11      Q    Do you see eyeglasses in that photograph?

12      A    Yes.

13      Q    Is that where those glasses were that evening?

14      A    Yes.

15      Q    And again, you may lay that on the table if you'd like.

16  Did you clean out the bathtub itself?

17      A    No, I didn't clean out the bathroom.  Karen did.

18      Q    Were you present while she did that?

19      A    Yes.

20      Q    Can you tell the jury what happened when the bathtub

21  was cleaned?

22      A    When we let the water out of the bathtub, there was

23  just hair -- there was hair in the bathtub, a large amount of

24  hair in the bathtub.  And we found earrings, Sheila's earrings

25  in the bathtub.  And we found another earring or some type of

1    earring in the bathtub.

2        Q    Did you recognize those items?

3        A    We recognized the earrings.  They were Sheila's

4    earrings that she wore most of the time.  The other earring we

5    weren't for sure if it was Sheila's.  We thought it was

6    Sheila's because she had piercings and we thought it was

7    Sheila's, but we later found out that Sheila had all her

8    piercings on her -- her earrings.

9        Q    So when you say "piercings," do you mean other than

10   piercings through the ear?

11       A    Correct.

12       Q    Body piercing?

13       A    Body piercing.

14            MS. CARNESALE:  Your Honor, at this time I'd ask

15   that Ms. Smith be shown what was previously marked for ID only

16   Exhibit No. 47?

17            THE COURT:  I believe it's down there.

18            MS. CARNESALE:  Okay.  I thought the Court had it.

19            THE COURT:  46, I believe.

20       Q    Ms. Smith, if you would take a look at what's contained

21   in that envelope.  Tell me if you recognize this.

22       A    Yes, I do.

23       Q    What is that?

24       A    These the items that we found, the earrings and this

25   piercing or whatever, this other earring.

1    Q    What is that other ring?

2    A    It look like a body piercing or whatever.

3    Q    Okay.  You may place those back in the envelope.

4         MS. CARNESALE:  Your Honor, at this time we'd ask

5    those be moved into evidence.

6         MR. J. BAILEY:  Would Your Honor indulge us one

7    moment on that question?  No objection.

8         THE COURT:  Remove the ID designation, Exhibit 46.

9         (Exhibit No. 46 was marked and filed.)

10   Q    Ms. Smith, had you had a conversation with the

11   defendant earlier in that day about a ring?

12   A    Yes.

13   Q    Can you tell the jury about that?

14        MR. J. BAILEY:  Objection, hearsay.

15        MS. CARNESALE:  Judge, it's the statement --

16        THE COURT:  The defendant's?

17        MR. J. BAILEY:  I'm sorry.  I thought she said the

18   victim.

19        THE COURT:  Overruled.

20   A    Vern and Ms. Wallace and myself was standing around the

21   kitchen table, and Vern started to pat his chest.  And he said

22   I can't find my nipple ring.  I'm missing -- I lost my nipple

23   ring.  And so Ms. Wallace said your what?  And I said Ms.

24   Wallace, you don't want to know.  And so he said -- you know,

25   he patted again and he said I can't find my nipple ring.  And

1    so he asked was the bedroom closed down or shut down to some

2    -- something like that.  And I said yeah, nobody has been in

3    there.

4          And so he said I got to use the rest room.  And so he

5    went to the back and I looked at Ms. Wallace and I said do you

6    think he should go back there?  I said that water is still in

7    the tub.  And so she said -- before we could really dialogue

8    about it, he came back.  And he said I still can't find my

9    nipple ring.  And so we walked to the door to the front door,

10   and he said I got to go and get me another nipple ring.  And

11   Ms. Wallace said, you know, don't you think it's something

12   else you could be doing.  And I said well maybe he just needs

13   some air.  I said let's not, you know, argue or whatever.  And

14   so then he left.

15   Q    Was this the same day that Sheila died?

16   A    Yes, this was that morning.

17   Q    About what time?

18   A    I don't remember.  I just know this was -- this was

19   after he came from downtown.

20   Q    Was this before the bathroom and bathtub were cleaned?

21   A    Yes, this was before we left to go to Ms. Harris'

22   house.

23   Q    And later that evening you cleaned out or the bathtub

24   was cleaned out and you were there and that's when those

25   earrings and the ring were recovered from the bathroom?

1    A    Yes.

2    Q    You also described there was a large amount of hair?

3    A    Yes.

4    Q    Can you describe that for the jury?

5    A    It was -- it was a lot of hair.  It was more hair than

6    just, you know, your hair shedding.  It was probably a nice

7    amount to put in your hand.  It was -- it was a lot of hair.

8    Q    What color was the hair?

9    A    It was dark hair.  It was -- it looked like Sheila's

10   hair.

