

W2006-01081-CCA-23-CD

1   IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

2   THE THIRTIETH JUDICIAL DISTRICT

3

4   STATE OF TENNESSEE                )        **ORIGINAL**

5                                     )

6   vs.                              )        Case No.   05-03038

7   VERN BRASWELL,                    )        8 76-06

8          Defendant.                 )        Clears

9   ----------------------------------------------------------

10                  TRANSCRIPT OF EVIDENCE

11              Volumes 10 of 11 Volumes

12                  DECEMBER 5, 2005

13   ----------------------------------------------------------

14      THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

15                      APPEARANCES

16   FOR THE STATE:

17          BETSY CARNESALE AND AMY WEIRICH
            Assistant District Attorneys General
18          District Attorney General's Office
            201 Poplar Avenue - Third Floor
19          Memphis, TN  38103

20   FOR THE DEFENDANT:

21          J. BAILEY AND WALTER BAILEY
            Attorneys at Law
22          100 North Main - Suite 3002
            Memphis, TN  38103

23

24

25   FILED                    Reported by:
                            **Katherine Knowles**
     NOV 0 7 2006             Court Reporter        Vol.10

     Clerk of the Court


TABLE OF CONTENTS

VOLUME ONE

                                                              PAGE

Appearances                                                     1

Table of Contents                                               2

List of Exhibits                                                9

Style and Caption                                              13

**Monday, December 5, 2005**

Pre-trial Motions                                              14

Voir Dire Examination and Jury Selection                      25

**(VOLUME TWO)**

**Tuesday, December 6, 2005**

**VERN BRASWELL**

        Voir Dire Examination (By Mr. J. Bailey)             185

Jury Sworn                                                   187

Reading of Indictment and Entry of Plea                      187

Opening Statements (By Ms. Weirich)                          187

Opening Statements (By Mr. W. Bailey)                        192

**STATE'S PROOF**

**PEARLINE WASHBURN**

        Direct Examination (By Ms. Weirich)                 199

**ANGELA SNYDER**

        Direct Examination (By Ms. Weirich)                 227

**JESSICA GREEN**

        Direct Examination (By Ms. Weirich)                 236

1                    TABLE OF CONTENTS

2                      VOLUME ONE

3                                                    PAGE

4    **ROOSEVELT COLEMAN**

5            Direct Examination (By Ms. Weirich)       243
             Cross-Examination (By Mr. J. Bailey)      247
6

7    **LIEUTENANT JACKSON**

8            Direct Examination (By Ms. Carnesale)     250
             Cross-Examination (By Mr. J. Bailey)      264
9            Redirect Examination (By Ms. Carnesale)   270

10   **BABA TANZY**

11           Direct Examination (By Ms. Carnesale)     271
             Cross-Examination (By Mr. W. Bailey)      283
12

13   **MATT HAMM**

14           Direct Examination (By Ms. Carnesale)     285
             Cross-Examination (By Mr. W. Bailey)      293
15           Redirect Examination (By Ms. Carnesale)   295

16   **OFFICER GALLOWAY**

17           Direct Examination (By Ms. Weirich)       296
             Cross-Examination (By Mr. J. Bailey)      308
18

19   **SERGEANT KJELLIN**

20           Direct Examination (By Ms. Carnesale)     313
             Cross-Examination (By Mr. J. Bailey)      323
21           Redirect Examination (By Ms. Carnesale)   328

22   **SERGEANT MERRITT**

23           Direct Examination (By Ms. Weirich)       328

24

25

1                    TABLE OF CONTENTS

2                      VOLUME ONE

3                                                    PAGE

4    LIEUTENANT MILLER

5          Direct Examination (By Ms. Weirich)      362
             Cross-Examination (By Mr. W. Bailey)     368
6            Redirect Examination (By Ms. Weirich)    369

7    (VOLUME THREE)

8    Wednesday, December 7, 2005

9    DARRELL BURTON

10         Direct Examination (By Ms. Carnesale)    384
             Cross-Examination (By Mr. J. Bailey)     389
11

12   JERRY BROWN

13         Direct Examination (By Ms. Carnesale)    390
             Cross-Examination (By Mr. J. Bailey)     395
14

15   BENJANETTE STURDEVANT

16         Direct Examination (By Ms. Carnesale)    396
             Cross-Examination (By Mr. J. Bailey)     403
17

18   LIEUTENANT MITCHELL

19         Direct Examination (By Ms. Carnesale)    407
             Cross-Examination (By Mr. J. Bailey)     414
20

21   Jury-Out Hearing                              419

22   OFFICER FAIR

23         Direct Examination (By Ms. Weirich)      424
             Cross-Examination (By Mr. W. Bailey)     432
24           Redirect Examination (By Ms. Weirich)    434

25

TABLE OF CONTENTS

VOLUME ONE

PAGE

**CAROLYN CHAMBERS**

    Direct Examination (By Ms. Weirich)    435

**OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    444

Jury-Out Hearing

    **OFFICER WALLS**

    Direct Examination (By Ms. Carnesale)    448
    Cross-Examination (By Mr. J. Bailey)    450

**OFFICER WALLS**

    Direct Examination Continued (By Ms. Carnesale)    451
    Cross-Examination (By Mr. W. Bailey)    455
**WILLIAM MANGUM**
    Direct Examination (By Ms. Weirich)    457
    Cross-Examination (By Mr. J. Bailey)    468
    Redirect Examination (By Ms. Weirich)    475
    Recross Examination (By Mr. J. Bailey)    476

**DOCTOR CARTER**

    Direct Examination (By Ms. Carnesale)    478
    Cross-Examination (By Mr. W. Bailey)    518
    Redirect Examination (By Ms. Carnesale)    542

**(VOLUME FOUR)**

**Thursday, December 8, 2005**

**KRISTIE WOODS**

    Direct Examination (By Ms. Weirich)    563
    Cross-Examination (By Mr. J. Bailey)    618
    Redirect Examination (By Ms. Weirich)    629

1

TABLE OF CONTENTS

2

VOLUME ONE

3

PAGE

4 Jury-Out Hearing

5 **VERA COLE**

6    Direct Examination (By Ms. Weirich)        633
     Cross-Examination (By Mr. W. Bailey)        637

7

8 **MAGRA HARDEN**

9    Direct Examination (By Ms. Weirich)        640
     Cross-Examination (By Mr. W. Bailey)        645

10

11    Court's Ruling        653

12 **KRISTIE WOODS**

13    Redirect Examination Continued (By Ms. Weirich)    658
     Recross Examination (By Mr. J. Bailey)        660
14    Further Redirect Examination (By Ms. Weirich)    662

15 **SHERONDA SMITH**

16    Direct Examination (By Ms. Carnesale)        667
     Cross-Examination (By Mr. J. Bailey)        678

17

18 **VERA COLE**

19    Direct Examination (By Ms. Weirich)        682
     Cross-Examination (By Mr. J. Bailey)        690
20    Redirect Examination (By Ms. Weirich)        693
     Recross Examination (By Mr. J. Bailey)        695

21

22 **MAGRA HARDEN**

23    Direct Examination (By Ms. Weirich)        698
     Cross-Examination (By Mr. W. Bailey)        703

24

25 Motion for Judgment of Acquittal        706

TABLE OF CONTENTS

VOLUME ONE

|  |  | PAGE |
|---|---|---|
| State Rests |  | 709 |

**(VOLUME FIVE)**

**DEFENSE'S PROOF**

**GLEN WRIGHT**

| Direct Examination (By Mr. J. Bailey) | 722 |
|---|---|
| Cross-Examination (By Ms. Weirich) | 729 |

**VERN BRASWELL**

| Direct Examination (By Mr. J. Bailey) | 730 |
|---|---|
| Cross-Examination (By Ms. Weirich) | 788 |

**DOCTOR SCHWARTZ**

| Direct Examination (By Mr. W. Bailey) | 816 |
|---|---|

Jury-Out Hearing

**DOCTOR SCHWARTZ**

| Direct Examination (By Mr. W. Bailey) | 826 |
|---|---|
| Cross-Examination (By Ms. Carnesale) | 827 |
| Redirect Examination (By Mr. W. Bailey) | 829 |

| Court's Ruling | 835 |
|---|---|

**DOCTOR SCHWARTZ**

| Direct Examination Continued (By Mr. W. Bailey) | 838 |
|---|---|

| Jury-Out Hearing | 843 |
|---|---|

**DOCTOR SCHWARTZ**

| Direct Examination Continued (By Mr. W. Bailey) | 846 |
|---|---|
| Cross-Examination (By Ms. Carnesale) | 847 |
| Redirect Examination (By Mr. W. Bailey) | 858 |
| Recross Examination (By Ms. Carnesale) | 858 |

| | | |
|---|---|---|
| 1 | TABLE OF CONTENTS | |
| 2 | VOLUME ONE | |
| 3 | | PAGE |

4   **(VOLUME SIX)**

5   **Friday, December 9, 2005**

6   Motion for Judgment of Acquittal — 872

7   Jury Charge Discussion — 872

8   Defense Rests — 873

9   Closing Arguments (By Ms. Carnesale) — 873

10  Closing Arguments (By Mr. W. Bailey) — 884

11  Closing Arguments (By Ms. Weirich) — 899

12  Jury Charge — 926

13  Alternates Excused — 941

14  Jury Questions — 942

15  Verdict — 945

16

17  Certificate of Reporter — 948

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 1 | State | Evidence | P. Washburn, photo | 202 |
| 2 | State | Evidence | P. Washburn, photo | 207 |
| 3 | State | ID | P. Washburn, photos | 312 |
| 3 | State | Evidence | Officer Walls, photos | 452 |
| 4 | State | Evidence | P. Washburn, check and letter | 217 |
| 5 | State | Evidence | P. Washburn, money | 218 |
| 6 | State | ID | P. Washburn, note | 218 |
| 6 | State | Evidence | K. Woods, note | 617 |
| 7 | State | ID | P. Washburn, document | 219 |
| 7 | State | Evidence | W. Mangum, document | 467 |
| 8 | State | ID | P. Washburn, document | 219 |
| 8 | State | Evidence | W. Mangum, document | 466 |
| 9 | State | ID | P. Washburn, document | 219 |
| 9 | State | ID | W. Mangum, document | 466 |
| 10 | State | Evidence | A. Snyder, photo | 235 |
| 11 | State | Evidence | J. Green, tape | 241 |
| 12 | State | Evidence | R. Coleman, report | 245 |
| 13 | State | Evidence | Lt. Jackson, sketch | 259 |
| 14 | State | Evidence | B. Tanzy, photo | 278 |
| 15 | State | Evidence | B. Tanzy, photo | 279 |

1                              INDEX OF EXHIBITS

2

3     NO.   STATE/DEFENSE      ID/EVIDENCE      TO/DESCRIPTION          PAGE

4     16    State              Evidence         Officer Galloway,       298

5                                               crime scene sketch

6     17    State              Evidence         Officer Galloway,       304

7                                               photo

8     18    State              Evidence         Officer Galloway,       304

9                                               photo

10    19    State              Evidence         Officer Galloway,       304

11                                              photo

12    20    State              Evidence         Officer Galloway,       304

13                                              photo

14    21    State              Evidence         Officer Galloway,       304

15                                              photo

16    22    State              Evidence         Officer Galloway,       304

17                                              photo

18    23    State              Evidence         Officer Galloway,       304

19                                              photo

20    24    State              Evidence         Officer Galloway,       304

21                                              photo

22    25    State              Evidence         Officer Galloway,       308

23                                              two bottles

24    26    State              Evidence         Sgt. Merritt,           335

25                                              Advice of Rights form

1                    INDEX OF EXHIBITS

2

| 3 | NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|---|-----|---------------|-------------|----------------|------|
| 4 | 27 | State | Evidence | Sgt. Merritt, CD | 358 |
| 5 | 28 | State | Evidence | Lt. Miller, statement | 365 |
| 6 | 29 | State | Evidence | J. Brown, phone record | 391 |
| 7 | 30 | State | Evidence | B. Sturdevant, | 397 |
| 8 |  |  |  | phone records |  |
| 9 | 31 | State | Evidence | Dr. Carter, photo | 483 |
| 10 | 32 | State | Evidence | Dr. Carter, photo | 485 |
| 11 | 33 | State | Evidence | Dr. Carter, photos | 489 |
| 12 | 34 | State | Evidence | Dr. Carter, photos | 489 |
| 13 | 35 | State | Evidence | Dr. Carter, photo | 491 |
| 14 | 36 | State | Evidence | Dr. Carter, necklace | 492 |
| 15 | 37 | State | Evidence | Dr. Carter, photo | 495 |
| 16 | 38 | State | Evidence | Dr. Carter, photo | 497 |
| 17 | 39 | State | Evidence | Dr. Carter, photo | 498 |
| 18 | 40 | State | Evidence | Dr. Carter, photo | 499 |
| 19 | 41 | State | Evidence | Dr. Carter, photo | 503 |
| 20 | 42 | State | Evidence | Dr. Carter, photo | 504 |
| 21 | 43 | State | Evidence | Dr. Carter, photo | 511 |
| 22 | 44 | State | Evidence | Dr. Carter, photo | 513 |
| 23 | 45 | Defense | Evidence | Dr. Carter, photo | 525 |
| 24 | 46 | State | ID | K. Woods, earrings | 618 |
| 25 | 46 | State | Evidence | S. Smith, earrings | 676 |

1

## INDEX OF EXHIBITS

2

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

```
 1            THE COURT:  Mr. Bailey, you may call your first

 2   witness.

 3            MR. J. BAILEY:  Yes, Your Honor.  Call Mr. Glen

 4   Wright.  For the record, Your Honor, the defendant waives any

 5   privilege.

 6            THE COURT:  All right.

 7

 8                        GLEN WRIGHT

 9   called as a witness, being first duly sworn, was examined and

10   testified as follows:

11                     DIRECT EXAMINATION

12   BY MR. J. BAILEY:

13      Q    State your name for the record, please.

14      A    Glen Wright.

15      Q    And, Mr. Wright, what is your occupation?

16      A    I'm a lawyer.

17      Q    And how long have you practiced law?

18      A    Since 1982.

19      Q    And where do you currently practice law?

20      A    Here in Memphis, Shelby County.

21      Q    And are you with a firm?

22      A    Wilson and Wright.

23      Q    And how long have you been with Wilson and Wright?

24      A    Since about '93.

25      Q    Okay.  And prior to going into private practice, where
```

1    did you work?

2    A    The District Attorney's Office here in Shelby County.

3    Q    In fact, did you work in the same office with these two

4    ladies?

5    A    That's correct.

6    Q    And how long were you in that office?

7    A    About eight years.

8    Q    And altogether how long have you been practicing law?

9    A    Since '82 so I think that's about 23 years.

10   Q    And I think at one point did you serve with the Board

11   of Professional Responsibility?

12   A    I still do.

13   Q    You still do?

14   A    Yes.

15   Q    And what is the Board of Professional Responsibility?

16   A    It's an organization that governs the conduct of

17   lawyers in the State of Tennessee.

18   Q    And how were you chosen to serve on that board?

19   A    Selected by the Chief Justice of the Supreme Court.

20   Q    Do you know the defendant in this case Mr. Vern

21   Braswell?

22   A    I do.

23   Q    And at what point -- at one point in time did you

24   represent Mr. Braswell?

25   A    I did.

1    Q    I want to take you back to the date in question.

2    You're familiar with this case; is that correct?

3    A    I am.

4    Q    Did you represent Mr. Braswell at all in terms of legal

5    representation in this case?

6    A    I did.

7    Q    And at one point in time did you have an opportunity to

8    visit Mr. Braswell immediately after or soon thereafter he was

9    arrested?

10   A    I did.

11   Q    And where did you visit Mr. Braswell?

12   A    The first visit was in the Homicide Office in this

13   building, I think on the 11th floor.

14   Q    All right.  And did you have an occasion to -- and for

15   the record, you weren't in here when we did this, but Mr.

16   Braswell I'll state as his counsel he waives any privilege.

17   A    Okay.

18   Q    Did you have an occasion to ask him what happened or

19   something of that nature?

20              MS. WEIRICH:  May we approach, Judge?

21              THE COURT:  You may.

22              (Bench conference commenced.)

23              MS. WEIRICH:  I object to hearsay.

24              MR. J. BAILEY:  It's the defendant and they raised

25   this issue about him never telling anybody other than -- I

1    mean, never telling anybody until now about his statement of

2    how these things occurred.  They raised that issue several

3    times.  And this is -- and my proof is going to be that he did

4    tell counsel and counsel told him not to say anything else to

5    the police.  And that's crucial to his defense, Judge.

6              MS. CARNESALE:  It's still hearsay.

7              MR. J. BAILEY:  It's the defendant.  It's a

8    statement of the defendant.

9              THE COURT:  Just because it's a statement of the

10   defendant it can still be self-serving.  It can still be

11   hearsay.  I mean, the reason that the statements of the

12   defendant come in normally is that they're incriminating.

13   Generally, things a defendant says in a criminal case that are

14   sought to be introduced are incriminating statements,

15   therefore, they are an exception to the hearsay rule.  But a

16   defendant can't go out and make self-serving statements and

17   then come in and have other people testify to them in court.

18   Otherwise, anybody charged with a crime could go out and find

19   ten priests and tell them all these self-serving things and

20   then just call the priests in to testify on their behalf and

21   never have to take the stand themselves.

22             MR. J. BAILEY:  But I would state to the Court for

23   this record that the State has raised this issue in front of

24   this jury that this defendant -- that the first time that he's

25   ever said anything about this was now, about the death

1    occurring as a result of rough sex.  And he did say something

2    about it and that statement is going to be -- I mean, Mr.

3    Wright's statement would be that they advised him not to give

4    anymore statements to the police, Judge, and that -- but this

5    jury -- all this jury has heard over and over and over again

6    is that the only -- what he told -- three police officers have

7    taken the stand to this occurrence and I think that the jury

8    needs to hear why he didn't tell them.

9              MS. WEIRICH:  The defendant can testify to all

10   that, Judge, not Mr. Wright.  It's a self-serving statement by

11   someone that's his party.  It's not a party by (indiscernible)

12             MR. W. BAILEY:  Judge, there's one other thing.

13   He did mention to Mr. Wright that he -- that his defense at

14   that point was he revealed to Mr. Wright that he was having

15   rough sex with his wife.  And of course that goes contrary --

16   that rebuts a stance in his defense that he did speak earlier

17   about it, until told by counsel not to say anything else, not

18   to talk to the police.

19             MS. WEIRICH:  It doesn't fit --

20             MR. W. BAILEY:  So it's not so much going to the

21   truth of what he said as much as it is that he did say.

22             MS. WEIRICH:  It's completely offered for the

23   truth of the matter.

24             MR. W. BAILEY:  His action.

25             MS. WEIRICH:  It's not his action.  It's his

1   statement that they're trying to introduce for the truth of

2   the matter.  They're not trying to introduce conduct.

3               MR. J. BAILEY:  Well, I am also trying to rebut

4   the statement that the officer put into evidence.

5               MS. WEIRICH:  And he can do that through his

6   client.

7               THE COURT:  Okay.  For now I'm going to sustain

8   the objection.  We may revisit this after your client

9   testifies.  So have Mr. Wright remain on call and remain

10  nearby.

11              MR. J. BAILEY:  Very well.

12              THE COURT:  If this would complete your

13  examination of him, ask him to remain nearby.  At this point

14  having heard no more, I'm going to sustain the objection.

15              MR. J. BAILEY:  I do have a couple other things

16  I'm going to ask about his demeanor and so forth.  I can ask

17  that, can't I?

18              THE COURT:  You can ask that.

19                  (Said bench conference concluded.)

20  Q    Mr. Wright, without getting into what the defendant

21  said, how was his demeanor?

22  A    He was upset.

23  Q    Was he crying?

24  A    I don't recall any crying but he was upset.

25              MR. J. BAILEY:  May we approach one more time,

1    Your Honor?

2                    (Bench conference commenced.)

3                    MR. J. BAILEY:  I thought about -- precaution, ask

4    you as a precaution.  Am I allowed to ask him did he advise

5    the defendant to give no more statements to the police?  Now

6    that's not hearsay.

