W2006 01081-CCA-R3-CD

IN THE CRIMINAL COURT OF TENNESSEE AT MEMPHIS

THE THIRTIETH JUDICIAL DISTRICT

STATE OF TENNESSEE            )

                             )            **ORIGINAL**

vs.                          )            Case No.   05-03038

VERN BRASWELL,               )            876-06

          Defendant.         )            Clerks

-----------------------------------------------------------

TRANSCRIPT OF EVIDENCE

Volumes 11 OF 11 volumes

DECEMBER 5, 2005

-----------------------------------------------------------

THE HONORABLE JOSEPH B. DAILEY, PRESIDING JUDGE

APPEARANCES

FOR THE STATE:

       BETSY CARNESALE AND AMY WEIRICH
       Assistant District Attorneys General
       District Attorney General's Office
       201 Poplar Avenue - Third Floor
       Memphis, TN  38103

FOR THE DEFENDANT:

       J. BAILEY AND WALTER BAILEY
       Attorneys at Law
       100 North Main - Suite 3002
       Memphis, TN  38103

                          Reported by:
                       **Katherine Knowles**
                        Court Reporter

FILED

NOV 0 2 2006

Clerk of the Court

Vol. 11

# TABLE OF CONTENTS

## VOLUME ONE

| | PAGE |
|---|---|
| Appearances | 1 |
| Table of Contents | 2 |
| List of Exhibits | 9 |
| Style and Caption | 13 |
| **Monday, December 5, 2005** | |
| Pre-trial Motions | 14 |
| Voir Dire Examination and Jury Selection | 25 |
| **(VOLUME TWO)** | |
| **Tuesday, December 6, 2005** | |
| **VERN BRASWELL** | |
| Voir Dire Examination (By Mr. J. Bailey) | 185 |
| Jury Sworn | 187 |
| Reading of Indictment and Entry of Plea | 187 |
| Opening Statements (By Ms. Weirich) | 187 |
| Opening Statements (By Mr. W. Bailey) | 192 |
| **STATE'S PROOF** | |
| **PEARLINE WASHBURN** | |
| Direct Examination (By Ms. Weirich) | 199 |
| **ANGELA SNYDER** | |
| Direct Examination (By Ms. Weirich) | 227 |
| **JESSICA GREEN** | |
| Direct Examination (By Ms. Weirich) | 236 |

1

TABLE OF CONTENTS

2

VOLUME ONE

3

PAGE

4

**ROOSEVELT COLEMAN**

5
6
      Direct Examination (By Ms. Weirich)     243
      Cross-Examination (By Mr. J. Bailey)    247

7

**LIEUTENANT JACKSON**

8
      Direct Examination (By Ms. Carnesale)   250
9
      Cross-Examination (By Mr. J. Bailey)    264
      Redirect Examination (By Ms. Carnesale)  270

10

**BABA TANZY**

11
12
      Direct Examination (By Ms. Carnesale)   271
      Cross-Examination (By Mr. W. Bailey)    283

13

**MATT HAMM**

14
15
      Direct Examination (By Ms. Carnesale)   285
      Cross-Examination (By Mr. W. Bailey)    293
      Redirect Examination (By Ms. Carnesale)  295

16

**OFFICER GALLOWAY**

17
18
      Direct Examination (By Ms. Weirich)    296
      Cross-Examination (By Mr. J. Bailey)    308

19

**SERGEANT KJELLIN**

20
21
      Direct Examination (By Ms. Carnesale)   313
      Cross-Examination (By Mr. J. Bailey)    323
      Redirect Examination (By Ms. Carnesale)  328

22

**SERGEANT MERRITT**

23
      Direct Examination (By Ms. Weirich)    328

24

25

TABLE OF CONTENTS

VOLUME ONE

PAGE

**LIEUTENANT MILLER**

    Direct Examination (By Ms. Weirich)    362
    Cross-Examination (By Mr. W. Bailey)    368
    Redirect Examination (By Ms. Weirich)    369

**(VOLUME THREE)**

**Wednesday, December 7, 2005**

**DARRELL BURTON**

    Direct Examination (By Ms. Carnesale)    384
    Cross-Examination (By Mr. J. Bailey)    389

**JERRY BROWN**

    Direct Examination (By Ms. Carnesale)    390
    Cross-Examination (By Mr. J. Bailey)    395

**BENJANETTE STURDEVANT**

    Direct Examination (By Ms. Carnesale)    396
    Cross-Examination (By Mr. J. Bailey)    403

**LIEUTENANT MITCHELL**

    Direct Examination (By Ms. Carnesale)    407
    Cross-Examination (By Mr. J. Bailey)    414

Jury-Out Hearing    419

**OFFICER FAIR**

    Direct Examination (By Ms. Weirich)    424
    Cross-Examination (By Mr. W. Bailey)    432
    Redirect Examination (By Ms. Weirich)    434

TABLE OF CONTENTS

VOLUME ONE

1

2

3                                                                  PAGE

4   CAROLYN CHAMBERS

5        Direct Examination (By Ms. Weirich)              435

6   OFFICER WALLS

7        Direct Examination (By Ms. Carnesale)            444

8   Jury-Out Hearing

9        OFFICER WALLS

10        Direct Examination (By Ms. Carnesale)           448
          Cross-Examination (By Mr. J. Bailey)            450
11

12  OFFICER WALLS

13        Direct Examination Continued (By Ms. Carnesale)  451
          Cross-Examination (By Mr. W. Bailey)             455
14  WILLIAM MANGUM
          Direct Examination (By Ms. Weirich)              457
15        Cross-Examination (By Mr. J. Bailey)             468
          Redirect Examination (By Ms. Weirich)            475
16        Recross Examination (By Mr. J. Bailey)           476

17

18  DOCTOR CARTER

19        Direct Examination (By Ms. Carnesale)            478
          Cross-Examination (By Mr. W. Bailey)             518
20        Redirect Examination (By Ms. Carnesale)          542

21  (VOLUME FOUR)

22  Thursday, December 8, 2005

23  KRISTIE WOODS

24        Direct Examination (By Ms. Weirich)              563
          Cross-Examination (By Mr. J. Bailey)             618
25        Redirect Examination (By Ms. Weirich)            629

1

TABLE OF CONTENTS

2

VOLUME ONE

3                                                                 PAGE

4    Jury-Out Hearing

5            **VERA COLE**

6                    Direct Examination (By Ms. Weirich)      633
                     Cross-Examination (By Mr. W. Bailey)     637

7

8            **MAGRA HARDEN**

9                    Direct Examination (By Ms. Weirich)      640
                     Cross-Examination (By Mr. W. Bailey)     645

10

11                   Court's Ruling                           653

12   **KRISTIE WOODS**

13           Redirect Examination Continued (By Ms. Weirich)  658
             Recross Examination (By Mr. J. Bailey)           660

14           Further Redirect Examination (By Ms. Weirich)    662

15   **SHERONDA SMITH**

16                   Direct Examination (By Ms. Carnesale)    667
                     Cross-Examination (By Mr. J. Bailey)     678

17

18   **VERA COLE**

19                   Direct Examination (By Ms. Weirich)      682
                     Cross-Examination (By Mr. J. Bailey)     690

20                   Redirect Examination (By Ms. Weirich)    693
                     Recross Examination (By Mr. J. Bailey)   695

21

22   **MAGRA HARDEN**

23                   Direct Examination (By Ms. Weirich)      698
                     Cross-Examination (By Mr. W. Bailey)     703

24

25   Motion for Judgment of Acquittal                         706

1

## TABLE OF CONTENTS

2

## VOLUME ONE

3                                                                        PAGE

4     State Rests                                                         709

5     **(VOLUME FIVE)**

6     **DEFENSE'S PROOF**

7     **GLEN WRIGHT**

8            Direct Examination (By Mr. J. Bailey)              722
             Cross-Examination (By Ms. Weirich)                729

9

10    **VERN BRASWELL**

11           Direct Examination (By Mr. J. Bailey)              730
             Cross-Examination (By Ms. Weirich)                788

12

13    **DOCTOR SCHWARTZ**

14           Direct Examination (By Mr. W. Bailey)              816

15    Jury-Out Hearing

16        **DOCTOR SCHWARTZ**

17           Direct Examination (By Mr. W. Bailey)              826
             Cross-Examination (By Ms. Carnesale)              827
18           Redirect Examination (By Mr. W. Bailey)           829

19           Court's Ruling                                     835

20    **DOCTOR SCHWARTZ**

21           Direct Examination Continued (By Mr. W. Bailey)    838

22    Jury-Out Hearing                                          843

23    **DOCTOR SCHWARTZ**

24           Direct Examination Continued (By Mr. W. Bailey)    846
             Cross-Examination (By Ms. Carnesale)              847
25           Redirect Examination (By Mr. W. Bailey)           858
             Recross Examination (By Ms. Carnesale)            858

1

## TABLE OF CONTENTS

2

## VOLUME ONE

3                                                                          PAGE

4       **(VOLUME SIX)**

5       **Friday, December 9, 2005**

6       Motion for Judgment of Acquittal                                   872

7       Jury Charge Discussion                                             872

8       Defense Rests                                                      873

9       Closing Arguments (By Ms. Carnesale)                               873

10      Closing Arguments (By Mr. W. Bailey)                               884

11      Closing Arguments (By Ms. Weirich)                                 899

12      Jury Charge                                                        926

13      Alternates Excused                                                 941

14      Jury Questions                                                     942

15      Verdict                                                            945

16

17      Certificate of Reporter                                           948

18

19

20

21

22

23

24

25

1                          INDEX OF EXHIBITS

2

3    NO.   STATE/DEFENSE      ID/EVIDENCE      TO/DESCRIPTION          PAGE

4    1     State             Evidence         P. Washburn, photo      202

5    2     State             Evidence         P. Washburn, photo      207

6    3     State             ID               P. Washburn, photos     312

7    3     State             Evidence         Officer Walls, photos   452

8    4     State             Evidence         P. Washburn,            217

9                                             check and letter

10   5     State             Evidence         P. Washburn, money      218

11   6     State             ID               P. Washburn, note       218

12   6     State             Evidence         K. Woods, note          617

13   7     State             ID               P. Washburn, document   219

14   7     State             Evidence         W. Mangum, document     467

15   8     State             ID               P. Washburn, document   219

16   8     State             Evidence         W. Mangum, document     466

17   9     State             ID               P. Washburn, document   219

18   9     State             ID               W. Mangum, document     466

19   10    State             Evidence         A. Snyder, photo        235

20   11    State             Evidence         J. Green, tape          241

21   12    State             Evidence         R. Coleman, report      245

22   13    State             Evidence         Lt. Jackson, sketch     259

23   14    State             Evidence         B. Tanzy, photo         278

24   15    State             Evidence         B. Tanzy, photo         279

25

## INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 16 | State | Evidence | Officer Galloway, crime scene sketch | 298 |
| 17 | State | Evidence | Officer Galloway, photo | 304 |
| 18 | State | Evidence | Officer Galloway, photo | 304 |
| 19 | State | Evidence | Officer Galloway, photo | 304 |
| 20 | State | Evidence | Officer Galloway, photo | 304 |
| 21 | State | Evidence | Officer Galloway, photo | 304 |
| 22 | State | Evidence | Officer Galloway, photo | 304 |
| 23 | State | Evidence | Officer Galloway, photo | 304 |
| 24 | State | Evidence | Officer Galloway, photo | 304 |
| 25 | State | Evidence | Officer Galloway, two bottles | 308 |
| 26 | State | Evidence | Sgt. Merritt, Advice of Rights form | 335 |

## INDEX OF EXHIBITS

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 27 | State | Evidence | Sgt. Merritt, CD | 358 |
| 28 | State | Evidence | Lt. Miller, statement | 365 |
| 29 | State | Evidence | J. Brown, phone record | 391 |
| 30 | State | Evidence | B. Sturdevant, phone records | 397 |
| 31 | State | Evidence | Dr. Carter, photo | 483 |
| 32 | State | Evidence | Dr. Carter, photo | 485 |
| 33 | State | Evidence | Dr. Carter, photos | 489 |
| 34 | State | Evidence | Dr. Carter, photos | 489 |
| 35 | State | Evidence | Dr. Carter, photo | 491 |
| 36 | State | Evidence | Dr. Carter, necklace | 492 |
| 37 | State | Evidence | Dr. Carter, photo | 495 |
| 38 | State | Evidence | Dr. Carter, photo | 497 |
| 39 | State | Evidence | Dr. Carter, photo | 498 |
| 40 | State | Evidence | Dr. Carter, photo | 499 |
| 41 | State | Evidence | Dr. Carter, photo | 503 |
| 42 | State | Evidence | Dr. Carter, photo | 504 |
| 43 | State | Evidence | Dr. Carter, photo | 511 |
| 44 | State | Evidence | Dr. Carter, photo | 513 |
| 45 | Defense | Evidence | Dr. Carter, photo | 525 |
| 46 | State | ID | K. Woods, earrings | 618 |
| 46 | State | Evidence | S. Smith, earrings | 676 |

1                          INDEX OF EXHIBITS

2

| NO. | STATE/DEFENSE | ID/EVIDENCE | TO/DESCRIPTION | PAGE |
|-----|---------------|-------------|----------------|------|
| 47 | Defense | ID | V. Braswell, vibrator | 771 |
| 47 | Defense | Evidence | V. Braswell, vibrator | 777 |
| 48 | Defense | ID | V. Braswell, butterfly | 772 |
| 48 | Defense | Evidence | V. Braswell, butterfly | 777 |
| 49 | Defense | ID | V. Braswell, bullet | 772 |
| 49 | Defense | Evidence | V. Braswell, bullet | 777 |
| 50 | Defense | ID | V. Braswell, Nubby G | 773 |
| 50 | Defense | Evidence | V. Braswell, Nubby G | 777 |
| 51 | Defense | Evidence | V. Braswell, whips | 777 |
| 52 | Defense | Evidence | V. Braswell, bullet | 777 |
| 53 | State | Evidence | V. Braswell, photo | 805 |
| 54 | State | Evidence | V. Braswell, photo | 805 |

1          THE COURT:  All right.  Mr. Bailey, will you have

2     any additional proof?

