W2006-01081-CCA-R3.CD

IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE
THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
DIVISION V

ORIGINAL

STATE OF TENNESSEE,                    )
                                       )
VS.                                    )      CASE NO. 05-03038
                                       )
VERN BRASWELL,                         )
                                       )      FILED   3-1-07
        Defendant.                     )      WILLIAM R. KEY CLERK
                                              BY _____ D.C.

                                              (supplement approved
                                              by Criminal Court of
                                              appeals)

_____

                    SENTENCING HEARING
                    January 6, 2006
_____


              THE HONORABLE JOSEPH B. DAILEY


                        APPEARANCES

FOR THE STATE:

        BETSY CARNESALE
        Assistant District Attorney General
        Shelby County District Attorney General's Office
        201 Poplar Avenue - Third Floor
        Memphis, Tennessee 38103
        (901) 545-5900

FOR THE DEFENDANT:

        JAVIER BAILEY, Esquire
        100 North Main - Suite 3002
        Memphis, Tennessee 38103
        (901) 575-8702


                    REPORTED BY:
FILED         BETTYE A. KEE, COURT REPORTER
                    (901) 545-5070
MAR 0 1 2007

Clerk of the Courts

Vol.12

TABLE OF CONTENTS

                                                                    PAGE

Appearances ........................................    1

Table of Contents .................................    2

Style and Caption .................................    3




                         **STATE'S PROOF**

Testimony of:
**PEARLINE WASHBURN**
        Direct Examination by Ms. Carnesale .............    11


Closing Argument of State
        by Ms. Carnesale ................................    20

Closing Argument of Defense
        by Mr. Bailey ...................................    21

Sentencing (24 years) .................................    25-27

Motion For New Trial (2/10/06) ........................    28

Adjourned (11:45 A.M.) ................................    28

Court Reporter's Certificate .........................    29

                         - - - - -

1

IN THE CRIMINAL COURT OF SHELBY COUNTY, TENNESSEE
THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
2                                    DIVISION V

3

4    STATE OF TENNESSEE,                  )
                                          )
5    VS.                                  )        CASE NO. 05-03038
                                          )
6    VERN BRASWELL,                       )
                                          )
7          Defendant.                     )

8    _____

9              This cause came on to be heard and was heard on

10   the 6th day of January, 2006, at 11:00 A.M., before the

11   Honorable Joseph B. Dailey, Judge, holding the Criminal Court

12   for Shelby County at Memphis, Tennessee.

13              The following proceedings were had, to-wit:

14

15                            *  *  *  *  *

16

17              THE COURT:  Are you ready to go forward on Vern

18   Braswell?

19              MR. BAILEY:  I'm ready to go forward, Your Honor.

                THE COURT:  Alright.  Bring out Vern Braswell,
20
     please.
21
     (Complied.)
22
                Proceed, Ms. Carnesale.
23
                MS. CARNESALE:  Yes, Your Honor.  Mr. Braswell was
24
25   found guilty back in December of murder in the second degree,

1   which is an A felony.  The State has filed a Notice of

2   Enhancement factors.  The State alleges that the defendant is

3   within Range 1 standard offender which as Your Honor knows

4   carries to twenty-five years.

5           We've also indicated that the defendant has a

6   previous history of criminal convictions or criminal behavior

7   in addition to those necessary to establish his range.  A

8   Pre-Sentence Report bears that out.  Mr. Braswell has two

9   prior misdemeanor convictions, one is a theft of property

10  under $500 from 1992, the second was an aggravated assault

11  that he pled to misdemeanor assault from 1990.  He received

12  six months sentence with six months probation.

13          And we're going forward based on those two

14  convictions.  We don't have any proof other than I'd like to

15  call Ms. Pearline Washburn.  She has submitted a letter that

16  she wrote as part of the victim impact statement, part of the

17  sentencing report.  She'd like to read that to the Court with

18  Your Honor's permission.

19          MR. BAILEY:  I have no problem with that.  I just

20  want to ask the Court does -- I do have some objections to the

21  use of those convictions as enhancement factors.  Would Your

22  Honor just rather we just hold til argument or did you want to

23  hear -- Your Honor want to hear it now?