11   Q    Was it long?

12   A    It was long.

13           MS. CARNESALE:  Your Honor, may I have a moment?

14   Thank you, Ms. Smith.  I pass the witness.

15           THE COURT:  Mr. Bailey.

16

17                      CROSS-EXAMINATION

18   BY MR. J. BAILEY:

19   Q    You had an opportunity to talk with the police in this

20   matter prior to today; is that correct?

21   A    Yes.

22   Q    And isn't it true that you told the police of an

23   incident where you and your friend Sheila and Vern --

24           MS. WEIRICH:  Objection, Your Honor.  Can we

25   approach?

1          THE COURT:  Uh-huh.

2               (Bench conference commenced.)

3          MS. WEIRICH:  I'm anticipating an objection on

4     hearsay and before the question pollutes the air --

5          MR. J. BAILEY:  It won't be hearsay.  I'm going to

6     ask her what she told the police.

7          THE COURT:  About what?

8          MR. J. BAILEY:  About what she observed my client

9     doing.  That's what I'm going to ask.

10         MS. WEIRICH:  Doing when?

11         MR. J. BAILEY:  She told the police that they were

12    out of town together and she was curious as to why Vern kept

13    hanging around this S and M display.  That's what she told the

14    police.  That's in my discovery packet.

15         THE COURT:  When in time in relation to the event

16    of the death?

17         MR. J. BAILEY:  I'd have to look at it.  If I was

18    correct it was about a year before.  But the point is that he

19    -- then I'm going to ask was she aware that my client had been

20    -- you know, that he had been buying those kind of items.  She

21    was of her own personal knowledge, she knows that.  She told

22    the police that.

23         MS. WEIRICH:  But I think she knows of it from

24    what the victim told her, Judge, except for the incident at

25    the conference.  I don't know.

```
1          THE COURT:  You can ask but you can't ask didn't
2    you tell the police that.  You just have to ask her directly.
3    Weren't you at the location X and didn't you see this and
4    this, without referring to statements she made to the police.
5    You just have to ask her directly.
6              (Said bench conference concluded.)
7    Q    Ms. Smith, did you have an opportunity to go out of
8    town with the Braswells at some point to North Carolina?
9    A    Yes.
10   Q    And while in North Carolina, isn't it true that you
11   observed Mr. Braswell at an S and M display?
12   A    Yes.
13   Q    Do you know what S and M is or what it means?
14   A    Not -- not really.  I just -- not really.  I don't know
15   what it means.
16   Q    Then how do you know what I asked you when I said you
17   observed him at an S and M display?
18   A    I said I don't know what it means.  I don't know what
19   the initials stand for.  I know what it's in relation to.
20   Q    What kind of display was it?  Describe that display.
21   A    It had different outfits, different leather outfits.
22   Q    Sexual in nature?
23   A    Yes.
24   Q    And they had floggers and whips, didn't they?
25   A    I don't remember in particular what they had.  I saw
```

1    some outfits.  That's what I saw.

2        Q    Okay.  And you aren't here trying to tell this jury

3    today -- well, let me rephrase that.  You don't know -- have

4    you ever seen Vern Braswell's nipple ring?

5        A    No, I have not.

6        Q    So you don't know if that's his in there or not, do

7    you?

8        A    No, sir.

9        Q    And in fact to that day, isn't it true you didn't even

10   know he had one?

11       A    Yes, I did know.

12       Q    Okay.  All right.  So you knew he had one?

13       A    I was told that he had one.

14       Q    Okay.  And you knew Mrs. Braswell had them too; right?

15       A    Yes, sir.

16            MR. J. BAILEY:  That's it, Judge.  No further

17   questions.

18            MS. CARNESALE:  No redirect.  Thank you, Ms.

19   Smith.

20            THE COURT:  You may step down.  Call your next

21   witness.

22            MS. WEIRICH:  State calls Vera Cole.

23

24

25

1     VERA COLE

2    called as a witness, being first duly sworn, was examined and

3    testified as follows:

4     DIRECT EXAMINATION

5    BY MS. WEIRICH:

6       Q     Good afternoon.

7       A     Good afternoon.

8       Q     Would you please tell the jury your name and spell your

9    name for the court reporter?

10      A     Vera Cole.  V-E-R-A C-O-L-E.

11      Q     Do you know the defendant Vern Braswell?

12      A     Yes.

13      Q     How do you know him?

14      A     He's my brother-in-law.

15      Q     You're married to his brother?

16      A     Yes.

17      Q     What's your husband's name?

18      A     Eric Cole.

19      Q     Would you point to the defendant for me if you see him

20   in the courtroom today?

21      A     He's right there in the brown suit, white shirt and

22   beige --

23           MS. WEIRICH:  Let the record reflect she's

24   identified the defendant.