7                    MS. CARNESALE:  That's still hearsay out-of-court

8    statement offered for the truth --

9                    MR. J. BAILEY:  I'm asking did he in fact --

10                   MS. CARNESALE:  It's his statement.

11                   THE COURT:  Mr. Wright's statement, is it not?  I

12   mean, why would that not be hearsay also?

13                   MR. J. BAILEY:  He's not testifying as to what

14   somebody else is saying.  He's testifying as to what he said.

15                   MS. WEIRICH:  That's hearsay.

16                   THE COURT:  So what?  It's an out-of-court

17   statement offered for the truth of the matter therein.  You're

18   asking that he be allowed to say --

19                   MR. J. BAILEY:  Did I advise the defendant not to

20   give anymore statements to the police.  That's it.

21                   MS. WEIRICH:  It's an out-of-court statement

22   offered for the truth of the matter.  It doesn't fit the

23   exception to the hearsay rule.

24                   MR. J. BAILEY:  I don't think it's offered for the

25   truth of the matter.  I think it's offered just simply --

1          MR. W. BAILEY:  They can cross-examine him if they

2     want to on that.

3          THE COURT:  But how do you get past the hearsay

4     objection, cross-examination or not?

5          MR. J. BAILEY:  I don't think it's offered for the

6     truth -- I'm not offering it for the truth of the matter

7     asserted.  I'm simply offering it to rebut what they have

8     already put before the jury, Judge.

9          MS. WEIRICH:  Which is offering it for the truth

10    of the matter.

11         THE COURT:  No, I'm going to sustain the

12    objection.

13         MR. J. BAILEY:  Very well.

14         (Said bench conference concluded.)

15         MR. J. BAILEY:  Your Honor, I'm going to at this

16    time pass the witness.  I have Mr. Wright under a subpoena and

17    I'd ask that infurtherance of Your Honor's ruling that that

18    subpoena be a continuing subpoena until later in the trial.

19         THE COURT:  It will be.  Ms. Weirich.

20

21                    CROSS-EXAMINATION

22    BY MS. WEIRICH:

23    Q    Good afternoon, Mr. Wright.

24    A    Good afternoon.

25    Q    When you were in the Homicide Office with your then

1    client, the defendant, this was or was it a Saturday; correct?

2    A    I can't recall.

3    Q    All right.  Had he already been placed under arrest?

4    A    He was under arrest, yes.

5    Q    All right.  So this was November 6th, 2004, or do you

6    recall?

7    A    I trust you for the date, but I don't recall what date

8    it was.

9         MS. WEIRICH:  Thank you.  I have nothing further.

10        THE COURT:  You may step down.  Call your next

11   witness.

12        MR. J. BAILEY:  Call the defendant Vern Braswell.

13

14                      VERN BRASWELL

15   called as a witness, being first duly sworn, was examined and

16   testified as follows:

17                   DIRECT EXAMINATION

18   BY MR. J. BAILEY:

19   Q    You are Vern Braswell?

20   A    That's correct.

21   Q    And you're the defendant in this matter; is that right?

22   A    That's correct.

23   Q    And you know why you're here; is that correct?

24   A    Yes.

25   Q    Now let me take you back.  You sat through the trial.

1    You've been here every minute of the trial; is that correct?

2    A    That's correct.

3    Q    You were married to the decedent Sheila Braswell; is

4    that correct?

5    A    Yes, that was my wife.

6    Q    And of that marriage, how many children?

7    A    We had two boys, William and Miles.

8    Q    And where did you meet Sheila Braswell?

9    A    Sheila and I met at the -- at that time was the Days

10   Inn on Union across from the Peabody.  We was at a college

11   party.  We met on the elevator on the way up.  There's some

12   disputes or discrepancies as to who was hitting on who.  My

13   version is that she was hitting on me.  Her version was that I

14   was hitting on her.  But we met at a college party, swapped

15   phone numbers and actually talked that night until the sun

16   came up the first night we met.

17   Q    And at some point did you all begin dating?

18   A    Uh-huh.

19   Q    And how long did you date?

20   A    For approximately three years, approximately two or

21   three years.

22   Q    And now during this courtship -- what kind of courtship

23   was it?  How would you characterize it?

24   A    Sheila was like one of the guys when she was female.

25   She liked sports.  You could watch football with her,

1   basketball.  She could out-drink me and that was the first in

2   a girl I ever dated.  And, you know, whereas in college I take

3   road trips with my buddies with the guys, I started taking,

4   you know, road trips with Sheila.

5       Q    At some point did you all get married?

6       A    Yes.

7       Q    Obviously.  And what year was it that you were married?

8       A    In 1994.

9       Q    And now you've heard the testimony regarding this

10  incident in Millington.

11      A    Uh-huh.

12      Q    Is that testimony -- or tell us about what happened in

13  Millington.

14      A    You know, I -- I sat here and I've listened to this

15  incident about me supposedly dragging her down the, you know,

16  stairs pregnant.

17      Q    Did that happen?

18      A    No.  No.

19      Q    Now you don't deny -- you saw the Millington Police

20  Officer?

21      A    That's correct.

22      Q    His name is on my pad but you saw him come take the

23  stand; is that correct?

24      A    Correct.

25      Q    And what he testified to, you don't deny that, do you?

```
 1     A     No.  You know what, I made -- I made -- I made some

 2   mistakes.  I made a lot of mistakes.  And if I had to do it

 3   all over again, intentionally hitting Sheila April 19th, 1996,

 4   that's one I would have never done.

 5     Q     You don't deny that incident?

 6     A     No, no, I was wrong.

 7     Q     Let's start with did you hear Vera Cole take the stand?

 8     A     Yes.

 9     Q     Was she telling the truth?

10     A     No.

11           MS. WEIRICH:  Objection, Your Honor.  That's not

12   for him to determine.

13           THE COURT:  Sustained.

14     Q     Do you agree with her testimony?

15     A     Absolutely not.

16     Q     Do you ever remember a time where Sheila went and lived

17   at her home?

18     A     No, sir.  As I stated, when Sheila was pregnant, there

19   wasn't a night that she stayed away from the house.  Yes, I

20   made some mistakes, but if there was one time I was really a

21   good dude, it was when she was pregnant.

22     Q     Now let me ask you this question.  Now there was one --

23   was there a time when she did go stay somewhere else?

24     A     Uh-huh.

25     Q     And where was that?
```

1    A    She did go stay with Magra while I was in treatment,

2    while I was in rehab.

3    Q    So you don't deny she went and stayed with Magra?

4    A    That's correct.

5    Q    On the night of November 4th in the morning of November

6    5th, that time span is the subject of this case.  Did you call

7    the phone of Vera Cole?

8    A    No.

9    Q    You don't deny -- do you deny that you called a bunch

10   of people?

11   A    Yes, but she wasn't one of them.

12   Q    Do you deny calling Lieutenant Mitchell?

13   A    No, I called him a lot of times.

14   Q    Why did you call Lieutenant Mitchell?

15   A    Because I was trying to get some help for my wife.  I

16   was trying to get some help.  When the EMTs came, they didn't

17   try to resuscitate her.  When I dialed 911, all I could think

18   was to get somebody there to help my wife.  I was trying to

19   get Sheila some help.

20   Q    And Lieutenant Mitchell wasn't the only cop you called,

21   was he?

22   A    No.

23   Q    You called -- what other police officer did you call?

24   A    I called Myron, Myron Fair.  I called Captain Fifer.

25   It's a policeman I know from Hanley.

1    Q    Now when you say Hanley, tell the jury what Hanley is.

2    A    Hanley Elementary School is over in Orange Mound.  And

3    before I got arrested I worked as assistant principal.

4    Captain Fifer worked at the Orange Mound CO-ACT which is kind

5    of like a police substation next door.  And I would -- I'd

6    take kids to work with him and stuff like that.  So I had his

7    number in his phone if you ever need me, just hit me up and

8    give me a call.  So his number was already in my phone.

9    Q    So you don't deny calling him either, do you?

10   A    No.

11   Q    All right.  Let's go back.  You went to -- where did

12   you go to school, college?

13   A    Memphis State.

14   Q    And did you graduate?

15   A    I did.

16   Q    And where did you go -- did you obtain any

17   post-graduate education?

18   A    Yeah.  As soon as I graduated, I got -- I went right

19   back.  It was then The University of Memphis.  I got a

20   master's.  I got a master's degree in administration and

21   supervision.

22   Q    And you mentioned Hanley.  At some point did you begin

23   to work there?

24   A    Uh-huh, yes.

25   Q    And you didn't -- when you started working there, what

1    was your position?

2    A    I started working there as a teacher's aide.  I was in

3    college.  And I worked my way to becoming a teacher and then

4    instructional facilitator.  And then in the summer of 2004, I

5    became the assistant principal there.

6    Q    In the summer of what year?

7    A    In 2004.

8    Q    Now let's get this out of the way.  You know Kristie

9    Woods, don't you?

10    A    Uh-huh.

11    Q    Tell these ladies and gentlemen of this jury how you

12    know Kristie Woods.

13    A    She's a young lady I had an affair with.  We dated for

14    a couple of years and that was it.

15    Q    How did you come to meet Kristie Woods?

16    A    I was over by Baptist College and I saw a guy that I

17    kind of grew up with and he flagged me down, saying this girl

18    wanted to meet me and we swapped numbers.  During that time my

19    wife and I -- I was doing instructional facilitator.  I was

20    also -- had a store online on E-bay and was doing a lot of

21    business stuff.  Sheila was also involved in a lot of business

22    stuff.  And we just kind of grew apart a little bit.

23        I was focusing on the boys and being a daddy and

24    focusing on work and career stuff, and she was focusing on

25    work and career stuff and we just kind of grew apart a little

1    bit.  And I began to have an affair.

2          I dated Kristie about two years.  Initially, it was

3    just all about sex.  That's all it was initially.  It kind of

4    got out of hand.  I grew to like her.  She grew to like me.

5    And that was that.  I came clean with her, told her I was

6    married.  That didn't matter to her.  We kept dating, kept

7    seeing each other.

8    Q    Now how did Sheila actually come to find out about

9    Kristie Woods?

10   A    In the spring of 2004, Kristie began to get a little

11   obsessive.  If Kristie couldn't find me or didn't know where I

12   was, she would call Sheila, kind of prank calls, call with a

13   blocked number and would hang up on her.  She would send her

14   text messages, things of that nature.  And Sheila was, like,

15   something's going on or what's going on.

16         She began also to send her, like, harassing e-mails.

17   Because I had a store on E-bay and had done some computer

18   work, I learned how to trace what's called an IP address.  And

19   Sheila showed me one of the e-mails and I traced the IP

20   address and it came from St. Jude.  So she was, like, what's

21   going on.  Who is at St. Jude?  It was Kristie.  And then

22   right at the same time of that, Sheila came to the motorsports

23   track where I was with Kristie.

24   Q    Is that what Ms. Woods -- you heard Ms. Woods testify.

25   Is that true what she said?

```
 1    A    Yes, that was true.

 2    Q    Now, do you deny the altercations that Ms. Woods

 3  testified to?

 4    A    I don't -- I don't deny the altercations.  I deny the

 5  reason behind them though.

 6    Q    Let's start with that first altercation she spoke of in

 7  June 2004.

 8    A    Uh-huh.

 9    Q    What happened?

10    A    After -- during the spring when she was doing harassing

11  e-mails and phone calls, I told her, I said, look, leave my

12  wife and my family alone.  Leave them alone.  This is going to

13  be about us if we're to have anything.  Leave them alone.  And

14  I found out that she was continuing to do that.  So I kind of

15  broke it -- broke away from her a bit, was kind of waning away

16  from her.  We was at the party.  I found out -- Sheila called

17  me and said I'm still getting these e-mails, still getting

18  these text messages.

19    Q    Who said that?

20    A    Sheila called me while I was at the party and told me

21  that.  And in addition to that, a friend or somebody was at

22  the house and she was, like, why don't you come on home so I

23  can take this person home and talk about it.  Because I had

24  told Kristie earlier and I was -- I was pretty nice to her.

25  Even though I was wrong for dating her, I was pretty nice to
```

1    her and I felt that, look, if I set this up as a boundary, the

2    least that you can do is respect this.  And I got angry

3    because she didn't.  And at the party, I grabbed her and said

4    look, you fucked up.  Leave me the fuck alone.  And I pushed

5    her away and I proceeded to leave.

6    Q    Is that what happened?

7    A    That is what happened.

8    Q    And then there was this second incident she testified

9    that she alleges occurred at her home?

10   A    Correct.

11   Q    What happened at that incident?

12   A    Around -- that was Labor Day weekend of 2004, which is

13   incidentally me and Sheila's anniversary, too.  I was supposed

14   to be having an event down at the club.  I closed down early

15   to go home to be home with Sheila.  She canceled her plans to

16   come to the club to be with me.  So we kind of missed each

17   other.  When we caught up with each other, she was like where

18   you at.  I'm like, I'm at home where are you.  She was, like,

19   where you at?  Like, I'm at home.  Where are you?  She, like,

20   I'm at the club.

21        So me and Sheila hooked up and wound up going out that

22   weekend and celebrating our 10th anniversary.  Kristie gets

23   upset about it and comes and slashes Sheila's tires.  And like

24   I said, I repeatedly told her, look, Sheila, my family are off

25   limits.  Leave them alone.  Because -- let me back up a little

1    bit.  Where Sheila and I went that Friday night was we went to

2    Platinum Plus, a club over on Mt. Moriah.

3        Q    And Platinum Plus is what kind of facility?

4        A    It's a strip club.

5        Q    Let me ask you this question.  Did you and Sheila often

6    go to strip clubs?

7        A    Yes, frequently.

8        Q    Did you and Kristie go to some strip clubs?

9        A    Yes, frequently.

10       Q    What about with the Rough Riders?  Did you all go to

11   strip clubs?

12       A    Yeah, we did.

13       Q    Often?  Not often?  How often?

14       A    We would every -- about once or twice a month we do a

15   night out and we kind of rotated.  One night it would be a

16   movie.  One night we may go to a strip club.  So, yes, we did

17   but it wasn't our regular thing.

18       Q    Okay.  Go ahead.

19       A    But let me say this though.  That night Sheila and I

20   went to Platinum Plus and we had another young lady with us

21   who's lesbian and I had some doubts in my mind as to did this

22   girl's girlfriend slash these tires or did Kristie do it.  So

23   I called Kristie and she basically tells me she did it.  What

24   made me angry was two of the tires were slashed.  One of them

25   was punctured.  So we take those tires to Wal-Mart, get new

1    tires and she starts driving on that car and has a blowout and

2    that kind of -- kind of ticked me off a little bit.

3       Q    You said she started driving?

4       A    Sheila did, Sheila.

5       Q    And so you go to Kristie's and what happened?

6       A    I go to Kristie's and she told me she did it.   And I

7    grabbed her, said, look, leave my damn wife alone.   Leave her

8    alone.

9       Q    Did you hold her head against the --

10      A    No.

11      Q    -- the glass table?

12      A    No, I didn't bang her head against the table.   I didn't

13   bang her head against any wall, do any of that stuff.

14      Q    But you don't deny the altercation?

15      A    That's correct.

16      Q    Okay.   The incident in Millington, why did that occur?

17      A    In '95 when Sheila was living with Magra, she had had

18   an affair.   I was in treatment also during that summer.   Right

19   after that Sheila went to Richmond, Virginia, to complete some

20   clinicals.   She was in the OT program at UT Memphis and they

21   had to do clinicals to wrap up their course work.   So Sheila

22   was in Richmond.   I'm back at home in Millington.

23          Sheila comes back, moves in.   I'm doing some cleaning

24   and I find some letters and some notes from the guy that she

25   was having an affair with.   And we get into an argument about

```
1    it.  I ask her, you know, what's this?  Why were you doing
2    this?  Her response to me was, if your ass would have been
3    here with me instead of out in them streets drinking and
4    drugging, then I wouldn't have had to go to another man.  I
5    snapped.  I popped her, hit her, put her in a headlock and I
6    left.
7        Q    Did you ever have another physical altercation with
8    Sheila Braswell, an angry one, a -- any kind of abusive
9    situation after that?
10       A    Nothing.  Nothing.  Absolutely nothing.
11       Q    Were the police ever called to your home that you know
12   of after that?
13       A    No.
14       Q    All right.  You have heard a lot in this courtroom, I
15   would assume since you've been in here, about rough sex; is
16   that correct?
17       A    (Witness nodded head up and down.)
18       Q    Could you explain how you got into that?
19       A    Through watching porn.
20       Q    Can you speak up a little louder, please?
21       A    I got in it through watching porn, and it just kind of
22   evolved into what we liked to do.  For us, me and Sheila, it
23   was adventuresome.  She had a lot of outfits, a lot of
24   knee-highs, heels.
25       Q    Who bought those things?
```

1   A    She did, I did.  It depended on the occasion.  If it

2   was me wanting to surprise her, I'd buy it, lay it out, she'd

3   wear it.  If it was her wanting to surprise me, she'd buy it,

4   put it on and surprise me.

5   Q    Are you familiar with a place called The Treehouse?

6   A    (Witness nodded head up and down.)

7   Q    What is The Treehouse?

8   A    The Treehouse is a swingers club.  It's kind of a sex

9   club, a swingers club.

10  Q    When you say "swingers club," explain to these ladies

11  and gentlemen here what that is.

12  A    Swingers are when people that swap partners or may not

13  even be any partner swapping.  Some people have certain

14  fetishes like voyeurism.  They like to watch other people.

15  Some people like to watch their spouse or their mate having

16  sex with somebody else.  Some people like three-somes and

17  four-somes.  And Treehouse is a place where things of that

18  nature can be practiced in a controlled environment.

19  Q    Is that here in Shelby County?

20  A    Uh-huh.

21  Q    Have you been there?

22  A    Uh-huh.

23  Q    How many times have you been there?

24  A    Three or four.

25  Q    Has Sheila Braswell been there with you?

1    A    Uh-huh.

2    Q    How many times?

3    A    One -- she went one less time than I did.  I've been

4    there four times.  She went three.

5    Q    Is there a reason why Sheila got into these things with

6    you?

7    A    Uh-huh.

8    Q    Explain.

9    A    Because she loved me.  Because she loved me.  The rough

10   sex, the kinkiness, the outfits, I mean, she was trying to

11   please me.  The only thing that I didn't bring to the table

12   was the autoasphyxia.  That's something she developed on her

13   own.

14   Q    Now when you say "she developed on her own," explain

15   what it is and tell me how she developed it on her own.

16   A    Autoasphyxia, autoeroticism, that term explains

17   somebody choking themselves.  And the trick is to time it with

18   the orgasm so that you're getting the intensity of the orgasm,

19   along with the intensity of a choking sensation.  And auto is

20   when you do it to yourself or do it by yourself.

21   Q    All right.

22   A    How it's done?

23   Q    No.  Let me ask my second question.  Did you or Sheila

24   Braswell ever engage in that activity?

25   A    Uh-huh, we did.

1    Q     Did you or Sheila Braswell ever engage in it as a

2    couple?

3    A     Uh-huh.

4    Q     Explain that to the jury.  How did you do it?

5    A     When she did it -- and I was real uncomfortable with

6    her doing it -- if you can imagine a bathrobe or anything

7    long, but a bathrobe is what she did most.  Take it and just

8    drape it around you and then take those ends and then wrap

9    them up so that when the pressure is released, it just

10   automatically falls apart or the detention is released.  But

11   when you got it up, you take it and just say wrap it around

12   something else so that you can pull and just get tension.

13   Just enough to get the blood cut off and get the circulation

14   going -- I mean, get that affect going.  As you're doing that

15   or -- you have it set up.  When you're getting ready to --

16   when you feel the orgasm coming on, you tighten it so that

17   that feeling coincides with the orgasm.  When you go limp or

18   when it's cut off, automatically you're going to let it go and

19   it's going to loosen or release.  That's how autoerotica slash

20   asphyxia is done.

21   Q     And did Sheila Braswell ever engage in that activity?

22   A     Yes.

23   Q     And how did you all do it as a couple?

24   A     We were having sex together, she didn't care for me

25   being in front of her asphyxiating her.  What she preferred,

1    it was for me to be behind her, using -- just like Kristie

2    said this morning, behind her the doggy-style position with my

3    arm around her.  It was just the same way Kristie did with the

4    officer behind her, my arm around, sometimes with my hand

5    pinching the arteries and the veins, the carotid and jugular

6    on the side.