3          MR. J. BAILEY:  Your Honor, at this point in time

4     the defense is going to rest.

5          THE COURT:  And, Ms. Weirich, will you have any

6     rebuttal proof?

7          MS. WEIRICH:  No, Your Honor.

8          THE COURT:  You can rest when the jury comes in

9     and we'll get right into argument.

10         MR. J. BAILEY:  Your Honor, just let me go ahead

11    and renew my earlier motion before Your Honor brings in the

12    jury for judgment of -- directed verdict of acquittal without

13    argument.

14         THE COURT:  Sure.  And I'll deny it for the

15    reasons I've mentioned earlier.  Are there any special

16    requests other than the curative instruction I gave them

17    earlier, which I plan to repeat in the charge?  Anything else?

18         MR. J. BAILEY:  What lesser includeds is Your

19    Honor planning to instruct?

20         THE COURT:  All of the lesser includeds.

21         MR. J. BAILEY:  Does that include reckless and

22    negligent homicide?  Likewise, and I know Your Honor will give

23    the standards.  I just want to ask.  On the credibility of

24    witnesses when defendants testify, which is found in the

25    pattern jury instructions, 42.04, is Your Honor going to

1    charge that?

2              THE COURT:   I'm going to charge the standard

3    charge I've always charged.

4              MR. J. BAILEY:   I guess I'm asking the Court to

5    charge that.

6              THE COURT:   Sure.   The charge I give is either

7    identical to that or very close to it.

8              MR. J. BAILEY:   And Your Honor is also going to

9    give the expert testimony charge?

10             THE COURT:   Yes.

11             MR. J. BAILEY:   That would be it for the defense.

12             THE COURT:   All right.   Bring in the jury.

13             (Jury present.)

14             THE COURT:   Good morning, ladies and gentlemen.

15   We are ready to resume the trial at this time.   Mr. Bailey,

16   any additional proof?

17             MR. J. BAILEY:   Your Honor, at the present time

18   the defense rests.

19             THE COURT:   All right.   Ms. Carnesale,

20   Ms. Weirich, you may argue.

21             MS. CARNESALE:   Thank you, Judge.

22        Ladies and gentlemen of the jury, on November 4th,

23   2004, or early morning hours of November 5th, 2004, Sheila

24   Braswell had the life squeezed out of her at the hands of that

25   man, her husband Vern Braswell.   He put his hands around her

1   neck and he squeezed second after second, minute after minute

2   until the blood vessels in her eyes burst, until the tiny

3   blood vessels throughout her face, throughout her mouth burst

4   under that pressure as he squeezed and squeezed this woman's

5   neck, causing hemorrhaging throughout her entire neck,

6   throughout the layers of muscle into the cartilage in her

7   neck.  He choked Sheila Braswell until she lost consciousness

8   and she died.  He literally choked the life out of Sheila

9   Braswell in November of 2004.

10          The defendant wants you to believe that this occurred

11  as an act of rough sex.  In fact at her asking, at her request

12  for a fix, that that's how this choking occurred.  Ladies and

13  gentlemen, Ms. Amy Weirich told you in voir dire that there

14  are three things necessary for you to use in reaching a

15  verdict in this case.  Number one is the evidence that comes

16  through the witnesses.  And you've heard a lot of evidence

17  this week.  You've heard witnesses testify.  You have a table

18  full of exhibits that have been introduced.  You are to take

19  that evidence and Judge Dailey very shortly will give you the

20  law in this case, the law that you apply to that evidence to

21  reach a verdict.

22          And finally and very importantly what you came with,

23  your common sense, ladies and gentlemen.  You are to use your

24  common sense.  Remember what we heard this week in the

25  evidence and take the law and apply it to that evidence.  And

1    I'm going to ask you to do that right now as I talk to you

2    this morning.

3        And let's go over what we heard this week with regards

4    to how this woman had the life choked out of her last

5    November.  The defendant and Ms. Braswell, Sheila, married in

6    1994.  In 1995 the defendant was in rehab, and Sheila was

7    living with a friend and went to visit him in rehab where he

8    choked her, put his hands around her neck and squeezed until

9    her voice became raspy, until she had marks on the neck that

10    were visible hours later when she went home to her roommate.

11    This wasn't an act of kinky sex.  This wasn't at her request.

12    This was out of anger at her.  This was out of control that he

13    was trying to exhibit with her.

14        Let's go forward a year to 1996.  Sheila's still living

15    with the defendant, still married to the defendant.  They're

16    living in Millington.  And what happens?  Another fight.  The

17    defendant's angry.  And let's listen to what Sheila said

18    happened.  We've got some of her own words and you're welcome

19    to review this, and I urge you to go over this in your

20    deliberations.  Let's hear what Sheila said.  On the night of

21    April 17th, 1996, between 10 and 11 p.m., my husband and I had

22    a dispute.  During this dispute he hit me, slapped me in my

23    face, which resulted in a scratch on my right cheek and sore

24    jawbones.  He also choked me, pulled my hair, threw me up

25    against the wall and chair, choked me from behind, cutting off

my air supply and told me to say my prayers.  Do you think he
told her once again to say her prayers in November of last
year when he followed through on the choking?  We'll never
know.  Sheila's not here to tell us.

But she did go get an order of protection after that
incident.  She still stayed with him.  She was still married
to him and she had kids with him.  And we know that when she
was pregnant with him, yet another altercation.  Vera Cole,
the defendant's sister-in-law who's married to his brother, a
member of their family came forward to tell you what she knows
about Sheila and their relationship.  And she told you that
Sheila appeared at her door late one night crying, upset, car
packed full of her things.  She wanted to come stay with her
because she's pregnant and Vern had dragged her down the
stairs by her hair, and Vera saw an injury to Sheila's mouth.

Ladies and gentlemen, use your common sense in
evaluating what happened last November, what the defendant
wants you to believe happened versus what you've heard was
going on between them.

The defendant acquires a girlfriend Kristie Woods in
2002.  She's a young girl, a small girl like Sheila, easy to
control, easy to manipulate.  She does what he wants.  He sets
her up in an apartment.  Their relationship, according to both
of them, has a lot to do with sex.  Kristie told you they had
sex as often as they could, pretty much any chance they got.

1    She's living in an apartment that he pays for and they date.
2    And eventually, he gets around to mentioning that he's
3    married.  This doesn't deter her and she continues to date
4    him.  But when she gets out of line, what does he do?  Where
5    does he put his hands?
6         She told you that at a party where she was dancing with
7    other people, he got angry and he put his hands around her
8    neck.  And based on that, Kristie contacted Sheila, told
9    Sheila that they were having an affair.  What did Sheila do?
10   Sheila met with her and talked to her, followed her home that
11   night to make sure she got home okay, knowing that Vern had
12   been calling all night long looking for Kristie.
13        Sheila files for divorce in June of '04 after that
14   meeting.  She has a lawyer.  She files for divorce.  She
15   continues to pay that lawyer, but she also continues to live
16   with Vern, to live with their kids, to continue in the
17   marriage.  Kristie continues to date Vern.  He told you
18   himself well, we didn't date after June.  I still slept with
19   her but I kept telling her, you know, we're just friends.
20        September of that year.  Again, Kristie displeases
21   Vern.  She actually has the audacity while he's living with
22   his wife to go out with someone else.  What does he do?  What
23   is his response to that?  He put his hands around her neck,
24   chokes her, throws her up against the wall, bangs her head on
25   the wall.  This is Vern Braswell.

1   Ladies and gentlemen, I urge you to recall everything

2   you've heard, to listen to the witnesses that you heard and

3   what they told you and use your common sense to determine what

4   you think is true.

5   Let's look at what happened the night Sheila died.

6   Let's look at what the defendant did.  What did he say

7   happened to anyone and everyone who would listen?  The police,

8   the paramedics, friends, family, anyone and everyone that he

9   talked to and he talked to a whole host of people that morning

10  of the fifth.  And he told everyone who would listen we were

11  having sex.  I went and got in bed.  She went and got in the

12  bathtub.  I went to sleep.  I woke up.  Sheila was dead or

13  dying in the bathtub.  She was submerged in water in the

14  bathtub.  That was his story over and over and over and over

15  again.  Not once to anyone in private, in public, to the

16  police did he say this is so embarrassing but this is what we

17  do and this is what happened.  I choked her as a sex act and

18  something went wrong.  Not one single time was there any

19  mention.

20  Look at his statement with the police officers.  You

21  have it in evidence.  They go over the sex.  They asked him

22  did he ejaculate.  He says no.  They talked in intimate

23  details of things of that nature.  He had every single

24  opportunity anyone would have in a small room with two male

25  detectives to tell them this is so horrible but here's what we

1    do in the privacy of our bedroom.  And, ladies and gentlemen,

2    he never told them that because that's not what happened, I

3    submit to you.  He told everyone who would listen that she

4    drowned in the bathtub.

5         Let's also look at how he acted that night.  What were

6    his actions?  Was he acting like someone who just accidentally

7    killed a loved one?  Or was he acting like someone who was

8    trying to cover something up?  You have the records in

9    evidence and I ask you to look at them.  But let's consider

10   all the phone calls he made.  We've heard so much about his

11   cell phones, his home phone, who he called.  Vera Cole tells

12   you that he called her house, his brother's cell phone at 1:36

13   a.m., right smack in the middle of the time that he's supposed

14   to be having this night of love with his wife, he's calling

15   his brother.

16        What we do know from the phone records is that the very

17   first three phone calls he made after he found -- supposedly

18   found his wife in the bathtub were to a Memphis Police

19   Department Lieutenant John Mitchell, not a neighbor, not a

20   doctor, not 911, to an acquaintance who is a high-up in the

21   Memphis Police Department.  Use your common sense, ladies and

22   gentlemen.  What was he trying to do?  And after that only did

23   he call 911, he continued to call John Mitchell over and over

24   and over and over and over and over, 19, 20 times in the

25   course of 40 minutes.

1    What was he trying to do?  John Mitchell wasn't the

2 only one.  He called other police officers that he knew, not

3 close friends.  These weren't close friends.  These weren't

4 family members.  What do those actions reveal?  Those actions

5 reveal that this was a man who was panicked, who was afraid

6 and who was trying to figure out what he was going to do

7 because he had just killed his wife.  He had just murdered his

8 wife and he didn't want 911 there until he figured out what he

9 was going to do.

10    We heard the 911 call.  Did that make any sense?

11 Sheila Braswell was 4-foot-11 inches, 125 pounds.  He tells

12 the 911 operator he can't get her out of the bathtub, can't

13 get her out of the bathtub.  I'm trying.  I'm scared.

14 Finally, she says, sir, can you drain the water out of the

15 bathtub then?  If you can't lift her out of the bathtub,

16 you've got to get her out of that bathtub because of course

17 the 911 operator thinks she's drowning.  Again, Vern Braswell

18 trying to cover up what he's done.

19    Now, ladies and gentlemen, I also want you to consider

20 his actions and what took place afterwards.  Were those

21 actions, were what Vern Braswell did actions that were

22 consistent with someone who loved his wife and accidentally

23 killed her in a bizarre sex episode?  Or were those actions

24 consistent with someone who just killed his wife because she's

25 divorcing him and he was angry and when he gets angry he

1    chokes?

2         Let's think about what he did afterwards.  You heard

3    the jail calls.  You heard his demeanor from the jail.  You

4    heard his priorities from the jail, what he talked about, what

5    he was concerned with, how he acted.  And you heard that he

6    kept calling Kristie Woods, a woman that he supposedly broke

7    up with five months earlier.  He asked about her all the time.

8    How's "The Soldier"?  Have you heard from "The Soldier"?

9    What's "The Soldier" doing?  Is "The Soldier" underground?

10        Finally, he gets through to Kristie and he talks to her

11   at work because in fact, her mother took her underground as we

12   heard, to get her away from that man who had just killed one

13   woman.  He talks to Kristie Woods and what is he saying to

14   her?  Does he say leave me alone, leave my wife alone, leave

15   my family alone as he insists that's the only thing he would

16   say to her?  No.  He says you're my favorite cousin.  Here's

17   how you can write me and keep it secret.  I communicate with

18   you through my thoughts and through my dreams.  Vern Braswell

19   was every bit as involved with Kristie Woods in November and

20   December of 2004 as he was a year earlier.

21        Ladies and gentlemen, use your common sense in

22   examining everything you've heard and everything that I'm

23   telling you this morning.  Everything we've heard this week

24   are actions and incidents consistent with someone who murdered

25   his wife, who murdered this woman, mother of two, beloved

1    friend of many.

2           Now the Judge is going to instruct you on the law.  And

3    the law in this case is very important.  I'm going to touch on

4    that just for a moment with you right now.  Vern Braswell is

5    charged with first degree murder.  First degree murder is

6    defined as the following:  Any person who commits the offense

7    of first degree murder is guilty of a crime.  For you to find

8    the defendant guilty of this offense the State must have

9    proven beyond a reasonable doubt the existence of the

10   following essential elements:  That the defendant unlawfully

11   killed the alleged victim, Sheila Braswell; and that the

12   defendant acted intentionally.  A person acts intentionally

13   with respect to the nature of the conduct or to a result of

14   the conduct when it is the person's conscious objective or

15   desire to engage in the conduct or cause the result.  And

16   finally, that the killing was premeditated.  A premeditated

17   act is one done after the exercise of reflection and judgment.

18   Premeditation means that the intent to kill must have been

19   formed prior to the act itself.  It is not necessary that the

20   purpose to kill preexist in the mind of the accused for any

21   definite period of time.

22           There is no definite period of time required.  There is

23   no five minutes and up.  Two minutes and up.  60 seconds and

24   up requirement for premeditation.  All it means is that the

25   intent to kill must have existed prior to the act.

1       Now the Judge is also required under the law to charge

2   you with what is called "lesser included offenses," lesser

3   degrees of murder.  So you will hear about first degree

4   murder, but the Judge is also required to give you lesser

5   includeds; second degree murder, voluntary manslaughter,

6   reckless homicide, negligent homicide.