24          THE COURT:  I'll hear from you now.

25          MR. BAILEY:  Alright.  Your Honor, after reading

1   the Reform Act of 1989 and likewise after reviewing the -- for

2   the record State vs. Edwin Gomez, which Your Honor's familiar

3   with, but it's cited at 163 SW 3rd 632; also the Decision of

4   State of Tennessee vs. Royce Dino Lane which is not reported

5   in the SW 2nd Reporter, but cited as 1992 West Law 120.89; and

6   finally the McConnell Decision that the State of Tennessee vs.

7   McConnell -- actually it's McConnell vs. the State of

8   Tennessee, which was a second degree murder case.

9          All of these I've cited with the exception of

10  Gomez is a second degree murder case.  And this case is cited

11  at 12 SW 3rd 795.  The Court, the Supreme Court of the State

12  of Tennessee and the Tennessee Criminal Court of Appeals has

13  now reached out through the Gomez case and adopted the

14  provisions, although they say it's not a new rule or principle

15  of law but they're simply restating a principle of law.

16          But they've adopted the Decision as stated by the

17  United States Supreme Court in the Blakley Decision.  And

18  essentially it says that the factual findings -- and I'll get

19  to the other two issues -- but the factual findings with

20  regards to enhancements of the sentence beyond the -- a

21  presumptive sentence which is in the middle of the range have

22  to be done by the jury.  It's as simple as that.

23          Now, it does give the Court discretion, but in the

24  use of that discretion if I may just quote the Court -- it

25  says that Your Honor is to utilize that which is in the

1   record, those facts which are in the record, but it also says

2   that the requirements of the Sixth Amendment are clear, that

3   the application of Washington sentencings which was the

4   Blakley Decision -- violated the defendant's right to have the

5   jury find the existence of any particular fact that the law

6   makes essential for his punishment.

7          And quoting the Blakley Decision we have the

8   Booker Decision, which is 125 Supreme Court 749.  Says the

9   Court in Booker concluded accordingly we affirm in Gomez, we

10  affirm our holding in a prendre any fact -- and then it says

11  "other than a prior conviction," and I'm going to come back to

12  that.

13         Any fact other than a prior conviction which is

14  necessary to support a sentence exceeding the maximum

15  authorized by the fact established by a plea of guilty or jury

16  verdict must be admitted by the defendant or approved by a

17  jury beyond a reasonable doubt.  And in Gomez and in the other

18  cases -- oh, I'm sorry, in the other cases which cite Gomez,

19  which are second degree murder cases, it sets a presumptive

20  sentence at twenty years.

21         And Your Honor knows that, but for the record a

22  presumptive sentence is twenty years.  It's at the mid-point

23  range.

24         Now, the Reform Act of 1989 does not contemplate

25  the use of misdemeanor convictions.  A Class A misdemeanor

1    which was some thirteen years ago and another Class A

2    misdemeanor which was the assault charge which is almost --

3    this April will be sixteen years ago -- and nothing since then

4    to enhance a felony conviction by a jury -- doesn't

5    contemplate that.

6         In fact, I think the Sentencing Commission

7    specifically in their comments talk about using prior

8    convictions, a felony, to enhance.

9         THE COURT:  Let me see what you're referring to.

10   Does it preclude the use of misdemeanors?

11        MR. BAILEY:  No, it does not preclude it.  I'm not

12   stating that to the Court, but their discussion -- and I'll

13   just pass this forward -- their discussion in the matter, you

14   know, clearly in my opinion indicates that the Court is

15   presuming or the Sentencing Commission presumed that -- excuse

16   me one second, Judge, I have it here somewhere -- that the

17   Sentencing Commission presumed the use of felonies as a

18   enhancement factor.

19        A assault charge that happened, I think -- and

20   Your Honor heard about this assault charge when we were having

21   the bond hearing, that happened on the University of Memphis

22   campus in 1990, in April of 1990, that -- and the theft of

23   property, which I don't know the facts regarding the theft of

24   property, which occurred -- which occurred in 1992 -- that's

25   not what I'm looking for -- anyway those -- the Court -- I

1   don't think that the Sentencing Commission nor any court that

2   I know of, any Decision, any major Decision that I know of has

3   utilized or presumed the use misdemeanors over ten years old

4   to enhance the sentence.