25      Q     Ms. Cole, you knew Sheila Braswell; correct?

```
 1    A    Yes.

 2    Q    She was your sister-in-law?

 3    A    Yes.

 4    Q    When was the last time you saw her alive?

 5    A    Probably like a week or two before.  We had taken the

 6  kids to football practice for her.

 7    Q    All right.  I'm going to ask you to speak up, Ms. Cole.

 8  You're soft spoken.  I'm having trouble hearing you and I want

 9  to make sure the jurors in the back can hear you.  When was

10  the last time you saw her?

11    A    Maybe like a couple of weeks prior.  We had taken the

12  boys to football practice for them.

13    Q    Okay.  You had taken their boys to football practice as

14  a favor to them?

15    A    Yes.

16    Q    Did you live near the Braswells?

17    A    No, not really.  I mean, it's not far but we're not

18  neighbors.

19    Q    Just helping out?

20    A    Yes.

21    Q    Do you remember a time when Sheila was pregnant with

22  their first child?

23    A    Yes.

24    Q    What is their oldest child's name?

25    A    William.
```

1    Q    How old is William today?

2    A    Eight.

3    Q    So what year would she have been pregnant with him, if

4    you know?

5    A    '97.

6    Q    Where was -- were Sheila Braswell and the defendant

7    married at that time?

8    A    Yes.

9    Q    Where were they living?

10   A    In Millington.

11   Q    Do you remember what their address was in Millington?

12   A    No.

13   Q    Did they have -- did they live in several houses in

14   Millington or just one?

15   A    I only know of one.

16   Q    Was it a house or an apartment or a townhouse?

17   A    Townhouse.

18   Q    Did Sheila Braswell ring your door late one night?

19   A    Yes.

20   Q    About what time was it?

21   A    It was late, like, after 10, 11 or so at night.

22   Q    Did you answer the door?

23   A    Yes.

24   Q    What did you find when you answered the door?

25   A    That she was at the door crying and upset.  I found her

1    at the door.

2        Q      Sheila Braswell?

3        A      Yes.

4        Q      Did you invite her in?

5        A      Yes.

6        Q      Did you ask her why she was crying and upset?

7        A      Yes.

8        Q      What did she tell you?

9        A      That her and her husband had gotten into it.

10       Q      "Gotten into it."  What does that mean?

11       A      That's what she had said when she came to the door,

12   that they had gotten into it.

13       Q      Okay.  Did you ask her some more questions?

14       A      Yes.

15       Q      And what did she tell you?

16       A      That he had -- she was coming -- that he had pulled her

17   by the hair down the stairs.

18       Q      Again, I'm going to ask you to speak up.

19       A      He had pulled her by her hair down the stairs.

20       Q      Down the stairs of their townhouse?

21       A      Yes.

22       Q      Why did she come to your house?

23       A      I asked her why she didn't go to her mom's because she

24   didn't want them to know what was going on at the time.

25       Q      Why did she leave her own house?

1          MR. J. BAILEY:   She can't testify to that, Your

2     Honor.

3          THE COURT:   Sustained.

4     Q     Did she tell you why she was at your house or asked you

5     a favor?

6     A     She wanted to come -- let me slow down.   Excuse me.

7     Q     It's all right.

8     A     When she came in she just came in and said she wanted

9     to stay over there.

10    Q     Okay.   Did you say that was all right?

11    A     Yes.

12    Q     Did she -- how did she get to your house?

13    A     She drove.

14    Q     Did she have her bags packed?

15    A     Yes.

16    Q     And when she got in your house and you began talking to

17    her, did you notice any injuries on her?

18    A     She showed me her lip.   It wasn't busted.   It wasn't

19    swollen on the outside.   It was like a cut on the inside, like

20    a tooth cut.

21    Q     Okay.   Did she stay with you?

22    A     Yes.

23    Q     Do you know for how long?

24    A     I know it was some days.   So that's -- I've been trying

25    to think for the longest but I know it's been at least over a

1    week with us.

2      Q    Okay.  Did she eventually go back to the house that she

3    shared with the defendant?

4      A    Yes.

5      Q    And they continued to stay married?

6      A    Yes.

7      Q    Until her death on November 5th, 2004?

8      A    As far as I know of, yes.

9      Q    The early morning hours of November 5th, 2004, where

10   were you?