7        Q    How often did you all practice that?

8        A    Roughly once a week.

9        Q    Was there a fail-safe or some kind of signal that was

10   supposed to be given to let you know when to stop?

11       A    Uh-huh.

12       Q    And what was the signal?

13       A    What she would do, we would always be next to something

14   that she could put her fingers on, like the side of the

15   jacuzzi or like the headboard or something.  And the purpose

16   for doing that was if your fingertips are on something, when

17   you go limp they're going to fall and I would see her fingers

18   fall, that would let me know to release.  Or if I was too

19   tight, she'd tap.  She'd just tap and that would let me know

20   to release some.

21       Q    And how often did you say that occurred?

22       A    Roughly once a week.  We may do it two -- between one

23   and three times whenever we did.

24       Q    Were there -- excuse me, for lack of a better word "sex

25   toys" utilized in your home?

1    A    Uh-huh.

2    Q    Were there a lot of them or were there few?

3    A    It depends on what you're comparing it to.

4    Q    Was there more than one?  More than ten?

5    A    Yeah, perhaps, yeah.  When you take into account the

6    bullets and floggers or whips and vibrators, yeah.  It was a

7    lot.

8    Q    Now when you left your home the last time you saw your

9    home before being arrested, were those items in your home?

10    A    Yes, they were.

11    Q    Can you identify those items if you were to see them

12    today?

13    A    Uh-huh.

14    Q    We'll come back.  Now I want to take you to the day of

15    November 4th of 2004.  Let's start with your getting up that

16    morning.  What did you -- tell me what you did that day.  And

17    I want you to take me up to your going home that night.

18    A    Typically, she yelled at me get your butt up, it's time

19    to go to work; shake me, shake me, shake me.  I was a hard

20    sleeper.  I get up.  The boys' stuff would be laid out.  I

21    would get them dressed.  One of us would go through the

22    oatmeal, toast whatever they was having for breakfast.  They

23    would eat breakfast on the way to school.  They went to school

24    where I worked at so we was together during the day.

25         My daily duties at work.  My daily duties, you know, at

```
 1    work.  They had switched to a new football team and this
 2    football team, little league football team had made it into
 3    the playoffs.  So with this being -- with that being football
 4    season, after work I wrapped up my stuff, we'd go to the
 5    house.  They'd have a snack.  We'd knock out homework and take
 6    them on to football practice, which was, like, 5:30 to 7,
 7    7:30.
 8         Q    Okay.  What happened then?
 9         A    On that particular night after practice I bring the
10    boys home.  We would have already knocked out homework,
11    already had a snack.  Mom would have been home getting them
12    something ready for dinner.  I had a rental that next night at
13    the club --
14         Q    Explain what you mean by "you had a rental that night."
15         A    Whenever somebody needed somewhere to have their party
16    or event or whatever they was having, I would lease -- I would
17    lease the space out to them.
18         Q    Now let me stop you right there, sir.  Were you trying
19    to finish your question, your answer?
20         A    Go ahead.
21         Q    You heard the talk of you and Papa Bear on this tape.
22    What's Papa Bear's real name?
23         A    Darnell Gardner.
24         Q    From your phone calls from the jail not long after you
25    were arrested; is that correct?
```

1    A    Uh-huh.

2    Q    And when you were talking about the club and closing it

3    down and letting them -- on the tape.  You heard the tape.

4    Was that the rental you all were talking about?

5    A    Uh-huh.

6    Q    All right.  Go ahead.

7    A    A friend was going to have a bachelor's party or some

8    type of party the next night, and I had some air conditioning

9    and some heating issues so I met somebody there.  It was

10   getting in November.  It was going to be cold that night so I

11   met somebody there to work on the heating and air and to make

12   sure things were going to be okay because on Friday from the

13   time I leave work, boys' football practice, I wouldn't have

14   had time to do anything in preparation for this guy's rental

15   and I had some code enforcement people coming by, too.

16   Q    What happened after that?  Did you see Kristie Woods

17   that night?

18   A    I believe I did.  I believe I --

19   Q    Was there anything eventful about that?

20   A    No.

21   Q    Was she -- you heard her testimony that she was the

22   bookkeeper.  Was that true?

23   A    Yes, it was true.  In actuality, I was kind of

24   gravitating those responsibilities away from her somewhat.

25   But she still -- she had all of the financial records and all

1   that stuff so yes, she was the bookkeeper but we was in the

2   process of moving all that stuff away from her.

3       Q    So after the boys' football practice, what happened?

4       A    Dropped the boys off at home, let Sheila know what was

5   done in terms of homework.  That's Thursday.  Friday William

6   had a spelling test, go over his spelling words with him.  I

7   told her I had to go meet Patrick at the club.  He was

8   checking out the heating and the air.

9       Q    Now Sheila was getting ready for some event; is that

10  right?

11      A    Uh-huh.

12      Q    What was the event?

13      A    What she did was called Beauty Control.  And what they

14  would do is, like, pampering parties.  They come to somebody's

15  house and pamper you and it's like a women's session and they

16  do manicures and just pamper them and things of that nature.

17  And they sold beauty products at those things and she was

18  doing one at her brother and sister-in-law's that next night.

19  She was scheduled to do one.

20      Q    All right.  And go ahead.  What happened after you

21  brought the boys home and you think -- you ended by saying you

22  went back to meet the guy about the heating and air?

23      A    Right.  I go back to the club and I started to put some

24  things up and get some things out the way.  May have worked on

25  some records while the heating and air man was doing his

751

1    thing.  And that was about it at the facility.

2        Q    What time did you go home?

3        A    It was late, like 10:45, 11.  It was late.

4        Q    I want to pass to you what was previously marked as

5    Exhibit 30.  Let me refer you to a specific page, please.  I'm

6    going to refer you to at the top of the page it says "page 7

7    out of 10."  In fact, I've already turned the page.  You've

8    seen this before, haven't you?

9        A    Uh-huh.

10       Q    You've gone over it with me before; is that right?

11       A    Uh-huh.

12       Q    Now that's the -- I think it's already in evidence that

13   that's the phone log from Nextel; is that correct?

14       A    Uh-huh.

15       Q    Do you deny that that's your telephone?

16       A    I don't deny that.

17       Q    Do you deny making the calls there or receiving the

18   calls as they indicate on the record?

19       A    I don't deny that.

20       Q    Tell me the last call, if you can find it on that

21   sheet, the last call that was made or received by your phone

22   on November 4th.

23       A    22:57, which would be 10:57.

24       Q    And who was that call made from?

25       A    It came from Kristie's house.

1    Q    And she testified to that, did she?

2    A    That's correct.

3    Q    Do you deny that?

4    A    No.

5    Q    Now do you see another call on there -- when is the

6    next call?  Maybe that's what I should ask you.

7    A    The next call is out-bound call at 3:55.

8    Q    All right.  And who was that call made to?

9    A    Lieutenant Mitchell.

10    Q    Okay.  Tell the ladies and gentlemen of this jury why

11    you called Lieutenant Mitchell at 3:55.

12    A    Trying to get some help for my wife.

13    Q    Did you make a call from that phone at least at 1:30?

14    A    No.

15    Q    All right.  You got home, I think you just testified

16    around 10:30; is that right?

17    A    Uh-huh.

18    Q    What happened after you got home that night?

19    A    One of my duties and responsibilities is doing teacher

20    attendance.  So normally about that time around 11-ish, I

21    would have checked the substitute teacher system or the

22    teacher absence system to find out which teachers are going to

23    be absent so that I can make sure I have adequate subs to do

24    the -- to cover my classrooms and things of that nature.

25    Q    Then what happened?

1    A    I would have made sure my stuff was laid out.  I would

2    have made sure the boys' stuff was laid out.

3    Q    Okay.  Now you say "the boys" and the boys are --

4    you're referring to your sons?

5    A    Uh-huh.

6    Q    And where is their room in relation -- when I say room,

7    bedroom, in relation to the master bedroom that you and your

8    wife slept in?

9    A    It's across from our bedroom.

10    Q    Is it directly across?

11    A    Indirectly.  Our -- our bedroom has a little piece of a

12    hallway because that's where the utility closet is, the washer

13    and dryer is right there.  Right after that little utility, it

14    T's and the guest bedroom and boys' bedroom are right there.

15    Q    And if someone were to scream from your bedroom, could

16    they be heard in the children's room?

17    A    Absolutely.  When they scream we hear them.

18    Q    I'm going to get to -- let's just take it step by step.

19    All right.  So after you finish your teacher work, what did

20    you do then?

21    A    Like I said, I would have made sure my stuff was laid

22    out for the morning.  I would have made sure the boys' stuff

23    was laid out for in the morning.  I'm not absolutely 100

24    percent sure but that would have about been my normal routine.

25    Q    Was Sheila -- what was Sheila doing?

1    A    Getting -- I know she was going back and forth upstairs

2    and downstairs getting products ready for the next day.

3    Q    And what's upstairs?

4    A    Office and guest bedroom, bathroom, attic.

5    Q    Now did you all ever engage in sexual activity that

6    night on the night of November 4th?

7    A    Uh-huh.

8    Q    In the morning of November 5th, did you engage in

9    sexual activity?

10   A    Yes.

11   Q    Okay.  Explain what happened.

12   A    Somewhere around midnight we get into the jacuzzi and

13   we just relax at the end of our day.  And during this time we

14   are real girlfriend and boyfriend-ish, real, real giddy.  We

15   had worked through some stuff.  We had worked through this

16   Kristie stuff.  It was like we was dating again.  It was like

17   she was my brand new fresh girlfriend and I was her brand new

18   fresh boyfriend again.  One of the things we did was hopped in

19   the jacuzzi at the end of the night and kind of went over our

20   day, just talked about our day.

21        We start, you know, caressing each other and we start

22   getting intimate.  We start having sex.

23   Q    Now without -- I don't want to have to get into a whole

24   lot of graphic detail but I want you to explain -- you say "we

25   started having sex," was it rough sex?  Was it natural sex?

1    Explain to these ladies and gentlemen.

2    A    When we were in the jacuzzi, we just did a lot of

3    caressing and kissing.  We started but sometimes a lot of

4    water and sex don't mix so we got out and got onto the floor.

5    We did it on the floor in the bathroom, worked our way, floor

6    of our bedroom.  She asked me to fix her.  That was the way

7    she -- that's the way she asked for an asphyxiation, will you

8    fix me.  She's on her knees.  I'm on my knees behind her.

9    Q    Did you choke her?

10   A    Yeah.

11   Q    Were you trying to kill her?

12   A    No.

13   Q    Were you trying to hurt her?

14   A    No.

15   Q    Were you trying to cut her air off?

16   A    That's apart of it.

17   Q    Were you trying to cut her air off until she died?

18   A    No.

19   Q    Where were your children at that time?

20   A    Asleep.

21   Q    Where in the house?

22   A    In the bedroom across from our room.

23   Q    Were they ever awakened?

24   A    No.

25   Q    Let me ask you this question.  It's been a lot of

1    testimony, and I think you heard it, regarding the children

2    being next door.  How did the children get next door?

3        A    At, like, a little bit right after four o'clock as soon

4    as the EMTs and the fire truck pulled up, Jim my next-door

5    neighbor called and said what's going on.  He wanted to know

6    what was happening.  And I told him she won't breathe.  She

7    won't breathe.  She won't breathe.  And he said oh, shit, and

8    ran over and came over.

9        Q    Were the children awake or sleep when he got there?

10       A    They were still asleep.  And as a matter of fact, they

11   were still pretty asleep when he carried them back home with

12   him.

13       Q    So you didn't take those children -- did you take the

14   children next door?

15       A    No.

16       Q    Who took them next door?

17       A    Jim did.

18       Q    Were y'all friends or were you just acquaintances?

19       A    We were friends.  We had been neighbors for seven

20   years.  They come over to our house for family functions and

21   stuff like that.  And we go next door to theirs.

22       Q    So you all were engaged in what y'all called fixing?

23       A    (Witness nodded head up and down.)

24       Q    Now I need you to explain how you would fix her.

25       A    I'm behind her.  We're having sex.  We're at the foot

1  of the bed.  I don't know if you have the pictures but our bed
2  had big poles on it.  And connecting those poles is a strip
3  that goes across the foot of the bed and that's where we are,
4  the reason being so that she can put her fingers along that
5  strip.  I put my arm around her.  She pinches me, which let's
6  me know to tighten up and she stops when I got my arm where
7  she wants it.  She starts having an orgasm.  Her hands drop.
8  I release.  But when her hand is dropped, I can't keep holding
9  her and I can't let her go so I have to just kind of cradle
10  her and lay her down and relax her.
11      Q    Now at this point where are you all?
12      A    We're at the foot of the bed on the floor.
13      Q    All right.
14      A    When she's coming back around, at this time I'm still
15  caressing her, fondling her, kissing her.
16      Q    Do you shake her?  Do you say wake up?  How does he
17  come back around?
18      A    In the beginning I would --
19      Q    When you say "in the beginning" you mean this day?
20      A    No, when we first started -- when we first started
21  doing asphyxia.
22      Q    And how long had you been doing asphyxia?
23      A    About two years or so.
24      Q    Go ahead.
25      A    In the beginning when she would go limp, I would just,

1    you know, sit there and watch her and she was, like, don't do

2    that.  Stop.  Don't, don't, don't.

3       Q    Why?

4       A    And I asked her why.  She equates and she says, don't

5    you know how you feel in the morning --

6              MS. WEIRICH:  Objection, Your Honor, hearsay.

7              MR. J. BAILEY:  It's not offered for the truth of

8    the matter asserted but I can rephrase it.

9              THE COURT:  Rephrase.

10      Q    Why -- did she want you to shake her and wake her up?

11      A    No.

12      Q    Was that part of the orgasm experience?

13      A    Yes.  Here's what I learned.  When you're coming out of

14   it, to be shaken kind of ruins the moment of it.  Don't shake

15   them.  Just let them come to.  And if I had to equate it to

16   something, it would kind of be like to waking up in the

17   morning naturally or waking up having somebody to shake you --

18      Q    Now --

19      A    -- the difference.

20      Q    So what happened after she comes around?

21      A    While we're on the floor, like I said, after she goes

22   limp I lay her down.  I'm still -- we're still in the act.

23   I'm kissing on her, still rubbing her so that when she comes

24   out of it, she's still getting some additional sensations.  I

25   start to feel carpet burns on my knees so we hop in the bed

1    and we're having sex in the bed.

2        Q    Okay.  And then?

3        A    We have sex for about, I don't know, 20, 30 minutes in

4    the bed.  She asked me would I fix her again and can I get

5    another fix.  That's the way she asked.

6        Q    Now how do you all end up in the bathroom?

7        A    After that second one, we just kind of layout, layout

8    in the bed watching TV.  She said she was cramping a little

9    bit.  She gets up, goes into the bathroom part and our -- our

10   bathroom is in a suite by itself.  It's not -- it's like a

11   whole different room and stuff.  I hear the -- I hear water

12   running.  I hear the jets come on.  I go on off to sleep.

13   However, about two -- I don't know what time it is, somewhere

14   about 2:45, three o'clock, she wakes me up and she's

15   performing oral sex on me and that's how she wakes me up.

16       Q    You mean that day?

17       A    Uh-huh.  She turns around and now we're doing oral sex

18   on each other.  I'm rubbing her, caressing her and she asked

19   me -- she asked me if I wanted to have some anal sex with her.

20   I told her yeah, sure.  She said come on.  When we did sex

21   that way, she liked to be in the jacuzzi.  There's something

22   therapeutic about the water.  It kind of provided -- the jets

23   kind of hit in different parts of her body, would provide kind

24   of like a distraction.  Just that type of sex in and of itself

25   is kind of unpleasurable unless she was kind of in this mood

1    or had some distractions or something.

2        Q    She related -- had she related to you before that she

3    didn't really care for that kind of sex?

4        A    Yeah.  Yeah.  She really didn't -- she really didn't

5    care for anal but she did it to please me.  And if she was

6    stimulating herself or doing something else, it was a lot

7    better if we were in the jacuzzi.  It's a lot better.

8        Q    All right.  Now what happened?  Get -- you all are back

9    in the jacuzzi.  What happened?

10       A    We get in.  We don't hop immediately into it, some

11   kissing, some caressing.  She turns the water on hot with the

12   jets on.  With our jacuzzi if you just fill it up with hot

13   water, flip the jets on, what's going to be in it is a bunch

14   of cold water coming out the jets.  So what she would do is

15   she'd fill the jacuzzi up with hot water while the jets are on

16   so that we got hot water circulating through it.  So while

17   we're kissing and being intimate that's what she's doing.  And

18   she liked the water hot as all get-out.  The heat that she

19   liked in that thing was unbearable by me.

20       Q    Was there a reason why Sheila liked the water that hot?

21       A    I don't know.  Now when she was in there by herself,

22   she said it would alleviate her cramping.  Frequently after

23   sex she would have some abdominal pains or something and she

24   said it would alleviate it.  But she just liked that water

25   hot, much hotter than me.

1    Q    So you're in the jacuzzi and what happens?

2    A    She asked me if I was ready and I said yeah.  And in

3    the back of the jacuzzi, it slopes up, goes into the wall and

4    whereas when we were on the floor we was up against the foot

5    of the bed.  When we were in the bed, we was up against the

6    headboard.  When we were in the jacuzzi, we're at the back of

7    the jacuzzi.  I started to fix her, puts her hand on the side

8    of the jacuzzi and gives me the pinch and I started tightening

9    up.  I have anal with her.

10   Q    Did she go limp?

11   A    Yes.

12   Q    What did you do?

13   A    When she go limp in the jacuzzi, we had a -- an

14   inflatable suction pillow.  And like I said when she go limp,

15   I set her down and I just lay her down.  The water start to --

16   the water was hot and that's how she had it and that's how she

17   kept it and I just go on and get on out and go to the bed and

18   wait on her to come to me.

19   Q    Did you have -- what happened then?

20   A    She didn't come.  She didn't come.

21   Q    So what did you do?  Mr. Braswell, you say she didn't

22   come, what do you mean?

23   A    Normally, she -- normally, she get out and come on and

24   get in the bed.  She never came to the bed.

25   Q    What did you do?

1    A    I laid around for a minute.  I noticed it was, like,

2  3:45, 3:50.  I may have dozed off or something.  I don't

3  remember specifically.  I go back in there and she's submerged

4  in the water.  She's under the water.

5    Q    You say she was what now?

6    A    When I go back in there, she's submerged under the

7  water.  She's under the water.

8    Q    What did you do at that point?

9    A    I grab her.  I pull.

10   Q    This is very important now.  Where did you grab her?

11 How did you grab her?

12   A    I don't remember.  I'm grabbing at my wife.  My wife is

13 under the water.  One time grabbing her around her head area.

14 One time grab her around the neck, around her -- around her

15 abdomen, around her waist.  And I couldn't get her out.

16   Q    All right.  Did you try to get her out?

17   A    Yeah.

18   Q    Now you listened to this 911 call; is that correct?

19 That was you on the tape.  You don't deny that, do you?

20   A    Correct.

21   Q    The operator says Calm down, sir.  Pull her out.  Put

22 your hands under her, I think between her underarms or

23 something of that nature.  Pull her out.  And you say I can't.

24 Could you?

25   A    No.

1    Q     Now you heard the testimony of the EMT and the

2    paramedic and they said -- and I think it was Lieutenant

3    Jackson, said she was halfway in the tub and halfway out of

4    the tub.  How did she get like that?

5    A     I'm constantly trying to pull her out.  I'm grabbing.

6    I'm tugging.  I'm pulling.  On the side that she was on is

7    where our suction is.  And it seem like her hair might have

8    been in the suction or something because every time I'm

9    pulling, everything comes -- when I say everything, her breast

10   area, neck area comes out and it pulls her neck back and,

11   like, back down when I release her, it pulls her back down

12   into the jacuzzi.  So --

13   Q     I'm sorry, go ahead.

14   A     So at the same time I'm trying to pull her out.  I'm

15   trying to dial 911.  I'm trying to call anybody that can get

16   my wife some help while all at the same time trying to do

17   this.

18   Q     All right.  Now you heard the testimony of Ms.

19   Sturdevant and the other witness from Bellsouth, the gentleman

20   from Bellsouth; is that correct?