7       But, ladies and gentlemen, he will instruct you it is

8   your duty to consider the charged offense first degree murder.

9   You are to deliberate on that offense first.  And unless and

10  until you unanimously decide that he is not guilty of the

11  first degree murder, it is only then that you are to consider

12  the lesser included offenses.

13      Last November Sheila Braswell had the life choked out

14  of her by the defendant.  We will never know exactly how that

15  happened, exactly what angered Vern Braswell that night, what

16  he found, what he thought that he decided once again to take

17  control of Sheila Braswell, show her who's boss.  Perhaps it

18  was the divorce check dated October 24th that was in the

19  kitchen that her mother found.  Perhaps he found that.  Who

20  knows.  We will never know exactly what ticked him off, but

21  what we do know beyond any reasonable doubt is that he put his

22  hands around her neck and he squeezed the life out of Sheila

23  Braswell.  He did this unlawfully.  He did this intentionally.

24  And he did this with premeditation, taking at least three

25  minutes of constant pressure as we heard from Dr. Joye Carter

1    to squeeze and squeeze until the life left her body.

2           Ladies and gentlemen, it is now time for you to hold

3    Vern Braswell accountable for what he did.  It's time for you

4    to find him guilty as charged of first degree murder.  And I

5    ask you to do that this morning.

6           THE COURT:  Mr. Bailey.

7           MR. W. BAILEY:  May it please, Your Honor, ladies

8    and gentlemen of the jury.  Let me first at the outset thank

9    you for your patience and attention that you've given

10   throughout this trial.  You have agreed when you raised your

11   hand, took the oath to serve as this panel, you agreed to

12   discharge one of the highest callings that a citizen in this

13   country can render and that is jury service.  You agreed and

14   took the oath that you would follow the law.  And let me

15   quickly say that jury service is something that everybody in

16   the world doesn't have the opportunity of doing.  And

17   fortunately in this country, an indictment alone or a charge,

18   an accusation doesn't get you snatched off the streets and

19   held indefinitely without benefit of a trial.  That's what we

20   do here.

21          Now, you made certain promises when you were being voir

22   dired or examined.  And those promises consisted of the first

23   being that you would follow the law.  The second promise being

24   -- and apply the law.  The second promise being that you would

25   look at the evidence and weigh the evidence and be persuaded

1    by the evidence alone, that you wouldn't be motivated by

2    sympathy one way or the other.  And it's easy in a murder case

3    to be swayed by or driven by emotions of the moment because we

4    do have a life that was lost.  And nobody regrets that, the

5    proof is going to show, as much as our client Vern Braswell.

6    But he can't bring her back.  You can't bring her back.

7         The other thing you promised is that you would call a

8    ball a ball and a strike a strike.  You said that you would be

9    objective and fair, that you wouldn't lean one way or the

10   other.  You wouldn't lean for the prosecution, nor would you

11   lean for the defense, but you make this a level playing field.

12        We also talked about burden of proof.  You said and you

13   promised when you took your oath that you would require the

14   prosecution, these prosecutors, these fine prosecutors, to

15   establish guilt beyond a reasonable doubt.  And you said you

16   wouldn't look at suspicion or go on good instinct or look to

17   extraneous material outside the proof in this case.  You said

18   you would apply your common senses.  And you said if

19   reasonable doubt wasn't established, and each one of you said

20   that your course would be simple, you said that you would

21   return a verdict of not guilty.  That's what you said.

22        You also said that this young man sits over here

23   enshrouded with one of the most sacred cloaks and that is a

24   presumption of innocence.  And you said you wouldn't -- that

25   you would give him the benefit of that presumption.  And you

1   said that that presumption wouldn't be removed unless it was

2   with cogent, competent, convincing proof, that as far as

3   you're concerned, that his sitting over here as a defendant

4   doesn't mean anything to you, that you would wipe that out of

5   your minds the fact that he's sitting over here charged.  And

6   we talked about the grand jury indictment.  And we talked

7   about the indictment being no more than a summons to get him

8   to appear in court, that he has to honor his appearance once

9   you're indicted, just like in a civil case, I instructed the

10  analogy.

11       We talked about a civil case and I showed you the

12  difference that in a civil case is by greater weight or

13  preponderance of the evidence, which is a far cry different

14  from proof beyond a reasonable doubt in a criminal case.

15  Standard of proof is entirely different.  You're talking about

16  a whole different ball game.

17       We talked about direct and circumstantial evidence.

18  You promised that if the circumstantial evidence chain didn't

19  follow the links, didn't connect like in a bracelet, follow

20  the links, don't connect, you don't have a bracelet.  That's

21  what you said.  And His Honor is going to charge you the

22  guidelines involving circumstantial evidence.

23       This is not a direct evidence case.  We talked about

24  direct evidence being where somebody said I saw what happened,

25  I was there.  In this case this case is built entirely, this

1   man is charged entirely on circumstantial evidence, entirely

2   on circumstantial evidence.

3            Now one other thing on your promise and then I'm -- I'm

4   going to talk about this evidence.  You said that if you had

5   some reservation, some moral reservation about guilt --

6                 MS. WEIRICH:  May we approach, Your Honor?

7                 THE COURT:  You may.

8                     (Bench conference commenced.)

9                 MS. WEIRICH:  There's no charge on moral

10  certainty.

11                THE COURT:  I don't plan to charge on moral

12  certainty.  I haven't since, I guess since Judge Nixon in

13  Middle Tennessee reversed a death penalty case when it was

14  charged.

15                MR. W. BAILEY:  Very well.

16                    (Said bench conference concluded.)

17                MR. W. BAILEY:  Thank you, Your Honor.  That if

18  you had reservation where you couldn't, after leaving this

19  courtroom, feel that you did the right thing, that there was

20  proof beyond a reasonable doubt, that you'd resolve those

21  reservations in favor of this young man sitting over here.

22            Now you heard -- the Court is going to charge you about

23  first degree murder.  He's going to charge you about other

24  degrees of homicide; first degree, second degree,

25  manslaughter, criminal negligent homicide and negligent

1    homicide.  He's going to walk you through those.  I won't take

2    the time to do that.  That's the Court's job, that's Judge

3    Dailey's responsibility.

4         But I will talk with you about the elements of first

5    degree.  And one of the things that's required, a key element

6    is premeditation, premeditation.  That means that you must

7    plan to kill.  That you must kill with an intent.  It can't be

8    passionately driven.  There must be a certain calmness about

9    the killing.  It can't be sporadic without pre-planning.  And

10   it must be intentional.  You must have committed premeditation

11   with one thing in mind, that is a death to result.  Now if you

12   don't find that in this case after having examined the proof

13   when you deliberate, then your job is clear, that's required

14   that you do the right thing and you find this young man not

15   guilty of premeditation and intentional murder.

16        There are certain -- you heard the testimony.  And let

17   me tell you one thing that runs throughout this testimony.

18   And that this man was at the point of a nervous breakdown,

19   that he was in uncontrollable sobbing, that he was crying on

20   the telephone trying to get help, that he called several

21   people trying to get help.  Now, does that show the calmness

22   and the cold-bloodedness of somebody who just committed first

23   degree murder?

24        There are certain areas of reasonable doubt in this

25   case that leap out at you.  I have pinpointed seven of them.

I'm going to walk you through.  The first area of reasonable doubt is quite apparent.  It stands out like a sore thumb. It's called motive.  It's called motive.

Here's a young man who's at the peak of his career. Four months earlier he just got an outstanding promotion after having worked himself up from a substitute teacher in the school system, he's worked himself up to assistant principal, four months earlier.  He's got everything going for him.  Why would he want to blow it?  Why would he want to blow it?  It doesn't make sense.  It does violence to your common sense to think that he'd want to blow it.

He's got two young kids; one five, one seven.  Adores both of them.  Why would he want to blow it?  It does violence to your common sense.

Let's talk about his wife.  You heard a lot of discussion about what he and his wife did prior to '96 about him grabbing her by the hair and abusing her.  But did you hear anybody come here and take that witness stand and talk about what he did to her after '96?  Was there any live testimony to come up here on this stand and say that he mistreated his wife after '96?  You heard about him running around, but did you hear him talk about, anybody talk about him abusing his wife after '96?  That's nine years since anybody talked about him physically abusing his wife, nine years ago.  Does that not do violence to your common sense?

1  He had everything going they did as a couple.  They traveled
2  together.
3        But now his running around got him involved with
4  Chastity (sic) Woods.  And what did he try to do?  What does
5  the proof show?  That's what we're talking about.  We're
6  talking about evidence.  What does the proof show happened
7  between him and Chastity (sic) Woods?  The proof shows he
8  tried to break it off.  That's what the proof shows.  In June
9  he tried to break it off.  He said leave -- I wanted her to
10 leave my family alone.
11       Now we talked earlier about this not being a case of
12 morality, that you're not here to evaluate the propriety or
13 his conduct regarding his relationship with Ms. Woods.
14 Ms. Woods is a fine lady.  And those things happen.  Those
15 things have always happened and will continue to happen, and
16 we're not here to wage a campaign against infidelity.  That's
17 not our job here today.
18       He had a business.  The business was going well.  Why
19 would he want to blow it?  He didn't have a motive.
20       Now let's talk about number two area of reasonable
21 doubt.  Let's talk about the environment in which this young
22 lady's death occurred and the circumstances.  Is there any
23 suggestion that somebody had a weapon?  Anybody bludgeoned her
24 to death or a firearm or a stabbing?  But more importantly,
25 where did her death result, ladies and gentlemen?  Her death

1    resulted in the bathroom right next to the bedroom where these

2    two fine young children rest sleeping.   Does that not do

3    violence to your common sense, that one would deliberately

4    with premeditation, intentionally kill his wife with neighbors

5    next door with his children in the next bedroom?   Does that

6    comport with common sense?   I submit to you that that's

7    reasonable doubt area number two.

8         Let's look at his conduct, reasonable doubt area number

9    three.   Let's look at his conduct in terms of whether it

10   squares with one who's a cold-calculated killer, planned a

11   killing.   You heard the prosecutor here earlier say by her own

12   admission that he didn't know what to do, to start calling

13   around to his buddies.   Is that more consistent with one who's

14   had an accidental situation tragedy in the family or one who

15   cold-bloodedly and calculatedly planned a killing?   I submit

16   to you the one who coldly and calculatedly and calmly plans a

17   killing always has an exit strategy.   You know what you're

18   going to do.   You know where you're going.   You've planned

19   this.   You've got a cover-up.   You've got a scheme.   Where is

20   the reasonable doubt proof here about a scheme?   There is

21   none.

22        Reasonable doubt area number four, I believe, the next

23   area.   Where is proof?   You've seen the witnesses.   You've

24   heard from the witnesses.   You've heard and seen exhibits that

25   His Honor has permitted to be introduced.   Where is the proof

1   of intent?  Where is proof of intent?  You could say we know

2   that there was an intent if he took a weapon and shot her

3   because you know that a gun is calculated to result in death.

4   But where is the intent here?  And where is the premeditation?

5   Where is the planning?  Where is the cold-bloodedness?

6       The next area of reasonable doubt.  You heard from the

7   medical examiner.  You heard from the police.  And another

8   thing from that leaps out at you like a sore thumb.  Where is

9   evidence of a struggle?  No body wounds.  The medical examiner

10  said that would be important.  You saw the photographs of her

11  with her hands in bags to preserve the fingerprint.  That's

12  important because if you're being -- if you're struggling

13  you're going to ward off instinctively and here's where you

14  really use your common sense, ladies and gentlemen.  Here's

15  where you really use your common sense.  If you're being the

16  subject of an intentional strangulation you'd struggle.

17  That's just instinctive.  There is nothing, nothing in the

18  record here, nothing to suggest that there was a struggle.

19  There's nothing.  And the medical examiner said that would be

20  important, that's why we look for body wounds, defensive body

21  wounds to see whether there was a struggle.  Those fingernails

22  give us important information.  They were intact.  There was

23  nothing to suggest that there was any struggle or had a fight.

24  Very important.  Those are your very survival instincts that

25  come into play when you're being attacked is a struggle.  Use

1    your common sense.

2         The next area of reasonable doubt, let's talk about the

3    sexual practices of this couple.  And everybody -- nobody

4    condemns anybody because of your sex practice.  That's your

5    own private domain.  This is not a trial about one's sexual

6    practices.  You're not here to pass judgment on that.  You're

7    not to be judgmental on one's sexual practices.  That's about

8    as sacred as one's religion.  That's something that

9    everybody's entitled to, his or her lifestyle.  This is not a

10   trial about a lifestyle.  But it just so happens that we've

11   got involved here kinky sex, violent, rough, kinky sex.  Rough

12   sex.  Rough sex.

13        Now if you want to convict him because he was involved

14   in rough sex, then go ahead.  But I don't think you're going

15   to do that.  I think you're going to follow your oath and keep

16   your promise, that you're going to look for premeditation.  If

17   that's not there, then your course is clear.

18        Now let's talk about their sexual practice.  Let's talk

19   about erotic asphyxiation.  You've heard from the paramedic

20   who talked about erotic asphyxiation.  You heard from the

21   medical examiner who talked about erotic asphyxiation.  And

22   you heard from our client who told you in graphic detail what

23   was involved, how he and his wife had their sexual practice.

24        And one of the things that you should look at, I say

25   respectfully, is the detail in which he explained it.  Even to

1   the point of when he or she, rather, did her tapping to let

2   him know to back off, you're choking me too much or where she

3   would go limp.  And isn't that consistent with the practice?

4         And we knew that there would be a strange area in which

5   to venture.  So that's why we got one of the leading clinical

6   sexual experts in this country to come here and share and give

7   you jurors and give the Court and give myself some insight

8   into what that was all about.  You heard from Dr. Schwartz

9   from Johns Hopkins University.  And one of the things about

10  Dr. Schwartz is that he is mechanical.  When I say

11  "mechanical," he doesn't know anybody here.  Doesn't know me.