5           THE COURT:  I've used them on many occasions.  I

6   don't know anything in the law that precludes the use of

7   misdemeanors or that sets a ten year time bar.

8           MR. BAILEY:  Well, I granted the Court -- granted

9   Your Honor that --

10           THE COURT:  I'll be happy to look at such law if

11   you point me to it but --

12           MR. BAILEY:  I'm trying -- I had a stack of --

13           THE COURT:  -- I'm unaware of any law.

14           MR. BAILEY:  And, again, what I'm passing to the

15   Court I agree with the Court.

16           THE COURT:  Obviously a felony that occurred a

17   year ago would carry more weight than a misdemeanor that

18   occurred sixteen years ago, but I know of nothing in the law

19   that precludes a Court from considering misdemeanors, even

20   thirteen and sixteen year old misdemeanors.

21           MR. BAILEY:  And I agree with the Court.  I said I

22   don't think it precludes it, but I think that when you read

23   the Sentencing Commission's comments that I don't think that

24   that's what's considered.  That's my point, and I don't think

25   that that was the Legislative's intent behind it.

1            But other than that I'd also state to the Court

2    that we, of course, we have -- we understand the Victim Impact

3    Statement and that Ms. Washburn is here to testify so, of

4    course, we have no comments with regard to that.  I want to

5    just also state to the Court that I've discussed with Mr.

6    Braswell his testifying today, and he will not testify today.

7            THE COURT:  Well, look, I assume that this line

8    that you have underlined, the sentence that you have

9    underlined is that to which you refer on the second page

10   talking about prior felony convictions, but that's talking

11   about enhancing to a different range of punishment --

12           MR. BAILEY:  I understand.

13           THE COURT:  -- altogether.

14           MR. BAILEY:  I understand.

15           THE COURT:  Not for -- not for enhancing within a

16   range.  That's two separate things.

17           MR. BAILEY:  Alright.  But I'm thinking to the

18   Court that in order to -- in order to abridge the presumption

19   I believe that the Sentencing Commission --

20           THE COURT:  You're talking about two different

21   things.  If you want to move from Range 1 to Range 2 to Range

22   3 to career then you have to rely on appropriate felonies, of

23   course.  We all understand that.

24           MR. BAILEY:  Yes, sir.

25           THE COURT:  And that's what this is referring to,

1  this line that you have underlined in here.  But if you're

2  talking about enhancing within a range there's nothing in the

3  law that I'm aware of nor has there ever been that would

4  preclude the consideration of misdemeanor convictions for that

5  purpose.

6          In fact, it doesn't even have to be a conviction,

7  it can be criminal behavior.  And I don't believe the Blakley

8  language in Gomez would have any bearing at all.  It

9  specifically culls out this prior conviction factor as one --

10  as a Blakley consideration at all.

11          MR. BAILEY:  Well, I actually was using -- I went

12  ahead and just made my full argument with regard to the Gomez

13  and Blakley factors, not with regards to the prior convictions

14  but just in anticipation of other factual findings that Your

15  Honor might make in determining the sentence.  I want to go

16  ahead and go on the record on that.

17          THE COURT:  Right.

18          MR. BAILEY:  And I would state to the Court that

19  the recent Decision of Tate and also McConnell say that if I

20  don't make that argument it's waived specifically.

21          THE COURT:  Yes, sir, I understand.

22          MR. BAILEY:  Okay.

23          THE COURT:  Alright.  Call your witness.

24          MS. CARNESALE:  Thank Your Honor.  The State would

25  call Pearline Washburn.

1    Whereupon,

2                          PEARLINE WASHBURN

3    was called as a witness herein and, after first having been

4    duly sworn, was examined and testified as follows:

5                  THE COURT:  Have a seat, please.

6                          DIRECT EXAMINATION

7    BY MS. CARNESALE:

8    Q          Good morning.

9    A          Good morning.

10   Q          Would you please state and spell your name for the

11   record?