11     A    At home.

12     Q    Where was your husband?

13     A    He was at his friend's house named Frankie.

14     Q    Okay.  Had you and he had an argument?

15     A    Yes.

16     Q    Okay.  Had he left y'all's house?

17     A    Yes.

18     Q    About what time did he leave?  Do you remember?

19     A    It was around 11 that night.

20     Q    Okay.  Did he leave his cell phone behind?

21     A    Yes.

22     Q    What kind of cell phone did he have?

23     A    Cricket.

24     Q    Do you remember what the number was?

25     A    Yes.

1     Q     What was it?

2     A     949-0192.

3     Q     Do you have a Cricket phone?

4     A     Yes.

5     Q     Do you have another kind of phone, too?

6     A     A house phone?

7     Q     Another cell phone.

8     A     No, just those two Crickets.

9     Q     Does your husband still have that cell phone?

10    A     Yes.

11    Q     He left your house around 11, you said?

12    A     Yes.

13    Q     Did his cell phone ring at some time?

14    A     Yes.

15    Q     What time was it?

16    A     Around 1:36 in the morning.

17    Q     Did you look at the phone?

18    A     Yes.

19    Q     What did it say?

20    A     It just said Vern.

21    Q     Did it ring again?

22    A     Yes.

23    Q     What time?

24    A     1:38.

25    Q     Did you look at it?

1   A   Yes.

2   Q   What did it say?

3   A   Vern.

4   Q   Did you answer it?

5   A   No.

6   Q   Was that the last time that cell phone rang?

7   A   No, it started ringing again.

8   Q   When?

9   A   Around 4:05, 4:10 in the morning.

10   Q   Did you answer it then?

11   A   I answered it each time.

12   Q   After the 1:36 and 1:38?

13   A   Right, because it didn't have a name on it.

14   Q   When did it not have a name on it?

15   A   The number that came -- that was coming in, in the
16   early morning wee hours of the morning, I looked at it --
17   looked at the phone and it didn't have a name so I answered
18   it.

19   Q   Okay.  But when it came in at 1:36 and 1:38 did it have
20   a name on it?

21   A   Yes.

22   Q   Okay.  That was what?

23   A   Vern.

24   Q   So you're talking about the four o'clock time it didn't
25   have a name?

1    A    Right.

2    Q    So you answered that?

3    A    Right.

4    Q    Okay.  And who was it?

5    A    At four in the morning?

6    Q    Uh-huh.

7    A    It was his aunties calling for Eric.

8    Q    Okay.  And then you later learned that your

9    sister-in-law Sheila Braswell was dead?

10   A    Yes.

11        MS. WEIRICH:  If I may have a moment, Your Honor.

12   Pass the witness.

13        THE COURT:  Mr. Bailey.

14

15             CROSS-EXAMINATION

16   BY MR. J. BAILEY:

17   Q    And what telephone number was it that was being called?

18   A    949-0192.

19        MR. J. BAILEY:  By the way, any Jencks statements?

20        MS. WEIRICH:  No.

21   Q    I'm going to pass you what's been previously marked as

22   Exhibit 30.  Before I pass it to you, let me make sure I'm

23   passing you the right one.  There are two.  I want you to --

24   this has previously been identified Exhibit 30 and I want you

25   to find that telephone number you just gave me on that

1    telephone log?

2    A    First of all, I need my glasses and they're outside.

3         MR. J. BAILEY:   Your Honor, can she go get them?

4         THE COURT:   You may step out and go get them.

5              (Pause in proceedings.)

6    A    I don't see it on here.

7    Q    You didn't see it on there?

8    A    No, sir.

9    Q    You sure about those phone calls you got?

10   A    I'm very sure.

11        MR. J. BAILEY:   May I have that back?

12   Q    And what time in the morning did you say it came in?

13   A    The first phone call came onto that cell phone at 1:36.

14   The next one was at 1:38.

15   Q    Now you -- and of course you can't be telling this

16   jury, are you, that you knew who was on the other end of that

17   call?

18   A    No, I didn't know.

19   Q    And you said that call came in at 1:36?

20   A    Exactly.

21   Q    On November 5th?

22   A    Yes.

23   Q    Can you explain why it doesn't show up on the Braswell

24   phone log?

25   A    I cannot explain that.   But I also know that that

1    phone, the number that it came up under, under Vern it had two

2    phone numbers.  One was a Nextel phone number and one was a

3    Cricket phone number.  And it was on my husband's phone listed

4    under Vern.  Now I assumed it was my husband calling is why I

5    didn't answer it.

6    Q    Okay.  I spoke with you two days ago, didn't I?

7    A    Yes, you did.

8    Q    Did you tell me about this incident?

9    A    I don't know if you asked me about that incident.

10   Q    Isn't it true that you told me you didn't know anything

11   about this and didn't know why you were asked to be here?

12   A    And I still did not know why I was asked to be here.

13   Q    Isn't it true that you said you didn't know anything

14   about all of this?

15   A    I don't know anything about anything.  I know about my

16   phone.  I know I'm not the only one person that seen those

17   calls, either.

18   Q    Isn't it likewise true, ma'am, that you called Ms. Mary

19   Wallace, the mother of Vern Braswell and said you got one son

20   in jail and you about to have another?