21   A     Uh-huh.

22   Q     Were you working two phones trying to get some help?

23   A     Right.

24   Q     You don't deny making all those calls, do you?

25   A     No, I was trying to get some help.

1     Q     Let me pass to you what has been previously marked as

2     Exhibit 2.  Is that a picture of -- I think it's been

3     identified as a picture of your jacuzzi, your tub.  Is that

4     what it is?

5     A     Yeah.

6     Q     Now you see some eyeglasses sitting on the side; is

7     that correct?

8     A     Uh-huh.

9     Q     How did those eyeglasses get there?

10    A     We got back in there, I took them off her face, put

11    them over there.

12    Q     Okay.  Now there was some testimony today about some

13    earrings that were -- let me pass this to you.

14          MR. J. BAILEY:  For the record I'm passing what

15    was previously marked as Exhibit 46.

16    Q     I want you to look in that envelope, sir, and tell me

17    if you can identify those earrings or identify what's in it.

18    A     It's two earrings and a nipple ring.

19    Q     Okay.  The two earrings, who did they belong to?

20    A     Sheila.

21          MR. BAILEY:  Mr. Lafferty, may I see that, please?

22    Q     Now I want you to take a look at the clasps of these

23    earrings.  The clasps, I mean the part that goes into the ear.

24    That's what I mean by clasp.  In what condition are they in?

25    A     They're functional.

1    Q      Would you characterize -- how would you characterize

2    them?

3    A      Working condition.  They look undamaged.

4    Q      Are they broken off?

5    A      No, sir.

6    Q      When was the last time you saw those earrings?

7    A      They was sitting on the side of the jacuzzi.

8    Q      How did they get on the side of the jacuzzi?

9    A      We took them off.

10   Q      Now the other ring that's there, that was allegedly

11   found in the tub --

12   A      Uh-huh.

13   Q      -- who does that belong to?

14   A      It looks like one of Sheila's.  She had -- Sheila had

15   -- originally had hoops and she had went to some longer

16   dangling nipple rings so she transferred from hoops to the

17   dangling ones.

18   Q      What did she have in her breasts on the day of her

19   death?

20   A      The dangling ones.

21   Q      Now you call 911.  They tell you to get her out of the

22   tub, get her out of the tub.  And if I understand your

23   testimony, you couldn't.  You got her halfway out and then

24   what happened?

25   A      Every time I pull her up, something would jerk her back

1   down in there.  Every time I'm trying to yank her out and

2   something's yanking her back down.  I'm pulling and the lady

3   said, look, you've got to get her out of there.  She said put

4   your arms around her waist or abdomen or something and yank

5   her.  I was kind of afraid because while I'm -- while I was

6   pulling her up around her head and the top area, I thought I

7   heard something pop or snap or something so I'm afraid.  But I

8   step over into the tub, reach down around her and --

9        Q    Go ahead, Mr. Braswell.

10       A    One yank I pull her on out and I get her on the side of

11   the tub and so she's now resting on the side of the jacuzzi.

12       Q    Now you make a lot of calls.

13       A    Uh-huh.

14       Q    At some point the police arrive; is that correct?

15       A    Uh-huh.

16       Q    And why did you not tell this to the police and to the

17   paramedics?

18       A    Tell them about the fixie?

19       Q    Yeah.

20       A    It's not something that me and Sheila shared with folks

21   openly.  That ain't something we talked about.  That ain't

22   something that I would want known.  Sheila would have never

23   wanted me to tell folks that we were having anal sex and oral

24   sex and choking and asphyxia.  And to tell you the truth, to

25   talk about it now, it kind of feels like I'm dragging her name

```
 1    through the mud or dishonoring her.  Can I say something else,

 2    too?

 3       Q    Go ahead.

 4       A    Let me give you one of the biggest reasons.  One, I

 5    never thought I would have been charged with her death.  Two,

 6    one of the headlines read --

 7              MS. WEIRICH:  Objection, Your Honor.

 8       Q    You can't tell us what the headlines say or what anyone

 9    else says, Mr. Braswell.  Let me ask you the question.  When

10    you -- did they have to handcuff you to take you down to

11    homicide or how did you go?

12       A    I went in a car with Bobby, her brother.

13       Q    The police didn't take you down there, did they?

14       A    No.

15       Q    Did they issue a warrant for you to come down?

16       A    No.

17       Q    Did you go voluntarily?

18       A    Yes.

19       Q    Did you say I'm not going to talk to y'all?

20       A    No.

21       Q    What did you tell them?

22       A    I answered all the questions they asked me.

23       Q    Okay.  Now did there come a point where you wanted to

24    give them the rest of the story?

25       A    Yeah.
```

```
1    Q    What happened?  Why didn't you?

2    A    Glen and --

3    Q    When you say Glen, who is Glen?

4              MS. WEIRICH:  Objection, Your Honor.

5              MR. J. BAILEY:  What's the objection?  I just

6    asked him who's Glen.  He said Glen.

7              MS. WEIRICH:  May we approach?

8              THE COURT:  You may.

9                   (Bench conference commenced.)

10             MS. WEIRICH:  Obviously he's going to answer that

11   these lawyers told me not to and our objection is that that's

12   hearsay.

13             THE COURT:  Well --

14             MS. WEIRICH:  I don't know if that's the answer.

15   I'm just anticipating it.

16             THE COURT:  I assume that's what the answer will

17   be.  And I do think that at this point since an issue has been

18   raised by the State with regard to why he failed to tell or --

19   the version he told the police, these would be the version

20   he's telling us now that he -- that this would be introduced

21   not so much for the truth of it but to rebut the suggestion

22   that he just this week came up with this version so I'll

23   overrule the objection.

24             MR. J. BAILEY:  Thank you, Your Honor.

25                  (Said bench conference concluded.)
```

1    Q    Do I need to restate my question or do you remember?

2    A    Restate it.

3    Q    Why did you fail to go forward and tell the police the

4    rest of what happened?

5    A    On Saturday when they picked me up, it was Sergeant

6    Miller at that time.  Now he's Lieutenant Miller.  He's asking

7    me what happened.  And I said I'll make a statement.  I want

8    my lawyers here.  I want my attorney here.  My attorneys came.

9    They told me not to tell anybody.  Keep my mouth shut.  My

10   lawyers told me don't say a word.  I told him what happened

11   and he said don't say anything.  As a matter of fact, he told

12   the officers that I wouldn't be making a statement.

13   Q    And when you say "he," was that Mr. Wright?

14   A    Yes.

15   Q    Was that the same Mr. Wright that took the stand today?

16   A    That's correct.

17   Q    Now I'm going to move forward just a little bit, okay.

18   You listened to and for the record -- you were in the

19   courtroom when the CD what's -- for the record what was

20   previously marked Exhibit 27 -- was played; is that correct?

21   A    Uh-huh.

22   Q    And of the jail calls that you made; is that correct?

23   A    Uh-huh.

24   Q    And you can't tell me what somebody told you, but is

25   there a reason why you have a certain demeanor during those

1   calls?

2       A    Uh-huh.

3       Q    Would you explain that?

4       A    You can't cry in jail.  You can't.  When they first

5   arrested me, I was shocked.  I was surprised.  That was kind

6   of like a dream.  I didn't understand what in the hell what

7   was going on.  And I was distraught.  And I was crying.  They

8   took all of my clothes, all of my possessions and threw me

9   into a suicide ward.  That's one of the things that happen

10  when you cry in jail.  So to this day, I haven't even been

11  able to grieve Sheila's death.  You can't cry in jail.  I

12  ain't been able to grieve the fact that I ain't been with my

13  children in over a year.  I ain't been able to grieve the fact

14  of the first time I saw my momma in a year was when I walked

15  in the courtroom the other day.

16       And if you cry in jail, you get taken advantage of.  So

17  you have to have a certain outward appearance.  You have to

18  have a certain image you project when you in jail.  Ain't no

19  crying.  I made a mistake.  Unless you in the shower, that's

20  the only place you can cry.  That's because water is already

21  running on you.

22       Q    All right.  I'm going to pass you some items.  I want

23  you to first tell me if you can identify the items.  We'll

24  start there, okay.

25       A    Uh-huh.

1   Q    Can you identify that?

2   A    Yes, it's one of our vibrators, one of the ones Sheila

3   uses.

4   Q    Where did it come from?

5   A    Should have been in the nightstand on her side of the

6   bed.

7   Q    Did you purchase it?

8   A    I think she purchased this one.

9   Q    All right.  Can you identify that as being one of the

10  items that was in your home the day Sheila died?

11  A    Yeah.

12       MR. J. BAILEY:  May I ask that right now just be

13  marked for ID purposes only.

14       THE COURT:  All right.  Exhibit 47.

15       (Exhibit No. 47 was marked for identification.)

16  Q    I'm going to pass to you another item.  Can you

17  identify that item?

18  A    Yeah.  This is the shell of a butterfly.

19  Q    What is a butterfly?

20  A    A butterfly is a vibrator that Sheila would strap on

21  around her legs so that -- and it will be up out of the way so

22  that while we're having sex, she's being stimulated by the

23  vibrator.  The straps would fit around her legs and she would

24  -- she would wear it.

25  Q    Do you recognize that particular item?

1      A     Yes.

2      Q     And where was the last time you saw that particular

3    item?

4      A     In one of our nightstand drawers.

5      Q     Okay.

6              MR. J. BAILEY:  Your Honor, may we have that

7    marked ID purposes only at this time.

8              (Exhibit No. 48 was marked for identification.)

9      Q     Can you identify that item that's been passed to you?

10     A     Yes.

11     Q     Can you tell me what it is?

12     A     It's the minibullet that comes with the butterfly.

13     Q     What is a minibullet?

14     A     A bullet is just something a woman use for direct

15   stimulation.  It doesn't go -- it's not like a vibrator that

16   goes inside.  It's just for stimulation of the clitoris.

17     Q     All right.  And do you recognize that particular item?

18     A     Absolutely.

19     Q     And when was the last time you saw that particular

20   item?

21     A     In our nightstand when we -- prior to Sheila's death.

22             MR. J. BAILEY:  All right.  May I have that marked

23   for ID purposes at this time.

24             (Exhibit No. 49 was marked for identification.)

25     Q     Do you recognize that item that's been passed to you?

1    A    (Witness nodded head up and down.)

2    Q    Did you purchase that item?

3    A    I purchased this one.

4    Q    And when is the last -- what is it, first of all?

5    A    The name of it is the Nubby G.  A woman's G-spot is --

6    Q    Let me --

7    A    It's for stimulating the G-spot.

8    Q    And when is the last time you saw that item?

9    A    I haven't seen this one in a while.  We kept this one

10   upstairs in the guest bedroom.

11   Q    When you say "upstairs in the guest bedroom," at what

12   address?

13   A    At our house.

14   Q    The Creekside address?

15   A    Absolutely.

16   Q    And where was that item on November 5th?

17   A    Upstairs.

18   Q    Of 2004?

19   A    This was upstairs.

20   Q    Where was it on November 4th of 2004?

21   A    Upstairs.

22        MR. J. BAILEY:  May I have that marked, Your

23   Honor.

24        (Exhibit No. 50 was marked for identification.)

25   Q    Can you identify that item?

1    A    Yes.

2    Q    What is that item?

3    A    It's a regular -- it's what's called an egg.

4    Q    Is it a sex toy?

5    A    It's a bullet, yeah.

6    Q    And do you recognize that particular one?

7    A    Absolutely.

8    Q    And when was the last time you saw that item?

9    A    One of the nights preceding Sheila's death.  This we

10   kept in the nightstand next to the bed.

11   Q    Now when you talk about the nightstand next to the bed,

12   how many nightstands were next to your bed?

13   A    Two.

14   Q    On either side of the bed?

15   A    Yes.

16   Q    And were those nightstands -- were these items in which

17   nightstand?

18   A    The bullet would have been in hers.  The butterfly

19   would have been in hers.  All these would have been in hers,

20   the ones you've given me would have been hers.

21   Q    And I think you testified one item was upstairs?

22   A    Uh-huh.

23   Q    Okay.  I'm sorry?

24   A    I didn't say anything.

25   Q    I want you to tell me whether or not you can identify

1    these items.

2        A    Yeah.

3        Q    Where were those items retrieved?

4        A    This one would have been in my nightstand.   This one

5    would have been upstairs.

6        Q    How do you know the difference?

7        A    This one is rubber.   This one is rubbery.   This one is

8    leather strands.   She liked to rub them on --

9        Q    Now earlier today you heard the testimony of Ms.

10   Sheronda Smith; is that correct?

11       A    Uh-huh.

12       Q    And I asked Ms. Smith on cross-examination about you

13   all attending a -- an event in North Carolina and your being

14   at an S and M stand or kiosk or whatever, a display I think

15   was what my question was.

16       A    Uh-huh.

17       Q    Were these the kind of items that were at that kiosk or

18   that display?

19       A    This one actually came from North Carolina.   This one

20   did.   And I bought another flogger while we were there and

21   wore it out.   It just unraveled and broke.

22       Q    And are those the items that she was testifying she saw

23   you looking at?

24       A    Uh-huh.

25       Q    When you say "uh-huh," you have to say yes or no.

1    There's someone typing this.

2    A    Yes, I apologize.  Yeah.  Actually, they were having a

3    whole S and M convention there.

4    Q    Did you know that before you went?

5    A    Had no idea.  Didn't have a clue.

6    Q    But when you got there, did it spark your interest?

7    A    To say the least.

8    Q    And did Sheila look at those displays or go to that

9    display with you?

10   A    Uh-huh.

11   Q    Sir?

12   A    Yes, I apologize, yes.

13   Q    Before I go any further --

14            MR. J. BAILEY:  Would Your Honor indulge me one

15   moment, please?

16            DEFENDANT BRASWELL:  Your Honor, some water,

17   please?

18   Q    Would you explain how those floggers were used?  How

19   are they used?  How would you use them?

20   A    Three ways.  One, either popping with the leather part.

21   Two, popping with the plastic part.  Three, is just a dragging

22   over the skin.

23   Q    Did you and your wife use those?

24   A    Yeah.  This one had a few more leathers than this one

25   before we started, I think.

1        MR. J. BAILEY:  Your Honor, I'm going to move to

2   admit each one of those items into evidence.

3        THE COURT:  All right.  Are you asking that these

4   be marked for ID purposes only?

5        MR. J. BAILEY:  Move them into evidence.

6        THE COURT:  All right.  Are you asking to remove

7   the ID designation from the previous several?

8        MR. J. BAILEY:  Yes.  I'd like to remove the ID

9   designation for the record and have them entered into

10   evidence.

11        THE COURT:  Okay.

12        (Exhibit No. 51 was marked and filed.)

13        (Exhibit No. 47-50 were marked and filed.)

14        (Exhibit No. 52 was marked and filed.)

15        THE COURT:  All right.  Mr. Bailey.

16        MR. J. BAILEY:  Yes, Your Honor.

17   Q    Now can you explain the significance of the body

18   piercings that both you and Ms. Braswell had?

19   A    Yeah, anything -- when your nipples or other body parts

20   are pierced, it heightens the sensitivity.  So let's say if

21   I'm kind of sensitive, my nipples once they're pierced, I'm

22   super or hypersensitive.  That's the nature of it.

23   Q    Now you had a white bathrobe on, I think that was the

24   testimony, when the paramedics arrived.  I think their

25   testimony was you were in the front yard flagging them down or

1   waving them down or something of that nature?

2      A   Yes, sir.

3      Q   At what point did you put that bathrobe on?

4      A   When I heard the sirens. I knew I was going to have to

5   go let them in. So when I run by the bed, I just grabbed the

6   bathrobe. They sat on the poles of our beds. Grabbed it,

7   threw it on.

8      Q   Was your body visible under that bathrobe?

9      A   Yes.

10     Q   Was it tight around you?

11     A   No.

12     Q   Did the police ever ask you to -- to take your clothes

13  off so that they can look at your body?

14     A   No.

15     Q   Did you submit to DNA sampling?

16     A   I did.

17     Q   Voluntarily or did they have to make you?

18     A   Voluntarily.

19     Q   Who was present in the room with you?

20     A   Sergeant Merritt, another female officer from homicide

21  and one of my lawyers.

22     Q   Which lawyer?

23     A   You were.

24     Q   Now when you came in this jail, did you have to get any

25  kind of medical attention for scratches or bruises?

1    A    No.

2    Q    Were you bleeding?

3    A    No.

4    Q    I want to show you something.  I want you to take a

5    look at both -- well, three things.  For the record -- let's

6    just do them one by one.  First, I'm going to pass you what's

7    previously been marked as Exhibit 19.  You recognize what's in

8    that picture; is that correct?

9    A    Yes.

10   Q    Now what -- what's in the picture?

11   A    TV and VCR.

12   Q    Where was the picture taken?  I guess I should ask

13   that.

14   A    In our bedroom.

15   Q    Okay.  And it's kind of cluttered; is that correct?

16   A    Junky.

17   Q    Is that how y'all's house always was?

18   A    Yes.

19   Q    Was it like that on November 3rd?

20   A    Yes.

21   Q    Was it like that on October 3rd?

22   A    If we wasn't expecting visitors, yes.

23   Q    Likewise, I'm going to pass you Exhibits 17, 20 and 24.

24   Do you see anything unusual about your home in those pictures?

25   A    No.

1    Q    Is the ironing board turned over on the floor?

2    A    No.

3    Q    Are things knocked off the vanity like there's been

4    some kind of struggle?

5    A    No.

6    Q    Now I'm going take you through the phone calls that you

7    heard, briefly.  On one call your mother asked you about

8    insurance and you stated you didn't know who the beneficiary

9    was and you didn't know how much it was.

10   A    That's correct.  My mother had my children at that time

11   and she was asking about insurance and financial stuff.

12   Q    Why?

13   A    She had my children.

14   Q    When you say "she had my children," what did that mean?

15   A    She had William and Miles in her custody and that's who

16   I left them with.  And then if somebody was going to pay the

17   house note, it was going to be my mother and so she wanted to

18   know what she was going to have to work with.

19   Q    Speaking of that, now Lieutenant Miller testified that

20   you were at a football game at Bolton High School when you

21   were arrested.  Who was playing in that game?

22   A    My children.

23   Q    And why did you take your children to the game?

24   A    Because they was going to get a trophy and they didn't

25   want to miss out on they trophy.

1    Q    Were you callously over there watching some football

2    game cheering rah, rah?

3    A    No.

4    Q    Was Bolton High School playing?

5    A    No.

6    Q    How old were the children in that football game?

7    A    Miles is five and William was seven.

8    Q    Now Sheila filed for divorce in June of 2004; is that

9    correct?

10    A    Correct.

11    Q    Did you all -- did you file a (indiscernible)?

12    A    No.

13    Q    Did you hire a lawyer?

14    A    No.

15    Q    Why?

16    A    She told me don't worry about it.

17    Q    Did she take you down to the courthouse and have the

18    judge put you out the house?

19    A    No.

20    Q    Now on one call there's a discussion about -- that you

21    heard that was played before this jury, there was a discussion

22    about "papers," I quote, and bank account records being

23    shredded.  Why did you tell them -- I think it was Brian or

24    Papa Bear, why did you tell Brian and Papa Bear to shred the

25    records?

1    A    No, it was my brother.

2    Q    Why did you tell your brother to shred the records?

3    A    Because I have sensitive stuff on it.  That bank

4    account number is on it and social security number is on it.

5    Q    And who was packing your house?

6    A    My brother was.

7    Q    Were there other people going in the house?

8    A    Absolutely.  I didn't know how many keys were out

9    there.

10    Q    Where is Sheila's car right now?

11    A    I don't know.

12    Q    Where is your vehicle?

13    A    I don't know.  One has been taken away.

14    Q    So is it your testimony that's why you told them to

15    shred all those financial records?

16    A    Uh-huh.

17    Q    Were you trying to hide anything?

18    A    No.

19    Q    Were you in bankruptcy?

20    A    No.

21    Q    Were you trying to get insurance money?

22    A    No.

23    Q    Have you filed for any insurance money to date?

24    A    No.

25    Q    Did you ever hire a lawyer and ask them to go open an

1   estate?

2      A     No.

3      Q     In fact, who's the beneficiary on Sheila Braswell's

4   policies?