12  Doesn't know this young man over here, Mr. Braswell.  Doesn't

13  know anybody.  Doesn't know the prosecutors.  So he came to do

14  one thing, to provide information for the benefit of you

15  jurors and the Court.  He wanted to walk us through the tunnel

16  of that kinky sex experience called "asphyxiation."

17        And he, just like the medical examiner said and just

18  like the paramedic said, he emphasized that it involves a

19  certain amount of choking, which is a euphemism for

20  strangulation.  It involves just another name for

21  strangulation.  It involves a certain amount of choking.

22        Why do we have these sex toys on the table?  Why were

23  they introduced into evidence?  It certainly wasn't designed

24  to embarrass anybody.  It certainly wasn't designed to offend

25  you jurors.  It was designed to do one thing, to show you the

1    lifestyle, the sexual lifestyle that's consistent with the

2    kinky sex of the choking sex for heightened sexual arousal.

3    That's why we brought the sex toys.

4        And you even heard the medical examiner say that in her

5    experience with this kinky experience called "erotic

6    asphyxiation," the sex toys as part of the crime scene would

7    be important, would provide her information.  One thing that

8    we know.  One thing we know in that sex play of choking, that

9    it's risky.  But the other thing is and incidentally, mind

10   you, nobody took that stand and say -- and deny that not one

11   piece of shred of evidence that contradicts that this was

12   their sex practice, not one.

13       Now there is proof that not only did this young man

14   engage with it with the decedent, his wife, but also when he

15   was having sex with Ms. Woods and she demonstrated.  She

16   grabbed Mr. Lafferty, the deputy sitting over here, from

17   behind and demonstrated for your satisfaction how he -- how

18   this applied, what went on in this kinky sexual experience.

19       But again, please, now if you decide this case on a

20   moral basis, if you get off into the morality of it in terms

21   of whether that was right or wrong, then we don't stand a

22   chance.  But you're not going to do that.  You're going to

23   look at the evidence.  You're going to look at the presumption

24   of innocence and reasonable doubt.

25       Now you've heard a lot of -- of some testimony, I

1   should say, about him prior to '96 having marital difficulties

2   with his wife.  But let me assure you, let me assure you

3   that's a smoke screen.  That's a smoke screen.  When the proof

4   is weak or reasonable doubt, you throw up a smoke screen.  You

5   bring in and you trot in all this other stuff.  They've got no

6   bearing on what happened on November 4th.  You bring all of

7   that in, tongue-in-cheek saying I'm not trying to say that

8   because he did that, that he did it on November 4th but I'm

9   just trying to show that he had the disposition or that it

10  goes to his motive or his intent.  There's nothing in the

11  record about him ever having tried to kill his wife.  Nothing

12  in the proof about that.  It's a smoke screen.

13       You know, I mentioned a tree earlier in my opening

14  statement and I guess some of you say well what in the world

15  are you talking about in terms of a tree?  I'm talking about

16  that tree of reasonable doubt, that tree of reasonable doubt.

17  It's just as strong as any oak tree in this county.  And you

18  -- you can't move that tree, Prosecutors, with a chain by

19  trying to cut it down limb by limb.  You can't yank down.

20  That tree stands firmly affixed in the courtroom in the middle

21  of it.  And the only way you can get that tree, to move that

22  tree of reasonable doubt, the only way you can get that tree

23  of reasonable doubt overcome or removed is by proof, cogent

24  and convincing proof.  And if you don't, that tree still

25  stands.

1   And let me finally say that I don't get the opportunity

2   of making the last comments.  Under our procedural rules, the

3   prosecutor makes the first opening statement and the

4   prosecutor is last at bat with the last statements, last

5   comments.  Last people you hear from will be these

6   prosecutors.  You won't hear from us.  When I sit, our defense

7   is done.  It's up to you.  But one of the things I want to

8   remind you is that these prosecutors weren't at the scene.

9   Neither was I.  So we don't know what happened.  All those

10  prosecutors are doing are theorizing.  That's all they're

11  doing.  They don't know anymore about this case than you.

12      But when they get up here behind us, I want you to look

13  at them and I want you to ask them, say where is the motive?

14  Why in the world did this young man want to kill his wife, two

15  fine children, two fine kids five and seven, everything going

16  for him just got a career promotion?  Why in the world would

17  he want to kill his wife?  Make her answer that.

18      Also, look at her and make her answer with proof beyond

19  a reasonable doubt as to how come he would do such a horrible

20  thing with the children in the next bedroom.  The next thing

21  is say, Ms. Prosecutor, where is the intent?  Ms. Prosecutor,

22  where is the intent?  Where is the premeditation?  Where is

23  the planning?

24      And finally, I want you to look at them and say

25  Ms. Prosecutor, they both were involved in this kinky sex

1    practice and we heard how it occurred.  We heard the

2    defendant's account of what happened.  And we know he didn't

3    tell the police initially.  We know that in his statement he

4    didn't say to the police I was having kinky sex.  But,

5    Ms. Prosecutor, did you expect him to say that to the police?

6    Using your common sense, would he say I was having kinky sex

7    to the police?  Ms. Prosecutor, why was this man just in

8    uncontrollable distress?  Why did he cry and constantly cry,

9    cry to Ms. Braswell's mother?  She defined him as constantly

10   sobbing.  Why was he constantly sobbing?  You saw him on the

11   witness stand.  Why was this man in such emotional turmoil and

12   distress?  Is this the mark of a cold, calculated killer?

13   Absolutely not.  It defies your common sense.  It does

14   violence to it.  Look at her and make her -- and ask her that.

15        Ask her, say why are you bringing this smoke scene here

16   about all of those other events that have nothing to do with

17   November 4th?  Is that not smoke in mirrors?  Is not that to

18   try to suggest that maybe something else happened?  What

19   relevancy does that have to November 4th, Ms. Prosecutor, if

20   it's not a smoke screen?

21        Again, I want to thank you, ladies and gentlemen.

22   You've been very patient and very attentive.  And I'm not

23   going to try -- I wouldn't dare try to go over everybody's

24   testimony.  You heard it.  You made notes.  You did a very

25   good job of following this trial, all of you.  And for that,

1    there's one thing that you give this young man, our client

2    Mr. Braswell, justice.  That's all he's asking, justice.

3    Thank you very much.

4                    THE COURT:  Ladies and gentlemen, we'll take about

5    a ten-minute recess at this time.  As always, do not discuss

6    the case in any way among yourselves during the recess.

7                    (Jury out.)

8                    THE COURT:  Take him out.  Stand in recess.

9                    (Recess.)

10                   THE COURT:  Bring out the defendant, please.  All

11   right.  I don't care if anybody else comes in or not, but are

12   there others that intend to come in?  If there are, I'd prefer

13   that they come in before we resume the argument and charge.

14                   DEPUTY WILLIAMS:  They're not out here, Judge.

15                   THE COURT:  Okay.  That's fine.  Then bring in the

16   jury, please.

17                   (Jury present.)

18                   THE COURT:  Ms. Weirich.

19                   MS. WEIRICH:  Thank you, Your Honor.

20        It's November 5th, 2004, around two o'clock in the

21   morning, maybe a few minutes before.  The defendant gets home.

22   We know he's not home around 11 because he's called Kristie

23   Woods, told her that he had been at the club waiting on the

24   heating and air guy.  He tells her he's on his way home.

25   Maybe he is, maybe he isn't.  We know he calls his brother's

1   cell phone at 1:36 and then again at 1:38.  Well, he couldn't

2   have been killing his wife while he was calling his brother's

3   cell phone and he couldn't have been making love to his wife

4   while he was calling his brother's cell phone.  So what's he

5   doing?

6          Suppose for a minute that he's driving home or maybe

7   still at the club or maybe God knows where else.  He gets home

8   around two and his wife's in the tub.  She's taking a bath.

9   Think for a minute.  This is a man who has been cheating on

10  Sheila Braswell for two years at this point, two years.  Have

11  you heard anybody tell you that Sheila Braswell and Vern

12  Braswell had an open marriage, whatever you wanted to do was

13  fine?  No.  He was cheating on his wife.  Do you think Sheila

14  Braswell was real happy to see him at two o'clock in the

15  morning or whenever it was about that time that he got home

16  November 5th, 2004?  Do you think she greeted him with open

17  arms?  No.

18         Suppose for just a minute that she's in the tub and she

19  starts arguing with him.  She's had it.  She's filed for

20  divorce.  She's met Kristie Woods.  She's asked Kristie Woods

21  to leave her husband alone.

22         I told you in opening statement that Sheila Braswell

23  was flip-flopping between leaving Vern Braswell and trying to

24  keep her family together.  She filed for divorce.  She didn't

25  move out.  Those two things are inconsistent, yes.

1    Going back to 1995 when we know he beat her and choked
2    her and Magra Harden tried to get her to do something about
3    it.  She never would.  But she had finally in the summer of
4    2004 taken some action and filed this complaint for divorce.
5    You'll have it back in the jury room.  You can read through
6    it.  Plaintiff would show to the Court that the Defendant is
7    guilty of such inappropriate marital conduct as renders
8    cohabitation unsafe and improper.  That's not just a we ain't
9    getting along anymore.  She'd had it.  So he comes strolling
10   in around two o'clock in the morning.  Do you think maybe she
11   thought he's been with Kristie Woods again?  Here he is
12   telling me we're going to work it out.  Here he is telling me
13   we're going to make things right.  What's he doing out at two
14   o'clock in the morning on a Thursday night, Friday night?

15       But see, what Sheila Braswell forgot that fateful
16   night, her last night, while she was sitting in her tub that
17   would soon become her coffin, she forgot the fundamental rule
18   of being in a relationship with the defendant.  And that rule
19   is nobody tells me what to do.  Nobody tells me where to go
20   and when to come home.  You, Sheila Braswell, better act
21   right.  But I can carry on with whomever I want to whenever.
22   Nobody leaves Vern Braswell.

23       You saw what happened.  You heard what happened.
24                    (Timer went off.)
25       MS. WEIRICH:  That's five minutes from the moment

1   I stood up and started talking to you until now when that
2   beeper went off, that's five minutes.   If we split the time in
3   which Dr. Carter told you that it would take for Sheila
4   Braswell's neck to be squeezed through the six layers of
5   hemorrhaging that she saw, that's how long.   Maybe even more.
6   Maybe a little less.   But that's how long.

7        But let's get back to what probably happened that
8   night.   You heard from Kristie Woods' own mouth what that
9   defendant did to her when she was seeing other men.   Never
10  mind the fact that he's married.   Never mind the fact that he
11  goes home to his wife and kids every night.   My women don't
12  make me look like a fool because I'm in control.   I'm calling
13  the shots.   Kristie Woods had the audacity to dance with
14  someone at a party.   You heard what happened to her.   He put
15  his hands on her neck.   Ms. Woods, was it a loving, playful
16  kind of hold?   No, ma'am.   Did it hurt?   Yes, ma'am.   Was he
17  applying pressure to your neck?   Yes, ma'am.

18       And then in September of 2004, when he found out once
19  again that she had the audacity to be seeing another man,
20  never mind the fact that he's married and has two kids, what
21  did he do that day?   He pushed her down on the couch.   He
22  threw her up against the wall.   He bashed her head against the
23  wall.   And then as one final point of emphasis, as one final
24  reminder that I'm in control, he took her head, her small tiny
25  neck and slammed it against a glass coffee table.

1          Ms. Woods, was it a playful kind of hold?  No, ma'am.
2     Was it the same kind of hold he would sometimes do when you
3     two were having sex?  No, ma'am, it was nothing like that.
4     Did it hurt you?  Yes, ma'am.  Did it scare you?  Yes, ma'am.
5     So we know what happens to the women in Vern Braswell's life
6     that try to tell him what to do.

7          They get their hair pulled.  They get drug down the
8     stairs.  They get choked to the point that hours later Magra
9     Harden can see the injuries on her.  They get choked to the
10    point that hours later Magra Harden can hear that her voice is
11    different.  So he moseys in around two in the morning.  His
12    wife has the nerve to question where he's been.  And he
13    teaches her that final lesson.  He won.  He won.

14         He held her neck in that tub, ladies and gentlemen, but
15    there was no struggle.  If there was no struggle, why did
16    Sheronda Smith find long hair, lots of long hair in the tub
17    when she drained it out?  You heard her testify.  This wasn't
18    just hair that you lose anyway in the shower.  This was long
19    hair that belonged to Sheila.

20         If there was no struggle in the tub, why are there two
21    ladies' earrings and a man's nipple ring in the bottom of the
22    tub?  Is that where people normally keep their jewelry?
23    That's your sign of a struggle, ladies and gentlemen.  She's
24    grabbing at him any way she can.  He's got her pushed up
25    against the wall of the tub.  We're talking about a tub that

1    from wall to wall is five-foot-one inch.  We're not talking
2    about a swimming pool.  She's got nowhere to go.  She's got no
3    way to escape.  He's got her up against that back corner and
4    she's grabbing at him the best she can.  Why isn't there any
5    evidence under her fingernails?  She was under water.  She sat
6    in that water.  You heard Dr. Carter tell you the washer woman
7    effect, the wrinkleness that we see that develops on the skin
8    after you've been in the water, it was more pronounced on the
9    hands than the feet.  You heard her tell you that.  Washes
10   away.

11        You see, we don't get to make the crime scene, ladies
12   and gentlemen.  Prosecutors and police officers aren't called
13   before defendants decide to squeeze the life out of somebody.
14   We're not notified and told to bring note pads and video
15   cameras.  We get what they leave us.  When he finally after
16   three, four, five, six or maybe seven minutes of squeezing her
17   neck with his hands, when he finally sees he's done, does he
18   panic?  Of course he panics.  Nobody kills wanting to be
19   caught.  There's never been a murderer walk through these
20   doors that wanted to get caught, that wanted a jury to stand
21   up and say, you know what?  We, the jury, find you guilty of
22   murder in the first degree.  Of course he panicked.  But he
23   wasn't about to undo what he wanted to do.  He wasn't about to
24   get her out of that water and try to help her.