12   A          Pearline Washburn, P-e-a-r-l-i-n-e,

13   W-a-s-h-b-u-r-n.

14   Q          And, Ms. Washburn, you understand that we're here

15   today for the sentencing hearing in the matter of Vern

16   Braswell in his conviction of second degree murder, is that

17   correct?

18   A          Yes.

19   Q          You're the mother of Sheila Braswell, the victim

20   of the murder, is that right?

21   A          Yes.

22   Q          And I understand that you wrote a letter in

23   response to the Probation Officer's request for a Victim

24   Impact Statement.  Do you have a copy of that letter with you

25   today?

1    A          Yes.

2    Q          At this time would you like to read that into the

3    Court and into the record?

4    A          Yes.

5              MS. CARNESALE:  Your Honor, we'd ask permission.

6              THE COURT:  You may.

7              THE WITNESS:  "...On Friday, November 5th, 2004, a

8    tragedy occurred.  Sheila Braswell's life was snatched from

9    this earth, not by a stranger but by her husband.  The first

10   record of occurrence of her death Sheila was found floating in

11   the bathtub.  The second record of occurrence was Saturday,

12   November 6th, 2004, manual strangulation.

13             It was very difficult to function not knowing the

14   truth and trying to digest two days of hurt, betrayal, anger,

15   frustration and accept death.  Our family's very small in

16   numbers but our extended family is extensive and strong in

17   faith.

18             Sheila was a good wife.  She shared the birth of

19   two boys with their marriage.  Numerous activities were

20   planned around the boys.  They attended family gatherings

21   locally and out of the city.  During her busy schedule she

22   managed to clean, wash and complete other house cleaning

23   chores.  Sheila was responsible for Vern completing his

24   undergraduate and graduate degrees at Memphis State

25   University.

1   After Vern's betrayal as a husband Sheila

2   continued to maintain her daily routine and care for her

3   family.  Sheila was a good mother, and her life was centered

4   around the well being of her boys.  She made sure they got

5   their homework, cooked wholesome meals and disciplined as

6   necessary.

7   She read bedtime stories and exposed them to

8   travelling out of town by automobile, air and train.  The boys

9   completed Tae Kwon-Do classes, ran track, and both boys played

10   Pee-Wee's football.  She would sit in the heat, cold and rain

11   during practice.  The 2004 Pee-Wee team went undefeated and

12   won the championship division one week after Sheila's death.

13   She did not get the opportunity to cheer them on.

14   Both boys attended the banquet and received trophies.  Sheila

15   enjoyed sports from high school and played softball through

16   2001.  Sheila took her boys to church, served as president of

17   the PTA at Hallie (phonics spelling) Elementary, adoptive

18   school coordinator at Cummings Elementary; several years a

19   member of our church ministry, a member of the (inaudible)

20   club, always helping and making a difference in someone's

21   life.

22   Sheila was my daughter, my confidante, my friend

23   and my prayer partner.  We talked almost every day and often

24   saw her during the week to make bank deposits.  She was a

25   beautiful thirty-two year old woman that had everything going

1   for her.  She had a big heart, enjoyed improving the quality

2   of life for her family, friends and patients.

3              She was strong mentally, physically and

4   spiritually.  She was intelligent, wore a big smile, and could

5   be heard from quite a distance.  It was very difficult to

6   sitting through the court proceeding re-living Sheila's death,

7   very painful observing exhibits, listening to the tapes,

8   listening to the forensic evidence and other witnesses.

9              I fear the day her boys will have to learn the

10  truth about their mother's death and how their father tried to

11  present such heinous acts to paint an ugly image and destroy

12  Sheila's reputation as a good mother and a good woman.  Sheila

13  loved her stepfather and would often ask for advice and

14  guidance.

15             When she told us she had filed for her divorce in

16  June of 2004 his advice to her was be careful and be

17  prayerful.  They often told jokes and short tales.  Sheila's

18  relationship with her father was unique.  Their bond allowed

19  them to have differences of opinion but knew where they stood

20  with one another.  She was very close to her grandparents who

21  gave her solid advice and shared words of wisdom, which many

22  she applied in her daily life working with patients and

23  co-workers.