21   A    I sure did.

22            MR. J. BAILEY:  No further questions.

23

24

25

1    REDIRECT EXAMINATION

2    BY MS. WEIRICH:

3    Q    What was that in reference to?

4    A    Because me and my husband had a fight and my ankle had

5    gotten broken and I was asking her to get him out of my house.

6    And I said, look, you already got one in jail and I don't want

7    the police to take him to jail.  That's what that was about.

8    Q    Are you sitting here today, Ms. Cole, because you're

9    mad at your husband?

10   A    No, I love my husband.  I'm not mad at him.

11   Q    Are you sitting here today because you're mad at the

12   defendant?

13   A    No, I love my brother-in-law.  I'm not mad at him

14   either.

15   Q    What are you sitting here doing?

16   A    Telling the truth.

17   Q    Okay.  And you testified that your husband's phone, the

18   one that we've been talking about, it would show up Vern but

19   then you said something about a Nextel phone and Cricket

20   phone.  What are you talking about?

21   A    There were two phone numbers under the name Vern.

22   Q    Okay.  Did Vern have two cell phones?

23   A    I guess so.  I don't know but there were two numbers

24   under the phone -- under his name.  And when it showed Vern,

25   the reason I did not answer it is because I assumed my husband

```
 1    went over there and was calling me and was wanting to --
 2    wanting to talk and I didn't want to talk.
 3        Q    Okay.  You didn't want to talk to him right then?
 4        A    Right.
 5        Q    All right.  And the records that Mr. Bailey just passed
 6    you were Nextel records; right?
 7        A    I don't know.  I didn't see what that was.
 8             MR. J. BAILEY:  She doesn't know that, Your Honor.
 9    I withdraw it.
10        Q    You didn't see the number that you're talking about on
11    those records that you were just passed?
12        A    I didn't look on there.  I just looked for the other
13    phone number on there.  That's all I looked for.
14        Q    You didn't see it?
15        A    No, I did not.
16             MS. WEIRICH:  May I have a moment, Your Honor?
17        Q    Why do you remember those times so clearly, 1:36 and
18    1:38?
19        A    Because when it rung, I was already sleep and I picked
20    the phone up and I looked at it.  And I say what?  Oh, no.
21    This Eric calling me from Vern house and I laid the phone back
22    up under the pillow, didn't answer it.  Then it rung again.
23    And what made me remember those calls as clearly as I did,
24    when I did find out, my phone rung that morning about 20
25    times, that phone, from his aunts and everyone else trying to
```

1    find -- locate Eric.

2        Q    After four o'clock?

3        A    After four.  When Eric finally called me, I said Eric,

4    did you call me from Vern house?  He said no.  And when he

5    came home, I showed him where the calls came in.  He saw those

6    calls also.

7                    MS. WEIRICH:  Thank you.  Nothing further.

8                    MR. J. BAILEY:  I have one based on that.

9                    THE COURT:  Sure.

10

11                    <u>RECROSS EXAMINATION</u>

12   BY MR. J. BAILEY:

13       Q    All right.  Now you say that the reason you remember

14   is was why?

15       A    Because me and my husband had got into it and I looked

16   at it.  And I was like, oh, no, he calling from Vern house.

17   Vern don't call me at nighttime like that, don't call here

18   like that.

19       Q    You said Vern don't call you, but I thought it was your

20   husband's phone?

21       A    It is but it's in my name.  It's my phone.

22       Q    Now and this happened in November of 2004; is that

23   right?

24       A    Yes.

25       Q    And you went to the police and told them about this in

1   December 2004?

2       A    I didn't go to the police and tell them about anything.

3       Q    And you told the State about this in January 2005;

4   right?

5       A    No, I did not.

6       Q    And you told the Braswell family about this in February

7   of 2005; right?

8       A    My husband knew about it at the very next day.

9       Q    Okay.  You and your husband told them about it?

10      A    Okay.

11      Q    Did y'all go tell them about it?

12      A    I didn't think nothing of it.  Why should I tell --

13      Q    So why did you think something of it today?

14      A    Because I was asked today.

15      Q    Oh, I see.  You were asked today.  And you knew that

16  your brother-in-law was charged with murder in the first

17  degree and today is the first day that you told anybody about

18  this?

19      A    Oh, no, it's not the first day and --

20      Q    I want you to tell me --

21           MS. CARNESALE:  Judge, she --

22           THE COURT:  Let her finish her answer, Mr. Bailey.

23      A    I'm not trying to hurt my brother-in-law.  I'm just

24  answering the questions.