5      A     If I'm not mistaken her mom, the boys and me.

6      Q     Were you about to receive some $350,000 or $400,000?

7      A     No.

8      Q     Were your businesses in trouble?

9      A     No.

10     Q     Did you intend to leave your wife for Kristie Woods?

11     A     No.

12     Q     Did you pack a bag ever?

13     A     Never.

14     Q     Did Sheila pack a bag and leave?

15     A     No.

16     Q     As a matter of fact since 1996, has Sheila Braswell

17  ever left your home?

18     A     No.

19     Q     Was Sheila in good relations with her own mother?

20     A     Yes.

21     Q     Do you know whether or not she was getting ready to

22  move in with her mother?

23     A     That's not the case.

24     Q     She has a brother here in town, too; is that correct?

25     A     That's correct.

784

1    Q    His name?

2    A    Bobby.

3    Q    What's his whole full name?

4    A    Robert Wade Franks.

5    Q    And is that where your children are?

6    A    (Witness nodded head up and down.)

7    Q    Did Sheila move in with Robert Franks?

8    A    No.

9    Q    Mr. Braswell, are you here -- are you telling this jury

10   that you were a fantastic husband?

11   A    Never.  Like I said, I made some mistakes, a lot of

12   mistakes.  I wasn't a perfect husband.

13   Q    Were you even close to perfect?

14   A    No, don't even claim to be.

15   Q    Now one of the witnesses mentioned and I think you have

16   now mentioned at one point you went to treatment; is that

17   correct?

18   A    Uh-huh.

19   Q    And I'm almost through.  Did you and Sheila have an

20   opportunity to begin working with others in treatment?

21   A    Uh-huh.

22   Q    Don't say "uh-huh."  You've got to say yes or no.

23   A    I apologize.  Yes, we did.  I -- one of the neat or

24   unique things about our marriage is that it was -- it was

25   resilient.  We went through troubles but then we would take

1    them troubles -- we would take lemons and make lemonade.  I

2    went through treatment.  It didn't stop there.  I began

3    working with other people that had the same type of problems

4    that I did when I was in treatment.  She began working with

5    wives and mothers that had the same type of problems that she

6    had when she went through treatment.

7        Q    Was she a member of Al-Anon?

8        A    Yes.

9        Q    And for those ladies and gentlemen of the jury that

10   don't know what Al-Anon is, would you explain that?

11       A    Al-Anon is for the families or loved ones of

12   alcoholics.  Frequently, we would be asked to come give a

13   talk, come give talks.  I would do the AA -- I would do the AA

14   talk and she would do the Al-Anon talk.

15       Q    When was the last time -- how much sobriety do you have

16   under your belt now?

17       A    The last time I took a drink or drug was in April of

18   1996 when I put my hands on her.  So this upcoming April I

19   have ten years of continuous sobriety.

20       Q    In April?

21       A    (Witness nodded head up and down.)

22       Q    Now did you intentionally, cold-blooded with malice

23   aforethought kill Sheila Braswell?

24       A    I absolutely did not.  I didn't.

25       Q    Were you all arguing and you got out of hand and you

1    choked her to death?

2    A    No.

3    Q    And where were your children?

4    A    In the bedroom across from ours.

5    Q    Did you ever hear Sheila Braswell on November 4th or

6    November 5th scream for help?

7    A    No.

8    Q    Did she run out of the house and go next door?

9    A    No.

10   Q    Was this an accident?

11   A    Yes.

12   Q    Mr. Braswell, when was the first time that you learned

13   that your wife died from the act in which you were engaged in?

14   A    When one of the lawyers came to see me after I was --

15   Q    You can't tell us what anyone said but when was that?

16   A    After I had been arrested.  After I was put in jail,

17   when Detective Miller picked me up from my children's football

18   game, he brought me down and he alluded to strangulation.

19   Q    Was that the first you'd heard of it?

20   A    Absolutely first I heard of it.

21   Q    What did you believe had happened up until that point?

22   A    I didn't know what had happened.  I didn't know.

23          MR. J. BAILEY:  Would Your Honor indulge me one

24   moment?

25          DEFENDANT BRASWELL:  Excuse me, can I get some

1    more water, please?

2              THE COURT:  One second.  Some more water, please.

3    Would you like a break?  Step down.  Leave the water there and

4    step down behind your attorney.  All right.  Ladies and

5    gentlemen, we will take a brief recess.  As always, do not

6    discuss the case during the recess.

7              (Jury out.)

8              THE COURT:  We'll stand in recess.

9              (Recess.)

10             THE COURT:  Step back around, Mr. Braswell.

11   Resume the witness stand.  Bring in the jury, please

12             (Vern Braswell resumed the witness stand,

13                  having previously been sworn.)

14        MR. J. BAILEY:  Your Honor, can we put the

15   exhibits on the exhibit table?

16             THE COURT:  That's fine.

17             (Jury present.)

18             MR. J. BAILEY:  Your Honor, I have one omitted

19   question, just one.

20

21              DIRECT EXAMINATION CONTINUED

22   BY MR. J. BAILEY:

23   Q    Mr. Braswell, what was -- when you were in treatment,

24   what was your drug of choice that led you to treatment?

25   A    Gin and crack cocaine.

```
 1              MR. J. BAILEY:  No further questions.

 2              THE COURT:  Ms. Weirich.

 3

 4                        CROSS-EXAMINATION

 5   BY MS. WEIRICH:

 6    Q    How tall are you?

 7    A    Five-four.

 8    Q    How much do you weigh?

 9    A    195 now.

10    Q    What did you weigh back on November 5th, 2004?

11    A    I weighed about 170, 175.

12    Q    All right.  When did you meet Sheila Braswell?

13    A    Around 1991.

14    Q    Y'all began dating immediately?

15    A    Yes, ma'am.

16    Q    You were married in what year?

17    A    1994.

18    Q    What year did you meet Kristie Woods?

19    A    I met Kristie in 2002.

20    Q    You were married?

21    A    Correct.

22    Q    You exchanged phone numbers with her?

23    A    That's correct.

24    Q    You met her on the street corner?

25    A    That's correct.
```

1    Q    You began calling her and you two began dating?

2    A    That's correct.

3    Q    You dated about eight months before you told her you

4    were married; correct?

5    A    Yes.

6    Q    Eight months?

7    A    That's correct.

8    Q    You were still married; right?

9    A    That's correct.

10   Q    You and Sheila Braswell weren't separated, were you?

11   A    No.

12   Q    In fact during this whole marriage y'all never

13   separated, did you?

14   A    Only in 1995.

15   Q    When she went to live with Ms. Harden?

16   A    Correct.

17   Q    The only time you claim; right?

18   A    That's correct.

19   Q    All right.  I'll get to that in just a minute.  When

20   you met Kristie Woods and you two started seeing each other

21   and dated for almost a year before you bothered to tell her

22   you were married, you and Mrs. Braswell were still living

23   under one roof?

24   A    That's correct.

25   Q    You said you're a hard sleeper; is that right?  Was

1    that your testimony?

2    A    Yes.

3    Q    What do you mean by that, hard to wake you up?

4    A    Correct.

5    Q    You don't stir very easily?

6    A    I don't understand.

7    Q    You're a deep sleeper?

8    A    Correct.

9    Q    Did you ever tell Sheila Braswell about Kristie Woods?

10   A    Yes.

11   Q    When she found out about her; right?

12   A    Yes.

13   Q    Then you came clean on it; right?

14   A    Yes.

15   Q    When y'all were living in Millington, how long did you

16   live there?

17   A    From '94 up until '97, right at three years.

18   Q    April of 1996 when the police were called to your

19   house, do you remember that night?

20   A    Yes.

21   Q    You left; right?

22   A    Right.

23   Q    Where did you go?

24   A    To do drugs and drink and get drunk.

25   Q    You beat up Sheila Braswell and then you left the

1    house; right?

2       A    That's correct.

3       Q    She told the judge on the night of April 17th, 1996,

4    around ten or 11, my husband and I had a dispute.   What were

5    y'all fighting about?

6       A    Found out she had had an affair.   I asked her about it.

7    I didn't like the answers she gave me.

8       Q    So you slapped her?

9       A    (Witness nodded head up and down.)

10      Q    Which resulted in a scratch on her cheek and sore

11   jawbone.   You then choked her.   How did you choke her?

12      A    Put her in a headlock.

13      Q    How?   Show me.

14      A    Put her like this.

15      Q    Pulled her hair?

16      A    That's correct.

17      Q    Was her hair long then?

18      A    I don't remember.

19      Q    You threw her up against the wall and a chair.

20   Remember that?

21      A    No.

22      Q    You choked her from behind.   How did you do that?

23      A    The only time I choked her was when I put her in a

24   headlock.

25      Q    So she made that part up about you choking her from

1   behind?

2   A   I don't -- I can't recall.

3   Q   Cutting off my air supply and told me to say my

4   prayers.  Remember saying that?

5   A   No.

6   Q   She made that up?

7   A   I don't know.  I don't remember saying it.

8   Q   I tried to leave the first time at which time he

9   restrained me.  Remember that?

10  A   No.

11  Q   He tried to punch me several times.  You remember that?

12  A   Yes.

13  Q   Some of which I was able to block.  After having me on

14  the kitchen floor, he took my wedding ring and diamond heart

15  pendant and reported he would be paid alimony when we got

16  divorced.  Remember that?

17  A   Yes.

18  Q   I was able to leave the house and ran next door to a

19  neighbors where 911 was called.  The Millington Police

20  Department came and took pictures.  She then came downtown the

21  next day with her mother and met with Judge Robilio and an

22  order of protection was signed; right?

23  A   That's correct.

24  Q   Were you ever served with it?

25  A   Yes.

793

1    Q    Did you show up in court on May 10th?

2    A    Yes.

3    Q    At that point the judge issued the year-long order of

4    protection; right?

5    A    I don't remember.  I remember us going down.  We sat in

6    a little room.  Sheila and I, we talked about it.  Said

7    look --

8    Q    Do you remember talking to the judge?

9         MR. J. BAILEY:  He was trying to finish his

10   answer.

11        THE COURT:  Let him finish the answer.

12   Q    I'm sorry, couldn't hear you.

13   A    Sheila and I went down.  We rode down there together.

14   We met in a little room.  We talked amongst ourselves, made

15   our agreement.  I would stop running the streets and getting

16   high and getting drunk, and she wouldn't have anymore affairs

17   and I wouldn't put my hands back on her again.

18   Q    She -- I'm sorry, what?

19   A    And we -- that was part of the agreement that I

20   wouldn't put my hands back on her again.

21   Q    Was part of the agreement that you were allowed to have

22   affairs?

23   A    No.

24   Q    That was later on?

25   A    No, I was wrong.

1     Q     In 1995 was that when you were in rehab?

2     A     That's correct.

3     Q     She came to visit you at rehab?

4     A     Correct.

5     Q     You choked her then.  Do you remember that?

6     A     I don't remember that.

7     Q     You deny that one?

8     A     That's correct.

9     Q     But you heard Magra Harden testify; right?

10    A     I did.

11    Q     And you admit that your wife lived with Magra Harden;

12    right?

13    A     That's correct.

14    Q     That part of it you admit?

15    A     That's correct.

16    Q     But you don't know how your wife ended up with red

17    marks all over her neck and a raspy voice?

18    A     Sheila's voice was always raspy.

19    Q     Did you hear Ms. Harden testify that her voice sounded

20    differently after she came home from visiting you?

21    A     I did.

22    Q     Did Sheila Braswell visit you when you were in rehab?

23    A     She did.

24    Q     In 1997, I believe, Ms. Braswell was pregnant with your

25    first child; is that right?

```
 1      A     Absolutely.

 2      Q     Y'all got in a fight?

 3      A     No.

 4      Q     Never?

 5      A     No.

 6      Q     You drug her down the stairs by her hair?

 7      A     No.

 8      Q     You didn't do that?  She packed her belongings and ran

 9   to her sister-in-law and brother-in-law's house.  You don't

10   remember that?

11      A     No, that did not happen.

12      Q     That did not happen.  There wasn't a time when she

13   wasn't at home with you?

14      A     During 1997 we lived in Millington all the way up until

15   September, maybe August.  There wasn't a time that she was

16   pregnant that we wasn't together.  She did not leave at any

17   time during she was pregnant.

18      Q     Why would you call over to the Cole's looking for her?

19      A     I don't recall that.  Now in 1996 she was having some

20   contact with her when we had the problems in Millington she

21   did, in 1996.  Nothing from 1997.

22      Q     Do you remember your bond hearing this summer?

23      A     I do.

24      Q     In front of Judge Dailey?

25      A     I do.
```

1    Q    You were asked the question: Who was Kristie Michelle

2    Woods?  Do you remember me asking you that question?

3    A    I do.

4    Q    Do you remember what you told me?

5    A    Yes.

6    Q    What did you tell me?

7    A    A member of the motorcycle club.

8    Q    That's right.  She's someone you had a relationship

9    with.  Do you remember me asking you that?

10    A    Uh-huh.

11    Q    Do you remember your answer?

12    A    Uh-huh.

13    Q    What did you tell me?

14    A    My answer was -- and I was a smart-ass and I shouldn't

15    have -- I should not have said it, but I snidely said I have a

16    relationship with all the members of my motorcycle club.

17    Q    I had a relationship with all the members of the club.

18    I was the president.  Is that what you told Judge Dailey?

19         DEFENDANT BRASWELL:  May I finish my answer?

20    Q    Is that what you told Judge Dailey?

21    A    Yes, but I --

22    Q    And I asked you --

23         MR. J. BAILEY:  Your Honor, he's trying to finish

24    his answer.

25         THE COURT:  All right.  Finish your answer.

1    A    Like I was saying, I was wrong.  I was being indignant

2    and I was being a smart-ass and I was wrong.

3    Q    You also weren't being very truthful, were you?

4    A    Beg your pardon?

5    Q    You also weren't being very truthful, were you?

6    A    I was being evasive.

7    Q    I asked you: Was she someone you had a romantic

8    relationship with?  And then you finally said, Yes.

9    A    That's correct.

10   Q    I asked you: At the time your wife died, do you

11   remember that?

12   A    That's correct.

13   Q    Remember what you told me?

14   A    I told you no.

15   Q    You told me, No.  I asked you:  When did it end?  When

16   did it end?

17   A    In June -- June, July 2004.

18   Q    That wasn't true either, was it?

19   A    That was the truth.

20   Q    Didn't you call Kristie Woods the night of November

21   4th, 2004, and tell her you love her?

22   A    No, she called me.

23   Q    Did you tell her you loved her?

24   A    No, I didn't.

25   Q    She made that part up?

1    A    She had to have had.

2    Q    Was she supposed to come by your school the next day

3    and pick up some keys from you?

4    A    That's correct.

5    Q    But your relationship was over?

6    A    Correct.

7    Q    Did you ever pay her any money for working at the club?

8    A    If it were the case that I had a rental and I needed

9    somebody there to open it and to close it, I give her a

10   portion of the money from that rental.

11   Q    Pass you Exhibit 4.  Is that your wife's writing?

12   A    It is.

13   Q    Is that y'all's checking account?

14   A    It is.

15   Q    What's the date on that check?

16   A    October 24th, 2004.

17   Q    Thank you.  If I could have that back, please.  How

18   many cell phones did you have back on November 4th and 5th,

19   2004?

20   A    Two or three.

21   Q    One was a Nextel.  What were the others?

22   A    The Cricket.

23   Q    Well, if you had three what was the third one?

24   A    Another one was a Tungston that I seldom used.

25   Q    That you what?

1     A     That I very, very, very seldom used.

2     Q     June of 2004 when you say your relationship with

3   Kristie Woods ends; right?

4     A     That's correct.

5     Q     What day did it end?  Do you remember?

6     A     I don't remember.

7     Q     All right.  June of 2004 you two are at a club?

8     A     That's correct.

9     Q     You get upset?

10    A     That's correct.

11    Q     You put your hands on her neck?

12    A     Yes, I put one hand on her neck.

13    Q     She told you, you were holding a little too tight?

14    A     Yes.

15    Q     You let go and you pushed her and she left?

16    A     I left first.  I don't know what she did when I left.

17    Q     Did you continue to see her after that?

18    A     I did continue to see her.  It wasn't --

19    Q     Did you keep -- I'm sorry.

20    A     I did continue to see her.  It wasn't as romantic as it

21   initially was.  I was -- when she did that stuff, I should

22   have scadaddled and I didn't.  I did keep seeing her in some

23   shape, form or fashion.  I did keep communicating with her.

24    Q     Did you keep calling her?

25    A     Our boyfriend/girlfriend/mistress relationship was

1    done.  She would -- she would call me and I don't feel like

2    living and she'd be depressed and I felt pretty responsible in

3    that relationship.  I was the older person.  She was younger.

4    I should not have -- one, I shouldn't have been having an

5    affair.  Two, I should not have been involved with somebody

6    that young and I was wrong.

7        Q    Did you call her "The Soldier"?

8        A    That's correct.

9        Q    Did you call her "The Rabbit"?

10       A    We referred to her as "The Rabbit."

11       Q    Did you call her "your favorite cousin" when you talked

12   to her from the jail?

13       A    That's correct.

14       Q    Did you tell her you dreamt about her at night when you

15   called her from the jail?

16       A    That's correct.

17       Q    September or October of 2004 you went to her house;

18   right?

19       A    Uh-huh.

20       Q    You were mad because she was seeing some man down in

21   Oxford, Mississippi; right?

22       A    No, that's not correct.

23       Q    You deny that?

24       A    That's correct.  I deny that.

25       Q    You went to her house?

1    A    Yes.

2    Q    Did y'all have an argument?

3    A    Yes.

4    Q    Did you shove her down on the couch?

5    A    No.

6    Q    Did you push her up against the wall?

7    A    No.

8    Q    Did you push her head up against the wall?

9    A    No.

10   Q    Did you grab her by the neck and throw her head against

11   the glass coffee table?

12   A    I did not.

13   Q    What did you do if you had this altercation?

14   A    I went.  I fussed at her.  I said, I told you, leave my

15   wife alone.  Leave her alone.  I grabbed her on the neck.  I

16   said leave her alone and that was it.  That was from the back.

17   Q    And that was it?

18   A    I said leave her alone.

19   Q    And then you left?

20   A    I did some more cursing, told her I wasn't going to see

21   her no more, deal with that, did some more fussing and I left.

22   Q    Did you keep telling her during all these months before

23   your wife ended up dead in the bathtub that you were going to

24   make things right?  Did you tell her that?

25   A    Yes.  May I explain?

1    Q    Did you tell her that?

2    A    Yes, I did.  May I explain?

3    Q    I'm going to pass you a picture.

4         MR. J. BAILEY:  Your Honor, he's entitled to

5    explain.

6         MS. WEIRICH:  It's a yes or no question, Your

7    Honor.

8         MR. J. BAILEY:  He can answer yes or no and then

9    he can explain.

10        THE COURT:  He may explain.  Go ahead.

11   A    One of the things I kept telling her was that, look,

12   after those two incidents was that we could only be friends

13   and that's all we could be is friends.  Yes, I slept with her

14   some more.  We even went out a time or two again, but I was

15   drilling in her head we can only be friends.  And I told her I

16   was going to make all this stuff right.  I was telling her

17   that we would only be friends and that's platonic friends.  No

18   sex, no nothing.  At that point Sheila -- on direct when Mr.

19   Bailey was talking to me, I talked about how I was moving

20   Kristie away from the records.  Sheila was becoming an active

21   part of my business endeavors and business ventures.  And I

22   just wanted Kristie away, out.  I would only be her friend and

23   we was going to keep it and have it platonic, no sex, no

24   nothing.  Why I still remained her friend because I felt

25   guilty and I felt wrong.  I felt to some extent I had

803

1    manipulated her.   That was it.

2        Q    You finished?

3        A    Yes.

4        Q    When you were in custody, how many times did you talk

5    to her?

6        A    I don't remember.

7        Q    More than once?

8        A    I don't remember.   Maybe three, four.   I don't

9    remember.

10       Q    The jury heard a few of the calls.   You'd call her at

11   work; right?

12       A    That's correct.

13       Q    You'd make sure every time you'd talk -- now who is

14   Para Bear?

15       A    Darnell Gardner.

16       Q    Who is he?

17       A    I've known Darnell about ten years and we done some

18   community stuff together and he became a member of the

19   motorcycle club.   And with him being an older gentleman, we

20   kind of gravitated towards each other, more so than me and the

21   younger guys.