25        Did he call his neighbor, the guy that came over to get

1    the kids, the guy that was concerned enough and friend enough

2    to come and say let me come get the kids?  He didn't call him.

3    Come help me get her out of the tub.  And this is a man that

4    you heard testimony who carried his wife when she was

5    pregnant.  He couldn't lift her.  Everyone who took the stand

6    said there was no reason she couldn't have been removed from

7    that tub.  Where there's a will, there's a way.  The problem

8    was he had her right where he wanted her.  He had her right

9    where he wanted her, dead.

10        But why didn't the boys hear anything?  How much

11   screaming is she going to be able to do?  How much noise is

12   she going to be able to make when he is squeezing her so hard

13   that Dr. Carter sees hemorrhaging through all six layers of

14   the neck and all around?  Bursts blood vessels in every part

15   of her face, her mouth, the piece of ligament that connects

16   your lip to your gum for God's sake, the pooling of the blood

17   in the eyes.  How much screaming is she going to be able to

18   do?

19        Who does he call?  His good buddy, best friend, just

20   talked to him an hour before Lieutenant John Mitchell with the

21   Memphis Police Department.  You heard Mr. Mitchell testify.

22   Came in, in uniform.  Been a lieutenant for many, many years.

23   Been with the police department many, many years.  He called

24   him at 3:55:57, 3:56:47, 3:57:17.  The first of those calls

25   was 12 seconds.  The second was three.  The third was four.

1    Then he called 911.

2          Y'all heard the tape and you can take it back to the

3    jury room and listen to it again.  He's wailing I want to help

4    my wife.  Help my wife.  Come help my wife.  Maybe what would

5    have helped your wife the most is if she'd gone on and left

6    you the first time you choked her.  Maybe if she'd listened to

7    Magra Harden, that would have been the best help Sheila

8    Braswell could have gotten.

9          He finally gets around to calling 911 and they carry on

10   trying to get him to get her out of the tub.  And then you

11   hear him on the cell phone calling somebody else.  Why is he

12   calling these law enforcement people?  For the very reason

13   that you're sitting here today, so he can come into court and

14   say but I called law enforcement people.  What cold-blooded,

15   calculated murderer in their right mind would call law

16   enforcement people after they've killed their wife?  The kind

17   that think they're in control of everybody and every

18   situation.  The kind who call the shots.  The kind who think

19   they're above the law.  If I call all my friends that I know

20   from the police department and the fire department, then I can

21   come in some day and tell a jury call I called law enforcement

22   personnel.  He called them to try to scam them.  No, he didn't

23   flee to California.  No, he didn't run out of the house and

24   leave his two boys there.  He's in control, ladies and

25   gentlemen.

1      This is his drama that he's written.  If he really

2  wanted to help his wife, he didn't want her dead, why wasn't

3  911 the first call he made?  Children.  Children in

4  kindergarten know that in the case of an emergency you dial

5  911.  You mean to tell me that a man with a master's degree

6  doesn't know that?  Give me a break.

7      He calls them at 3:57:48.  The paramedics told you they

8  arrived around four.  The air was still moist and the water

9  was still very warm.  All of the paramedics and EMTs that

10  touched the water told you that to their hand through their

11  gloves the water was warm.  An hour later at 5:07 the water

12  was tested, and I believe it was 94.6 degrees, which is warm

13  enough for an adult to take a bath.

14      So why is the water still warm?  Why an hour after the

15  paramedics had been there is the water still warm if Mr.

16  Watson, Mr. Darryl -- I've forgotten his last name but the man

17  from Watson's Pool and Spa, told you that in a tub like this,

18  which is not a jacuzzi, it's a home bathtub with jacuzzi jets,

19  in a bathtub like this, you're going to have to add hot water

20  less than every 15 minutes.  So why is that water still hot?

21  Because he wanted everybody to think she drowned.  So he ran

22  more hot water.  He turned on that hot water as hard and fast

23  as he could while he's dialing all his phones and calling all

24  his buddies and pushing all the numbers.  Hey, this is

25  perfect.  She's in the tub anyway.

1       See, when -- I kept waiting for the defendant or

2   somebody to say that they were having this night of erotic

3   asphyxia that he kept wanting to talk about.  Boy, he liked

4   talking about that, didn't he?  Didn't want to talk about a

5   lot of other things.  Didn't want to talk about some of the

6   chokings.  Wanted to deny all of that.  The only choking he

7   wanted to admit to is the one that, well, we've got spelled

8   out here in black and white that Judge Robilio signed, the

9   order of protection.  All the others though, no.  They're just

10  lies.  People coming in and lying on him.  But he sure wanted

11  to talk to y'all in detail about the private life that he and

12  Sheila Braswell shared.  The ironic thing about that is there

13  is only two people that know the truth about what happened

14  that night, that man right there who has every reason in the

15  world to tell you a story and Sheila Braswell.

16      But anyway, he wanted to talk all about that.  And I

17  kind of kept waiting for him to say that they were having this

18  night of fun sex that lasted for, what, three hours according

19  to him?  And that she died after the asphyxia and he put her

20  in the tub to cover it up.  I kept waiting for that.  Unh-unh,

21  he didn't say that.  He never said that.  He didn't think it

22  through very well.  She was already in the tub taking her own

23  bath.  That's why her glasses are laid gently to the side of

24  the tub.  They weren't knocked off of her in a struggle.  She

25  took them off when she got in the tub.  But he ran more hot

1   water to make it look like a drowning.  When the police got

2   there, when the EMTs got there, when anybody with ears got

3   there, that's what he told them.

4        We were having sex in the tub, then we got out of the

5   tub and we went in the bed and she got up about 1:30 because

6   her legs were hurting her and she got back in the tub.

7   Something made me wake up, even though I'm a hard sleeper,

8   even though I don't wake up very easily, something made me get

9   up and I found her dead in the tub.  She must have drown.  And

10  then the police start looking around and they start doing the

11  job that we want them to do, looking at everything, talking to

12  the only person who was a witness, the defendant.  They didn't

13  immediately charge him with murder and take him down here and

14  throw him in a cell.  And you heard Sergeant Kjellin say that,

15  you know, we like to talk to witnesses before friends and

16  family and the media and everything can influence what they

17  tell us.  So Sergeant Kjellin pulled him aside at the house

18  and said -- just the two of them, just two men -- what

19  happened?  We were having sex in the tub.  We got out of the

20  tub.  We got back in the bed, had sex, my wife's legs were

21  hurting.  She got back in the tub.  I woke up two hours later

22  and she was dead.  See, it wasn't adding up.  And his story he

23  was trying to sell you yesterday doesn't add up either, ladies

24  and gentlemen, not one bit.

25       We don't want you to just look at one side of the

picture.  This isn't about the prosecution and the defense and us against them and them against us.  We are at the point in the criminal justice process where those roads have converged.  Those roads have come together in front of you.  And it is your responsibility to fulfill the oath you took, to uphold the laws of the State of Tennessee, to look at everything, not just the fact that he choked her in 1995 therefore he must have killed her in November of 2004, that he choked her in 1996 therefore he must have killed her in 2004, that he choked her in 1997, pulled her hair and drug her down the stairs when she was pregnant therefore he must have killed her in 2004.

Mr. Bailey wants you to ask me why it's relevant, why I would bring you that proof.  I'll tell you.  That goes to motive.  That's intent, ladies and gentlemen.  That goes to show that it was a lack of mistake, that it was not an accident.

You see, once he realized that we might know all that stuff, what else is he going to say?  How else is he going to explain away the fact that he had his hands on her neck that night?  Oh, I know.  I can say she wanted it.  You can say whatever you want.  But this process, ladies and gentlemen, the reason that you are all here is to return a verdict that truth dictates and justice demands.

In a moment Judge Dailey is going to read to you the law that applies to this case; murder in the first degree,

1    premeditated murder.  We talked about that in voir dire and

2    opening statement.  What is premeditation?  Premeditation does

3    not have to exist in the mind of that defendant for any set

4    period of time.  It only has to exist before you start choking

5    her.  And while you keep applying that pressure for five, six,

6    maybe seven minutes, that, ladies and gentlemen, is

7    premeditation.

8          We can also look to someone's behavior after the murder

9    to see what they intended to do, to see what they

10   premeditated.  What did he do?  He tried to surround himself

11   with his buddies and take control just like he did with Sheila

12   Braswell, just like he did with Kristie Woods.  You heard him

13   on those jail tapes.  If you want to, go back and listen to

14   the hours and hours of them.  You heard Sergeant Merritt

15   testify that he listened to all of them.

16         The defendant never once cried for his wife.  You heard

17   what he was worried about, his palm pilot, somebody get me my

18   palm pilot.  Somebody get that club cleaned out.  Make sure

19   "The Soldier" is underground.  Is "The Soldier" underground?

20   Hey, we've got to talk gender-neutral here.  Do you remember

21   them talking about that?  Don't say "she" on the tape because

22   they might figure out who we're talking about here.  We've got

23   to talk gender neutral, "The Soldier."  Why was he so busy

24   trying to hide her if she wasn't part of the motive?  Why was

25   he so busy trying to hide her if she wasn't the reason he was

1    going to get rid of his wife and make it right for he and

2    Kristie?

3        He's still sticking to the story that they broke off

4    the relationship in June of '04.  She told you she last talked

5    to him a few months ago.  They've been communicating.  He

6    talked to her that night that he went home and killed his

7    wife.  He lied about her to Judge Dailey at a bond hearing

8    this summer.  If she's not the motive, why lie about her?  Why

9    make up all this?

10        Judge Dailey will instruct you on the murder first,

11    first.  And then he will go to murder second and voluntary

12    manslaughter and reckless homicide and criminally negligent

13    homicide.

14        Murder second degree is a knowing killing.  What it

15    lacks that murder first has is premeditation.  Okay.  But you

16    didn't necessarily think about it, but maybe you're in a fight

17    with somebody, you get a gun and you shoot them.  Or maybe

18    they made you mad three weeks ago at school or wherever and

19    you get a gun.  He's got a gun.  Y'all are arguing or whatever

20    and the shots are fired.

21        Voluntary manslaughter is a killing in the heat of

22    passion.  The classic example is when has husband comes home

23    and finds his wife in the bed with another man and he loses it

24    and shoots them both or shoots one of them.

25        Reckless homicide is on New Year's Eve when you go

1   outside at the stroke of midnight and shoot a gun in the air

2   for fun and unfortunately, the bullet falls three blocks away

3   and kills an eight year old in bed.  You didn't plan to hurt

4   anybody.  You didn't put your hands around anybody's neck and

5   hold them and apply all the pressure that your

6   five-foot-four-inch body could until the life was sucked out

7   of her.

8        Criminally negligent homicide is the tragedy that we

9   all live through every summer in Memphis when babies are left

10  in cars.  Someone makes a mistake, a horrible mistake and

11  somebody dies.  That's criminally negligent homicide.

12       The reason I go through all this with you is when

13  Judge Dailey reads to you the law that applies to each of

14  those charges, and again, the law requires that he do that,

15  that he read these charges to you.  When he reads them to you,

16  you're going to think well, criminally negligent homicide,

17  reckless homicide, voluntary manslaughter, murder second, all

18  of those seem to fit this situation.  Of course they do.

19  Because as we move up the rungs of the ladder to murder in the

20  first degree, those lesser includeds are swallowed up.  Okay.

21       The lesser includeds of criminally negligent, reckless

22  homicide, voluntary manslaughter and murder second are all

23  included within murder first degree.  All right.  So as you go

24  and listen to those, you're going to think that sounds like --

25            MR. J. BAILEY:  Your Honor, may we approach?

1      THE COURT:  You may.

2       (Bench conference commenced.)

3     MR. J. BAILEY:  Your Honor, that's an improper

4 argument.  Your Honor's instruction and the law in Tennessee

5 is they are to first consider murder in the first degree and

6 go down.  And what she's telling them is that as they look at

7 these things and go up the rung, that's not how it's done.

8     THE COURT:  No, no.  I think she's just explaining

9 the definition that elements that are so tuned by the greater

10 and the lessers, just logically one of them could assume that.

11 But no, she's not -- in fact, Ms. Carnesale told them just the

12 opposite, you start from murder first and work your way down.

13     (Said bench conference concluded.)

14     MS. WEIRICH:  Those lessers that I talked to you

15 about are consumed by the greater charge of murder in the

16 first degree.  And what murder in the first degree has that

17 the others don't is the premeditation, okay.  So you'll hear

18 that charge.

19    The other charge I want to talk to you briefly about is

20 credibility of witnesses.  You've heard from a lot of

21 witnesses this week.  And they are all -- you can ignore all

22 of what somebody has told you.  You can ignore none of what

23 they have told you.  You can ignore some of it and accept some

24 of it.  And every witness that takes the stand is judged by

25 the same set of standards under the law of the State of

1   Tennessee.  And I believe Judge Dailey will tell you, and if

2   he tells you something differently, listen to what Judge

3   Dailey tells you.  You are the exclusive judges of the

4   credibility of the witnesses and the weight to be given to

5   their testimony.

6        If there are conflicts in the testimony of the

7   different witnesses, like when Vern Braswell tells you I

8   didn't call my brother that night or when Vern Braswell tells

9   you I didn't choke Sheila Braswell at the rehab center, those

10  kinds of things and you've heard from other people that it did

11  happen, if there are conflicts in the testimony of the

12  different witnesses, you must reconcile them if you can.

13       In forming your opinion as to the credibility of a

14  witness, you may look to the proof, if any, of his or her

15  general character, the evidence, if any, of the witness'

16  reputation for truth and veracity, the intelligence and

17  respectability of the witness, his or her interest or lack of

18  interest and the outcome of the trial, his or her feelings,

19  his or her apparent fairness or bias, his or her means of

20  knowledge, the reasonableness of his or her statements and

21  their appearance and demeanor while testifying.

22       There have been some things testified to that have been

23  in conflict.  And you'll have to go back and ask yourself why

24  that is.  When you do, ask yourself of all the people you

25  heard from, who would have the biggest reason to lie to you?

1    Who would have the biggest reason to try to sell yet another

2    story about what happened November 5th, 2004?