24             Positive attitudes and patience will go a long

25  way.  They depended on Sheila to get them to the grocery

store, doctor's appointments, checking their blood pressure, blood sugar, providing ongoing therapy and exercise for her grandmother who had both knees replaced.

Sheila's death has left a gigantic hole in their hearts, and to see and listen to the court hearings have added to their hurt and pain.  Their recovery process is very slow. Her Uncle Ralph, mentally challenged, encouraged Sheila to become an occupational and physical therapist.  She wanted to help people with disabilities.  She was motivated to help those that had low or no self esteem and lacked the ability to help themselves.

Sheila was close to her brother.  He was referred to as her big and only brother.  Growing up he was a protective brother and she was a protective sister.  Their birthdays were two years and one day apart, August 27th and August 28th.  Usually they celebrated their birthdays together.  They attended the same schools, elementary and high school, and they had so much in common and respected each other.

She protected and placed a shield around her brother from knowing what she was encountering in her marriage.  Her big brother and sister-in-law have stepped in the role of guardianship to raise her boys with love, dignity and honor.

At the age of twenty Sheila helped care for her

1   adopted brother who was, at that time, two.  She was a full

2   time student at Shelby State College and managed to get him to

3   and from day care and complete her studies.  Not too many

4   people would have done what she did to help the family bond

5   and work as a family unit.

6          Again, she was always concerned and caring of

7   others.  Sheila was that type at an early age at Metropolitan

8   Baptist Church and loved her church family.  As a young child

9   the church provided tutorial programs at the school,

10  (inaudible), sports, bowling and other reading programs.  She

11  grew up in the Sunday schools, youth choirs and made Adults

12  For Christ Choir and had a melodious voice.

13         She had a special relationship with the Lord and

14  it was evidence because she carried herself in a manner that

15  she knew -- that you knew she knew the Lord.  During the month

16  of September, 2004 she enrolled in a thirty-two week

17  discipleship class at the church and was enjoying learning

18  more about the Bible and the fellowship of her class

19  participants.

20         Many patients of Sheila's attended her funeral on

21  walkers, crutches, wheelchairs, and walking canes.  They told

22  us over and over again Sheila was responsible for their

23  development and were going to miss her smile and small

24  stature, because of her confidence in them to become mobile

25  and self-sufficient.

1        She had a special patient almost like her own son.

2   She cared for him from age two until age six.  She provided

3   therapy three times a week and sometimes beyond her scheduled

4   hours.  Her dream was to see him walk in her lifetime.  Her

5   patient made his first step a week before Sheila's death.

6   They celebrated this milestone with tears and dancing.

7        Once a month I receive a telephone call from one

8   of Sheila's patients in Mason, Tennessee.  He shares his

9   concern and how Sheila has faith in him to walk again after a

10  serious auto accident that doctors stated he would not walk

11  again.  The odds were in his favor and he was blessed with a

12  good therapist.  He misses her very much and refers to her as

13  his angel.

14       They have no idea how many people have been

15  affected by Sheila's death, and most of all William and Miles.

16  They are the real victims.  They are confused and emotionally

17  traumatized.  Their mother has been snatched and they have

18  missed the intimacy of them cuddling in her arms, longing to

19  be held for comfort and encouragement, baptism, school trips,

20  teenage years, sports, science projects, hobbies, girlfriends,

21  prom dates, learning to drive, graduation from high school and

22  college, marriage and their future families.

23       We will never know how many lives could have been

24  saved or limbs restored to become flexible again, nor how many

25  souls would have been saved during Sheila's lifetime.  She

1   chose the right profession because her giving spirit and

2   asking for nothing in return.

3           Whatever the legal systems deems appropriate at

4   this time so shall it be done.

5           MS. CARNESALE:   Thank you.   Your Honor, the State

6   has no further proof.

7           MR. BAILEY:   No questions.

8           THE COURT:   Alright.   You may step down.   Thank

9   you.

10  (The witness was excused.)