25      Q    All right.  Answer this question.

1   A      Yes, sir.

2   Q      When did you tell and who did you tell this to?

3   A      The first day my -- the next day my husband came home,

4   I showed it to him and told him.

5   Q      Besides your husband?

6   A      I don't communicate with my in-laws.  I don't

7   communicate with anybody.  I mean --

8   Q      What about -- I'm sorry, I didn't mean to cut you off.

9   Go ahead and finish.

10  A      Go ahead.

11  Q      What about law enforcement?  Did you call them?

12  A      No.

13  Q      Okay.  And what about the prosecutor's office?  Did you

14  call them?

15  A      No, I did not.

16  Q      What about Mrs. Braswell's family?  Did you call and

17  tell them this?

18  A      No, I did not.

19          MR. J. BAILEY:  I don't have anything else.

20          THE COURT:  You may step down.  Call your next

21  witness.

22          MS. WEIRICH:  State calls Magra Harden.

23

24

25

<u>MAGRA HARDEN</u>

1

2   called as a witness, being first duly sworn, was examined and

3   testified as follows:

4                           <u>DIRECT EXAMINATION</u>

5   BY MS. WEIRICH:

6      Q     Good afternoon.

7      A     Good afternoon.

8      Q     Would you please tell the jury your name and spell your

9   first and last names for the court reporter?

10     A     My name is Magra Harden.  M-A-G-R-A.  Harden,

11  H-A-R-D-E-N.

12     Q     Where do you work?

13     A     I work for Methodist Alliance private duty.

14     Q     What do you do for them?

15     A     I'm an occupational therapist working with the

16  pediatrics and homecare.

17     Q     How long have you been an occupational therapist?

18     A     I have been an occupational therapist.  We graduated in

19  '95 of December.

20     Q     Did you graduate or attend school with Sheila Braswell?

21     A     I did.

22     Q     Have you known her since y'all were students together?

23     A     Since 1993 when we became students at UT.

24     Q     Was there a time that Mrs. Braswell came to live with

25  you?

```
 1      A    Yes.

 2      Q    Do you remember when that was?

 3      A    That was in -- it was warm weather, either spring or

 4   early summer of 1995.

 5      Q    Was she married to the defendant at the time?

 6      A    Yes.

 7      Q    Were they newly married?

 8      A    Yes, they were married in '94.

 9      Q    All right.  Did you attend their wedding?

10      A    I did.

11      Q    All right.  Where were you living when she came to live

12   with you?

13      A    I was living in Berclair in Memphis.

14      Q    All right.  In a house?

15      A    A house, uh-huh.

16      Q    All right.  How long did she live with you?

17      A    Several months.  I don't recall exact dates but it was

18   several months.

19      Q    Shortly after coming to live with you, do you remember

20   a day that she was going to visit the defendant?

21      A    Yes.

22      Q    Where was the defendant?

23      A    In a rehabilitation facility.

24      Q    Do you know where?

25      A    I don't recall the name of it.
```

1    Q    Somewhere in Memphis?

2    A    It was in Memphis, uh-huh.

3    Q    Were you -- did you see her that morning before she

4    left?

5    A    I did.

6    Q    Was she physically fine?

7    A    She was.

8    Q    Did you see her later that day after she returned from

9    her visit with the defendant?

10   A    I did.

11   Q    Back at your house?

12   A    Yes.

13   Q    Was her physical condition different?

14   A    Yes.

15   Q    How was it different?

16   A    She had marks on her neck and she was upset, confused,

17   distraught.

18   Q    What do you mean "marks on her neck"?

19   A    She had some discoloration, like, on both sides of her

20   neck.

21   Q    If you could show the jury with your hands?

22   A    Kind of like in this area here, right in here.

23   Q    And you said she was upset and crying?

24   A    And raspy, her voice was very raspy, very irritated

25   voice.

1    Q    Did her voice sound different than it had that morning?

2    A    Oh, definitely.

3    Q    What was she upset about?

4    A    She said that her husband had choked her on the grounds

5 of the rehabilitation facility when she had gone to visit him

6 that day.

7    Q    Did she tell you how he was able to choke her at the

8 rehabilitation facility?

9    A    I obviously questioned that as well, but she said that

10 in their ability to walk around the grounds, that he kind of

11 got in a position where there was a van that separated she and

12 him from the rest of the people on the grounds and that he

13 choked her there.

14    Q    Did she tell you why he choked her?

15    A    Not specifically, that he was just accusing her of some

16 things and upset.  She wasn't very specific about that.

17    Q    Did she press charges?

18    A    Not to my knowledge, although I strongly encouraged her

19 to.

20    Q    How long did her voice continue in that raspy

21 condition?

22    A    It seems like it was a couple of days maybe.  I don't

23 -- didn't document that.  I don't recall exactly but it was

24 for a bit.

25    Q    Did you take pictures of her injury?

1    A   I asked to but she preferred that I would not.  She was

2    very upset about the -- she was very confused.