22       Q    And he's a friend of yours?

23       A    That's correct.

24       Q    And he kind of kept tabs on Kristie Woods while you

25   were locked up, took care of her?

1    A    What do you mean when you say "took care of her"?

2    Q    Made sure she was underground?

3    A    No.

4    Q    Who did that?

5    A    Her mother.

6    Q    Okay.  At your request?

7    A    No.

8    Q    Just came up with that on her own?

9    A    I don't know.

10   Q    Well, you asked about it in those phone calls?

11   A    Yes, I did.

12   Q    Make sure she was; right?

13   A    I don't remember.

14   Q    Okay.  I'm going to ask that two pictures be passed to

15   you.  Do you recognize those?

16   A    Yes.

17   Q    What are they?

18   A    One is a picture of my bed and one is a picture of

19   Sheila laying on the floor.

20        MS. WEIRICH:  Judge, I'd ask that those be moved

21   into evidence as the next numbered exhibits.

22        MR. J. BAILEY:  Your Honor, may we approach for a

23   second?

24        THE COURT:  All right.

25        (Bench conference commenced.)

1        MR. J. BAILEY:  I didn't want to say anything out

2   loud, but I'm asking Ms. Weirich to start showing us the

3   pictures or whatever it is just briefly before she passes it

4   up.  I didn't want to say anything in front of the jury.

5        MS. WEIRICH:  I'm sorry.  These were pictures I

6   didn't know if they were already in evidence or not and I was

7   just doubling up.

8        THE COURT:  Let's do that in the future.

9            (Said bench conference concluded.)

10       THE COURT:  All right.  Exhibits 53 and 54.

11           (Exhibit No. 53 was marked and filed.)

12           (Exhibit No. 54 was marked and filed.)

13   Q    Who's R. Fifer?

14   A    Was Captain was a Captain.  Lieutenant Fifer.  He's the

15   gentleman that I spoke of that is at the Orange Mound CO-ACT.

16   He's kind of like the commander or the policeman that ran the

17   Orange Mound CO-ACT, which was like a little police substation

18   next door to Hanley Elementary.

19   Q    You called him on November 5th, 2004; right?

20   A    One second, please.  Whenever we would come across some

21   strange or unique situations at Hanley, if little Johnny was

22   having some home problems and we needed some help, I would --

23       MS. WEIRICH:  Objection, Your Honor,

24   nonresponsive.

25       THE COURT:  I'm going to sustain that.  Mr.

1   Bailey, he's entitled to explain an answer as long as it's

2   concise and responsive, but he's not entitled to just launch

3   off on a longer nonresponsive explanation so I'm going to

4   sustain that objection and instruct the witness to answer the

5   question directly.

6   Q    You called Captain Fifer on November 5th, 2004, around

7   4:40 in the morning; right?

8   A    That's correct.

9   Q    Did you call his cell phone or home phone?  Do you

10  remember?

11  A    I don't know which number was stored in my cell phone.

12  Q    All right.  Talked for 647 seconds; is that right?

13  A    No, that's not correct.

14  Q    That's not right?  If the records show that from the

15  phone company, that's wrong?

16  A    When he answered the phone, I told him, I said Captain

17  Fifer --

18          MS. WEIRICH:  Objection, Your Honor, to what was

19  said out of court.

20          MR. J. BAILEY:  She asked him.

21          MS. WEIRICH:  I asked how long they spoke.

22          THE COURT:  Sustained.

23  Q    How long did you speak to him if it wasn't as the phone

24  company recorded it?

25  A    I spoke to him for a few seconds and then handed the

1    phone to someone else.

2        Q    And you talked to -- called John Mitchell; right?

3        A    That's correct.

4        Q    You called John Mitchell at 3:55:57; right?

5        A    That's correct.

6        Q    At 737-6100.  Is that his home number or cell number?

7        A    I don't know.  I don't know.  The names or the numbers

8    are stored in my cell phone just under his names.  I don't

9    know when I was hitting seeing for his name.  I don't know if

10   it was dialing his cell phone or home number.  I don't know

11   which is which.

12       Q    Then you called back at 3:56:47; right?

13       A    Correct.

14       Q    Then you called back at 3:57:17; right?

15       A    That's correct.

16       Q    And then you called 911 at 3:57:48; right?

17       A    That's correct.

18       Q    When did your neighbor come over?

19       A    I don't remember.  It was after the ambulances and

20   paramedics and EMTs had got there.  He called --

21       Q    When was your neighbor -- I'm sorry, what?

22       A    He called first to see what was going on and came

23   directly over.

24       Q    So he had a phone, your neighbor?

25       A    He called me from his house.

1    Q    Right.   He had a phone at his house.   And what was his

2    name?

3    A    Jim.

4    Q    Jim what?

5    A    Herbert.

6    Q    All right.   How long had he been your neighbor?

7    A    Seven years.

8    Q    Who is Frank Cotton?

9    A    Frank Cotton is a Lieutenant or some officer.   I don't

10   know his office, but he works for the Memphis Fire Department.

11   Q    Did you know him through your fraternity, too?

12   A    I did.

13   Q    Did you call him that morning, too?

14   A    I don't remember if I called Frank or not.   I know I

15   talked with him later in the day and he also came by.

16   Q    After the paramedics and everyone cleared the scene and

17   you were asked to come down here, who brought you down here?

18   A    Bobby.

19   Q    Who is Bobby?

20   A    Sheila's brother.

21   Q    You weren't under arrest?

22   A    That's correct.

23   Q    They just asked you to come down; right?

24   A    That's correct.

25   Q    You were in a room?

1      A      Correct.

2      Q      With Sergeant Merritt?

3      A      Yes.

4      Q      And Lieutenant Miller?

5      A      Yes.

6      Q      And then eventually a woman came in to type down what

7  you said; right?

8      A      Correct.

9      Q      I'll pass you Exhibit 28.  Do you recognize that

10  document?

11     A      I do.

12     Q      Is that your writing in red?

13     A      Yes.

14     Q      Is that your signature on the last page?

15     A      Yes.

16     Q      Thank you.  If I could have that back, please.  Were

17  you given an opportunity to look over this?

18     A      I was.

19     Q      Were you given an opportunity to make any changes,

20  corrections, deletions or additions that you wanted to?

21     A      I believe I was.

22     Q      All right.  And that's what you did here in red; right?

23     A      It appears, yes.

24     Q      That's your writing?

25     A      Yes.

1    Q    Where you corrected certain things?

2    A    Yes.

3    Q    And then they let you go; right?

4    A    That's correct.

5    Q    The next day you're at your son's football game;

6  correct?

7    A    Yes.

8    Q    Is that November 6th?

9    A    Yes.

10    Q    At Bolton High School?

11    A    Yes.

12    Q    And that's when you were placed under arrest; right?

13    A    Yes.

14    Q    Remember what time of day it was?

15    A    It was in the morning.

16    Q    Did they bring you back down here?  Did they bring you

17  back down here?

18    A    Yes.

19    Q    Take you back up to Homicide Office?

20    A    Yes.

21    Q    All these items that Mr. Bailey handed you on direct

22  examination, do you see any of them in these crime scene

23  pictures that you looked at?

24    A    No.

25    Q    These Skyy vodka bottles that the officers tagged, do

1      you remember these?

2          A      Yes.

3          Q      There was one on the ironing board; right?

4          A      Correct.

5          Q      One by the bathtub?

6          A      Correct.

7          Q      Who drank those?

8          A      Sheila.

9          Q      When?

10         A      She drank one of them before we got in the jacuzzi.

11     She drank the other one as we were in there the first time.

12         Q      The last time you got in the jacuzzi was around what

13     time?  2:45?

14         A      2:45 to three-ish.

15         Q      You had sex.  Is that your testimony?

16         A      Yes.

17         Q      She was on her knees and you were on your knees?

18         A      Yes.

19         Q      Did she ask you to fix her?

20         A      Yes.

21         Q      What did you use?

22         A      Used my arm.

23         Q      Show me.

24         A      Put it around her neck in this fashion.

25         Q      How long?

1    A    I don't remember.

2    Q    Seconds?  Minutes?  Hours?

3    A    I don't remember.

4    Q    Then you got out of the tub; right?

5    A    Yes.

6    Q    You went and laid down?

7    A    Yes.

8    Q    What were you wearing?

9    A    Nothing.

10   Q    Did you doze off?

11   A    I don't remember.

12   Q    You don't remember if you fell asleep?

13   A    Unh-unh.  I may have dozed off.  I don't remember.

14   Q    But at some point you got up and went back in the

15   bathroom; right?

16   A    Yeah.

17   Q    What time was that?

18   A    It was about 3:40-ish.

19   Q    What did you have on?

20   A    Nothing.

21   Q    Was she dead?

22   A    She appeared to be.

23   Q    You called 911; right?

24   A    Uh-huh.

25   Q    Eventually; right?

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | Was there a phone in the bedroom? |
| 3 | A | Yes. |
| 4 | Q | Where were both your cell phones? |
| 5 | A | On the -- on my vanity. |
| 6 | Q | In the bedroom? |
| 7 | A | In the bathroom. |
| 8 | Q | So you had three phones back there? |
| 9 | A | Uh-huh. |
| 10 | Q | Right?  Was her body stiff? |
| 11 | A | Yeah, kind of. |
| 12 | Q | You don't remember or what? |
| 13 | A | Not -- I don't remember specifically. |
| 14 | Q | Did John Mitchell live next door to you? |
| 15 | A | No. |
| 16 | Q | Did he live across the street? |
| 17 | A | No. |
| 18 | Q | Did Myron Fair live next door to you? |
| 19 | A | No. |
| 20 | Q | Did he live across the street? |
| 21 | A | No. |
| 22 | Q | What about Frank Cotton? |
| 23 | A | No. |
| 24 | Q | What about Fifer? |
| 25 | A | No. |

1     Q    Isn't it true that some of these toys that you say were

2  in your house, some of them you kept upstairs; right?

3     A    That's correct.

4     Q    Some of them you kept down in your bedroom?

5     A    Correct.

6     Q    Isn't it true that some of the toys that you kept

7  upstairs, your wife didn't want to have anything to do with

8  them?

9     A    No, that's not the case.

10    Q    You disagree with that?

11    A    Yes, that's correct.  I disagree with that.

12    Q    When did this night of lovemaking start?

13    A    Around midnight when we got in the jacuzzi.

14    Q    So for over three hours you two were being intimate,

15  off and on?

16    A    Yes.

17    Q    Were you both naked completely the whole time?

18    A    Yes.

19    Q    When you're talking to the 911 operator and we can hear

20  you click over on another phone and say, I've got 911 on the

21  phone, Bro, who were you talking to then?  Do you remember?

22    A    Brian.

23    Q    Brian James?

24    A    Uh-huh.

25    Q    Your friend?

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | You called him, too? |
| 3 | A | Correct. |
| 4 | Q | Did he live next door? |
| 5 | A | No, but he -- |
| 6 | Q | Did he live across the street? |
| 7 | A | No, but he is an EMT. |
| 8 | Q | Did he come over? |
| 9 | A | Yes, he eventually made it over there. |
| 10 | Q | What time? |
| 11 | A | I don't remember what time he arrived. |
| 12 | Q | Did you ever find that nipple ring you couldn't find? |
| 13 | A | Yes. |
| 14 | Q | Where was it? |
| 15 | A | Inside of my shirt. |
| 16 | Q | It's not the one that's in evidence? |
| 17 | A | No. |
| 18 | Q | Where is it? |
| 19 | A | It's over in the jail. |
| 20 | | MS. WEIRICH:  I don't have anything else. |
| 21 | | THE COURT:  Mr. Bailey. |
| 22 | | MR. J. BAILEY:  No redirect. |
| 23 | | THE COURT:  Step down.  Call your next witness. |
| 24 | | MR. W. BAILEY:  Dr. Mark Schwartz. |
| 25 | | MR. J. BAILEY:  Can we take a brief recess, Judge? |

1          THE COURT:  All right.  Ladies and gentlemen,

2     we'll take a brief recess at this time.  We'll call you back

3     shortly.

4          (Jury out.)

5          THE COURT:  Okay.  Take the defendant out, please.

6     Stand in recess.

7          (Recess.)

8          THE COURT:  Bring in the jury, please.

9          (Jury present.)

10          THE COURT:  Call your next witness.

11          MR. W. BAILEY:  Dr. Mark Schwartz.

12

13                    DOCTOR SCHWARTZ

14     called as a witness, being first duly sworn, was examined and

15     testified as follows:

16                    DIRECT EXAMINATION

17     BY MR. W. BAILEY:

18     Q    Sir, state your full name, please.

19     A    Mark Schwartz.

20     Q    And you are Dr. Schwartz; is that correct?

21     A    That's correct.

22     Q    Dr. Schwartz, where do you live?

23     A    St. Louis, Missouri.

24     Q    And your -- tell us what other association you have

25     with St. Louis.  Is your business address St. Louis?

1   A   Yes.

2   Q   And I believe you and your wife operate a psychological

3   sexual treatment center there?

4   A   We've been the director of Masters and Johnson Clinics

5   in St. Louis, Missouri.  We took over after Masters and

6   Johnson retired and we've been the director of that for a

7   number of years.  And now we have a sexual and relational

8   therapy clinic.

9   Q   Let's go back with your curriculum and where did you go

10  to college?

11  A   Went to graduate school at Johns Hopkins University and

12  did my internship in the department of psychiatry at Johns

13  Hopkins.

14  Q   And you graduated from Johns Hopkins?

15  A   Correct.

16  Q   And you got your Ph.D. from Johns Hopkins?

17  A   That's correct.

18  Q   And when did you obtain your Ph.D.?

19  A   It's a doctor of science degree and I received it in

20  1977.

21  Q   All right.  And would you share with us what

22  educational institution with which you are associated?

23  A   Yes.  I'm in the department of psychiatry at St. Louis

24  University and I teach the residents in psychiatry, sexual

25  medicine.  And I lecture throughout the country on the average

1    of 30 or 40 times a year to other professionals on sexual

2    medicine.

3        Q    What is sexual medicine?

4        A    It's a subspecialty where we focus on the physiology of

5    sexual behavior, the brain and how it relates to sexual

6    behavior.  And my particular specialty has been in sexual

7    trauma and perpetrators of sexual abuse and sexual deviation.

8        Q    All right.  And how many hospitals have you -- you've

9    been associated with several hospitals too as well?

10       A    Correct.

11       Q    What are those hospitals?

12       A    Over the years I've been with St. Louis University

13   Department of Medicine, Washington University School of

14   Medicine, Tulane University School of Medicine, University of

15   New Orleans, Johns Hopkins University School of Medicine.  I

16   think a couple others.

17       Q    All right.  And you've been director, I understand, of

18   certain -- of several programs?

19       A    Correct.  I started a sex offender program in the

20   prison system in the State of Missouri and I was working for

21   probation and parole in a sex offender program for a number of

22   years and was the director of the State of Missouri's child

23   sexual abuse program and the State of Louisiana's child sexual

24   abuse program.

25       Q    All right.  Now you also have been published?

1    A    That's correct.

2    Q    And of course you've had a number of publications, I

3  understand?

4    A    Several books and articles.

5    Q    All right.  And would you share with us the titles of

6  some of those books?

7    A    One of the books called *Sexual Abuse and Eating*

8  *Disorder*.  Second book is called *Gender Identity and Problems*

9  *of Gender Identity*.  And the articles range from the reason

10  for paraphilias and some of the subspecialties of different

11  paraphilia and how they manifest themselves, how to treat

12  them.

13    Q    And have you published many or few books?

14    A    Two books.

15    Q    Two books.  And how many articles?  Many or few

16  articles?

17    A    About 30 articles.

18    Q    Have they been widely recognized?

19    A    Yes.

20    Q    In your field?

21    A    One of them was the *Encyclopedia Britannica*.

22    Q    Now also in terms of your qualifications, you have

23  dealt with sexual deviant behavior, I believe?

24    A    That's my specialty.

25    Q    And would you explain to us what sexual deviant

1   behavior is?

2      A   Individuals have a history of sexual abuse, sexual

3   trauma, and then they go on to have fantasy and behavior,

4   which is atypical.  Sometimes it's of a fetish kind of nature

5   where they like leather or cross-dressing or some sort of

6   objects in sex.  Sometimes it's the arousal patterns are

7   deviant.  They're aroused by children rather than by adults.

8   They're aroused by unusual kinds of things like urination or

9   somehow they like pain associated with sex called

10   sadomasochism, that kind of deviant sexual behavior.

11   Sometimes it's cross dressing and gender kinds of confusion.

12   Sometimes fetishes, where there's a fetish and they like some

13   sort of leather objects or whips involved in sex.

14      Q   All right.  Now you also have been involved with erotic

15   asphyxiation, I understand?

16      A   Yes, I've had a lot of experience with erotic

17   asphyxiation.

18      Q   Would you explain to the jury what that is?

19      A   It's an activity that some people involve themselves in

20   where they somehow limit the amount of oxygen going to the

21   brain during orgasm.  So it's anoxia during the sexual act.

22   It enhances the pleasure.  It decreases dopamine.  It

23   increases the endorphins and enhances the sexual arousal.  And

24   it's a pattern being used with increased frequency among

25   adolescents, starting around the ages of 13 to 15 where they

1   learn about it through television and such and they begin

2   trying it out on their own in masturbation and then involving

3   themselves with partners.

4       Q    I see.  And also there is -- you've been involved with

5   autoasphyxiation?

6       A    That's the majority of cases is autoasphyxiation, where

7   they're -- during masturbation they're somehow using some

8   ligature around their neck to limit the oxygen or stopping

9   somehow the breathing pattern in order to enhance their sexual

10  arousal.  Eventually, they'll take it on with partners and

11  teach their partners how to do it and involved in activity.

12  And so in my practice, you know, I'll hear about this as much

13  as 20 times a year among patients.  And then I've been

14  involved in a number of cases where it's resulted in death.

15      Q    So death -- is death one of the natural consequences of

16  that practice?

17      A    The problem with any addiction is that tolerance

18  develops and the person needs more and more in order to get

19  the same sexual arousal pattern.  So part of the high is

20  taking greater risks.  And either a person has an accident or

21  they push themselves to a point of too great of danger and

22  they slip and they either kill themselves or they kill someone

23  else.

24      Q    Now let me ask you.  You have had the opportunity of

25  conferring with Mr. Braswell?

1    A    I have.

2    Q    And I believe you visited with him extensively?

3    A    I wouldn't call it extensively.  I met with him last

4    evening for maybe two and a half hours.

5    Q    And you got a history?

6    A    Correct.

7    Q    And would you share that history?

8    A    Well, it would take a long time.  You want me to go

9    through the details of the history?

10   Q    Would you summarize that history more or less?

11   A    The history of what happened or the history of his

12   life?

13   Q    No, the history taken into -- in terms of the deviant

14   pattern.

15   A    Well, he reported to me that --

16        MR. W. BAILEY:  Your Honor, before we get into

17   that, I submit him as an expert in the field of deviant

18   behavior.

19        THE COURT:  Any voir dire?

20        MS. WEIRICH:  No, sir.

21        THE COURT:  You may proceed.

22        MS. WEIRICH:  May we approach?

23        THE COURT:  You may.

24        (Bench conference commenced.)

25        MS. WEIRICH:  Judge, we would object on the

1  grounds of hearsay at this point to him launching into a

2  dissertation of what the defendant told him.

3          THE COURT:  Why wouldn't that be hearsay?

4          MR. W. BAILEY:  It's part of the history.  History

5  is not hearsay.  It's part of the history of which he draws

6  his conclusions.

7          MS. CARNESALE:  It's what he told him last night.

8          MR. W. BAILEY:  His opinion.

9          THE COURT:  His opinion of what?  That your client

10 is sexually deviant?

11         MR. W. BAILEY:  Yes.

12         THE COURT:  What is the purpose of calling this

13 witness, I guess I need to ask that?

14         MR. W. BAILEY:  The purpose of calling this

15 witness is to have him -- is to elicit testimony that his

16 conduct is -- on the night in question is consistent with

17 erotic sexual asphyxiation.

18         THE COURT:  Okay.  Well that would not necessitate

19 a diagnosis based on history.

20         MR. W. BAILEY:  But history is important.  It is,

21 Your Honor, in terms -- with the expert it is.  This is

22 important information, his history, his sex history, her sex

23 history.