3         Let's talk about Dr. Carter.  You heard her tell you

4    that she was familiar with erotic asphyxia.  She was familiar

5    with those types of cases.  She performed autopsies on many of

6    them.  She'd been to scenes where she had seen them.  Was this

7    a case of erotic asphyxia, Dr. Carter?  No.  Why do you say

8    that?  Because of the injuries, because of what was not found

9    at the scene.

10        All of that stuff that Vern Braswell enjoyed so much

11   explaining to y'all yesterday, go through those crime scene

12   pictures and tell me where you see any of it.  Go through this

13   crime scene sketch and tell me where the officers found any of

14   it.  They didn't.  He brought it in here.  Who knows where it

15   came from.  He tells you it comes from their house, but who

16   has a reason to make that up?

17        Dr. Carter told you that this was hands on a neck.  And

18   she made the distinction because Mr. Bailey tried to get her

19   to go down this road that it could have been a forearm.  No,

20   it couldn't have, Mr. Bailey.  No, sorry, Mr. Defendant, it

21   couldn't have been because of the extent of the injury and the

22   coverage of the injury.  This was not an injury that was

23   located in the front part of the neck.  This was not an injury

24   where there was anything broken or fractured.  This was an

25   injury consistent with pressure being applied all over the

1    neck with two hands.  Like a choking?  Yeah.  Like when you

2    mean to kill somebody.

3         There was petechiae, the rupturing of the blood vessels

4    all over the face, the hemorrhaging.  Go back through your

5    notes and review what she told us about what she found.

6         And then contrast that, if you will, with Mark Schwartz

7    from St. Louis, Missouri, drove in for $3000 yesterday.  Found

8    by the defense team on Saturday.  Came down here to tell you

9    that after reviewing the extensive file that he was sent, you

10   know, he never bothered to call us.  Never bothered to call

11   the police.  Never bothered to talk to any witnesses.  Who did

12   he talk to?  The guy in control.  The guy that's calling the

13   shots.  He looked at five pictures, five, of Sheila Braswell's

14   body, the way it was positioned on the floor.  Did you catch

15   that?

16        The EMTs put her on the floor.  If he'd stayed another

17   day and we'd paid him another $3000, was he going to tell us

18   that the EMTs performed erotic asphyxia on her?  What's he

19   talking about?  How relevant is that, that the position where

20   the paramedics put her lifeless body, trying to do what they

21   could, that that was relevant?  No.  Or is he maybe just

22   saying what Mr. Power Man over there wanted him to say for

23   $3000?

24        He's not a medical doctor.  He's a doctor of science.

25   He didn't dispute what Dr. Carter found.  I was waiting for

1   them to call in some medical examiner to come in and say this

2   wasn't a manual strangulation.  This was a drowning and here's

3   why.  No.  He'll say whatever they want him to say for $3000.

4   And all he had to look at was what they had given him.  And

5   the only person he bothered to talk to was the guy that's got

6   the biggest motive to lie.

7        Contrast his testimony with Dr. Carter.  Look at the

8   pictures of the injury, the extent of the injury to Sheila

9   Braswell's body.  Ask yourself a few more questions when y'all

10   are back in that jury room.

11        Why was he so worried about that nipple ring?  You

12   remember Sheronda Smith telling you that he had just -- here's

13   a man whose wife has just died some, as far as he knows,

14   unexplained death.  The last time he saw her she was

15   unconscious in the bathtub, according to his story.  How much

16   sense does that make, you're going to leave your unconscious

17   wife in the bathtub full of water?  The next thing he knows

18   she's dead.  The police come to his house, drag him down here

19   to 201 Poplar to talk to him.  He gets home hours later.  He's

20   apparently still not told his kids your wife -- your mother's

21   dead.

22        But what's he worried about?  I seem to have lost my

23   nipple ring.  I can't find my nipple ring.  His own mother

24   said what?  What are you worried about?  His nipple ring.

25   Because see, by now it's the light of day.  By now the police

1    have been called.  They've talked to him.  He's given this

2    statement that you can take back and read that you heard

3    Sergeant Merritt read to you.  He's locked into something, but

4    he's panicking because he's thinking you know what, this may

5    not all go off as well as I planned.  I may have got caught in

6    a little lie here.  I've got to find that nipple ring because

7    if they find that nipple ring, they might think -- they might

8    realize that Sheila was fighting for her life.  Sheila was

9    struggling the only way she could to have one more day with

10   her two boys.

11        Sheila was using the only weapon she could, just

12   grabbing at him with her hands.  And if they find that nipple

13   ring, they might realize I killed her.  If they find Kristie

14   Woods, they might find out I had a reason to kill her.  If

15   they find out that Sheila had filed for divorce, they might

16   think that maybe our marriage wasn't so great.

17        And then the big bomb was dropped.  We found out about

18   all the other incidents, all the other times he's put his

19   hands on her neck, put his hands on Kristie Woods' neck.

20        Mr. Bailey made a big point in opening statement and

21   just a moment ago that Kristie Woods and this defendant

22   engaged in erotic asphyxia.  That's not what I heard her say

23   at all.  In fact, I asked her, Ms. Woods, when I asked you

24   down in my office what -- if you two engaged in erotic

25   asphyxia, her answer to me was what is that.  She didn't know

1  what it was, had never heard of it.  When she testified in

2  front of you and we discussed it she said no, no, no, no, we

3  didn't do that.  He would just sometimes hold me to position

4  me to keep me still.  Was it forceful?  No.  Did you ever lose

5  consciousness?  No.  Did you ever get dizzy?  No.  Was it

6  different when y'all were having sex and he would hold your

7  neck and the time when he grabbed your neck and he pushed it

8  against the coffee table?  Yeah.  They never engaged in it.

9       And if Sheila Braswell, God love her, could walk in

10  that back door right now and tell us the rest of the story,

11  what do you want to bet she'd say I never heard of it either?

12  What do you want to bet she'd say I don't know what he's

13  talking about?  We were fighting because I was tired of him

14  carousing around with Kristie Woods.  We were fighting because

15  he found the check that I wrote out the last week of October

16  to the divorce attorney, the divorce complaint that wasn't

17  nonsuited until five days after her death.  It's kind of hard

18  to proceed with a divorce case when you're dead.  That's why

19  it was dismissed, ladies and gentlemen.  Look at the date on

20  it.  We were fighting about that, ladies and gentlemen of the

21  jury.

22       But see, I forgot the number one rule.  I forgot that

23  Vern Braswell is in control.  He calls the shots.  And he came

24  out with those hands that he's come at you with before and he

25  squeezed my neck before but it wasn't anything like that.  It

1  was longer and harder this time.  He didn't let go.  The times

2  before he always let go and I was always able to get away and

3  go live with my sweet sister-in-law and brother-in-law or go

4  live with my dear friend Magra Harden, or I was able to go

5  down to Judge Robilio's chambers and get an order of

6  protection.  This time I wasn't so lucky.  This time I died at

7  the hands of my husband who held my neck while I struggled

8  until my body had physically reached the point where I could

9  no longer struggle.

10       And a few times he held my head under the water.  How

11  do we know that?  Dr. Carter told you there were signs of

12  water fluid in the lungs, not enough to rule this a drowning

13  but enough for her to tell you, Dr. Carter, could this have

14  been a situation where while she was being choked her head was

15  held under water to gain control over?  Oh, yes, ma'am,

16  definitely.  Is it a drowning?  No.

17       Troy Walls, the officer from the Millington Police

18  Department, told you something that I want you to be sure to

19  remember when you go back and you read through the facts as

20  Sheila Braswell, you know, it's ironic these are the only

21  words she can speak to us.  This is all we know about her side

22  of their marriage.  Why'd she stay with him?  I don't know.

23       What a great day it would be in this city and all the

24  others if prosecutors didn't have to deal with women who were

25  abused and continued to stay with their spouses, if

1   prosecutors didn't have to look at women and say, you know,

2   you can make this all better by leaving, getting your number

3   changed, moving to another town, whatever, go into a shelter,

4   whatever you need to do.  What a great day it would be if the

5   Sheila Braswell's of this city would come to us first looking

6   like that instead of when we usually meet them like that.

7                    MR. W. BAILEY:  Your Honor, may we approach?

8                    THE COURT:  You may.

9                        (Bench conference commenced.)

10                   MR. W. BAILEY:  Counsel is arguing outside the

11  record in terms of how they usually meet.

12                   THE COURT:  Okay.  Move on with regard to the

13  encounter of abused women in the prosecutor's office.  We'll

14  move on from that.

15                       (Said bench conference concluded.)

16                   MS. WEIRICH:  That's the last picture you have of

17  her.  But we know that on this day, when according to Sheila

18  Braswell, now remember the defendant told you they were

19  fighting because she was having an affair.  Remember that?

20  Sheila writes in here though and you can take this back and

21  look at it, we had a dispute over drinking and drugs.  His

22  drinking and his drugs.  He had slapped me in the face, pulled

23  my hair, threw me up against the wall and chair.  Sound

24  familiar, doesn't it?  Did that to Kristie Woods just last

25  year.  Choked me from behind, cutting off my air supply, told

1    me to say my prayers.  Think she got a chance to say her

2    prayers in those three to seven minutes?

3         I tried to leave.  He restrained me because nobody

4    leaves Vern Braswell.  Nobody tells him what to do.  He tried

5    to punch me.  He ripped my jewelry off, and he said that he

6    would be paid alimony when we got divorced.

7         She was able to leave the house and call 911.  And

8    Officer Walls who was a young officer, a new officer riding

9    with Officer Nicholson that night.  Even though he didn't

10   remember this incident like it had happened yesterday and he

11   was very honest with you about that, he did remember it.  He

12   said there were a few of those incidents, a few of those calls

13   he made early on in his career that still stick with him and

14   this was one of them.

15        The defendant had already left the scene by the time

16   they got there.  Fred Jackson told you he was the fire

17   department lieutenant first to get there that drew the sketch

18   that you have in evidence that shows you how the body was when

19   he had halfway pulled her out to show that he had done

20   something, but for some reason couldn't get all 120 pounds of

21   her out of that tub.  Lieutenant Jackson told you that when he

22   walked in that bathroom the air was still moist.  Remember

23   that?  The bathroom was still wet like somebody had just run

24   water.

25        Yeah, Mr. Power Man over there had just turned the

1   water on again, made it look like a drowning.  But then when

2   the medical examiner didn't cooperate with that, she ruled it

3   a strangulation, he had to think of something else.  But why

4   would Lieutenant Jackson remember that?

5        Myron Fair with OCU testified, he had a suit and tie

6   on, testified that he got a call from the defendant.  Mr.

7   Bailey said wasn't he crying and distraught and incoherent

8   when you talked to him?  No, I don't remember that.  He was

9   just calling, telling me his wife was dead.  18 calls he

10  placed to a Lieutenant John Mitchell, Memphis Police

11  Department, his big buddy.  Even Lieutenant Mitchell told you

12  he didn't know why he was calling him.

13       Pearline Washburn, she was the first witness you heard

14  from, Sheila Braswell's mother.  Been here everyday.  Remember

15  something that she told you that was important.  At the time

16  we didn't know it was important.  She told you that when she

17  sat on the couch next to the defendant and touched his robe,

18  his robe was wet.  Why was his robe wet if according to his

19  story yesterday he didn't put it on until the paramedics were

20  at his door?  Did you hear him?  He grabbed it at the end of

21  the bed when he was on his way to answer the door when he

22  thought he heard the paramedics.  How did it get wet?  Was

23  there a flood in the hallway?  No, it got wet when he was

24  struggling, trying to kill his wife as she was resisting,

25  trying to fight for her life.  That's when it got wet.

1    That's also, ladies and gentlemen, why there is no sign

2    of a struggle in the bedroom.  There wasn't a struggle in the

3    bedroom.  There was a struggle in the bathtub.  That's the

4    crime scene, ladies and gentlemen, where the jewelry was,

5    where the hair was, where the hot water was, where the body

6    that had already undergone rigor mortis was.

7    This isn't about people's lifestyles and who you like

8    and who you don't like.  This is about seeking truth and

9    justice.  That's why it's all laid out for you here.  That's

10    why you're called here to make that determination, to make

11    that decision.  Before you leave the courtroom, Judge Dailey

12    will send you off with the words "to return a verdict that

13    truth dictates and justice demands."  And it's because of

14    those words that we talk so much in voir dire about the law,

15    the evidence and the common sense.  No sympathy, no prejudice.

16    We don't want you to just look at five pictures like

17    Mike Schwartz did.  We don't want you to just listen to what

18    the defendant told you yesterday, which was completely

19    contrary to what he told the police and everybody else who

20    would listen.  It's why the police department continues to

21    investigate after they take a statement like that.  It's why

22    the medical examiner's office does their job.  Everyone that

23    has testified has had a little bit to tell you.  It is now

24    your job to take it all.

25    And in following the laws of the State of Tennessee

1    that Judge Dailey will read to you, to return the only verdict

2    that you can after you take everything and turn it inside out

3    and review it.

4         And when you go back there to do that, ask yourself

5    another question.  Why did he tell the police that he didn't

6    ejaculate?  After this night of love making, why did he say no

7    to that question?  Do you think maybe that's why he so

8    willingly submitted to the DNA because he knew they could find

9    his DNA in her if he had?  They hadn't had sex.  She was in

10   the tub, the tub that soon became her coffin.

11        The only verdict you can return is that of guilty of

12   murder in the first degree.

13             THE COURT:  Ladies and gentlemen, the State of

14   Tennessee versus Vern Braswell, Indictment Number 05-03038.

15        This indictment charges that the defendant did

16   unlawfully, intentionally and with premeditation kill Sheila

17   Braswell.  This offense embraces and includes the lesser

18   offenses of murder in the second degree, voluntary

19   manslaughter, reckless homicide and criminally negligent

20   homicide.

21        The law makes it the duty of the Court to give in

22   charge to the jury the law relative to the case on trial and

23   the duty of the jury to carefully consider all of the evidence

24   delivered to them on the trial and under the law given them by

25   the Court, render their verdict with absolute impartiality.