11          Any further proof?

12          MS. CARNESALE:   No, Your Honor.

13          THE COURT:   Alright.   Any proof, Mr. Bailey?

14          MR. BAILEY:   Your Honor, in the interest of

15  judicial economy there were several letters that we had --

16  that were filed actually with Judge Bennett prior to the

17  matter being indicted and sent to Your Honor's court and was

18  made a part of the technical record during our bond hearing.

19          I'd ask the Court to take judicial notice of

20  those, and if the Court chooses to read them into the record I

21  can, but Your Honor can take a look at that there were --

22          THE COURT:   You're right, let me make sure they're

23  in here.

24          MR. BAILEY:   If not there were two files and I

25  want to make sure the Court knows that.

1        THE COURT:  Yes, there are many letters in here

2  that I recall from the bond hearing having been introduced.

3        MR. BAILEY:  And I'll just state to the Court that

4  since they are already a part of the record we'd ask the Court

5  to take note of them.

6        THE COURT:  I will.

7        MR. BAILEY:  Those -- and just for the record it

8  would be our position that those came from a cross section of

9  the community, although it was during -- for purposes of bond

10  they speak to the character and the work of Mr. Braswell in

11  his local community.

12        Also I'll ask the Court since we did have a very

13  extensive bond hearing, we put on quite a few witnesses that

14  the Court has already heard from, his employer who's Ms. Ruby

15  Payne, Doctor Ruby Payne, and several other people with regard

16  to those same things, Mr. Braswell's character and his work in

17  the community, we'd ask the Court to take note of that.

18        THE COURT:  I will.

19        MR. BAILEY:  With that said, as I stated earlier,

20  I have discussed with Mr. Braswell his right to be heard

21  during this hearing.  Mr. Braswell, for the record, did

22  testify at trial and as a result he's going to waive his right

23  to be heard today.

24        THE COURT:  Alright, and you have no additional

25  proof?

1                 MR. BAILEY:  No additional proof in addition to

2   that.

3                 THE COURT:  Alright.  Ms. Carnesale, I'll hear any

4   arguments you care to make.

5

6                       * * * * *

7

8                 CLOSING ARGUMENT OF STATE

9   BY MS. CARNESALE:

10                 Your Honor, the Court heard all the testimony at

11   trial and the State would submit that there was testimony

12   regarding prior criminal behavior of the defendant, not

13   limited to only to the two prior misdemeanor convictions that

14   we do have on the Pre-Sentence Report.

15                 Mr. Braswell, it was elicited at trial, both with

16   Sheila Braswell, the victim, as well as other women had a

17   violent history, he had choked both Ms. Braswell and Ms.

18   Christy Woods in the past.  He had assaulted the victim in the

19   past and the State would ask that Your Honor take that into

20   consideration as an enhancement factor based on the factor

21   we've selected.

22                 We understand that he's Range 1, and obviously the

23   Court is aware that -- start a presumptive twenty year

24   sentence we're asking that the Court move Mr. Braswell to the

25   maximum twenty-five years.  So we would certainly ask the

1    Court to find if the maximum is inappropriate that we enhance

2    it beyond the presumptive twenty years based on his past

3    criminal behavior as well as his prior convictions.

4

5                              *  *  *  *  *

6

7                        CLOSING ARGUMENT OF DEFENSE

8    BY MR. BAILEY:

9                    I'm going to submit on the issue of mitigation, as

10   I've just stated on what's in the technical record, however,

11   with regards to enhancements I will bring to the Court's

12   attention that's why I was making my argument earlier about

13   some -- Gomez and the cases that I've already cited that in

14   order to utilize the proof that counsel has stated with regards

15   to acts against the witness, Ms. Christy Woods, and also

16   allegedly acts were put into the record with regards to prior

17   assault behavior against the victim in this matter I think that

18   requires a factual finding that Mr. Braswell's unreasonably

19   dangerous.

20                   And I think that unless that was specifically put

21   to the jury I disagree that that could be used as an

22   enhancement factor based on the Gomez Decision, Gomez, a

23   prendre and Blakley.

24                   THE COURT:  Well, I don't know where you're getting

25   that but the excerpt from Gomez that you just read into the

1    record ten minutes ago specifically excludes these factors as

2    requiring an a prendre or a Blakley type consideration.