3    Q   Did you try to counsel her as best you could?

4    A   I did.  I strongly encouraged her to file a police

5    report or to at least discuss it with her mother.  And she

6    just was very sensitive to not wanting to upset her family.

7    And being so young and newly married and wanting Vern to be

8    accepted into her family, she at that time did not contact her

9    mother and I don't know if she disclosed that later.

10    Q   How long did she continue to live with you?

11    A   It was several months.  We both went to field work.

12    She went to Virginia and I went to Indiana in the late part of

13    the summer, sometime in the summer she moved to do her field

14    work.

15    Q   And then when that field work was concluded, did she go

16    back to living with her husband, the defendant?

17    A   She did -- I don't recall if she moved in immediately.

18    We both went to work in the same facility at Healthsouth here

19    in Memphis in '95 when we returned from field work.  I don't

20    recall if she immediately moved back in with him because I

21    know there was discussion and letters and things that occurred

22    between Vern and her while she was on her field work.  But I

23    do know that they got back together pretty shortly after that.

24    Q   And they stayed married?

25    A   They did.

```
 1      Q     Until her death in November of 2004?

 2      A     That's correct.

 3            MS. WEIRICH:  I'll pass the witness, Your Honor.

 4            THE COURT:  Mr. Bailey.

 5

 6                      CROSS-EXAMINATION

 7    BY MR. W. BAILEY:

 8      Q     Ms. Harden, as I understand it -- it is Harden, isn't

 9    it?

10      A     Ms. Harden, that's correct.

11      Q     As I understand it, you weren't a witness to anything.

12    You don't know what happened by your own observation, do you?

13      A     I did not see it.

14      Q     And this occurred some eight, nine years ago?

15      A     It was ten years ago.

16      Q     Ten years ago.  A long time ago, isn't it?

17      A     It is in some respects, yes.

18            MR. W. BAILEY:  No further questions.

19            MS. WEIRICH:  Nothing further, Your Honor.

20            THE COURT:  You may step down.  Call your next

21    witness.

22            MS. WEIRICH:  May we approach, Judge?

23            THE COURT:  You may.

24            (Bench conference commenced.)

25            MS. WEIRICH:  We may be ready to rest but we may
```

```
 1    have one more witness and the witness we may want to recall is
 2    down in General Sessions right now so if we could --
 3              THE COURT:  We'll stop for lunch at this time.
 4    But does this additional witness have anything to do with the
 5    prior acts?
 6              MS. WEIRICH:  No, sir.
 7              MR. J. BAILEY:  I'd like to ask what witness
 8    they -- I may have an objection to their recalling a witness.
 9              MS. CARNESALE:  No one that's been in the
10    courtroom.
11              THE COURT:  Let me get the jury gone to lunch and
12    we'll talk about it.
13                   (Said bench conference concluded.)
14              THE COURT:  All right.  Ladies and gentlemen,
15    evidence has been introduced in this case regarding certain
16    prior acts of misconduct and/or crimes allegedly committed by
17    the defendant Vern Braswell.  It is up to you, the jury, to
18    decide whether or not you choose to rely on this proof and if
19    so what weight you choose to give it.  If you do accredit this
20    proof, it can only be used to determine the specific issues of
21    identity, intent or rebuttal of accident or mistake.
22              This evidence should not be used as propensity
23    evidence.  As always, the State has the burden of proving
24    every element of the offense charged beyond a reasonable
25    doubt.
```

```
 1            We will stop at this time for lunch and resume the

 2    trial at 1:30.  As always, do not discuss the case in any way

 3    among yourselves during the lunch hour.

 4            (Jury out.)

 5            THE COURT:  Let me just ask you this.  Did I hear

 6    you correctly that if you do call this additional witness, it

 7    will be recalling a witness that's already testified?

 8            MS. WEIRICH:  We may -- we don't know yet.  We may

 9    find a new witness to testify to what we want them to testify

10    to or we may just recall Sergeant Merritt to clear up

11    something.

12            THE COURT:  Okay.  If you have an objection when

13    he comes in after lunch, if they do call him, then I'll hear

14    from you at that time.

15            MR. J. BAILEY:  Very well.

16            MR. W. BAILEY:  Your Honor, again, in terms of

17    proof marshaling, where are we?

18            THE COURT:  I would assume this is their last

19    witness as Ms. Weirich said, if they call another witness.  So

20    as I indicated yesterday, y'all need to have your proof ready

21    at 1:30.  Thank you.  Take a recess.

22            (Recess.)

23            THE COURT:  Are the attorneys in the back?

24            DEPUTY THOMPSON:  Yes, sir, they are.

25            THE COURT:  Ask all three of them to step out,
```

```
 1   please.  Is Ms. Weirich on the way?

 2              MS. CARNESALE:  She is.  She was just out in the

 3   hallway.

 4              THE COURT:  Now will y'all be calling an

 5   additional witness?

 6              MS. WEIRICH:  No, sir.  We'll be resting.

 7              THE COURT:  In that case then, rather than bring

 8   the jury in and have to send them right back out --

 9              MR. J. BAILEY:  May I step outside first before we

10   do those motions, Judge, I need to see if my next witness --

11   I'm sorry.  I didn't mean to cut the Court.  I'll let the

12   Court finish.

13              THE COURT:  No, no, that's okay.  Go ahead.

14              MR. J. BAILEY:  Would Your Honor -- Your Honor

15   knows the standard motions.  Would Your Honor like me to make

16   that now or after --

17              THE COURT:  Sure.  Make it now because then we can

18   bring the jury in and begin with your proof right after they

19   announce that they've rested.

20              MR. J. BAILEY:  At the present time then, Your

21   Honor, we would move for a directed verdict of acquittal.  Our

22   argument simply being that the State has not carried its

23   burden of proof.  There's nothing, no factual basis to go back

24   to the jury room.  The only proof that we feel is in the

25   record at the present time, other than that of the medical
```