24         MS. WEIRICH:  It may be important to this witness,

25 Judge, but I don't see how it gets around the hearsay.

1    was much more fond of it.

2         We talked about why that might be so.  And we talked

3    about the details of her rape, where she went to the

4    university visiting her friend, went to the car and she was

5    grabbed by the hair, pulled to the ground and told to take it.

6    And the word "take it" was a very severe trigger for her and

7    would send her into flashback and so he was very careful not

8    to use those kinds of terms.  But it seemed likely that this

9    activity was related to a reenactment of some of her rape, as

10   I got the details of that.  She also got herpes from her rape,

11   which I think made it injury -- insult to injury.

12        She after the rape could get in the shower with her

13   clothes on, said she felt dirty and scrubbed and rubbed and as

14   far as she knew she didn't get any counseling from a

15   therapist.  So I see her as having sort of a full-rape trauma

16   syndrome.

17        He -- I asked him about the history of violence and he

18   told me that there had been no violence between where he had

19   strangled her in any way in the past five years and that there

20   had been some activity when he was involved with alcohol and

21   drugs of violence with her but that he had stopped that and

22   that they were kind of in Al-Anon together and kind of leaders

23   in Al-Anon together and that their relationship was excellent.

24   On a one to ten scale, he rated it as an eight.

25        They did do swinging and had other partners once every

1          MR. W. BAILEY:  It goes into the equation of his

2     opinion.

3          MS. WEIRICH:  I also see that he has documents in

4     front of him, and I've asked Mr. Bailey and I've asked the

5     witness repeatedly if he has a report and they've denied it.

6     I don't know what these documents are.

7          MR. W. BAILEY:  I still don't have a report as of

8     this date.

9          MS. WEIRICH:  Right.  But I noticed he pulled some

10    papers out of his pocket when he sat down.

11         THE COURT:  And taken by your comment that he also

12    plans to testify --

13         MR. W. BAILEY:  Sir?

14         THE COURT:  Does he also plan to testify as to

15    what allegedly were her sexual patterns as well, based on what

16    your client told him?

17         MR. W. BAILEY:  He needs that history, yes.  It's

18    important history in terms of the sexual practice of erotic

19    asphyxiation.  He has to take the information as he acquires

20    it.

21         MS. CARNESALE:  Judge, everything he says is

22    coming from the conversation he had with the defendant last

23    night.  This isn't like he's spoken with other doctors that

24    have seen the defendant or researched the matter, investigated

25    it.  It comes from hearsay from the defendant for him to just

1   parrot it back to the jury.

2            MR. W. BAILEY:  Well, I can assure Your Honor that

3   we're going to confine it to his activities, his sexual

4   activities.  It's not going to be any different from what he

5   said in the courtroom.  I mean, there are no surprises if that

6   was a concern.  I can give it to him hypothetically in terms

7   of what he testified to in the courtroom.

8            MS. WEIRICH:  I guess my concern is that the

9   sexual deviant behavior of the defendant, how is that relative

10  -- or relevant, rather, if their whole defense is this is

11  something that she wanted?  I mean, where does it get us to

12  launch us into this defendant's history for purposes of

13  evoking sympathy from the jury.  I don't know.  I don't know

14  what he's going to say because there's no report.

15           THE COURT:  Perhaps we better have an out-of-jury

16  hearing to determine the scope of this because I'm not really

17  sure where we're headed with this or what the relevance would

18  be for the purpose of this witness' testimony so let me send

19  the jury out.

20               (Said bench conference concluded.)

21           THE COURT:  Ladies and gentlemen, I'm going to

22  excuse you for a few minutes.  We'll call you back shortly.

23               (Jury out.)

24           THE COURT:  Okay.  Now that the jury is out, why

25  don't you go ahead, ask the doctor about the history and we'll

1    revisit it.

2

3                        DIRECT EXAMINATION

4    BY MR. W. BAILEY:

5        Q    Dr. Schwartz, based on your experience and training and

6    specialization in the field of deviant behavior, you're

7    qualified to recognize erotic asphyxiation, are you not?

8        A    I've been consulted by law enforcement officials to be

9    at scenes of erotic asphyxiation and to consult them as to

10   whether the crime scene is one of suicide or asphyxiation.

11       Q    So you're identified as what you do?

12       A    I specialize in that and I know the research literature

13   on the comparison of cases of asphyxiation with suicide and

14   what are the particulars.  Oftentimes the crime scene is quite

15   different.

16       Q    Very well.  Now as part of -- and in your arriving at

17   your opinion in terms of identifying or pining on whether this

18   is a case of sexual asphyxiation or not, erotic asphyxiation,

19   is not the sexual history important?

20       A    The sexual history is critical for determining whether

21   it's erotic asphyxiation or homicide.

22       Q    And in your discussions with the -- with Mr. Braswell,

23   did he not provide you with his sexual history?

24       A    He gave me a comprehensive sexual history of his life

25   and of his wife's life.

1     Q     And is not that important -- would you not deem that

2     important?

3     A     It's one of the factors that's used in making a

4     decision as to whether the case is one of asphyxiation or one

5     of homicide.  If you identify the scientific criteria to

6     identify whether a case is asphyxiation versus suicide, there

7     are about seven or eight criteria that have been well

8     established in the literature.  One of them is the sexual

9     history.

10                    MR. W. BAILEY:  I tender the witness.

11

12                          CROSS-EXAMINATION

13    BY MS. WEIRICH:

14    Q     What else did you -- what else were you provided,

15    besides access to the defendant?

16    A     Beside access to what?

17    Q     The defendant.  What else were you given besides Mr.

18    and Mr. Bailey?

19    A     I was given the pictures of the crime scene, the

20    drawings of what the people at the site drew, the medical

21    report of the autopsy and I think that's it.

22    Q     Do you have those things with you?

23    A     No, I don't right now.

24    Q     You didn't bring them with you?

25    A     Not to the courtroom.

1    Q    Are they here in the building?

2    A    They're -- I left them back with my stuff, which is at

3    the hotel.

4    Q    In St. Louis or at the hotel?

5    A    At the hotel, yeah.

6    Q    What are the documents you have in front of you?

7    A    Notes that I took while I was interviewing the client

8    last night, just handwritten notes.

9    Q    All right.  And the other?

10   A    The other is a criteria that -- the scientific criteria

11   for evaluating the difference between autoerotic asphyxiation

12   and suicide asphyxiation and how they relate to this case.

13   Q    And when were you provided this material by Mr. and Mr.

14   Bailey?  When did they first contact you?

15   A    Saturday night.

16   Q    Saturday night or Sunday night?

17   A    It was Saturday night.  I told you Sunday but it was

18   actually Saturday.

19   Q    Okay.  And they found you how?

20   A    As an expert witness in the area of sexual deviation.

21   Q    Right.  But how did they locate you?

22   A    By the web.

23   Q    And then they shipped these things to you?

24   A    E-mail.

25   Q    Okay.  All right.  Did you talk to any witnesses?

1    A    No.

2    Q    Did you talk to any police officers?

3    A    No.

4    Q    You've only spoken with Mr. and Mr. Bailey and the

5    defendant?

6    A    Correct.

7    Q    And then reviewed those few items that you mentioned?

8    A    That's correct.

9              MS. WEIRICH:  Judge, I don't have anymore

10   questions, but I would ask that we be allowed to make a copy

11   of whatever those documents are that he's relying on.

12             WITNESS SCHWARTZ:  Of course.

13             MR. W. BAILEY:  That's his personal notes, Judge.

14             THE COURT:  Well, before we get to that, I really

15   want to hear in this out-of-jury hearing a summary of what the

16   -- of what the history was.  That's what brought us to the

17   bench to begin with, the objection to his reciting the history

18   that he was told by your client in the two-and-a-half-hour

19   conversation that he had last night.  And so not every detail

20   but sort of a summary of what you would anticipate his

21   testimony to be with regard to the history.

22

23                    REDIRECT EXAMINATION

24   BY MR. W. BAILEY:

25   Q    Would you recite the history that you were told by the

1    defendant Mr. Braswell?

2    A    Well, I began by asking him to describe what actually

3    occurred.  And what he said was that he and Sheila had a term

4    just called "fixing" in quotes F-I-X-I-N-G, and that that

5    meant that they were going to involve themselves in erotic

6    asphyxiation.  He said that he had found his wife doing this

7    with a bathrobe during masturbation and had walked in and was

8    sort of shocked some years ago.  And when he found out more

9    about it, they began to involve themselves and involve into

10   erotic asphyxiation approximately two times a month.  And

11   they've been doing that for the last two years.

12   And I asked him why this hadn't come forth earlier, and

13   he said that he felt like he'd rather die than drag his wife's

14   name through the mud and that he said that he was thinking

15   that he would like to just die rather than talk out loud about

16   the violation of their privacy and to reveal this in public

17   and particularly in front of her family.

18   So he didn't disclose the truth and sat in jail for

19   almost a year.  And I guess in that period of time he realized

20   that he needed to tell the truth, whatever the consequences,

21   and so he came forth with the real story.

22   He said that they had a very strong, intense sexual

23   life and what he would do is he would use his arm and put her

24   Adam's apple around the V in the chokehold and that they had a

25   pattern where she would pinch him when she wanted more

1    pressure.  She would tap when she wanted him to just stay at

2    some constant level, and she would go down like this in a

3    passive sort of way putting her arm down as a sign that she

4    wanted him to stop.  And it took them a period of time to

5    coordinate this, sort of like learning how to dance, you have

6    to get these signals down over a significant period of time

7    and that over time he got better at it.  But she would get

8    very angry at him if he let go too soon because then it -- she

9    didn't get the rushed orgasm.

10        And that -- that sometimes they would do this in the

11   bed.  Sometimes they would do this in the floor.  Sometimes

12   they would do this in the jacuzzi.  And it's not uncommon for

13   them to have multiple sexual activities in an evening.  It was

14   not uncommon for them to use whips and dildos, that she had a

15   very large dildo that she used and produced pain for herself.

16   And sometimes they brought other partners in.

17        Do you want me to say anything about or just keep -- so

18   they would involve themselves in multiple kinds of acts;

19   including oral sex, anal sex and they would do it in and out

20   of the jacuzzi.  She would use the jacuzzi to add clitoral

21   stimulation and they had particular positions and he was able

22   to illustrate each of the positions he would use, either from

23   the floor or from the jacuzzi or from the bed or how she used

24   the ligature around the bed by herself and she used the robe

25   strap in order to be able to do it.

1    All of his details he could not possibly have known

2    unless he had engaged in this activity.   It's exactly what I

3    hear from other clients and is reported in the literature.

4    And the details were remarkably similar so it's one of these

5    things I think with high degree of psychological certainty a

6    person could not make up the details of this.

7    So he went into excruciating details and I asked him

8    for very particular kinds of things about the way she

9    straddled him and the way he straddled her that would be

10   consistent with a history of this kind of abuse.

11   So that -- let's see.  The way that she would indicate

12   that he should stop is there was a finger drop kind of relax.

13   And he illustrated how he would stimulate her breasts, that

14   she liked pain.  That's why she had the nipple piercing and I

15   think some sort of belly piercing.  And that she would use the

16   vibrator during the activity.  She would use the bathrobe with

17   one loop around the bedpost and then release it.

18   He was afraid that she was involved with autoerotic

19   behavior, that she would hurt herself and so he felt safer

20   with him in the room because he felt somehow he could protect

21   her.  And that all this scared him because he is an addict and

22   he knows what happens with a drug rush and he could get the

23   same kind of rush with this that he could get with -- when he

24   did drugs and that it scared him and that he was much more

25   reluctant to get involved in the activity than she was.  She

1    about two months.  This is another form of sexual deviation

2    that's consistent with this subtype of erotic asphyxiation.  I

3    went into some detail about the activity of whether she did

4    any cutting on her body, which she did not.  How she used the

5    big vibrator.  The details about whips and spanking and why

6    there is the piercing.

7          I then began to ask the history of each of them.  In

8    summary, the -- the client Mr. Braswell has had a very

9    traumatic history where his dad was looking for his mother and

10   found out that she had been gone.  Her brother wouldn't tell

11   the father where the mother was so his dad shot his brother.

12          MR. J. BAILEY:  Your Honor, may we approach one

13   second?

14          THE COURT:  Okay.

15          (Bench conference commenced.)

16          MR. J. BAILEY:  There is an instance of where Mr.

17   Braswell told Dr. Schwartz that he was molested by a family

18   member that he does not want to waive his privilege on.  He

19   doesn't want that family member discovered.  And I know -- I

20   was there so I know what Dr. Schwartz is getting into.  And I

21   know Your Honor wants to hear it, hear the whole background,

22   but that was one thing that Mr. Braswell just doesn't want

23   this public to hear.  He told -- and he told Dr. Schwartz last

24   night that he was telling him that because he wanted to be --

25   he answered all his questions but he did not want that made

1   public and he doesn't want it made public now.   There's a

2   family member that's here, Judge.

3               THE COURT:   All right.   I've heard enough to rule

4   anyway.

5               (Said bench conference concluded.)

6               THE COURT:   Okay.   With regard to the objection to

7   the Doctor recounting the history that he was told by the

8   defendant when he interviewed him last night, I'm not sure we

9   get any -- I'm not sure how relevant a specific recitation of

10  that history is to the facts in issue in this case.

11              Now I do agree that -- and this is what I'll allow the

12  Doctor to state.   That he can state that after having

13  consulted with the defendant for two and a half hours last

14  night, that he's reached certain conclusions regarding whether

15  the defendant practiced this sexual behavior that has been the

16  focal point of the defense in this case and whether in his

17  opinion, in his expert opinion, the history that was told to

18  him by the defendant is consistent with someone practicing

19  this sexual behavior, without the necessity of getting into

20  all the details that were given about specifics that we didn't

21  even hear from, from the defendant and about the history,

22  about the wife's rape, about the father and the mother and

23  things that went well beyond what the defendant himself even

24  testified to.   That certainly would not have been relevant had

25  the defendant tried to testify to them on the stand himself.

1    So I'll allow you to ask in front of the jury if the

2    doctor took a history, was it an extensive history or a

3    cursory one.  How much time did it take you to acquire that

4    history and from that history did you reach certain

5    conclusions regarding his sexual practices.  And then we can

6    go from there.

7         MR. W. BAILEY:  And of course I can recount his

8    testimony in court in terms of what he said, which is -- it

9    seems to me important.

10         THE COURT:  In terms of what?

11         MR. W. BAILEY:  The sexual practices that he

12   talked about in court.

13         THE COURT:  Yeah.  You can ask the doctor if that

14   conduct would be consistent with this sexual diagnosis and let

15   him -- is fine.  But we're going to limit it to that though.

16   We're not going to go off on these other -- into these other

17   areas.  Bring in the jury.

18         MS. WEIRICH:  Judge, may we copy what Dr. Schwartz

19   has brought with him?

20         THE COURT:  Yes.  We'll make a -- Officer

21   Lafferty, could you borrow these notes from the Doctor and

22   make a copy of them, please?

23         MS. WEIRICH:  And the other notes.

24         MR. W. BAILEY:  Well, Your Honor, would we not be

25   getting into privileged communication between him and --

1        MR. J. BAILEY:  I was about to say that would be

2    privileged.

3        THE COURT:  It pretty much seems to me like any

4    privilege has been waived.  I mean, we've already gone into at

5    Mr. Bailey's request and attempt to go into the history that

6    was given last night for two and a half hours.  Then Mr. J.

7    Bailey wanted to sort of qualify that testimony by not getting

8    into some of what was -- we want to assert a privilege with

9    regard to some of it but not all of it.  So I don't know where

10   y'all are coming from.

11       Do you want him to get into these things or not?  If

12   you don't, he can step back down.  If you want to get into

13   some but not all because some are too sensitive, you know, I

14   don't know where we're heading on this.  Go copy them.  If you

15   want him to testify we're going to copy them.  We're going to

16   share them.

17       There has been no report generated.  Apparently, this

18   man was just contacted five days ago and so the State's been

19   without benefit of even his knowledge until this week.  And so

20   in fairness to them and consistent with your efforts to get

21   into what he has gleaned thus far in his preparation for

22   testimony, I'm going to copy these for the State's benefit.

23       MR. J. BAILEY:  I'll just state to the Court also

24   before he brings in the jury and just for the record that I

25   had Dr. John Hutson lined up to come here and he notified me

1    on Friday that after talking to his lawyers, he has a contract

2    with Shelby County and when they looked at that contract, it

3    prevented him from testifying -- being hired out privately.

4    And that's why I had to let it -- we had to find someone else.

5             MS. WEIRICH:  I was never notified of Dr. John

6    Hutson.

7             MR. J. BAILEY:  I mean, that's because he wasn't

8    secured at that point.

9             THE COURT:  All right.  Give the originals back to

10   the Doctor, please, and give the copy to the State.

11            (Jury present.)

12            THE COURT:  All right.  Mr. Bailey.

13            MR. W. BAILEY:  Thank you, Your Honor.

14

15                    DIRECT EXAMINATION CONTINUED

16   BY MR. W. BAILEY:

17   Q    Dr. Schwartz, you've given us your credentials and

18   you've been accepted as an expert.  Let me ask you to explain

19   for the benefit of the jury exactly what is erotic

20   asphyxiation?

21   A    Erotic asphyxiation is a form of clay behavior that

22   people indulge in to enhance erotic activity.  What it does is

23   it decreases the oxygen going to the brain and causes orgasm

24   to be enhanced.  Physiologically, it seems to decrease

25   dopamine and increase endorphins and so it's like getting a

1   hit and a rush that's much like doing heroine or some major

2   drug high.  And once people get involved in it, it becomes

3   addictive in nature.  They tend to do it more and more

4   frequent.  They tend to need, as with any addiction, tolerance

5   takes place.  They need more and more danger in order to get a

6   high.  And so what they do is they take increased risks.  And

7   when they take increased risks, then often what's associated

8   with it is it ends up killing them or killing the other person

9   that's involved in it.  It's very dangerous and it's one of

10  those activities that is increasing in incidents.

11          There's been a three-fold increase in the last five

12  years of measurable cases and we're afraid to talk about it in

13  public because it begins in adolescents and as soon as you

14  talk about it, adolescents start practicing it and trying it.

15  So we're afraid to go on talk shows.  I've been asked to go on

16  talk shows and discuss it because as soon as you do, there is

17  this huge increase in incidents of it.  People want to do it

18  to get a higher rush.

19      Q    Now what mechanical devices are utilized in that

20  process?

21      A    There are multiple kinds of usages.  In a crime scene

22  you'll oftentimes find a ligature that they use around the

23  neck.  In this case there was a robe tie that was being used

24  on her when she did it by herself so there is no other

25  ligatures that were reported to me.

1          In this case the person used the Adam's apple against

2     the V of the neck and that's a very effective form of erotic

3     asphyxiation.  Sometimes people hang themselves.  Sometimes

4     people use ropes and hang them around the bed.  Sometimes they

5     use the arm of the other person if they're doing it with

6     activities.  It depends on whether it's autoerotic or whether

7     it's with a partner.

8          Q     Now assuming that -- let me also ask you, what is the

9     significance of sex toys such as the ones you see displayed

10    here?

11         A     In a statistical study where they look at large numbers

12    of crime scenes where there is erotic asphyxiation versus

13    strangulation or suicide or homicide, one of the most common

14    features that distinguish the two of them is that individuals

15    who involve themselves with erotic asphyxiation use other

16    forms of sex play that is deviant and sex toys.  And so

17    finding dildos and finding some sort of whips, leather or some

18    sort of objects that cause pain or discomfort with sex are

19    highly associated with erotic asphyxiation.

20         The instruments that are on the table there would be a

21    very important evidence to distinguish whether this was erotic

22    asphyxiation or a homicide.  And when you see that kind of

23    paraphernalia, it leans on you the side of believing that it's

24    an erotic asphyxiation case.

25         Q     Now let me also ask you, of course you took the

1     personal history from Mr. Braswell.   I believe you met with

2     him for about two and a half hours?