1    The jury are the sole judges of the facts and of the

2    law as it applies to the facts in the case.  In making up your

3    verdict, you are to consider the law in connection with the

4    facts; but the Court is the proper source from which you are

5    to get the law.  In other words, you are the judges of the law

6    as well as the facts under my direction.  The jury in no case

7    should have any sympathy or prejudice or allow anything but

8    the law and the evidence to have any influence upon them in

9    determining their verdict.  They should render their verdict

10   with absolute fairness and impartiality as they think truth

11   and justice dictate.  Every fact and circumstance in the case

12   you may consider in arriving at your verdict.

13   The indictment in this case is the formal written

14   accusation charging the defendant with a crime.  It is not

15   evidence against him and does not create any inference of

16   guilt.

17   At times during the trial, I have ruled upon the

18   admissibility of evidence.  You must not concern yourselves

19   with these rulings.  Neither by such rulings, these

20   instructions, nor any other remarks which I have made do I

21   mean to indicate any opinion as to the facts or as to what

22   your verdict should be.

23   Statements, arguments, and remarks of counsel are

24   intended to help you in understanding the evidence and

25   applying the law, but they are not evidence.  If any

1   statements were made that you believe are not supported by the
2   evidence, you should disregard them.

3        I instruct you that the words used in these
4   instructions importing a masculine gender include the feminine
5   and neuter.

6        The evidence and arguments in this case have been
7   completed, and it is my duty now to instruct you as to the
8   law.   The law applicable to this case is stated in these
9   instructions, and it is your duty to carefully consider all of
10  them.   The order in which these instructions are given is not
11  an indication of their relative importance.   You should not
12  single out one or more of them to the exclusion of another or
13  others but should consider each one in the light of and in
14  harmony with the others.

15       You are the exclusive judges of the facts in this case.
16  You are also the exclusive judges of the law under my
17  direction.   You should apply the law to the facts in deciding
18  this case.   You should consider all of the evidence in the
19  light of your own observations and experience in life.

20       I will now explain to you the law applicable to the
21  charge in this indictment.

22       First degree murder.   For you to find the defendant
23  guilty of this offense, the State must have proven beyond a
24  reasonable doubt the existence of the following essential
25  elements:   That the defendant unlawfully killed the alleged

1    victim; and that the defendant acted intentionally.

2         A person acts intentionally when it is the person's

3    conscious objective or desire to cause the death of the

4    alleged victim.  A defendant's conscious objective need not be

5    to kill a specific victim.  If you find beyond a reasonable

6    doubt that the defendant intended to cause the result, the

7    death of a person, and that he did so with premeditation, then

8    the killing of another even if not the intended victim would

9    be first degree murder.  And that the defendant -- that the

10   killing was premeditated.

11        A premeditated act is one done after the exercise of

12   reflection and judgment.  Premeditation means that the intent

13   to kill must have been formed prior to the act itself.  It is

14   not necessary that the purpose to kill preexist in the mind of

15   the accused for any definite period of time.  The mental state

16   of the accused at the time he allegedly decided to kill must

17   be carefully considered in order to determine whether the

18   accused was sufficiently free from excitement and passion as

19   to be capable of premeditation.  If the design to kill was

20   formed with premeditation, it is immaterial that the accused

21   may have been in a state of passion or excitement when the

22   design was carried into effect.  Furthermore, premeditation

23   can be found if the decision to kill is first formed during

24   the heat of passion, but the accused commits the act after the

25   passion has subsided.

1   If you find from the proof beyond a reasonable doubt

2   the defendant is guilty of murder in the first degree, you

3   will so report and your verdict in that event shall be we, the

4   jury, find the defendant guilty of murder in the first degree.

5   Second degree murder.  For you to find the defendant

6   guilty of this offense, the State must have proven beyond a

7   reasonable doubt the existence of the following essential

8   elements:  That the defendant unlawfully killed the alleged

9   victim; and that the defendant acted knowingly.

10   Voluntary manslaughter.  For you to find the defendant

11   guilty of this offense, the State must have proven beyond a

12   reasonable doubt the existence of the following elements:

13   That the defendant unlawfully killed the alleged victim; and

14   that the defendant acted intentionally or knowingly; and that

15   the killing resulted from a state of passion produced by

16   adequate provocation sufficient to lead a reasonable person to

17   act in an irrational manner.

18   The distinction between voluntary manslaughter and

19   second degree murder is that voluntary manslaughter requires

20   that the killing result from a state of passion produced by

21   adequate provocation sufficient to lead a reasonable person to

22   act in an irrational manner.

23   Reckless homicide.  For you to find the defendant

24   guilty of this offense, the State must have proven beyond a

25   reasonable doubt the existence of the following essential

1    elements:  That the defendant killed the alleged victim; and

2    that the defendant acted recklessly.

3         Criminally negligent homicide.  For you to find the

4    defendant guilty of this offense, the State must have proven

5    beyond a reasonable doubt the existence of the following

6    essential elements:  That the defendant's conduct resulted in

7    the death of the alleged victim; and that the defendant acted

8    with criminal negligence.

9         Criminal negligence means that a person acts with

10   criminal negligence when that person ought to be aware of a

11   substantial and unjustifiable risk that the victim will be

12   killed.  The risk must be of such a nature and degree that the

13   failure to perceive it constitutes a gross deviation from the

14   standard of care that an ordinary person would exercise under

15   all the circumstances as viewed from the accused person's

16   standpoint.

17        The requirement of criminal negligence is also

18   established if it is shown that the defendant acted

19   intentionally, knowingly or recklessly.

20        Intentionally means that a person acts intentionally

21   when it is the person's conscious objective or desire to cause

22   the death of the victim.

23        Knowingly means that a person acts with an awareness

24   that his conduct is reasonably certain to cause the death of

25   the victim.

1    The requirement of knowingly is also established if it

2  is shown that the defendant acted intentionally.

3    Recklessly means that a person acts recklessly when the

4  person is aware of but consciously disregards a substantial

5  and unjustifiable risk that the alleged victim would be

6  killed.  The risk must be of such a nature and degree that its

7  disregard constitutes a gross deviation from the standard of

8  care that an ordinary person would exercise under all the

9  circumstances as viewed from the accused person's standpoint.

10    The guilt of the defendant as well as any fact required

11  to be proved may be established by direct evidence,

12  circumstantial evidence, or by both combined.

13    Direct evidence is defined as evidence which proves the

14  existence of the fact in issue without inference or

15  presumption.  Direct evidence may consist of testimony of a

16  person who has perceived by the means of his or her senses the

17  existence of a fact sought to be proved or disproved.

18    Circumstantial evidence consists of proof of collateral

19  facts and circumstances which do not directly prove the fact

20  in issue but from which that fact may be logically inferred.

21    When the evidence is made up entirely of circumstantial

22  evidence, then before you would be justified in finding the

23  defendant guilty, you must find that all the essential facts

24  are consistent with the hypothesis of guilt, as that is to be

25  compared with all the facts proved; they must exclude every

1   other reasonable theory or hypothesis except that of guilt;

2   and they must establish such a certainty of guilt of the

3   defendant as to convince the mind beyond a reasonable doubt

4   that the defendant is the one who committed the offense.  It

5   is not necessary that each particular fact be proved beyond a

6   reasonable doubt if enough are proved to satisfy the jury

7   beyond a reasonable doubt of all the facts necessary to

8   constitute the crime charged.  Before a verdict of guilty is

9   justified, the circumstances, taken together, must be of a

10  conclusive nature and tendency, leading on the whole to a

11  satisfactory conclusion that the defendant and no one else

12  committed the offense.

13       You enter upon this investigation with the presumption

14  that the defendant is not guilty of any crime and this stands

15  as a witness for him until it is rebutted and overturned by

16  competent and credible proof.  It is, therefore, incumbent

17  upon the State before you can convict the defendant, to

18  establish to your satisfaction beyond a reasonable doubt that

19  the crime charged in the indictment has been committed; that

20  the same was committed within the County of Shelby and State

21  of Tennessee before the finding of this indictment and that

22  the defendant at the bar committed the crime in such manner

23  that would make him guilty under the law heretofore defined

24  and explained to you.

25       A reasonable doubt is a doubt based upon reason and

1    common sense after careful and impartial consideration of all

2    of the evidence in the case.

3        It is not necessary that the defendant's guilt be

4    proved beyond all possible doubt, as absolute certainty of

5    guilt is not demanded by the law to convict of any criminal

6    charge.

7        A reasonable doubt is just that, a doubt that is

8    reasonable after an examination of all the facts of the case.

9        If you find the State has not proven every element

10   beyond a reasonable doubt, then you should find the defendant

11   not guilty.

12       There are several modes of impeaching a witness.  One

13   mode is to prove that a witness has at different times made

14   conflicting statements as to material facts of the case as to

15   which he testifies.  Still another mode is by rigid and close

16   cross-examination to involve the witness in contradictions and

17   discrepancies as to the material facts stated by him.

18       Immaterial discrepancies or differences in the

19   statements do not affect their credibility unless there is

20   something to show that they originated in a willful falsehood

21   and you, members of the jury, are to determine how far the

22   testimony of any impeached witness has been impaired by any

23   invalidating process.

24       You will take all of the evidence adduced in the case

25   by the State and the defendant and give it a full, fair and

1   impartial consideration.  If there are any conflicts in the

2   statements of the different witnesses, it is your duty to

3   reconcile them if you can, for the law presumes that every

4   witness has sworn to the truth but if you cannot, the law

5   makes you the sole and exclusive judges of the credibility of

6   the witnesses and the weight to be given their testimony.

7        In forming your opinion as to the credibility of a

8   witness, you may look to the proof, if any, of his general

9   character, the manner and demeanor of the witness, the

10  consistency or inconsistency of his statements, their

11  probability or improbability, his ability and willingness to

12  speak the truth, his intelligence and means of knowledge, his

13  motive to speak the truth or swear to a falsehood, his

14  interest or lack of interest in the outcome of the trial.

15       When the defendant makes himself a witness in his own

16  behalf, his credibility is to be determined by the same rules

17  by which the credibility of others is determined, and you will

18  give to the defendant's testimony in this case such weight as

19  you may think it entitled to.

20       You have heard testimony about the defendant's good

21  character.  You should consider this testimony, along with all

22  the other evidence, in deciding if there is a reasonable doubt

23  as to the defendant's guilt.

24       Evidence has been introduced in this case regarding

25  certain prior acts of misconduct and/or crimes allegedly

1    committed by the defendant, Vern Braswell.  It is up to you,

2    the jury, to decide whether or not you choose to rely on this

3    proof and if so, what weight you choose to give it.

4        If you do accredit this proof, it can only be used to

5    determine the specific issues of identity, intent or rebuttal

6    of accident or mistake.  This evidence should not be used as

7    propensity evidence.  As always, the State has the burden of

8    proving every element of the offense charged beyond a

9    reasonable doubt.

10       The rules of evidence provide that if scientific,

11   technical or other specialized knowledge might assist the jury

12   in understanding the evidence or in determining a fact in

13   issue, a witness qualified as an expert by reason of special

14   knowledge, skill or experience may testify and state his or

15   her opinions concerning such matters and give reasons for his

16   or her testimony.

17       Merely because an expert witness has expressed an

18   opinion does not mean, however, that you are bound to accept

19   this opinion.  The same as with any other witness, it is up to

20   you to decide whether you believe this testimony and choose to

21   rely upon it.  Part of that decision will depend on your

22   judgment about whether the witness's background and training

23   and experience is sufficient for the witness to give the

24   expert opinion that you heard.  You must also decide whether

25   the witness's opinions were based on sound reasons, judgment

1    and information.

2         You are to give the testimony of an expert witness such

3    weight and value as you think it deserves along with all of

4    the other evidence in the case.

5         Members of the jury, you have been allowed to take

6    notes in this case.  I charge you that these notes are for

7    your individual use only, and you should not use notes

8    directly or indirectly, explicitly or implicitly to persuade

9    other jurors as to the accuracy of said notes.  They should

10   not be shown to others, nor compared, nor referred to in any

11   way as authority, but should be used privately only by the

12   maker of said notes as an aid to his or her individual memory.

13        The verdict must represent the considered judgment of

14   each juror.  In order to return a verdict, it is necessary

15   that each juror agree thereto.  Your verdict must be

16   unanimous.

17        It is your duty, as jurors, to consult with one another

18   and deliberate with a view toward reaching an agreement, if

19   you can do so without violence to individual judgment.  Each

20   of you must decide the case for yourself, but do so only after

21   an impartial consideration of the evidence with your fellow

22   jurors.  In the course of your deliberations, do not hesitate

23   to reexamine your own views and change your opinion if

24   convinced it is erroneous.  But do not surrender your honest

25   conviction as to the weight or effect of evidence solely

1    because of the opinion of your fellow jurors, or for the mere

2    purpose of returning a verdict.

3        When you retire to consider your verdict in the

4    indictment, you will first inquire, is the defendant guilty of

5    murder in the first degree as charged in the indictment.  If

6    you find the defendant guilty of this offense beyond a

7    reasonable doubt, your verdict should be, "We, the jury, find

8    the defendant guilty of murder in the first degree as charged

9    in the indictment."

10       If you find the defendant not guilty of this offense or

11   have a reasonable doubt of his guilt of this offense, you will

12   acquit him thereof and then proceed to inquire whether or not

13   he is guilty of murder in the second degree as included in the

14   indictment.

15       If you find beyond a reasonable doubt that the

16   defendant is guilty of this offense, your verdict should be,

17   "We, the jury, find the defendant guilty of murder in the

18   second degree as included in the indictment."

19       If you find the defendant not guilty of this offense or

20   have a reasonable doubt of his guilt of this offense, you will

21   acquit him thereof and then proceed to inquire whether or not

22   he is guilty of voluntary manslaughter as included in the

23   indictment.

24       If you find beyond a reasonable doubt that the

25   defendant is guilty of this offense, your verdict should be,

1    "We, the jury, find the defendant guilty of voluntary

2    manslaughter as included in the indictment."