3              Do you have Gomez there?

4              MR. BAILEY:  I do.  I'll pass it forward.  I have

5    it in full.  In fact, let me just go ahead and pass forward the

6    cases I've cited.

7              THE COURT:  Sure.

8              MR. BAILEY:  In case Your Honor wants to take a

9    look at those.  Those are all the cases I cited.

10   (Complied.)

11             THE COURT:  Well, in looking back through Gomez I

12   don't see anything in here that supports your conviction --

13   your contention.  I disagree with it.  I think that the Supreme

14   Court in this Opinion written by Chief Justice Drowota clearly

15   distinguished the State law from the Federal law, and

16   apparently in this case, once again, our State Attorney

17   General's Office concedes error there only to be told by the

18   Court that no, we're not going to accept your concession of

19   error, you're wrong it wasn't error.

20             That's happened so many times, but notwithstanding

21   the white flag waved by the State Attorney General's Office the

22   Supreme Court concluded that our sentencing system does not

23   violate the Blakley principles since our guidelines are

24   advisory only.  They do not set up a definite grid by which --

25   by which we must -- to which we must adhere when we sentence.

1              The discretionary, the advisory and beyond that the

2    challenge really was to factual issues the defendant felt

3    should have been resolved by a jury, not the prior convictions.

4    That wasn't even really at issue.

5              So for all those reasons I just don't think that

6    Blakley or any form of Blakley argument would apply in this

7    case, so I do think that as this -- as the enhancement factors

8    specifically set out in the wording of the Enhancement Factor

9    No. 2 the prior convictions as well as prior criminal behavior

10   would be applicable for my consideration in determining what

11   the appropriate sentence is.

12             The Enhancement Factor reads:  The defendant has a

13   previous history of criminal convictions, not felony

14   convictions, not felony convictions within the past ten years,

15   but criminal convictions or criminal behavior, not behavior

16   within the past ten years or not behavior that results in a

17   felony conviction, but criminal behavior in addition to those

18   necessary to establish the appropriate range.  And, of course,

19   Range 1 no prior convictions are required, so any prior

20   criminal behavior would apply.

21             MR. BAILEY:  May I, just for the record, then make

22   this argument with regards to the section of the Tennessee

23   Statute that -- that specifically says "Criminal Behavior."

24             I'll state to the Court that on behalf of Mr.

25   Braswell I believe that that's unconstitutional, that it

1  violates his right to confrontation in light of the fact that

2  if it's behavior that he's not been convicted of then he has

3  not had an opportunity to confront his accuser, to have a jury,

4  those due process rights both procedural and substantive.

5  whereby he can confront his accuser and have a jury decide his

6  innocence or guilt.

7          And for them to be used in a "sentencing scheme"

8  then it presumes guilt.  When the law, I think, and the

9  Constitution, both Tennessee and the United States Constitution

10  presumes innocence.  And so I'll just make that argument for

11  the record.

12          Also, let me just state this before I sit down.

13          THE COURT:  Okay.

14          MR. BAILEY:  That -- and I'm not objecting to the

15  hearing today but, again, if I don't make the objection now

16  it's waived.  We only received our Pre-Sentence Report today,

17  and although I did go through it with the defendant and I

18  didn't find anything in that period of time in going through

19  that was objectionable.

20          THE COURT:  Are you asking for a continuance to

21  review it further?  I'll be glad to grant that if you want

22  that.

23          MR. BAILEY:  I'm not -- I understand that Your

24  Honor would, but I'm not.  But I just want to make that -- make

25  it known for my own protection too, okay?

1    THE COURT:  Okay, alright.  In --

2    MR. BAILEY:  Also --

3    THE COURT:  Okay, go ahead.

4    MR. BAILEY:  Also -- well, that'll be saved for a

5 different time.

6    THE COURT:  Okay.  And with regard to your argument

7 on criminal behavior would you consider his dishonest testimony

8 at the bond hearing to be under oath to be criminal behavior

9 that I could consider?

10    MR. BAILEY:  Yes.

11    THE COURT:  Okay.

12    MR. BAILEY:  I think anything that the defendant

13 says on the stand is something that Your Honor has a right to

14 consider well within all the principles of law that we've just

15 read.