1   examiner, is proof that occurred some ten years ago.  And we

2   don't feel the State has carried its burden.

3          THE COURT:  Okay.  Well I think that

4   circumstantially there is ample proof to make this a jury

5   question and I'll deny the motion.

6          MR. J. BAILEY:  Thank you.  May I just step

7   outside?  I called a witness over and I just need to see if

8   he's here.

9          THE COURT:  Sure.

10          MR. J. BAILEY:  May we approach?

11          THE COURT:  Uh-huh.

12          (Bench conference commenced.)

13          MR. J. BAILEY:  Your Honor, I apologize to take so

14   long.  We called Glen Wright over and I thought he was

15   outside.  I told him to be here at 1:40.  It's 1:45.  If you

16   could just bear with us, give me five minutes, I'm going to

17   step out and call his office.

18          THE COURT:  That's fine.

19          MR. J. BAILEY:  He may be on his way.

20          (Said bench conference concluded.)

21          THE COURT:  Take the defendant out, please.  Stand

22   in recess.

23          (Recess.)

24          MR. J. BAILEY:  Your Honor, we have in terms of in

25   order of our order of proof -- is the jury on the way in?

```
1              THE COURT:  No.

2              MR. J. BAILEY:  In terms of our order of proof --

3              THE COURT:  Have you located Mr. Wright?

4              MR. J. BAILEY:  He's ready.  I was just going to

5   let the Court know at some point Dr. Schwartz is here and

6   we'll need to take a recess just for him to set up his

7   apparatus.  It's a projector.

8              THE COURT:  Okay.  And which witness will he be,

9   first, second, third, fourth?

10             MR. J. BAILEY:  He'll be the last.

11             THE COURT:  The last of how many?

12             MR. W. BAILEY:  Number three.  He'll testify after

13  the defendant.

14             THE COURT:  Bring in the jury.

15             MR. W. BAILEY:  Judge, on that note, of course

16  it's up to Your Honor's discretion as to whether he can remain

17  in the courtroom while the defendant testifies or not, since

18  he's not a fact witness and an expert.  And we would request

19  that he be allowed to remain in the courtroom and hear the

20  factual information that he'll put into his equation in terms

21  of rendering his opinion.

22             THE COURT:  Well, Ms. Weirich, what's your

23  position?

24             MS. WEIRICH:  Judge, I'm not sure that he's -- I

25  don't know.  He's not an expert in the sense that he's going
```

 1   to be listening to one expert testify and then take the stand

 2   and refute what that expert says.  He's an expert --

 3   allegedly, an expert in some tangential area that nobody has

 4   discussed as an expert.  So for that reason we would object.

 5          THE COURT:  I think his testimony is more fact

 6   related than that of most experts because it's going to be

 7   directly tied into the testimony of your client.  And for that

 8   reason -- I mean, I think there are circumstances, as Ms.

 9   Weirich alluded to, where experts are allowed to remain in the

10   courtroom to listen to other experts for that purpose of sort

11   of competing with one another on level of expertise.  But I'm

12   not going to --

13          MR. W. BAILEY:  It's discretionary with Your

14   Honor.

15          THE COURT:  I understand that and I think I'm

16   going to exercise my discretion and deny that request.  Bring

17   in the jury, please.

18                (Jury present.)

19          THE COURT:  All right.  Ms. Weirich.

20          MS. WEIRICH:  Thank you, Your Honor.  Your Honor,

21   ladies and gentlemen of the jury, that is the State's case and

22   we rest.

23

24

25                (END OF VOLUME FOUR)