3          A     Correct.

4          Q     And looking at that history he gave you and also

5     looking at -- assuming that he and his wife have been

6     practicing asphyxiation for some two years where she would ask

7     him about a fix and assuming further that oftentimes when they

8     would engage in that process or that conduct in the jacuzzi

9     and she had given him three signals; one a pat when it was to

10    suggest to communicate to him in terms of the fix being

11    applied and the other one where her hand would be on the

12    bathtub and he would use that as a signal to release the

13    pressure and assuming further that they would on an occasion

14    in question that they would -- that they did asphyxiation or

15    at least had suffocation involved in some three instances

16    within about a four-hour period, would you have an opinion as

17    to whether that's -- also assuming that they visited swingers

18    club, would you have an opinion as to whether her being found

19    dead on -- as a result of these activities on the day that I

20    mentioned, would that be consistent with -- do you have an

21    opinion as to whether that's consistent with erotic

22    asphyxiation?

23         A     Yes.

24         Q     And what is that opinion?

25         A     I'll go through it in detail.   One question that you

1    ask in such cases is what your signals are for stopping.  And

2    if you've not been involved with such activity, you wouldn't

3    be aware of what these signals are.  So it's a way of finding

4    out veracity.

5        The one signal was a tap like that.  And tap meant stay

6    right where you are, don't go anymore.  Second was a pinch.  A

7    pinch meant more pressure.  And the third one was limp, limp

8    means stop.  Now it takes time to coordinate these signals and

9    months.  You know, it's like learning how to dance.  You have

10   to get these signals down.  And so he traced to me the history

11   of learning these signals and teaching each other signals.

12       And what he reported was that she would get very mad at

13   him if he would go limp too soon because then she wouldn't get

14   the hit at orgasm and so she would get angry, raise her voice

15   and be mad at him.  So he became kind of walking on egg shells

16   whether he was doing it right or not.  The problem with that

17   system is that a person usually waits until the last minute

18   and you need to wait more and longer and longer to get the hit

19   that you used to get and so it's a very dangerous system and

20   I'd say lethal kind of system that they used.

21       And particularly in a jacuzzi, it's 160 degrees, no one

22   knows what the physiologic effect of doing this in a jacuzzi

23   is going to be in terms of the heart and blood pressure and so

24   on.  So it was a very dangerous activity they were involving

25   themselves in.

1          The history of the swinging and prior lesbian

2    activities and such, these are consistent with people who do

3    sexual deviant behavior.   What happens is that if you're

4    involved in one form of forming extra excitement, then almost

5    always you're involved in others.   And so like the dildos, the

6    swinging clubs, these are people who need high degrees of

7    excitement in order -- and illicitness, riding the motorcycle,

8    high degree of excitement and illicitness in order to get

9    aroused.   And you typically see that in individuals who've had

10   a history of rape.   What seems to happen is that when a person

11   is raped --

12               MS. WEIRICH:   May we approach, Judge?

13               THE COURT:   You may.

14                  (Bench conference commenced.)

15               MS. WEIRICH:   We just talked about this.

16               THE COURT:   I believe that's what we just

17   discussed.

18               MR. W. BAILEY:   Oh, I didn't lead him into the

19   discussion.

20                  (Said bench conference concluded.)

21               THE COURT:   Ladies and gentlemen, let me excuse

22   you for a minute and call you back shortly.

23                  (Jury out.)

24               THE COURT:   You know, when I rule and issue

25   limiting instructions in a ruling, you have a certain

1    responsibility, I think, to step in and stop your witness if

2    you think the witness is going beyond what I've ruled.

3            MR. W. BAILEY:  I understand.

4            THE COURT:  You didn't lead him into it, true

5    enough, but he was going right down that path.  He's a bright

6    man.  He's got a degree from Johns Hopkins, for goodness

7    sakes.  He heard what the ruling was.  He knew full well.  I

8    specifically mentioned the rape that was not admissible in

9    front of the jury with regard to what he was told by your

10   client.  And these other matters that he's volunteered, I

11   specifically stated that with regard to the history that he

12   received from your client in that two-and-a-half-hour

13   conversation last night, you could ask him based on the

14   history that was given, do you think that that history is

15   consistent with this sexual deviant practice.

16           MR. W. BAILEY:  And I asked --

17           THE COURT:  And that was clear.

18           MR. W. BAILEY:  I understand.  I asked him also

19   some hypothetical questions based on his testimony.

20           THE COURT:  And I understand that.  And then he

21   began relating everything to those specific matters that he

22   was told by your client last night, the tapping the three

23   things, the dance lessons, the rape, the this, the that, the

24   lesbianism I don't know where that came from.  And so what's

25   that all about?

1          MR. W. BAILEY:  Well, I asked him about the

2    tapping myself.  I asked him about the signals, the three

3    signals.  I asked him on direct about the three signals.

4          THE COURT:  He has obviously been gratuitously

5    bringing into his testimony matters that you did not ask him

6    about, and I'm sure the doctor full well heard what I ruled,

7    the lesbianism and the rape and all these things that are just

8    triggers for the jury to say where does that fit in?  What are

9    we missing here?  What have we not been told?  Oh, my, there

10   must be more to this case.  And so at the risk of the doctor

11   being asked to step down and the jury being instructed to

12   disregard his testimony in its entirety, you need to be

13   responsive to the question and conform your answers to the

14   ruling that you heard me give 20 minutes ago.  And you know

15   full well what that ruling is.

16         MR. J. BAILEY:  Would Your Honor just, so that we

17   don't get back into that again, would Your Honor just explain

18   to Dr. Schwartz what he's not to get into?

19         THE COURT:  I don't need to explain a thing.  The

20   ruling was pretty clear.  I mean, I think you understood it.

21         MR. J. BAILEY:  I understand that.

22         THE COURT:  And I think Mr. Walter Bailey

23   understood it.  And that is that he's not to incorporate into

24   his answers those facts that your client gave him in that

25   two-and-a-half-hour interview last night.  And I don't know

1    how much plainer I can state it.  That's what I stated before.

2    I told Mr. Bailey he could -- he could make a reference to

3    that interview and ask if based on that information his

4    conduct was consistent with this so that that's before the

5    jury without getting into the specific details that were told

6    to him by your client.

7                    MR. W. BAILEY:  I think --

8                    THE COURT:  And so if we head down that road

9    again, he's going to be asked to stand down and the jury is

10   going to be instructed to disregard the entirety of his

11   testimony.

12                   MR. W. BAILEY:  Dr. Schwartz, I guess the better

13   view would be for you to let me have those notes so you won't

14   look at them and that won't prompt you.

15                   WITNESS SCHWARTZ:  All right.  I'll just put my

16   notes away.

17                   (Jury present.)

18

19                   DIRECT EXAMINATION CONTINUED

20   BY MR. W. BAILEY:

21   Q    Dr. Schwartz, one thing I want to ask you is, is it not

22   characteristic -- is it often that these incidences go

23   unreported?

24   A    That -- the vast majority of these cases are unreported

25   partly because they wipe the crime scene clean, parents do or

1   family members do because they're ashamed of the sexual act.

2      Q   All right.  Now one thing I want to ask you, I believe

3   I asked you based on the hypothetical information that I gave

4   you and your review of the material that has been admitted

5   into evidence, I believe I asked you is not -- let's say did

6   you have an opinion as to whether this is a case of erotic

7   asphyxiation and I believe you said you did and I believe you

8   said that it is.  Is that a fair statement?

9      A   With a high degree of psychological certainty, I

10  believe that this death was an accident due to erotic

11  asphyxiation.

12         MR. W. BAILEY:  Very well.  Thank you.

13

14                CROSS-EXAMINATION

15  BY MS. CARNESALE:

16     Q   A high degree of psychological certainty of this death

17  was due to erotic asphyxiation?

18     A   That's correct.

19     Q   Are you a psychologist?

20     A   I am.

21     Q   Aren't you a doctor of science?

22     A   I'm a psychologist.

23     Q   What is a doctor of science?

24     A   A doctor of science is a degree that they give at Johns

25  Hopkins in psychology and medicine together, and I'm licensed

1    as a psychologist.

2       Q    Do you have a medical degree?

3       A    No, I don't.

4       Q    Do you have a Ph.D. in psychology?

5       A    I have a license in psychology, which is called a

6    doctor of science.

7       Q    What type of educational requirement is there for a

8    license in psychology?

9       A    You have to complete a doctoral program in psychology

10    at a university, which I have.

11       Q    Without obtaining the Ph.D. degree?

12       A    That's correct.  They think of doctor of science as one

13    above a Ph.D. at Johns Hopkins.

14       Q    How many years of training did you receive at Johns

15    Hopkins?

16       A    Five years of training and then two years of

17    internship.

18       Q    Post-college five years of training?

19       A    Correct.

20       Q    And your expertise is in the area of sexual deviancy?

21       A    That's correct.

22       Q    Are you saying that Vern Braswell is a sexual deviant?

23       A    I'm saying that erotic asphyxiation is a deviant sexual

24    act.

25       Q    And solely based on what Mr. Braswell has told you,

1    you're here to say that he practiced that deviancy?

2              MR. W. BAILEY:  Your Honor, to clear the record, I

3    think we need to talk about the hypothetical facts that I gave

4    him, not what Mr. Braswell told him.

5              MS. CARNESALE:  Well, Judge, he's testified that

6    what Mr. Braswell told him is the foundation for his opinion.

7              MR. W. BAILEY:  Oh, I see, without going into the

8    specifics.

9              THE COURT:  Exactly, yes.

10   Q    I'm not asking you what Mr. Braswell told you.  I'm

11   asking you based only on what he's told you is what you base

12   your conclusion on; is that correct?

13   A    I base the conclusion on the reports that I received,

14   the crime scene details and the history given me by the

15   client.

16   Q    Okay.  The reports that you received.  What were those

17   reports, specifically?

18   A    One report I received was a description of the autopsy.

19   Q    Did you receive a copy of the autopsy report?

20   A    Correct.

21   Q    The entire autopsy report?

22   A    That's correct.  Another thing that I received was a

23   description of how the body lied and the details and then I --

24   Q    How the body lied --

25   A    Was lying on the ground at the time.

1    Q    After it was pulled out of the bathtub by the

2    paramedics?

3    A    Correct.  And then the pictures of the crime scene, the

4    objects that are sitting on the table over there.

5    Q    Which objects on the table?

6    A    There's a dildo -- two dildos.  There's a strap.

7    Q    The sex toys.  Not all of the objects that have been

8    introduced into evidence?

9    A    No, the sex toys.  And then my interview with the

10   client.

11   Q    So the crime scene photographs, did you receive an

12   entire copy of each crime scene photograph?

13            MR. J. BAILEY:  Your Honor, he wouldn't know what

14   the entire copy would be?

15            MS. CARNESALE:  I'll rephrase.

16            THE COURT:  Rephrase.

17   Q    How many photographs did you review?

18   A    Five.

19   Q    Five.  And what were -- what was depicted in those five

20   photographs?

21   A    Sheila was lying on the ground.  There was fluid coming

22   out of the mouth.  There was piercing of the breasts and of

23   the belly area and then there was some tape around there from

24   the, I guess the people were doing the investigation.

25   Q    And the five photographs were different variations of

1     that?

2        A     Correct.

3        Q     And that's all the photographs you reviewed?

4        A     That's correct.

5        Q     The autopsy report?

6        A     Correct.

7        Q     And you're not a medical doctor so I take it you're not

8     a forensic pathologist?

9        A     No, I'm not.

10       Q     Okay.  And then your interview with the defendant?

11       A     That's correct.

12       Q     And that interview consisted of two and a half hours

13    last night; is that right?

14       A     And I believe there was the report from the detectives

15    that were in the case or something of that sort.

16       Q     Well, something of that sort.  Specifically, what was

17    it?

18       A     I don't recollect.

19       Q     You don't recall?

20       A     No.

21       Q     Did you review that report in preparation for your

22    testimony today?

23       A     Yeah, there was some 50 or 60 pages of it.

24       Q     Did you read it?

25       A     Yes.

```
 1    Q    When did you read it?

 2    A    I read it over the last two days.

 3    Q    When were you retained by Mr. Braswell?

 4              MR. W. BAILEY:  Your Honor, that's inappropriate.

 5              MS. CARNESALE:  I think it goes toward his

 6    credibility, Judge, and his amount of preparation.

 7              MR. W. BAILEY:  I don't care.  Go ahead.  We'll

 8    withdraw it.

 9    A    I was retained on Saturday so I spent all day Monday

10    reading.

11    Q    When did you arrive in from St. Louis?

12    A    Last night.

13    Q    And I'm assuming you're being compensated; is that

14    correct?

15    A    That's correct.

16    Q    How much do you get paid?

17    A    I get paid $2000 a day for leaving the office, $1000

18    for expenses.

19    Q    And you left the office yesterday?

20    A    Today.

21    Q    Today.

22    A    Yeah.

23    Q    I thought you met with Mr. Braswell last night?

24    A    Yeah, but today is my day.

25    Q    Okay.  So you received a total of $3,000?
```

1   A   Correct.

2   Q   To testify on behalf of Mr. Braswell?

3   A   Uh-huh.

4   Q   You mentioned when you spoke with Mr. Bailey the water

5   temperature of 160 degrees.  Where did you get that figure?

6   A   It was on the report that -- from the crime scene, it

7   said that they measured the water.  It was lower than 160 but

8   it was turned up to 160.

9   Q   What was turned up to 160?

10   A   The knob on the jacuzzi.

11   Q   The jacuzzi hot tub?

12   A   Correct.

13   Q   I'm going to pass forward to you what's previously been

14   marked Exhibit 2.  Have you ever seen that picture before?

15   A   No.

16   Q   Are you aware what that is?

17   A   Looks like a jacuzzi.

18   Q   A jacuzzi or a conventional home bathtub with jacuzzi

19   jets or do you know the difference?

20   A   They're called jacuzzis.  I don't know.

21   Q   Do you know the difference between a hot tub and a

22   bathtub with jacuzzi jets?

23   A   I didn't know there was a difference.  I mean, there is

24   a brand name Jacuzzi.

25   Q   Do you see a knob on that bathtub that reflects the

1    temperature, which can be adjusted for that bathtub?

2        A    No, I don't.

3        Q    Would it surprise you to learn that that is the bathtub

4    in fact that Sheila Braswell was found in after what you say

5    she engaged in erotic asphyxia with the defendant?

6        A    I'm just going on the report that I read.

7        Q    You can place that down.  Did you produce a report with

8    your findings with regard to this case on Vern Braswell?

9        A    Pardon me?

10       Q    Did you generate a report?

11       A    No, I didn't.

12       Q    Isn't that typically common in a case such as this

13   where you serve as an expert to produce a report?

14       A    It is common, yes.

15       Q    Did you ever speak with Sheila Braswell?

16       A    Of course not.

17       Q    Everything you know about Vern Braswell, his practices,

18   Sheila Braswell, her alleged practices came from the mouth of

19   Vern Braswell; is that correct?

20       A    And evidence that's sitting there.

21       Q    I believe a moment ago when you testified under direct

22   examination that one of the signs of veracity, I believe is

23   what you called it, that Mr. Braswell did indeed engage in

24   erotic asphyxia was the fact that he stated that he and Mrs.

25   Braswell used signals; is that correct?

1    A    That's correct.

2    Q    Isn't it true that all of this information, including

3    that regarding signals as well as everything else can easily

4    be found in literature and books on the Internet?

5    A    No, it's not true.

6    Q    It's not true?

7    A    The way you ask the questions, you get answers that --

8    you get trained clinically and being able to find veracity and

9    pick up lies or inconsistencies in people's reports and so you

10   ask for excruciating details and you try to look for

11   inconsistencies.  And there was not one time in my interview

12   that I found inconsistency or a detail that was inconsistent

13   with another, and so I concluded on the basis of that, that

14   there's a high degree of certainty that he was telling me the

15   truth.

16   Q    You didn't have any background information on this case

17   until they contacted you and provided it; correct?

18   A    I believe clinical interview is still the best  --

19   Q    Isn't that correct?  Would you answer my question, sir?

20        MR. J. BAILEY:  He's trying to, Your Honor.

21        MS. CARNESALE:  Judge, he's not.  He's avoiding my

22   question and launching into an explanation.

23        THE COURT:  If you would answer yes or no and then

24   you are welcome to explain.

25   A    What is the question?

1     Q     Isn't it true that everything you knew about this case

2     came from what was provided to you either by Mr. Braswell or

3     through his attorneys; correct?

4     A     That's correct.

5     Q     Okay.  So when you say there were no inconsistencies,

6     there was nothing to be inconsistent with?

7     A     That's not what I said.  What I said was that I had

8     been trained how to do a clinical interview, particularly in a

9     forensic situation and having worked in a jailhouse, how to

10    work with the criminal personality and how to be able to ask

11    questions in a very detailed way to look for inconsistencies.

12    And I believe that I'm an expert at really picking up people

13    who are lying or not telling the truth.  And I'm telling you

14    that in my interview, my clinical interview, which is still

15    the best criteria to evaluate such cases, there was no

16    incidents of any inconsistencies in the way this man reported

17    the details.

18    Q     Inconsistencies with what?

19    A     I would ask one question at one time and I would ask it

20    a different way at another time.  And when you ask the

21    question, you look for inconsistencies as you're doing that.

22    Q     So someone who had had a year and a lot of free time

23    could not have boned up in this area to avoid such

24    inconsistencies.  Is that what you're telling this jury?

25    A     I'm saying that --

1    Q    Yes or no, Mr. Schwartz, is then you can answer.

2    A    The answer is no, I don't believe he could have

3    falsified this.

4    Q    You stated that based on the fact that those sex toys

5    were in the home of Vern Braswell, that's what led you to

6    believe that this case involved erotic asphyxiation?

7              MR. W. BAILEY:  That's not --

8    Q    And if that's not true, please correct me.

9    A    What I said is if you look at scientific literature to

10   distinguish cases of erotic asphyxiation from suicide or

11   homicide, one of the most common features that you'll find is,

12   A, deviant sexual activity other than; and B, erotic toys, sex

13   toys and a history of sadomasochistic kind of behavior, such

14   as whips or dildos.

15   Q    And those erotic toys would be found in the location

16   where that type of behavior was taking place?

17   A    In the house.  That's one of the things you would look

18   for.

19              MS. CARNESALE:  Judge, may we have a moment?

20   Nothing further.

21              THE COURT:  Redirect?

22              MR. W. BAILEY:  One omitted question on redirect.

23

24

25

1                          REDIRECT EXAMINATION

2    BY MR. W. BAILEY:

3        Q    Body piercing.  What information does that provide you?

4        A    The body piercing is consistent again with scientific

5    literature on cases of erotic asphyxiation, that individuals

6    get involved in that lifestyle oftentimes have whips, chains,

7    and body piercing.  And so when you see that, it's very common

8    with people with a history of erotic asphyxiation.  It's pain

9    caused to the body and there's a certain subculture that

10   enjoys pain with sex.

11               MR. W. BAILEY:  Very well.  Thank you.

12

13                          RECROSS EXAMINATION

14   BY MS. CARNESALE:

15       Q    Well, isn't it true actually that those piercings

16   supposedly increase sensitivity?  Isn't that commonly a reason

17   why people get those?

18       A    I wouldn't know.

19       Q    You wouldn't know?

20       A    I don't know what the motives are for people in getting

21   piercing.

22       Q    Didn't you just say they get it to enjoy the sensation

23   of pain?

24       A    I said that in the subculture that enjoys pain with

25   sex, it's very common to find body piercing.

1         MS. CARNESALE:  Nothing further.

2         THE COURT:  You may step down.  Ladies and

3    gentlemen, we'll stop for the day at this time.  We will

4    resume the trial tomorrow morning at nine o'clock.  As always,

5    do not discuss the case in any way overnight.  We will see you

6    tomorrow morning at nine o'clock.

7         (Jury out.)

8         THE COURT:  Mr. Bailey, were you about to say

9    something as I was excusing the jury?

10        MR. J. BAILEY:  I actually thought I was going to

11   rest.

12        THE COURT:  Oh, I'm sorry.  I didn't know if you

13   wanted overnight to think about it.  That's often the case

14   when we're at a stopping point, I give you overnight to

15   consider your options.

16        MR. J. BAILEY:  I didn't mean to interrupt you,

17   Your Honor.

18        THE COURT:  No, no.  That's fine.  You may adjourn

19   court.

20

21        (Court was adjourned until 9 a.m.,

22            Friday, December 9, 2005.)

23

24

25        (END OF VOLUME FIVE)