3         If you find the defendant not guilty of this offense or

4    have a reasonable doubt of the defendant's guilt of this

5    offense, you will acquit him thereof and then proceed to

6    inquire whether or not he is guilty of reckless homicide as

7    included in the indictment.

8         If you find beyond a reasonable doubt that the

9    defendant is guilty of this offense, your verdict should be,

10   "We, the jury, find the defendant guilty of reckless homicide

11   as included in the indictment."

12        If you find the defendant not guilty of this offense or

13   have a reasonable doubt of his guilt of this offense, you will

14   acquit him thereof and then proceed to inquire whether or not

15   he is guilty of criminally negligent homicide as included in

16   the indictment.

17        If you find beyond a reasonable doubt that the

18   defendant is guilty of this offense, your verdict should be,

19   "We, the jury, find the defendant guilty of criminally

20   negligent homicide as included in the indictment."

21        If you do find the defendant guilty, you can convict

22   him of only one of the above named offenses charged and

23   included in this indictment.

24        If upon all the proof, you have a reasonable doubt of

25   his guilt of the offenses charged and included in the

1    indictment under the law defined and explained to you, it is

2    your duty to acquit him and your verdict should be, "We, the

3    jury, find the defendant not guilty in the indictment."

4         You will write your verdict as to the indictment on the

5    outside of the jacket and sign one of your names as foreman or

6    foreperson.

7         Take the case, consider all of the facts and

8    circumstances fairly and impartially and report to the -- and

9    report such verdict to the Court -- and report to the Court

10   such verdict as truth dictates and justice demands.

11        Anything further, Mr. Bailey?  Ms. Weirich?

12             MS. WEIRICH:  No, Your Honor.

13             MR. J. BAILEY:  Nothing from the defense, Your

14   Honor.

15             THE COURT:  All right.  Ladies and gentlemen, you

16   will have the charge back in the jury room with you.  Feel

17   free to reread any or all of it.  When you have reached your

18   verdict in this case, whatever your verdict may be, I would

19   refer you to the last several pages of the charge and ask you

20   to follow the appropriate verdict form that can be found on

21   those last several pages in writing up your verdict.

22        Please, write your verdict on the outside of the

23   jacket, date it, sign one of your names as foreman or

24   foreperson.  You'll have most of the exhibits back in the jury

25   room with you for your review as well.  If there are any that

1    aren't passed back there that you want to view, let us know

2    and you can certainly view them in the courtroom.

3          And at this time I think given the time, we'll stop for

4    lunch.  Once you've completed lunch, then you may begin your

5    deliberations.  There won't be any need to come back into the

6    courtroom.  But do not discuss the case during the lunch hour

7    even though we've gotten to this point in the trial.  During

8    lunch you are not to discuss the case at all.  It wouldn't be

9    right for two or three of you to be down at one end of the

10   table talking about the case.

11          Only after you've completed lunch and you've been

12   handed the jacket and the charge and the exhibits by Officer

13   Lafferty, only then may you begin your deliberations.  And at

14   this time I will excuse Mr. Gillespie and Mr. Wade.  If the

15   rest of y'all would retire to the jury room at this time.

16

17   (At 11:59 a.m., the jury retired from the courtroom to begin

18             deliberations upon its verdict.)

19

20          THE COURT:  All right.  Mr. Wade and

21   Mr. Gillespie, I want to thank both of you for serving as

22   alternates in this case.  I'm sure you understand how

23   important it is that we have alternates available if in the

24   event we needed you.  At this time you are excused, and the

25   bailiffs will assist you in getting back to the hotel and

1    getting your belongings and making sure you have a ride home.

2    Thanks very much.   And I don't plan to bring the jurors back

3    in after lunch so y'all don't need to be back here at 1 or

4    1:30 but leave your phone numbers where we can reach you

5    certainly.   Stand in recess.

6                (Recess.)

7                THE COURT:   The jury has a question, two questions

8    actually, that need to be answered.   All right.   Bring in the

9    jury, please.

10

11    (At 3:29 p.m., the jury returned to the courtroom and the

12                following proceedings were had to wit:)

13

14                THE COURT:   All right.   Ladies and gentlemen, I've

15    received two questions that were submitted to me.   The first

16    reads as follows:   Should we consider -- should we consider

17    every witness's testimony as evidence?

18                As I read to you earlier in the charge, you will take

19    all of the evidence adduced in the case by the State and the

20    Defendant and give it a full, fair, and impartial

21    consideration.   If there are any conflicts in the statements

22    of the different witnesses, it is your duty to reconcile them

23    if you can for the law presumes that every witness has sworn

24    to the truth.   But if you cannot, the law makes you the sole

25    and exclusive judges of the credibility of the witnesses and

1    the weight to be given their testimony.

2         In forming your opinion as to the credibility of a

3    witness, you may look to the proof, if any, of his general

4    character, the manner and demeanor of the witness, the

5    consistency or inconsistency of his statements, their

6    probability or improbability, his ability and willingness to

7    speak the truth, his intelligence and means of knowledge, his

8    motive to speak the truth or swear to a falsehood, his

9    interest or lack of interest in the outcome of the trial.

10        When the defendant makes himself a witness in his own

11   behalf, his credibility is to be determined by the same rules

12   by which the credibility of others is determined and you will

13   give to the defendant's testimony in this case such weight as

14   you may think it entitled to.

15        There was also some mention made of a question about

16   transcripts of certain witness's testimony.  There are no

17   transcripts in the trial.  You must rely on your memory,

18   individually and collectively, your memory of the testimony

19   during the trial, but there are no transcripts made

20   simultaneous to the testimony to be passed back to the jury

21   during their deliberations.

22        And then the final question is a factual question and I

23   can only state that I am not allowed to make any comment on

24   the facts of the case.  It's up to you jurors to recall again

25   individually and collectively what the facts of the case are

1   and were and reach your verdict based on the proof that came

2   into evidence this week from the witness stand and the

3   physical proof and the law that I've presented to you.   But I

4   cannot answer any questions that relate to factual issues of

5   the case.

6            Having said that, I'll ask you to return to the jury

7   room to resume the deliberations.

8

9   (At 3:33, p.m., the jury retired from the courtroom to resume

10                  deliberations upon its verdict.)

11

12            MR. J. BAILEY:  May we approach?

13            THE COURT:  You may.

14               (Bench conference commenced.)

15            MR. J. BAILEY:  Are we entitled to know what the

16   fact question is?

17            THE COURT:  Oh, sure.  I just didn't see any need

18   to read it out.

19            MR. J. BAILEY:  Yeah, that's why I asked to

20   approach.

21            THE COURT:  When performing the erotic

22   asphyxiation was penetration to Sheila performed?

23            MR. J. BAILEY:  Okay.  Thank you.  I think that is

24   a fact question.  I just wanted to know, Your Honor.

25               (Said bench conference concluded.)

1        THE COURT:  Take him out.  Stand in recess.

2              (Recess.)

3        THE COURT:  Bring in the jury, please.  The jury

4    has asked for a few more minutes to continue their

5    deliberations.  Take him out, please.  Stand in recess.

6              (Recess.)

7        THE COURT:  Bring in the jury, please.  All right.

8    Let's take him out.  Stand in recess.

9              (Recess.)

10       THE COURT:  Bring in the jury, please.

11

12   (At 10:02 p.m., the jury returned to the courtroom and the

13             following proceedings were had to wit:)

14

15       THE COURT:  All right.  Ladies and gentlemen, have

16   you reached your verdict at this time?

17            FOREPERSON:  Yes, Your Honor.

18       THE COURT:  May I see the jacket, please.

19      All right.  In Indictment 05-03038 your verdict reads

20   as follows:  We, the jury, find the defendant guilty of murder

21   in the second degree as included in the indictment.  Signed

22   Mary Brooks, 12/9/05.

23   (The jury was polled and no negative responses were elicited.)

24       THE COURT:  All right.  I want to thank all of you

25   for serving on this jury.  As the attorneys have already

1   mentioned, we appreciate and understand the sacrifice and

2   inconvenience that's involved in serving on a sequestered jury

3   of this sort.   It's not an easy task, and it takes you away

4   from your families for an entire week.   But our system would

5   not work -- in my opinion it works better than any system in

6   the world -- and it would not work like it does without

7   citizens from the community agreeing to serve on juries and

8   listen to cases and reach verdicts.   So we all genuinely

9   appreciate your service this week on this jury.

10          At this time you are excused.   Of course the bailiffs

11   will help you get back to the hotel and make sure you have

12   your belongings and have a ride home.   Thank you very much.

13                  (Jury out.)

14          THE COURT:  All right.   Stand up, Mr. Braswell.

15   Mr. Braswell, after a fair and impartial trial by a jury of

16   your peers, said jury having found you guilty in Cause Number

17   05-03038 of the included offense of murder in the second

18   degree, I hereby find you guilty of that offense.   The

19   sentencing hearing will be scheduled for the 17th of January.

20   Of course all bond if there is any at any point in time is

21   revoked.   January 17th for sentencing.

22          MR. W. BAILEY:  Your Honor, can we pick another

23   date other than the 17th?   I've got a trial starting in

24   Federal Court on that day.

25          THE COURT:  The 20th?   January 20th?   Will you be

1   through by then?

2         MR. W. BAILEY:  That trial probably is going to

3   run somewhere between -- maybe a two-week trial.

4         THE COURT:  Okay.  Let's set it on the -- why

5   don't we set it on the 6th, January 6th?  Can you be here that

6   date?

7         MR. W. BAILEY:  That would be fine.

8         MR. J. BAILEY:  And of course we will just for the

9   record --

10        THE COURT:  Get a date for motion for new trial at

11   that time.  January 6th.  Step out, sir.

12

13        THIS WAS ALL THE EVIDENCE INTRODUCED AND PROCEEDINGS

14   HAD RELEVANT TO QUESTIONS RAISED ON APPEAL ON THE TRIAL OF

15   THIS CAUSE.

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

STATE OF TENNESSEE   )

                     )

COUNTY OF SHELBY     )

      I, the undersigned, **Katherine Knowles**, Court Reporter for the Thirtieth Judicial District of the State of Tennessee, do hereby certify that the foregoing to be true, accurate and complete transcript to the best of my knowledge, understanding and ability of all the evidence that was heard in this cause in Division 5 of the Criminal Court for Shelby County, Tennessee, before the Honorable Joseph B. Dailey, Presiding Judge, on the 5th day of December, 2005.

      I do further certify that I am neither of kin, counsel nor interest to any party hereto.

      Dated this 10th day of April, 2006.

_____
Katherine Knowles
Court Reporter

IN THE CRIMINAL COURTS FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
DIVISION <u>FIVE</u>

STATE OF TENNESSEE
    APPELLEE

VS.

VERN BRASWELL
    APPELLANT

Docket No. 05-03038

**FILED:** *8-16-06*

**WILLIAM R. KEY, CLERK**

**BY:** _____ **D.C.**

---

**APPELLANT'S FILING OF TRANSCRIPT AND NOTICE OF FILING TO THE
DISTRICT ATTORNEY GENERAL**

---

Pursuant to Rule 24(b), Tennessee Rules of Appellate Procedure, this is to notify that the Petitioner/appellant has filed the transcript with the Clerk of the Criminal Court of Shelby County, Tennessee.

This 16TH of AUGUST, 2006.

_____
ATTORNEY FOR DEFENDANT/APPELLANT

**CERTIFICATE OF SERVICE OF NOTICE
<u>TO THE DISTRICT ATTORNEY GENERAL</u>**

I certify that I have delivered a copy of this Certification and Filing of Transcript to the office of the District Attorney General on this 16TH  day of AUGUST, 2006.

_____
ATTORNEY FOR DEFENDANT/APPELLANT

IN THE CRIMINAL COURTS FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
DIVISION NINE

STATE OF TENNESSEE
    APPELLEE

VS.

Docket No. 05-03038

FILED: _10-11-06_

WILLIAM R. KEY, CLERK

VERN BRASWELL
    APPELLANT

BY: _____ D.C.

## ORDER APPROVING TRANSCRIPT OF EVIDENCE AND MAKING THE TRANSCRIPT OF EVIDENCE PART OF THE RECORD ON APPEAL

This is to certify that the Transcript of Evidence adduced at the Trial of this cause has been filed with the Clerk on AUGUST 16, 2006 in accordance with Tennessee Rules of Appellate Procedure, Rule 24, Section (b) within ninety (90) days after filing the Notice of Appeal, which was filed on MAY 22, 2006 and has been examined by counsel for the defendant and the Assistant Attorney General and has been found by both to be a true and accurate record of the proceedings in this cause and has been approved by both counsel.

This is to further certify that the Court has examined the Transcript of Evidence of the Trial in this cause and has found it to be a true and accurate record of the proceedings. The Court therefore certifies that the Transcript of Evidence reflects truly & accurately the trial of this cause.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that the Transcript of Evidence is hereby approved by the Court and counsel for the defendant and the State of Tennessee, and the Clerk is hereby ordered to make the Transcript of Evidence part of the record on appeal in this cause.

ENTERED, this the _11_ day of _October_, 20_06_

                                        JUDGE

APPROVED:

_____
ATTORNEY FOR THE STATE OF TENNESSEE

_____
ATTORNEY FOR THE DEFENDANT/APPELLANT

STATE OF TENNESSEE}
    SHELBY COUNTY}

I, William R. Key, Clerk of the Criminal Court of the 30th Judicial Circuit at Memphis, do herby certify that the forgoing **3711** pages of writing contain a full, complete, true and perfect copy of the **TRANSCRIPT OF THE RECORD** in the case of:

**STATE OF TENNESSEE**

vs.                             Docket No    **05-03038**

**VERN BRASWELL**

**FIRST DEGREE MURDER;** as the same appears on file, and of record in my office, and that I am the Custodian of said records and that all **entries** are presently under my care, custody and control.

WITNESS my hand and the seal of said Court, at office in Memphis, this **26TH** day of **OCTOBER 2006**.

                                  **WILLIAM R. KEY, Clerk**

                                  By:_____ **D.C.**

**SEAL**