16

17                   *  *  *  *  *

18

19                 **SENTENCING**

20 BY THE COURT:

21    Alright.  Okay.  Well, of course, Mr. Braswell,

22 unlike many defendants that come through court is a well

23 educated man that had a responsible job in the community.  He,

24 in many ways, led a productive life.  That was testimony that

25 came out during the bond hearing, during the trial, and is

1   borne out by the numerous letters that were submitted on his

2   behalf.   So I acknowledge all that, and that's on this side of

3   the ledger.

4              However, on the other side of the ledger is a

5   heinous offense as found by the jury.   And, of course, we

6   haven't had the motion for new trial yet, but I do think and

7   I'll state now that I think that there was more than ample

8   proof on which the jury could base its decision.   So I think

9   the jury has settled that issue and it was, indeed, a heinous

10  offense that required considerable effort and -- well,

11  considerable effort on your client's part to commit, and that

12  was followed up by some very defective and questionable conduct

13  on his part as borne out by the proof in the bond hearing and

14  the trial.

15             And I think as well this isn't an enhancement

16  factor but that just as listed statutorily but just as an

17  observation there's been little of what I would consider to be

18  genuine remorse expressed in this case.   Notwithstanding his

19  conduct on the witness stand during the trial I think if one

20  were to listen to those tapes of those phone calls from the

21  jail one would have to question the degree of remorse that your

22  client exhibited with regard to this offense.

23             But with regard to the actual enhancement factor

24  that was listed he clearly does have these two prior

25  convictions.   They're not recent but they are, nonetheless,

1    prior convictions, and very relevant convictions.   The assault

2    which began as an aggravated assault was pled out, apparently

3    as a simple assault, is obviously very relevant to this type of

4    an offense.

5        The theft of property involving the dishonesty that

6    any theft was involved is very relevant in my opinion to his

7    conduct after this offense was committed, and to his testimony,

8    his dishonest testimony, from the witness stand during the bond

9    hearing.   All that sort of the prior conviction validates the

10   sort of deceptive statements that were made during the bond

11   hearing and at other times, and so I am concerned by the prior

12   convictions and behavior that he exhibited since this case has

13   been in this court.

14       And the law, of course, does require that the

15   punishment in any offense be commensurate with the seriousness

16   of the crime and the facts of the case.   Therefore, considering

17   all of the factors in this matter on both sides of the ledger,

18   if you will, I am sentencing Mr. Braswell to serve a period of

19   twenty-four years in the State Penitentiary.

20

21                    *  *  *  *  *

22

23       MR. BAILEY:   Your Honor, with regard to the motion

24   for new trial I was going to -- we had talked about having that

25   today.   I called Ms. Carnesale a few days ago, and I'm

1  preparing for a trial that starts this Monday and it's just

2  been impossible with all the proof that we had to do that, so

3  I'll just reduce it to writing and have it another time if

4  that's okay with the Court.

5         THE COURT:  That's fine.  February 10.

6         MR. BAILEY:  That's fine.

7         THE COURT:  Sure.

8

9

10

11     *** (11:45 A.M. - END OF REQUESTED PROCEEDINGS.) ***

12

13

14

15

16

17                  - - - - -

18

19

20

21

22

23

24

25

## CERTIFICATE

STATE OF TENNESSEE )
                   )
COUNTY OF SHELBY   )



     I, the undersigned, Bettye Ann Kee, Court Reporter for the Thirtieth Judicial District of the State of Tennessee, do hereby certify the foregoing to be a true, accurate and complete transcript, to the best of my knowledge, understanding and ability of all the evidence that was heard in this cause in Division V of the Criminal Court for Shelby County, Tennessee, before the Honorable Joseph B. Dailey, Presiding Judge, on the 6th day of January, 2006.

     I do further certify that I am neither of kin, counsel nor interest to any party hereto.

     Dated this 4th day of March, 2006.



                              _Bettye Ann_____
                              Bettye Ann Kee
                              Court Reporter

My Commission Expires:

December 13, 2008




                              _ _ _ _ _